**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| STATES OF NEVADA; TEXAS; ALABAMA; ARIZONA; ARKANSAS; GEORGIA; INDIANA; KANSAS; LOUISIANA; NEBRASKA; OHIO; OKLAHOMA; SOUTH CAROLINA; UTAH; WISCONSIN; COMMONWEALTH OF KENTUCKY, BY AND THROUGH GOVERNOR MATTHEW G. BEVIN; TERRY E. BRANSTAD, GOVERNOR OF THE STATE OF IOWA; PAUL LePAGE, GOVERNOR OF THE STATE OF MAINE; SUSANA MARTINEZ, GOVERNOR OF THE STATE OF NEW MEXICO; GOVERNOR PHIL BRYANT OF THE STATE OF MISSISSIPPI; and ATTORNEY GENERAL BILL SCHUETTE ON BEHALF OF THE PEOPLE OF MICHIGAN, | CIVIL ACTION NO. 4:16-cv-00731-ALM |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF LABOR; THOMAS E. PEREZ, in his Official Capacity as United States Secretary of Labor, THE WAGE AND HOUR DIVISION OF THE DEPARTMENT OF LABOR; DR. DAVID WEIL, in his Official Capacity as Administrator of the Wage and Hour Division; MARY ZIEGLER, in her Official Capacity as Assistant Administrator for Policy of the Wage and Hour Division, | **EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**<br><br>**AND**<br><br>**REQUEST FOR ORAL ARGUMENT AND EXPEDITED CONSIDERATION** |
| Defendants. | |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................1

II. STATEMENT OF FACTS ..................................................................................................5

   A.  The White Collar Exemption is Enacted Without a Compensation or Salary Requirement .....5

   B.  The DOL Adds Minimal Compensation and Salary Requirements to the Overtime Exemption...........................................................................................................................6

   C.  A "Time to Time" Requirement is added to 29 U.S.C. § 213(a)(1) ...............................................7

   D.  The End of the "Long" and "Short" Tests.................................................................................8

   E.  The Supreme Court's Application of the FLSA to the States........................................................9

   F.  The New Overtime Rule Challenged Here ................................................................................13

III. ARGUMENT........................................................................................................................16

   A.  The Preliminary Injunction Standard.....................................................................................16

   B.  The Plaintiff States are Likely to Succeed on the Merits of Their Claims...................................17

      1.  *It is Unconstitutional to Apply the New Overtime Rule to the States* ......................................18

        a. The FLSA invades the Plaintiff States' sovereignty that is preserved by the Tenth Amendment ...............................................................................................................18

        b. *Garcia* has been—or should be—overruled ...........................................................26

        c. Consistent with the Supreme Court's cases post-*Garcia*, the salary level test is unconstitutional as applied to the States for lack of a "clear statement" that Congress intended to impose a salary threshold for EAP employees to be exempt from overtime...28

      2.  *The New Overtime Rule Violates the Clear Command of 29 U.S.C. § 213(a)(1)* ..............................29

        a. The standard salary level test.................................................................................31

        b. Indexing mechanism.............................................................................................41

      3.  *The Indexing Mechanism Violates the APA* ..................................................................43

      4.  *Alternatively, the New Overtime Rule is an Unlawful Delegation of Congressional Power* ....................44

   C.  Plaintiff States Will Be Irreparably Harmed............................................................................45

D.  The Harm to the States Outweighs Any Harm from the Injunction...........................................48

E.  The Public Interest Necessitates a Preliminary Injunction...........................................................49

F.  Nationwide Injunction .............................................................................................................................50

IV. CONCLUSION..................................................................................................................................................50

# TABLE OF AUTHORITIES

**Cases**

*Alden v. Maine,*
   527 U.S. 706 (1999) ...................................................................................................26

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock,*
   835 F.2d 912 (D.C. Cir. 1987).................................................................................36

*Bayou Lawn & Landscape Servs. v. Sec'y of Labor,*
   713 F.3d 1080 (11th Cir. 2013) ..............................................................................17

*Bond v. U.S.,*
   134 S. Ct. 2077 (2014) ............................................................................................28

*Buckner v. Armour & Co.,*
   53 F. Supp. 1022 (N.D. Tex. 1942) ........................................................................38

*Byrum v. Landreth,*
   566 F.3d 442 (5th Cir. 2009) ........................................................................... 16, 17

*Califano v. Yamaski,*
   442 U.S. 682 (1979) ................................................................................................50

*Cardenas v. Dretke,*
   405 F.3d 244 (5th Cir. 2005) ..................................................................................27

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................................29

*City of Arlington, Tex. v. F.C.C.,*
   133 S. Ct. 1863 (2013) ............................................................................................30

*Cleveland v. U.S.,*
   329 U.S. 14 (1946) ..................................................................................................36

*Conn. Nat. Bank v. Germain,*
   503 U.S. 249 (1992) ................................................................................................30

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
   779 F.3d 258 (5th Cir. 2015) .........................................................................30, 32, 42

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,*
   710 F.3d 579 (5th Cir. 2013) ..................................................................................17

*Dep't of Transp. v. Ass'n of Am. Railroads,*
 135 S. Ct. 1225 (2015) ...................................................................................................44

*Devoe v. Atlanta Paper Co.,*
 40 F. Supp. 284 (N.D. Ga. 1941) ..................................................................................38

*Encino Motorcars, LLC v. Navarro,*
 136 S. Ct. 2117 (2016) ............................................................................................ 32, 43

*Evans v. United States,*
 504 U.S. 255 (1992) .......................................................................................................12

*Gaby v. Omaha Home for Boys,*
 No. 8:CV95-00228, 1997 WL 406275 (D. Neb. May 9, 1997)....................................35

*Garcia v. San Antonio Metro. Transit Auth.,*
 469 U.S. 528 (1985) .................................................................................................passim

*Geier v. Am. Honda Motor Co.,*
 529 U.S. 861 (2000) .......................................................................................................12

*Girouard v. U.S.,*
 328 U.S. 61 (1946) .........................................................................................................36

*Gonzales v. Oregon,*
 546 U.S. 243 (2006) .......................................................................................................25

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) .................................................................................................passim

*Kansas v. U.S.,*
 249 F.3d 1213 (10th Cir. 2001) ....................................................................................46

*Krill v. Arma Corp.,*
 76 F. Supp. 14 (E.D.N.Y. 1948) ...................................................................................39

*Maryland v. Wirtz,*
 392 U.S. 183 (1968) .........................................................................................................9

*Moreau v. Klevenhagen,*
 508 U.S. 22 (1993) .........................................................................................................13

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
 132 S. Ct. 2566 (2012) ...................................................................................................26

iv

*Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.,*
   503 U.S. 407 (1992) ................................................................................................30

*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas,*
   903 F. Supp. 2d 446 (N.D. Tex. 2012) ........................................................ 45, 46

*Nat'l League of Cities v. Usery,*
   426 U.S. 833 (1976) ..........................................................................................passim

*New York v. U.S.,*
   505 U.S. 144 (1992) ...................................................................................18, 19, 26

*Printz v. U.S.,*
   521 U.S. 898 (1997) ..........................................................................................passim

*Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.,*
   621 F.2d 683 (5th Cir. 1980) ...........................................................................46

*Roho, Inc. v. Marquis,*
   902 F.2d 356 (5th Cir. 1990) ...........................................................................17

*Russello v. U.S.,*
   464 U.S. 16 (1983) .............................................................................................35

*Seminole Tribe of Fl. v. Florida,*
   517 U.S. 44 (1996) ...................................................................................... 12, 26

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,*
   531 U.S. 159 (2001) ..........................................................................................28

*South Carolina v. Baker,*
   485 U.S. 505 (1988) ..........................................................................................28

*Supreme Beef Processors, Inc. v. U.S.D.A.,*
   275 F.3d 432 (5th Cir. 2001) ..................................................................... 39, 40

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ..................................................................... 46, 48

*Texas v. U.S.,*
   809 F.3d 134 (5th Cir. 2015) ...........................................................................passim

*U.S. Steel Corp. v. E.P.A.,*
   595 F.2d 207 (5th Cir. 1979) ...........................................................................44

*U.S. v. Criminal Sheriff, Par. of Orleans,*
    19 F.3d 238 (5th Cir. 1994) ............................................................................................16

*U.S. v. Lopez,*
    514 U.S. 549 (1995) ......................................................................................................26

*U.S. v. Morrison,*
    529 U.S. 598 (2000) ......................................................................................................26

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981) ......................................................................................................16

*West v. Anne Arundel Cnty., Md.,*
    137 F.3d 752 (4th Cir. 1998) ........................................................................................27

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ................................................................................................44, 45

*Wirtz v. Mississippi Publishers Corp.,*
    364 F.2d 603 (5th Cir. 1966) ........................................................................................38

**Statutes**

5 U.S.C. § 553 ..................................................................................................................43

5 U.S.C. § 706 ..................................................................................................................17

16 U.S.C. § 497c(b)(3) .....................................................................................................43

28 U.S.C. § 2201 ..............................................................................................................17

29 U.S.C. § 206 ...........................................................................................................5, 43

29 U.S.C. § 207 ..................................................................................................................5

29 U.S.C. § 213(a)(1) ..................................................................................................passim

29 U.S.C. § 213(a)(5) .......................................................................................................34

29 U.S.C. § 213(a)(6)(D)(i) ..............................................................................................34

29 U.S.C. § 213(a)(8) .......................................................................................................34

29 U.S.C. § 213(a)(12) .....................................................................................................34

29 U.S.C. § 213(a)(15) .....................................................................................................34

29 U.S.C. § 213(a)(16) ................................................................................................34

29 U.S.C. § 213(a)(17) ................................................................................................43

29 U.S.C. § 213(b)(11) ................................................................................................34

29 U.S.C. § 213(b)(24) ...............................................................................34, 35, 43, 45

29 U.S.C. § 1083(c)(7)(D)(vii) ....................................................................................43

43 U.S.C. § 1337(a)(3)(C)(vii) ....................................................................................43

Fair Labor Standards Act of 1938, Pub. L. No. 75-718, 52 Stat. 1060 ........................... 5, 6, 9

Fair Labor Standards Amendments of 1961, Pub. L. No. 87-30, 75 Stat. 65 ...................... 8, 9

Fair Labor Standards Amendments of 1966, Pub. L. No. 89-601, 80 Stat. 830 ...................... 9

Fair Labor Standards Amendments of 1974, Pub. L. No. 93-259, 88 Stat. 55 ................... 9, 35

**Other Authorities**

1985 Report of the Senate Committee on Labor and Human Resources, S. Rep. 99–159, 1985
    U.S.C.C.A.N. 651 ..................................................................................................13

A DICTIONARY OF AMERICAN ENGLISH ON HISTORICAL PRINCIPLES (William A. Craigie & James R.
    Hulbert eds., 1940) ................................................................................................33

Andrew S. Gold, *Formalism and State Sovereignty in* Printz v. United States: *Cooperation by Consent*, 22
    HARV. J.L. & PUB. POL'Y 247 (1998)........................................................................27

BLACK'S LAW DICTIONARY (8th ed. 2004)........................................................................32

Chris Opher & Ben Penn, *Chamber, 21 States File Lawsuits to Block Overtime Rules,* BLOOMBERG BNA
    (Sept. 21, 2016), *available at* http://www.bna.com/chamber-21-states-n57982077333/ ...................3

Remarks of President Barack Obama as Delivered in his Weekly Address at the White House:
    Expanding Overtime Pay (May 21, 2016), *available at* https://www.whitehouse.gov/the-press-
    office/2016/05/21/weekly-address-expanding-overtime-pay .............................................4

Report and Recommendations on Proposed Revisions of Regulations, Part 541, by Harry Weiss,
    Presiding Officer, Wage and Hour and Public Contracts Divisions, U.S. Department of Labor
    (June 30, 1949) ...........................................................................................7, 15, 32

THE OXFORD ENGLISH DICTIONARY (1933 ed.).............................................................. 32, 33

Vicki C. Jackson, *Federalism and the Uses and Limits of Law:* Printz *and Principle?*, 111 HARV. L. REV. 2180 (1998) ..................................................................................................................................26

**Rules and Regulations**

29 C.F.R. § 541.100.......................................................................................................... 8, 18

29 C.F.R. § 541.200.......................................................................................................... 8, 18

29 C.F.R. § 541.204...............................................................................................................18

29 C.F.R § 541.300........................................................................................................... 8, 18

29 C.F.R. § 541.400...............................................................................................................18

29 C.F.R. § 541.600........................................................................................................... 8, 18

29 C.F.R. § 541.602...............................................................................................................18

29 C.F.R. § 541.604...............................................................................................................18

29 C.F.R. § 541.605...............................................................................................................18

29 C.F.R. § 541.607..................................................................................................14, 18, 41

Regulations Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," pursuant to section 13(a)(1) of the Fair Labor Standards Act, 3 Fed. Reg. 2518 (Oct. 20, 1938) ..................................................................................................................................6

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," 5 Fed. Reg. 4077 (Oct. 15, 1940) ..............................................................................6

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," 14 Fed. Reg. 7705 (Dec. 24, 1949) .......................................................................... 7, 8

