**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| STATE OF NEVADA, *et al.*, | |
| Plaintiffs, | |
| v. | No. 4:16-CV-731-ALM<br>LEAD |
| UNITED STATES DEPARTMENT OF LABOR, *et al.*, | |
| Defendants. | |

## <u>DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.     Statutory Background ................................................................................................ 2

II.    Regulatory History.................................................................................................... 5

III.   Notice of Proposed Rulemaking ............................................................................... 8

IV.    Final Rule.................................................................................................................. 11

       A.     Standard Salary Level ....................................................................................... 11

       B.     Automatic Updating........................................................................................... 13

       C.     Duties Test ......................................................................................................... 15

V.     Procedural History .................................................................................................... 16

LEGAL STANDARD.......................................................................................................... 16

ARGUMENT ...................................................................................................................... 17

I.     The State Plaintiffs Have Not Established a Likelihood of Success on the Merits .......... 17

       A.     The State Plaintiffs Cannot Show a Tenth Amendment Violation ....................... 17

       B.     The Final Rule Must be Upheld as a Reasonable Interpretation of the Statute
             Entitled to Chevron Deference.............................................................................. 21

             1.     Section 213(a)(1) is Ambiguous and Congress Delegated Broad
                  Discretion to the Agency to Interpret it Through Regulation ................... 21

             2.     The Salary Level Test – and the Final Rule Salary Level – are
                  Entitled to Chevron Deference and Must be Upheld ............................... 25

             3.     The Automatic Updating Component Is Entitled to Chevron
                  Deference ................................................................................................ 31

             4.     The Final Rule Fully Complies with the APA's Procedural
                  Requirements .......................................................................................... 35

       C.     There is no Unlawful Delegation of Congressional Power ................................... 39

II.    The State Plaintiffs Have Not Demonstrated Irreparable Injury ....................................... 42

III.   The Harm to the Agency and to the Public Outweigh any Injury to the State
       Plaintiffs ................................................................................................................... 45

IV.    The State Plaintiffs Have Not Demonstrated Entitlement to a Nationwide Injunction .... 48

CONCLUSION ........................................................................................................................ 50

## TABLE OF AUTHORITIES

CASES

*A.L.A. Schechter Poultry Corp. v. United States,*
   295 U.S. 495 (1935) ........................................................................ 40

*Accord American Hospital Ass'n v. Harris,*
   625 F.2d 1328 (7th Cir. 1980) ...................................................... 45

*Agostini v. Felton,*
   521 U.S. 203 (1997) ........................................................................ 20

*Allen v. City of Texas City,*
   No. G-10-176, 2012 WL 1316568 (S.D. Tex. Mar. 6, 2012) ........................................... 19

*Am. Petroleum Inst. v. E.P.A.,*
   661 F.2d 340 (5th Cir. 1981) .................................................. 31, 37

*American Power & Light Co. v. SEC*,
   329 U.S. 90 (1946) .......................................................................... 40

*Anderson v. Jackson,*
   556 F.3d 351 (5th Cir. 2009) ........................................................ 17

*Associated Builders & Contractors of Texas v Nat'l Labor Relations Bd.*,
   826 F.3d 215 (5th Cir. 2016) ........................................................ 21

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
   875 F.2d 1174 (5th Cir. 1989) ................................................. 42, 44

*Aquifer Guardians in Urban Areas v. Fed. Highway Admin*,
   779 F. Supp. 2d 542 (W.D. Tex. 2011) ................................... 42, 45

*Auer v. Robbins,*
   519 U.S. 452 (1997) .................................................................. 20, 23

*Barrentine v. Arkansas-Best Freight Sys., Inc.,*
   450 U.S. 728 (1981) ..................................................................... 2, 41

*BNSF Ry. Co. v. United States*,
   775 F.3d 743 (5th Cir. 2015) ........................................................ 21

*Brown v. District of Columbia*,
   888 F. Supp. 2d 28 (D.D.C. 2012) .............................................. 45

*Byrum v. Landreth,*
   566 F.3d 442 (5th Cir. 2009) ................................................... 17, 46

iii

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ........................................................................................... 48

*Caplin & Drysdale, Chartered v. United States*,
    491 U.S. 617 (1989) ........................................................................................... 49

*Chevron U.S.A. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984) ........................................................................ 21, 22, 24, 33

*Commodity Futures Trading Comm'n v. Schor*,
    478 U.S. 833 (1986) ........................................................................................... 30

*ConocoPhillips Co. v. U.S. EPA*,
    612 F.3d 822 (5th Cir. 2010) ............................................................................. 25

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ............................................................................. 20

*Davis v. J.P. Morgan* Chase,
    587 F.3d 529 (2d Cir. 2009) .............................................................................. 41

*Digital Generation, Inc. v. Boring*,
    869 F. Supp. 2d 761 (N.D. Tex. 2012) .............................................................. 45

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) .......................................................................... 28, 36, 37

*Fanelli v. U.S. Gypsum Co.*,
    141 F.2d 216 (2d Cir. 1944) ................................................................. 27, 39, 42

*Friends of the Earth v. Laidlaw Envt'l Servs.*,
    528 U.S. 167 (2000) ........................................................................................... 49

*Garcia v. San Antonio Metropolitan Transportation Authority*,
    469 U.S. 528 (1985) ..................................................................................... 17, 18

*Gonannies, Inc. v. Goupair.Com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) .............................................................. 45

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ........................................................................................... 19

*Holland Am. Ins. Co. v. Succession of Roy*,
    777 F.2d 992 (5th Cir. 1985) ............................................................................. 42

*Hollon v. Mathis Indep. Sch. Dist.*,
    491 F.2d 92 (5th Cir. 1974) ............................................................................... 48

*Home Care Ass'n v. Weil,*
    799 F.3d 1084 (D.C. Cir. 2015) ............................................................................ 25, 33

*House the Homeless, Inc. v. Widnall,*
    94 F.3d 176 (5th Cir. 1996) ............................................................................ 16

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) ............................................................................ 17, 20

*Justin Indus., Inc. v. Choctaw Sec., L.P.,*
    920 F.2d 262 (5th Cir. 1990) ............................................................................ 48

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004)............................................................................ 49

*Lakedreams v. Taylor,*
    932 F.2d 1103 ............................................................................ 20

*Lewis v. Casey,*
    518 U.S. 343 (1996)............................................................................ 49

*Lion Health Servs., Inc. v. Sebelius,*
    635 F.3d 693 (5th Cir. 2011) ............................................................................ 48

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158, 165 (2007)............................................................................ 24, 25, 33

*Louisiana State v. United States Army Corps of Engineers,*
    --- F.3d ---2016 WL 4446067 (5th Cir. Aug. 23, 2016) ................................................ 24

*Loving v. United States,*
    517 U.S. 748 (1996)............................................................................ 40

*Matrix Partners VIII v. Nat. Res. Recovery,*
    2009 WL 175132 (E.D. Tex. Jan. 23, 2009)................................................................ 16

*McCabe v. Atchison, T. & S.F.R. Co.,*
    235 U.S. 151 (1914)............................................................................ 50

*McCormack v. Hiedeman,*
    694 F.3d 1004 (9th Cir. 2012) ............................................................................ 48

*Mistretta v. United States,*
    488 U.S. 361 (1989)............................................................................ 40, 41

*Morgan Cty., Bd. of Cty. Comm'rs,*
    166 F.3d 1222 (10th Cir. 1999) ............................................................................ 19

*Morrison v. Cnty. Of Fairfax, Va.,*
    No. 14-2308, 2016 WL 3409651 (4th Cir. June 21, 2016) ............................................. 19

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................................... 36

*Mylan Pharm., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) .................................................................................. 45

*Narvaez v. Wilshire Credit Corp.,*
    757 F. Supp. 2d 621 (N.D. Tex. 2010) .......................................................................... 45

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    132 S. Ct. 2566 (2012) ................................................................................................. 19

*Nat'l Park Hospitality Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) ............................................................................................... 38, 39

*Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.,*
    534 F. Supp. 2d 16 (D.D.C. 2008) ................................................................................ 46

*New York v. United States,*
    505 U.S. 144 (1992) ..................................................................................................... 19

*Panama Refining Co. v. Ryan,*
    293 U.S. 388 (1935) ..................................................................................................... 40

*PCI Transp., Inc. v. Fort Worth & W. R.R. Co.,*
    418 F.3d 535 (5th Cir. 2005) ........................................................................................ 43

*Printz v. United States,*
    521 U.S. 898 (1997) ..................................................................................................... 19

*Quijas, et al., v. Shearson/American Express, Inc.,*
    490 U.S. 477 (1989) ..................................................................................................... 20

*Reno v. Condon,*
    528 U.S. 141 (2000) ..................................................................................................... 18

*Robertson v. Morgan Cty., Bd. of Cty. Comm'rs,*
    166 F.3d 1222 (10th Cir. 1999) .................................................................................... 19

*Salinas v. United States,*
    522 U.S. 52 (1997) ....................................................................................................... 20

*Schlesinger v. Reservists Comm. to Stop the War,*
    418 U.S. 208 (1974) ..................................................................................................... 50

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    133 S. Ct. 817 (2013) ........................................................................................ 30

*Seminole Tribe of Fl. v. Florida*,
    517 U.S. 44 (1996) ........................................................................................... 19

*South Carolina v. Baker*,
    *485 U.S. 505 (1988)* ........................................................................................ 18

*Southdown, Inc. v. Moore McCormack Res., Inc.*,
    686 F. Supp. 595 (S.D. Tex. 1988) ................................................................... 46

*Star Satellite, Inc. v. City of Biloxi*,
    779 F.2d 1074 (5th Cir. 1986) .......................................................................... 46

*Supreme Beef Processors, Inc. v. U.S.D.A.*,
    275 F.3d 432 (5th Cir. 2001) ............................................................................ 29

*Texas Clinical Labs v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) ............................................................................ 30

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................................ 50

*Touby v. United States*,
    500 U.S. 160 (1991) ......................................................................................... 41

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995) ............................................................................... 45

*U.S. Dep't of Defense v. Meinhold*,
    114 S. Ct. 374 (1993) ....................................................................................... 48

*United States v. Mead Corp.*,
    533 U.S. 218 (2001) ......................................................................................... 22

*United States v. Lopez*,
    514 U.S. 549 (1995) ......................................................................................... 19

*United States v. Morrison*,
    529 U.S. 598 (2000) ......................................................................................... 19

*Utility Air Regulatory Grp. v. EPA*,
    --- U.S. ---, 134 S. Ct. 2427 (2014) ................................................................. 24

*Valley v. Rapodes Parish School Bd.*,
    118 F.3d 1047(1997) ........................................................................................ 44

*Walling v. Morris*,
    155 F.2d 832 (6th Cir. 1946) ........................................................................ 26

*Walling v. Yeakley*,
    140 F.2d 830 (10th Cir. 1944) ......................................................... 26, 39, 41

*Watchguard Techs., Inc. v. Valentine*,
    433 F. Supp. 2d 792 (N.D. Tex. 2006) ............................................. 42, 44, 46

*Weinberger v. Romero-Barcelo*,
    456 U.S. 305 (1982) ..................................................................................... 46

*West. v. Anne Arundel Cty., Md.*,
    137 F.3d 752 (4th Cir. 1998) ........................................................................ 19

*Whitman v. American Trucking Assoc.*,
    531 U.S. 457 (2001) ............................................................................... 40, 41

*Winter v. NRDC*,
    555 U.S. 7 (2008) ......................................................................................... 16

*Wirtz v. Mississippi Publishers Corp.*,
    364 F.2d 603 (5th Cir. 1966) ....................................................... 23, 26, 31, 34

STATUTES

5 U.S.C. § 553 ................................................................................... 15, 35
5 U.S.C. § 801 ........................................................................................ 16
29 U.S.C. § 202 ..................................................................................... 41
29 U.S.C. § 203 ..................................................................................... 21
29 U.S.C. § 206 ................................................................................. 2, 34
29 U.S.C. § 207 ....................................................................................... 2
29 U.S.C. § 213 ............................................................................... passim

REGULATIONS

29 C.F.R. part 541 ................................................................................... 5
29 C.F.R. 541.303 ................................................................................. 44
29 C.F.R. 641.600 ................................................................................. 44

OTHER AUTHORITIES

3 Fed. Reg. 2518 (Oct. 20, 1938) ...................................................... 5, 30
5 Fed. Reg. 4077 (Oct. 15, 1940) ................................................... 5, 6, 33
14 Fed. Reg. 7705 (Dec. 24, 1949) ................................................ 6, 33
28 Fed. Reg. 7002 (July 9, 1963) ......................................................... 7
35 Fed. Reg. 883 (Jan. 22, 1970) ......................................................... 7
40 Fed. Reg. 7091 (Feb. 19, 1975) ...................................................... 7

