# EXHIBIT B

Part 1

UNITED STATES DEPARTMENT OF LABOR
WAGE AND HOUR DIVISION
WASHINGTON, D. C.

✛

# "Executive, Administrative, Professional . . . Outside Salesman" Redefined

✛

**Effective October 24, 1940**

### Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON: 1940

# TABLE OF CONTENTS

| | Page |
|---|---|
| Section I. BACKGROUND OF PROCEEDINGS | 1 |
| Original Definitions | 1 |
| Hearings on Proposed Redefinitions | 1 |
| Section II. THE ADMINISTRATOR'S AUTHORITY UNDER SECTION 13 (a) (1) OF THE ACT | 2 |
| Administrator Has Broad Powers | 2 |
| Exemptions Should Be Interpreted Narrowly | 2 |
| Changes Are Recommended | 3 |
| Changes Cannot Be Retroactive | 3 |
| Section III. EXECUTIVE AND ADMINISTRATIVE | 3 |
| Joint Definition Criticised | 3 |
| Separate Definitions Advisable | 4 |
| Section IV. SALARY TESTS | 5 |
| Salary Tests for the Various Types of Employment | 5 |
| Regional and Population Salary Differentials | 5 |
| Section V. THE EXEMPTION OF ALL WHITE-COLLAR WORKERS | 6 |
| Legal Arguments | 6 |
| Overtime and "In-Service" Training | 7 |
| Low Wages of Salaried Workers | 8 |
| Section VI. EXECUTIVE EMPLOYEES | 10 |
| Recommended Definition | 10 |
| "Department or Recognized Subdivision Thereof" | 10 |
| "Primary Duty" | 11 |
| "Customarily and Regularly Directs" | 11 |
| The Plural Form "Employees" | 12 |
| "Authority to Hire and Fire" | 12 |
| "Exercises Discretionary Powers" | 13 |
| "Work of the Same Nature as That Performed by Nonexempt Employees" | 13 |
| Fixed Percentage Suggested | 14 |
| Based on Hours Worked by Nonexempt Employees | 15 |
| Working Foremen and Working Supervisors | 15 |
| "Independent * * * or * * * Branch Establishment" | 17 |
| "Work of the Same Nature" | 18 |
| Phrase "of the Employer" Deleted | 18 |
| "Not Less Than $30 a Week" | 19 |
| Exemption Applies Only to Salaried Employees | 23 |
| Section VII. ADMINISTRATIVE EMPLOYEES | 23 |
| Recommended Definition | 23 |
| Distinction Between "Executive" and "Administrative" | 24 |
| Main Aspects of the Problem | 24 |
| Descriptions or Titles Insufficient as Yardsticks | 25 |
| Salary Limitation Vital | 26 |
| Executive and Administrative Assistants | 27 |
| Staff Employees | 27 |
| Those Who Perform Special Assignments | 28 |
| All Are "White-Collar" Employees | 28 |

| | Page |
|---|---|
| Section VII—Continued. | |
| Motion-Picture Employees | 29 |
| Draftsmen | 29 |
| Public-Utility Fieldmen | 30 |
| Various Salary Qualifications Suggested | 30 |
| Practice in the Federal Government | 30 |
| Salaries of Stenographers | 31 |
| Salaries of Bookkeepers and Accountants | 32 |
| $200 a Month Recommended | 32 |
| Pay Periods | 32 |
| Fee Payments | 33 |
| Section VIII. PROFESSIONAL EMPLOYEES | 33 |
| Recommended Definition | 33 |
| General Problem | 34 |
| New Professions | 35 |
| Artistic Professions | 35 |
| Need for Salary Test | 36 |
| "Predominantly * * * Varied in Character" | 36 |
| "Time of Performance" | 36 |
| "Active Direction and Supervision" | 37 |
| "Discretion and Judgment" | 37 |
| "The Result Accomplished Cannot be Standardized" | 37 |
| "Educational Training" | 38 |
| Specialized Study Customary | 39 |
| Academic Degree Generally Required | 39 |
| Amount of Nonexempt Work Allowed | 40 |
| Artists, Writers, etc. | 40 |
| Effect of Salary Test | 42 |
| No Salary Test for the Traditional Professions | 42 |
| Professional Salaries in the Federal Government | 43 |
| $200 a Month Recommended | 43 |
| Fee Payments | 43 |
| Section IX. OUTSIDE SALESMEN | 44 |
| Recommended Definition | 44 |
| Must Make Outside Sales | 44 |
| "Away From His Employer's Place or Places of Business" | 44 |
| What Are Sales? | 45 |
| Outside Buyers and Other Outside Workers Not Exempt as Outside Salesmen | 45 |
| Promotion and Missionary Men | 46 |
| How Much Nonexempt Work Will Be Allowed | 47 |
| Travel Time | 47 |
| Training Other Salesmen | 48 |
| Twenty Percent | 49 |
| Driver Salesmen | 49 |
| No Salary Qualification | 52 |
| Appendix: | |
| Appendix A—Present Definitions | 53 |
| Appendix B—Recommended Definitions | 54 |
| Appendix C—List of Appearances | 55 |
| Appendix D—Occupational Index | 60 |

## STATEMENT OF THE ADMINISTRATOR

The construction of Regulations, Part 541, as amended, which the Wage and Hour Division will follow in enforcing the act thereunder (unless and until the regulations are set aside in whole or in part by amendment or by authoritative decisions of the courts) will be found in this Report and Recommendations.

PHILIP B. FLEMING,
*Administrator.*

# Section I. BACKGROUND OF PROCEEDINGS

Section 13 (a) of the Fair Labor Standards Act states that "The provisions of sections 6 and 7 shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)."

Shortly before the effective date of the act the Administrator called a conference of representatives of industry and labor to ascertain their views on an appropriate definition and delimitation of these terms. A draft was discussed and revised after which those present at the conference expressed their decisive approval thereof. The final draft was approved by the Administrator on October 19, 1938, and published in the Federal Register on October 20, 1938, as Regulations, Part 541. Section 541.1 defined jointly the terms "executive" and "administrative." Section 541.2 defined the term "professional." Section 541.3 defined the term "local retailing capacity." [1] Section 541.4 defined the term "outside salesman." Section 541.5 provided for opportunity to petition for amendment of the regulations.[2]

## ORIGINAL DEFINITIONS [*]

Since the issuance of these Regulations, there has been much correspondence and many conferences between the Wage and Hour Division and interested employers, employees, trade associations, and unions concerning the propriety of the definitions and their correct interpretation. In recent months controversial points have come into sharper focus and applications for amendments to sections 541.1, 541.2, and 541.4 were filed by the Southern States Industrial Council, the U. S. Independent Telephone Association, and others.

## HEARINGS AND PROPOSED REDEFINITIONS

Accordingly, the Administrator determined to call public hearings to allow all interested parties to express their views on the regulations and to propose amendments. In order to make the record more usable, the hearings were divided into four groups according to a rough industry classification. Such a grouping was purely for administrative convenience.[3] This report and the Administrator's determination take into account the consolidated record of the four hearings. The hearings were held as follows:

Wholesale Distributive Trades—April 10, 11, 12, 15, and 16.
Manufacturing and Extractive Industries—June 3, 4, and 5.
Banking, Brokerage, Insurance, Financial, and Related Institutions—July 9 and 10.
Publication, Communication, Public Utility, Transportation, and Miscellaneous Industries—July 25, 26, 27, and 29.

---

[1] The propriety of this definition, however, was not within the scope of this investigation and is not considered herein.
[2] These regulations are reproduced in full in Appendix A.
[3] In addition to the formal Notices of Hearing, this procedure was explained by the Administrator in a series of general press releases, as follows: March 18, 1940, R–689; April 10, 1940, R–725; May 11, 1940, R–770; June 21, 1940, R–871; July 25, 1940, R–929.

At these hearings all interested parties were given full opportunity to testify and to cross-examine witnesses. There was wide representation from both industry and labor; [4] many of those who testified based their statements on painstaking and prolonged study. These statements contain a mass of valuable information. In addition to the oral testimony, approximately 180 briefs, written statements and memoranda were received. The Administrator also called upon members of his staff for suggestions based on their own experiences in making decisions under the regulations during the course of actual inspection work. The following report and recommendations are based on the whole investigation which has been carried out in the manner described.

## Section II. THE ADMINISTRATOR'S AUTHORITY UNDER SECTION 13 (a) (1) OF THE ACT

### ADMINISTRATOR HAS BROAD POWERS

It was freely admitted by interested parties that the Administrator is given a large degree of discretion under section 13 (a) (1) of the Fair Labor Standards Act.[5] It is clear from the very terms of the act itself that Congress felt that the mere use of the phrase "employed in a bona fide executive capacity" etc. was adequate as a standard, but inadequate as a detailed rule to guide employers, employees, and the courts. It therefore gave the Administrator the responsibility of amplifying and describing more precisely the type of employees to whom the exemption would be applicable. Use by Congress of the word "delimited" as well as the word "defined" is a further indication of the extent of the Administrator's discretionary power under this section of the act. Therefore, the Administrator is responsible not only for determining which employees are entitled to the exemption, but also for drawing the line beyond which the exemption is not applicable.

### EXEMPTION SHOULD BE INTERPRETED NARROWLY

The general rule in a statute of this nature, that coverage should be broadly interpreted and exemptions narrowly interpreted, is so well known as to need little elaboration here. This doctrine was recently restated by the Circuit Court of Appeals for the Eighth Circuit in its opinion in the Hawkeye case,[6] in connection with the exemption in section 13 (a) (5) of the act. In this opinion, which is equally applicable to the problems of definition and delimitation under section 13 (a) (1), the court said:

The manifest declared purpose of the statute was to eradicate from interstate commerce the evils attendant upon lower wages and long hours of service in industry. Accepting this as the declared purpose of the act, exemption would tend to defeat its purpose. The statute is remedial, with a humanitarian end in view. It is, therefore, entitled to a liberal construction.

