# EXHIBIT B

Part 2

rates for overtime work. This is appropriate. Whatever their value to the employer, it would be improper to describe them as "administrative" employees. Generally speaking, it is not believed that there will be any difficulty in determining that such employees are not included within the definitions set forth. On the other hand, the performance of some incidental manual work, in a technical sense, should not serve as a bar to exemption. For example, if otherwise qualified, the incidental performance of stenographic work by an executive secretary or the incidental operation of a machine by a machine demonstrator would not disqualify them from the exemption.

## MOTION-PICTURE EMPLOYEES

A few cases in which this question has been raised in the past may be noted here. One of these concerns the so-called key members of a shooting unit in the moving-picture industry.[94] The key members include, for example, the first and second cameramen, the stand-by prop makers, the make-up artists, the hairdressers, the stand-by gaffers, the scrip girl, best boy, and many others. The first cameraman might well be exempt as an executive or administrative employee. He himself performs no manual labor and merely directs the general process of photography.[95] The second cameraman may well be a professional employee, as the term is defined below. However, in all or almost all the other instances the persons employed are craftsmen and are typically members of such unions as the International Alliance of Stage and Theatrical Employees and Moving Picture Machine Operators, the Brotherhood of Painters, Decorators, and Paperhangers of America, and so forth. Moreover, when performing identical work but not within the shooting group they are treated like the other craftsmen of the industry and are paid overtime for overtime work. Although the hourly pay of most of these employees is extremely high in comparison with most other industries,[96] that fact in itself does not and cannot qualify them for exemption as "administrative employees."

## DRAFTSMEN

Another group of employees for whom exemption has been suggested under this head are draftsmen and other technical-professional employees. All mechanical engineers are draftsmen but not all draftsmen are engineers. Furthermore, while some draftsmen do perform individual assignments and are completely responsible for their whole job, it is believed that, generally speaking, when such employees should be exempt, they meet the qualifications set forth later for professional employees. Most draftsmen, however, work in a group and under close supervision and do not exercise individual discretion and judg-

---

[94] The function and duties of such employees were discussed by Homer Mitchell, Motion Picture Producers and Distributors of America, George Bodle, Hollywood Guild Council, and Steve B. Newman, International Alliance of Theatrical and Stage Employees and Motion Picture Operators, record July 25–29, hearing at vol. I, p. 52, vol. IV, p. 593, and vol. IV, p. 635, respectively.

[95] The average rate of pay of such employees is $348 a week. *Supplement to Oral Argument,* Motion Picture Producers and Distributors of America, p. 23, hearings' branch docket No. 73.

[96] Average weekly salaries of representative employees of the unit are as follows : Second cameramen, $123; stand-by prop makers, $91; make-up artists, $139; hairdressers, $74; script clerks, $58; stand-by painters, $92; stand-by electricians, $92; class I costumer, $57; first assistant director, $139; gaffer, $94; best boy, $81. Ibid, p. 42.

ment.[97] For this reason it is not believed, even though draftsmen are frequently fairly well paid, that under any normal circumstances they can appropriately qualify for exemption as "administrative employees."[98] Furthermore, draftsmen like others in the general professional-technical group do not usually perform tasks "directly related to management policies or general business operations."

## PUBLIC-UTILITY FIELDMEN

A more questionable group, perhaps, are the fieldmen working for public-utility companies.[99] In some instances, where their primary duty is to contact the public and to maintain relations with state and local governmental units for their employer, they may well be performing truly administrative work and, if their compensation is adequate may qualify for this exemption. Where, however, their work is almost entirely in the nature of repair and service work, it is not felt the exemption is applicable. Generally, the differentiation between the two groups will be adequately made by the salary requirement.

## VARIOUS SALARY QUALIFICATIONS SUGGESTED

In the preceding discussion the reasons have been set forth for establishing a salary qualification as one of the qualifications for exemption for administrative employees. There has also been set forth in some detail the reason for establishing a salary limit that will be high enough to prevent abuse. It is difficult to determine precisely where to draw the line. The suggestions range from $30 a week,[100] or even less, to $5,000 a year.[101] Employer suggestions included $140, $150, and $200 a month.[102] It may be noted that during the Seventy-sixth Congress proposed amendments of the act were introduced (but not enacted) which would have exempted persons earning $150 and $200 a month, respectively.[103]

## PRACTICE IN THE FEDERAL GOVERNMENT

One important guide in determining at what point an employee should be considered an administrative employee rather than a clerk

[97] E. E. Bensenberg, National Council of Marine Draftsmen, Inc., testified that normally marine draftsmen work under squad leaders who in turn are supervised by assistant chief and chief draftsmen. All men up to the assistant chief draftsmen may belong to the union and are normally paid time and one-half for overtime. record July 25–29, hearing, vol. I, p. 161.
[98] A. L. Funke, appearing for the Automatic Electric Co., stated that his company did not propose the exemption of draftsmen and squad chiefs, record July 25–29, hearing, vol. I, p. 92.
[99] The duties of a group of employees termed "local superintendents" are described in the statement filed by the Otter Tail Power Co. and found in hearings' branch docket No. 73.
[100] A $30 a week requirement for "administrative" was included in redefinitions proposed by Mid Continent Oil and Gas Association, National Wholesale Druggist Association, Illinois Manufacturers' Association, Motion Pictures Producers and Distributors of America, Manufacturers' Association of Connecticut, Inc., National Association of Manufacturers, Oklahoma Stripper Well Association, Insulation Board Institute, and Edison Electric Institute. The lowest proposal was $18 a week made by the Indiana Manufacturers Association.
[101] A salary requirement of $5,000 a year was suggested by Lewis Merrill, United Office and Professional Workers of America, op. cit., note 69.
[102] The national Small Business Men's Association proposed $150 a month. The Pittsburgh Plate Glass Co. suggested $140. W. W. Peake of the Association of Stock Exchange firms, speaking in a personal capacity, suggested $200. The original proposal of the Motion Picture Producers' Association for "executive" recommends $50 a week or $200 a month.
[103] H. R. 7133 (introduced by Congressman Barden) would exempt in section 5a "any employee employed * * * at a guaranteed monthly salary of $150 or more, or at a guaranteed yearly salary of $1,800 or more, if such employee is not required by his

is to be found in the practice of the Government itself. Several years ago the Federal. Personnel Classification Board reported to Congress on problems of classification within the so-called clerical, administrative, and fiscal group of Government employees.[104] This group includes several hundred thousand workers. Under the recommendations of that Board CAF grades 1 to 6 have been reserved for clerical employees, CAF 7 to 14 for administrative employees, and CAF 15 and 16 for executive employees.[105] (For reasons set forth above it is not deemed proper to adopt for the purposes of these Regulations the theory that an administrative employee is merely a lower species of executive employee.) The established salary for grade CAF 6 at the time of the Board's closing report ranged from $2,300 to $2,800 per annum and the established salary for grade CAF 7 from $2,600 to $3,100.[106] The average for each grade was $2,550 and $2,850, respectively. It would therefore appear that in Government practice the turning point between the clerk and the administrative official comes between $2,550 and $2,850 per annum or about $2,700. It is interesting to observe that in a study made under the Brookhart Act of 1930 the average salary of clerical, administrative, and fiscal non-Government positions equivalent to CAF 6 was found to be in round figures, about $2,550 and for non-Government positions equivalent to CAF 7 about $2,950.[107] Thus the non-Government dividing line is about $2,750. There is, therefore, some reason for setting a salary test of about $2,700 per annum as the appropriate distinction between clerical and administrative employees, if the average of Government and non-Government salaries is used as a basis.

## SALARIES OF STENOGRAPHERS

Another guide in determining a reasonable salary qualification is the probable percentage of persons in certain types of occupations who would be exempted by various salary limitations. Obviously, if a large percentage of persons in a highly routinized occupation would be exempted, the salary qualification fails to act as a differentiating factor between the clerical employee and the administrative employee. Thus, in a report of the Wage and Hour Division it is shown that more than 10 percent of all stenographers, typists, and secretaries earn more than $1,600; almost 5 percent earn more than $1,800.[108] On the other hand, less than 1 percent earn more than $2,400. Thus, in this group, if it is conceded as would appear reasonable, that there are a few who have truly responsible positions and that the enormous majority are

---

employer to work any specified minimum number of hours in any workday, workweek, or other period * * *." H. R. 5435, H. R. 7348, and S. 2008 would exempt "any employee employed at a guaranteed monthly salary of $200 or more." H. R. 8624 would exempt any employee who is employed by the month at the rate of $200 a month or more, or who is employed by the week and paid at the rate of $50 a week or more, or who is employed by the hour and paid at the rate of $1.25 an hour or more if he is guaranteed employment of 40 hours or more a week.
[104] The Board was established by the Classification Act of March 4, 1923, to investigate the duties and responsibilities of each individual position and to administer the administrative provisions of the act.
[105] Personnel Classification Board, Class Specification for Positions in the Departmental Service, Washington, 1924, P. C. B. Form No. 12, pp. 8–9.
[106] Personnel Classification Board, Closing Report of Wage and Personnel Survey, Washington, 1931, 71st Cong., 3d sess., H. Doc., No. 771, p. 115. The maximum for each grade has since been increased.
[107] Ibid., pp. 114–117.
[108] U. S. Department of Labor, Wage and Hour Division, Report on Proposal to Exempt Clerical Employees From the Hours Divisions of the Fair Labor Standards Act, March 1, 1940, table 3.

employed in routine clerical work, neither $1,500 nor $1,800 as the salary requirement would be adequate to guard against abuse. On the other hand, a figure higher than $2,400 would tend to include within the coverage of the act certain workers whose work carries with it a status that may well deserve exemption from the act.

## SALARIES OF BOOKKEEPERS AND ACCOUNTANTS

In the same study it is shown that practically 50 percent of the book-keepers covered by the survey (nonmachine operators) are paid more than $30 per week.[109]   Bookkeeping is of course one of the most routine of all the normal business occupations.  At $35 a week, almost 32 percent would still meet the qualification—at $40, over 20 percent, and at $50, about 8 percent.  Here again it is obvious that adequate protection for a group of workers who need the protection of the act because of habitually long hours is not provided unless the salary limit is raised to at least $50 a week.  That this limit would not also exclude persons who properly deserve the exemption is illustrated by the fact that almost 50 percent of the accountants and auditors earn at least $50 a week.[110]   This is a group of employees whose work, while related to that of bookkeepers, requires in general far more training, discretion, and independent judgment.  Many of these employees are employed in a bona fide administrative or professional capacity in the proper sense of the terms, whereas only in the most exceptional instances could a bookkeeper be properly described as employed in an administrative or professional capacity.