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," 14 Fed. Reg. 7730 (Dec. 27, 1949) ..............................................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," 19 Fed. Reg. 4405 (July 17, 1954) ..............................................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesman," 23 Fed. Reg. 8962 (Nov. 17, 1958)...................................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity, or in the Capacity of Outside Salesman," 26 Fed. Reg. 8635 (Sep. 15, 1961) ...................................................................................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity, or in the Capacity of Outside Salesman," 28 Fed. Reg. 9505 (Aug. 30, 1963). ..................................................................................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity (Including Any Employee Employed in the Capacity of Academic Administrative Personnel or Teacher in Elementary or Secondary Schools), or in the Capacity of Outside Salesman," 32 Fed. Reg. 7823 (May 30, 1967) ......................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity (Including Any Employee Employed in the Capacity of Academic Administrative Personnel or Teacher in Elementary or Secondary Schools), or in the Capacity of Outside Salesman," 35 Fed. Reg. 883 (Jan. 22, 1970) ......................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity (Including Any Employee Employed in the Capacity of Academic Administrative Personnel or Teacher in Elementary or Secondary Schools), or in the Capacity of Outside Salesman," 38 Fed. Reg. 11390 (May 7, 1973) ......................................................7

Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional Capacity (Including Any Employee Employed in the Capacity of Academic Administrative Personnel or Teacher in Elementary or Secondary Schools), or in the Capacity of Outside Salesman," 40 Fed. Reg. 7091 (Feb. 19, 1975) ......................................................7

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122 (April 23, 2004) .................................................passim

Presidential Memorandum of March 13, 2014; Updating and Modernizing Overtime Regulations, 79 Fed. Reg. 18737 (Apr. 3, 2014) ......................................................................................... 13, 14, 40, 41

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 80 Fed. Reg. 38516 (proposed July 6, 2015)...........................................13

Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32391 (May 23, 2016)...................................................passim

ix

**Constitutional Provisions**

U.S. CONST. art. I, § 1................................................................................................................44

U.S. CONST. amend. X................................................................................................................19

# I. INTRODUCTION

Without this Court's intervention, on December 1 of this year the United States Department of Labor ("DOL")[1] will impose upon the Plaintiff States[2] irreversible budgetary damage, displacement of State policy choices about crucial governmental functions and services, workplace and administrative disruption, and possibly even eventual employee terminations.  In the process, our Nation's foundational principles of federalism and separation of powers will be another, albeit less visible, casualty.  At the epicenter of this devastation is the DOL's new regulatory revision to the Fair Labor Standards Act's ("FLSA") overtime exemption for "any employee employed in bona fide executive, administrative, or professional capacity"—the so-called "white collar" or "EAP" exemption that was intended to exempt these particular types of workers from the requirement that they be paid overtime.

The new overtime rule more than doubles the salary amount that employers, including States, must pay before an employee is eligible for an exemption from overtime, even if that employee unquestionably performs executive, administrative, or professional duties.  According to the DOL, this "*salary level* test"—not a test based on the actual type of work performed—"is the best single test of exempt status for white collar employees."[3]  Simply put, a federal statute *requires* an overtime exemption for employees working in a "bona fide executive, administrative, or professional capacity," with no reference at all to a minimum salary, yet the DOL's new rule *disallows* any overtime exemption for such employees, unless they make more than $47,476 a year.

As a consequence of the new salary level test, tens of thousands of State employees (and millions of private employees) "employed in a bona fide [EAP] capacity" will now have their overtime exempt status eliminated, with no change in their actual duties, based solely upon the amount of salary

---

[1] All Defendants are collectively referred to as the "DOL."
[2] All Plaintiffs are collectively referred to as the "Plaintiff States."
[3] 81 Fed. Reg. 32392.

that State officials choose to pay them.  Suddenly removing the exemption from these State employees, and coercing States to pay them more (either by overtime or by raising their salaries), will disrupt State fiscal policy and inherent governmental services.  Worse, this upheaval will now be repeated every three years.  The new rule invents an "indexing" mechanism to automatically ratchet up the salary cutoff triennially, regardless of actual necessity, the condition of State budgets, or the state of the economy.  Even in the middle of a severe recession, the salary cutoff will be cranked up every three years, like clockwork.

Neither the salary level test nor the indexing mechanism is authorized by the governing statute—29 U.S.C. § 213(a)(1).  The salary test has been used for decades, but always as a DOL invention.  It has never been ratified by Congress.  Nor could it be, for the DOL rule is not some inference from an ambiguous law, but a contradiction of that law.  The statute says that "any" EAP employee gets the overtime exception.  Yet the DOL has created a class of EAP employees who do *not* get the exception.  If the salary level test has not met with serious challenges before now, that is because the game was not worth the candle: the threshold was set low enough that the DOL's perversion of the statute, in practical terms, affected so few actual EAP employees.  A test that used to be primarily about duties, with an inconsequential (if unlawful) salary threshold, has now been converted into a test that is primarily about a minimum salary level, with actual duties an afterthought at best.  The magnitude of the DOL's recent revision—the massive re-categorization of formerly overtime-exempt workers into non-exempt status—has now brought the rule's unlawful salary level test to the fore.

The plain language of the statute demonstrates that Congress intended the white collar exemption to apply to "*any* employee employed in a bona fide [EAP] *capacity*."  Actual job duties, not the salary amount, must be the primary consideration.  Confronted with the unambiguous statutory text, the DOL unapologetically confesses that "it is true that section 13(a)(1) does not reference

2

automatic updating, [and] it also does not reference a salary level or salary basis test …. *These changes were all made without specific Congressional authorization*."[4] Seth Harris, the Administration's former Acting Secretary of Labor, is even on record stating that "[i]n fact, Congress didn't specify that there should be a [salary] threshold" at all.[5]  Undeterred, the DOL has rejected any congressional limitations on its authority and abandoned its previous recognition that the agency does not have the power to adopt a "salary only test"[6] or a system of automatic indexing.[7]

But 29 U.S.C. § 213(a)(1) does not delegate to the DOL authority to set a minimum salary level for EAP workers.  Only Congress may establish generally applicable rules of private conduct through the exercise of legislative power.  Congress has reserved for itself the power to set wages for American workers, including the minimum wage.  The DOL has usurped Congress's prerogative to establish overtime wages by unilaterally grafting the salary level test onto 29 U.S.C. § 213(a)(1).  The DOL's action not only violates the decrees of Congress, but those of the Supreme Court.  In this sensitive area of law, in which federal policy runs up against State self-governance, the Court has imposed on lower courts what it calls the "clear statement" rule.  This crucial doctrine of statutory construction requires a court to invalidate agency action unless the court is "absolutely certain" that Congress intended to allow that action.  In fact, this doctrine originated *precisely* in response to the Court's explicit concern about federal intrusions on States—under laws like the FLSA.

---

[4] 81 Fed. Reg. 32431 (emphasis added).

[5] Chris Opher & Ben Penn, *Chamber, 21 States File Lawsuits to Block Overtime Rules,* Bloomberg BNA (Sept. 21, 2016), *available at* http://www.bna.com/chamber-21-states-n57982077333/.

[6] 69 Fed. Reg. 22173.

[7] *Id.* at 22171–72.

President Obama unabashedly applauds the new overtime rule as "the single biggest step [he] can take through executive action to raise wages for the American people."[8]  But neither the Constitution nor Congress ever granted authority to the Executive Branch to unilaterally raise the minimum wage for a class of workers; certainly, it is a gross distortion to read the FLSA's explicit overtime *exemption* for "any" executive, administrative, or professional employee as such a grant.  The Constitution is structured to prevent the consolidation of legislative and executive power for the protection of the People and the States.  The Federal *Executive* should not possess authority—inherent or statutory—to legislate a salary level for EAP employees, and it certainly should not have dominion over the employment relationships within the Plaintiff States.  If the Federal Executive can single-handedly dictate the amount that States must pay their employees, the already badly blurred lines in our system of federalism or divided government will disappear altogether.  There is perhaps no better way for the Federal Executive to "commandeer" State Governments than by controlling their relationship with their employees.  By claiming for itself the authority to commit an ever-increasing amount of State funds to the payment of salaries and overtime, the Federal Executive can unilaterally deplete State resources, control State budgets, and dragoon States into surrendering to Federal policies instead of implementing State priorities.  The Constitution is designed to prohibit the Federal Executive's power to so easily bend the States to its will.  This Court should enjoin the new overtime rule as violating the Constitution, exceeding statutory authority, and conflicting with the procedures required by law.

---

[8] Remarks of President Barack Obama as Delivered in his Weekly Address at the White House: Expanding Overtime Pay (May 21, 2016), *available at* https://www.whitehouse.gov/the-press-office/2016/05/21/weekly-address-expanding-overtime-pay (emphasis added).

## II. STATEMENT OF FACTS

### A. The White Collar Exemption is Enacted Without a Compensation or Salary Requirement

The FLSA was originally enacted in 1938.  52 Stat. 1060.  It generally requires that employees "engaged in commerce" receive not less than the Federal minimum wage for all hours worked and also receive overtime (at one-and-half times the regular rate of pay) for all hours worked in excess of a forty-hour workweek.  *See generally id.*; *see also* 29 U.S.C. §§ 206–07.

When enacted, however, the FLSA contained a number of exceptions to the overtime requirement.  52 Stat. 1067–68.  Section 13(a)(1) of the enabling legislation contained what is commonly referred to as the "white collar" or "EAP" exemption.  It excluded from both minimum wage and overtime "any employee employed in a bona fide executive, administrative, or professional … capacity …."  52 Stat. 1067.  There was no mention in the statute of any minimum salary for this exemption, or indeed, of any compensation level at all associated with the overtime exemption.

The relevant language of the white collar exemption remains largely unchanged and is presently codified at 29 U.S.C. § 213(a)(1).  It states:

> The provisions of section 206 [minimum wage] and section 207 [overtime] of this title *shall not apply* with respect to —
>
> (1) *any employee employed in a bona fide executive, administrative, or professional capacity* (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (*as such terms are defined and delimited from time to time by regulations of the Secretary*, subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities); …

*Id.* (emphasis added).

Congress, through the FLSA, did not define the terms "executive," "administrative," or

"professional."  *See* 52 Stat. 1060–61, 1067–68; 81 Fed. Reg. 32394.  The original version of the exemption stated that those terms would be "defined and delimited by regulations of the Administrator [of the Department of Labor's Wage and Hour Division]."  52 Stat. 1067.

### B.  The DOL Adds Minimal Compensation and Salary Requirements to the Overtime Exemption

The first regulations to interpret the white collar exemption were issued in 1938.  3 Fed. Reg. 2518.  "Executive" and "administrative" employees were jointly defined primarily based upon the duties that they performed.  *Id.*  As one might expect, those duties included managing an establishment or department, directing the work of other employees, exercising discretionary powers, and possessing authority to hire and fire or to offer suggestions for the same.  *Id.*  Even though the statute did not express any intention regarding employee compensation, the regulations contained a marginal $30 per week compensation element.  *Id.* ("[A]nd who is compensated for his services at not less than $30 (exclusive of board, lodging, or other facilities) for a workweek.").  The regulations did not require that "executive" and "administrative" employees be paid on a salary basis.  *Id.*  Initially, the definition of "employee[s] employed in a bona fide … professional … capacity" did not have a compensation component at all; that term was described solely in terms of duties.  *Id.*; 81 Fed. Reg. 32401.  A regulation regarding remuneration was not added for "professional" employees until 1940.  5 Fed. Reg. 4077.

That same year—two years after the FLSA was enacted—the DOL first required that EAP employees be paid on a salary basis at a certain specified amount.  *Id.*  "Professional" and "administrative" employees were defined as those "compensated for … services on a salary or fee basis at a rate of not less than $200 per month …."  5 Fed. Reg. 4077.  "Executive" employees were considered those "who [are] compensated for … services on a salary basis at not less than $30 per week …."  *Id.*  The regulations continued to require that certain duties be performed.

6

The salary thresholds were purposefully set low.  The DOL, defending the legality of a salary level test in 1949, explained that the test's purpose was to "screen[] out the obviously nonexempt employees, making an analysis of duties in such cases unnecessary."  Report and Recommendations on Proposed Revisions of Regulations, Part 541, by Harry Weiss, Presiding Officer, Wage and Hour and Public Contracts Divisions, U.S. Department of Labor 7–8 (June 30, 1949) (hereinafter "Weiss Report"); 81 Fed. Reg. 32412.  The DOL argued that "[i]n an overwhelming majority of cases … personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them."  Weiss Report at 8.  The DOL justified the use of the salary level test because it lacked "evidence" that the test had defeated the exemption "for any substantial number of individuals who could reasonably be classified for purposes of the act as bona fide executive, administrative, or professional employees."  *Id.* at 9.  It acknowledged that it could not adopt a test "based on salary alone …"  *Id.* at 23.

### C.  A "Time to Time" Requirement is added to 29 U.S.C. § 213(a)(1)

Since it was initially grafted in as a regulatory requirement for the EAP exemption, the salary level test has been steadily raised and modified.  *See*, *e.g.*, 14 Fed. Reg. 7705; 14 Fed. Reg. 7730; 19 Fed. Reg. 4405; 23 Fed. Reg. 8962; 26 Fed. Reg. 8635; 28 Fed. Reg. 9505; 32 Fed. Reg. 7823; 35 Fed. Reg. 883; 38 Fed. Reg. 11390; 40 Fed. Reg. 7091.  Some important developments stand out.