68 Fed. Reg. 15,560 (Mar. 31, 2003) ........................................................................................... 8

69 Fed. Reg. 22,122 (Apr. 23, 2004) ........................................................................... 7, 8, 34, 37

80 Fed. Reg. 38,516 (July 6, 2015) ............................................................................ 9, 10, 11, 35

81 Fed. Reg. 32,391 (May 23, 2016) .................................................................................. passim

Fair Labor Standards Act of 1938, Pub. L. No. 75-718, 52 Stat. 1060 ......................................... 2

Minimum Wage – American Samoa, Pub. L. 101-583, 104 Stat. 2871 (Nov.15, 1990)...... 4, 5, 30

National Industrial Recovery Act of 1933, Pub. L. 73-67, 48 Stat. 195........................................ 4

Pub. L. 87-30, 75 Stat. 65 (May 5, 1961) ........................................................................ 4, 6, 30

Pub. L. 89-601, 80 Stat. 830 (Sept.23, 1966)........................................................................ 4, 30

## INTRODUCTION

Responding to the compelling reality of economic changes over the course of time, nearly half a year ago the Department of Labor (the "Department") revised certain aspects of its overtime rules, giving employers some six months to prepare before the revision takes effect on December 1, 2016.  That rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees*, 81 Fed. Reg. 32,391 (May 23, 2016) (the "Final Rule" or "Rule"), revises final regulations under the Fair Labor Standards Act ("FLSA") implementing the exemption from minimum wage and overtime pay for executive, administrative, and professional employees ("EAP employees" or "EAP exemption").  For more than 75 years, the Department has used, in conjunction with an analysis of an employees' work duties, a minimum salary level that an employee must receive to qualify for the EAP exemption.  After a robust notice-and-comment rulemaking—in which more than 270,000 comments were reviewed—the Department promulgated the Final Rule to update the standard salary level and provide a method to keep that salary level current to better effectuate Congress's intent to exempt bona fide white collar workers from overtime protections. The State Plaintiffs' motion challenging these aspects of the Final Rule should be denied as they have failed to establish any of the four elements required to secure a preliminary injunction.

The State Plaintiffs' claims have no likelihood of success on the merits.  Supreme Court precedent forecloses their argument that the FLSA and its overtime requirements violate the Tenth Amendment.  Their claims that the salary level test—which the Department has used for more than 75 years and which the Fifth Circuit has upheld—and the automatic updating mechanism exceed the Department's statutory authority fail because the FLSA expressly grants authority to the Department to "define and delimit" the scope of the EAP exemption, and the agency here did so reasonably and in a procedurally proper fashion.  And their alternative

1

argument that Congress improperly delegated legislative authority to the Department is contrary to well-established precedent and in any event lacks merit.

Nor have the State Plaintiffs carried their burden as to the remaining preliminary injunctions here.  They have not clearly established that they will suffer irreparable harm without a preliminary injunction.  Indeed, two-thirds of the State Plaintiffs failed to even submit evidence to support such a showing.  And those that did simply submitted affidavits that estimated a cost without providing any rationale behind the calculation, used unrealistic assumptions regarding the Rule's application, or otherwise failed to meaningfully support their position.  Moreover, the State Plaintiffs failed to demonstrate that the threatened irreparable harm outweighs the harm an injunction causes Defendants and the public.  Indeed, an injunction would deprive more than four million workers of the protections Congress intended that they receive.

And even if a preliminary injunction were warranted (which it is not), the State Plaintiffs fail to make any showing that such relief should apply nationwide.  Because any relief should be tailored to any irreparable harm that the State Plaintiffs establish, a nationwide injunction would compound the error that would be present in any injunction in this case.

## BACKGROUND

### I.      Statutory Background

Congress enacted the FLSA in 1938 to protect workers "from the evil of overwork as well as underpay."  *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (internal quotation marks omitted); *see* Fair Labor Standards Act of 1938, Pub. L. No. 75-718, 52 Stat. 1060 (1938).  The FLSA generally requires covered employers to pay their employees at least the federal minimum wage (currently $7.25 an hour) for all hours worked, and overtime premium pay of one and one-half times the employee's regular rate of pay for any hours worked over 40 in a workweek.  *See* 29 U.S.C. 206(a)(1); 29 U.S.C. § 207(a)(1).  Section 13(a)(1) of the

FLSA, however, exempts from both minimum wage and overtime protection "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary" of Labor.  29 U.S.C. § 213(a)(1).[1]  The FLSA does not define the terms "bona fide executive, administrative, or professional capacity," but instead delegates to the Secretary of Labor the power to define and delimit these terms through regulation.  *Id.*

The Section 213(a)(1) exemption is premised on the idea that bona fide executive, administrative, and professional employees typically earn salaries well above the minimum wage and enjoy other privileges to compensate them for their long hours of work, setting them apart from nonexempt workers entitled to overtime pay.  *See* Report of the Minimum Wage Study Commission, Volume IV, pp. 236 and 240 (June 1981).  In addition, these employees typically perform work that by its nature cannot easily be spread to other workers after 40 hours in a

---

[1] The full text of Section 213(a)(1), as it is presently codified, reads as follows:

> The provisions of section 206 (except subsection (d) in the case of paragraph (1) of this subsection) and section 207 of this title shall not apply with respect to—

> (1) any employee employed in a bona fide executive, administrative, or professional capacity (including any employee employed in the capacity of academic administrative personnel or teacher in elementary or secondary schools), or in the capacity of outside salesman (as such terms are defined and delimited from time to time by regulations of the Secretary, subject to the provisions of subchapter II of chapter 5 of Title 5, except that an employee of a retail or service establishment shall not be excluded from the definition of employee employed in a bona fide executive or administrative capacity because of the number of hours in his workweek which he devotes to activities not directly or closely related to the performance of executive or administrative activities, if less than 40 per centum of his hours worked in the workweek are devoted to such activities).

29 U.S.C. § 213(a)(1).  Hereafter, Defendants refer to this provision of the FLSA as "Section 213(a)(1)," which reflects where it is codified in the United States Code.

workweek, generally precluding the potential job expansion intended by the overtime provision. *See id.* Prior to the passage of the FLSA, maximum hour requirements under the National Industrial Recovery Act codes similarly exempted executive, administrative, and professional employees, usually if they earned above a certain wage rate. *See* National Industrial Recovery Act of 1933, Pub. L. 73-67, § 3 48 Stat. 195, 196-97 (1933) (authorizing the President to approve codes of fair competition); Stein Report at 20 (noting that the majority of codes with maximum hour requirements exempting executive, administrative, and supervisory employees included a salary qualification).[2] State wage-and-hour laws in effect at the time also exempted executive, administrative, and supervisory employees, often based on a salary qualification. *See, e.g.*, Female Labor Act for Arkansas, Walter L. Pope & C.M. Buck, *Digest of the Statutes of Arkansas*, ch. 108, §§ 9084-9090, 1921, amended by Act 33, Laws 1937; Colorado Six-Day-Week Law, 1937 Colo. Sess. Laws 418; *see also* Stein Report at 20 (identifying ten State wage-and-hour laws in effect in 1939 that exempted executive, administrative, and supervisory employees based on a salary qualification).

Beginning in the 1960s, Congress amended Section 213(a)(1) several times to change the universe of executives, administrators, and professionals eligible for the exemption. *See* Pub. L. 87-30, 75 Stat. 65, Sec. 9 (May 5, 1961) (adjusting for expansion of FLSA coverage to retail employees); Pub. L. 89-601, 80 Stat. 830, Sec. 214 (Sept. 23, 1966) (exempting teachers and

---

[2] In 1940, 1949, and 1958, the Department published reports along with its revised Part 541 regulations. *See* Wage and Hour Division, U.S. Department of Labor, *Executive, Administrative, Professional . . . Outside Salesman Redefined: Report and Recommendations of the Presiding Officer (Harold Stein) at Hearings Preliminary to Redefinition* (Oct. 10, 1940) ("Stein Report"); Wage and Hour Division, United States Department of Labor, *Report and Recommendation on Proposed Revisions of Regulations, Part 541, by Harry Weiss, Presiding Officer* (June 30, 1949) ("Weiss Report"); Wage and Hour Division, United States Department of Labor, *Report and Recommendation on Proposed Revision of Regulations, Part 541, by Harry S. Kantor, Presiding Officer* (Mar. 3, 1958) ("Kantor Report")

academic administrative personnel); Pub. L. 101-583, 104 Stat. 2871, Sec. 2 (Nov. 15, 1990)

(instructing the Secretary to promulgate regulations exempting computer professionals).

## II.  Regulatory History

For more than 75 years, the Department's Part 541 regulations have generally defined

and delimited the terms "bona fide executive, administrative, or professional capacity" by use of

three criteria.  With some exceptions, for an employee to be exempt: (1) the employee must be

paid on a salary basis ("salary basis test"); (2) the employee must receive a minimum salary

amount ("salary level test"); and (3) the employee's job must primarily involve executive,

administrative, or professional duties ("duties test").  *See* 29 C.F.R. Part 541.

The Department issued the initial Part 541 regulations in October 1938, about four

months after the FLSA became law.  *See Regulations Defining and Delimiting the Terms*

*Pursuant to Section 13(a)(1) of the Fair Labor Standards Act*, 3 Fed. Reg. 2,518 (Oct. 20, 1938).

These regulations established a duties test for executive, administrative, and professional

employees, and set a minimum compensation level of $30 per week for exempt executive and

administrative employees.  *Id.*

Two years after the FLSA's passage, the Department held extensive public hearings and

revised the Part 541 regulations.  *See* Stein Report at 1-2; *Defining and Delimiting Terms*, 5 Fed.

Reg. 4,077 (Oct. 15, 1940).  Among other things, the revised regulations established the salary

basis test, retained a $30 per week salary level for executive employees, and established a $50

per week ($200 per month) salary level for administrative and professional employees.  *Id.*; Stein

Report at 23, 32, 43.  During the hearings, stakeholders—including many employers—generally

agreed on the desirability of a salary level test.  *See* Stein Report at 5.  Stakeholders noted that

the language of Section 213(a)(1) implies a "status" not attained by workers whose pay is close

to the minimum wage.  *Id.*  Moreover, Section 213(a)(1)'s use of the term "bona fide," specifically requires an employer's good faith, which is best demonstrated through the salary an employer pays.  *See* Stein Report at 5, 19, 26.

The Department again amended the Part 541 regulations nine years later, in 1949, this time establishing a two-tier structure for assessing compliance with the salary level and duties tests.  *See Defining and Delimiting Terms*, 14 Fed. Reg. 7,705, 7,706 (Dec. 24, 1949); 81 Fed. Reg. 32,401.  Employers could satisfy either a "long" test based on the previous test—combining a rigorous duties test and lower salary level—or a new "short" test—combining an easier duties test and a higher salary level.  *Id.*  The long duties test was more rigorous because it contained a bright-line, twenty percent limit on the amount of time an employee could spend performing nonexempt work.[3]  *See id.*; 14 Fed. Reg. 7,706.   The Department tied this more rigorous duties test to a salary level that would "exclude [from exemption] the great bulk of nonexempt persons."  Weiss Report at 18.  The short duties test, in contrast, did not limit the amount of time an exempt employee could spend on nonexempt duties.  *See* 14 Fed. Reg. 7,706; Weiss Report at 22-23.  The Department paired this less rigorous duties test with a "considerably higher" salary level: approximately 80 percent higher than the long test salary level for executives.  Weiss Report at 23; *see* 14 Fed. Reg. 7,706; *see also* 81 Fed. Reg. 32,402 n.24.   The Department reasoned that employees who met this higher salary level would meet the requirements of the long duties test—including the twenty percent limit on performing nonexempt work.  Weiss

---

[3] The Department had instituted a 20 percent cap on nonexempt work for executive and professional employees in 1940.  *See* 5 Fed. Reg. 4,077; *see also* Stein Report at 14, 33; 81 Fed. Reg. 32,401.  It added the cap for administrative employees in 1949.  *See* 14 Fed. Reg. 7,706; *see also* 81 Fed. Reg. 32,401.  In 1961, when Congress expanded FLSA coverage for retail employees, it amended Section 213(a)(1) to provide that exempt retail employees could spend up to 40 percent of their hours worked performing nonexempt work.  *See* Pub. L. 87-30, 75 Stat. 65, Sec. 9 (May 5, 1961).

Report at 23.