---

[4] There were 127 appearances on behalf of employers and employers' associations; 34 on behalf of employee groups (A. F. of L., C. I. O., and independent); 3 on behalf of the American Association of Schools and Departments of Journalism; and 1 for the League of Women Shoppers, Inc.; a full list of appearances will be found in Appendix C.
[5] See, for example, statements of Elisha Hanson, American Newspaper Publishers Association, and Morris Zeitlin, International Federation of Architects, Engineers, Chemists, and Technicians, Hearing July 25-9, vol. II, p. 317 and vol. 1, p. 149, respectively.
[6] Fleming v. Hawkeye Pearl Button Co., 113 F. (2d) (adv. ops.) 52 (C. C. A. 8th, 1940).

Later the opinion quotes the following from *United States* v. *Dickson:* [7]

In short, a proviso carves special exceptions only out of the enacting clause; and those who set up any such exception must establish it as being within the words as well as within the reason thereof. '

The *Hawkeye* opinion continues:

This rule of construction is applicable even though the statute contains certain penal provisions. Here no penalties are sought to be enforced but remedies. In such circumstances, exemptions should be construed strictly.

## CHANGES ARE RECOMMENDED

Certain modifications of the present definitions are recommended in this report. These recommendations should in no way be construed, however, as an admission that the present definitions are either improper or beyond the scope of the Administrator's statutory authority. They should be construed, rather, as evidence that improvements can be made in the light of actual experience. The investigation shows not only that the present definitions are not perfect,[8] but also that no definition can ever be expected to be perfect. And it also shows that the Administrator's discretionary powers are broad enough to cover various possible definitions; all of which would be well within his legal rights. This was conceded by many witnesses.[9]

## CHANGES CANNOT BE RETROACTIVE

This point is of some consequence, since it means that any substantive change in the regulations can affect only the future status of the employees concerned. The amendments do not and cannot in any way affect the responsibility of employers toward their employees from October 24, 1938, until the date of the amendment of the regulations. Both the present and the proposed regulations are, it is believed, entirely legal. Both are in full accord with the general policy of Congress as expressed in the preamble of the act and both give practical effect to the specific statutory exemption created by Congress in section 13 (a) (1). Certain substantive changes are recommended, partly to describe the properly exempt groups of employees more precisely and partly to make the extent of the exemptions more easily understandable. This will aid in the effective enforcement of the act.

## Section III. EXECUTIVE AND ADMINISTRATIVE

### JOINT DEFINITION CRITICISED

Of the numerous criticisms made of the present regulations there is perhaps none so frequently repeated as that the Administrator erred in not making separate definitions of the two words "executive" and "administrative." In some instances it was merely suggested that there would be certain desirable practical results obtained by separating the terms.[10] In other instances the Administrator was charged with

---

[7] 40 U. S. 141 (1841).
[8] Reports were requested and obtained from all the regional offices of the division on the experiences of inspectors in applying the definitions to actual cases.
[9] Statements of Elisha Hanson and Morris Zeitlin, op. cit., note 5.
[10] Statement of Alexander Konkle, Machinery and Allied Products Institute, record of June 3 and 5 hearing, vol. II, p. 252.

failure to carry out his statutory responsibility by not making separate definitions.[11] The validity of this contention is doubtful, since "executive" and "administrative" are used synonymously in common speech and in court decisions.[12] Furthermore, this contention was usually coupled with a proposal so drafted that any employee who could qualify under the "executive" definition would also invariably qualify under the "administrative" definition.[13] In other words, the definition of the term "administrative" was made so broad as to surround and completely engulf the term "executive."

Clearly the Administrator would not fulfill an alleged responsibility to define the terms separately by promulgating two different sets of words one of which renders the other superfluous. If the present investigation resulted in the conclusion that an appropriate definition of the term "administrative" must be so broad as to deny independent value to the definition of the term "executive," it would be wise to draft a single definition, as at present. However, careful analysis shows that this is not a necessary or even the best conclusion.

The present definition of the terms "executive" and "administrative" applies with particular aptness to persons who are commonly called "bosses." The range of exemption is broad. It extends from the president of a large and complex corporate structure down to the foreman in charge of a very minor department. Although certain minor modifications are proposed below, the present definition does describe and exempt the person who possesses and wields specific executive authority. However, the investigation also shows that in modern business there has been an increasing use of persons whose authority is functional rather than departmental. Primarily they determine or affect policy or carry out major assignments rather than give orders to individuals.[14] Many of these persons have mixed responsibilities and succeed in qualifying under the present definition, but there is a large group who either do not qualify or whose qualifications are dubious.

## SEPARATE DEFINITIONS ADVISABLE

The investigation justifies the conclusion that a reasonable interpretation of section 13 (a) (1) can include exemption for certain employees with miscellaneous policy-making or policy-executing responsibilities. This exemption can be made effective most easily by drafting separate definitions of the terms "executive" and "administrative." While the usage of the two terms is so vague and so overlapping that there is no generally recognized and precise line of demarcation between them, it does no violence to the common understanding of the words to apply "executive" to the person who is a boss over men and to apply "administrative" to the person who establishes or affects or carries out policy but who has little or no authority over the specific actions of other

---

[11] Statement of Clarel B. Mapes, Mid-Continent Oil & Gas Association; record of June 3 and 5 hearing, vol. II, p. 142; Statement of Homer Mitchell, Motion Picture Producers and Distributors of America, record of July 25–29, hearing, vol. 1, p. 37.

[12] See, e. g., Words and Phrases, vol. 1, p. 198; second series, vol. 2, p. 383; third series, vol. 1, p. 277; *Saint* v. *Allen*, 169 La. 1046, 126 So. 548 (1930); *Nissen* v. *City of Winston-Salem*, 206 N. C. 888, 175 S. E. 310 (1934); *In re Healy*, 285 N. Y. S. 180, 247 App. Div. 277 (1936), affirmed *Healy* v. *McCabe*, 1 N. E. (2nd) 357, 270 N. Y. 616 (1936).

[13] For example, see proposed redefinitions submitted by Wholesale Dry Goods Institute, Inc., Montgomery Ward & Co., National Lumber Manufacturers Association, and American Bankers Association.

[14] Examples of this type of employee are executive assistants, traveling inventory men, purchasing agents, tax experts, and safety directors.

individuals. Doubtless the present single definition could be so amplified as to include this latter group within its scope, but the regulations will be more easily understood and administered if a separate definition and delimitation is adopted for the term "administrative." [15]

## Section IV. SALARY TESTS

### SALARY TESTS FOR THE VARIOUS TYPES OF EMPLOYMENT

With few exceptions, there was general agreement on the appropriateness of a salary test for the terms "executive" and "administrative." [16] It was widely conceded that the terminology of section 13 (a) (1) implies a status which cannot be attained by those whose pay is close to or below the universal minimum envisaged in the act. It was further pointed out that the good faith specifically required by the act is best shown by the salary paid. A more detailed examination of these matters will be found below in sections VI and VII of this report.

The propriety of a salary test for professional employees was not given such full consideration at the hearings but insofar as the question was raised, there was considerable agreement on its appropriateness; this is discussed in section VIII. On the other hand, it was apparently universally assumed that there would be no salary test in the definition of "outside salesman"; this opinion is commented on in section IX.

The amounts proposed for the various definitions varied from nothing to $5,000. Further, a considerable number of definitions suggested different salary tests for the different terms, and this is recommended below. However, it was notable that only one of the proposals included differentials based on regional or population differences. This proposal, which has not been adopted in the recommendations, requires analysis.

### REGIONAL AND POPULATION SALARY DIFFERENTIALS

It was proposed by the American Bankers Association and various other parties that various salary minima be established. Generally speaking, these proposals suggested different minima for different sized communities. [17] Other proposals suggested either varying minima or a single minimum specifically designed to take into account some local customary salary base. Furthermore, some parties claimed that the Adminstrator did not have authority and should not establish

---

[15] Compare the distinction between "administration," "management," and "operation" in the article entitled "Administration and Organization, Functions of" in Pitman's Dictionary of Industrial Administration, vol. 1, p. 10. "Administration" is explained as the policy-making function, "management" as the policy-executing function.

[16] A salary qualification was included in proposed redefinitions submitted by the following: Shell Oil Co., Mid-Continent Oil & Gas Association, National Wholesale Druggists' Association, Council of National Wholesale Associations, Indiana Manufacturers' Association, United Wholesale Grocers Association Inc., American Retail Federation, Manufacturers' Association of Connecticut Inc., National Association of Manufacturers, National Association of Ornamental Metal Manufacturers, Oklahoma Stripper Well Association, Insulation Board Institute, Motion Pictures Producers and Distributors of America, National Small Business Men's Association, American Newspaper Publishers' Association, Edison Electric Institute, National Association of Broadcasters, and International Brotherhood of Electrical Workers. The alternative redefinitions of "executive" and "administrative" submitted by the American Bankers Association were based entirely on a salary qualification.

[17] The American Bankers' Association's alternative redefinition for "administrative" provided for six different salary qualifications varying from $80 a month for those employed in towns having a population of less than 10,000 to $200 a month for those employed in cities having a population of 1,000,000 or more.

a general national minimum requirement for exemption.[18] Aside from the serious difficulties in enforcement that would be involved, these various suggestions fail to take into account the fact that the Fair Labor Standards Act itself has as an objective "a universal minimum wage of 40 cents an hour" and contemplates lower differential minima only as a temporary device in reaching the universal minimum as rapidly as possible.

Further, it should be recognized and admitted that the minimum salary qualification in the definitions of "executive," "administrative," and "professional" must be in each instance an approximation of what will best effectuate the purposes of the act. Like most laws of national application, the act itself and the regulations issued thereunder cannot pretend to be scientific in the sense of taking into account every small variation occurring over the length and breadth of the country. To make enforcement possible and to provide for equity in competition, a rate should be selected in each of the three definitions which will be reasonable in the light of average conditions for industry as a whole. In some instances the rate selected will inevitably deny exemption to a few employees who might not unreasonably be exempted, but, conversely, in other instances it will undoubtedly permit the exemption of some persons who should properly be entitled to the benefits of the act.