### $200 A MONTH RECOMMENDED

It is not necessary to repeat here what has been said in section IV concerning the undesirability of salary differentials for different areas or industries.  There must be a single reasonable salary test for "administrative," and the best indication of the appropriate amount is probably to be derived from the findings of the Personnel Classification Board referred to before.  This would imply an annual salary of about $2,700.  However, as will be seen in section VIII, if the same basis is used the salary test for "professional" would be placed at about $2,550.  Inasmuch as the two definitions necessarily overlap, it is desirable to set the same requirement for both groups.  Furthermore, these figures are averages, and the act applies to low-wage areas and industries as well as to high-wage groups.  Caution therefore dictates the adoption of a figure that is somewhat lower, though of the same general magnitude.  Accordingly $2,400 per annum or $200 per month is recommended as the salary qualification for "administrative."[111]   The same figure, although independently arrived at, will also be recommended for professional.

### PAY PERIODS

The same general qualifications set forth in relation to the term "executive" apply with reference to the appropriate pay period for "administrative" employees.  Clearly the week is the shortest pay

---

[109] Ibid., table 4.
[110] Ibid.
[111] This figure is amply supported by other evidence cited above.

period which can be appropriate for a salaried employee employed in a supposedly important capacity. In most American industries it would probably be proper to require that pay be on a monthly rather than on a weekly basis, since in many businesses the weekly pay roll is characteristically the pay roll for the production, maintenance, and clerical workers, while the monthly pay roll is characteristically the pay roll for the company officials, executives, and administrative employees. However, there are a few industries, of which the most notable is the moving picture industry, in which even the most important executive and administrative employees are paid on a weekly basis. It would be discriminatory, therefore, to require that payment be on a monthly basis. However, when the pay period is weekly, the employment agreements should provide that the monthly earnings will at no time fall below $200. In default of such an arrangement, a weekly salary of not less than $50 should be taken as meeting the requirement, for that is the lowest weekly salary that will insure the payment of $200 in each month of the year.

## FEE PAYMENTS

It is also recommended that provision be specifically included for persons paid the equivalent of $200 per month on a fee basis. Many administrative employees, particularly those in the advisory consultant group, are paid by the job rather than by the time-unit. This is entirely consistent with the status implied by the term "administrative." The requirement is met if the employee's fee for the time spent on the job represents the equivalent of $200 a month—i. e., if it amounts to $50 for a week's work.

## Section VIII. PROFESSIONAL EMPLOYEES

### RECOMMENDED DEFINITION

Section 541.3. Professional.

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee who is—

(A) Engaged in work—
(1) Predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and
(2) Requiring the consistent exercise of discretion and judgment in its performance, and
(3) Of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and
(4) Whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees; provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work, and
(5) (a) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; or
(b) Predominantly original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed

with general manual or intellectual ability and training, and the result of which depends primarily on the invention, imagination, or talent of the employee, and

(B) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities) ; provided that this subsection (B) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine, or any of their branches, and who is actually engaged in the practice thereof.

## GENERAL PROBLEM

The present definition of the term "employee employed in a bona fide * * * professional * * * capacity" has been productive of some confusion because the wording is not sufficiently clear to indicate in all cases the general type of employee to whom the definition should be applicable. It is clear, for example, that many employees in the traditional learned professions would be exempt, but is not clear to what extent the definition is supposed to apply to employees in the more modern professions, in the quasiprofessions and in artistic callings. Many of the questions that have arisen concern persons who are more aptly described as administrative employees.[112] Inasmuch as it is recommended that there be a separate definition for the term "administrative," the criticism of the definition of "professional" loses much of its force since many of the employees in question will be exempt under the proposed section 541.2 of the Regulations. There still remains a large group of employees who, if they are to be exempt at all, would be exempt under the term "professional." This group includes persons in the more recent professions, or in vocations which are sometimes described as professional, or in artistic fields.

Common speech uses the term "professional" in a great variety of ways. It is sometimes used humorously so as to apply to every occupation that man undertakes. However, the Administrator is required to delimit as well as define the term "professional." He must, therefore, draw a line beyond which the term "professional" may not be extended for the purpose of granting the exemption afforded by section 13 (a) (1) of the act. Thus, for example, since the exemption is based on the nature of the individual employee's employment, the definition must not operate to exempt nonprofessional employees of a so-called professional firm.

The question of the artistic professions is distinctive and is considered below. In regard to the professions based on learning or knowledge, a useful guide is furnished by a recent decision of the New York State Court of Appeals.[113] The case involved the interpretation of a section of the New York tax law which provides for the collection of an unincorporated business tax but which exempts from the tax, income derived from the practice of the professions of law, medicine, dentistry, and architecture. It also exempts any business entity deriving more than 80 percent of its gross income from the personal services rendered by the members of the entity "in the practice of any other professions" in which capital is not a material income-producing factor. In an opinion by Judge Lewis, in which the other members of the

[112] These are particularly the so-called advisory specialists, such as tax experts, insurance experts, wage rate analysts, investment consultants, estimators, and social security experts.
[113] *People ex rel. Tower et al.* v. *State Tax Commission,* 282 N. Y. 407, 26 N. E. (2nd) 955 (1940).

Court of Appeals unanimously concurred, it was stated that, "We find nothing in the record to prove that the service rendered by a custom house broker requires knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study. Such a requirement we regard as implicit in the term 'professional' when given its legal application and it is read in its context in the statute here involved."

## NEW PROFESSIONS

Although the problem raised under the New York statute is different from the problem presented here, the same general principles may apply. For even though the term "professional" be no longer restricted to the traditional professions of law, medicine and theology, the Administrator must similarly limit its application so that it will include (aside from the artistics calling) only those professions which have a recognized status and which are based on the acquirement of so-called professional knowledge through prolonged study. The field of the professions is an expanding one and 20 years from now professions whose members will qualify will no doubt be found in occupations not recognized as professions today. A pertinent example can be found in the profession of accountancy. Twenty or 25 years ago it was the normal practice for accounting firms to hire young men with a general academic education and to train them through what might be described as an apprenticeship system. Today, with the development of uniform standards for the certificate of C. P. A., it is no longer practical for accounting firms to hire persons with a more general education. With few exceptions, it is now required that the entrants into accounting firms be persons with a thorough training in the principles and practices of accountancy as given in some recognized institution of learning.[114]

## ARTISTIC PROFESSIONS

The definition in the present regulations was designed to cover the same group of professionals described by the New York Court of Appeals and the recommendations made for alteration of the first part of the definition are primarily designed to make that fact clear. However, while there is no specific record of the matter available, it appears that in drafting the present definition no thought was given to persons employed in the artistic professions, such as acting or music, and during the past 18 months the Division has not made its position entirely clear as to the applicability of the exemption to such workers. Since the exemption in New York tax law would not involve workers of this type, the opinion of the court is of no guidance in this respect. However, there would seem to be little doubt that the Administrator can appropriately effect the exemption of persons in these occupations, and provision should be made therefor in the Regulations. Since the test of the bona fide professional capacity of such employment is different in character from the test for persons in the learned professions, it is necessary to set up an alternative definition in addition to the requirements common to both groups.

---

[114] The requirement of training is stressed in a letter from G. P. Ellis of the American Institute of Accountants, dated September 21, 1940, hearings branch docket No. 78.

## NEED FOR SALARY TEST

As will be seen in further detail later, the effect of most of the recommended changes in the definition of the term "professional" will be to exempt more employees than have heretofore been exempt. In fact, the exemption is made broad enough to provide an opening for abuse in its application. Furthermore, certain parts of the definition must necessarily depend on matters which are determinable only by subjective judgment.[115] Therefore, in order to avoid disputes, to assist in the effective enforcement of the act and to prevent abuse, it appears essential, as has been set forth above, to include a salary test in the definition. An exception to this is proposed only in the case of the traditional professions of law and medicine, where possession of a State certificate or license is regarded as an adequate equivalent of a salary test. It is believed that this is the only substantive change from the present Regulations regarding this term which imposes a more rigorous requirement. All the other changes merely clarify the existing definition or widen its scope. The choice of $200 per month as the appropriate amount for this test is discussed in detail later.

## "PREDOMINANTLY . . . VARIED IN CHARACTER"

Some criticism was made of subsection (a) (1) of the present Regulations, which requires that the employee be engaged in work "predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work." It was suggested, for example, that a doctor making a series of medical examinations might be held to be engaged in work which is not "varied in character."[116] Other criticisms were similar in nature and merely varied in their choice of illustrative examples. It is not believed that this is a valid criticism. The problem is one of reasonable interpretation of the present language. It is clear that the word "varied" should apply to the type of thinking which must be performed by the employee in question. While a doctor may make 20 physical examinations in the morning and perform in the course of his examinations essentially similar tests, it requires not only judgment and discretion on his part but a continual variety in his interpretation of the tests to perform satisfactory work. Likewise, although a chemist may make a series of similar tests, the problems presented will vary as will the deductions to be made therefrom. The work of the true professional is inherently varied even though similar outward actions may be performed. With this understanding it is not believed that any formal change in this part of the Regulations is necessary.

## "TIME OF PERFORMANCE"

There was also criticism of subsection (2) of the present Regulations which reads "requiring the consistent exercise of discretion

---

[115] For example, the phrase "the result of which depends primarily on the invention, imagination, or talent of the employee" cannot be translated into an exact formula.
[116] This was suggested by Noel Sargent, National Association of Manufacturers, who also pointed out that under this interpretation of this phrase, a lawyer who does nothing but prepare or review leases would also be barred from the exemption, record June 3–5, hearing, vol. III, p. 385.

and judgment both as to the manner and time of performance, as opposed to work subject to active direction and supervision." The criticism was partly directed at the words "manner and time of performance." It was pointed out, for example, that a doctor or a lawyer or any other typical professional employee must frequently keep perfectly regular office hours or hours in court and cannot perform his work at will.[117] Similarly, much of his paper work must be performed in a manner which conforms to the strictest legal requirements. Actors and musicians are likewise strictly limited as to the time of their performance and, in a sense, as to the manner also. Innumerable other examples could be adduced. There seems to be no doubt that this is a valid criticism, and it is recommended that the phrase "manner and time of performance" be deleted.

### "ACTIVE DIRECTION AND SUPERVISION"

There was also objection to the phrase, "as opposed to work subject to active direction and supervision." This phrase has some meaning with respect to certain professional occupations, although its exact application in specific cases is not always easily ascertained. On the other hand, it is difficult to see how any actor, for example, could qualify thereunder; and other recognized professional occupations would be similarly affected. Under the circumstances it would appear sensible to delete the phrase.

### "DISCRETION AND JUDGMENT"

On the other hand proposals that would omit all reference to discretion and judgment must also be rejected. A prime characteristic of professional work is the fact that the employee does apply his special knowledge or talents with discretion and judgment. Purely mechanical or routine work is not professional. It is, therefore, proposed that this basic requirement be retained and that the amended subsection read as follows: "requiring the consistent exercise of discretion and judgment."