In 1949, the DOL developed two tests to assess whether an employee qualified for the EAP exemption.  14 Fed. Reg. 7705; *see also* 81 Fed. Reg. 32401.  The first, the "long test," had a lower salary threshold paired with a longer list of duties that employees had to satisfy before being considered exempt from overtime.  14 Fed. Reg. 7706.  There was also a cap on the amount of nonexempt work an employee could do and still remain exempt.  *Id.*  The second, the "short test," had a higher salary threshold but a shorter list of duties that the employee had to meet.  *Id.*  The short test did not have a limit on the amount of nonexempt work that an employee could do.  *Id.*  From 1949 to 1975, there

was a single short test salary level and multiple long test salary levels that applied to the different EAP

categories.  81 Fed. Reg. 32402.  The original long test salary level was $55 weekly for executive

employees and $75 for administrative and professional employees.  14 Fed. Reg. 7706.  The short test

salary level was initially set at $100 weekly for all three classes.  *Id.*; *see also* 81 Fed. Reg. 32401.

After the DOL's implementation of the "long" and "short" tests, Congress amended 29 U.S.C.

§ 213(a)(1) to require the DOL to define and delimit the EAP categories "from time to time."  *See* 75

Stat. 71.  By adding this requirement to 29 U.S.C. § 213(a)(1), Congress made clear its intent that the

DOL periodically revisit how it had defined the overtime-exempt duties of EAP employees to make

sure that those definitions kept current with the modern workforce.

### D.  The End of the "Long" and "Short" Tests

In 2004, the DOL abolished the long and short tests and replaced them with a single salary

threshold for all three categories and a "standard" duties test.  81 Fed. Reg. 32403.  The DOL justified

the changes because the "duties" tests had not been updated since 1949 and the minimum salary level

had not been revised since 1975.  69 Fed. Reg. 22122.

The new minimum salary level set by the DOL's 2004 rule was $455 a week.[9]  29 C.F.R

§ 541.600.  Thus, under the new test, to be exempt from overtime an employee had to earn a minimum

of $455 per week *and* meet the rule's additional requirements relating to the employee's actual duties.[10]

---

[9] $455 per week equates to a minimum annual salary of $23,660.

[10] For example, in addition to meeting the minimum salary requirement, for an "administrative" employee to fall within the rule's EAP exemption the employee's primary duty must be office or non-manual work directly related to the management or general business operations of the employer or the employer's customers and include the exercise of discretion and independent judgment on significant matters.  29 C.F.R. § 541.200; *see also* 29 C.F.R. § 541.100 (executives); 29 C.F.R § 541.300 (professionals).

In its 2004 rulemaking, the DOL recognized that Congress had expressly limited its power to use a minimum salary for defining and delimiting who is a bona fide EAP employee.  "[T]he law," the DOL acknowledged, "does not give the Department authority to set minimum wages for executive, administrative and professional employees."  69 Fed. Reg. 22165.  The DOL reiterated that it did not have authority under the FLSA to employ a "salary only" test.  *Id.* at 22173.  According to the DOL in 2004, any change in the salary threshold part of the EAP rule "has to have as its primary objective the drawing of a line separating exempt from nonexempt employees."  *Id.* at 22165.  The DOL furthermore denied that it had authority to adopt a regulation to automatically update the salary level. *Id.* at 22171–72.

### E.  The Supreme Court's Application of the FLSA to the States

As originally passed, the FLSA specifically provided that it did not apply to employees of the States or their political subdivisions.  52 Stat. 1060 ("'Employer' … shall not include the United States or any State or political subdivision of a State ….").  Congress extended FLSA coverage to certain State and public entities in the 1960s, 75 Stat. 65; 80 Stat. 831, and attempted to cover virtually all public sector employees in 1974.  88 Stat. 58–59.  The 1974 amendments imposed upon almost all public employers the minimum wage and overtime requirements previously limited to private employers engaged in interstate commerce.  *See id.*

The first constitutional challenge to the application of the FLSA to the States came in *Maryland v. Wirtz*, 392 U.S. 183 (1968).  Maryland, 27 other States, and a school district sued the DOL to enjoin the FLSA to the extent that it applied to State-run schools and hospitals.  *Id.* at 187.  They asserted that applying the FLSA to the States exceeded Congress's Commerce Clause power and interfered with their sovereign State functions.  *Id.* at 187, 193.  The Court, discounting the substantial economic and intangible Constitutional harm claimed by the States, *id.* at 193–95, ruled that the States were

engaging in commerce and could therefore be regulated by the Federal Government to the same extent as private parties. *Id.* at 197.

Justices Douglas and Stewart dissented. *Id.* at 201. They thought the FLSA and the Court's decision were "a serious invasion of state sovereignty protected by the Tenth Amendment [and] not consistent with our constitutional federalism." *Id.* The dissenters gave great weight to the FLSA's "overwhelm[ing]" effect on "state fiscal policy." *Id.* at 203. "It is one thing to force a State to purchase safety equipment for its railroad and another to force it either to spend several million more dollars on hospitals and schools or substantially reduce services in these areas." *Id.* They asked, presciently, "Could the Congress virtually draw up each State's budget to avoid 'disruptive effect(s) … on commercial intercourse'?" *Id.* at 205. If Congress is able to take action toward that end, the dissenters saw that "the National Government could devour the essentials of state sovereignty, though that sovereignty is attested by the Tenth Amendment." *Id.*

The Supreme Court overruled *Wirtz* in *National League of Cities v. Usery*, 426 U.S. 833 (1976). It held that the Tenth Amendment limited Congress's power under the Commerce Clause to apply FLSA's minimum wage and overtime protections to the States. *Id.* at 842–55. The Court's "examination of the effect of the 1974 amendments, as sought to be extended to the States and their political subdivisions, satisfie[d] [the Court] that both the minimum wage and the maximum hour provisions will impermissibly interfere with the integral governmental functions of these bodies." *Id.* at 851. The Court recognized that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime." *Id.* at 845. It reasoned that the Federal Government does not have the authority to usurp the policy choices of the States as to how they structure the pay of State employees or how States allocate their budgets. *Id.* at 846–48. The Federal

10

Government, for instance, cannot force States to cut services and programs to pay for federal policy choices related to wages. *Id.* at 855. "If Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest," the Court wrote, "we think there would be little left of the States' 'separate and independent existence.'" *Id.* at 851 (citations omitted).

Within a decade the Court *again* reversed itself on this question; Justice Blackmun, in particular, had switched his vote. In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), the Court wrote that the "political process" would ensure that "laws that unduly burden the States will not be promulgated." *Id.* at 556. The Court now "perceive[d] nothing in the overtime and minimum-wage requirements of the FLSA … that is destructive of state sovereignty or violative of any constitutional provision." *Id.* at 554.

Once again, dissenters advanced powerful arguments. Justice Powell, joined by three others, contended that the Court's reversal "substantially alter[ed] the federal system embodied in the Constitution …." *Id.* at 557. They characterized the decision as "effectively reduc[ing] the Tenth Amendment to meaningless rhetoric when Congress acts pursuant to the Commerce Clause." *Id.* at 560. They pointed out that the role of the States in our divided government should not depend upon the grace of elected officials. *Id.* at 560–61. They concluded:

> the harm to the States that results from federal overreaching under the Commerce Clause is not simply a matter of dollars and cents. Nor is it a matter of the wisdom or folly of certain policy choices. Rather, by usurping functions traditionally performed by the States, federal overreaching under the Commerce Clause undermines the constitutionally mandated balance of power between the States and the Federal Government, a balance designed to protect our fundamental liberties.

*Id.* at 572 (citations omitted).

Remarkably, Justice Rehnquist's separate dissent predicted that the principles of the Tenth Amendment and federalism "will … in time again command the support of a majority of this Court."

11

*Id.* at 580. A dissenting Justice O'Connor, too, surveyed the role of federalism and the Tenth Amendment in protecting the sovereignty of the States and, like Justice Rehnquist, expressed her "belief that this Court will in time again assume its constitutional responsibility." *Id.* at 589.

In fact, *Garcia* remained a controversial, far-reaching decision and subsequent majorities of the Court moved to cabin it. They developed, in particular, what is known as the "clear statement" rule. *Garcia*'s reasoning was that State protection from Commerce Clause abuses had to come primarily in the political arena, not in courts. If so, the post-*Garcia* Court held, in cases where States present federal exercises of power that usurp traditional State authority, "we must be absolutely certain that Congress intended such an exercise." *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). "[T]o give the state-displacing weight of federal law to mere congressional *ambiguity*," the Court continued, "would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." *Id.* (citations omitted). The "clear statement" rule has been repeatedly discussed by the Court not merely as a limitation on the Commerce Clause, but a limitation on the *Garcia* decision in particular. *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 907 (2000); *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 183–84 (1996). The doctrine was well-put in *Evans v. United States*, 504 U.S. 255, 291–92 (1992):

> Congress enjoys broad constitutional power to legislate in areas traditionally regulated by the States—power that apparently extends even to the direct regulation of the qualifications, tenure, and conduct of state governmental officials [citing *Garcia*]. As we emphasized only last Term, however, concerns of federalism require us to give a *narrow* construction to federal legislation in such sensitive areas unless Congress' contrary intent is unmistakably clear in the language of the statute. This plain statement rule is nothing more than an acknowledgment that the States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.

Congress, too, recognized its duty under the clear statement rule—its duty to speak cautiously and precisely in framing laws that trench on long-standing State authority. "In response to the *Garcia* decision," for instance, the Supreme Court noted, "both Houses of Congress held hearings and considered legislation designed to ameliorate the burdens associated with necessary [FLSA] changes

in public employment practices." *Moreau v. Klevenhagen*, 508 U.S. 22, 26 (1993).  In these hearings, the Court added, it was none other than the FLSA's overtime provisions that were "specifically identified as a matter of grave concern to many States and localities." *Id.*  Congress legislated to respond to what it recognized as threatened State injuries.  *See* 1985 Report of the Senate Committee on Labor and Human Resources, S. Rep. 99–159, 7–8, 1985 U.S.C.C.A.N. 651, 655–56.

Under *Garcia,* then, State law as to remuneration of its own employees can be displaced only on two conditions: (1) Congress itself acts and (2) does so clearly.  Only in this way can the Court ensure that the political check on federal overreach is respected.  The Court requires judges to be "absolutely certain" that Congress authorized a particular exercise of power and to identify "unmistakably clear" language for it.  Language this strong condemns creative extensions or inferential uses of purported statutory authority.  Under the clear statement rule, congressional silence is congressional prohibition.  This is one dispositive reason why, even under *Garcia*, the DOL rule is invalid.

### F.  The New Overtime Rule Challenged Here

On March 13, 2014, the President sent to the DOL's Secretary a Presidential Memorandum "directing him to modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." 79 Fed. Reg. 18737.  The President opined that, despite being updated in 2004, "regulations regarding exemptions from the [FLSA's] overtime requirement, particularly for executive, administrative, and professional employees (often referred to as "white collar" exemptions) have not kept up with our modern economy." *Id.*  "Because these regulations are outdated," surmised the President, "millions of Americans lack the protections of overtime and even the right to the minimum wage." *Id.*

In response to the President's memorandum, in July 2015 the DOL published a Notice of Proposed Rulemaking to suggest revisions to 29 C.F.R. Part 541.  80 Fed. Reg. 38516.  The DOL

13

proposed a salary level "at the 40th percentile of all full-time salaried employees [nationally] ($921 per week, or $47,892 for a full-year worker, in 2013) …." *Id.* at 38517. The DOL also proposed to "automatically update the standard salary and compensation levels annually … either by maintaining the levels at a fixed percentile of earnings or by updating the amounts based on changes in the CPI-U"—the same automatic indexing mechanism that it had rejected in 2004 as beyond its power. *Id.* at 38518.

Despite the President's instruction to "address the changing nature of the workplace," 79 Fed. Reg. 18737, the DOL did not propose any revisions to the standard "duties" test that was put in place in 2004, because that was considered "more difficult." 81 Fed. Reg. 32444. Thus, increasing the salary level test was the DOL's only proposed solution to the problems and concerns that motivated the Notice of Proposed Rulemaking. *Id.*

The final version of the overtime rule was announced on May 23, 2016. *Id.* at 32391. It set the new salary level based upon the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage census region, which is currently the South. *Id.* at 32404. Utilizing only data from the fourth quarter of 2015, the DOL "determined that the required standard salary level will be $913 per week, or $47,476 annually…." *Id.* at 32405. The revised rule more than doubles the current salary test level of $455 per week. As previewed in the Notice of Proposed Rulemaking, the new rule also invents an indexing mechanism to automatically update the standard salary level threshold every three years. *Id.* at 32430. The indexing regulation will be memorialized in 29 C.F.R. § 541.607. While the revised salary level threshold will take effect on December 1, 2016, the first automatic ratcheting up of that threshold will occur on January 1, 2020. *Id.*

Importantly, the final rule expressly acknowledges that "[w]hite collar employees subject to the salary level test earning less than $913 per week will not qualify for the EAP exemption, and therefore will be eligible for overtime, *irrespective of their job duties and responsibilities*." 81 Fed. Reg. 32405

14

(emphasis added).  Thus, the new rule creates a de facto salary-*only* test for any employee earning less than $913 per week—a species of litmus test that the DOL has repeatedly acknowledged Congress did not authorize.  The DOL defended its decision to simply double the salary threshold because, per the DOL, "a salary threshold significantly below the 40th percentile would require a more rigorous duties test than the current standard duties test in order to effectively distinguish between white collar employees who are overtime protected and those who may be bona fide EAP employees."  *Id.* at 32404.  In other words, the DOL knew full well that its new threshold would trap many "bona fide EAP employees" under the cutoff, but deliberately set the cutoff high because it was unwilling to adopt a "more rigorous duties test" that would distinguish between actual EAP and non-EAP employees.  The DOL simply opted for a new threshold that it knew would err on the side of denying an exemption to many bona fide EAP employees, to avoid changing the current standard duties test (which it said elsewhere was "more difficult").