For the next five decades, the Department retained the "long" and "short" test structure. 81 Fed. Reg. 32,402-32,403.  The Department updated the salary levels four times between 1958 and 1975.  *See* 81 Fed. Reg. 32,402-32,403.  Beginning in 1958, the Department set the lower long test salary level to exclude approximately the lowest paid ten percent of salaried employees who passed the more rigorous long duties test in low wage regions, low wage industries, small establishments, and small towns.  *See* Kantor Report at 6-7; *see also* 81 Fed. Reg. 32,402.  The Department followed a similar methodology in 1963 and 1970, setting the salary at a level that excluded a small percentage of employees who satisfied the long duties test.  *See* T*entative Decision on Proposed Rulemaking*, 28 Fed. Reg. 7,002, 7,004 (Jan. 22, 1970); *Defining and Delimiting Terms*, 35 Fed. Reg. 883, 884 (Jan. 22, 1970); *see also* 81 Fed. Reg. 32,402.  In 1975, the Department set what were intended to be "interim" salary levels, adjusting the previous long test salary level for inflation.  *See Defining and Delimiting Terms*, 40 Fed. Reg. 7,091 (Feb. 9, 1975); *see also* 81 Fed. Reg. 32,402.  At each of these updates, the Department always set the short test salary level significantly higher than the long test salary levels.  *See* 81 Fed. Reg. 32,402-32,403; *see also* Table A., 81 Fed. Reg. 32,401.  Overall, the ratio of the short test salary level to the long test salary level ranged from approximately 130 percent to 180 percent during this period.  81 Fed. Reg. 32,402.

Nearly thirty years passed before the Department next updated the Part 541 regulations in 2004.  By this point the passage of time had eroded the long test salary levels below the amount a minimum wage employee earned for a 40-hour week, and even the short test salary levels were not far above the minimum wage.  *See Defining and Delimiting Exemptions*, 69 Fed. Reg. 22,122, 22,164 (Apr. 23, 2004); 81 Fed. Reg. 32,403.  Thus, as a practical matter, employers

used the short test, with its less rigorous duties requirement, and the long test fell out of operation. *See Defining and Delimiting Exemptions*, 68 Fed. Reg. 15,560, 15,564-65 (Mar. 31, 2003); 69 Fed. Reg. 22,126.  In 2004, the Department eliminated the "long" and "short" test structure and created a new "standard" test.  *See* 69 Fed. Reg. 22,164; *see also* 81 Fed. 32,403. Like the old short duties test, the new standard duties test did not limit the amount of nonexempt work an exempt employee could perform.  *See* 69 Fed. Reg. 22,127; *see also* 81 Fed. Reg. 32,411.  To accompany the standard duties test, however, the Department set a salary level test of $455 per week—equivalent to the lower salary that would have resulted from the methodology the Department previously used to set the lower long test salary levels.  *See* 69 Fed. Reg. 22,168; *see also* 81 Fed. Reg. 32,412.  The result was a less protective salary level with a less protective duties test.

In the same rulemaking, the Department also established a new test for "highly compensated employees."  Under this test, if an employee earned at least $100,000 a year, he or she needed to satisfy only a very minimal duties test.  *See* 69 Fed. Reg. 22,269.  In finalizing this change, the Department rejected a request from employer commenters to eliminate the duties test entirely and create a "salary only" test for highly compensated employees.  *See* 69 Fed. Reg. 22,173 (citing the United States Chamber of Commerce and others).  The Department disagreed that Congress authorized it to exempt workers from overtime protections merely because they are well paid.  *See id.*; *see also* 69 Fed. Reg. 22,174 ("The Administrator would undoubtedly be exceeding his authority if he included within the definition of these terms craftsmen, such as mechanics, carpenters, or linotype operators, no matter how highly paid they might be.").

### III.    Notice of Proposed Rulemaking

On July 6, 2015, the Department published a Notice of Proposed Rulemaking ("NPRM").

*See Defining and Delimiting Exemptions*, 80 Fed. Reg. 38,516 (July 6, 2015).  One of the

Department's primary goals in undertaking the rulemaking was updating the Section 213(a)(1)

exemption's salary level test, which had not been updated since it was last set in 2004 and was

not working to effectively distinguish between overtime-eligible employees and those who may

be exempt.  *See* 80 Fed. Reg. 38,517, 38,523; 81 Fed. Reg. 32,406.  The Department proposed

setting the standard salary level at the 40th percentile of weekly earnings for full-time salaried

workers nationally.  *Id.* at 38,517.  The Department projected that adopting this methodology in

the final rule would likely mean a salary level of $970 per week ($50,440 annually) using 2016

data.  *Id.* at 38,517 n.1.  In proposing to update the salary threshold, the Department sought to

reflect increases in actual salary levels nationwide since 2004, and to correct for the

Department's mismatch in 2004 of pairing the standard salary level (based on the old lower long

test salary) with the standard duties test (based on the old less rigorous short duties test).  *Id.* at

38,527-29.  The Department explained that because the standard duties test does not impose a

quantitative cap on nonexempt work, and is therefore significantly less rigorous than the long

duties test, any salary threshold tied to it must play a greater role in protecting overtime eligible

employees.  Alternatively, a significantly lower salary level would require a more rigorous duties

test in order to effectively differentiate between white collar employees who are overtime

protected and those who may be bona fide EAP employees.  *See id.* at 38,529, 38,533-34,

38,543.

The Department also proposed to establish a mechanism to automatically update the

salary level so that it remains a meaningful test for helping determine an employee's exempt

status.  *Id.* at 38,537. [4]  The Department explained that this would ensure that the salary test is based on the best available data (and thus remains a meaningful, bright line test), produce more predictable and incremental salary level changes, and promote government efficiency.  *Id.*  The Department requested comment on two possible automatic updating methodologies: updating the salary level based on a fixed percentile of earnings for full-time salaried workers (i.e., applying the same methodology used to set the initial salary level), and updating based on changes in the Consumer Price Index for All Urban Consumers ("CPI-U"), a commonly used index for measuring inflation.  *See id.*  The Department proposed automatically updating the salary level annually and announcing the new level at least 60 days before it would take effect.  *Id.* at 38,540.

Finally, the Department's proposal addressed the duties test, which has always worked in tandem with the salary level test to identify exempt EAP employees.  *Id.* at 38,542.  During listening sessions preceding publication of the NPRM, employer stakeholders universally urged the Department not to alter the duties test, while many employee representatives favored changes to make the duties test more rigorous.  *Id.*  In its proposal, the Department expressed concern that, as a result of the current regulations' pairing of a duties test based on the less rigorous short test with a salary level based on the long test for lower paid employees, lower-level employees might be inappropriately classified as ineligible for overtime pay, even though they are spending a significant time performing nonexempt work.  *Id.* at 38,543.  The Department invited input on

---

[4] The Department also proposed to automatically update the total annual compensation requirement for highly compensated employees, which the Department proposed setting equal to the annualized equivalent of the 90th percentile of earnings for full-time salaried workers ($122,148 annually).  *See* 80 Fed. Reg. 38,537.  This test is not mentioned in the Plaintiff States' motion, but if the Department lacks authority to establish a standard salary level test it presumably must also lack authority to permit employers to exempt highly compensated employees who meet a heightened compensation requirement and pass a minimal duties test and *vice versa*.

what, if any, changes should be made to the standard duties test.  In particular, the Department

sought comments on whether it should strengthen that test by returning to the "long" and "short"

test structure, or by restoring a quantitative limitation on nonexempt work through other means.

*See id.*  The Department allowed until September 4, 2015, for public comment.  *Id.* at 38,516.

## IV.     Final Rule

The Department received and carefully considered more than 270,000 timely comments

on the NPRM.  *See* 81 Fed. Reg. 32,432, 32,526.  Although in the NPRM the Department

specifically sought comments from state governments, *see* 80 Fed. Reg. 38,609, only a handful

of the 21 Plaintiff States submitted timely comments.[5]  On May 23, 2016, the Department

published its Final Rule.

### A.     Standard Salary Level

Commenters on the NPRM expressed a wide range of views on the appropriate salary

level.  Almost no commenters—and none of the State Plaintiffs that submitted comments—

questioned the Department's authority to establish a salary level test, favored eliminating the

salary test, or supported a duties-only test with no salary requirement.  The overwhelming

majority of commenters instead agreed that a salary level increase was needed, but differed

sharply on the appropriate level.  *Id.* at 32,405.  Commenters favoring a salary level at or above

the proposed level often highlighted that the proposed level was lower than historical *short* test

salary levels would dictate, while commenters supporting a lower threshold often stated that the

proposed level was out of step with historical *long* test salary levels.  *Id.* at 32,407.

Many commenters were concerned that setting the salary level at the 40th percentile of

---

[5]  These comments were submitted by state agencies.  *See, e.g.*, Georgia Department of
Administrative Services (Exh. G); Maine Department of Labor (Exh. H); Mississippi State
Personnel Board (Exh. I); the New Mexico State Personnel Board (Exh. J).

salaried workers nationally discounted salary disparities among different regions and industries. *Id.* at 32,407.  The Department had tried to account for these differences in its proposal, but agreed with commenters that an additional adjustment was needed.  *See* 81 Fed. Reg. 32,408. Accordingly, the Department switched from a national to a regional data set, and in the Final Rule set the standard salary level equal to the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census region (which is currently the South), or $913 per week ($47,476 for a full-year worker).  *Id.* at 32,405, 32,408.   The Department declined to adopt a higher salary level because of concerns that such a level would deny employers the ability to use the exemption for too many employees in low-wage regions and industries who perform EAP duties.  *Id.*

In response to commenters who favored only a minimal salary level increase, the Department reaffirmed that a significant increase from the level set in 2004 was needed both to account for the declining real value of the salary threshold and to correct for the Department's mistake in 2004 of setting the standard salary level without accounting for the elimination of the more rigorous long duties test.  *Id.* at 32,406.  As to concerns that too high a salary level would exclude from exemption too many employees who satisfied the standard duties test, the Department reiterated that the salary level test and the duties test have always worked in tandem to identify bona fide EAP employees, and explained that an employee's meeting of the duties test, especially the more lenient standard duties test, does not alone indicate that he or she is a bona fide executive, administrative or professional employee.  *Id.* at 32,413.

The salary level established in the Final Rule corresponds to the low end of the historical range of salaries for the short duties test on which the current standard duties test is based.  *Id.* at

32,410.[6]  Reaffirming that the salary level test should "provide an 'index to the 'bona fide'

character of the employment for which the exemption is claimed,'" *id.* 32,406 (quoting Stein

Report at 19), the Department concluded the new methodology appropriately balanced the need

to protect overtime eligible workers while reducing undue exclusions of bona fide EAP

employees from the exemption.  *Id.* at 32,414.[7]  It also avoided the need to impose a quantitative

limit on nonexempt work as part of the standard duties test—an alternative that commenters

requesting a smaller increase to the salary level strongly opposed.  *Id.*

### B.      Automatic Updating

The Department also received considerable feedback on its automatic updating proposal.

In the Final Rule preamble, the Department first responded to commenters who questioned its

authority to institute this change, concluding that establishing an updating mechanism though

notice and comment rulemaking is a permissible exercise of its delegated authority under Section

213(a)(1).  *See id.* at 32,430-33.  As to whether the Department should institute automatic

updating, those supporting this change generally agreed with the rationale presented in the

NPRM and emphasized the benefits to employees and employers of maintaining an up-to-date

salary level, while those opposed emphasized the burdens this change posed for employers.  *Id.*

at 32,433.

After examining the submitted comments, and considering its past refusals to institute an

---

[6]  As previously discussed, the short test salary level historically ranged from 130 to 180 percent
of the long test salary level, which equates to amounts from $889 to $1,231 per week (measured
in FY2015 dollars).  81 Fed. Reg. 32,404, 32,410, 32,463.

[7]  At the urging of many employer stakeholders, in the Final Rule the Department also modified
the EAP exemption regulations to, for the first time, permit nondiscretionary bonuses and
incentive payments (including commissions) to satisfy up to 10 percent of the salary test.  *See* 81
Fed. Reg. 32,426.  This change, which is not mentioned in the Plaintiff States' motion, would
become moot if the Department lacks authority to establish a salary level test.

updating mechanism, the Department decided to finalize this aspect of its proposal.  Agreeing

with many commenters, the Department explained that a fixed and outdated salary level

increases the risk of employees being inappropriately classified as exempt as the real value of the

salary threshold falls, while automatic updating using the most recent BLS salary data will

ensure that the salary level reflects current salary conditions and thus can fulfill its intended

function.  *See id.* at 32,435.  However, in response to commenter concerns about the financial

and administrative burdens associated with updating the salary level annually, the Department

changed the updating frequency from every year to every three years.  *See id.* at 32,438.[8]

As to the automatic updating method, the Department chose the fixed percentile

approach.  *Id*. at 32,440.  The Department explained that the same reasons that justified setting

the salary level at the 40th percentile of full-time salaried workers in the lowest-wage Census

region supported updating using this method, whereas updating using the CPI-U could cause

future salary levels to deviate from the underlying salary setting methodology that the

Department determined in the Final Rule works best with the standard duties test.  *See id.* at

32,440.  While the Plaintiff States that submitted comments expressed many concerns with

automatic updating, several agreed that the fixed-percentile method was more appropriate than

CPI-U-based updating.  *See, e.g.*, Georgia Dep't of Administrative Services (Exh. G); Maine

Dep't of Labor (Exh. H); Mississippi State Personnel Board (Exh. I).  Finally, to promote a

smooth transition to future salary levels, the Department increased the period between

announcing updated salary levels and the effective date of the updates from 60 days to at least

---

[8]  Similarly, the Final Rule provides that the Department will automatically update the total
compensation level for highly compensated employees triennially to keep it at the annualized
equivalent of the 90th percentile of the weekly earnings of full-time salaried workers nationwide.
81 Fed. Reg. 32,443.