## Section V. THE EXEMPTION OF ALL WHITE-COLLAR WORKERS

### LEGAL ARGUMENTS

Some of the proposals, most notably perhaps the proposal of the Southern States Industrial Council (as originally presented in written form)[19] would have the effect of exempting all of that very large group of persons known loosely as "white collar workers"—generally speaking, all employees except laborers, machine operators and tenders, craftsmen, and maintenance workers. It is unnecessary herein to discuss in detail the various legal arguments that were advanced in support of the proposition that such workers are not covered by the act at all. The Administrator has on numerous occasions expressed the opinion that white collar workers as such are entitled to the benefits of the act[20] and his opinion is, of course, followed in this report. Under the contrary opinion the specific statutory exemptions for named groups of typical white collar employees would not be needed nor would there be any occasion for a reexamination of Regulations, Part 541. However, it was urged alternatively by some that, while the general coverage of the statute might be thought to include "white collar " workers, the terms "executive," "administrative," and "professional" (and presumably "outside salesman") in and of themselves should be construed and were meant by Congress to exclude from the benefits of the act all white collar workers. Surely if Congress had meant to exempt all white collar workers, it would have adopted far

[18] It was argued by Mary M. Manderscheid, Montgomery Ward & Co., that this involves the assumption by the Administrator of a power to fix minimum wages for "executive" and "administrative" employees for which no basis is found in the act. Record April 10–16 hearing, vol. II, p. 267.
[19] It was later stated at the hearing by the Council's general counsel, J. H. Ballew, that a salary qualification of $20 to $30 a week would not be objectionable; record June 3–5 hearing, vol. I, p. 27.
[20] See Wage and Hour Division Interpretative Bulletin No. 1, par. 5.

more general terms than those actually found in section 13(a)(1) of the act. The theory of general exemption is further negated by the grant of power to the Administrator to define and delimit those terms.

## OVERTIME AND "IN-SERVICE" TRAINING

In addition to the legal arguments advanced, it was stated as a reason for exempting "white collar" workers that the overtime penalty interferes with the efforts of ambitious young men to improve their status by studying their employer's business after working hours.[21] An employer may frequently consider such after-hours work of inadequate educational value to justify overtime payments. However, the normal practice throughout industry for both factory and clerical workers is to give training on the job and during working hours, and the act in no way discourages such training. While a hardship with respect to training may be produced in occasional exceptional instances, this hardship must be weighed against the general widespread improvement of working conditions which results from application of the act.

It was also stated that the overtime requirements force some employers to place their clerical employees on staggered shifts which are inconvenient to both employer and employee.[22] No doubt this has occurred in some instances, although much of the testimony on this point referred to staggered shifts as a future possibility rather than a present actuality. These inconvenient staggered shifts may or may not be put into effect and at most will be adopted by only a small percentage of employers. Again such inconvenience as may result must be balanced against widespread shortening of working hours and increased employment.[23]

Another general argument advanced to support proposals that all clerical workers be exempted is that compliance with the act may lead employers to change many of their employees from a weekly or monthly salary to a straight hourly pay basis with the result that the employees will earn less in slack times.[24] Without underestimating the general desirability of weekly or monthly salaries which enable employees to adjust their expenditures on the basis of an assured income (so long as they remain employed), there is little advantage in salaried employment if it serves merely as a cloak for long hours of work. Further, such salaried employment may well conceal excessively low hourly rates of pay.[25] It also does not appear why there should be a reluctance to make occasional or even frequent overtime payments to salaried workers (other than those who fall into the narrower group of specifically exempted employees). Either the penalty payments will discourage long hours of work, or the worker will receive a reasonable compensation for his additional

---

[21] For example, see statement of A. L. M. Wiggins, American Bankers' Association, record July 9 and 10 hearing, vol. I, p. 26.
[22] For example, see statement of F. G. Addison, Securities Savings and Commercial Bank of Washington, D. C., record July 9 and 10 hearing, vol. I, p. 54.
[23] One large New York bank hired 300 additional employees to reduce hours below the statutory maximum; see address of Administrator before the Iowa Bankers' Association, Des Moines, Iowa, Sept. 11, 1940; Wage and Hour Division, G-79, p. 4.
[24] See statement of A. L. M. Wiggins, op. cit., note 21, p. 10.
[25] It was stated by Hugh C. McKenny, Commercial Telegraphers' Union, that, as a result of the exemption from overtime payments accorded executives, employees in nonexecutive positions working the same number of hours and being paid at a lower rate will frequently surpass the executive in total compensation received. Record July 25–29 hearing, vol. IV, p. 546.

efforts. Extra payments by way of bonuses have long been common and are not considered inconsistent with salaried status.

Although it is not suggested that under all circumstances the requirement of overtime payments to salaried workers is completely desirable and completely equitable, it is believed that under normal conditions the requirement is appropriate for salaried as well as for hourly paid workers. Finally, while it is reasonable to hold that the terms "bona fide executive, administrative * * * and professional capacity" are properly applicable in general only to salaried workers,[26] it does not necessarily follow that all salaried workers fall within these three categories. Even if such action were desirable, and it is not thought to be so, the Administrator does not have the power to exempt all salaried workers.

Another argument frequently advanced by the proponents of a blanket exemption for white collar workers is that the maximum hours provisions of the act are or should be applicable only to persons whose earnings approximate the minimum wage. "A ceiling for hours" is just as much an independent objective of the act as a "floor for wages," and surely it is a serious misreading of the act to assume that Congress meant to discourage long hours of work only where the wages paid were close to the statutory minimum. Living conditions can be improved and work spread even where wages are comparatively high.

## LOW WAGES OF SALARIED WORKERS

All the foregoing arguments have as an inarticulate major premise the assumption that all salaried white collar workers enjoy satisfactory working conditions—that they need no protection against oppressively long hours. The record shows the incorrectness of this assumption. There is evidence, some of it introduced by proponents of the blanket exemption, that, prior to the effective date of the act, a workweek of 48 or 54 hours or even longer was common.[27] This is confirmed by the results of a survey of 4,821 women office employees in 39 States and the District of Columbia which was quoted by one witness to show that the hours of work of these employees are frequently long, 30 percent of them having a workweek of 44 to 48 hours and 10 percent having one of 48 hours or more.[28] The significance of this testimony is enhanced by the fact that the 1930 Census of Population showed that 1,986,830 or 49.4 percent of the total number of clerical workers were women. Moreover, there was testimony that vacations with pay are far from universal [29] and that long hours at sedentary occupations are not conducive to health.[30] Thus, the labor conditions of this group of employees have frequently been, in fact, "detrimental to health, efficiency, and general well-being." This

[26] As will be seen below, a requirement that pay be on a salary basis is recommended for executive employees and on a salary or fee basis for administrative and professional employees.
[27] See, for example, statement of Joseph T. Owens, representing the Pittsburgh Plate Glass Co., record April 10–16 hearing, vol. II, p. 243 ; statement of Lewis Merrill, United Office and Professional Workers of America, record April 10–16 hearing, vol. II, p. 342.
[28] Women's Bureau, U. S. Department of Labor, Bulletin No. 132, Women Who Work in Offices. Quoted by Nina P. Collier, League of Women Shoppers, Inc., record April 10–16 hearing, vol. V, p. 786.
[29] Statement of Morris Zeitlin, International Federation of Architects, Engineers, Chemists, and Technicians, record July 25–29 hearing, vol. I, p. 156.
[30] Statement of Louis Merrill, United Office and Professional Workers of America, record April 10–16 hearing, vol. II, p. 340.

conclusion is corroborated by the testimony of union representatives who furnished evidence of the enhanced well-being of their members caused by the shortening of their working hours. Concretely, for example, one union representative stated that the reduction of weekly hours of work had been followed by a notable decline in per capita sick benefits.[31]

The desire to have all white-collar workers exempted under section 13 (a) (1) is probably also linked with a forgetfulness of the fact that section 13 (a) exempts workers from both section 6 and section 7 and an unawareness of the low wages that an astonishingly large percentage of these workers have been paid. It was admitted by some employer representatives that occasionally white-collar workers receive low wages,[32] but the prevalence of low wages is best shown by surveys made by governmental agencies, State and Federal. The survey of women office workers previously referred to showed that 25.4 percent of the employees covered earned less than $20.00 a week,[33] while another survey which covered both men and women office employees showed surprisingly large percentages earning less than $17.50 per week.[34]

In addition to the many statements made at the hearings by both employee and employer representatives concerning the attitude of white-collar workers toward their inclusion under the act, consideration must also be given to direct expressions from those immediately and personally affected by the proposed exemption. The Administrator has received a number of such letters. Typical among them is one from a white collar employee in North Carolina [35] who states that:

Federal labor legislation has been responsible for reducing our hours * * * from 70 and 80 a week to around 42 * * * We and countless thousands of other so-called white-collar workers owe our leisure to the Wage-Hour Act. May I urge you again not to weaken it.

It is notable that although this employee obviously receives more than 40 cents an hour, he is deeply concerned with hours limitation. This is merely one individual statement out of many. The basic position is the same as that adopted by labor unions testifying on behalf of thousands of employees. To exempt these employees under section 13 (a) (1) would deprive them of their right to the minimum wage

---

[31] Statement of Leo Bernstein, United Wholesale and Warehouse Employees of New York, record April 10–16 hearing, vol. V, p. 810.
[32] For example, see statement of J. H. Ballew, Southern States Industrial Council, record July 25–29 hearing, vol. I, p. 20, and statements of individual employers requesting exemption for white-collar employees with salaries ranging as low as $12 and $15 a week and $52, $55, and $57.50 a month, in Southern States Industrial Council Exhibit No. 4 (hearings branch Docket No. 55).
[33] Women's Bureau, op. cit., note 28.
[34] A census of office employees conducted in Pennsylvania in 1934 showed the percentage of workers in various white-collar occupations who earned less than $17.50 a week to be as follows:

| | Percent |
|---|---|
| Office machine operators | 52.4 |
| Telephone and switchboard operators | 68.4 |
| File clerks | 46.4 |
| Order clerks | 59.8 |
| Office clerks | 38.7 |
| Shipping and receiving clerks | 40.8 |
| Stock clerks | 47.4 |
| Secretaries | 23.3 |
| Stenographers | 51.9 |
| Typists | 62.1 |
| Bank tellers | 5.4 |
| Bookkepers | 41.3 |

Pennsylvania Emergency Relief Administration, Census of Employable Workers in Urban and Rural Non-Farm Areas, Pennsylvania, pp. 64 to 68.
[35] Letter dated August 25, 1940, from B. S. Dekle, found in hearings branch Docket No. 73.

required under section 6 and the overtime payments required by section 7. Their need for both should not be overlooked.