### "THE RESULT ACCOMPLISHED CANNOT BE STANDARDIZED"

The third subsection of the Regulations was not the object of much criticism.[118] It was generally agreed that the work should be "of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time." One witness[119] made the observation that although a lawyer, for example, might be confined to regular office hours, he may within that time determine the actual number of hours required for satisfactory preparation or examination of each lease or document. It is believed that the phrase "result accomplished" indicates that, to obtain a standard in the sense of this requirement, the result itself must be of the kind

---

[117] Statement of Elisha Hanson, American Newspaper Publishers Association, record July 25–29, hearing, vol. II, p. 312.
[118] This section was retained in proposed redefinitions submitted by the following: Council of National Wholesale Associations, Motion Picture Producers and Distributors of America, Mid Continent Oil & Gas Association, National Association of Ornamental Metal Manufacturers, American Newspaper Publishers Association, and Edison Electric Institute.
[119] Noel Sargent, National Association of Manufacturers, record June 3–5, hearings, vol. III, p. 386.

that can be standardized. Obviously the nature of the accomplishment of each biologist or architect or lawyer will differ, even though other biologists or architects or lawyers perform similar work at times. It is equally apparent that the work produced by a sculptor or a violinist is not subject to standardization. In the light of this fact it does not appear that it can be said that the results can be standardized "in relation to a given period of time" since the results themselves are largely unstandardized.

## "EDUCATIONAL TRAINING"

Most of the criticism directed at the definition of "professional" was directed at the fourth subsection, which reads "based upon educational training in a specially organized body of knowledge as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, mechanical, or physical processes in accordance with a previously indicated or standardized formula, plan or procedure." [120] Much of this criticism related to the effect of this subsection on members of the artistic professions; a separate subsection is recommended below that establishes an alternative requirement for such employees. On the other hand, in relation to the learned professions, one question frequently raised was whether or not this subsection means that the individual himself must have received the educational training. Another question raised was whether such training must be a standard prerequisite for the alleged profession or merely a common practice. Still another question was raised concerning the meaning of the phrase "in a specially organized body of knowledge." [121]

It is proposed that language be substituted for this present phrase, which will provide an answer to these questions. The redraft reads as follows: "requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual or physical processes." The proposed redraft makes use of the language in the *Tower* case cited above,[122] which in turn is an adaptation of language found in the article on Professions by A. M. Carr Saunders and P. A. Wilson in the Encyclopedia of the Social Sciences," [123] which in turn cites one of the definitions in the Oxford English Dictionary.

An analysis of the three definitions clearly brings out the essential elements. The first element in the requirement is that the knowledge be of an advanced type. Thus, generally speaking, it must be knowledge which cannot be attained at the high-school level. Second, it must be knowledge in a field of science or learning. This in itself is not entirely definitive but will serve to distinguish the professions from the mechanical arts where in some instances the knowledge is of a fairly advanced type, but not in a field of science or learning.

---

[120] This requirement was criticized extensively by Noel Sargent in supporting the proposed redefinition of "professional" submitted by the National Association of Manufacturers, record June 3–5, hearing, vol. III, pp. 387–390.

[121] The National Association of Manufacturers inserted "in a recognized professional, scientific, or technical field" in its proposal in the place of "in a speically organized body of knowledge."

[122] Op. cit., note 113.

[123] Vol. III, p. 376.

## SPECIALIZED STUDY CUSTOMARY

The requisite knowledge, in the third place, must be customarily acquired by a prolonged course of specialized intellectual instruction and study. Here it should be noted that the word "customarily" has been used to meet a specific problem occurring in many industries. As is well known, even in the classical professions of law, there are still a few practitioners who have gained their knowledge by home study and experience. Characteristically, the members of the profession are graduates of law schools, but some few of their fellow professionals whose status is equal to theirs, whose attainments are the same, and whose work is the same did not enjoy that opportunity. It would be unfair to bar such persons from the exemption. Accordingly, the proposed requirement is limited by the word "customarily." This implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession. It makes the exemption available to the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry, etc., but it does not include the members of such quasiprofessions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training.[124] Of course, many employees in these quasiprofessions would 'qualify for exemption under other sections of the proposed regulations or under the alternative subsection of the proposed "professional" definition applicable to the artistic fields.

## ACADEMIC DEGREE GENERALLY REQUIRED

It does not appear necessary here to attempt to translate the word "prolonged" into arithmetical terms. It is sufficient to indicate that generally speaking the professions which meet this requirement will include law, medicine, theology, accountancy, actuarial computation, engineering, architecture, various types of physical, chemical and biological sciences, teaching, and so forth. The typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not absolutely universal) prerequisite.

In a number of professions, a state certificate must customarily be obtained before an individual may offer his services to the public for a fee. These include among others law and medicine. Although it does not appear that the possession or lack of such a certificate can properly be made a prerequisite for exemption under this section of the Regulations, it is, however, recommended below that the salary test be waived for those possessing such a certificate or license in the traditional professions of law and medicine.

---

[124] Dean Kenneth E. Olsen, appearing for the American Association of Schools and Departments of Journalism, estimated that about 6,700 graduates of member schools and departments are now employed by newspapers, record July 25–29, hearing, vol. II, p. 193. This number, however, must be compared with the total number of newspaper employees, and Elisha Hanson, representing the American Newspaper Publishers' Association, quoting the 1937 Census of Manufacturers, testified that 142,689 salaried employees were engaged in the newspaper and periodical publishing and printing field that year, record July 25–29, hearing, vol. II, p. 280.

## AMOUNT OF NONEXEMPT WORK ALLOWED

There was considerable questioning of the term "who does no substantial work of the same nature as that perfromed by nonexempt employees of the employer." [125] These questions were somewhat different in kind from the criticism aimed at the same phrase as it applies to "executive" and "administrative" employees. Although there was some desire to exempt employees who are partly professional and partly engaged in obviously nonprofessional work, this was not wide spread. There was also criticism of the phrase on the grounds of vagueness. For reasons explained in detail in section VI in connection with the definition of the term "executive," it is proposed that the 20 percent limitation be substituted for the "no substantial amount of work" rule. The rule will be applied to professional employees in the same manner as it is applied to executive employees and outside salesmen in relation to computing the standard base, etc.

A special criticism of the "no substantial amount of work" clause arose with reference to the type of professional employee whose work must necessarily involve some of the actual routine physical tasks also performed by obviously nonexempt employees.[126] For example, a chemist performing important and original experiments will frequently find it necessary to perform himself some of the most menial tasks in connection with the operation of his experiments, even though at times these menial tasks can be conveniently or properly assigned to laboratory assistants. This is a valid criticism of the present Regulations because if strictly construed, they do not provide for the proper performance of technically nonexempt work by the truly professional employee.

Accordingly, it is recommended that the requirement be modified by the following proviso: "Provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature such essential and incidental work shall not be counted as nonexempt work." With this clarifying modification, it is believed that the requirement is proper and appropriate. It may be further remarked that this same proviso will operate to preserve the exemption in the case of a senior chemist, for example who does work similar to that of a junior chemist who is paid less than $200 a month, provided that the work is not clearly routine in nature.

## ARTISTS, WRITERS, ETC.

Except by the most tortuous construction, neither the present nor the proposed requirement of educational training can be interpreted to include as qualified persons engaged in artistic fields of activity. Nevertheless, the general qualifications and methods of work of the bona fide artist make it reasonable to include such workers within the definition of "professional." Accordingly, an alternative requirement has been drafted which is designed to permit exemption for employees

---

[125] None of the proposed redefinitions of "professional" submitted for consideration retained this requirement, although several required that the employee be "customarily and regularly engaged" in work of the required type.
[126] Alexander Maxwell, representing the Edison Electric Institute, in arguing for the deletion of this requirement, stated that, "in many cases the exemption contemplated is voided by the fact that many professional men, in practicing their chosen work, actually do assist their subordinates and thus might be considered as performing a substantial amount of work of nonexempt employees." As an example he cited the instance of a professional electrical engineer who may spend a portion or all of a day assisting his subordinates in order to obtain satisfactory results from a technical application, record July 25-29, hearing, vol. III, p. 390.

in these fields. The requirements therein concerning the character of their work are threefold. First, it is required that the work be "in a recognized field of artistic endeavor." This includes such fields as music, writing, the theatre, and the plastic and graphic arts. Under the second requirement the work must be "predominantly original and creative in character, as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training." In the field of music there should be little difficulty in ascertaining the application of this requirement. Musicians, composers, conductors, soloists, all are engaged in original and creative work within the sense of this definition. In the plastic and graphic arts the requirement is, generally speaking, met by painters who at most are given the subject matter of their painting. It is similarly met by cartoonists who are merely told the title or underlying concept of a cartoon and then must rely on their own creative powers to express the concept. It would not normally be met by a person who is employed as a copyist or as an "animator" of moving picture cartoons, or as a retoucher of photographs [127] since it is not believed that such work is properly described as creative in character.

In the field of writing the distinction is perhaps more difficult to draw at least in the abstract. Obviously the requirement is met by essayists or novelists or scenario writers who choose their own subjects and hand in a finished piece of work to their employers (the majority of such persons are, of course, not employees but self-employed). The requirement would also be met, generally speaking, by persons holding the more responsible and better-paid positions in the editorial departments of newspapers or in advertising agencies. The fulfillment of this and the two other related qualifications in occupations of this type is largely a matter of degree, and the degree is usually best evidenced by the salary received. For this reason, the proposed salary requirement will tend in itself to preclude from the exemption newspaper workers whose work is, in general, not "original and creative in character," etc. It should also be remembered that certain editorial department employees such as city editors and managing editors, for example, are normally exempt under the proposed definition of the term "executive."

The third requirement is that the employee be engaged in work "the result of which depends primarily on the invention, imagination, or talent of the employee." No discussion is necessary to explain that this requirement is easily met by a person employed as an actor, or a singer, or a violinist, or a short story writer. In the case of newspaper employees the distinction here is similar to the distinction observed above in connection with the work's being "original and creative in character." [128] Obviously the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on "invention, imagination, or talent." On the other hand, this requirement will normally be met by actors, musicians, painters, and other artists.

---

[127] Frederick A. Fishel, representing the Photographers' Association of America and the Chicago Photographic Guild, specifically opposed the exemption of retouchers, enlargers, copy men, and "artists" doing color work on negatives and prints. Mr. Fishel contended that the only professional in the field of photography is the camera man, record July 25–29, hearing, vol. IV, pp. 631–2.
[128] A phrase similar to this was incorporated in the definition proposed by the Motion Picture Producers and Distributors of America, Inc.