The DOL estimates that "*4.2 million* employees who meet the standard duties test will no longer fall within the EAP exemption and therefore will be overtime-protected."  *Id.* at 32405; *see also id.* at 32393.  The sheer number of employees that will no longer be exempt demonstrates that the DOL has flipped the very purpose for which the salary test was adopted.  It started as a measure to screen out only those who were "obviously nonexempt employees" without disqualifying "any substantial number of individuals who could reasonably be" considered bona fide EAP employees.  Weiss Report at 7–9, 23.  The new overtime rule does exactly the reverse: it purposefully denies an exemption to many "bona fide EAP employees" that the DOL knows should be exempt under the FLSA, just to avoid improperly giving an overtime exemption to any non-EAP employees. And it does so because the DOL believes the "current standard duties test" is too lenient and it would be "difficult" to make that test "more rigorous."  81 Fed. Reg. 32404, 32444.

15

The new overtime rule's ruinous financial and operational consequences to the States—along with the DOL's brazen admissions that 29 U.S.C. § 213(a)(1) does not expressly authorize the salary level test or automatic updating, 81 Fed. Reg. 32431—have ended whatever reason the States may have had to tolerate the application of the DOL's patently unauthorized salary test.  The Plaintiff States have brought this litigation to protect their citizens, budgets, employees, and our Nation's constitutional design.

## III. ARGUMENT

### A.  The Preliminary Injunction Standard

The Court may issue a preliminary injunction where the plaintiff demonstrates (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury, (3) that the threatened injury outweighs any harm stemming from the injunction, and (4) the grant of an injunction will not disserve the public interest.  *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir. 2009).  The purpose of a preliminary injunction "'is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'"  *U.S. v. Criminal Sheriff, Par. of Orleans*, 19 F.3d 238, 239 (5th Cir. 1994) (quoting *Meis v. Sanitas Serv. Corp.,* 511 F.2d 655, 656 (5th Cir. 1975)).  "Given this limited purpose, and given the haste that is often necessary if [the parties'] positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

As set forth below, the Plaintiff States satisfy each of the prerequisites for a preliminary injunction and, absent an injunction, the Plaintiff States will suffer irreparable constitutional harm as well as crippling, irreversible budgetary injury before the Court can issue a decision on the merits. Accordingly, it is appropriate to enjoin the DOL from implementing the new overtime rule pending this challenge.  *See, e.g., Texas v. U.S.*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by an*

16

*equally divided court* -- U.S. --, 2016 WL 3434401 (June 23, 2016); *Bayou Lawn & Landscape Servs. v. Sec'y of Labor*, 713 F.3d 1080 (11th Cir. 2013) (affirming preliminary injunction of new DOL rule during pendency of the action).

### B.      The Plaintiff States are Likely to Succeed on the Merits of Their Claims.

To establish a likelihood of success on the merits, a plaintiff does not need to prove that victory is a foregone conclusion or even that it is entitled to summary judgment. *Byrum,* 566 F.3d at 446. If all of the other elements are satisfied, a plaintiff need only present a prima facie case on the merits. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). The standards of the underlying substantive law inform the likelihood of success analysis. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990) (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 622 (5th Cir. 1985)).

Plaintiff States invoke the Declaratory Judgment Act and ask the Court to declare their constitutional, statutory, and regulatory rights in relation to the DOL's new overtime rule. 28 U.S.C. § 2201. They also request that the Court "hold unlawful and set aside" the increased salary level test and indexing mechanism as "contrary to constitutional right, power, privilege, or immunity … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right [and] without observance of procedure required by law." 5 U.S.C. § 706(2)(B), (C), (D). The Plaintiff States are able to demonstrate that they are likely to succeed on each of these underlying claims and, at minimum, have set forth a prima facie case. Consequently, an injunction is warranted pending a full trial on the

merits.[11]

    **1.**  ***It is Unconstitutional to Apply the New Overtime Rule to the States.***

      **a.**  **The FLSA invades the Plaintiff States' sovereignty that is preserved by the Tenth Amendment.**

  Because States existed before the adoption of the Constitution, and possessed their own attributes of sovereignty, the Federal Government's authority to directly regulate the States was hotly debated by the Framers in and around the Constitutional Convention. *New York v. U.S.*, 505 U.S. 144, 161–66 (1992); *Printz v. U.S.*, 521 U.S. 898, 918–19 (1997). The Framers' experience under the Articles of Confederation convinced them that allowing the Federal Government to act directly upon the States "was both ineffectual and provocative of federal-state conflict." *Printz*, 521 U.S. at 919. They sought to reduce the Federal Government's ability to apply coercive pressure to the States. *Id.*; *New York*, 505 U.S. at 164–65.

  Indeed, much of the initial Antifederalist opposition to the Constitution stemmed from the fear that the Federal Government would become too powerful and "eliminate the States as viable political entities. This concern was voiced repeatedly until proponents of the Constitution made assurances that a Bill of Rights, including a provision explicitly reserving powers in the States, would be among the first business of the new Congress." *Garcia*, 469 U.S. at 568–69 (Powell, J., dissenting). Eight States voted for the Constitution only after proposing some version of what would later become the Tenth Amendment. *Id.* at 569.

---

[11] The new overtime rule revises the regulations found at 29 C.F.R. §§ 541.100, 541.200, 541.204, 541.300, 541.400, 541.600, 541.602, 541.604, 541.605, and 541.607. These revisions, and any other facilitating regulations, are the provisions that the Plaintiff States seek to enjoin. *See also* 81 Fed. Reg. 32393.

Ultimately, "the Framers rejected the concept of a central government that would act upon and through the States" and, instead, adopted a system of "dual sovereignty" whereby the Constitution "confers upon Congress the power to regulate individuals, not States." *Printz*, 521 U.S. at 918–20 (quotations omitted). Thus, even though the States surrendered some of their powers as the price of admission to the Union, the Federal Government is prohibited from regulating the States except to the extent expressly authorized in the Constitution. *Id.* at 918–22.

The Tenth Amendment is an embodiment of the States' "'residuary and inviolable sovereignty.'" *Id.* at 919 (quoting THE FEDERALIST NO. 39, at 245 (J. Madison)). It states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X. There are essentially two corresponding ways to view the Tenth Amendment inquiry: "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York*, 505 U.S. at 156.

While drawing the boundaries of the States' reserved power may not always be easy, "[w]hatever the outer limits of that sovereignty may be, one thing is clear: The Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* at 188. States are not mere extensions of the Federal Government, *id.*, and they cannot be dragooned or commandeered into implementing Federal policies at their own expense. *Printz*, 521 U.S. at 925–29.

As the Supreme Court once held in *Usery*, applying the FLSA's overtime requirements to the States violates this core constitutional principle by impermissibly regulating the States as States and coercing them to adopt the Federal Government's wage policy choices to the detriment of State priorities, budgets, and services. 426 U.S. at 847–48, 850. The States' residual sovereignty should be a limit on Congress's power under the Commerce Clause to regulate overtime as against the States.

19

*Id.* at 851–52.

It is no less true today, as the *Usery* Court observed, that "[o]ne undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime." *Id.* at 845.  The payment of employee compensation is a corollary to the States' "essential[] and peculiar[] … power" to appropriate the use of their own public funds.  *Id.* (quoting *Coyle v. Oklahoma*, 221 U.S. 559, 565 (1911)).

Similar to the 1974 FLSA amendments at issue in *Usery*, the DOL's new overtime rule supplants the Plaintiff States' independence to set employee compensation with the Federal Government's policy preferences.  The rule mandates that States pay their employees a certain increased salary level or pay overtime for all hours worked in excess of forty per week.  *See id.* at 848–52.  The resulting economic costs alone are enormous.

For comparison, the Supreme Court in *Usery* considered estimated fiscal impacts ranging from $250,000 to $16 million to be significant.  *Id.* at 846–47.  The estimated monetary effect *per year* on each of the Plaintiff States is well within that range and, in many cases, exceeds it.[12]  Seven Plaintiff States serve as paradigmatic examples.  The South Carolina Department of Administration's Executive Budget Office, for instance, estimates that the aggregate potential impact per fiscal year is $2,926,814, exclusive of mandatory payouts for compensatory time when an employee leaves service.  (Aff. B.

---

[12] The DOL grossly underestimates the financial impact on the States.  It predicts that the first year cost to State and local governments totals only $115.1 million.  81 Fed. Reg. 32546.  The DOL also anticipates that State and local governments will suffer an additional $85.4 million after each automatic update.  *Id.*  While these figures certainly amount to constitutional and irreparable budgetary harm, they are far less than the actual shock that the States are bracing for.

Gaines at ¶¶ 5–7. Ex. 1.)  Compensatory time represents a significant additional financial liability created by the rule for state agencies.  (Aff. K. Paul at ¶ 5, Ex. 2.)

The Director of the Office of Personnel Services in the Kansas Department of Administration anticipates that increasing the salaries of all 550 employees that will no longer be exempt under the new rule would cost $3,108,714 annually.  (Decl. K. Knowlton at ¶¶ 5–6, Ex. 3.)  The Executive Human Resource Office of the Wisconsin Department of Administration estimates that the State would need to pay an extra $4.3 million each year to keep exempt its more than 1,000 full-time employees affected by the rule.  (Decl. W. Mickelson at ¶ 5, Ex. 4.)  This amount does not include other employee fringe benefits that would also be incurred or the impact of automatic updating.  (*Id* at ¶ 6.)

The State of Iowa estimates that the new overtime rule will add approximately $19.1 million of additional costs to the State.  (Compl. at ¶ 66.)  Its universities will be particularly hurt.  The State's three public universities estimate that the new overtime rule will increase their personnel costs by an estimated $9,975,000.  (Aff. R. Donley at ¶ 3, Ex. 5.)  Each additional dollar involuntarily spent on employee salaries or overtime is less money that Iowa has available to fulfill its educational mission. (*See generally id.*)

Arkansas, which employs roughly 14% of its States' workforce (Compl. at ¶ 70), conservatively estimates more than $1,000,000 as the resulting financial burden to the State in additional annual employment costs and overtime/compensatory time accruals for the approximately 3,951 employees that will lose their exemption.  (Decl. K. Barnhill at ¶¶4–5, Ex. 6.)  In Arizona, there will be a nearly $10,000,000 budgetary hit if the State increases the salaries of the 1,437 employees that are presently exempt but earn below the new threshold.  (Compl. at ¶ 76.)

Indiana estimates that the new overtime rule "will cost the State a minimum of approximately $20,000,000 annually and create productivity and morale problems."  (Aff. J. Darrow at ¶ 6, Ex. 7.)

21

Of that amount, $3,000,000 annually will directly stem from increasing approximately 700 employees' salaries to the new salary threshold to preserve the exemption. (*Id.* at ¶ 5.)

In Oklahoma, the new rule implicates 4,057 currently exempt State employees that earn less than $913 per week. (Aff. L. Meltabarger at ¶ 8, Ex. 8.) "The annual cost of increasing the salaries of all 4,057 employees to the new minimum threshold is estimated to be $29,597,734.06, excluding any impact on benefits" and damage to workforce morale. (*Id.* at ¶ 9.) Alternatively, if agencies elect to reclassify their employees to hourly, rather than raising salaries, those agencies will not only be forced to undertake the administrative task of tracking those hours, Oklahoma will have to pay $177,557.02 *for each additional hour* on average of overtime that its newly non-exempt employees work per week. (*Id.* at ¶ 13.) Even if the State tracked each hour of every newly non-exempt employee (a costly and burdensome task itself), the new rule "will fundamentally transform the nature of the State of Oklahoma's workforce." (*Id.* at ¶ 15.) The State's workforce is presently 64% non-exempt and 36% exempt. (*Id.*) "The Rule will transform the workforce such that absent salary increases to maintain exempt status, 77% of the workforce is non-exempt and 23% is exempt. The Rule deprives Oklahoma of the ability to maintain the balance between non-exempt and exempt employees that it believes best serves its interests as an employer, by ensuring high morale and productivity at the lowest possible cost." (*Id.*)

Many States are simply unable to make budgetary adjustments to minimize the new rule's damage. Indiana and Maine are exemplars. Indiana's Legislature has not been in session since the rule was adopted and has not appropriated money, as required by Article 10, Section 3 of the Indiana Constitution, to pay for the DOL's new mandate. (Ex. 7 at ¶ 7.) "Therefore, this would amount to an unplanned, unbudgeted cost to State agency budgets, within the existing appropriation, which may affect other operational needs." (*Id.*) Maine's biennial budget does not include funding to offset the resulting financial burden to the State in additional annual employment costs, overtime, or

compensatory time accruals, if the State maintains its current level of overtime usage and payouts. (Compl. at ¶ 73.)  These States illustrate what is true for many others—the new overtime rule's effective date, December 1, 2016, is a looming budgetary doomsday.