150 days, and set January 1 of the relevant year as the effective date for future salary level updates. *Id.* at 32,431.

### C.  Duties Test

In the Final Rule, the Department also examined commenter responses to the questions posed in the NPRM concerning the duties test.  While employee representatives often favored strengthening the duties test by, for example, limiting the amount of nonexempt work an exempt employee could perform, most employer commenters strenuously opposed any changes to the duties test.  *See id.* at 32,445-47.  For example, the Georgia Department of Administrative Services, the Mississippi State Personnel Board, and the New Mexico State Personnel Board all opposed modifying the duties test to add a limit on nonexempt work.  *See* Exhs. G, I, J.  The Mississippi State Personnel Board stated that "[r]estricting the percentage of time overtime-exempt employees spend on overtime-protected tasks would have a serious impact on certain public services and is not a restriction that can be practically monitored."  *See* Exh. I at 4.[9]

The Department ultimately decided to not make any changes to the duties test, concluding that the new salary level coupled with automatic updating adequately addressed the problems and concerns that motivated the questions posed in the NPRM about the standard duties test.  *Id.* at 32,444.

Last, in response to commenter concerns about implementation, the Department delayed the Final Rule's effective date by 191 days, to December 1, 2016.  *Id.* at 32,399.  This exceeded the 30-day minimum required under the Administrative Procedure Act, 5 U.S.C. § 553(d), and the 60 days mandated for a "major rule" under the Congressional Review Act, 5 U.S.C.

---

[9] Similarly, nearly all of the plaintiffs representing private employers in *Plano Chamber of Commerce, et al. v. Perez et al.*, 4:16-cv-732-ALM opposed changes to strengthen the standard duties test.  *See, e.g.*, National Federation of Independent Business Comment (Exh. K), at 5-6.

§ 801(a)(3)(A).  It is also more than the 120-day delayed effective date following the 2004 Final

Rule, which significantly changed both the salary level and duties tests.  81 Fed. Reg. 32,399.

### V.        Procedural History

The State Plaintiffs filed their complaint on September 20, 2016.  *See* ECF No. 1.  The

Plano Chamber of Commerce and more than fifty other business organizations filed a complaint

challenging the Final Rule in this Court on the same day.  *See Plano Chamber of Commerce, et*

*al. v. Perez, et al.*, No. 4:16-CV-732-ALM, ECF No. 1.  On October 12, 2016, the State Plaintiffs

moved for preliminary injunctive relief.  *See* ECF No. 10.  The plaintiffs in *Plano Chamber of*

*Commerce* moved for "expedited summary judgment" on October 14, 2016.  *See* ECF No. 7 in

case no. 4:16-cv-732-ALM.  The Court consolidated these two cases on the unopposed motion of

the plaintiffs in *Plano Chamber of Commerce*.  *See* ECF No. 11 in case no. 4:16-cv-732-ALM.

The Court will hear argument on the motion for preliminary injunctive relief on November 16,

2016.

### LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a

clear showing that the plaintiff is entitled to such relief."  *Winter v. NRDC*, 555 U.S. 7, 22

(2008).  Indeed, the Fifth Circuit "frequently cautions" that "'the decision to grant a preliminary

injunction is to be treated as the exception rather than the rule.'"  *Matrix Partners VIII v. Nat.*

*Res. Recovery*, 2009 WL 175132, at *6 (E.D. Tex. Jan. 23, 2009), quoting *House the Homeless,*

*Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996).  To obtain a preliminary injunction, a movant

must demonstrate

> (1) A substantial likelihood of success on the merits, (2) a substantial threat of
> irreparable injury if the injunction is not issued, (3) that the threatened injury if
> the injunction is denied outweighs any harm that will result if the injunction is
> granted, and (4) that the grant of an injunction will not disserve the public
> interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011). Relief "should only be granted when the movant has clearly carried the burden of persuasion" on all four requirements. *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009). The State Plaintiffs cannot carry this heavy burden.

## ARGUMENT

### I. The State Plaintiffs Have Not Established a Likelihood of Success on the Merits

The State Plaintiffs have not established a substantial likelihood of success on the merits of any of their claims. This alone is fatal to their request for injunctive relief. *See Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009).

#### A. The State Plaintiffs Cannot Show a Tenth Amendment Violation

Despite acknowledging Supreme Court precedent to the contrary, the State Plaintiffs assert that the Final Rule, and by extension the FLSA, should be deemed unconstitutional under the Tenth Amendment as applied to the states. That argument is squarely foreclosed by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985), in which the Supreme Court held that there is no Tenth Amendment violation where a governmental employer "faces nothing more than the same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet." *Id.* at 554. After *Garcia*, it is hornbook law that the federal government may subject state and local-government employers to the same standards that apply to private-sector employers. *See, e.g.*, William J. Rich, Modern Constitutional Law § 35:15 (3d ed.) (*Garcia* "restored the previously accepted view that, as long as Congress acted within its enumerated powers, it could regulate state as well as private entities"); Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law – Substance and Procedure § 4.10(d)(ii)(6) (2014) ("Until such time as *Garcia* might be overruled, the Court will not create a judicially enforceable limit on the extent of the federal commerce power to

17

subject state and local governments to commercial regulations of the type that govern private sector activities.").

Such generally applicable laws—like the FLSA and its overtime requirements—survive constitutional scrutiny even if they impose costs on state or local governments. *See Garcia*, 469 U.S. at 554; *see also South Carolina v. Baker*, 485 U.S. 505, 515 & n.8 (1988) (noting with approval that, "[a]fter *Garcia*, for example, several States and municipalities had to take administrative and legislative action . . . or raise the funds necessary to comply with the wage and overtime provisions of the" FLSA); *see also Reno v. Condon*, 528 U.S. 141, 150 (2000) (rejecting unanimously a Tenth Amendment challenge even though it "agree[d] with South Carolina's assertion" that the Driver's Privacy Protection Act "requires the State's employees to learn and apply the Act's substantive restrictions, . . . [and] that these activities will consume the employees' time and thus the State's resources."). Indeed, the crux of the State Plaintiffs' argument here — *i.e.*, that imposing financial obligations upon a state can force it to make budgetary adjustments — is identical to the argument in the *Garcia* dissent, which the majority declined to adopt. *See Garcia*, 469 U.S. at 557, 578 (Powell, J., dissenting) ("The financial impact on States and localities of displacing their control over wages, hours, overtime regulations, pensions, and labor relations with their employees could have serious, as well as unanticipated, effects on *state and local planning*, *budgeting, and the levying of taxes*." (emphasis added)). "Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *South Carolina*, 485 U.S. 505, 514-15 (1988).

Dissatisfied with Supreme Court precedent, the State Plaintiffs ask this Court to change

it.  They assert that "*Garcia* has been—or should be—overruled," Pls.' Br. In Support of their

Mot. for Prelim. Inj. ("Pls.' Br.") at 26, ECF No. 10, and that "[s]cholars have debated" the

FLSA's continued application to the States.  But the State Plaintiffs cite no case overruling

*Garcia*, and although they cite a number of cases that allegedly call its "continuing validity into

question," Pls.' Br. 26 & n.15, those decisions do no such thing and are irrelevant.  None of those

cases addresses (or questions) the widely accepted principle that generally applicable laws—like

the FLSA and its overtime requirements—can be applied to states.[10]  Indeed, courts have

consistently rejected arguments like the State Plaintiffs' here, holding that *Garcia* remains

binding.  *See W. v. Anne Arundel Cty., Md.*, 137 F.3d 752, 757-58, 760 (4th Cir. 1998) (holding

FLSA constitutional under *Garcia*), *superseded on other grounds as stated in Morrison v. Cnty.

Of Fairfax, Va.*, 826 F.3d 758 (4th Cir. 2016); *Robertson v. Morgan Cty., Bd. of Cty. Comm'rs*,

166 F.3d 1222, 1999 WL 17787, at *7 (10th Cir. Jan. 6, 1999) (table) ("[I]t would be

inappropriate for this court to conclude that *Garcia* has been overruled by *Printz*."); *Allen v. City

of Texas City*, No. G-10-176, 2012 WL 1316568, at *1 (S.D. Tex. Mar. 6, 2012) ("Unless or until

the Supreme Court overrules *Garcia,* its holding controls and, as such, the FLSA applies to the

---

[10] *See New York v. United States*, 505 U.S. 144, 160, 166 (1992) (explaining that "this is not a case in which Congress has subjected a State to the same legislation applicable to private parties," and holding that "the Commerce Clause . . . authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce"); *Printz v. United States*, 521 U.S. 898, 935 (1997) ("We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly."); *United States v. Morrison*, 529 U.S. 598, 613 (2000) (holding that Congress's authority under Commerce Clause did not extend to proscribed noneconomic activity); *United States v. Lopez*, 514 U.S. 549, 551, 561 (1995) (holding the same as *Morrison*); *Seminole Tribe of Fl. v. Florida*, 517 U.S. 44, 53, 61 (1996) (holding Congress lacked authority under Indian Commerce Clause to abrogate Eleventh Amendment state sovereign immunity); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2606 (2012) (holding expansion of Medicaid not a valid exercise of Congress's spending clause authority); *Gregory v. Ashcroft*, 501 U.S. 452, 464, 470 (1991) (holding Age Discrimination in Employment Act of 1967 did not apply to state judges).

Defendant City.").  And the Supreme Court declined to revisit *Garcia* in holding that

Section 213(a)(1) gives the Department "broad authority" to issue legally binding rules that

apply to public-sector employers.  *Auer v. Robbins*, 519 U.S. 452, 456-58 (1997).

The State Plaintiffs recognize that "[t]his court may likewise be constrained from

overruling *Garcia*."  Pls.' Br. at 27.  Indeed, it is.  As the Supreme Court has instructed, even if

its precedent "'appears to rest on reasons rejected in some other line of decisions,'" if that

precedent has "'direct application in a case . . . the Court of Appeals should follow the case

which directly controls, leaving to this Court the prerogative of overruling its own decisions.'"

*See Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v.*

*Shearson/American Express, Inc.,* 490 U.S. 477, 484 (1989)).  *Garcia* directly applies here.[11]

The State's citation to the clear statement rule is inapposite.  That rule provides that when

"a statute [is] susceptible of two plausible interpretations, one of which would have altered the

existing balance of federal and state powers," the statute should be read to maintain the existing

balance absent a clear indication from Congress.  *See Salinas v. United States,* 522 U.S. 52, 59

(1997).  That rule has no application here, and *Garcia* forecloses any argument to the contrary.

*See supra* at 17-20.  Overlooking this, the State Plaintiffs assert that a "clear statement of

Congress would be necessary to impose any salary level test on the States," Pls.' Br. at 40, and

---

[11] The State Plaintiffs also say that they have somehow demonstrated a "prima facie case" that *Garcia* has been overruled.  *See* Pls.' Br. at 27; *see also id.* at 17. The State Plaintiffs' argument is foreclosed by governing law and thus they have *no* likelihood of success on the merits; their hope that that law will someday change is irrelevant.  *See Janvey*, 647 F.3d at 595 (explaining that plaintiff must "establish" a "substantial likelihood of success on the merits"); *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) ("A preliminary injunction is an extraordinary remedy.").  The cases cited by the State Plaintiffs do not counsel otherwise; those cases stand for the unremarkable proposition that a movant offering evidence to support a fact-based claim need not prove that the movant will ultimately prevail.  *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013) (discussing fact-based claim); *Janvey*, 647 F.3d at 599 (same).

that using salaries to gauge the exemption is contrary to Congress's intent to exempt "any employee employed in a bona fide executive, administrative, or professional capacity."  But the FLSA and its overtime requirements expressly apply to states, *see* 29 U.S.C. § 203(s)(1)(C); 29 U.S.C. § 203(x), and the FLSA expressly delegates to the Department of Labor the authority to "define and delimit" "any employee employed in a bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1).  Thus Congress plainly intended the Department to define and delimit the overtime exemptions as it has done with the new rule, and that this generally applicable rule should apply to state governments.