## Section VI. EXECUTIVE EMPLOYEES

### RECOMMENDED DEFINITION

**Section 541.1. Executive.**

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee

(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

(B) who customarily and regularly directs the work of other employees therein, and

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and,

(D) who customarily and regularly exercises discretionary powers, and

(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

Much of the criticism of the present Regulations, Part 541, has been directed at section 541.1 thereof.[36] This has arisen principally because section 541.1 tends to exclude from the exemption the type of employee previously described as being employed in an administrative capacity. Inasmuch as a separate section of the Regulations defining this type of employee is recommended,[37] no attempt will be made at this point to consider this problem. The following discussion, therefore, is concerned with employees whose responsibility is directly managerial—employees, in other words, who in addition to other responsibilities, are concerned with the supervision of other workers.

### "DEPARTMENT OR RECOGNIZED SUBDIVISION THEREOF"

There was some criticism of the requirement in the present Regulations that the employee must have as a primary duty "the management of the establishment, or a customarily recognized department thereof, in which he is employed."[38] Criticism of this section was primarily made by those who were concerned with employees who supervise miscellaneous groups of employees not constituting a customarily recognized department or subdepartment of an establishment. This criticism might be felt to have greater weight and the problem might need more careful scrutiny if it were not for the fact that, with only rare exceptions, the evidence shows that these group supervisors customarily perform a substantial amount of the same work as do the men whom they supervise. Furthermore it would require a strange interpretation of "bona fide executive" to include

---

[36] For full text of present Regulations, see Appendix A.
[37] For full text of recommended Regulations, see Appendix B.
[38] See, for example, statement of Noel Sargent, National Association of Manufacturers, record June 3–5, hearing, vol. II, p. 376.

such group supervisors within the term. It would seem improper to give as imposing a title as "executive" to a person who supervises a collection of men performing a job, or a series of jobs, but whose responsibilities do not include the kind of permanent status that is properly associated with the management of a recognized department.

There has been some question raised as to the precise significance of the term "department" and it was suggested that the words "or subdivision thereof" should be added.[39] To avoid confusion this suggestion has been adopted, since the word "department" has varying applications. Fundamentally and properly the distinction lies between the supervision of a unit with a permanent status and function and the supervision of a group of men assigned to a specific job, even though the same employee may supervise similar jobs at various times in different places or on different materials, etc. The present Regulations do not denote a specific type of unit by the use of the word "department," but contemplate the continuing functioning of the unit and the customary recognition of the functioning unit as such. This is merely made clear in the proposed alteration.

## "PRIMARY DUTY"

*A priori* it might be thought that the term "primary duty" would be the cause of serious questioning in the actual application of the definition to specific cases. Apparently this has not occurred. Presumably this somewhat general phrase has failed to cause difficulty because anyone who does not have the management of a department or subdivision as his primary duty could hardly qualify as not performing a "substantial amount of work of the same nature as that performed by nonexempt employees," (except possibly in the case of "administrative" employees). In other words, if the amount of nonexempt work performed by the managerial person is insubstantial, it would normally follow that his primary duty consists of his managerial responsibilities.

## "CUSTOMARILY AND REGULARLY DIRECTS"

There was little detailed criticism of the phrase "who customarily and regularly directs the work of other employees therein." What criticism there was arose largely from a misunderstanding. Apparently there has been considerable doubt in the minds of employers, employees, and inspectors concerning the status of assistant department heads.[40] In a large machine shop, for example, there may be a machine-shop supervisor and two assistant machine-shop supervisors. The question has been asked whether the two assistant supervisors qualify for the exemption. Assuming that they meet all the other qualifications of section 541.1 and particularly that they are not working foremen and do not perform the work performed by the men under their supervision, they should certainly qualify for the exemption. A small department in a plant or in an office is usually supervised by one person. Any attempt to describe one of the other workers in the de-

---

[38] Redefinition proposed by the Edison Electric Institute.
[39] Among the occupations for which exemption was requested are the following: assistant managers, assistant office managers, assistant buyers, assistant cashiers, assistant producers, assistant directors, assistant foremen, and assistant story department heads. Of course, many employees in these occupations fail to qualify for exemption on several counts.

partment as an assistant supervisor merely by giving him an honorific title will almost inevitably fail as there will not be sufficient true supervisory work to keep two persons occupied unless one of them performs a substantial amount of work like that performed by the nonexempt employees. It should not be difficult to distinguish abuse of this type. On the other hand it is incorrect to assume that, in a large department the supervision cannot be distributed among two or three employees, conceivably among more. In such instances, assuming that the other tests are met, especially the one concerning the performance of non-exempt work, each such employee should be held to be one "who customarily and regularly directs the work of other employees therein." It is not thought that any change in the wording of section 541.1 is needed to enforce this point.

## THE PLURAL FORM "EMPLOYEES"

There has been some doubt about the position of the Wage and Hour Division on the use of the plural form "employees." The plural form was used deliberately in the original drafting of this section of the Regulations because it was felt that an employee, to be a true "executive," should direct the work of at least two other persons. The rule has been called into question occasionally in connection with well-paid one-man department heads—personnel directors, safety directors, etc. However, under the redefinitions proposed herein such employees may qualify for exemption as administrative employees. Thus in the future there will be no reason for departing from a rule that deserves strict application in the case of executive employees.

## "AUTHORITY TO HIRE AND FIRE"

Criticism of the phrase "who has the authority to hire and fire other employees,"[41] has been based on the ground that in modern industrial practice the function of hiring is frequently delegated to a personnel department or director, even though the function of firing, or at least recommending dismissal, is normally retained by the supervisor in charge of a group.[42] Accordingly it is felt that the value of the test will be retained and the requirement will be made more in accord with modern industrial employment practice by changing the word "and" in the phrase "hiring and firing" to "or."[43] This is recommended both for "hiring and firing" in this clause and also for "hiring and firing" in the next clause. With this slight modification it is felt that the test is entirely appropriate. It is difficult to see how anyone, whether high or low in the hierarchy of management, can be considered as employed in a bona fide executive capacity unless he is directly concerned either with the hiring or the firing and other change of status of the employees under his supervision, whether by direct action or by recommendation to those to whom the hiring and firing functions are delegated.

---

[41] See for example the statements of Noel Sargent, National Association of Manufacturing, record June 3–5, hearing, vol. III, p. 372; and John V. Lawrence, American Trucking Association, record July 25–29, hearing, vol. III, p. 449.
[42] A question concerning the exemption of executives who have delegated the hiring power was raised by John V. Lawrence representing the American Trucking Association, record July 25–29, hearing, vol. III, p. 448.
[43] This was formally proposed by the National Association of Manufacturers and the American Newspaper Publishers Association, and was suggested informally by several other groups.

## "EXERCISES DISCRETIONARY POWERS"

It was argued by some that the clause "who customarily and regularly exercises discretionary powers," is vague. Actually, this phrase or phrases almost identical with it were proposed by many of the proponents of modification of the Regulations.[44] In some instances it was used in the same or in a comparable position in their proposed definitions and in other instances it was used in other connections. In any event, no satisfactory substitute has been suggested. It was fairly generally agreed that the test of the use of discretion is not unreasonable. Actually there have been few instances of an employee qualifying on all other counts but disqualified because he fails to exercise discretionary powers. Clearly a person whose work is so completely routinized that he has no discretion should not qualify. It is therefore advisable to preserve the phrase lest on occasion, particularly in industries where the scale of pay is high, a job might be set up which was really established to evade the spirit of the regulations and in which the final critical test would be the use of discretionary power. It will not operate to disqualify any true executive.

## "WORK OF THE SAME NATURE AS THAT PERFORMED BY NONEXEMPT EMPLOYEES"

Much of the criticism of section 541.1 was directed at the phrase "who does no substantial amount of work of the same nature as that performed, by nonexempt employees of the employer." This criticism was twofold in nature. In the first place, the clause was strenuously objected to by those who found it vague and ambiguous and who felt that it has led to conflicting results in the actual administration and enforcement of the act.[45] It was also objected to by another group of employer representatives who felt that however clarified, it would operate to disqualify a group of employees whom they wished to exempt.[46]

The first point to be considered is the alleged ambiguity of the phrase "who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer." It is undoubtedly true that this phrase has proved difficult of administration. Many proposals were received, not unnaturally, to drop the phrase

---

[44] This same phrase or a phrase substantially the same is found in the proposed redefinitions of "executive" submitted by the following: Shell Oil Co., Council of National Wholesale Associations, Manufacturers Association of Connecticut, Inc., Montgomery Ward & Co., Inc., National Association of Manufacturers, Mid Continent Oil & Gas Association, National Association of Ornamental Metal Manufacturers, Insulation Board Institute, American Bankers Association, Association of Stock Exchange Firms, Motion Picture Producers and Distributors of America, Inc., American Newspaper Publishers Association, and the Edison Electric Institute. In addition to these, the American Trucking Association, the Illinois Manufacturers Association, The Indiana Manufacturers Association, and the National Small Business Men's Association, would by use of this qualification as one of a series connected by the disjunctive "or" make compliance therewith sufficient to exempt.

[45] Among those who argued that the phrase produces confusion were J. E. Timberlake, National Wholesale Grocers Association, and Maxwell Field, New England Shoe & Leather Association, record, April 10–16, hearing, vol. I, pp. 81, 34, 40; record June 3–5, hearing, vol. I, pp. 87, 88.