## EFFECT OF SALARY TEST

One final requirement to be discussed, which applies to both the newer learned and the artistic profession but not to law and medicine, is the requirement that the employee be paid at not less than $200 per month. The same basic reasons which make the use of a salary test desirable in connection with the definition of "executive" and "administrative" are applicable here. The salary paid the employee is the best single test of the employer's good faith in characterizing the employment as of a professional nature. Further, the salary test is of major importance in retaining the benefits of the act for a group of employees whose hours of work are frequently long, whose hourly rate of pay has frequently been low, and who frequently have enjoyed no compensatory advantages in the form of security of tenure and vacations with pay that are more common among executive and administrative employees, even those whose weekly stipend is not great.[129] At least some of these reasons for applying a salary test appear to have been recognized by employers who proposed such a test for "professional."[130] Similarly of 165 N. R. A. codes, all adopted by the industries themselves, carrying an exemption for professional employees, 141 included a salary test.

## NO SALARY TEST FOR THE TRADITIONAL PROFESSIONS

The three traditional professions of law, medicine, and theology[131] occupy a distinctive position in the United States as well as elsewhere. Members of these professions acquire a special status and are recognized as quasipublic officials. Indeed until recently only the members of these professions would have been considered as persons employed "in a bona fide professional capacity." This was recognized by the United States Supreme Court when it remarked in the Laws case[132] that "formerly theology, law, and medicine were specifically known as the professions; but as the application of science and learning are extended to other departments of affairs, other vocations also receive the name." Although this indicates that a reasonable definition of "professional" must extend beyond the traditional professions, it also indicates that some special consideration for members of these professions is reasonable. This special consideration is, of course, applicable only to those who have actually acquired the special status referred to—in other words, to those who have received a State license or certificate to practice law or medicine. The action of the appropriate State authority in issuing the certificate or license may be taken as an adequate substitute for the salary test in the case of the professions of law and medicine.

---

[129] Morris Zeitlin, appearing on behalf of the International Federation of Architects, Engineers, Chemists, and Technicians, testified that technical-professional employees, whose salaries average about $1,800 a year, enjoy no more security of tenure than other production employees.
[130] A salary test for "professional" was proposed by the Mid-Continent Oil and Gas Association, Oklahoma Stripper Well Association, Photographers' Association of America, and Automatic Electric Co. The propriety of such a proposal was agreed to by other employer representatives.
[131] As the practice of the profession of theology is presumably of only academic interest so far as the application of the Fair Labor Standards Act is concerned, mention of it is omitted in the proposed regulations.
[132] U. S. v. Laws, 163 U. S. 258 (1896).

## PROFESSIONAL SALARIES IN THE FEDERAL GOVERNMENT

There is not much useful available data on the incidence of various salary levels on employees in the learned and artistic professions, particularly because so many members of the professions are self-employed. As with "administrative," a practical and effective guide can be derived from the studies made by the Personnel Classication Board and the practice of the Government itself.

### $200 A MONTH RECOMMENDED

The classification system of the Federal Government includes one service described as "professional" and another as "subprofessional"; the symbols commonly used are P and SP. These services embrace all the fields of learning and the arts. It is reasonable to conclude that the distinction between the professional and the subprofessional service is basically the same distinction as that implied in the phrase "bona fide professional capacity." The service grades run from SP 1–8 and P 1–8, but the salaries paid P–1 overlap the salaries paid SP–6. Thus the salary range from the lowest P–1 to the highest SP–8 will be one in which is found the transition from subprofessional to "bona fide" professional.[133] At the time the Personnel Classification Board made its survey, P–1 paid from $2,000 to $2,500, the average being $2,250. For comparable nongovernment positions the average pay was found to be about $2,100. SP–8 paid at that time from $2,600 to $3,100. The average is $2,850. The comparable nongovernment average was about $3,100.

Thus the appropriate figure, based on these averages, for the dividing line between subprofessional and professional is about $2,550 or $2,600.[134] But, as in the case of "administrative" as discussed in section VIII, it is wise to set a figure somewhat lower than the average and particularly, since the two terms overlap to some extent, to set the same figure for "professional" as for "administrative." It is therefore recommended that the requirement be $200 per month.

### FEE PAYMENTS

Similarly, it is recommended in the case of professional as well as administrative employees that the $200 a month be on a salary or fee basis. It is obvious that in this field fee payments are common, and payment on a fee basis is entirely consistent with professional status, even though the fees may be earned at irregular intervals, sometimes frequently, sometimes far apart. To permit payment to be on either a salary or fee basis, therefore, seems entirely reasonable.

In determining compliance with the $200 a month requirement, an agreement whereby an employee is guaranteed not less than $200 for each month of employment will be clearly satisfactory. In doubtful cases, however, compliance is assured if the employee's compensation for the time spent on a job is not less than $50 for a week's work.

[133] Personnel Classification Board, op. cit., note 106, p. 182.
[134] Ibid., pp. 114–18, 120–2. It should be noted that the maximum salary for each grade has been increased since the Personnel Classification Board made its final report.

## Section IX. OUTSIDE SALESMAN

### RECOMMENDED DEFINITION

**Section 541.5. Outside Salesmen.**

The term "employee employed  *  *  *  in the capacity of outside salesman" in section 13(a) (1) of the act shall mean any employee—

(A) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in—
(1) Making sales within the meaning of section 3 (k) of the act; or
(2) Obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and
(B) Whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

### MUST MAKE OUTSIDE SALES

Questions have been raised concerning each of the requirements in section 541.4 of the present regulations defining the term "outside salesman." There has been little criticism but much inquiry concerning the first requirement, that the employee be one "who customarily and regularly performs his work away from his employer's place or places of business." This requirement is based on the obvious connotation of the word "outside" in the term "outside salesman." In a few instances the suggestion has been made that "outside salesman" should be construed to include inside salesmen,[135] but such a definition would obviously lie beyond the scope of the Administrator's authority, even if it were desirable.[136] However, the question remains as to the extent to which the employee must perform his work *away* from his employer's place or places of business. There appears to be one simple and practical way of settling this problem. Inside sales and other inside work (except such as is directly in conjunction with and incidental to outside sales and solicitations, as explained below) is ipso facto work of the same nature as that performed by nonexempt employees, as for example, inside salesman. Accordingly it is recommended that such inside work should merely be counted as nonexempt work and exemption determined in accordance with section 541.5 (B) of the proposed regulations.

### "AWAY FROM HIS EMPLOYER'S PLACE OR PLACES OF BUSINESS"

Some question has been raised about the correct interpretation of the phrase "away from his employer's place or places of business," particularly in connection with persons soliciting sales or contracts by telephone, who use an office rented by themselves (rather than directly by their employer) or who use their own homes as their offices. Although the application of the definition in such instances may appear ambiguous on superficial inspection, it can be definitely decided by reference to the significance of the exemption. Character-

---

[135] For example, J. William Rosenbluth, representing the Downtown Dry Goods Jobbers Association, Inc., proposed that the term be so defined as to exempt salesmen who work at the firm's office, but who customarily engage in making sales to customers with whom the salesman has developed his own trade or following, record April 10–16, hearing, vol. V, p. 734.
[136] Inside salesmen, like a number of other types of employees who do not qualify for exemption as outside salesmen under the present or the proposed definition, may in some instances qualify as administrative employees under the proposed definition of that term, particularly under the alternative provided in subsection B (3).

istically the outside salesman is one who makes his sales at his customer's place of business. This is the reverse of sales made by mail or telephone (except where the telephone is used merely as an adjunct to personal calls). Thus any fixed site, whether home or office, used by the salesman as a headquarters or for telephonic solicitation or sales must be construed as one of his employer's places of business, even though the employer is not in any formal sense the owner or tenant of the property. It should not be inferred for the foregoing that an outside salesman loses his exemption by displaying his samples in hotel sample rooms as he travels from city to city; these sample rooms should not be considered as his employer's places of business.

## WHAT ARE SALES?

Several problems have arisen concerning the interpretation of the phrase in the present regulations which reads "who is customarily and regularly engaged in making sales as defined in section 3 (k) of the act." [137] Generally speaking, the Division has interpreted section 3 (k) of the act to include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Thus the sale of goods such as automobiles, coffee, shoes, and cigars has been construed as a sale within the meaning of section 3 (k). The Division has also included the sale of stocks and bonds and the sale of insurance because stocks, bonds, and insurance policies, although not always negotiable, have an inherent value in themselves. Their loss can be the occasion of either great inconvenience or permanent loss to the owner. It is not believed that any modification of this section is needed to cover such instances.

Aside from the foregoing, the Division has expressed the opinion that the word "sales" as defined in section 3 (k) does not cover certain activities which are popularly described as sales. Particular reference is made to the selling of time on the radio, the solicitation of advertising for newspapers and other periodicals and the solicitation of freight for railroads and other transportation agencies. All these activities are commonly known as sales and may even be sales legally under some statutes and for certain purposes. [138] Furthermore, in a practical sense, these people are salesmen in that their activities are of the same nature as those of persons making sales within the meaning of section 3 (k). Accordingly, it is deemed desirable to add a further clause which will specifically include within the exemption persons engaged in selling activities of this type. The proposed clause reads as follows: "soliciting orders or contracts for the use of facilities for which a consideration will be paid by the client or customer."

## OUTSIDE BUYERS AND OTHER OUTSIDE WORKERS NOT EXEMPT AS OUTSIDE SALESMEN

In extending the scope of the term "outside salesman" to include such employees as radio time, advertising, and freight solicitors, it is

[137] The term "sale" is defined in section 3 (k) as follows : " 'Sale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."
[138] Joseph L. Miller, representing the National Association of Broadcasters, offered in evidence part of a report of the Federal Communications Commission to show that that agency regards those who sell radio time as "outside salesmen," record July 25–29, hearing, vol. I, p. 109.

not intended to include persons who in a very loose sense are sometimes described as selling "service."

There have been frequent requests for the inclusion within the exemption of outside buyers, both of a general type [139] and the special type employed by renderers.[140] It has been alleged that these persons. are engaged in selling their employer's "service" to the person from whom they obtain their goods. While occasionally the phrase "sell- ing service" is used in this sense in common speech, it is obvious that the relationship here is the reverse of that of salesman—customer. Congress might have included an exemption for outside buyers in the act, if it had so desired, but it would clearly be a violation of the Administrator's power of definition and delimitation to include within an outside salesman exemption the exemption of the sales- man's opposite and counterpart, the outside buyer. Similarly, re- quests to include as outside salesmen such employees as service men, installation men, delivery men, and collectors must be denied as lying outside the scope of the Administrator's authority.