Yet the greatest constitutional offense is the intrusion into the States' sovereign authority to structure employment relationships and provide integral governmental services.  *Usery*, 426 U.S. at 845–52.  "This congressionally imposed displacement of state decisions may substantially restructure traditional ways in which the local governments have arranged their affairs."  *Id.* at 849.  As in *Usery*, the requirement to pay overtime or raise salaries "appears likely to have the effect of coercing the States to structure work periods in some employment areas … in a manner substantially different from practices which have long been commonly accepted among local governments of this Nation."  *Id.* at 850.  It is this interference with core State government functions—all for the benefit of federal policy preferences picked by an unelected federal agency—that runs afoul of the Tenth Amendment.  *Id.* Left unchecked by this Court's application of the "clear statement" rule, it would also cast into doubt *Garcia*'s optimism that the "political process" would ensure that "laws that unduly burden the States will not be promulgated."  469 U.S. at 556.

Indiana illustrates the invasion into State sovereignty perpetrated by the overtime rule.  In Indiana, the new overtime rule will affect an estimated 8,500 employees out of the State's 28,100 civil service employees—roughly 30%.  (Ex. 7 at ¶ 5.)  The majority of Indiana's "professional" and "administrative" employees will no longer qualify for the white collar exemption.  (*Id.* at n.1.)  As a result, approximately 5,000 employees will be reclassified as overtime-eligible but, to avoid paying overtime, they will not be permitted to work more than a regular week.  (*Id.* at ¶ 5.)  Employee workloads will be restricted.  (*Id.* at ¶ 6(b).)  This work limitation will decrease employee work output without cost savings.  (*Id.* at ¶ 5.)  Management will be compelled "to ensure that services are not provided, for which [the State] cannot pay the time and a half rate …."  (*Id.* at ¶ 6(b).)  "There will be

23

tremendous opportunity costs, as resources are diverted to employment policies imposed on the State by USDOL, instead of those resources going to serve the citizenry as prescribed and prioritized per Indiana law." (*Id.* at ¶ 8(b).)

The Commonwealth of Kentucky estimates that, on December 1, 2016, it will have about 1,600 employees who will move into the category of employees covered by the new rule, i.e., into non-exempt status.  (Compl. at ¶ 75.)  The South Carolina Department of Administration, Division of State Human Resources warns that "[i]n considering the costs involved in implementing the new Fair Labor Standards Act Overtime Rule, the potential impact based on a reduction of services or deferral of projects due to budget limitations should also be taken into account."  (Ex. 2 at ¶ 6; *see also* Ex. 1 at ¶ 8.)

Arkansas will also be required to reclassify many salaried EAP employees as hourly and limit those employees' hours to avoid the payment of overtime.  (Ex. 6 at ¶ 8.)  Limiting and shifting workloads to avoid additional overtime liability is likely to result in the reduction of services or delays in the provision of services.  (*Id.* at ¶ 9.)[13]

Maine will feel the same ill effects.  It will have to re-characterize many salaried EAP employees as hourly and restrict hours to avoid overtime expenses.  (*Id.* at ¶ 74.)  This shift will likely result in the loss of flex schedules over Maine's two-week pay period and eliminate certain strategies to conform with the State's biennial budget, including telecommuting.  (*Id.*)  Being forced to limit and

---

[13] The new overtime rule will also harm local governments.  In Arkansas, the County Quorum Courts of Baxter, Pope, Benton, White, and Marion Counties have passed resolutions citing the hardship (financial and otherwise) that the new overtime rule will impose upon employers and employees.  (Ex. 9.)  They have requested that the Arkansas Attorney General take legal action to protect the interests and well-being of all Arkansas citizens.

shift workloads and eliminate workplace flexibility to avoid additional overtime will likely result in the reduction of services or delays in providing services. (*Id.*)

The new overtime rule conscripts the States into spending substantial sums of State money against their will while interfering with many functions that governments are created to provide. *Usery*, 426 U.S. at 851. That is a decision that properly belongs to the States themselves, accounting for the health and well-being of their budgets, programs, services, employees, and citizens. *Id.* at 848. *Usery* cautioned that if "Congress may withdraw from the States the authority to make those fundamental employment decisions upon which their systems for performance of these functions must rest, we think there would be little left of the States' separate and independent existence." *Id.* at 851 (quotations omitted). Here, it isn't even *Congress* that has chosen this latest interference with State governments; it is a federal agency acting in clear disregard of the actual text of the law passed by Congress. *Usery*'s warning applies with double force, especially as buttressed by the clear statement rule of *Gregory* and the Supreme Court's most recent pronouncements.

Taken to the logical extreme, the Federal Executive and the DOL could wield the overtime rule—and the salary level test in particular—to exhaust State budgets, force State reliance on federal money, and transform the States into mere vassals of Federal prerogative. To preserve our Constitutional system of federalism and dual sovereignty, the Federal Government cannot, consistent with the Tenth Amendment, prescribe the salary level or overtime rate that States must pay in their capacities as sovereign governments. *Id.* at 852.[14]

---

[14] As will be developed *infra*, the salary level test is not clearly approved by Congress and, *a priori*, it does not implicate Congress's Article One power. Here, therefore, the Tenth Amendment is a barrier to the *Executive Branch's* wrongful attempt to use the salary level test to coerce the States. *Cf. Gonzales v. Oregon*, 546 U.S. 243, 275 (2006) ("The Government, in the end, maintains that the prescription requirement delegates to a single executive officer the power to effect a radical shift of authority from

**b.** *Garcia* **has been—or should be—overruled.**

Notwithstanding the soundness of *Usery* in light of the history and purpose of the Tenth Amendment, the Plaintiff States acknowledge that the Supreme Court narrowly overruled that decision in *Garcia*. But the Supreme Court itself has since admitted that "[its] jurisprudence in this area has traveled an unsteady path." *New York*, 505 U.S. at 160. "The Court has swung back and forth with regrettable disruption on the enforceability of the FLSA against the States …." *Alden v. Maine*, 527 U.S. 706, 814 (1999) (Souter, J., dissenting). The Court overruled itself twice in 17 years.

Subsequent decisions have called *Garcia*'s continuing validity into question.[15] For instance, majorities of the Supreme Court continue to rely upon Justice Powell's dissent in *Garcia*. *See, e.g., Gregory*, 501 U.S. at 458; *U.S. v. Morrison*, 529 U.S. 598, 616 n.7 (2000). Justices dissenting or writing separately occasionally accuse the majority of backing away from *Garcia*. *See, e.g., Gregory*, 501 U.S. at 477 (White, J., concurring in part, dissenting in part, and concurring in the judgment); *Morrison*, 529 U.S. at, 650–52 (Souter, J., dissenting).

Scholars have debated whether succeeding opinions, *Printz* among them, might render unconstitutional the FLSA's application to the States. *See, e.g.,* Vicki C. Jackson, *Federalism and the Uses and Limits of Law:* Printz *and Principle?*, 111 HARV. L. REV. 2180, 2206–07 (1998) ("Of greater concern are *Printz*'s effects on the constitutionality of those federal statutes that are generally applicable to

_____

the States to the Federal Government …. The text and structure of the CSA show that Congress did not have this far-reaching intent to alter the federal-state balance and the congressional role in maintaining it."). As already discussed, the Supreme Court's creation of the clear-statement rule post-*Garcia* gives sharp teeth to the idea that, whatever liberties *Garcia* may have granted to *Congress* to burden state sovereignty, those liberties were not granted to an executive federal agency absent "absolute[] certain[ty] that Congress intended such" a burden. *Gregory*, 501 U.S. at 464.

[15] *See, e.g., Printz v. U.S.*, 521 U.S. 898 (1997); *U.S. v. Lopez*, 514 U.S. 549 (1995); *New York v. U.S.*, 505 U.S. 144 (1992); *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44 (1996); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566 (2012); *Gregory v. Ashcroft*, 501 U.S. 452 (1991); *U.S. v. Morrison*, 529 U.S. 598 (2000).

private persons and states …. These laws include statutes like the Fair Labor Standards Act ….”); Andrew S. Gold, *Formalism and State Sovereignty in* Printz v. United States: *Cooperation by Consent*, 22 HARV. J.L. & PUB. POL'Y 247, 273 & n.169 (1998) (identifying the FLSA as an “important law[] which may now be held to contain unconstitutional provisions”).

Lower courts too have questioned whether the Supreme Court’s later decisions have overruled *Garcia sub silentio*. In one Fourth Circuit case, Chief Judge Wilkinson requested supplemental briefing on the question: “‘In light of the Supreme Court’s decision in [*Printz*] whether the Fair Labor Standards Act may be constitutionally applied to the salary determinations at issue in this case.’” *West v. Anne Arundel Cnty., Md.*, 137 F.3d 752, 756–57 (4th Cir. 1998) (citation omitted), *superseded on other grounds as stated in Morrison v. Cnty. of Fairfax, Va.*, No. 14-2308, 2016 WL 3409651 (4th Cir. June 21, 2016). Even though the Fourth Circuit suspected that *Garcia* rested on reasons rejected in more recent cases, it felt constrained by its inability to preemptively overrule Supreme Court precedent without direction from the Court. *Id.* at 760.

This Court may likewise be constrained from overruling *Garcia*. *See Cardenas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005) (holding court of appeals should follow controlling precedent until Supreme Court overrules it). Even so, the Plaintiff States have, at the very least, demonstrated a prima facie case that *Garcia* has been implicitly overruled and that Tenth Amendment bars the application of the FLSA to the States. This showing, combined with the imminent harm threatened if the rule goes into effect December 1, warrants a stay of the rule pending a full hearing on the merits and the potential for review by the Supreme Court.

> c. **Consistent with the Supreme Court's cases post-*Garcia,* the salary level test is unconstitutional as applied to the States for lack of a "clear statement" that Congress intended to impose a salary threshold for EAP employees to be exempt from overtime.**

Separate and apart from the question of whether *Congress* can generally apply the FLSA and its overtime requirements to the States, the *DOL* cannot apply its salary level cutoff for EAP employees and automatic indexing of that cutoff to the States. This follows from the "clear statement" rule, the doctrinal means by which the Court, since *Garcia,* has carefully limited the sweep of that contentious decision.

*Garcia* held that the Tenth Amendment limits on Congress's ability to regulate the States are "structural, not substantive—*i.e.,* that States must find their protection from congressional regulation through the national political process, not through judicially defined spheres of unregulable state activity." *South Carolina v. Baker,* 485 U.S. 505, 512 (1988). Because *Garcia* left to the "political process" the States' protection from Congress's exercise of its Commerce Clause powers, courts "must be absolutely certain that Congress intended such an exercise" before they will uphold it as applied to the States. *Gregory,* 501 U.S. at 464. "'[T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests.'" *Id.* (quoting L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 6-25, p. 480 (2d ed. 1988)).

To ensure that Congress actually intended to interfere with areas that are traditionally within the States' sovereign domain, the Tenth Amendment and concerns of federalism require a "clear statement from Congress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,* 531 U.S. 159, 174 (2001); *Bond v. U.S.,* 134 S. Ct. 2077, 2088–90 (2014); *Gregory,* 501 U.S. at 460, 463. "If Congress intends to alter the usual constitutional balance between the States and the Federal

28

Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460.

Here, Congress has made no "unmistakably clear" statement that it authorized the DOL to deny an overtime exemption for States' bona fide EAP employees simply because they make less than a threshold salary picked by the DOL. Quite the opposite, the plain language of 29 U.S.C. § 213(a)(1) requires that "*any* employee employed in a bona fide executive, administrative, or professional capacity" (emphasis added), be exempted from the FLSA's overtime requirement. The DOL's salary level test and its indexing do not merely exploit statutory ambiguity to impose a burden on the States (which would itself be barred by the clear-statement rule); the salary level test has been imposed against the States notwithstanding Congress's "clear statement" to the contrary.

At most, assuming the FLSA can be applied to the States, Congress has expressed its intention that States pay overtime to all employees performing non-EAP *duties*. *See* 29 U.S.C. § 213(a)(1). Congress has not given any indication that salary should be considered, much less be the *only* consideration for any employee making less than the salary level picked by the DOL. *Id.* Since structuring employee wages is an integral aspect of State sovereignty, *Usery*, 426 U.S. at 845, a clear statement of Congress would be necessary to impose any salary level test on the States. *Gregory*, 501 U.S. at 460. The absence of a clear statement approving the use of the salary level test and indexing against the States prohibits their application under the Tenth Amendment and principles of federalism.

### 2. The New Overtime Rule Violates the Clear Command of 29 U.S.C. § 213(a)(1).

"When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter …." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). If, however, "the statute

is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If the agency's interpretation is supported by the statute's plain language, courts owe deference. *Nat'l R.R. Passenger Corp. v. Boston & Maine Corp.*, 503 U.S. 407, 417 (1992).[16]

But "[u]nlike the deference given to agency interpretations of ambiguous statutes, the judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (quotation and alteration omitted). Courts must presume that Congress "says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "Where Congress has established a clear line, the agency cannot go beyond it …." *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1874 (2013).