### B.  The Final Rule Must be Upheld as a Reasonable Interpretation of the Statute Entitled to *Chevron* Deference

#### 1.  Section 213(a)(1) is Ambiguous and Congress Delegated Broad Discretion to the Agency to Interpret it Through Regulation

Because section 213(a)(1) explicitly grants authority to the Department to define and delimit the terms "bona fide executive, administrative, or professional capacity," and the agency did so reasonably and through a robust notice-and-comment rulemaking process, the Court must defer to the agency's reasonable interpretation of the statute.  The State Plaintiffs, therefore, cannot show any likelihood of success on the merits of their substantive APA claims.  Under any of their legal theories, the State Plaintiffs cannot meet their "high burden" "of demonstrating that no set of circumstances exists under which this regulation would be valid."  *Associated Builders & Contractors of Tex. v Nat'l Labor Relations Bd.*, 826 F.3d 215, 229, 226 (5th Cir. 2016).

In evaluating the validity of an agency's reading of a statute, "'[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'"  *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015) (quoting *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984)).

21

However, if "the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step of the *Chevron* analysis, asking whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

Here, the phrase "bona fide executive, professional, or administrative capacity" is ambiguous, so this case cannot—contrary to the State Plaintiffs' assertion—"be decided at *Chevron*'s step one." Pls.' Br. at 31. Section 213(a)(1) exempts from the FLSA's minimum wage and overtime protections "any employee employed in a bona fide executive, administrative, or professional capacity . . . *as such terms are defined and delimited from time to time by regulations of the Secretary.*" 29 U.S.C. § 213(a)(1) (emphasis added). Thus Congress contemplated that the terms in this statutory provision are ambiguous and expressly delegated to the Department the authority to interpret them. It is well-settled that, where Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency," and "any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to law." *U.S. v. Mead Corp.*, 533 U.S. 218, 227 (2001). The Final Rule was promulgated under express Congressional authority to fill just such gaps regarding the scope of the Section 213(a)(1) exemption; the Department did so through notice-and-comment rulemaking in a way that brought the exemption's criteria more in line with the policy objectives of the FLSA. *See* Fed. Reg. 32,400. Indeed, the Department has issued such regulations defining the scope of the exemption nearly fifteen times since the FLSA was enacted, pursuant to the statutory command to "define[] and delimit[]" the terms by regulation. *See* Fed. Reg. 32395; 29 U.S.C. § 213(a)(1).

The State Plaintiffs' claim that Congress unambiguously defined the scope of this exemption in a specific way—thus triggering *Chevron*-step-one analysis, *see* Pls.' Br. at 31—is

not only belied by the plain language of the statute, but it is also foreclosed by Fifth Circuit

precedent.  The Fifth Circuit has already held that the FLSA grants the Secretary "broad latitude"

to define and delimit the section 213(a)(1) exemption—including by adopting a salary level test

that excludes from exemption some employees who satisfy the duties test.  *See Wirtz v.*

*Mississippi Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966).  That case began as an FLSA

enforcement action involving employees who met the duties test then in place, but whose salary

was effectively below the then-applicable salary test.  *Id.* at 605-07.  Like the State Plaintiffs

here, the employer-appellee argued that "the minimum salary requirement is not a justifiable

regulation under Section [2]13(a)(1) of the Act" because the salary test was "not rationally

related to the determination of whether an employee is employed in a 'bona fide executive . . .

capacity.'"  *Id.* at 608.  Although *Mississippi Publishers Corporation* predates *Chevron*, the

Court of Appeals rejected this argument with a two-step analysis presaging that decision.  First,

the Fifth Circuit confirmed that Section 213(a)(1) "gives the Secretary broad latitude to 'define

and delimit the meaning of the term 'bona fide executive [. . .] capacity."  *Id.*  In other words,

Section 213(a)(1) does not speak "directly" or "unambiguously" about  the types of executive

employees that "must" be exempt from the FLSA's overtime and minimum wage requirements.

*See* Pls.' Br. at 31.  Then, relying on this "broad latitude," the Court of Appeals held that "the

minimum salary requirement [was not] arbitrary or capricious."  *Id.*  In reviewing the

Department's interpretation of a different regulation interpreting Section 213(a)(1), the Supreme

Court recognized that "[t]he FLSA grants the Secretary broad authority to 'defin[e] and

delimi[t]' the scope of the exemption for executive, administrative, and professional employees."

*See Auer*, 519 U.S. at 456.

Notwithstanding this clear precedent, the State Plaintiffs attempt to argue, based on an

examination of the dictionary definitions of Section 213(a)(1)'s terms, that the language is in fact unambiguous.  For example, the State Plaintiffs claim that the term "capacity" somehow unambiguously signals Congress's intent for the Department to define the exemption in terms of duties alone.  But the State Plaintiffs' focus misses the relevant point—Congress delegated to the Department the authority to define the term "capacity" as well as "bona fide executive, administrative, or professional capacity."  Because the FLSA does not "directly address the precise question at issue in this case," *Chevron,* 467 U.S. at 843, the Court should review the agency's interpretation under the deferential standard applied at the second step of *Chevron,* and decide whether "the agency has acted reasonably and thus has 'stayed within the bounds of the law,'" *Louisiana State v. U.S. Army Corps of Engineers,* --- F.3d ---, No. 15-30962, 2016 WL 4446067, at *4 (5th Cir. Aug. 23, 2016), quoting *Utility Air Regulatory Grp. v. EPA,* 134 S. Ct. 2427, 2439 (2014).[12]

Under this same analytical framework, the Supreme Court upheld a different regulation interpreting another statutory exemption to the FLSA's minimum wage and overtime protections in *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 165-171 (2007).  Because in the relevant statutory provision, the FLSA "explicitly [left] gaps . . . as to the scope and definition of statutory terms such as 'domestic service employment' and 'companionship services,'" the Court deferred to the Department's interpretation of those terms under *Chevron,* holding that "Congress intended its broad grant of definitional authority to the Department to include the

---

[12] Moreover the dictionary definitions of these phrases fully support the Department's use of a salary level test alongside a duties test.  "Capacity" was defined, for example, as "position," 2 *Capacity,* The Oxford English Dictionary 89 (1933 ed.), which was in turn understood to mean "relative place, situation, or standing; specif[ically], social or official rank or status," Webster's Dictionary at 774 (1942).  Nothing about the historic definition of "capacity" limits the term to the narrow meaning the States attempt to ascribe to it.

authority to answer these kinds of questions."  *Id.* at 168; *see also Home Care Ass'n v. Weil*, 799

F.3d 1084, 1090-92 (D.C. Cir. 2015) (addressing a challenge to a subsequent 2013 regulation

interpreting those terms and holding that the grant of authority to the Department to interpret the

relevant terms precluded resolving the matter at *Chevron* step one).  Thus the Court must review

the Final Rule under the highly deferential *Chevron* standard, in accordance with Fifth Circuit

and Supreme Court precedent.

### 2.   The Salary Level Test—and the Final Rule Salary Level—are Entitled to *Chevron* Deference and Must be Upheld

In reviewing the salary level test and Final Rule salary level under *Chevron* step two, the

Court "owe[s] substantial deference to [the] agency's construction of a statute that it

administers."  *Id.* (internal quotation omitted).  "An agency's interpretation is permissible if it is

reasonable.  The question of reasonableness is not whether the agency's interpretation is the only

possible interpretation or whether it is the most reasonable, merely whether it is reasonable *vel*

*non*." *ConocoPhillips Co. v. U.S. EPA*, 612 F.3d 822, 831 (5th Cir. 2010) (citation omitted).[13]

The State Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their

claims under the APA.  The Final Rule is a reasonable interpretation of Section 213(a)(1), and

one that effectuates the intent of Congress in creating the EAP exemption.

Plaintiffs argue that the salary level test is "unlawful," Pls.' Br. at 37, but the regulatory

history, not to mention Fifth Circuit precedent, support the Department's authority to consider

such a test.  For more than 75 years, the Department has interpreted the terms "bona fide

executive, administrative, or professional capacity" by use of the salary basis test, the salary

---

[13] The State Plaintiffs state that that the clear-statement rule somehow "flips the normal
deference given to agency interpretations of ambiguous statues as applied to States."  Pls.' Br. at
30 n.16.  As addressed *supra* at 20-21, that rule provides no barrier to the Department's
regulation here.

level test, and the duties test.  81 Fed. Reg. 32,400-03.  The salary level test helps implement

Congress's instruction that only "bona fide" executive, administrative, and professional

employees be exempt from minimum wage and overtime protections.  *See* Stein Report at 5

(explaining that "the good faith specifically required by the act is best shown by the salary

paid"); *id.* at 19 (explaining that the salary an employer pays an employee provides "a valuable

and easily applied index to the 'bona fide' character of the employment for which exemption is

claimed").  As the Department explained as early as 1940, "if an employer states that a particular

employee is of sufficient importance to be classified as an 'executive' employee," for example,

"and thereby exempt from the protection of the act, the best single test of the employer's good

faith in attributing importance to the employee's services is the amount he pays for them."  *Id.*;

*see also* Weiss Report at 9 ("salary is the best single indicator of the degree of importance

involved in a particular employee's job").  The salary test thus ensures that the Section 213(a)(1)

exemption does not "invite evasion" of the minimum wage and overtime requirements for "large

numbers of workers to whom the wage-and-hour provisions should apply."  Stein Report at 19.

 If the Court were to adopt the State Plaintiffs' argument that the Department lacks

authority to set a salary level test—indeed that the salary level test has "always been unlawful,"

Pls.' Br. at 37—all of the Department's regulations since the test was adopted in 1938, including

the 2004 rule that is currently in place, would be unlawful.  Such a holding would be contrary to

the Fifth Circuit's decision upholding the salary level test as a reasonable decision made under

the FLSA's "broad latitude."  *Mississippi Publishers Corp.*, 364 F.2d at 608.  The Fifth Circuit is

not alone; every other circuit that has considered the question has upheld the validity of the

salary level test. *See Walling v. Morris*, 155 F.2d 832, 836 (6th Cir. 1946), *vacated sub nom.*

*Morris v. McComb*, 332 U.S. 422 (1947); *Walling v. Yeakley*, 140 F.2d 830 (10th Cir. 1944);

*Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944).

Moreover, the State Plaintiffs' assertion that the Department in the Final Rule has abandoned the duties test in favor of a "salary-only test," *see* Pls.' Br. at 36, is mistaken.  Under the Finale Rule, the Department continues the well-established practice of relying on both a duties test and a salary test to define and delineate those employees who should qualify for the EAP exemption.  To be clear, the Final Rule changed the methodology for calculating the salary level threshold so that it better identifies, when read in tandem with the less rigorous standard duties test adopted in 2004, the bona fide EAP employees Congress intended to exempt from overtime protection.  But this change was necessary because the methodology used to set the 2004 salary level was derived from the old "long" salary test—which the Department set at the low end of salaries and paired with a rigorous duties test that imposed a cap on nonexempt work—while the standard duties test established in 2004 was based on the old "short" duties test—which did not impose such a cap, and with which the Department historically paired a higher salary level that was between 130 and 180 percent of the long test salary level.

The Final Rule does not make changes to the 2004 duties test (which employer commenters, including several of the State Plaintiffs opposed, *see supra* at 15).  Instead, it adopts a methodology for calculating the salary level test which results in a salary level threshold at the low end of the historical range of short test salary levels, based on the historical ratios between the short and long test salary levels.  *See* 81 Fed. Reg. 32,405.  The Department established this methodology to correct the "mismatch in the 2004 Final Rule between a low salary threshold and a less rigorous duties test," 81 Fed. Reg. 32,409, not to make the duties test obsolete, as the State Plaintiffs claim, *see* Pls.' Br. at 36.  Furthermore, to the extent the Final Rule changes the salary level set forth in the 2004 final rule, it did so to ensure that the test (when read with the duties

test adopted in 2004) more accurately identifies bona fide EAP employees.  "Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) (citation omitted).  The agency's comprehensive analysis of its reasons for adopting the salary level test methodology it chose in the 2016 Final Rule "display[s its] awareness that it is changing position" and "show[s] that there are good reasons for the new policy," which entitles the agency's interpretation to considerable deference under *Chevron*.  *Id*. at 2126 (citation omitted).