[46] Typical of the arguments presented by this group is that of Cleveland A. Newton, special committee of Wholesale Distributive Trades, Associated Industries of Missouri, who stated: "We submit that if an employee has the other qualifications set out in the definition, the performance of nonexempt work should not eliminate him from his proper classification as an executive or administrative employee," and added that "this is true in many smaller companies where they do not have sufficient exempt work to perform, and the employee helps on other matters when the occasion arises," record, April 10–16, hearing, vol. II, p. 316.

entirely, but upon closer scrutiny, the proponents usually admitted that deletion of the phrase would not solve the problem. It was freely admitted that an employee who is an executive ·1 hour a week should not qualify for the exemption.[47] The deletion of this phrase would then throw the same problem of interpretation on the words "primary duty," found earlier in the definition. "Primary duty" would then become subject to the same controversy that has already arisen over "substantial amount of work."

## FIXED PERCENTAGE SUGGESTED

As an alternative to deletion, it was suggested that the phrase be defined in terms of fixed percentage. There is little doubt that any percentage that might be taken as an arithmetical equivalent of the word "substantial" must be somewhat arbitrary in nature and will cause some hardship. It will exclude certain employees from the exemption who probably might well be permitted exemption. On the other hand, it will permit the exemption of certain employees who probably should be entitled to the benefits of the Act. Nevertheless, even if full weight is given to the difficulties that inhere in the choice of a quantitive measurement, this remains the most practical solution of a difficult problem.

Many persons who agreed that a percentage requirement was proper differed on the actual percentage that should be used.[48] In a number of instances proponents of a clarification of this clause indicated that the amount of nonexempt work allowable was not in itself of major consequence.[49] Their primary interest was in obtaining a sufficiently definite rule so that they could adjust their practices accordingly. There are, of course, any number of ways in which the word "substantial" might be translated into numerical terms. A number of employers and employer representatives suggested that "substantial" should be considered over 50 percent.[50] However, a number of employers agreed that this was an unduly large allowance for a person who is considered as employed in a "bona fide executive capacity." Among other proposals was one that "substantial" should be interpreted to mean not more than 20 percent. The recognition of the fairness of this by quite a few employer groups would seem to be an adequate assurance that it will not work hardship on employers.[51] Equally, since there was no uniform objection to this amount by the unions, it may be taken as not unfair to employees.[52]   Furthermore,

---

[47] See, for example, statement of Joseph L. Miller, National Association of Broadcasters, record July 25–29, hearing, vol. I, p. 116.
[48] The proposals varied from "no nonexempt work" in the proposed redefinitions of the International Brotherhood of Electrical Workers to not more than 50 percent in the redefinitions submitted by Montgomery Ward & Co.
[49] For example, see statement of Maxwell Field, op. cit., note 45, pp. 88, 89.
[50] For example, Montgomery Ward & Co., Illinois Manufacturers' Association, Indiana Manufacturers' Association, Institute American Poultry Industries, and National Association of Manufacturers.
[51] It was stated by Claudius I. Murchison, representing the Cotton Textile Institute, that an interpretation of the word "substantial" to mean not more than 8 hours a week "would relieve the problem a great deal" and "would be very valuable," record June 3–5, hearing, vol. III, p. 347. Maxwell Field, representing the New England Shoe & Leather Association, made a definite proposal that "substantial" be defined as not more than 20 percent, op. cit., note 45.
[52] Lazare Teper, representing the International Ladies Garment Workers' Union, testified that "not more than 20 or 25 percent of normal working time of nonexempt employees should be the guiding mark with regard to "substantial amount of work," record April 10–16, hearing, vol. III, p. 397. Likewise Nathan Weinberg, also appearing for the I. L. G. W. U., indicated that he would not object to the defining of "no substantial" as 20 or 25 percent, record June 3–5, hearing, vol. III, p. 459.

in the recent past the Wage and Hour Division in answering inquiries on the subject has stated that it would not consider 10 percent as in violation of the "substantial" requirement, whereas it would consider work in excess of 20 percent as a violation of that requirement. It is felt that this reply has, if not generally, at least frequently proved satisfactory. Although this implies 15 percent rather than 20 percent, the evidence adduced at the hearings indicates the desirability of a slightly greater allowance. The 20 percent allowance will be entirely adequate for such common situations as the bank cashier who acts as relief for a nonexempt employee one hour a day, or the radio station executive who performs one eight-hour shift of nonexempt work each week.

### BASED ON HOURS WORKED BY NONEXEMPT EMPLOYEES

In the proposals for adopting a percentage criterion there was usually no indication as to the base upon which the percentage should be taken. When this defect was pointed out the proponents agreed that it was proper to use as a base the standard workweek of the employees under the direction of the executive in question.[53] If the base were the workweek of the employee himself, he could obtain exemption merely by increasing his hours of exempt work. In such instances the rate per hour paid the exempt employee would frequently fall below the hourly rate paid the nonexempt employees.[54] Such a rule would encourage excessive hours of work. As a matter of administrative convenience, it will be proper in all normal situations, where the hours of work approximate 40, to take as a base for computation the 40-hour week that is established as the permanent standard under the act and consider 8 hours per workweek as the maximum allowance of nonexempt work. Unusual situations can be handled by the strict arithmetical application of the 20 percent rule; thus where the nonexempt employees work, for example, 30 or 50 hours, the allowance would be 6 and 10 hours respectively.

### WORKING FOREMEN AND WORKING SUPERVISORS

As previously stated, the phrase "substantial amount of work of the same nature as that performed by nonexempt employees of the employer" was criticized by some as vague and by others as improper even if made certain.[55] The second group of critics had in mind certain types of employees who would be excluded from the exemption even if a figure of approximately 20 percent were adopted as a criterion for "substantial." Among the employees typically excluded from the exemption by such limitation are working foremen (as for example in tanneries and in press rooms or print shops), local superintendents of public utility companies, head mail clerks and shipping clerks, head bookkeepers, terminal managers of bus and trucking companies, and file room supervisors. It will be noted that a number of these occupations involve employees who are in charge of a physically separated branch establishment or a small independent establishment. Such employees present a special problem which is separately considered and

[53] For example, see statement of Maxwell Field, op. cit., note 45, p. 89.
[54] Statement of Hugh C. McKenny, op. cit., note 25.
[55] Op. cit., notes 45 and 46.

treated below. The following discussion applies only to employees who are department heads within an establishment.

The employees in question fall into two major groups: Working foremen in charge of skilled or unskilled laborers, and supervisors of clerical or semiclerical employees. Since a vast majority of clerical workers of all grades are not members of unions, union contracts in this field are of little assistance in determining the appropriate status of working supervisors. On the other hand, consideration can properly be given to union practice with regard to working foremen. It should be noted, of course, that for obvious reasons labor unions normally exclude from their membership and from the provisions of their collective bargaining agreements persons employed in a bona fide executive capacity. Frequently, union agreements also exclude other employees who have a direct relationship to management even though it be of an admittedly nonexecutive type.[56] For this and other reasons union practices constitute a useful guide but cannot be taken as determinative in the problem of definition.

In most industries working foremen are not admitted to union membership. This prohibition is, of course, based on the fact that the working foreman, like various other types of employees, as, for example, the company policeman, is in a sense identified with the management of the company. In a number of other instances working foremen are admitted to union membership and are covered by the same general wage and hour provisions in collective bargaining agreements as are the employees whom they supervise. In such instance the normal practice is to exclude the nonworking foreman from the union and from the collective bargaining agreement.[57] An unusual situation is typified by the typographical unions where both working and nonworking foreman must be union members if they are employed in union shops.[58] The general practice in typographical union contracts apparently limits the number of hours that the working foreman can work on journeyman's work but allows him to work additional time performing clerical work arising out of his supervisory duties. In any event, this is a special situation. The best modern industrial practice limits the hours of working foremen in the same manner as it does that of all production employees. Furthermore, many of the witnesses who testified at the hearing on behalf of employers explained that they did not seek exemption for working foremen.[59]

The same general problem arises with respect to head bookkeepers and other white collar supervisors, but there is little doubt that the head bookkeeper, for example, who spends a substantial amount of his time keeping books of the same general nature as those kept by the other bookkeepers, is not primarily an executive employee and

[56] For example, contracts negotiated by the United Rubber Workers of America exclude those employed in supervisory or executive capacities and those whose duties are confidential in nature. Bureau of Labor Statistics, U. S. Department of Labor, Collective Bargaining by United Ruber Workers, p. 3.
[57] Agreements obtained by bakery unions generally include foremen who regularly work with the product but exclude those whose work is normally entirely supervisory. Bureau of Labor Statistics, U. S. Department of Labor, Wages, Hours, and Working Conditions in Union Bakeries, June 1, 1939, p. 6.
[58] This is noted in the Bureau of Labor Statistics Report, Union Wages, Hours, and Working Conditions in the Printing Trades, June 1, 1939, p. 29.
[59] See, for example, statements of Noel Sargent, National Association of Manufacturers, record June 3–5, hearing, vol. III, p. 396; A. L. Funke, Automatic Electric Co., record July 25–29, hearing, vol. I, p. 92; and Homer Mitchell, Motion Picture Producers & Distributors of America, Inc., record July 25–29, hearing, vol. I, p. 63.

should not be so considered. Some employer representatives testified that they did not object to paying such employees for their overtime at the required rate.[60] While undoubtedly in many instances a working foreman or supervisor is an employee of a mixed type since he does perform some duties in an executive capacity and some duties which are admittedly not so performed, it would be inconsistent with the purposes of the act to encourage excessive hours of work on the part of such foremen by granting an exemption. Many of the labor unions' witnesses opposed to exemption of working foremen on the ground that their exemption would tend to decrease employment possibilities for other union members.[61] The matter is, of course, somewhat one of degree. If the phrase used in the Regulations were "no work of the same nature as that performed by nonexempt employees,"[62] a hardship might frequently be worked, because the foreman or supervisor might feel barred from occasionally pitching in to help his fellow employees. However, the phrase has been in fact "no substantial amount of work." It is proposed that this be rephrased so that exempt employees can work at nonexempt tasks as long as the time spent in such work does not exceed 20 percent of the hours of nonexempt employees. Furthermore, as set forth later, the employee in sole charge of an establishment is accorded special treatment. In view of these liberal provisions, it is not believed that an employee who fails to meet the proposed requirement in the regulations is in any reasonable sense an employee employed in a "bona fide executive * * * capacity."