### PROMOTION AND MISSIONARY MEN

A further group of persons for whom exemptions has been asked and who are admittedly not outside salesmen, in that they do not make actual sales, are sales promotion men and missionary men.[141] These persons are engaged in paving the way for salesmen, assisting retailers, and establishing sales displays, and so forth. Frequently the sales promotion man deals with retailers who are not customers of his own employer but of his employer's customer, the jobber. In- cidental sales made by the sales promotion man under these circum- stances are normally credited to the jobber. Where the retailers are actually customers of the employer, the promotion man's incidental sales are normally credited to the outside salesman who covers the territory. It should be noted that frequently the promotion man is primarily interested in sales *by* the retailer, not *to* the retailer. Thus, inasmuch as the promotion man's earnings are normally not directly related to his working time, as is customarily the case with outside salesmen, it is doubtful that the nature of his work requires or justi- fies an exemption from the provisions of the act. In any event it is clear that it would be an unwarrantable extension of the Admini- strator's authority to describe as a salesman anyone who does not in some sense make a sale. Sales promotion and missionary men are

---

[139] The exemption of "assistant buyers" of general merchandise was requested by Chas. E. Wyzanski and David B. Craig of the American Retail Federation, record April 10–16, hearing, vol. I, pp. 109 and 111. A detailed description of the duties and responsibilities of such "assistant buyers" was given by H. C. Hangen and R. B. Fox of J. C. Penney Co., to support the proposed exemption, record April 10–16, hearing, vol. I, pp. 113–143. Normally, these assistant buyers, if they meet the salary requirement, would qualify for exemption under the proposed definition of "administrative."

[140] The exemption of buyers of fats, bones, suets, hides, skins, etc., was requested by the following: F. B. Wise, Inedible Fats Producers' Association, record April 10–16, hearing, vol. II, p. 378; B. J. McWaters, Association of American Producers of Domestic Fats, record June 3–5, hearing, vol. II, p. 217; and Carlos Alling, Darling & Co., record July 25–29, hearing, vol. II, p. 246. It was admitted by all three of these witnesses, however, that the Administrator's authority to so define "outside salesmen" as to exempt outside buyers is questionable and an alternative proposal to exempt them as "administrative" or "executive" employees was made in each instance.

[141] Redefinitions of the term "outside salesmen" so phrased as to exempt employees engaged in sales promotion activities were submitted by the following: Shell Oil Co., National Association of Manufacturers, Insulation Board Institute, American Newspaper Publishers Association, and Edison Electric Institute.

persons who normally make no sales at all and who are not employed for the purpose of making sales.[142]

## HOW MUCH NONEXEMPT WORK WILL BE ALLOWED

As is the case with the other sections of part 541 of the regulations, there has been criticism of the clause "who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer." This particular clause as used in the definition of outside salesmen is crucial in determining the inclusion or exclusion of the group of employees known generally as "route salesmen" or "driver salesmen." Inasmuch as this problem is interrelated with a further requirement in the present definition that excludes many such employees from exemption,[143] it will be considered later in that connection.

This phrase has also been criticized as uncertain. For reasons set forth in detail in the discussion concerning the definition of the term "executive," it appears desirable to define "no substantial" in numerical terms as "not more than 20 percent." However, there are certain additional problems peculiar to outside salesmen concerning the nature of nonexempt work and the time base to be used. In the first place, it is a widespread practice for outside salesmen to spend part of their working time in the office. The city salesman frequently reports at the office in the morning and again in the afternoon and engages therein in such clerical work as is necessary to complete the records of or correspondence concerning the sales he has made or is about to make.[144]

In the case of a salesman who does not work within the city these visits to his employer's place of business occur at less frequent intervals. In that event, he may require several days at the office to catch up with the backlog of work, all of it connected with his outside sales, prospective or completed. Furthermore, for city salesmen a weekly sales conference, frequently held on Saturday morning, is exceedingly common.[145] In the case of salesmen whose routes are more extensive, the conferences may be held monthly, quarterly, or semiannually. In any event such conferences can be considered a normal part of the outside salesman's job. Also since the clerical work performed in checking sales made outside the office and attendance at sales conferences are a recognized part of the duties of outside salesmen it appears improper to count such work as nonexempt work.

## TRAVEL TIME

A question has also been raised about traveling time, both for salesmen who make no deliveries and for route salesmen.[146] The amount of

---

[142] It should be noted that the making of an occasional or incidental sale by a sales promotion employee would not meet the requirement that the employee "be employed for the purpose of and * * * customarily and regularly engaged * * * in making sales * * * or soliciting orders or contracts."

[143] This is the requirement that "for the purposes of this definition, recurrent routine deliveries, whether or not prior orders are placed by the purchasers, and collections, shall not be considered sales."

[144] As regards driver or distributor salesmen, J. S. Rice of the Dr. Pepper Co. estimated that route salesmen employed by his company spent on an average of only 30 minutes a day at the plant or office, record April 10–16, hearing, vol. V, p. 726, 727. John J. Wolf., Jr., of Kraft Cheese Co., stated that its distributor salesmen spend an average of only 36 minutes a day at the warehouse, record April 10–16, hearing, vol. IV, p. 501.

[145] For example, Richard M. Keck of the Kraft Cheese Co. stated that its salesmen generally work on their routes 5 days a week and attend a sales meeting on Saturday mornings, record April 10–16, hearing, vol. IV, p. 494.

[146] It was testified that Kraft Cheese distributor salesmen spend an average of 24½ percent of their time operating the motor vehicle. Ibid., p. 477. R. L. Fruchterman of Standard Brands, Inc., stated that its route salesmen spend 18 to 20 percent of their time in driving, record April 10–16, hearing, vol. V, p. 654.

time spent in travel as contrasted with the amount of time spent in actual selling is primarily determined by the nature of the goods being sold and by the density of population. In sparsely settled regions the salesman, whatever the commodity he sells, may spend more time on the road in travel, whether by car, truck or train, than he does in his customers' places of business. The reverse may well be true if he is a salesman in a large city.[147] It would therefore appear unjustifiable to establish any requirements as to the proportion of time to be spent by the salesman in making sales as contrasted with the proportion of time he spends in travel.[148]

To sum up, it appears proper to consider as part of outside sales, all time spent by the outside salesman in work performed incidental to and in conjunction with his outside sales. Thus an employee who is regularly employed as an outside salesman remains an outside salesman even when he attends a sales conference for an entire week. Similarly a route salesman who spends 60 percent of his time driving his truck and only 40 percent of his time in the stores of his customers is likewise engaged as an outside salesman provided that his truck-driving activities are directly concerned with the sales and deliveries he makes and with nothing else. In such instances the question is not one as to the percentage of time spent in customers' stores as contrasted with the percentage spent in driving the truck; it is whether or not he meets the further requirement, that he be "employed' for the purpose of * * * and is customarily and regularly engaged in * * * making sales * * * or obtaining orders or contracts."

## TRAINING OTHER SALESMEN

Nonexempt work, accordingly, is that work which is not directly connected with the outside sales made by the employee. It includes outside activities like meter-reading, which are not part of the sales process. Inside sales and all work incidental thereto are also nonexempt work. So is clerical or warehouse work which is not related to the employee's own sales. Similarly, the training of other salesmen is nonexempt work with the one exception. In some concerns it is the custom for the salesman to be accompanied by the trainee while actually making sales.[149] Under such circumstances it appears that normally the trainer salesman and the trainee make the various sales jointly, and both normally receive a commission thereon. In such instances, since both are engaged in making sales, the work of both should be considered exempt work. However, the work of a helper who

---

[147] Frank P. Will of the Consolidated Cigar Corporation and G. H. P. Cigar Co. stated that in eastern metropolitan areas their salesmen average 40 calls a day, while in Minnesota, Michigan, or some New England areas the number of calls a day may be as few as 10. This is a result of the larger territory salesmen in the latter areas must cover, record June 3–5, hearing, vol. I, p. 80.
[148] The recent decision of division 5 of the Interstate Commerce Commission Ex. Parte No. MC–3, in which exemption for driver salesmen is related to driving time, is of course not relevant here. The commission is interested in the driver salesman qua driver, the Wage and Hour Division is interested in him (for purposes of exemption) qua salesman.
[149] For example, it was testified by J. S. Rice that Dr. Pepper driver-salesmen work for several weeks on trucks with experienced men before they are given the responsibility of selling, record April 10–16, hearing, vol. V, p. 723. Likewise, it was testified that Kraft Cheese distributor salesmen trainees are given practical experience by calling upon retail customers of the employer in the company of experienced salesmen, record April 10–16, hearing, vol. IV, p. 472.

merely assists the salesman in transporting goods or samples and who is not directly concerned with effectuating the sale is nonexempt work.[150]

## TWENTY PERCENT

It is obvious that when an outside salesman performs certain types of nonexempt work he may on occasion be the only person employed by his employer in performing such nonexempt work. Since it is recommended that the percentage of time allowed for such nonexempt work be based on the work-week of nonexempt employees, as is explained above in connection with the term "executive," the proviso is written herein as "20 percent of the number of hours worked in the workweek by such nonexempt employees." Whenever the outside salesman is performing work which is likewise performed by other employees of his employer the standard to be adopted is of course the workweek of those employees. When, however, he is the only employee of his employer who performs such work, the customary working hours of employees of other employers who perform similar nonexempt work may be taken as the standard. For example, if the outside salesman spends a certain amount of time each week in the occupation of bookkeeper and he is the only bookkeeper employed by his employer, the standard may be the customary hours of work of bookkeepers in similar establishments where full time bookkeepers are employed. In all doubtful cases, for the purpose of simplicity and in default of evidence to the contrary, the standard may be taken as 40 hours a week and the amount of nonexempt work allowed, therefore, will be 8 hours per week.

## DRIVER SALESMEN

There has been considerable controversy concerning the following sentence in the present regulations: "For the purpose of this definition, recurrent routine deliveries, whether or not prior orders are placed by the purchasers, and collections, shall not be considered sales."[151] This proviso was designed to and effectively has excluded from the exemption many of the large group of employees known generally as "route salesmen," "distributor salesmen," or "driver salesmen." Such employees are commonly employed by distributors of carbonated beverages and beer, cigars, and numerous dairy and other food products.

Some employees occasionally described as outside salesmen, merely deliver orders in an amount exactly or approximately prearranged

---

[150] It was proposed by the Indiana Manufacturers' Association that the term "outside salesman" should include "any assistants that work with him in completing the sales, transaction, installation, or further servicing, recurrent deliveries, and collections in respect to the selling transactions." It is obvious that the term "outside salesman" was not intended to cover deliverymen, servicemen, or those who install the goods sold by the salesman, and a definition so framed as to exempt such employes would extend the exemption far beyond the limits intended by Congress.

[151] This sentence is eliminated in proposed redefinitions of "outside salesman" submitted by the following: Shell Oil Co., Council of National Wholesale Associations, Associated Grocery Manufacturers of America, Inc., Illinois Manufacturers Association, United States Wholesale Grocery Association, Inc., Indiana Manufacturers' Association, National Association of Manufacturers, Insulation Board Institute, Cigar Manufacturers Association of America, Inc., and American Newspaper Publishers' Association. An additional phrase designed to make the exemption of driver salesmen certain was added by the Associated Grocery Manufacturers of America, Inc., the Illinois Manufacturers' Association, and the Cigar Manufacturers Association of America, Inc.