To determine whether a statute is ambiguous, courts use the "'traditional tools of statutory construction.'" *Contender Farms,* 779 F.3d at 269 (quoting *Chevron,* 467 U.S. at 843 n.9). Courts begin with the statute's plain language giving undefined words their ordinary, contemporaneous, and common meaning. *Id.* Additionally, courts read the words in context of the entire statute and consider them in light of the statute's overarching purpose. *Id.* Should the words of a statute prove unambiguous, the first canon of statutory construction "is also the last: judicial inquiry is complete." *Conn. Nat. Bank*, 503 U.S. at 254 (quotations omitted).

---

[16] This is how *Chevron's* two-step inquiry operates in the ordinary course. As already explained, where, like here, a federal agency is seeking to impose a burden on the sovereign States absent a clear statement by Congress, "[t]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." *Gregory*, 501 U.S. at 464. The clear-statement rule thus flips the normal deference given to agency interpretations of ambiguous statutes as applied to States.

In this case, Congress directly and unambiguously spoke about the types of employees that *must* be exempt from the overtime requirements, the considerations to be used when assessing exempt status, and the frequency and manner in which the DOL is to "define and delimit" the EAP exception. Because the intent of Congress is clear, this case should be decided at *Chevron*'s step one.

### a.        The standard salary level test

Since it was enacted, the FLSA has required an overtime exception for "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1). Congress did not define the terms "executive," "administrative," or "professional" in the FLSA itself, 81 Fed. Reg. 32394, but left it to the DOL to "define[] and delimit[]" these terms "from time to time by regulations," 29 U.S.C. § 213(a)(1).  While this explicit delegation would presumably give the DOL significant leeway in establishing the *types of duties* that might qualify for each of these categories of employee, there is nothing in the FLSA to indicate that Congress intended the DOL to define the terms with respect to a minimum salary level.  If Congress had intended to authorize the DOL to impose a minimum salary cutoff for overtime exemptions, it could have easily said so.

Indeed, the fact that Congress expressly commanded the DOL to provide an overtime exemption for "any" EAP employee—not just those above a certain salary threshold—is one clear textual indication that Congress did *not* intend the DOL to impose a minimum salary requirement that would exclude "any" employees genuinely performing EAP tasks (however defined by the DOL). Similarly, the fact that Congress bookended the EAP categories with the terms "bona fide ... capacity" is additional strong textual evidence that Congress intended the categories to be based on what the

31

employees actually *do*.[17]   Consistent with these clear textual indicators, the DOL, by repeatedly conceding that it has no authority to adopt a test "based on salary alone," Weiss Report at 23, or a "salary only" test, 69 Fed. Reg. 22173, has itself implicitly acknowledged that whether an employee qualifies as a "bona fide executive, administrative, or professional" employee cannot be determined by "salary alone."   Yet the DOL's new rule categorically denies EAP status to any employee making less than $47,476 per year—"based on salary alone."

If that were not enough, the meanings of the terms "executive, administrative, [and] professional," especially when coupled with the word "capacity," cannot reasonably be stretched to encompass only an employee who makes above a specific salary.   To ascertain how these terms were understood by the Congress that enacted the FLSA in 1938, a Court must look to their commonly understood meanings around that time.   *Contender Farms*, 779 F.3d at 269, 271–72; *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2129 (2016) (Thomas, J., dissenting) ("The FLSA does not define the term 'salesman,' so 'we give the term its ordinary meaning.'") (quoting *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012)).[18]

As one might expect, dictionary definitions from that era describe the words "executive," "administrative," and "professional" in functional terms—not by how much each category earns in salary.   For example, one of the most authoritative dictionaries[19]—*the Oxford English Dictionary*—from 1933 defines "executive" as one "[c]apable of performance; operative … Active in execution, energetic … Apt or skillful in execution … Pertaining to execution; having the *function* of executing or carrying

---

[17] *See* BLACK'S LAW DICTIONARY 220 (8th ed. 2004) (defining "Capacity" as "The role in which one performs an act").   "Capacity" was likewise understood in the 1930s as "position, condition, character, relation," "to be in, put into … a position which enables, or renders capable," or "legal competency or qualification."   2 THE OXFORD ENGLISH DICTIONARY 89 (1933 ed.).

[18] *Taniguchi* confirms that the Court must look to dictionary definitions of the subject terms from at or near the time that the statutory provision was enacted.   132 S. Ct. at 2002–04.

[19] *Taniguchi*, 132 S. Ct. at 2003.

to practical effect." 3 THE OXFORD ENGLISH DICTIONARY 395 (1933) (emphasis added). "Administrative" is defined as "[p]ertaining to, dealing with, the *conduct* or management of affairs; executive … Of the nature of stewardship, or delegated authority … An administrative body; company of men entrusted with management." 1 THE OXFORD ENGLISH DICTIONARY 118 (1933) (emphasis added). "Professional" is defined as a person "[e]ngaged in one of the *learned* or *skilled* professions, or in a calling considered socially superior to a trade or handicraft … That follows an occupation as his (or her) professional, life-work, or means of livelihood … That is *trained* and *skilled* in the theoretic or scientific parts of a trade or occupation … that raises his trade to the dignity of a learned profession." 8 THE OXFORD ENGLISH DICTIONARY 1428 (1933) (emphasis added).

The version of *A Dictionary of American English on Historical Principles* published between 1938 and 1944 contains similar definitions. For instance, it defines "executive" as "[a]n employee or official of an organization having directive duties" and as someone that is "[e]nergetic, competent; qualified to direct and control." 2 A DICTIONARY OF AMERICAN ENGLISH ON HISTORICAL PRINCIPLES 907–08 (William A. Craigie & James R. Hulbert eds., 1940). "Professional" is defined as one "[e]ngaged in an occupation or activity as a profession or means of livelihood." 3 DICTIONARY OF AMERICAN ENGLISH ON HISTORICAL PRINCIPLES 1838 (William A. Craigie & James R. Hulbert eds., 1942).[20]

All of these terms are defined by the nature of a person's "performance," "function," "conduct," "learning," "skills," "duties," "control," or "activities." The definitions never identify or even hint at a minimum amount of compensation as a defining or delimiting characteristic. By using these duties-based terms in conjunction with the word "capacity," and omitting any reference to salary or compensation, Congress emphasized its clear intention that the white collar exemption apply to all employees engaged in an EAP capacity based upon the tasks they perform without regard for the

---

[20] A definition of "administrative" was not locatable in hard copy.

amount of their compensation.

This result is confirmed when viewing the terms in context of the rest of Section 213. The remaining portions of the current version of Subsection (a)(1) also speak solely in terms of the duties that those categories of employees perform. There are specific references to the "capacity" in which the employee is employed and "the *performance* of executive or administrative *activities*." 29 U.S.C. § 213(a)(1) (emphasis added). There is no mention of minimum pay or salary as a consideration.

Many other subsections of Section 213 with a parallel structure similarly focus on duties and activities, with no allusion to a minimum level of pay. *See, e.g., id.* § 213(a)(5) ("any employee employed in the catching, taking, propagating, harvesting cultivating, or farming of any kind of fish"); *id.* § 213(a)(8) ("any employee employed in connection with the publication of any weekly … newspaper"); *id.* § 213(a)(12) ("any employee employed as a seaman on a vessel other than an American vessel"); *id.* § 213(a)(15) ("any employee employed on a casual basis in domestic service employment to provide babysitting services").

When the type of pay is a relevant consideration to be exempt from the minimum wage or overtime requirements under the FLSA, Congress has said so. For example, 29 U.S.C. § 213(a)(6)(D)(i) exempts "any employee employed in agriculture … if such employee … is sixteen years of age or under and is employed as a hand harvest laborer, *is paid on a piece rate basis* in an operation which has been, and is *customarily and generally recognized as having been, paid on a piece rate basis in the region of employment* …" (emphasis added). Likewise, a criminal investigator is exempt from minimum wage and overtime if he "is paid availability pay under section 5545a of Title 5." *Id.* § 213(a)(16). 29 U.S.C. § 213(b)(11) exempts from overtime "any employee employed as a driver … *who is compensated for such employment on the basis of trip rates, or other delivery payment plan* …" (emphasis added).

Significantly, when Congress thought there should be a specific compensation level test or threshold for an overtime exemption, it explicitly said that too. For example, 29 U.S.C. § 213(b)(24)

provides that FLSA overtime requirements do not apply to certain types of employees at nonprofit educational institutions "if such employee and his spouse reside in such facilities, receive, without cost, board and lodging from such institution, *and are together compensated, on a cash basis, at an annual rate of not less than $10,000 …*" (emphasis added).  Unlike the EAP exemption, the plain language of Subsection (b)(24) establishes a strict annual compensation requirement before the exemption applies.  *See Gaby v. Omaha Home for Boys*, No. 8:CV95-00228, 1997 WL 406275, at *2 (D. Neb. May 9, 1997), *aff'd*, 140 F.3d 1184 (8th Cir. 1998).

The omission of a similar compensation amount in 29 U.S.C. § 213(a)(1) further demonstrates that Congress did not mean to hinge an employee's EAP status on a particular pay or salary level.  This is especially true since Congress enacted Subsection (b)(24) in the same 1974 legislation that purported to extend the entirety of the FLSA to the States.  88 Stat. 55.  Had Congress wanted to limit the white collar exemption to employees (including *State* employees) making a certain amount, it would have expressed that intention in the statute as it did in Subsection (b)(24).[21]  "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  *Russello v. U.S.*, 464 U.S. 16, 23 (1983) (quoting *U.S. v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

The difference between Subsection (a)(1) and Subsection (b)(24) with regard to a specific compensation level requirement must be presumed to be intentional and must be given effect.  *Id.*[22]

---

[21] Conversely, if the DOL already had the authority to impose compensation requirements for Section 213 exemptions, there would have been little need for Congress to set forth a minimum compensation level for Subsection (b)(24) by statute.

[22] On the other hand, the Court should not give any weight to Congress's inaction with regard to the DOL's longtime use of a salary level test.  "It is at best treacherous to find in Congressional silence

The text of Subsection (a)(1) clearly indicates that Congress authorized the EAP exemption to be applied based upon the duties actually performed, not the amount of salary an employee is paid.

As if the plain language and context of the statute weren't enough, the DOL concedes that the statute "does not reference … a salary level or salary basis test …. These changes were all made without specific Congressional authorization."  81 Fed. Reg. 32431; *see also id.* ("[T]he salary level is purely a creature of regulation.").  The DOL has consistently recognized that its authority "to define and delimit who is employed in a bona fide executive, administrative or professional capacity" does not authorize it to adopt a "salary only" test.  *Id.* at 32429; *id.* at 32446 n.84 (stating that a salary only approach is "precluded by the FLSA."); 69 Fed. Reg. 22173 (agreeing that the "Secretary does not have authority under the FLSA to adopt a 'salary only' test …. The Department has always maintained that the use of the phrase 'bona fide executive, administrative or professional capacity' in the statute requires the performance of specific duties.").

The DOL has done precisely what it has acknowledged it cannot do by promulgating the equivalent of a salary-only test for all employees earning less than $913 per week.  Under the new rule, "[w]hite collar employees subject to the salary level test earning less than $913 per week will not qualify for the EAP exemption, and therefore will be eligible for overtime, *irrespective of their job duties and responsibilities.*"  81 Fed. Reg. 32405 (emphasis added).  In other words, an employee's duties, functions, tasks, and activities will not matter *at all* below the new salary threshold.

---

alone the adoption of a controlling rule of law."  *Girouard v. U.S.*, 328 U.S. 61, 69 (1946).  There are innumerable reasons why Congress may not take action to repudiate a misconstruction of a statute, "[a]mong them may be the sheer pressure of other and more important business."  *Cleveland v. U.S.*, 329 U.S. 14, 22–23 (1946) (Rutledge, J., concurring).  For this reason, courts require explicit congressional approval of an agency interpretation before it is viewed as statutorily mandated.  *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 915–16 (D.C. Cir. 1987) (the DOL's regulation was not "frozen into law" without a "strong affirmative indication" from Congress).

The DOL estimates that, as a result of the new salary level, "*4.2 million* employees who meet the standard duties test will no longer fall within the EAP exemption and therefore will be overtime-protected."   *Id.* (emphasis added).   Many informed commentators believe that estimate to be significantly understated.   Regardless, the new overtime rule's increased salary level test will exclude from exemption, on the basis of pay, *millions of employees* that Congress authorized to be exempt based upon the EAP duties they perform—thousands of employees in State government alone.   29 U.S.C. § 213(a)(1) plainly states that "*any*" bona fide EAP employee "*shall not*" be eligible for overtime.   The statute's plain language does not leave room for the DOL to adopt any standard or test—salary-based or otherwise—that would categorically bar *any* bona fide EAP employee from the exemption.

The DOL has said that "the Administrator would undoubtedly be exceeding his authority if he included within the [EAP] definition of these terms craftsmen, such as mechanics, carpenters, or linotype operators, no matter how highly paid they might be."   69 Fed. Reg. 22174.   Sure.   But the converse is just as true: the DOL exceeds its authority no less when it categorically excludes from the exemption "any" employees that the FLSA *expressly* requires to be granted an exemption because they perform bona fide EAP duties.   The DOL cannot impose an unlawful salary test, and then defend doubling its salary cutoff in a way that arbitrarily traps many bona fide EAP employees under the cutoff, based on that fact that its duties test is so bad that setting the cutoff lower might trap some non-EAP employees above the cutoff.   81 Fed. Reg. 32404.   The obvious solution to the DOL's quandary is to do the "difficult" work of focusing on what the *statute* actually tells the DOL to consider—duties—and to stop attempting to bootstrap a test that has always been unlawful (but not terribly consequential) into a test that is now unlawful, over- and under-inclusive, and very consequential.   Excluding millions (or even thousands) of bona fide EAP employees from the white collar exemption unquestionably violates the textual requirements of 29 U.S.C. § 213(a)(1).