The State Plaintiffs' argument is based on a mischaracterization of the regulatory history: that an individual is a bona fide EAP employee under the terms of the FLSA merely because he or she passes the Department's regulatory duties test, and therefore that the Final Rule salary level test "trap[s] many 'bona fide EAP employees' under the cutoff."  *See* Pls.' Br. at 15.  To the contrary, "the fact that an employee satisfies the duties test, especially the more lenient standard duties test, does not alone indicate that he or she is a bona fide executive, administrative, or professional employee."  81 Fed. Reg. 32,413.  Rather, the "salary level test and duties test have always worked in tandem to distinguish those who Congress intended the FLSA to protect from those who are 'bona fide' EAP employees."  *Id*.   As the Department explains in the Final Rule, nearly 50 percent (6.5 million) of the total salaried white collar workers who fail the duties test earn *above* the salary level threshold set in the Rule; for these workers, the duties test rather than the salary test is the basis for their non-exempt status.  *See* 81 Fed. Reg. 32,413.  By contrast, only 22 percent of salaried white collar workers who currently meet the standard duties test earn less than the salary level established by the Final Rule.  *See id*. Thus the Rule corrects the outdated salary level test that failed to accurately identify bona fide EAP employees when read with the 2004 standard duties test.

Indeed the fact that the Department long relied on a long and short version of the duties test until the 2004 rulemaking undermines the State Plaintiffs' contention that there is a single, precise definition of the duties test that can accurately differentiate between bona fide EAP employees and non-bona-fide EAP employees, regardless of salary.[14]  Thus, the State Plaintiffs' reliance on *Supreme Beef Processors, Inc. v. U.S.D.A.*, 275 F.3d 432 (5th Cir. 2001), a case decided at *Chevron* step one, *see id.* at 438-39, is inapposite here.  First, unlike in *Supreme Beef*, the language of Section 213(a)(1) is ambiguous, and has been reasonably interpreted for decades to include a duties test and a salary level test, and nothing in the statute conflicts with the agency's interpretation.  *See supra* at 21-25.  Second, the State Plaintiffs' argument is based on a misreading of the Rule.  The Final Rule does not describe the salary level test as a mere proxy for the duties test, but explains that the salary level test and the duties test work in tandem to distinguish those who Congress intended the FLSA to protect from those who are "bona fide" EAP employees.  *See* 81 Fed. Reg. 32,413; *see also* 81 Fed. Reg. 32,404 (explaining that the Department proposed to set the salary level as a percentile rooted in the distribution of earnings rather than a specific dollar amount, because earnings are linked to the type of work salaried workers perform).  Thus in updating the salary level test, the Final Rule does not create a proxy that conflicts with an unambiguous Congressional direction as in *Supreme Beef.*  Instead, the Rule updates the methodology for calculating the salary level threshold so that the level accurately configures with the duties test to identify bona fide EAP employees, which is the kind of interpretation Congress envisioned in granting the Department broad authority to interpret the

---

[14] Similarly, since 2004, the Department has had a separate, more lenient duties test for highly compensated employees.  The test for highly compensated employees pairs a very high compensation requirement ($100,000 under the 2004 regulation and $134,004 beginning December 1, 2016) with a very minimal duties test to exempt these highly compensated employees from overtime protection.

ambiguous terms in Section 213(a)(1).

The State Plaintiffs' attempt to construe Congressional intent regarding Section 213(a)(1) based on the language in other statutory exemptions to the FLSA's minimum wage and overtime protections is also unavailing. Congress's decision to define other exemptions more specifically cannot erase its express delegation in Section 213(a)(1) to the Department to define and delimit the exemption. Indeed, Congress's decision not to delineate the particular duties or salary level that should trigger Section 213(a)(1)'s exemption, and instead to direct the Department to define and delimit the terms in that section, further demonstrates the broad authority Congress delegated to the Department to determine the scope of this exemption. Notably, since the Department first adopted a salary level test in 1938, 3 Fed. Reg. 2,518, Congress has amended the FLSA numerous times, Section 13 itself over a dozen times, and Section 213(a)(1) specifically several times, *see* Pub. L. 87-30, 75 Stat. 65, Sec. 9 (May 5, 1961); Pub. L. No. 89-601, 80 Stat. 830, Sec. 214 (Sept. 23, 1966); Pub. L. 101-583, 104 Stat. 2871, Sec. 2 (Nov. 15, 1990). Where, as here, Congress "'revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress.'" *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 827–28 (2013) (quoting *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986)).

To demonstrate a likelihood of success on the merits of this claim, the State Plaintiffs have "the burden to overcome" the "presumption that the agency's decision is valid" under *Chevron* "by showing that the decision was erroneous." *Texas Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010). The State Plaintiffs fall well short of meeting this high burden. This decision was promulgated through a robust notice-and-comment procedure under a

30

broad grant of statutory authority, *see Mississippi Publishers Corp.*, 364 F.2d at 608.  The

Department here made a reasonable decision—one based on careful consideration of voluminous

comments from stakeholders—to correct the inadequately low salary level test to better

approximate, when read in tandem with the duties test, the type of bona fide executive,

administrative, and professional employees who Congress intended to exempt from the FLSA's

overtime protections.  To be upheld "[a]n agency's decision need not be ideal, or even, perhaps

correct . . . so long as the agency gave at least minimal consideration to the relevant facts as

contained in the record." *Am. Petrol. Inst. v. EPA*, 661 F.2d 340, 349 (5th Cir. 1982).  The State

Plaintiffs have demonstrated no basis on which this Rule could be overturned, let alone any basis

on which they could succeed on their challenge to the Rule.  Their motion fails on this ground

alone.

### 3.    The Automatic Updating Component Is Entitled to *Chevron* Deference

Recognizing that "[l]apses between rulemakings have resulted in EAP salary levels that

are based on outdated salary data, and thus are ill-equipped to help employers assess which

employees are unlikely to meet the duties tests for the exemptions," the Department included a

mechanism for automatically recalculating the salary level every three years using the same

methodology used to set the initial salary level (of $913 per week) in the Final Rule.  81 Fed.

Reg. 32,430-33.  Under the broad grant of authority under 29 U.S.C. § 213(a)(1) which permits

establishing the salary level test, the Department similarly has authority to include this updating

mechanism to ensure that the salary level test remains effective.  Under the automatic updating

mechanism, salary level changes will occur at regular intervals using a publicly available data

source, which will in turn benefit employers and employees by replacing infrequent, and thus

more drastic, salary level changes with gradual changes occurring at predictable intervals.  81

Fed. Reg. 32,435.  The State Plaintiffs reassert the same challenge to this automatic updating

mechanism as they did to the salary level test, arguing that the Department lacked authority to

create a salary level test at all.  *See* Pls.' Br. at 41-43.  The State Plaintiffs' arguments on that

point lack merit for the reasons previously discussed.  The State Plaintiffs' remaining arguments

against the automatic updating provision are similarly unpersuasive.

First, the State Plaintiffs' arguments are based on the misapprehension that the automatic

updating resets the salary level test "with *no* taking account of actual duties performed."  Pls.'

Br. at 41.  In the Final Rule, the Department established a methodology for "setting a salary

threshold that adequately distinguishes between employees who may meet the duties

requirements of the EAP exemptions and those who likely do not."  81 Fed. Reg. 32,393.  The

automatic updating component merely recalculates this salary threshold every three years based

on current data using the same methodology established through notice-and-comment

rulemaking so that the salary level test continues to adequately identify employees who may

meet the duties requirements of the exemption, and continues to define the scope of the

exemption in a way that is consistent with the FLSA's purpose.  Because the methodology—

which takes into account the coordinated duties test—remains the same, the automatic updating

component simply keeps the salary threshold accurate in light of changing salary levels in the

workplace.

Second, it is of no moment that the FLSA does not explicitly authorize automatic

updating.  The Supreme Court has long recognized that the "'power of an administrative agency

to administer a congressionally created . . . program necessarily requires the formulation of

policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'"  *Long

Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007), quoting *Chevron*, 467 U.S. at 843.

In another case interpreting the same exemption as *Coke*, in *Home Care Association*, the D.C. Circuit upheld a regulation in which the Department changed its position on the question central to the challenge in *Coke*: whether domestic service employees employed by third-party agencies are exempt from the FLSA's minimum wage and overtime protections.[15]  799 F.3d at 1089. Recognizing the ambiguity in the statute and the authority granted to the Department to interpret the relevant statutory terms, the D.C. Circuit upheld the changed regulation.  *Id.* at 1090-93. Indeed it is because the exemption at issue in *Coke* and *Home Care Association* "refer[] broadly to 'domestic service employment' and to 'companionship services,'" and in fact make no reference to third party employers, that the Supreme Court held that Congress "expressly instruct[ed]" the agency to work out the details of "whether to include workers paid by third parties within the scope of the definitions."  *Coke*, 551 U.S. at 167.

Here, Congress expressly delegated authority to the Department to "define and delimit" the terms in Section 213(a)(1), and left to the agency's discretion how to make that determination.  Under this broad delegation of authority, the Department has established a salary level test, a duties test, and a salary basis requirement, none of which are explicitly authorized by Congress.  Over the decades since the FLSA became law, the Department has made significant changes to how these tests are implemented – by adding separate salary level requirements for professional and administrative employees in 1940, *see* 5 Fed. Reg. 4,077; adopting the short and long tests in 1949, *see* 14 Fed. Reg. 7,705-07; and eliminating the long duties test, creating a standard duties test, and establishing a test for highly compensated employees in 2004, *see* 69

---

[15] The FLSA exempts "any employee" employed in domestic service "to provide companionship services for individuals" unable to care for themselves, 29 U.S.C. § 213(a)(15), and "any employee [] employed in domestic service in a household and who resides in that household, 29 U.S.C. § 213(b)(21).

Fed. Reg. 22,122– and none of these changes is explicitly mentioned in the FLSA.  Accordingly, just as establishing and recalibrating the various tests for the exemption over the decades is within the Department's "broad latitude," *see Mississippi Publishers Corp*., 364 F.2d at 608, to "define and delimit" the exemption, so too is establishing a mechanism through notice and comment rulemaking to keep the salary level current and consistent with changes in the labor market.  Notably, promulgating the automatic updating mechanism in no way prevents the Department from using notice and comment rulemaking to revisit the salary level test, or any other aspect of the EAP exemptions (including the automatic updating mechanism), from "time to time," 29 U.S.C. § 213(a)(1), as cumulative changes in job duties, compensation practices, and other relevant working conditions indicate that changes may be warranted.  *See* 81 Fed. Reg. 32,431.

Third, the State Plaintiffs' reliance on the fact that the FLSA does not provide for indexing for the minimum wage rate, the hourly wage for computer employees, or the annual compensation for "nonprofit parents" is misplaced.  *See* Pls.' Br. at 43, citing 29 U.S.C. §§ 206, 213(a)(17), 213(b)(24).  Congress explicitly set those rates in their respective statutory provisions and did not delegate to the Department the authority to define those figures.  By contrast, Section 213(a)(1)'s broad grant of discretion expressly contemplates that the Department will interpret the scope of the exemption through duly promulgated regulations, as it did with the Final Rule.  The State Plaintiffs have simply failed to identify any legitimate basis on which the Court could overturn the Department's reasonable decision to include a procedure to keep the salary level test up to date, particularly in light of the substantial deference owed to the agency's reasonable interpretation of this statutory provision.

Therefore, the State Plaintiffs cannot show that they are likely to succeed on the merits of

their substantive APA claims.

**4.     The Final Rule Fully Complies with the APA's Procedural Requirements**

The State Plaintiffs' claim that the automatic updating component of the salary level test violates the APA's procedural requirements is similarly unavailing. The APA imposes on an agency engaging in rulemaking certain procedural requirements: publication in the Federal Register; a comment period for public participation; and publication of a final rule that presents "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(b), (c). The Department promulgated the Final Rule through a robust notice-and-comment process that is fully consistent with these requirements. Prior to issuance of the NPRM, the Department "embarked on an extensive outreach program." 81 Fed. Reg. 32,396. The Department met with a wide range of stakeholders, and asked them to address the questions the Department intended to explore in the rulemaking; the information gleaned at these sessions informed the Department's NPRM, which was issued on July 6, 2015. *Id.* That NPRM expressly suggested the use of an automatic updating mechanism to preserve the accuracy of the salary level test. 80 Fed. Reg. 38,537-42. The Department provided a sixty-day comment period and received over 270,000 comments in response to the NPRM from a broad array of constituencies. *Id.* Many of these comments addressed the proposed automatic update to the salary level test. 81 Fed. Reg. 32,430. The Department carefully considered the comments and addressed them in the Final Rule, which provides extensive reasoning to support the Department's decisions, including the automatic updating provision. *See id.* at 32,430-33.

Thus, the State Plaintiffs' reliance on *Encino Motorcars* is unfounded. In that case, the Department completed a notice-and-comment rulemaking by "issuing a final rule that took the opposite position from the proposed rule," and provided "little explanation for its decision." 136

S. Ct. at 2123.  "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Id*. at 2125.  Specifically, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id*., quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  This requirement must be met when agencies change their existing policies as well.  *Id*.   The Final Rule easily meets this standard.  As outlined above, the agency provided a detailed discussion of the relevant regulatory history, explained its reasoning for initiating rulemaking, addressed issues or concerns raised in the comments, considered the equities for various groups of stakeholders, provided an explanation for any departure from the NPRM, and relied on empirical data.  The Final Rule provides this type of analysis for each issue raised in the NPRM, including the automatic indexing mechanism.