### "INDEPENDENT . . . OR . . . BRANCH ESTABLISHMENT"

The one situation where it seems unwise to apply even the liberal 20-percent rule is that of the employee in sole charge of an independent establishment or a physically separated branch establishment.[63] Clearly, if such an employee does have at least two other employees to supervise and is not himself supervised at the location where he works, he possesses a degree of executive freedom that would not be the case if he had a job of comparable importance in charge of a department inside a plant. Due weight must be given to this freedom from direct supervision enjoyed by the top person in an independent establishment or in a branch establishment physically separated from the supervising office of the company. For that reason it is recommended that there be no limitation on the amount of nonexempt work performed by such employees. It is felt that the occasional exigencies of business, particularly in small branch establishments where the flow of work may be very great at times in comparison with the size of the regular labor force, make such leeway desirable and will not tend to defeat the purposes of the act. Moreover, there is an adequate safeguard against abuse in the fact that only one person in any establishment can be classed as an "executive"

---

[60] See statement of Wm. W. Peake, Association of Stock Exchange Firms, record April 10–16, hearing, vol. III, p. 420. Mr. Peake, however, urged that the status of head bookkeepers and assistant head bookkeepers be clarified in the new regulations.

[61] For example, see statement of L. J. Buckley, International Stereotypers and Electrotypers Union of North America, record July 25–29, hearing, vol. IV, p. 527.

[62] This was proposed by Lawson Wimberly on behalf of the International Brotherhood of Electrical Workers, record July 25–29, hearing, vol. IV, p. 479.

[63] The problem presented by the Pittsburgh Plate Glass Co. with reference to its branch managers is a typical illustration, record April 10–15, hearing, vol. II, pp. 218, 219.

by the application of this proviso. Among those who will be exempt under such a provision, many of whom, at present, are probably not exempt or whose exemption is doubtful, are managers of branch warehouses, managers of branch trucking depots, local managers of branch offices of utility companies, cashiers of small banks and others.

It should be noted that the justification for discarding the limitation on nonexempt work in this situation is the comparatively high degree of freedom from supervision and the consequent weight of the executive responsibility involved. It follows that such exemption is and should be available only to a person who does have executive responsibilities and who is actually engaged in supervising the work of others. In no instance should this be construed as applying to a person who does not have at least two other employees under his permanent supervision.

It should also be noted that the term "independent establishment" must be given full weight. The establishment must have a fixed location and must be geographically separated from other company property. The management of operations within one among several buildings located on a single or adjoining tracts of company property does not qualify for the exemption under this heading. In the case of a branch, there must be a true and complete physical separation from the main office.

### "WORK OF THE SAME NATURE"

Some question has been raised from time to time as to what constitutes "work of the same nature as that performed by nonexempt employees of the employer." Usually the answer is not difficult. The head bookkeeper who keeps a set of books is performing such nonexempt work even though his books cover different transactions from the books maintained by the under bookkeepers. This is true because, in general, the work is of the same type and is not in itself indicative of the executive nature of the head bookkeeper's responsibilities. Even though the books are confidential in nature, the conclusion would not be altered, for they could obviously be maintained by any trusted bookkeeper. On the other hand, the work of maintaining production and personnel records and making reports thereon directly relative to a supervisory employee's department and reflecting the effect of his supervisory activities is, generally speaking, not to be construed as nonexempt work, even though, in a sense, the work of certain nonexempt employees might also be described as record-keeping and reporting.

Normally manual labor, including the operation and repair of machinery, will properly be counted as nonexempt work. Any exception to this may be found where the supervisor of a department sometimes participates in repair work of an unusually difficult nature which his subordinates cannot perform and which directly affects the continued operation of his whole department. Such instances would be rare.[64]

### PHRASE "OF THE EMPLOYER" DELETED

Occasionally an abuse of the definition has been attempted in which it is claimed that the employee in question performs work, which,

---

[64] For example, it was stated by Charles W. Boyce, Northwest Paper Co., that foremen in paper factories do not average an hour a week in repairing machinery, record June 3–5, hearing, vol. II, p. 312.

though nonexecutive in nature, is unlike work performed by other employees of the same employer. Clearly, in the great majority of cases, the easiest test of the nonexempt nature of an employee's work is that it is performed habitually by nonexempt employees in the establishment. The Regulations were obviously drafted with this in mind and have been so interpreted by the Wage and Hour Division. There is an occasional situation where the literal application of the phrase "of the employer" has lead to dispute, as where the work of a shipping department is so subdivided that the supervisor himself carries on all the routine clerical work of the department, even though in other establishments such work is normally performed by nonexempt employees. To clarify this part of the Regulations and to prevent any such attempted evasion, it is recommended that the phrase "of the employer" be deleted.

### "NOT LESS THAN $30 A WEEK"

Criticism was also directed at the clause "who is compensated for his services at not less than $30 (exclusive of board, lodging, or other facilities) for a workweek. It was asserted by some that the Administrator has no authority to include a salary qualification. This view had little support.[65] There was indeed surprisingly wide agreement that a salary qualification in the definition of the term "executive" is a valuable and easily applied index to the "bona fide" character of the employment for which exemption is claimed and which must be of a "bona fide" executive character by the terms of the statute itself. This agreement was manifested both in oral testimony and in the terms of many of the proposed redefinitions.[66]

The basis of this agreement is easily explained. The term "executive" implies a certain prestige, status, and importance. Employees who qualify under the definition are denied the protection of the act. It must be assumed that they enjoy compensatory privileges and this assumption will clearly fail if they are not paid a salary substantially higher than the wages guaranteed as a mere minimum under section 6 of the act. In no other way can there be assurance that section 13 (a) (1) will not invite evasion of section 6 and section 7 for large numbers of workers to whom the wage-and-hour provisions should apply. Indeed, if an employer states that a particular employee is of sufficient importance to his firm to be classified as an "executive" employee and thereby exempt from the protection of the act, the best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them. The reasonableness and soundness of this conclusion is sustained by the record.

---

[65] Specific oral approval of the use of a salary test for "executive" or "executive" and "administrative" was expressed by 32 representatives of employers; specific oral disapproval was expressed by only 4 such representatives.
[66] A salary qualification was included in proposed redefinitions for "executive" or "executive" and "administrative" submitted by the following: Shell Oil Company; Mid-Continent Oil & Gas Association; National Wholesale Druggists' Association; Council of National Wholesale Associations; Indiana Manufacturers' Association; United Wholesale Grocers Association, Inc.; American Retail Federation; Manufacturers' Association of Connecticut, Inc.; National Association of Manufacturers; National Association of Ornamental Metal Manufacturers; Oklahoma Stripper Well Association; Insulation Board Institute; Motion Pictures Producers and Distributors of America; National Small Business Men's Association; American Newspaper Publishers' Association; Edison Electric Institute; National Association of Broadcasters; and International Brotherhood of Electrical Workers. The alternative redefinitions of "executive" and "administrative" submitted by the American Bankers Association were based entirely on a salary qualification.

There is also ample precedent for the use of a salary qualification in this connection. There are 10 State wage-and-hour laws [67] requiring a salary qualification for exemption of executive, administrative, and supervisory employees. Furthermore, under the N. R. A., in codes adopted by industry, out of 534 codes exempting executive, administrative, and supervisory employees, 488 included a salary qualification. Thus, the salary test has been and is widely accepted as appropriate.

For the foregoing reasons, consideration need not be given here to the occasional proposals which suggested elimination of the salary requirement. However, criticism was also directed at the salary test in the definition because of the amount of compensation established as a test therein. It was claimed that $30 is too high a requirement.[68] Most of this criticism, however, was directed at this salary requirement as applied to "administrative" employees, it being argued that a lower salary requirement should be established in a separate "administrative" definition. It was contended, on the other hand, that $30 is too low.[69] A surprisingly large number of organizations apparently found the figure reasonable or at least satisfactory for their purposes and made no criticism of it.[70]

In evaluating the propriety of the $30 requirement, it is clear that there must be an adequate differentiation between the salary normally earned by a worker for a standard workweek who is employed as a craftsman or machine operator or tender and the salary of a person whose exemption is sought as an executive. Thus the proposal of one state manufacturers' association to set the salary qualification at $18 per week must clearly be rejected.[71] On the other hand, while in the abstract there is some justification for the suggestion made by the United Office and Professional Workers of America that the salary qualification be set at $5,000 per annum, it is equally clear that this is an impractical proposal.[72]

In determining a fair rate, it should be noted that in a number of industries a minimum of 40 cents per hour has already been established by wage orders. In these industries, this wage is applicable even to unskilled labor; semiskilled and skilled workers are consistently paid wages far in excess of 40 cents per hour. Thus, to take a single example, immediately prior to October 24, 1938, the average hourly earnings of workers in the full-fashioned hosiery industry were found to be: Skilled workers, $1.12 to 49¢; semiskilled workers, 76¢ to 35¢; unskilled

[67] U. S. Department of Labor, Division of Labor Standards, Chart Showing State and Federal Hours Limitations (October 15, 1939).
[68] The Indiana Manufacturers Association proposed $18 a week as a salary test, while the Southern States Industrial Council in its formal proposal suggested merely that the "executive" be paid on a straight salary basis, not specifying any definite salary.
[69] A proposal to make the requirement $40 a week was submitted by Lawson Wimberly, International Brotherhood of Electrical Workers, record July 25–29, hearing, vol. IV, p. 479; Lewis Merrill, representing the United Office and Professional Workers of America, argued that if any salary qualification is set it should be $5,000 a year, record April 10–16, hearing, vol. II, p. 345. Moreover, higher salary requirements of $35, $37.50, and $40 a week and $150 and $250 a month were suggested for "executive" by the Shell Oil Co., Council of National Wholesale Associations, Automatic Electric Co., Illinois Manufacturers' Association, National Small Business Men's Association, and American Bankers Association, respectively.
[70] The $30 requirement was retained in redefinitions of "executive" proposed by the following: Motion Picture Producers & Distributors of America, American Newspaper Publishers' Association, Edison Electric Institute, Insulation Board Institute, National Association of Broadcasters, National Association of Manufacturers, Mid-Continent Oil & Gas Association, National Association of Ornamental Metal Manufacturers, and Oklahoma Stripper Well Association.
[71] Indiana Manufacturers' Association.
[72] Proposal of Lewis Merrill, op. cit., note 69.

workers, 45¢ to 25¢.[73] The average hourly earnings of all workers in the industry on the same date was 66¢.[74] In the cloak and suit division of the apparel industry the average hourly earnings for manufacturing employees in the New York City producing area is $1.40.[75] For a 40-hour workweek employees in this group who are in no sense employed in an executive capacity receive an average of $56 per week. In such industries the $30 minimum is an exceedinly small protection, indeed no protection at all. In general, the difference between the weekly earnings of a skilled craftsman who does no supervising work and the minimum wage required herein for exemption as an executive is not very great in any industry covered by the act. This disparity will tend to decrease rather than increase as time goes on. Thus it appears that the adoption of a rate lower than $30 per week would not afford adequate protection against abuse in a great variety of instances.