The sentence was retained in proposed redefinitions submitted by the Edison Electric Institute and the National Association of Ornamental Metal Manufacturers.

by custom or contractual arrangement and frequently make collections for the goods they deliver.  Such employees are clearly not salesmen.[152]  More commonly, and correctly, the term "driver salesmen" is applied to another group of employees, the amount of whose deliveries is not prearranged by custom or contract.  The driver salesman of this type drives a truck, frequently a small panel-body truck, in which he carries an assortment of the articles he sells.[153]  He calls on the same customers at frequent and regular intervals.  He confers with the customer, replenishes the customer's stock of goods and if he is introducing new varieties or new lines, endeavors to persuade the customer to buy some of the new products.  He removes the empty bottles, cases, and other containers if these are to be returned to his employer and delivers the articles sold to the customer.  In some cases, as with cigars, if the order is large, it is customarily shipped on instructions from the salesman; if the order is small it is delivered immediately by the salesman.

This method of combining deliveries and sales is comparatively modern and is characteristically used where the products are small or varied.  It is also used where it is necessary to replenish the stock at extremely frequent intervals, such as daily or three or four times a week.[154]  Generally speaking, the persons who perform these jobs are both salesmen and truck drivers.  In some instances it is easy to see that they are primarily salesmen.  In other instances it would appear that manual strength is an important factor.  It can be seen that the Administrator has the authority either to include most or all of these persons within or exclude them from the exemption.  Either decision would fall within the scope of his authority.  When the regulations were originally drafted it appeared desirable on the evidence then at hand to exclude from the exemption typical driver salesmen, i. e., those who make recurrent routine deliveries.

However, the evidence presented at the hearings indicated that to a large extent these persons are in fact employed as salesmen; they are given sales training;[155] they frequently attend regular sales conferences;[156] in most instances they are paid either on a commission or a commission-plus-salary basis.[157]  Furthermore a great many of them are members of the International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers which requested that they be classed as outside salesmen, at least on the basis of the information presently

[152] In general, for example, newsboys and milk wagon drivers are not true salesmen, although many of them may be exempt under the definition of "local retailing capacity."

[153] An example is the Kraft Cheese Co. distributor salesmen who sell and deliver 200 or more items which are carried in a refrigerated truck.

[154] E. g., Coco Cola, Dr. Pepper, and other carbonated beverages, cigars, milk, butter, mayonnaise, cheese, crackers, baking powder, tea, coffee, gelatin, and yeast cakes.

[155] It was testified by Richard M. Keck that distributor-salesmen of the Kraft Cheese Co. are given a sales training course extending over a period of from 2 weeks to approximately 1 year, the length of the course generally depending on the salesman's previous experience.  During this period each salesman is schooled in the methods of manufacture of the 200 or more items he will be required to sell, the proper methods of displaying and handling them, and selling technique, record April 10–16, hearing, vol. IV, p. 472.

[156] In most instances these are held once a week, usually on Saturday morning.  Statement of Richard M. Keck, op. cit., note 146.

[157] A base weekly salary plus a fixed commission is the method of payment for driver salesmen employed by Kraft Cheese Co., Best Foods, Inc., Coca Cola Bottling Co., Dr. Pepper Co., and members of the National Cooperative Milk Producers Association, and of the International Association of Ice Cream Manufacturers, according to testimony given by their representatives, record April 10–16, hearing, vol. IV, p. 472, vol. V, pp. 664, 714, 727, and vol. IV, pp. 553, 601.

available on the subject.[158]   The union pointed out, among other things, that characteristically in union contracts driver-salesmen are described as salesmen and not as truck drivers.

It was also suggested as a possibility that a distinction might be drawn between those who are employed on a commission or salary-plus-commission basis and those who are employed on a straight salary basis.[159]   However, it is clear from other testimony given at the hearing that this distinction represents more a difference in personnel policy than a difference in the nature of the work.   Some persons, who are as obviously entitled to the exemption as many paid on a commission basis, are through an accident of personnel policy, employed on a salary basis.[160]   All the employers appearing in behalf of the exemption of these employees stated explicitly that their employees and similar employees are employed for the purpose of making sales and do in fact make sales.   They regarded this fact, if given regulatory effect, as a sufficient safeguard against the possible exemption of truck drivers who are not so employed and who only occasionally make sales, and whose salesmanship, if any, is merely incidental to their truck-driving activities.

With this limitation it appears on the whole desirable, in view of the evidence now in the record, not to exclude driver or route salesmen, as such, from the exemption for outside salesmen.   It is therefore recommended that the last clause· in the present regulations, which excludes many of these employees from the exemption, be deleted.

It is further recommended that the "substantial amount" clause be redrafted so as to exclude incidental deliveries and collections from the category of nonexempt work.   It is a logical concomitant of the ruling that the driving is incidental to the sales, to hold that the driving of a truck by a salesman is exempt work, insofar as the truck is driven only in connection with the salesman's own sales.   Driving a truck (or making collections) is not exempt work when the truck is being used to deliver goods sold by some one else, or when the collections are for sales made by another employee.   For the purposes of the proposed regulation it is immaterial whether the delivery or collection is made simultaneously with the sale or whether, as is customary in certain instances, the salesman takes the order and delivers or collects for it subsequently.

Finally, it is proposed that the phrase "who is employed for the purpose of * * * making sales" etc., be incorporated in the regulations.   This will, properly, deny the exemption to the employee who is primarily a truck driver and only incidentally or occasionally a salesman.   In border-line cases, a determination can be made in the light of facts that will illustrate the actual nature of the employee's work.   Among factors to be considered are: the employer's specifications as to qualifications for hiring; sales training; attendance at sales

---

[158] Memorandum Brief of the International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America, submitted by Joseph A. Padway, counsel, May 3, 1940, hearings, Branch Docket No. 45.
[159] This suggestion was made by Joseph A. Padway, who appeared on behalf of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers, record April 10–16, hearing, vol. V, p. 710.
[160] For example, route salesmen of Standard Brands, Inc., who sell over 100 products, are paid a straight salary averaging $159.85 a month or $37.17 a week, record April 10–16, hearing, vol. V, p. 637.

conferences; method of payment; proportion of earnings directly attributable to sales effort; description of occupation in union contracts; comparison of duties of employees in question and of other employees engaged as (*a*) truck drivers and (*b*) salesmen; possession of a salesman's or solicitor's license when such license is required by law or ordinance; and presence or absence of customary or contractual prearrangements concerning amount to be delivered.

## NO SALARY QUALIFICATION

In conclusion, there should be some mention of the failure to recommend a salary qualification for outside salesmen.[161] It needs no extended argument to show that this group of employees, whose duties involve neither importance nor prestige, can be defined without reference to earnings. Indeed, while it is absurd on its face to speak of an executive, for example, who is paid only $12 a week, it cannot be denied that a man can earn as little as $12 a week and still be an outside salesman. It is possible, however, that under the Administrator's power to delimit, also granted by section 13 (a) (1), it might be wise to retain the benefits of the act for the lower paid members of this group and particularly to encourage the spread of employment thereby. However, the information presently available to the Wage and Hour Division is insufficient to form the basis for such a decision. At the present time, therefore, it does not appear justifiable to make any recommendation concerning a salary qualification in the outside salesman definition.

HAROLD STEIN,
*Presiding Officer.*

OCTOBER 10, 1940.

---

[161] No direct proposal that a salary qualification be included in the definition of "outside salesman" was made by those appearing at the hearings.

# Appendix A. PRESENT DEFINITIONS

## PART 541

Regulations Defining and Delimiting the Terms "Any Employee Employed in a Bona Fide Executive, Administrative, Professional, or Local Retailing Capacity, or in the Capacity of Outside Salesmen" Pursuant to section 13 (a) (1) of the Fair Labor Standards Act

### Section 541.1. Executive and administrative.

The term "employee employed in a bona fide executive (and) administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee whose primary duty is the management of the establishment, or a customarily recognized department thereof, in which he is employed, and who customarily and regularly directs the work of other employees therein, and who has the authority to hire and fire other employees or whose suggestions and recommendations as to the hiring and firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and who customarily and regularly exercises discretionary powers, and who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer, and who is compensated for his services at not less than $30 (exclusive of board, lodging, or other facilities) for a workweek.

### Section 541.2. Professional.

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee—
(a) Who is customarily and regularly engaged in work—
(i) Predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and
(ii) Requiring the consistent exercise of discretion and judgment both as to the manner and time of performance, as opposed to work subject to active direction and supervision, and
(iii) Of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and
(iv) Based upon educational training in a specially organized body of knowledge as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, mechanical, or physical processes in accordance with a previously indicated or standardized formula, plan, or procedure, and
(b) Who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer.

### Section 541.3. Local retailing capacity.

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee who customarily and regularly is engaged in making retail sales the greater part of which are in intrastate commerce, or who performs work immediately incidental thereto, such as the wrapping or delivery of packages, and who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer.

### Section 541.4. Outside salesman.

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee who customarily and regularly performs his work away from his employer's place or places of business, who is customarily and regularly engaged in making sales as defined in section 3 (k) of the act and who does no substantial amount of work of the same nature as that performed by nonexempt employees of the employer. For the purposes of this definition, recurrent routine deliveries, whether or not prior orders are placed by the purchasers, and collections, shall not be considered sales.

### Section 541.5. Petition for amendment of regulations.

Any person wishing a revision of any of the terms of the foregoing regulations may submit in writing to the Administrator a petition setting forth the changes desired and the reasons for proposing them. If, upon inspection of the petition,

53

the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provisions for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes. In determining such future regulations, separate treatment for different industries and for different classes of employees may be given consideration.

Approved by the Administrator, October 19, 1938.
.Published in the Federal Register, October 20, 1938.

## Appendix B. RECOMMENDED DEFINITIONS

### EXECUTIVE

**Section 541.1. Executive.**

The term "employee employed in a bona fide executive * * * capacity" in section 13.(a) (1) of the act shall mean any employee—

(A) Whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

(B) Who customarily and regularly directs the work of other employees therein, and

(C) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

(D) Who customarily and regularly exercises discretionary powers, and

(E) Who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

(F) Whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

### ADMINISTRATIVE

**Section 541.2. Administrative.**

The term "employee employed in a bona fide * * * administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) Who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) Who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) Whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment.

### PROFESSIONAL

**Section 541.3. Professional.**

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee who is—

(A) Engaged in work—

(1) Predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and

(2) Requiring the consistent exercise of discretion and judgment in its performance, and

(3) Of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and

(4) Whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees; provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and

(5) (a) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; or

(b) Predominantly.original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training, and the result of which depends primarily on the invention, imagination, or talent of the employee, and

(B) Who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities); provided that this subsection (B) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof.

OUTSIDE SALESMAN

Section 541.5. Outside Salesman.