A number of lower federal courts have agreed with the Plaintiff States that the salary level test exceeds the DOL's congressional authorization.  In *Buckner v. Armour & Co.*, 53 F. Supp. 1022, 1024 (N.D. Tex. 1942), the Northern District of Texas addressed an assistant fire chief that met all of the duties requirements of an "executive" under 29 U.S.C. § 213(a)(1) except that he was not paid the requisite salary.  The court found the minimum salary requirement to be in excess of the DOL's statutory jurisdiction because "[o]nly Congress had the arbitrary power to make the exception that an executive who received a salary less than $30 per week should not be exempt.  It declared that *all* serving in executive and administrative capacities were exempt." *Id.* (emphasis added).  The court concluded that imposing a salary threshold "was purely an attempted law making function, while the power delegated to [the DOL] was only to define those terms." *Id.*[23]

*Buckner* is in accord with *Devoe v. Atlanta Paper Co.*, 40 F. Supp. 284, 286 (N.D. Ga. 1941).  In *Devoe*, the court rightly noted that the DOL's ability to define the EAP exemption is restricted to the limits set forth by Congress.  "These limits are marked out by the fair and natural meaning of the words 'bona fide executive … capacity." *Id.*  "Although the Administrator may legally define the term administrative employee with wide discretion within the meaning of such term," the court explained, "he cannot go beyond that and add elements which form no part of such conception.  In other words, he cannot add an element which is not a real incident to executive work." *Id.*  The court held that the salary level of an executive is not "a natural and admissible attribute of the term 'bona fide executive and administrative … capacity.'" *Id.*  The court continued:

> It might have been wiser for Congress to have classified employees to be covered by the Act upon the basis of their earnings, or to have added with respect to administrative officers the additional requirement of a minimum salary, but it did not do so, and in my opinion, the Administrator cannot, by adding such requirement,

---

[23] The Fifth Circuit Court of Appeals dealt with an arbitrary and capricious challenge to the salary level test in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966).  *Wirtz* did not involve the DOL's statutory authority to adopt the salary level test.

> which has no relation to the character of the work performed, bring within the scope
> of the Act a class of employees not intended.  The fact that an executive may work for
> less than $30 per week or even $1 a year does not alter the fact that he is an executive.

*Id.* at 286–87; *see also Krill v. Arma Corp.*, 76 F. Supp. 14, 17 (E.D.N.Y. 1948) ("It does seem to me

though that such a wage prerequisite is an arbitrary and fanciful classification of professional status."),

*disapproved of on other grounds by Johnston v. Spacefone Corp.*, 706 F.2d 1178 (11th Cir. 1983).

The DOL attempts to justify its complete disregard for the duties performed by employees

earning less than $913 weekly by nakedly asserting that it has "long recognized the salary level test is

the best single test of exempt status for white collar employees."  81 Fed. Reg. 32392.  The DOL

claims that the amount of an employee's salary "serves as an appropriate proxy for distinguishing

between overtime eligible and overtime exempt white collar workers."  *Id.* at 32404.

But the Fifth Circuit has rejected analogous agency attempts to adopt a "proxy" test that is

based upon considerations that conflict with clear statutory language.  *Supreme Beef Processors, Inc. v.

U.S.D.A.*, 275 F.3d 432 (5th Cir. 2001), illustrates the limitation.  There, the Federal Meat Inspection

Act classified a meat product as impermissibly "adulterated" if "it has been prepared, packed, or held

under insanitary conditions whereby it may have become contaminated with filth, or whereby it may

have been rendered injurious to health."  *Id.* at 434 (quoting 21 U.S.C. § 601(m)(4)).  To enforce this

statute, the Food Safety and Inspection Service promulgated a regulation to test the level of salmonella

in a meat plant's finished products.  *Id.* at 434–35.  It was urged that regulation was proper because

"*Salmonella* levels can be *a proxy* for the presence or absence of means of pathogen controls that are

required for sanitary conditions …."  *Id.* at 439 (second emphasis added).

A meat processor and grinder repeatedly failed the salmonella tests and eventually sued,

arguing—like the Plaintiff States—that the test was beyond the agency's statutory authority granted

under the Act.  *Id.* at 434–36.  The district court agreed and entered an injunction against enforcement

of the test. *Id.* at 436, 439. Analyzing the *Chevron* framework, the Fifth Circuit affirmed. *Id.* at 438–40.

The appellate court reasoned that the salmonella test conflicted with the text of the statute because the statute covered the conditions under which a meat product is "prepared, packaged or held," and the presence of salmonella is not necessarily indicative of unsanitary conditions. *Id.* at 438–40, 441–43. Salmonella is often present when meat enters a plant. *Id.* at 438–39. The test did not measure the difference in salmonella levels between incoming and outgoing meat so it did not accurately reflect the conditions of a plant. *Id.* at 442–43. The Fifth Circuit concluded that the salmonella test "cannot serve as a proxy for cross-contamination because there is no determination of the incoming *Salmonella* baseline." *Id.* at 442.

The DOL's new increased salary level test is without statutory authority for the same reasons set forth in *Supreme Beef.* 29 U.S.C. § 213(a)(1)'s plain language demonstrates that it meant to exempt from overtime any employee performing in a "bona fide executive, administrative, or professional capacity." But just as the agency in *Supreme Beef* did not examine the actual conditions of the meat plants, and instead used the salmonella test as a proxy, the DOL admits that it uses the salary level test "as an appropriate proxy" for duties rather than examine the actual duties that EAP workers perform in our modern economy. 81 Fed. Reg. 32404; *see* 79 Fed. Reg. 18737. The salary test, like the salmonella test, does not accurately capture the employees intended to be covered by the exemption because salary is not necessarily an indicator of bona fide EAP status. The DOL cannot disregard the plain language of 29 U.S.C. § 213(a)(1) and unilaterally decide to categorically exclude workers performing EAP duties from the exemption based solely on a factor—salary—that was never authorized by Congress.

### b.      Indexing mechanism

If the DOL's salary level test is unlawful, so, too, is the DOL's newly created indexing mechanism in 29 C.F.R. § 541.607.  The statute does not authorize the implementation of an indexing system that is tied to the impermissible salary test.  Indeed, the DOL bases its newfound authority to impose indexing on its (erroneous) belief that it has authority to impose a salary level test: "The Department concludes that just as we have authority under section 13(a)(1) to establish the salary level test, we likewise have authority to adopt a methodology … for automatically updating the salary level …." 81 Fed. Reg. 32431; *see also id.* at 32432 ("[T]he lack of on-point legislative history [for indexing] is unsurprising given the origin and evolution of the salary level test.").  Or, as one might say in Nevada: "In for a dime, in for a dollar …."

Even if the salary level test were permissible, the indexing mechanism is still in excess of statutory authority. The language of 29 U.S.C. § 213(a)(1) expressly mandates that the DOL "define[] and delimit[]" the meaning of the "executive, administrative, or professional" categories "from time to time by regulations of the Secretary."  This makes sense; as President Obama recognized in directing the DOL to update the rule, the precise duties that may legitimately be encompassed within a "bona fide executive, administrative, or professional capacity" might vary from "time to time" in our "modern economy."  79 Fed. Reg. 18737.  But nothing in the FLSA authorizes the DOL to automatically update the salary level test's minimum salary based entirely on indexing tied to average salary levels, with *no* taking account of actual duties performed in setting the new salary cutoff.  At least the DOL pretends that the new salary cutoff that goes into effect on December 1st has some ephemeral connection to duties performed by employees.  It can't even pretend that the automatic change three years from now will have anything to do with changes in duties vis-à-vis pay.  The indexing is tied a percentile of average salary levels for all salaried employees, regardless of duties— nothing more and nothing less.

As with its admission related to the salary level test, the DOL admits that 29 U.S.C. § 213(a)(1) "does not reference automatic updating …." 81 Fed. Reg. 32431. The DOL has previously disclaimed, however, that it has the authority to use indexing when setting the salary level. In 2004, the DOL flatly stated that adopting a method of automatic increases "is both contrary to congressional intent and inappropriate." 69 Fed. Reg. 22171–72. "Further, the Department [found] nothing in the legislative or regulatory history that would support indexing or automatic increases." *Id.* at 22171.

Reversing course, the DOL now relies primarily on Congress's failure to explicitly prohibit the use of indexing in 29 U.S.C. § 213(a)(1). Construing the lack of a specific prohibition as authorization, the DOL argues that Congress has implicitly left a "gap" for the DOL to fill. 81 Fed. Reg. 32431. But courts "do not merely presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Contender Farms*, 779 F.3d at 269 (citations omitted). An agency's construction of a statute does not receive deference "merely by demonstrating that 'a statute does not expressly *negate* the existence of a claimed administrative power (i.e., when the statute is not written in 'thou shalt not' terms).'" *Id.* (quoting *Ry. Labor Execs.' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (emphasis in the original)).

The DOL cannot assume for itself every power not directly prohibited by 29 U.S.C. § 213(a)(1). Its actions are constrained by the authority expressly conferred by Congress, and, here, the only power granted by Congress is the authority to define and delimit the exemption "from time to time by regulations." The inclusion of this phrase shows unequivocally that Congress desired the DOL to engage in the promulgation of regulations through the lawful rule-making process from "time to time." A directive to revisit an issue "from time to time" is exactly the opposite of the DOL's "set it and forget it" approach here—i.e., going through the rule-making process *one time* and then putting it on autopilot. Congress clearly knows how to expressly authorize indexing when that is what it

wants, including in the labor context.  *See, e.g.,* 29 U.S.C. § 1083(c)(7)(D)(vii) (indexing amount of excess employee compensation related to "Minimum funding standards for single-employer defined benefit pension plans"); *see also* 16 U.S.C. § 497c(b)(3); 43 U.S.C. § 1337(a)(3)(C)(vii).

Neither 29 U.S.C. § 213(a)(1) specifically, nor the FLSA generally, provide indexing for wage rates.  Tellingly, Congress has not indexed the minimum wage, the hourly wage for computer employees, or the annual compensation for "nonprofit parents."  29 U.S.C. § 206; 29 U.S.C. § 213(a)(17); 29 U.S.C. § 213(b)(24).  The absence of explicit language authorizing indexing in the EAP exemption's text, especially in light of other indexing statutes, establishes that even if Congress had authorized a salary level test (which it did not), it never authorized indexing to evade the requirement to define and delimit the exemption "from time to time by regulation."

### 3.   *The Indexing Mechanism Violates the APA.*

The indexing mechanism fails to comply with the APA for many of the same reasons that it conflicts with the plain language of 29 U.S.C. § 213(a)(1).  *See supra* § III(B)(2)(b).  With certain exceptions that are not relevant here, the APA mandates that all agency rulemaking must go through the notice and comment process.  5 U.S.C. § 553.  And when making a regulatory change, the agency must give sufficient reasons for its decision.  *Encino Motorcars, LLC*, 136 S. Ct. at 2125.  "The agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (quotations omitted).  An agency's failure to provide any analysis renders its actions invalid.  *Id.*

The indexing method of the new overtime rule is designed to allow the salary level test to automatically ratchet up every three years, while avoiding notice and comment on the change.  In prior rulemaking efforts, the DOL took a position consistent with the APA that changes to the salary level test should be data dependent.  "The salary levels should be adjusted when wage survey data and other policy concerns support such a change."  69 Fed. Reg. 22171.  Now, the salary level will mechanically

43

rise every three years without any critical examination of the necessity or justification for the increase and without any input from the States or other affected parties.

To its credit, the DOL has not hidden its desire to dispense with "the need for frequent rulemaking" by indexing the salary level test.  81 Fed. Reg. 32400.  Even though the salary level test is itself a shortcut around the statutorily required examination of the duties actually performed in the workplace, the DOL has decided that setting the salary level through notice and comment is still too arduous and "time-intensive."  *Id.* at 32435.

But the APA's notice and comment provisions must be followed regardless of whether an agency finds them inconvenient.  *See U.S. Steel Corp. v. E.P.A.*, 595 F.2d 207, 214 (5th Cir. 1979) (discussing 5 U.S.C. § 553(b)(B)).  Any increase in the salary level must be based upon the comments submitted and the actual facts and information existent at the time of the increase.  The DOL cannot lawfully put the salary level test on autopilot and effectively immunize itself from the APA.

### 4. *Alternatively, the New Overtime Rule is an Unlawful Delegation of Congressional Power.*

Article One, Section One of the Constitution states, "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  The text does not permit delegation of those powers.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001).  The grant of power is exclusive to Congress and absolute.  *Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1241 (2015) (Thomas, J., concurring).