Importantly, the State Plaintiffs mischaracterize the automatic updating procedure.  It does not change the salary level test – which requires that exempt employees be paid a salary equal to at least the 40th percentile of full-time salaried workers in the lowest-wage Census region.  That test is set in the Final Rule, and will remain in place until the next time the Department determines it needs to reassess the salary level test, which would be accomplished through notice and comment rulemaking.  Thus, utilizing the automatic updating mechanism does not substantively change the Rule, as it does not change the salary level test or the duties test.  It merely adjusts the salary level threshold based on current data.  Indeed the salary level threshold may not necessarily increase, as the State Plaintiffs assume.  "[M]aintaining the salary level at a fixed percentile of earnings will help ensure the test continues to reflect prevailing wage conditions."  81 Fed. Reg. 32,431-32.  Thus, for example, if a recession caused the 40th

percentile of salaried worker earnings in the lowest wage census region to decrease between updates, the salary level threshold itself would decrease accordingly.

Although it is true that the Department has previously declined commenter requests to institute automatic updating, *see* 81 Fed. Reg. 32,432, "[n]othing in the [APA] prohibits an agency from changing its mind, if that change aids it in its appointed task," *Am. Petroleum Inst. v. E.P.A.*, 661 F.2d 340, 355 (5th Cir. 1981), and, as is the case here, the agency "provide[s] a reasoned explanation for the change." *Encino Motorcars*, 136 S. Ct. at 2125.  Here, the length of time between recent rulemakings prompted the Department to reexamine its position on this matter, 81 Fed. Reg. 32,432, and the Final Rule explains in considerable detail the Department's reasons for instituting an automatic updating mechanism.  *See id.* at 32,430-43.  As to the State Plaintiffs' reference to the Department's statement in the 2004 final rule that automatic updating "is both contrary to congressional intent and inappropriate," Pls.' Br. at 42 (quoting 69 Fed. Reg. 22,171-72), as explained in the Final Rule, *see* 81 Fed. Reg. 32,432, this language simply reflected the Department's conclusion at that time that an inflation-based updating mechanism that unduly impacted low-wage regions and industries would be inappropriate.  Such concerns do not arise here because the methodology used to set (and thus automatically update) the salary level accounts for these low-wage groups.

Moreover, to the extent the State Plaintiffs are challenging the updated salary threshold that will be announced prior to January 1, 2020, such a challenge is not yet ripe.[16]  The first automatic update will be based on 2019 data, and will not take effect until January 1, 2020.  *See* 81 Fed. Reg. 32,433.  Any challenge to this adjusted salary threshold would arise when it is

---

[16] Accordingly, the State Plaintiffs cannot demonstrate that they will suffer any harm from the automatic updating mechanism until, at least, over three years from now.  Thus the State Plaintiffs' motion fails with respect to their procedural APA claim on this ground alone.

published in the Federal Register at least 150 days before its effective date, as required by the

Rule.  *See* 81 Fed. Reg. 32,430; *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S.

803, 807-08 (2003) (The ripeness doctrine "prevent[s] the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also to protect the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties.").  In determining whether the State Plaintiffs' claim is ripe, the Court

should consider "the fitness of the issues for judicial decision," and "the hardship to the parties

of withholding court consideration."  *Id*. at 808.  The State Plaintiffs should have to wait at least

until the updated salary level has been published, if not until they can show that they have been

or will be harmed by that salary level, to raise a procedural challenge to its publication.  And the

State Plaintiffs have not alleged, let alone demonstrated, any harm resulting from 2020 salary

level update that would weigh in favor of deciding this question before "the scope of the

controversy has been reduced to more manageable proportions, and its factual components

fleshed out."  *Id*.

It is important to note that the announcement of the first automatic update—through

publication in the Federal Register at least 150 days before to provide ample notice to

stakeholders—will simply notify the public about the new salary level threshold, recalculated

based on 2019 data.  It will not make any substantive changes to the salary level test or the Final

Rule, *see* 81 Fed Reg. at 32432, and therefore it is not a rulemaking that would trigger the APA's

procedural requirements.  However, any challenge the State Plaintiffs purport to raise to the form

or content of the first automatic update is premature, where, as here, there has been no "concrete

action applying the regulation to the claimant's situation in a fashion that harms or threatens to

harm him."  *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808.

Thus, the State Plaintiffs' procedural APA claim lacks merit.  The agency adopted the

automatic updating mechanism in the Final Rule through an extensive notice-and-comment

process, and in the Rule the agency provides a thorough explanation for its decision to

implement automatic updating.  Any procedural APA challenge with respect to the Final Rule

must therefore fail, and any procedural challenge to the announcement of the first automatic

update, which will be published in 2019, is not yet ripe.

### C.    There is no Unlawful Delegation of Congressional Power

In the alternative, the State Plaintiffs argue that if the FLSA grants the Department the

authority to promulgate the salary-level test and automatic updating mechanism, then the statute

represents an unconstitutional delegation of legislative authority.  Such an argument lacks any

precedential support, as courts have long held that Section 213(a)(1)'s authorizing the

Department to "define and delimit" the terms "bona fide executive, administrative, or

professional capacity" is a lawful delegation from Congress.  *E.g.*, *Walling v. Yeakley*, 140 F.2d

830, 832 (10th Cir. 1944) ("We think there can be no question that the power" to "define and

delimit" EAP exemption "was lawfully delegated."); *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216,

218 (2d Cir. 1944) ("In conferring such authority upon the Administrator," to "define and

delimit" the terms used in Section 213(a)(1), "Congress acted in accordance with a long

established tradition (frequently sanctioned by the Supreme Court), and did not

unconstitutionally delegate powers vested in the legislative branch.").

The nondelegation doctrine requires that Congress "lay down by legislative act an

*intelligible principle* to which the person or body authorized [to exercise the delegated authority]

is directed to conform."  *Whitman v. American Trucking Assoc.,* 531 U.S. 457, 472 (2001)

(emphasis added).  Rooted in "common sense and the inherent necessities of the government co-ordination," this minimal requirement stems from the "practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Mistretta v. United States,* 488 U.S. 361, 372 (1989) (citations omitted); *see also Loving v. United States,* 517 U.S. 748, 773 (1996) ("Separation-of-powers principles are vindicated, not disserved, by measured cooperation between the two political branches of the Government, each contributing to a lawful objective through its own processes.").  The Supreme Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law," *Whitman*, 531 U.S. at 474-75, and has "found the requisite 'intelligible principle' lacking in only two statutes"—both from cases in 1935—"one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition,'" *id.* at 474 (citing *Panama Refining Co. v. Ryan,* 293 U.S. 388 (1935); *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495 (1935)).

To set forth a constitutionally permissible "intelligible principle" while delegating authority to one of its coordinate Branches, Congress needs only to "'clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'"  *Mistretta*, 488 U.S. at 372-73 (quoting *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).  The FLSA's overtime exemption easily meets this criteria.  As addressed above, Congress vested the Department with authority to interpret the exemption through regulations.  *See* 29 U.S.C. § 213(a)(1).  The FLSA's overtime provisions further contain a

"clearly delineate[d] general policy," *Mistretta*, 488 U.S. at 372-73, of "correct[ing] and . . . eliminat[ing]" the "existence . . . of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers," 29 U.S.C. § 202; *see also, e.g.*, *Barrentine*, 450 U.S. at 739, and of spreading employment by incentivizing employers to hire more employees rather than imposing longer hours on current employees, *see Davis v. J.P. Morgan* Chase, 587 F.3d 529, 535 (2d Cir. 2009).  And by charging the agency to "defin[e] and delimit[]" the terms "bona fide executive, administrative, or professional capacity," Congress set forth a policy "of having specific criteria laid down . . . by which employer and enforcement agency could determine with certainty whether an employee fell within or without one of the exempted employments."  *Walling*, 140 F.2d at 832.

Not only does this clause (and the surrounding statutory framework) establish a policy to guide the Secretary, but it also marks the "boundaries of this delegated authority," *Mistretta*, 488 U.S. at 372-73, as the agency may exempt under the relevant provision only those employed in a "bona fide executive, administrative, or professional capacity," 29 U.S.C. § 213(a)(1).  The State Plaintiffs apparently reject these boundaries because they allege Congress must establish any salary "threshold."  Pls.' Br. at 44-45.  But as noted above, such an argument lacks any precedential support, *see supra* at 39, and "even in sweeping regulatory schemes [the Supreme Court] ha[s] never demanded . . . that statutes provide a determinate criterion for saying 'how much . . . is too much,'" *Whitman*, 531 U.S. at 475-76 (holding statute's requirement that EPA set air quality standards "at the level that is 'requisite' to protect public health with an adequate margin of safety fits comfortably within the scope of discretion permitted"); *see also id.* at 475 ("In *Touby* [*v. United States*, 500 U.S. 160, 165-67 (1991)]*,* for example, we did not require the statute to decree how 'imminent' was too imminent, or how 'necessary' was necessary enough,

41

or even . . . how 'hazardous' was too hazardous."). The nondelegation doctrine does not require that Congress set a salary threshold, and "the statutory standards here are far more precise than many which the Supreme Court has held sufficient," *Fanelli*, 141 F.2d at 218. As such, the State Plaintiffs' claim lacks any merit.

## II.     The State Plaintiffs Have Not Demonstrated Irreparable Injury

The State Plaintiffs bear a "heavy burden of clearly establishing to the Court irreparable harm." *Watchguard Techs., Inc. v. Valentine*, 433 F. Supp. 2d 792, 794 (N.D. Tex. 2006). A plaintiff must "demonstrate that irreparable harm is real, imminent, and significant—not merely speculative or potential—with admissible evidence." *Aquifer Guardians in Urban Areas v. Fed. Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011). The State Plaintiffs fail to carry their burden in multiple respects.

The State Plaintiffs insist that the "new overtime rule inflicts irreparable constitutional injury," Pls'. Br. at 46, but their alleged injury is foreclosed by Supreme Court precedent, *see supra* at 17-21. Any speculation that the Supreme Court may one day change the law—and thus allow the State Plaintiffs to claim a Tenth Amendment injury—cannot sustain the State Plaintiffs' burden here. *See also Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient.").

The State Plaintiffs' allegation of financial damage fares no better. Pls.' Br. at 46. "[A]s a general rule," "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989). This should be particularly so here, where the alleged financial harm amounts to costs incurred by the States in complying with a duly promulgated federal regulation that extends basic overtime protection to certain state employees. And even though

"[t]he plaintiff has the burden of introducing sufficient evidence to justify the grant of a preliminary injunction," *PCI Transp., Inc. v. Fort Worth & W. R.R. Co.*, 418 F.3d 535, 546 (5th Cir. 2005), two-thirds of the State Plaintiffs entirely failed to do so here, *see, e.g.*, Pls.' Br. at 21-23 (citing Compl. at ¶¶ 66, 73, 76).  Nor do the States even try to show any irreparable harm to businesses within the states.  Therefore, even if some or all of the State Plaintiffs have carried their burden to warrant an injunction (and they have not), then that injunction would apply only to the state governments who made that showing, and not to all businesses in those states.