Positive support for the adoption of a minimum not lower than $30 a week can also be derived from N. R. A. experience and from the practice found in State legislation. An exemption for executive and supervisory or managerial employees who received salaries in excess of $35 a week was provided for in 21 of the 30 N. R. A. Codes approved between September 7 and October 11, 1933. After that date the tendency to include an exemption based upon the $35 a week salary qualification was even more uniform, although in many of the codes a rate of $25 to $30 was set for smaller communities.

A similar tendency to exempt supervisory employees who receive more than a specified weekly compensation of about $30 is also found in State maximum hours statutes. Typical examples are the Female Labor Act for Arkansas,[76] which contains an exemption for "female persons employed in an executive or managerial capacity who exercise real supervision and managerial authority with duties and discretion entirely different from that of regular salaried employees, and who receive as compensation for their labor $35 per week, or more, exclusive of any and all bonuses and commissions," and the Colorado Six-Day-Week Law for cleaning and dyeing establishments,[77] which exempts executives receiving $30 or more a week. From the foregoing it is apparent that a salary requirement of less than $30 or $35 per week could not be justified for a person employed in a "bona fide executive" capacity.

A question remains, however, as to whether such a low requirement should be adopted and this can best be answered by estimating (1) the compensating advantages that may be found in the nature of the employment to justify the denial of the benefits of the act and (2) the protection against abuse provided by the entire definition including the salary proviso. The term "executive" as defined herein is applicable only to a person who directs others—who is responsible for a department of a business. This implies authority

[73] Findings and opinions of the Administration in the Matter of Recommendation of Industry Committee No. 3 for Minimum Wage Rates in the Hosiery Industry, August 18, 1939, pp. 92, 93.
[74] Ibid., p. 20.
[75] Findings and opinion of the Administrator in the Matter of Recommendation of Industry Committee No. 2 for Minimum Wage Rates in the Apparel Industry, May 15, 1940, p. 173.
[76] Crawford and Moses Digest, 1921, as last amended by Act 83, Laws 1937; sec. 7104; sec. 7109, as amended by 1927 supplement.
[77] Laws of 1937, ch. 113.

over people, a privilege generally considered desirable to possess. More important, as justification for unlimited hours of work, the opportunities for promotion to higher executive positions are clearly greater for those who already occupy some type of executive position. These intangible advantages are normally, though not always accompanied by more tangible advantages such as paid vacation and sick leave. Still more important is the fact that executives have a greater security of tenure than almost any other group of workers. When a factory retains only a skeleton crew, the foreman is normally a member of that crew; and the others members of the executive hierarchy also tend to retain their positions. Thus even the lower paid executives enjoy certain prerogatives that may be given weight.

The definition of the term "executive" as proposed and explained above is, of course, not without ambiguities. Borderline cases will arise. Nevertheless the combination of supervisory and discretionary responsibilities that form the heart of the definition is usually identifiable. It follows that there is no excessive danger of abuse through the granting of misleading titles, etc. Abuse there can be, for some foremen and supervisors are paid exceedingly low wages. Yet a rather low salary requirement will not impose an impossible task on those responsible for the enforcement of the act, because most claims for exemption under this heading can be analysed without undue difficulty on the basis of the job itself.

There is one further consideration that must be given weight. The penalty payment requirement for overtime work in the case of persons truly employed in an executive capacity would not usually have any considerable effect in spreading employment because in many instances the executive's work cannot be shared. In any event, it would produce this effect far less commonly than in the case of administrative and professional employees (as the terms are used herein). Thus a higher salary requirement for "executive" would not result in spreading employment to any very great extent, and particularly not in comparison with the increased employment to be anticipated from a comparable salary requirement for administrative and professional employees.

It should be noted further that executive employees are an essential feature of all industry. Many employers employ no administrative employees, as the term is used herein; thousands have no occasion to employ professional employees, in any sense of the term. Outside salesmen (and persons employed in a local retailing capacity) are found only in certain industries. But executives—high and low—exist and must exist everywhere. Accordingly, since, as has been explained, it is highly desirable not to establish regional salary differentials, the salary qualification for "executive" will affect both high and low wage areas, high and low wage industries, and large and small businesses.

When all the foregoing factors are taken into account, it appears desirable to retain a comparatively low salary requirement. The choice would appear to lie between $30 and $35.[78] In the absence,

---

[78] That a $35 requirement would not be seriously unfair to employers is indicated by the Arkansas statute cited above, since Arkansas is part of a comparatively industrialized and low-wage area and since female employees (those affected by the law) are customarily paid lower wages than males—who constitute the great majority of executive employees.

at least at the present time, of data to show that the present $30 requirement has proved unsatisfactory, it would seem the part of wisdom to retain that figure. If future investigations show the desirability of an upward shift, the alteration can be made at that time.

## EXEMPTION APPLIES ONLY TO SALARIED EMPLOYEES

It is hardly necessary to restate what has always been the position of the Wage and Hour Division, namely, that the $30 for a workweek can be translated into equivalent terms for longer periods. Thus the requirement is fulfilled if the worker is paid $130 for a month or a comparable amount for any other pay period. However, the requirement is not fulfilled by the earnings of a person who is paid on an hourly basis. The shortest pay period which can properly be understood to be appropriate for a person employed in an executive capacity is obviously a weekly pay period and hourly paid employees should not be entitled to the exemption. The executive status in and of itself connotes at least the tenure implied by a weekly pay period as the very minimum. Accordingly, it is recommended that this clause in the definition read: "Who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities)." One final explanation may be made. In some instances persons who would otherwise qualify as executive employees, particularly sales managers and branch sales managers, are paid in part or in full by methods of compensation which include commissions, drawing accounts, and other items. In such instances the salary requirement will be met if the employee is guaranteed a net compensation of not less than $30 a week "free and clear." Similarly, if board and lodging are involved, there should be a "free and clear" payment of $30 each week in cash.

It was also suggested that the phrase should read "at not less than the rate of $30 * * * for a workweek." [79] It was explained that this proviso was to take care of certain executives who are hired on a part-time basis. This would seem quite unnecessary, however, for a person earning at such a rate for part-time work would clearly fulfill the minimum wage requirements of the act and, if his work were only part-time, would not be subject to overtime payments. The modification therefore seems unnecessary.

## Section VII. ADMINISTRATIVE EMPLOYEES

### RECOMMENDED DEFINITION

**Section 541.2. Administrative.**

The term "employee employed in a bona fide * * * administrative * * * capacity" in Section 13 (a) (1) of the act shall mean any employee—

(A) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) Who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business opera-

79 Statement of Noel Sargent, National Association of Manufacturers, record June 3–5, hearing, vol. III, p. 374.

tions, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) Whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment.

## DISTINCTION BETWEEN "EXECUTIVE" AND "ADMINISTRATIVE"

In section III of this report there is a discussion of the propriety of establishing separate definitions for the terms "executive" and "administrative." The conclusion is reached that, while separate definitions for the two terms are not essential, they are proper and can be conveniently used to describe two different groups of employees both of whose duties may warrant exemption. It also is pointed out in section III and more fully in section VI, that, although the two terms are in large degree overlapping in common usage,[80] it is both convenient and appropriate to limits the term "executive" to persons whose duties include some form of managerial authority—to persons who actually direct the work of other persons. The term "administrative" can thus be reserved for persons performing a variety of miscellaneous but important functions in business. This latter group is large in modern industrial practice, and includes, typically, such persons as personnel managers, credit managers, buyers, supervisors of machine tools, safety directors, claim agents, auditors, wage-rate analysts, tax experts, and many others.

It may be stated at this point that there are other possible ways of dividing the total sphere between "executive" and "administrative." For example, a considerable number of the proposed redefinitions submitted to the Administrator conceive of "administrative" as merely a lower form of "executive."[81] While such a distinction might be appropriate for some other purposes, it would be clearly inappropriate in establishing definitions for two terms which must not overlap if effect is to be given to each of the words in an act of Congress.[82] If "administrative" is to be defined merely as a lower form of "executive," all executives would qualify under the administrative definition, and the term itself might well be left out of the act and the Regulations.[83] Such a distinction, therefore, cannot be adopted for the purposes of section 13 (a) (1) of the act and Part 541 of the Regulations issued thereunder.

## MAIN ASPECTS OF THE PROBLEM

The problem of defining "employee employed in a bona fide administrative capacity" has two aspects. First, the definition must be sufficiently broad and general to include employees performing a great variety of tasks; and second, the definition must contain such delimiting requirements, principally a salary qualification, as will prevent abuse.

---

[80] Words and Phrases, op. cit., note 12.

[81] See, for example, the proposed redefinitions submitted by the National Wholesale Druggists' Association, Council of National Wholesale Associations, United Wholesale Grocers' Association, Inc., and Manufacturers Association of Connecticut, Inc.

[82] Effect can be given to both terms in a single definition, just as it can be denied to one term in two definitions.

[83] It was admitted by several of the employer representatives who appeared at the hearings that their proposed redefinitions of "administrative" rendered the definition of "executive" merely ornamental. For example, see statement of A. L. M. Wiggins, American Bankers' Association, record July 9, 10, hearing, vol. I, p. 31.