The term "employee employed  *  *  *  in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A) Who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in

(1) Making sales within the meaning of section 3 (k) of the act; or

(2) Obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and

(B) Whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

---

Appendix C. LIST OF APPEARANCES ENTERED AT HEARINGS HELD ON PROPOSED AMENDMENTS TO·PART 541 OF REGULATIONS WITH RESPECT TO THE DEFINITION OF THE TERMS "EXECUTIVE, ADMINSTRATIVE, PROFESSIONAL  *  *  *  OUTSIDE SALESMAN"

WHOLESALE DISTRIBUTIVE TRADES HEARING HELD APRIL 10, 11, 12, 15, and 16

J. S. RICE, in support of American Bottlers of Carbonated Beverages.

JOHN J. RILEY, executive secretary, American Bottlers of Carbonated Beverages.

GEORGE S. DERRY, in support of American Bottlers of Carbonated Beverages.

W. E. UPCHURCH, in support of American Bottlers of Carbonated Beverages.

NELSON W. HEPBURN, executive secretary, ·American Butter Institute, Chicago.

DAVID R. CRAIG, president, American Retail Federation.

H. C. HANGEN, assistant merchandise manager, the J. C. Penney Co. of New York, on behalf of the American Retail Federation.

CHARLES E. WYZANSKI, Jr., representing American Retail Federation.

ROBERT F. WILSON, assistant to the president of the Associated Grocery Manufacturers of America, Inc., 205 East Forty-second Street, New York City.

CLEVELAND A. NEWTON, representing Associated Industries of Missouri, special committee of Wholesale Distributive Trades.

WM. W. PEAKE, secretary, Association of Stock Exchange Firms, New York City.

WALTER C. B. SCHLESINGER, representing the Beauty and Barber Supply Institute, Inc.

A. M. Davis, attorney, representing The Best Foods, Inc.
A. M. Gilbert, representing The Best Foods, Inc.
George C. Spitzmiller, vice president, The Best Foods, Inc.
Dorsey W. Hyde, Jr., representing the committee on professional standards, Special Libraries Association.
Joseph M. Klamon, St. Louis, Mo., appearing for the Construction Industries Credit Bureau of Greater St. Louis, 516 State National Life Building, St. Louis, Mo., and Missouri Building Material Supply Industry, St. Louis, Mo.
Joseph M. Klamon, representing the Hill-Behand Lumber Co., Goodfellow Lumber Co., Boeckler Lumber Co., and Wiles-Chipman Lumber Co.
Hector Lazo, executive vice president, Cooperative Food Distributors of America.
J. William Rosenbluth, Downtown Dry Goods Jobbers Association, Inc., New York.
Miss Helen M. Boyer, appearing for Congressman Clare E. Hoffman of Michigan.
John Harrington, representing Illinois Manufacturers Association, Chicago.
F. B. Wise, secretary-treasurer, Inedible Fats Producers Association.
Robert C. Hibben, executive secretary, International Association of Ice Cream Manufacturers, Washington, D. C.
Richard M. Keck, attorney, Erwin P. Snyder, attorney, and J. J. Wolf, Jr., assistant general sales manager, appearing for Kraft Cheese Co., 500 Peshtigo Court, Chicago, Ill.
Marie M. Manderscheid, representing Montgomery Ward & Co.
Sid L. Darling, secretary of the National-American Wholesale Lumber Association.
Milton J. Benjamin, assistant executive secretary of the National Association of Tobacco Distributors, New York City.
Horace H. Herz, secretary, National League of Wholesale Fresh Fruit & Vegetable Distributors, Washington, D. C.
Mrs. Nina P. Collier, national legislative chairman, League of Women Shoppers, Inc.
M. J. Trautman, representing National Refrigeration Supply Jobbers Association, Chicago, Ill.
Harold Held, representing Paper Trade Association of the United States.
Charles W. Holman, secretary, Washington, D. C., National Cooperative Milk Producers' Federation.
M. L. Toulme, chairman, Council of National Wholesale Grocers' Association.
Joe E. Timberlake, president, National Wholesale Grocers' Association.
Thomas A. Fernley, assistant secretary-treasurer, National Wholesale Hardware Association.
R. B. Fox, on behalf of the assistant buyers of J. C. Penny Co.
Joseph T. Owens, representing the Pittsburgh Plate Glass Co.
J. H. Ballew, representing the Southern States Industrial Council.
Albert R. Fleischmann, vice president, Standard Brands, Incorporated, 595 Madison Avenue, New York City.
Richard L. Fruchterman, representing Standards Brands, Incorporated, 595 Madison Avenue, New York City.
R. H. Rowe, executive vice president, United States Wholesale Grocers Association.
Henry Matter, executive secretary of the Wholesale Dry Goods Institute, Incorporated, New York.

## UNIONS

S. A. Lischinsky, Amalgamated Clothing Workers of America, C. I. O.
Boris Shishkin, American Federation of Labor.
Elinor Kahn, American Communications Association.
Geneva M. Marsh, secretary, American Federation of Office Employes International Council, New York, N. Y.
Victor Pasche, secretary-treasurer, American Newspaper Guild, New York.
Joseph Kovner, assistant general counsel, Congress of Industrial Organizations.
Joseph A. Padway, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers.
L. F. Vansciver, International Federation of Architects, Engineers, Chemists and Technicians.
Marcel Scherer, International Federation of Architects, Engineers, Chemists and Technicians, affiliated with the C. I. O.
Lazare Teper, director, Research Department, International Ladies Garment Workers Union, New York.

DANIEL D. CARMELL, International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Teamsters District Council, No. 25, Chicago.
ARTHUR OSMAN, president, United Wholesale and Warehouse Employees' of New York.
LEO BERNSTEIN, representing the United Wholesale and Warehouse Employees' Union of New York, affiliated with the C. I. O.
LEWIS MERRILL, on behalf of the United Office and Professional Workers of America.

## MANUFACTURING AND EXTRACTIVE INDUSTRIES HEARING HELD JUNE 3, 4, AND 5

American Paper & Pulp Association by:

> CHARLES W. BOYCE, The Northwest Paper Co.,
> F. S. POPE, The Mead Corporation,
> WALTER J. DAMTOFT, Champion Paper & Fibre Co.,
> E. D. STOETZEL, Marathon Paper Mills Co.
> H. G. NOYES, Oxford Paper Co.,
> R. E. CANFIELD, counsel for the American Paper and Pulp Association.
> E. W. TINKER, executive secretary of the American Paper & Pulp Association,
> GEORGE J. ADAMS.

F. B. WISE, representing the Association of American Producers of Domestic Inedible Fats, Washington, D. C.
B. J. MCWATERS, president of the Association of American Producers of Domestic Inedible Fats.
CLEVELAND A. NEWTON, representing a special committee of the Associated Industries of Missouri.
HOWARD C. CARR, vice president of Bayuk Cigars, Incorporated, in Philadelphia.
SAMUEL BLUMBERG and MORTIMER M. LERNER, representing Cigar Manufacturers Association of America, Inc.
FRANK P. ZURN, representing Clothing Manufacturers Association of the United States of America.
Mr. BREEN of the Congress Cigar Co.
PAUL ADAMS, appearing for the Connecticut Manufacturers Association.
FRANK P. WILL, vice president of the Consolidated Cigar Corporation, and executive vice president of the G. H. P. Cigar Co.
Mr. C. T. MURCHISON, representing The Cotton Textile Institute,

> The National Association of Cotton Manufacturers,
> The American Cotton Manufacturers Association,
> The State Associations of North Carolina, South Carolina, Georgia, and Alabama,
> National Federation of Textiles,
> National Rayon Weavers Association,
> Association of Finishers,
> The Cotton Thread Institute,
> Southern Combed Yarn Spinners Association.

RUSSELL B. BROWN, representing Independent Petroleum Association.
HALL COCHRANE, representing Indiana Manufacturers' Association, Indianapolis. Ind.
E. B. HEATON, representing Institute of American Poultry Industries.
Insulation Board Institute, by:

> GORDON RULE, attorney, and B. G. DAHLBERG, B. J. WESTOVER, and CRANSTON SPARY.

WILLIAM J. KELLY, representing Machinery and Allied Products Institute.
ALEXANDER KONKLE, Machinery and Allied Products Institute.
HAMILTON MERRILL, of Manning, Maxwell & Moore, also representing Manufacturers Association of Bridgeport, Connecticut, and Manufacturers Association of Connecticut, Inc.
Mid-Continent Oil & Gas Association by:

> Mr. C. H. MARCH, Jr.,
> Capt. A. A. NICHOSON,
> CLAREL B. MAPES.

HERMAN FAKLER, representing Miller's National Federation.
National Association of Manufacturers of the United States of America, by NOEL SARGENT, secretary, and RAYMOND S. SMETHURST, associate counsel.
B. W. STONEBRAKER, representing National Association of Ornamental Metal Manufacturers.
HARRY GANDY, JR., representing National Coal Association.
S. O. HALL, representing National Door Manufacturers Association, Inc.
HENRY BAHR, representing National Lumber Manufacturers Association, Washington, D. C.
HARRY S. FLYNN, secretary, National Metal Trades Association.
MAXWELL FIELD, representing New England Shoe & Leather Association of Boston.
Mrs. M. C. MALLON, representing Pennsylvania Grade Crude Oil Association.
G. A. WALSH, representing Printers National Association.
GUSTAVE BREAUX, secretary of the Southeastern Millers Association.
PHILLIP A. WALKER, on behalf of the Southern Pine Industry Committee.
J. H. BALLEW, representing Southern States Industrial Council.
Mr. BRAND, representing Tanners' Council of America.
HAROLD CONNETT, chairman of the board of the Tanners' Council of America.
Western Pennsylvanit Coal Operators Association by: R. N. GRIER; CHARLES B. BATON; H. L. GOOD; and H. C. ROSE.
JOSEPH M. KLAMON, representing Wiles-Chipman Lumber Company; Hill-Behand Lumber Company; Goodfellow Lumber Company; and Boockler Lumber Company, St. Louis.

## UNIONS

S. A. LISCHINSKY, in behalf of the Amalgamated Clothing Workers of America, The Textile Workers Union of America, and the C. I. O.
BORIS SHISHKIN, representing American Federation of Labor.
Dr. LAZARE TEPER, representing International Ladies' Garment Workers' Union.
NATHAN WEINBERG, International Ladies' Garment Workers' Union.