Should the Court determine that 29 U.S.C. § 213(a)(1) is so broad and ambiguous that it grants the DOL authority to impose upon the Plaintiff States a salary level test and indexing mechanism (and also that it is not therefore barred by the clear-statement rule), the statute constitutes an unconstitutional delegation of legislative authority.  To the extent salary plays any role in evaluating the white collar exemption, the threshold may only be established through the proper exercise of

legislative power, just as Congress does for the minimum wage and just as 29 U.S.C. § 213(b)(24) does for the overtime exemption in an another context.  The Constitution's separation of powers does not allow the DOL to simultaneously set the salary level, increase it every three years, and enforce it against the States—all on such slender a reed as that found in 29 U.S.C. § 213(a)(1).

The salary level test and indexing mechanism fail under the Court's "intelligible principle test." Under that test, the Supreme Court has said "that when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'"  *Whitman*, 531 U.S. at 472 (alteration in original) (quoting *J.W. Hampton, Jr., & Co. v. U.S.*, 276 U.S. 394, 409 (1928)).  Nothing in 29 U.S.C. § 213(a)(1) sets forth any intelligible principle for the DOL to establish the salary level test or the parameters of the indexing mechanism.  The statute merely instructs the Secretary to "define[] an delimit[]" the EAP terms "from time to time by regulations."  There are no guideposts, factors, or considerations that might establish a ceiling over which the DOL could not set the salary level test.  The DOL acknowledges the paucity of guidance provided by Congress, conceding that "Congress did not set forth *any criteria*, such as a salary level test, *for defining the EAP exemptions, but instead delegated that task to the Secretary*."  81 Fed. Reg. 32432 (emphasis added).  Without limiting principles from Congress, the DOL could continue to independently exercise the entirety of legislative power and executive power to completely exhaust State budgets and resources—without any protection from the "political process" as envisioned by *Garcia*.  No permissible interpretation of the Constitution allows the Federal Executive alone to exercise such unbridled and undirected power over the States.

### C.     Plaintiff States Will Be Irreparably Harmed.

"'When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable [harm] is necessary.'"  *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 470 (N.D. Tex. 2012) (alternation in original) (quoting *La. Seafood Mgmt. Council, Inc.*

45

*v. Foster*, 917 F. Supp. 439, 442 n.1 (E.D. La. 1996)).  Moreover, States suffer irreparable injury if their sovereign interests and public policies may be injured before they have a full and fair opportunity to be heard on the merits.  *Kansas v. U.S.*, 249 F.3d 1213, 1227 (10th Cir. 2001).  Even where damages are only economic, an injunction may issue if the likelihood that the plaintiff will actually be made whole is remote.  *Productos Carnic, S.A. v. Cent. Am. Beef & Seafood Trading Co.*, 621 F.2d 683, 686 (5th Cir. 1980).  This is especially so where States will be forced to expend significant sums of money to comply with a potentially unlawful federal mandate—money that the States will not be able to recoup regardless of whether they win.  *See Texas*, 809 F.3d at 186.

The new overtime rule inflicts irreparable constitutional injury on all States by trampling upon principles of federalism, tearing down the separation of powers, and infringing upon the sovereign rights that have been reserved to them under the Tenth Amendment.  These injuries by themselves are sufficient to warrant an injunction pending a full hearing on the merits and review by the appellate courts.  *See Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) ("Similarly, the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act may constitute irreparable injury.  In sum, Petitioners have shown irreparable injury."); *Nat'l Solid Wastes Mgmt. Ass'n*, 903 F. Supp. 2d at 470.

Moreover, the magnitude of the irreparable financial damage to the States also justifies an injunction.  The budgetary disaster chronicled above cannot be remediated if the Court later determines that the overtime rule is invalid.  The States will be forced to spend millions of unbudgeted funds or monies that would otherwise be spent on critical government services.  *Texas*, 809 F.3d at 186 ("The states have alleged a concrete threatened injury in the form of millions of dollars of losses."); *Texas*, 829 F.3d at 433 ("The tremendous costs of the emissions controls impose a substantial financial injury on the petitioner power companies which, in this circuit, may also be sufficient to show irreparable injury.") (quotation marks omitted).  Once additional salary or overtime is paid out to

46

employees, it cannot be easily recovered (if at all) even if the new rule is later invalidated.  (*See, e.g.*, Ex. 7 at ¶ 6(a).)  (Indiana: "As a practical matter, pay raises that would have to be granted to preserve the exemption cannot be taken back if USDOL's dictate is ultimately ruled invalid.  Similarly once an employee begins receiving time and a half overtime pay … it cannot … be taken away."); *compare Texas*, 809 F.3d at 186 ("retracting those benefits would be 'substantially difficult—if not impossible'").

A substantial portion of the States' monetary losses will go toward efforts to comply with, and prepare for, the effective date.  Kansas is illustrative.  "In order to mitigate the potential fiscal impact of this upcoming change, the State of Kansas agencies … must determine whether it would be more cost effective to increase the salary of these employees to the new minimum threshold or allow the employees to become non-exempt, and therefore eligible for overtime."  (Ex. 3 at ¶ 7.)  This is a "time intensive analysis of both the historical hours worked by these employees, as well as projections of hours that they will be expected to work after December 1, 2016, after taking into account any anticipated, new, or upcoming projects or responsibilities."  (*Id.* at ¶ 8.)  The analysis must be done on a case-by-case basis for almost every single one of Kansas's 550 impacted employees.  (*Id.* at ¶ 9.)  Completing the task will require "significant additional work for [the] State of Kansas HR, fiscal, and management staff in affect agencies, which will keep them away from their regular duties."  (*Id.*)  Due to the individualized nature of the employment and cost analysis, "the cost of this effort in either lost productivity or actual additional expenses cannot be fully accounted for … but it is anticipated to be substantial."  (*Id.*; *see also* Ex. 6 at ¶ 10; Ex. 8 at ¶¶ 6–7, 10–12.)

The brunt of the compliance costs will fall on two vital cabinet level agencies, the Kansas Department for Children and Families and the Kansas Department of Corrections.  (Ex. 3 at ¶ 10.)  Both agencies "have critical roles in protecting the citizens of the State of Kansas, so it is particularly concerning that HR, fiscal, and management staff will be taken away from their important jobs fulfilling the missions of these two critical agencies in order to perform the [compliance] analysis …."

47

(*Id.* at ¶ 12.)  These agencies are unable to simply increase the salaries of the impacted employees to keep their exemption because "the limited resources of both agencies are already being prioritized toward their critical, public safety-related function."  (*Id.* at ¶ 13.)

The Indiana State Personnel Department calculates that 7,900 hours have already been devoted to planning and training to implement the rule.  (Ex. 7 at ¶ 8(a).)  It expects that an additional 12,600 hours will be expended "to plan for implementation, train both management and staff, and execute the change from a technical standpoint."  (*Id.*; *see also* Ex. 2 at ¶ 6 (South Carolina "considering the costs involved in implementing the new [FLSA] Overtime Rule").)  There is no mechanism for the Plaintiff States to recover the time or expense incurred preparing for the unlawful rule.  "Indeed 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'"  *Texas*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)).

In the end, the citizens of the States suffer most.  Funds will be diverted from other governmental programs and services resulting in delays or outright termination.  (*See, e.g.,* Ex. 1 at ¶ 8; Ex. 2 at ¶ 6; Ex. 7 at ¶¶ 6(b), 8(b); Compl. at ¶¶ 68, 74.)  Only time will tell which States may have to eliminate some employment positions due to the new budgetary constraints thrust upon them against their will.  (*See* Compl. at ¶ 65.)  Forced employee reclassifications (and possibly terminations), program reductions, and service stoppages are undoubtedly irreparable harm necessitating an injunction pending this litigation.  *See Texas*, 829 F.3d at 434 (stating that threatened harm of unemployment, plant closures, and disruption of energy service "are great in magnitude" and "irreparable injury to Texans").

### D.  The Harm to the States Outweighs Any Harm from the Injunction.

On one side of the equation is the certainty that States will be required to spend substantial sums of unrecoverable public funds if the rule goes into effect, together with interference with

48

government services, administrative disruption, employee terminations or reclassifications, harm to the general public, and injury to fundamental notions of our Constitutional structure of government. On the other side, the DOL cannot point to any injury remotely approaching the enormous harm to the States and all of their citizens.  Basically, the DOL will need to wait a little longer before its novel rule goes into effect.  The current rule has been in place for more than a decade.  The DOL and the public will not suffer any harm from maintaining its status quo level while the serious constitutional and legal issues raised in this litigation are addressed.  *See Texas*, 809 F.3d at 186 ("The states have shown 'that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted.' …  The harms the United States has identified are less substantial[,] … vague, and the principles the government cites are more likely to be affected by the resolution of the case on the merits than by the injunction.").

  **E.**  **The Public Interest Necessitates a Preliminary Injunction.**

  "This factor overlaps considerably with the previous one, and most of the same analysis applies."  *Id.* at 187.  Considerations of federalism and the separation of powers are particularly important under this factor.  *Id.*  As shown, the new overtime rule upsets the balance of power between the States and the Federal Government as well as between Congress and the Executive.  The overtime rule visits harm upon the public by raiding State budgets, causing layoffs, and disrupting governmental functions.  It invades the sovereignty of the States' elected representatives to decide budget priorities, allocate employment costs, fund programs, and provide services in accordance with the needs (and means) of the citizenry.  And, to the extent Congress can dictate the wages that States must pay their employees, the DOL's new rule usurps that congressional power by imposing—through the Executive Branch alone—a salary level test and indexing that are not authorized by statute.  The Court should issue an injunction to halt these irreversible harms to the public.  *See id.* ("The public interest easily favors an injunction.").

### F.        Nationwide Injunction.

The Court's injunction should not be limited to this jurisdiction or to the Plaintiff States. "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamaski*, 442 U.S. 682, 702 (1979).  "[T]he Constitution vests the District Court with 'the judicial Power of the United States.'  That power is not limited to the district wherein the court sits but extends across the country.  It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas*, 809 F.3d at 188.  The Fifth Circuit has affirmed nationwide injunctions against the Federal Government in similar proceedings where principles of federalism and the separation of powers were at stake.  *See, e.g., id.*  If the Plaintiff States' arguments are likely to prevail, they apply everywhere.  A Nationwide injunction is appropriate here.

## IV. CONCLUSION

Based upon the foregoing, the Plaintiff States respectfully request that the Court enjoin the new overtime rule from becoming effective pending a full hearing on the merits and any review by higher courts.

Respectfully submitted,


Dated:  October 12, 2016.

By:  /s/  Lawrence VanDyke

ADAM PAUL LAXALT
  *Attorney General of Nevada*
LAWRENCE VANDYKE (TX Bar. 24063044)
 *Solicitor General*
JORDAN T. SMITH
  *Assistant Solicitor General*
STEVEN G. SHEVORSKI
  *Head of Complex Litigation*
OFFICE OF THE ATTORNEY GENERAL
100 North Carson Street
 Carson City, NV 89701
(775) 684-1100
LVanDyke@ag.nv.gov


*Counsel for Plaintiff States*

KEN PAXTON
  *Attorney General of Texas*
JEFFREY C. MATEER
 *First Assistant Attorney*
 *General*
BRANTLEY STARR
  *Deputy First Assistant Attorney*
 *General*
PRERAK SHAH (TX Bar. 24075053)
  *Senior Counsel to the Attorney*
 *General*
OFFICE OF THE ATTORNEY GENERAL
P.O Box 12548, Mail Code 001
Austin, TX 78711-2548
Prerak.Shah@texasattorneygeneral.gov


*Counsel for Plaintiff States*

[additional counsel and Governors listed on next page]

51

LUTHER STRANGE
Attorney General
State of Alabama

MARK BRNOVICH
Attorney General
State of Arizona

LESLIE RUTLEDGE
Attorney General
State of Arkansas

SAM OLENS
Attorney General
State of Georgia

GREG ZOELLER
Attorney General
State of Indiana

DEREK SCHMIDT
Attorney General
State of Kansas

JEFF LANDRY
Attorney General
State of Louisiana

DOUG PETERSON
Attorney General
State of Nebraska

MIKE DEWINE
Attorney General
State of Ohio

BILL SCHUETTE
Attorney General
State of Michigan

SCOTT PRUITT
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
South Carolina

SEAN REYES
Attorney General
State of Utah

BRAD SCHIMEL
Attorney General
State of Wisconsin

MATTHEW G. BEVIN
Governor
Commonwealth of Kentucky

TERRY E. BRANSTAD
Governor
State of Iowa

PAUL LEPAGE
Governor
State of Maine

SUSANA MARTINEZ
Governor
State of New Mexico

PHIL BRYANT
Governor
State of Mississippi

## CERTIFICATE OF SERVICE

I hereby certify that I served this document through the Court's electronic filing system and by email and mail on October 12, 2016 upon the following:

Julie Saltman, Esq.
Kevin Snell, Esq.
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
(202) 532−4252
Julie.Saltman@usdoj.gov
Kevin.Snell@usdoj.gov

*Counsel for Defendants*

/s/ Vicki J. Beavers

## CERTIFICATE OF CONFERENCE

I hereby certify that I have complied with the meet and confer requirement in LOCAL RULE CV-7(h).  I met and conferred with counsel for Defendants via email and telephone regarding the Plaintiff States' **EMERGENCY MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR ORAL ARGUMENT AND EXPEDITED CONSIDERATION.**  Counsel for Defendants stated that the Defendants opposed the requested injunction. The discussions conclusively ended in an impasse, leaving an open issue for the court to resolve. LR CV-7(i).

/s/ Lawrence VanDyke
Lawrence VanDyke

*Counsel for Plaintiff States*