As to the seven State Plaintiffs that did submit affidavits to try to meet their burden, this evidence is insufficient.  Several of the affidavits unrealistically estimate the cost that would be incurred to meet the new salary level for *all* employees, Kansas Decl. ¶ 6, Pls.' Br., Exh. 3; Wisconsin Decl. ¶ 5, Pls.' Br., Exh. 4; Oklahoma Decl. ¶ 9, Pls.' Br., Exh. 8, even though doing so will often not be cost effective for employees who work no overtime or work small amounts of irregular overtime, *see* 81 Fed. Reg. 32,490 (estimating that 60.4% workers who gain overtime protection do not work any overtime, and only 19.3% occasionally work overtime); *see also* Indiana Decl. ¶ 5, 6, Pls.' Br., Exh. 7 (estimating that 700 employees will receive raises to bring them within the exemption and speculating that this will effect morale).  Likewise, the State Plaintiffs have no reason to expect to pay overtime for every newly eligible employee each week, yet Oklahoma's alternative estimates so assume.  Oklahoma Decl. ¶ 13 & Pls.' Br. at 22. South Carolina estimates potential fiscal impacts but provides no explanation as to how those figures were calculated for each exempt employee, *see generally* South Carolina Decls., Pls.' Br., Exhs. 1, 2, while Arkansas relies on such broad and conclusory justifications for its calculation that Defendants (and the Court) cannot asses its reasonableness, *see generally* Arkansas Decl., Pls.' Br., Exh. 6.  Indiana states that it will cost about $3 million to raise the

salaries for some employees to retain the exemption, Indiana Decl. ¶ 5, but then goes on to estimate, without explanation, that the Final Rule will cost the state $20 million annually, *id.* ¶ 6. And although Iowa estimates costs for the state's higher education institutions, it remains unclear whether it took into account the fact that teachers are not subject to the salary level test (and thus are not affected by the rulemaking), and that academic administrative personnel need only earn a salary equivalent to an entry level teacher to be exempt. *See* 29 C.F.R. 541.303(d); 29 C.F.R. 641.600(c). Moreover, many of the states fail to account for other options to adjust for the Rule in their cost estimates, such as providing compensatory time off instead of cash payments for overtime hours or managing employees' hours to avoid paying overtime.[17]

With no meaningful estimate of costs, the State Plaintiffs argue that Kansas (and others) must perform "significant additional work" to determine if it should preserve employees' exempt status by raising wages or allowing employees to become overtime eligible. Pls.' Br. at 47. As both a legal and practical matter, this conclusory assertion fails. Legally, the State Plaintiffs have a "heavy burden of clearly establishing" irreparable harm, *Watchguard Techs., Inc.*, 433 F. Supp. 2d at 794, and cannot evade this requirement by alleging that it will entail "significant" work to comply with a federal regulation, *see Valley*, 118 F.3d at 1050 (explaining that plaintiffs must "unequivocally show the need for" injunctive relief); *Digital Generation, Inc. v. Boring*,

---

[17] Even if the State Plaintiffs' estimates were buttressed with reliable evidence (and they are not), the States have provided no meaningful context to assess the impact of these costs on State governments. Indeed, according to the Departments' economic analysis, total costs for state and local governments in the first year of the Final Rule will compose only approximately .01 percent of state and local government payrolls and a mere .004 percent of state and local government revenues. *See* 81 Fed. Reg. 32,547. The State Plaintiffs offer no meaningful rebuttal to that analysis, and their conclusory allegations that the Final Rule allegedly will impact their budgets cannot satisfy their heavy burden here. *Accord Atwood Turnkey Drilling*, 875 F.2d 1174, 1179 (5th Cir. 1989) (economic loss supporting irreparable harm should be "so great as to threaten the existence of the movant's business").

869 F. Supp. 2d 761, 778 (N.D. Tex. 2012); *Aquifer Guardians*, 779 F. Supp. 2d at 556; *accord American Hospital Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980) ("[I]njury resulting from attempted compliance with government regulation ordinarily is not irreparable harm."). And practically, the Final Rule is set to take effect in approximately one month; the State Plaintiffs have likely already incurred these costs, or will do so by the time the Court resolves the pending motion.  If these preparation costs were so significant, the State Plaintiffs would have filed their Complaint and motion for preliminary relief much earlier.[18]

Indeed, "[t]he law is well-established that[] [d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."  *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006).  Here, the State Plaintiffs' five-month delay from the Rule's promulgation to the filing of this preliminary injunction motion seriously "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal citation omitted); *see Brown v. District of Columbia*, 888 F. Supp. 2d 28, 32 (D.D.C. 2012) (noting as relevant to the irreparable harm analysis the fact that plaintiff waited almost seven months to file lawsuit); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm").

### III.    The Harm to the Agency and to the Public Outweigh any Injury to the State Plaintiffs

Because the State Plaintiffs have not made the threshold showings of either irreparable harm or a likelihood of success on the merits, there is no need for the Court to consider the final

---

[18] The States should not be permitted to introduce new arguments or evidence in its reply brief. *See, e.g.*, *Narvaez v. Wilshire Credit Corp.*, 757 F. Supp. 2d 621, 633 n.11 (N.D. Tex. 2010).

factors in the preliminary injunction analysis. *See, e.g.*, *Byrum*, 566 F.3d at 445.  Nevertheless, the State Plaintiffs have failed to demonstrate—as they must—that the threatened irreparable injury outweighs the threatened harm that the injunction would cause Defendants and unrepresented third parties, and that granting the injunction would not "be adverse to public interest." *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986); *Southdown, Inc. v. Moore McCormack Res.*, *Inc.*, 686 F. Supp. 595, 596 (S.D. Tex. 1988) (petitioner has burden to show injunction will cause "no disservice to unrepresented third parties").  Courts should "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312-13 (1982) (citation omitted).

Here, the balance of equities and the public interest weigh heavily against the State Plaintiffs' requested preliminary injunction.  As explained *supra*, the State Plaintiffs have failed to carry their "heavy burden of clearly establishing to the Court irreparable harm." *Watchguard Techs.*, 433 F. Supp. 2d at 794; *see supra* at 42-45.  By contrast, preventing the implementation of the Final Rule would cause serious harm and disruption.  "[T]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct an agency to develop and enforce." *Nat'l Propane Gas Ass'n v. U.S. Dep't of Homeland Sec.*, 534 F. Supp. 2d 16, 20 (D.D.C. 2008).

And blocking this particular regulation would have a profoundly harmful impact on the public.  More than four million workers in Fiscal Year 2017 meet the duties test and have a weekly salary of more than $455 but earn below the 40th earnings percentile in the South; staying the Final Rule would deprive these workers of the protections that Congress intended they receive on the basis of an outdated and less effective salary level—one that has not been updated in over a decade.  *See* 81 Fed. Reg. 32,393; *see also* 81 Fed. Reg. 32,400 (explaining

46

effect of 2004 rule "was to exempt from overtime many lower-wage workers who performed little EAP work and whose work was otherwise indistinguishable from their overtime-eligible colleagues").  Some of these individuals would be denied additional pay to which they are entitled, either from an increased salary or from overtime payments.  Employers will be incentivized to demand that some of their employees continue to work longer hours, which are correlated with an increased risk of injury or health problems.  *See* 81 Fed. Reg. 32,501-02.  And a stay would deny unemployed and underemployed workers expected opportunities, as the Final Rule is predicted to result in expanded employment opportunities (via new hiring or increased hours for part-time workers) as employers reallocate work hours previously worked by newly nonexempt employees.  *See* 81 Fed. Reg. 32,503.

Staying the Final Rule is likely to adversely impact some employees now entitled to overtime protection.  An estimated 732,000 salaried workers are currently entitled to overtime protection but are misclassified by their employers as exempt due to a misapplication of the duties test.  *See* 81 Fed. Reg. 32,463.  When the Final Rule takes effect, the salary level will provide a clear and easily applied test to determine exempt status and thus fewer of these employees are likely to remain misclassified.  And, an injunction may cause more government expenditures.  Because the current salary level falls below the 2015 poverty level for a family of four, some currently exempt workers are considered impoverished and therefore qualify for many social assistance programs.  *See* 81 Fed. Reg. 32,503.  Where such employees receive additional compensation because of the Rule, reliance on government social assistance programs may be reduced.  *See id.*

The public and the government would suffer if the Rule were stayed, particularly when so much of the affected public has presumably undertaken a lot to prepare for the Final Rule.

47

### V.      Any Injunction Must Be Carefully Tailored to Address the Harm Shown

Even if this Court determines that injunctive relief is warranted, it should deny the State

Plaintiffs' request for a nationwide injunction and should enjoin the Final Rule's effect only as to

the State Plaintiffs that have demonstrated that they face irreparable harm – and only in their

capacity as employers.[19]  "[I]njunctive relief should be no more burdensome to the defendant

than necessary to provide complete relief to the Plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682,

702 (1979); *see also Lion Health Servs., Inc. v. Sebelius*, 635 F.3d 693, 703 (5th Cir. 2011)

(same).  This is particularly true in preliminary injunction proceedings, where the "purpose" "is

always to prevent irreparable injury so as to preserve the court's ability to render a meaningful

decision on the merits." *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 269 (5th Cir.

1990); *see also McCormack v. Hiedeman*, 694 F.3d 1004, 1019–20 (9th Cir. 2012) ("[T]he

purpose of a preliminary injunction is to preserve the status quo between the parties pending a

resolution of a case on the merits.").

The Supreme Court and the Fifth Circuit have narrowed or vacated preliminary

injunctions that afforded relief beyond what was necessary to redress the irreparable harm that

the district court found to have been demonstrated by the plaintiffs in a particular case.  *See U.S.*

*Dep't of Defense v. Meinhold*, 114 S. Ct. 374 (1993) (staying the nationwide application of a

preliminary injunction against implementation of the military's Don't Ask, Don't Tell policy);

*Hollon v. Mathis Indep. Sch. Dist.*, 491 F.2d 92, 93 (5th Cir. 1974) (per curiam) (vacating

preliminary injunction as overbroad because "[i]n this case, which is not a class action, the

injunction against the School District from enforcing its regulation against anyone other than

---

[19] Likewise as will be made plain in Defendants' response to the summary judgment motion filed by the plaintiffs in *Plano Chamber of Commerce*, the plaintiffs in that case have not demonstrated that they are entitled to relief.

[plaintiff] reaches further than is necessary to serve [the] purpose" of preserving the status quo among the parties).

Only seven of the twenty-one Plaintiff States have even tried to demonstrate irreparable harm. *See* Pls.' Br., Exhs. 1-9. If the Court were to find all of the seven states to have met their burden of showing irreparable harm—and for the reasons demonstrated above, *see supra* at 42-45, they fall well short of this burden—the State Plaintiffs will have only established entitlement to enjoin the Rule from taking effect against those seven plaintiff States in their capacity as employers.[20] Notably, the State Plaintiffs introduced no evidence of any harm occurring in the State of Texas, or indeed, in any of the States that make up the Fifth Circuit. An injunction applying to all twenty-one of the State Plaintiffs, let alone to states that are not a party to this action, exceeds the scope of any injury established by the State Plaintiffs and would raise Article III concerns. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) ("[A] party generally . . . cannot rest his claim to relief on the legal rights or interests of third parties.") (quotation marks omitted)[21]; *see also Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 193 (2000) (explaining that Article III dictates that "federal courts should aim to ensure the framing of relief no broader than required by the precise facts" (quotation marks omitted)); *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (the scope of an injunction "must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established").

The State Plaintiffs request a nationwide injunction, but they have no legitimate interest in the Rule's effect in non-plaintiff states. Indeed, there has been no showing by the State

---

[20] Likewise, if the Court found fewer than all of these states carried their burden of showing irreparable harm, an injunction should issue only to those that made such a showing.
[21] The breadth of this rule is demonstrated by the narrowness of its exceptions. *See, e.g., Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989).

Plaintiffs of any kind of injury or harm to the State Plaintiffs as a result of enforcement outside of their borders or against non-plaintiff entities.  As the Supreme Court has long cautioned, "[t]he desire to obtain sweeping relief cannot be accepted as a substitute for compliance with the general rule that the complainant must present facts sufficient to show that his individual need requires the remedy for which he asks."  *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221-22 (1974) (alterations omitted) (quoting *McCabe v. Atchison, T. & S.F.R. Co.*, 235 U.S. 151, 164 (1914)).  The State Plaintiffs rely on the Fifth Circuit's decision upholding a nationwide injunction in *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015).  But that holding grew out of the unique features of the policy under review: that the Court of Appeals found there was a "substantial likelihood that a geographically limited injunction would be ineffective because DAPA beneficiaries would be free to move among states."  *Id.*   That holding is also specific to the immigration-law context in that it relied on the Constitutional and Congressional policies that immigration laws be uniform throughout the United States.

Accordingly, any injunction that issues (and none should) should be tailored to only those State Plaintiffs that have carried their heavy burden of clearly showing irreparable harm.

## CONCLUSION

The Court should deny the State Plaintiffs' Motion for Preliminary Injunction.

Dated:  October 31, 2016                     Respectfully submitted,

M. PATRICIA SMITH                           BENJAMIN C. MIZER
Solicitor of Labor                          Principal Deputy Assistant Attorney General

JENNIFER S. BRAND                           BRIT FEATHERSTON
Associate Solicitor                         Acting United States Attorney

PAUL L. FRIEDEN                             JUDRY L. SUBAR
Counsel for Appellate Litigation            Assistant Branch Director
                                            Federal Programs Branch

STEVEN W. GARDINER
Senior Attorney


ERIN M. MOHAN
Attorney
U.S. Department of Labor
200 Constitution Ave NW, N-2716
Washington, DC  20210

   /s/ Julie S. Saltman     
JULIE S. SALTMAN
KEVIN SNELL
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W., Room 7111
Washington, D.C.  20530
Tel: (202) 532-4252
Fax: (202) 616-8470
Email: Julie.saltman@usdoj.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 31, 2016, I filed the foregoing electronically with the

Clerk of the United States District Court for the Eastern District of Texas through the CM/ECF

system, which caused the all counsel of record to be served by electronic means.


*/s/ Julie Saltman*
JULIE SALTMAN