In the recommendation set forth above, the descriptive part of this section of the Regulation is taken principally from a proposal submitted by the National Association of Manufacturers and supported in large part by other employer associations.[84] Some modifications, however, have been made therein.

## DESCRIPTIONS OR TITLES INSUFFICIENT AS YARDSTICKS

It has been stated previously that the employees for whom exemption is sought under the term "administrative" have extremely diverse functions. It is further evident that in many instances their function is difficult to identify, although it may well be important. In such a situation, the final and most effective check on the validity of the claim for exemption is the payment of a salary commensurate with the importance supposedly accorded the duties in question. Furthermore, a title alone is of little or no assistance in determining the true importance of an employee to the employer. Titles can be had cheaply and are of no determinative value. Thus, while there are some superintendents of maintenance who qualify for exemption under section 13 (a) (1) (normally under the term "executive"), it is not hard to call a janitor a "superintendent" or a "superintendent of maintenance" if some result desirable to the employer will flow therefrom.[85]

In this group of administrative employees, there is a gradation of responsibility, authority, and prestige which cannot be isolated and for which a dividing line cannot be drawn for all American industry. In fact, it would be impossible to establish such a dividing line by a verbal definition even for any one important industry, although such a line might be drawn with reasonable success for a single employer. For example, time studies are widely used for cost estimating, cost accounting, and the setting of piece rates. Persons employed in this type of work have a great variety of titles. Some are called "rate setters," some are called "time study men," others "time control men." There is, however, no automatic way of distinguishing between a rate-setter whose function is limited to timing certain operations and jotting down times on a standardized form and the supervisor of production control in a large establishment whose decisions affect the welfare of thousands of employees. Clearly, the latter person is employed in a "bona fide administrative capacity," while the former is a mere cog in a large industrial wheel.

As another illustration, the term "claim agent" may cover a great variety of employees. A claim agent who settles claims for damages which in no case amount to more than five or ten dollars obviously performs mere routine work. On the other hand, a claim agent for a large oil company who is given authority to settle claims that amount to several thousand dollars must use discretion and judgment, and has the authority to affect the welfare of his employer in the most substantial degree.[86] Again, many businesses employ persons

---

[84] Similar proposals were made by the Illinois Manufacturers' Association, Motion Pictures Producers and Distributors of America, Insulation Board Institute, and American Newspaper Publishers Association. Some of the special wording of this last proposal has also been adopted.
[85] Some of the representatives of labor, notably Victor Pasche, of the American Newspaper Guild, contended that under the N. R. A. everyone for whom exemption was desired was called an "executive," record April 10–16, hearing, vol. III, p. 458.
[86] The work of such a claim agent was described in detail by Clarel B. Mapes, representing the Mid-Continent Oil & Gas Association, who stated that the minimum salary paid such employees in the oil industry is $200 or $250 a month, record June 3–5, hearing, vol. II, pp. 170–174.

they describe as "statisticians." A person may be described as a statistician who is little, if anything, more than a tabulating machine operator. On the other hand, he may be the person who plays a major part in determining the financial policy of a large firm.[87] Still another example is found in the term "personnel director." In some plants a personnel director so-called is merely a clerk at the hiring window. In other cases he is a man whose decisions determine personnel policies affecting thousands of workers.

Many more examples could be cited but these are sufficient to show that there is no description of duties or titles which in and of itself can prevent abuse or can differentiate between those persons who may reasonably be exempt under the act and those who deserve and require its benefits. One element distinguishing the two groups is the use of discretion and independent judgment and this requirement is included in each of the recommended alternatives for the term "administrative."[88] In some instances this requirement in and of itself will be adequate to differentiate between employees who should be exempt and those who should be covered by the act. In some cases, however, decision would be difficult if sole reliance were to be placed on the descriptive factors in the proposed definition. In these instances inclusion or exclusion should be determinable by reference to a completely objective requirement. This proposed objective requirement is, of course, the payment of a stated salary.

## SALARY LIMITATION VITAL

It is recommended that the salary limitation be established at $200 a month. The choice of this figure is explained in detail later. However, it may be reiterated here that a salary criterion constitutes the best and most easily applied test of the employer's good faith in claiming that the person whose exemption is desired is actually of such importance to the firm that he is properly describable as an employee employed in a bona fide administrative capacity.

There is one further reason for establishing a salary requirement for administrative employees. In the definitions of "executive," "professional," (and "outside salesman") both as originally drafted and as proposed herein, there is a clause, in varying forms, barring an employee from the exemption if he performs a substantial amount of nonexempt work. It is not proposed that a similar clause be included in the definition of "administrative." It is believed that the employees in the administrative group are so heterogeneous in function that it would present a disproportionately weighty problem in administration to determine what constitutes nonexempt work. However, when this valuable guard against abuse is removed, it becomes all the more important to establish a salary requirement for the exemption of administrative employees, and to set the figure therein high enough to prevent abuse.

---

[87] It was stated by Albert F. Clear, New York Curb Partners Association, that many of his statisticians receive from $450 to $750 a month, record July 9, 10, hearing. vol. II, p. 216.
[88] This phrase or one substantially similar to it is found in the redefinitions of "administrative" proposed by the following groups : Mid-Continent Oil and Gas Association, National Association of Manufacturers, Oklahoma Stripper Well Association, Insulation Board Institute, Motion Picture Producers and Distributors of America, and American Newspaper Publishers Association.

## EXECUTIVE AND ADMINISTRATIVE ASSISTANTS

It will be noted that there are three types of employees included within the proposed exemption (subject to the salary qualification). The first type is the assistant to an executive or administrative employee. In modern industrial practice there has been a steady and increasing use of persons who assist an executive in the performance of his duties without themselves having executive authority. Typical titles of persons in this group are executive assistant to the president, confidential assistant, executive secretary, assistant to the general manager, and adminisrative assistant. It may be noted that such positions have counterparts in Government service.[89]

Generally speaking, such assistants are found in large establishments where the official assisted has duties of such scope and which require so much attention that the work of personal scrutiny, correspondence, and interviews must be delegated. However, it is clear that without adequate safeguards the claim could be made that not only the executive secretary but also the special messenger, for example, is an assistant to the general manager. It is, therefore, specified in this subsection of the Regulations that the assistance "requires the exercise of discretion and independent judgment." This in itself will assist in drawing a line between the stenographer whose task is primarily mechanical in nature and the true executive secretary who, although she may take some dictation and do some typing, is primarily employed because of her ability to distinguish between callers at the office and to carry out other special and important duties. The further requirement of a salary limit should effectively prevent abuse.

## STAFF EMPLOYEES

Employees exempted by the second alternative in the definition are those who can be described as staff rather than line employees, or as functional rather than departmental heads. They include employees who act as advisory specialists to the management; many of them in the higher brackets are commonly described as consultants. Their advice is, of course, directly related to management policies. There is likely to be some overlapping between these employees and professional employees as in the case of legal advisors.[90] Typical examples are such persons as tax experts, insurance experts, sales research experts, wage rate analysts, investment consultants, foreign exchange consultants, and statisticians.

Also included in this group are persons who are in charge of a so-called functional department, which may frequently be a one-man department. The work of these employees is directly related to general business operations. Typical examples are such employees as bank tellers, credit managers, purchasing agents, buyers, safety directors, personnel directors, and labor relations directors. Employees of this type in the higher brackets habitually establish procedures and assist in the determination of policies which must be followed by all the employees of the employer. They can therefore, when

---

[89] Comparable employees in the Government service have such titles as junior administrative assistant, senior administrative assistant, junior administrative officer, and administrative officer.

[90] A number of the proposed redefinitions of "administrative," for example the one submitted by the Southern States Industrial Council, would render the definition of "professional" as well as the definition of "executive" largely ornamental.

given authority, be of great importance in the successful operation of their employer's business.[91] However, although they are in charge of departments, they frequently have no employees under their supervision and therefore are not eligible for exemption as "executive" employees. Furthermore, there is an imperceptible gradation in responsibility and authority up and down the line. Here, as in the other instances, the differentiation between the clerk and the person with true administrative responsibility is to be found, first, in the exercise of discretion and independent judgment, and, second, in the receipt of an appropriate salary.

### THOSE WHO PERFORM SPECIAL ASSIGNMENTS

The third and perhaps most varied group reasonably described as "administrative employees" consists of persons who perform all types of special assignments requiring individual activity and judgment and directly related to management policies or general business operations. Among them are to be found a number of persons whose work is performed away from the employer's place of business. These would include traveling auditors, lease buyers, traveling inventory men, field representatives of utility companies, location managers of moving picture companies, and district gaugers for oil companies. It should be particularly noted that this is a field which is rife with honorific titles that do not adequately portray the nature of the employee's duties. The field representative of a utility company, for example, may be, on occasion, as one witness described it, "a glorified serviceman."[92]

This general classification also includes employees whose special assignments are performed entirely or partly inside their employer's place of business. Examples are special organization planners, assistant buyers, customers' brokers in stock exchange firms, so-called account executives in advertising firms, certain salesmen, and contact or promotion men of various types.

These miscellaneous groups include many employees who need the protection of the act as well as many who should obviously be exempt. The salary test and the requirement concerning the use of discretion and judgment should adequately draw a line between them.

### ALL ARE "WHITE COLLAR" EMPLOYEES

The employees who fall within the three alternatives set forth above have one characteristic in common. They are all what is known loosely as white collar employees. The descriptions given are in no way applicable to mechanics, for example, no matter how highly they are paid. There are tool and die workers, cutters, and other craftsmen whose weekly earnings for a 40-hour week may range from $50 to $100.[93] Yet traditionally they are paid on an hourly basis and at overtime

---

[91] A detailed description of the function of such one-man departments as outside buyer (wardrobe), planter, and location auditor is given in the written supplement to the oral argument made by the Motion Picture Producers and Distributors of America. The average salaries paid these employees in the moving picture industry vary from $73 to $112 a week.
[92] Statement of Lawson Wimberly, International Brotherhood of Electrical Workers, record July 25–29, hearing, vol. IV, p. 483.
[93] It was testified by Lazare Teper, International Ladies' Garment Workers Union, that some tool and die workers earn over $100 a week, record April 10–16, hearing, vol. III, p. 403.