## BANKING, BROKERAGE, INSURANCE, FINANCIAL AND RELATED INSTITUTIONS HEARING HELD JULY 9 AND 10

American Bankers Association by:

A. L. M. WIGGINS.
FRANCIS G. ADDISON, president of the Securities Savings & Commercial Bank of Washington.
C. EDGAR JOHNSON, assistant vice president of the First National Bank of Chicago.
CLAY W. STAFFORD, cashier of the Ames Trust & Savings Bank of Ames, Iowa.
WILLARD F. JONES, executive vice president of the Farmers National Bank & Trust Co., of Rocky Mount, N. C.
HOWARD A. FOSTER, secretary and trust officer of the Provident Trust Company of Philadelphia, Pa..
H. LEE HUSTON, cashier of Columbus Junction State Bank of Columbus Junction, Iowa.
H. E. COOK, president of the Second National Bank of Bucyrus, Ohio.
H. G. BROWN, executive vice president and cashier of the Shenandoah Valley National Bank of Winchester, Va.

W. W. PEAKE, secretary, Association of Stock Exchange Firms, New York City.
ALBERT F. CLEAR, chairman of the board of New York Curb Partners Association.
J. H. BALLEW, counsel for the Southern States Industrial Council.
E. G. OTEY, director for the Southern States Industrial Council and president of the First National Bank of Bluefield, W. Va.

## PUBLICATION, COMMUNICATION, PUBLIC UTILITY, TRANSPORTATION, AND MISCELLANEOUS INDUSTRIES HEARING HELD JULY 25, 26, 27, AND 29.

CARL W. ACKERMAN, dean, School of Journalism, Columbia University; KENNETH E. OLSON, dean, Medill School of Journalism, Northwestern University; and

FRANK MARTIN, dean, School of Journalism, University of Missouri; on behalf of the American Association of Schools and Departments of Journalism.

ELISHA HANSON on behalf of the American Newspaper Publishers Association.

JOHN V. LAWRENCE, American Trucking Association, Inc.

A. L. FUNKE, Automatic Electric Co., American Automatic Electric Sales Co., The National Construction & Engineering Co., and Automatic Electric Sales Co., Ltd.

L. S. HARRIS, executive vice president, Automobile Contract Carriers Association.

J. RAYMOND TIFFANY, on behalf of the Book Manufacturers Institute, the Roll Leaf Manufacturers Association, the Subscription Book Publishers Association or Institute, and the National Small Businessmen's Association.

CARLOS ALLING, president of Darling & Co., Chicago, Ill.

ALEXANDER MAXWELL, Edison Electric Institute.

THOMAS BRENNEN of New York appearing on behalf of the Hearst Corporation.

CLAREL B. MAPES and RAYMOND MYERS, Mid-Continent Oil & Gas Association of Dallas, Tex.

HOMER MITCHELL, representing the Motion Picture Producers and Distributors of America.

JOSEPH L. MILLER, National Association of Broadcasters.

A. W. KOEHLER, secretary-manager of the National Association of Motor Bus Operators.

E. E. BENZENBERG, National Council of Marine Draftsmen, Inc.

WILLIAM L. DALEY, National Editorial Association.

CYRUS A. FIELD, counsel for the Otter Tail Power Co.

J. H. BALLEW, representing the Southern States Industrial Council.

Mr. BRUCKART, U. S. Independent Telephone Association.

OSCAR J. VAGO.

## UNIONS

SIDNEY E. COHN, on behalf of the American Communications Association, also representing more than 50 trade unions affiliated with the American Federation of Labor and Congress of Industrial Organizations.

HENRY JAFFE, American Federation of Radio Artists, a branch of the Associated Actors and Artists of America, an affiliate of the American Federation of Labor.

VICTOR PASCHE, American Newspaper Guild, C. I. O.

CHARLES S. DUKE, International Federation of Architects, Engineers, Chemists, and Technicians, C. I. O.

MORRIS ZEITLIN, International Federation of Architects, Engineers, Chemists, and Technicians, C. I. O.

H. H. DASH, Federation of Architects, Engineers, Chemists, and Technicians.

STEVE B. NEWMAN, international representative for the International Alliance of Theatrical and Stage Employees and Moving Picture Machine Operators.

LAWSON WIMBERLY, International Brotherhood of Electrical Workers.

C. L. ROSEMUND, International Federation of Technical Engineers, Architects, and Draftsmen's Union.

L. J. BUCKLEY, International Stereotypers and Electrotypers Union of North America.

JOHN R. EVANS on behalf of Clarence J. Desper representing President C. M. Baker of the International Typographical Union.

PAUL E. GRIFFITH, National Federation of Telephone Workers.

FREDERICK A. FISCHEL, for a committee of the Photographers' Association of America and the Chicago Photographic Guild.

WILLIAM MONTGOMERY SMITH, Screen Directors Guild.

GEORGE E. BODLE, Screen Writers Guild; Screen Publicists Guild; Screen Office Employees Guild; Society of Motion Picture Interior Decorators; Screen Readers Guild; Screen Set Designers; Hollywood Guild Council; Moving Picture Painters, Local No. 644, affiliated with the Brotherhood of Painters, Decorators, and Paperhangers of America; Screen Cartoonists Local Union No. 852, affiliated with the Brotherhood of Painters, Decorators, and Paperhangers of America.

JANE BENEDICT, Book and Magazine Guild, affiliated with the United Office and Professional Workers of America, C. I. O.

HUGH C. McKENNY, counsel for the Western Union Division of Commercial Telegraphers Union.

# Appendix D. OCCUPATIONAL INDEX

Accountant, 32, 35, 39.
Actor, 35, 37, 41.
Actuary, 39.
Administrative officers, 27n.
Administrative officer, junior, 27n.
Advisor, legal, 27.
Agent, purchasing, 4n, 28.
Analyst, wage rate, 24, 27, 34n.
Animator (motion picture), 41.
Architect, 34, 38, 39.
Artist, 40.
Artist, make-up, 29, 29n.
Artist, photography, 41n.
Assistant administrative, 27.
Assistant, junior administrative, 27n.
Assistant, senior administrative, 27n.
Assistant, executive, 4n, 27.
Auditor, 24, 32.
Auditor, location (motion picture) 28n.
Auditor, traveling, 28.

Best Boy (motion picture), 29, 29n
Biologist, 38, 39.
Bookkeeper, 9n, 16, 18, 32, 49.
Bookkeeper, head, 15, 16, 18.
Bookkeeper, assistant head 17n.
Broker, customers, 28.
Broker, customhouse, 35.
Buyer, 24, 28.
Buyer, assistant, 11n, 28, 46n.
Buyer, lease, 28.
Buyer, outside, 28n, 45, 46.
Cameraman, 29, 29n, 41n.
Cartoonist, 41.
Cashier, assistant, 11n.
Cashier, bank, 15, 18.
Chemist, 38, 39, 40.
Claim agent, 24, 25, 25n.
Clerk, 28, 30, 31.
Clerk, file, 9n.
Clerk, head, mail, 15.
Clerk, office, 9n.
Clerk, order, 9n.
Clerk, receiving, 9n.
Clerk, shipping, 9n, 15.
Clerk, head shipping, 15.
Clerk, stock, 17n.
Collector, 46.
Columnist, newspaper, 41.
Composer, 41.
Conductor, 41.
Consultant, 27, 33.
Consultant, foreign exchange, 27.
Consultant investment, 27, 34n.
Copyman (photography), 41n.
Copyist, 41.
Correspondent, 41.
Costumer, class I, 29n.
Cutter, 28.

Demonstrator, machine, 29.
Dentist, 34.
Department head, 12, 15.

Department head, assistant, 11, 11n.
Deliveryman, 46.
Director, assistant 11n.
Director, first assistant (motion picture), 29n.
Director, labor relations, 27.
Director, personnel, 12, 26, 27.
Director, safety, 4, 12, 24, 27.
Doctor, 34, 35, 36, 37, 39, 42.
Draftsman, 29.
Draftsman, assistant chief, 30n.
Draftsman, chief, 30n.
Draftsman, marine, 30n.
Draftsman, squad chief, 30n.
Draftsman, squad leader, 30n.
Driver, milk wagon, 50n.
Driver, truck, 50, 51, 52.

Editor, city, 41.
Editor, managing, 41.
Electrician, standby, 29n.
Enlarger, 41n.
Engineer, 29, 39.
Engineer, electrical, 40n.
Engineer, mechanical, 29.
Essayist, 41.
Estimator, 34n.
Executive, account, 28.
Executive, radio station, 15.
Expert, 27.
Expert, insurance, 27, 34n.
Expert, sales research, 27.
Expert, social security, 34n.
Expert, tax, 4n, 24, 27.

Field representative (utility company), 28.
Foreman, 4, 11, 15, 16, 17, 18n, 22.
Foreman, assistant, 11n.

Gaffer, standby, 29, 29n.
Gauger, district, 54.

Hairdresser, 29, 29n.

Inventory man, traveling, 4n, 28.
Installation man, 46.

Janitor, 25.
Journalist, 39.

Laboratory assistant, 40.
Lawyer, 34, 35, 36, 36n, 37, 38, 39, 42.

Manager, 18.
Manager, assistant, 11n.
Manager, assistant office, 11n.
Manager, branch, 18.
Manager, branch sales, 23.
Manager, credit, 24, 27.
Manager, assistant general, 27.
Manager, location (motion picture), 28.
Manager, personnel, 24.
Manager, sales, 23.

Manager, terminal, 15.
Mechanic, 28.
Messenger, special 27.
Missionary man, 46.
Musician, 35, 37, 41.

Newsboy 50n.
Novelist, 41.

Operator, office machine, 9n.
Operator, telephone, 9n.

Painter, 41.
Painter, standby (motion picture), 29.
Physicist, 39.
Planner, special organization, 28.
Planter (motion picture), 28.
Policeman, company, 16.
President, 4.
Producer, assistant, 11n.
Promotion man, sales, 46, 47n
Prop maker, standby, 29, 29n.

Rate setter, 25.
Reporter, 41.
Retoucher, photography, 41, 41n.

Salesman, distributor, 47n, 48n, 49, 50n.
Salesman, driver, 47, 47n, 48n, 49, 49n, 50, 50n, 51, 52, 52n.
Salesman, inside, 44, 44n.
Salesman, route, 47, 47n, 48, 48n, 49, 49n, 50, 50n, 51, 52n.
Script girl, 56, 56n.
Sculptor, 38.
Secretary, 9n, 31.
Secretary, executive, 27, 29.
Serviceman, 46, 49n.
Singer, 41.
Solicitor, 45.
Soloist, 41.
Specialist, advisory, 27, 34n.
Statistician, 26, 26n, 27.
Stenographer, 9n, 27, 31.
Superintendent, 15, 25, 30.
Supervisor, 12, 15, 16, 17, 18, 22, 24, 25.
Supervisor, assistant, 11.
Supervisor, assistant, machine shop, 11.
Supervisor, machine shop, 11.
Supervisor, working, 15.

Teacher, 39.
Teller, bank, 9n, 27.
Theologian, 35, 39, 42, 42n.
Time control man, 25.
Time study man, 25.
Tool and die worker, 28, 28n.

Violinist, 38, 41.

Writer, editorial, 41.
Writer, scenario, 41.
Writer, short story, 41.