# EXHIBIT E

## Part 1

UNITED STATES DEPARTMENT OF LABOR

Maurice J. Tobin, *Secretary*

Wage and Hour and Public Contracts Divisions

Wm. R. McComb, *Administrator*

WASHINGTON, D. C.

# REPORT AND RECOMMENDATIONS

## ON PROPOSED REVISIONS OF REGULATIONS, PART 541

Defining the Terms

# "Executive" "Administrative"
# "Professional"
# "Local Retailing Capacity"
# "Outside Salesman"

. . . . . as contained in Section 13 (a) (1) of the
Fair Labor Standards Act of 1938, providing
exemptions from the wage and hour provisions
of the act.

June 1949



UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1949

# TABLE OF CONTENTS

Page

I. BACKGROUND OF THESE PROCEEDINGS_____ 1
II. THE "TAFT-HARTLEY" DEFINITIONS_____ 3
III. THE SALARY REQUIREMENTS_____ 6
    Proposals to Abolish the Salary Tests_____ 7
    The Levels of the Salary Tests_____ 10
    Salary Test for Executives_____ 13
    Salary Test for Administrative and Professional Employees__ 15
    Puerto Rico and the Virgin Islands_____ 21
    Salary Exclusive of Board, Lodging, or Other Facilities_____ 21
    Special Provisos for High Salaried Executive, Administrative,
        or Professional Employees_____ 22
    "On a Salary . . . Basis"_____ 24
    Payment on a "Fee Basis"_____ 27
IV. SECTION 541.1. THE DEFINITION OF "EXECUTIVE"_____ 28
    The Nature of "Exempt" and "Nonexempt" Work in Rela-
        tion to the Exemption of Executive Employees_____ 29
    The Limitation on Nonexempt Work_____ 35
    Proposal for an 8-Hour Weekly Limitation on Nonexempt
        Work_____ 38
    Emergencies_____ 40
    Employees with a Substantial Proprietary Interest_____ 42
    Recognized Department or Subdivision Thereof_____ 43
    Number of Employees Who Must Be Supervised by an Ex-
        ecutive_____ 45
    Proposal to Require Participation in the Formulation of
        Policy_____ 46
    Executives-in-Training_____ 47
    "Sole Charge" Proviso_____ 48
V. SECTION 541.2. THE DEFINITION OF "ADMINISTRATIVE"_____ 52
    The Nature of "Exempt" and "Nonexempt" Work in Rela-
        tion to the Exemption of Administrative Employees_____ 54
    The Tolerance for Nonexempt Work_____ 58
    Nonmanual Work_____ 59
    Primary Duty * * * Directly Related to Management Policies
        or General Business Operations_____ 61
    Discretion and Independent Judgment_____ 65
    The Exemption for Ferry Pilots_____ 70
    Administrative Assistant to a Proprietor_____ 70
VI. SECTION 541.3. THE DEFINITION OF "PROFESSIONAL"_____ 71
    The 8-Hour Proposal_____ 72
    Proposal to Define Nonexempt Work in Terms of the "Pro-
        fessional" Functions_____ 73
    Primary Duty_____ 73
    Exemption of Occupational Groups_____ 73
    Proposed Exception for Architects, Engineers, and Librarians_ 76
    Or Any of Their Branches_____ 78
VII. SECTION 541.5. THE DEFINITION OF "OUTSIDE SALESMAN"_____ 79
    The 20-Percent Limitation on Nonexempt Work_____ 79
    Work Performed Incidental to and in Conjunction With Sales
        Work_____ 81
    Obtaining Orders for "Services"_____ 81
    Promotion Men_____ 82
VIII. SECTION 541.4. THE DEFINITION OF "LOCAL RETAILING CAPAC-
    ITY"_____ 84
    The Nonexempt Work Limitation_____ 85
    Employees Making Retail Sales of "Services"_____ 86

|  |  | Page |
|---|---|---|
| IX. MISCELLANEOUS PROBLEMS | | 86 |
| "Tacking" of Exempt Work | | 87 |
| Need for an Explanatory Bulletin | | 88 |
| X. RECOMMENDED REGULATIONS | | 88 |

APPENDIX:
| Appendix I. Notice of Hearing | | 92 |
| Appendix II. Present Regulations | | 94 |
| Appendix III. Definitions of "Supervisor" and "Professional Employee" | | 96 |
| Appendix IV. Appearances | | 97 |

## LETTER OF TRANSMITTAL

U. S. DEPARTMENT OF LABOR,
WAGE AND HOUR AND PUBLIC CONTRACTS DIVISIONS.

To Mr. WM. R. McCOMB, *Administrator.*

In accordance with your instructions, and following a public hearing on the subject, I am transmitting herewith my report and recommendations on proposed revisions of Regulations, Part 541.

HARRY WEISS,
*Presiding Officer.*

WASHINGTON, D. C., *June 30, 1949.*

v

# I. BACKGROUND OF THESE PROCEEDINGS

Section 13 (a) (1) of the Fair Labor Standards Act provides that sections 6 and 7 shall not apply with respect to "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by regulations of the Administrator)." The present regulations [1] defining these terms were promulgated in October 1940 after a series of public hearings called to reconsider the original regulations issued in 1938. There have been no changes in these revised regulations, with one exception, since their issuance.[2] The validity of these regulations has been upheld repeatedly by the courts.

During the years since 1940 the Divisions gradually became aware of a number of problems which indicated that there might be need for some revision of the regulations. These problems were brought to the attention of the Divisions in part by questions coming into the National Office directly from employers and employees. In the main, however, suggestions for changes in the regulations and requests for explanatory material came from the Divisions' field staff as a result of their accumulated experience acquired in the course of applying the regulations in many thousands of establishments. On the basis of recommendations by the regional directors the Administrator ordered an investigation of the operation of the present regulations to determine whether and to what extent changes and clarifications were needed. There was considerable preliminary study including consultation with the field staff and with an informal labor-management advisory committee. As a result of this study a number of specific proposals for amending the regulations were formulated and, together with some general questions, served as the subjects of the hearing held before me pursuant to notice published in the Federal Register, October 22, 1947.[3]

The specific proposals for amending the regulations are contained in the notice of hearing which is reproduced in appendix I. The notice also raised generally the question of the adequacy of the salary tests contained in the definitions of executive, administrative, and professional. Another question included in the notice of hearing was designed to open up for consideration all sections of the regulations, and to give notice to the public that the main purpose of the hearing was "to make it possible for interested parties to propose other improvements in the regulations, to present problems with which they have been confronted and to offer proposals for their solution within the limits of the Administrator's authority." [4] Also included in the

---

[1] These regulations are reproduced in full in appendix II.
[2] The regulations were amended in January 1942 to include in the definition of the term "administrative" a provision designed to exempt employees engaged in ferrying airplanes. See subsec. 541.2 (B) (4).
[3] 12 Federal Register 6896.
[4] Statement of the presiding officer, transcript of testimony, p. 6.

1

notice of hearing was an invitation to interested persons to present evidence as to the need for either revision or definition of any of the terms used in the regulations. Evidence was particularly invited with respect to certain phrases in the regulations which were set out in the notice. These phrases were specifically mentioned because the experience of the Divisions' field staff had shown that there was some misunderstanding of their meaning among employees and employers.

Notice was also given that a petition had been filed by a labor organization asking that the regulations be amended to increase the present salary requirement for exemption as an executive, administrative, or professional employee to $500 a month.[5] This petition was filed October 18, 1946, pursuant to section 541.6 of the regulations, but since the present investigation was already under way when the petition was filed, it was held over for consideration together with the other proposals at the hearing.

The hearing was held in Washington, D. C., on 22 separate days beginning December 2, 1947. All interested parties were given full opportunity to testify and to question witnesses. Over 100 witnesses testified on behalf of employers and employer associations, employee groups, "professional" associations and a Government bureau. Included among those represented were national associations representing business, state and local representatives of employer groups, representatives of small business, and individual employers, both large and small. General labor organizations as well as unions representing specific industries and crafts appeared.[6]

In addition, about 140 briefs and written statements were filed in lieu of personal appearance. A considerable number of the statements presented orally at the hearing, and many of the written statements, showed very careful study and analysis of the regulations and their applicability in particular situations as well as the effects of the proposed changes in the. particular industries represented. Elaborate exhibits were also presented by some of these witnesses, indicating considerable study of the problems involved. Some readily available statistical information having a bearing on the question of the salary requirements of the regulations was compiled by the Divisions, distributed to interested persons, and made a part of the record.[7] Considerable additional data on salaries of exempt and nonexempt employees were also presented by witnesses in the course of the hearing. The records of the hearings held in 1940 prior to the issuance of the present regulations were incorporated by reference into the record of this hearing. A number of supplemental statements, some of them furnishing information requested in the course of the hearing, were also received and made part of the record.

Numerous proposals for amending the regulations were made in the course of the hearing. Each of these has been carefully considered and most of them are discussed in this report. In the course of the hearing it was announced that in the event any changes were contemplated in addition to those set out in the notice of hearing, an opportunity would be given for the presentation of the views of inter-

---

[5] Exhibit No. 1, petition of the United Electrical Radio and Machine Workers of America, CIO. (All exhibits received in the course of the hearing have been numbered consecutively to simplify their identification.)
[6] A list of appearances is contained in appendix IV.
[7] Exhibit No. 3, *Statistical Materials Bearing on the Salary Requirement in Regulations, Part 541*, Wage and Hour and Public Contracts Divisions, U. S. Department of Labor, December 1947.

2

ested persons with respect to any such changes. In addition to the mass of evidence obtained through the hearing, I have drawn, in preparing this report, on the experience of the Divisions in the administration of these regulations and on court decisions. I have also consulted with staff members both in the National and Regional Offices and in the Office of the Solicitor of the Department of Labor to obtain their advice and the benefit of their experience.

To the extent possible, the various proposals made in the course of this proceeding have been grouped for purposes of discussion in this report under the sections of the present regulations which they are intended to change. In general, proposals to amend the definition of "executive" are discussed in one section, "administrative" in another, and so forth. It was not possible to follow this general outline with respect to all proposals since some of them, such as proposals to adopt the definitions of "supervisor" and "professional" contained in the Labor Management Relations Act of 1947, commonly known as the Taft-Hartley Act, and to amend the salary requirements of the regulations, relate to more than one section of the regulations. Since the proposal to substitute the "Taft-Hartley" definitions of "supervisor" and "professional" for the definitions contained in the present regulations would affect the fundamental character of these regulations, this proposal will be considered first.

## II. THE "TAFT-HARTLEY" DEFINITIONS

A number of witnesses proposed at the hearing and by briefs that the Administrator adopt the definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act. The principal reasons given in support of this proposal were: (1) that the Taft-Hartley Act evidences the latest congressional expression on this subject and should be followed by the Administrator; [8] (2) that the adoption of these definitions would provide uniformity in the administration of Federal labor regulations; and (3) that these definitions depend only on the duties of an employee and not on salary which, the proponents urged, should not be a criterion for exemption. The last of these reasons is considered separately in this report in the discussion of the proposals relating to the salary requirements.

Some of the proponents testified that in urging the adoption of the Taft-Hartley definitions they sought the deletion of the nonexempt work limitations in the Administrator's regulations.[9] Other witnesses testified that the proposal would provide exemption for working foremen, employees who perform any one of the duties specified in the Taft-Hartley definition of "supervisor," employees who supervise only one employee, and trainees learning a profession.[10] The definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act are set forth in appendix III. When these definitions are compared with the Administrator's present regulations defining bona fide executive, administrative and professional employees (reproduced in appendix II) it is apparent that the two differ in substantial respects. For example, the Taft-Hartley definitions of "supervisor" and "professional employee" (1) contain no specific limitation

[8] At the time of this writing, revision of this act is under consideration by the Congress.
[9] See, for example, transcript pp. 822-823, 853, 878.
[10] See, for example, transcript pp. 814-817, 822-823, 883, 1185, 1404-1410, 1415, and 1420-1421.

3

on the performance of nonsupervisory or nonprofessional work; (2) do not contain salary requirements; (3) do not include the artistic type of professional employee; (4) do not include administrative employees who perform neither supervisory nor professional work; (5) define "supervisor" in terms of a number of characteristic supervisory functions set forth as alternatives; and (6) include as professional employees "trainees" learning their professions.[11] These differences between the Administrator's present regulations and the Taft-Hartley definitions constitute the amendments to the regulations which the proponents in effect urged.

It is apparent from the testimony in support of the proposal that the proponents assumed that the Taft-Hartley definitions of "supervisor" and "professional employee" were intended to encompass the same classes of employees as the terms "bona fide executive" and "bona fide professional" in the Fair Labor Standards Act and that the two acts had the same general objectives.[12] It does not appear to me that these assumptions are sound. It seems clear to me that the objectives of the acts are entirely different and that different classes of employees were intended to be affected by the terms used in the two acts.[13]

It is clear, as many witnesses agreed, that the Taft-Hartley Act expressed the intent of the Eightieth Congress with respect to certain aspects of labor-management relations, including the right of employees to bargain collectively with their employer through a labor organization of their own choosing. In giving effect to this intent the Congress denied to "supervisors" the protection afforded other employees in their right to bargain collectively. Similarly, in effectuating its objectives, the Congress provided in its definition of "professional employee" in the Taft-Hartley Act a basis for establishing separate collective bargaining units for employees of a class having a community of interest.

On the other hand, in enacting the Fair Labor Standards Act, the Seventy-fifth Congress was concerned with the expressed purpose of eliminating labor conditions detrimental to the maintenance of the minimum standards of living necessary for the health, efficiency, and general well-being of workers. The Congress exempted from the minimum wage and overtime pay provisions of the act those employees, among others, "employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman." The benefit of this protection was thus withheld from groups of employees with varied interests, without relation to whether they are organized, or what kind of organization they have.

There are also other indications that the provisions of the two statutes were formulated with different objectives in mind. That the Administrator's regulations were known to the Congress is evident from the fact that the Taft-Hartley definition of "professional employee" parallels very closely, in part, the Administrator's definition of "bona fide professional." It is reasonable to assume that the Congress also knew that these regulations deal with "bona fide executive" employees. Nevertheless, the Congress chose to exclude from the definition of employee in the Taft-Hartley Act "supervisors" rather than "bona fide executives," which seems to me an obvious ex-

---

[11] The differences listed are the obvious ones. It is possible that others will be found after interpretation by the courts.
[12] For example, see transcript pp. 717-720, 762-764, 1179-1185.
[13] These differences were recognized by some industry witnesses. See, for example, transcript pp. 2428-2432.

4

pression of a difference in intent. Again, "bona fide administrative" employees, who are frequently on a higher economic level than "supervisors" or even "bona fide executives," are exempt from the wage and hour provisions of the Fair Labor Standards Act but are not mentioned in the Taft-Hartley Act. Similarly, the Administrator's definition of "bona fide professional" employee provides exemption for a large group of "artistic" employèes who are not considered "professional employees" under the Taft-Hartley Act.[14] On the other hand, the Taft-Hartley definition of "professional employee" includes employees who, though not actually performing professional duties, are being trained to assume such duties, while the Administrator's definition of "bona fide professional" excludes them.

Under the Taft-Hartley Act, of course, "professional employees" are not denied collective bargaining rights as are "supervisors", but are given the right to choose whether they wish to bargain collectively through separate units of "professional employees" or as parts of larger units including other employees. Thus it is clear that within the Taft-Hartley Act, the words "supervisor" and "professional employee" were each defined for a different purpose. By contrast, both "bona fide executive" and "bona fide professional" were used in the Fair Labor Standards Act for the same purpose; to exclude both classes from the wage and hour provisions of the act.

These various differences in terminology, and in groups of employees who are included or excluded by the Taft-Hartley definitions, as well as the nature of the rights affected, make it quite obvious that the Taft-Hartley definitions were not intended to apply to the same group of employees as do the Administrator's definitions under the Fair Labor Standards Act.

Some consideration should be given also to the possible effects of adopting the Taft-Hartley provisions. In enacting the Taft-Hartley Act, the Congress evidently sought to give effect to its judgment that supervisors should not be protected by the National Labor Relations Board machinery if they organize and bargain collectively. If the further step were to be taken of adopting the definition of "supervisor" for the Administrator's regulations, these very employees would, in addition, be denied the protection of the Fair Labor Standards Act. It appears to me, by contrast, that the enactment of the Taft-Hartley Act with its definition of "supervisor" has made increasingly important the need to distinguish carefully between those whom the Congress intended to exempt as "bona fide executives" because they do not need the protection of the Fair Labor Standards Act, and those who, though they may perform some supervisory duties need the protection of the Fair Labor Standards Act because they do not have the privileges and benefits which normally accrue to bona fide executives.

In determining whether the adoption of the proposal would accomplish the results indicated by the proponents, consideration should be given to the fact that if the definitions contained in the Taft-Hartley Act were adopted, there would be no provision in the Administrator's regulations either for the artistic type of professional employee or for the administrative employee. It was apparent from their testimony that not all of the witnesses who testified in favor of the

---

[14] Representatives of the radio broadcasting industry, which employs many professional employees of the "artistic" type, opposed the adoption of the Taft-Hartley definitions. Transcript, pp. 2374–2376, 2429–2430.

proposal had understood that the effect of adopting the Taft-Hartley definitions would be to delete the present provisions for such employees.[15] Obviously, the Administrator could not properly issue regulations which do not provide for these two large groups of employees. When this was called to the attention of the proponents, some suggested that, in adopting the proposal, provisions similar to those contained in the Administrator's present regulations for administrative and artistic employees should be added to the Taft-Hartley definitions. It seems obvious to me that such a change in the proposal would reduce the area of uniformity in administration of the Federal labor regulations urged so strongly by the proponents as a major reason for adopting this proposal.

Finally, the present definitions of the Administrator have been examined and approved by the courts and are well known to industry and labor generally. They have worked reasonably well in the past, and it may be expected that the years of experience in their application, and the changes made as a result of these proceedings will lead to improved regulations and better administration.[16]

Under all the circumstances, I have concluded that the adoption of the Taft-Hartley definitions would be contrary to the purposes of the Fair Labor Standards Act, would work to the detriment of many employers as well as employees, and would, in general, create many new problems. I therefore recommend that the proposals to adopt the Taft-Hartley definitions of "supervisor" and "professional employee" be rejected.

## III. THE SALARY REQUIREMENTS

The present definitions of "executive," "administrative," and "professional" each contain as one of the qualifications a requirement that the employee be paid a specific minimum salary. For qualification as an "executive" a salary of at least $30 a week is required, while a $200 a month salary test must be met for exemption as an "administrative" or "professional" employee. These amounts are exclusive of board, lodging, or other facilities furnished to the employee. The question of the adequacy of these salary levels as tests for exemption under present conditions, and the fundamental question whether salary criteria should be included in the definitions were raised in the notice of hearing by the following question:

> What, if any, changes should be made in the provisions contained in subsections 541.1 (E), 541.2 (A), and 541.3 (B) of the regulations with respect to salary criteria for exemption as executive, administrative, and professional employees?

Specific proposals with respect to the salary levels made prior to and in the course of the hearing ranged from proposals to abolish the salary test at one extreme, to the proposal that it be the sole test at the other, and from proposals to retain the present levels on the one hand to proposals to increase the requirements to $500 a month for each of the three categories of exempt employees on the other.

[15] See, for example, transcript, pp. 303–304, 565, 1414–1416, 2929–2932.
[16] Some witnesses testified that the present regulations operated satisfactorily and urged that no changes be made. Transcript, pp. 158, 3344, 3419, and Statement of Lieu of Personal Appearance No. 11. (Hereafter, in this report, statements in lieu of personal appearance will be referred to as "S. L." followed by an identifying number.)

## Proposals to Abolish the Salary Tests

A number of witnesses at the hearing proposed that the salary tests be eliminated from the regulations.[17] Many of these were witnesses who, as previously indicated, advocated adoption of the definitions of "supervisor" and "professional employee" contained in the Taft-Hartley Act.[18] Little factual evidence was offered in support of the proposal to abolish the salary tests. Some witnesses stated that the question of exemption should be determined on the basis of duties alone, without reference to compensation. A number of witnesses indicated that they thought such a change desirable without giving any specific reasons; others stated merely that they thought the salary requirements were unnecessary.

In several instances it was the contention of the witnesses that the salary tests were illegal.[19] The argument that the salary criteria are illegal need not be discussed at length since this is not the place to settle the question of their validity. It should be sufficient to point out that the salary requirements have been sustained in a number of circuit court decisions, and that their validity appears well established.[20]

It was evident from testimony of a considerable number of witnesses who favored the elimination of the salary test that they were concerned not so much with the salary test as such, but feared that the required salary would be raised to a figure so high as to disqualify for exemption individuals who they believed were intended by Congress to be exempt.[21] The statement in the notice of hearing referring to a union petition for a $500 a month salary test aroused concern among some who thought it to be a proposal of the Divisions, and a good deal of the opposition to maintaining a salary test in the regulations apparently resulted from this misunderstanding.

The arguments that the salary tests are unnecessary or that they do not perform the function of assisting in drawing a line between exempt and nonexempt employees [22] are not supported by the experience of the Divisions. In determining whether a salary test is desirable the Divisions can rely on more than 10 years of experience with such tests. A salary requirement was part of the original regulations defining "executive (and) administrative" issued in 1938. The present requirements of $30 a week for executives [23] and $200 a month for administrative and professional employees were adopted in 1940. There was wide agreement at the 1940 hearings that the salary tests were desirable.[24] Regarding that agreement, the presiding officer stated:

> The basis of this agreement is easily explained. The term

[17] See, for example, transcript, pp. 41, 534, 733 ; see also S. L. Nos. 126, 134.
[18] See, for example, transcript, pp. 43, 704, and S. L. No. 88. The proposal was also made, however, to adopt the Taft-Hartley definitions but to add a salary requirement. See transcript pp. 968, 997, 1406–1407, 2289.
[19] Transcript, pp. 765–766, 855, 1804–1805.
[20] See, for example, *Walling* v. *Yeakley*, 140 F. (2d) 830 (CCA 10) ; *Helliwell* v. *Haberman*, 140 F. (2d) 833 (CCA 2) ; and *Walling* v. *Morris*, 155 F. (2d) 832 (CCA 6) [reversed on another point in 332 U. S. 442].
[21] For example, see transcript, pp. 47, 49–50, 159, 598–600, 740–741.
[22] One witness presented data which purported to prove mathematically that any salary level selected would be inaccurate as a means of distinguishing exempt from nonexempt employees. The witness testified in response to questions, however, that it is possible to select a level with a relatively low over-all probability of error. Transcript, pp. 3589–3603, 3614–3616. See also Exhibit No. 35.
[23] The salary test for "executive (and) administrative" in the original regulations was also $30 a week.
[24] Exhibit No. 4, *"Executive, Administrative, Professional * * * Outside Salesman" Redefined*, Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition (U. S. Department of Labor, Wage and Hour Division, Washington, D. C., 1940), p. 5. This exhibit will hereafter be referred to as the "Stein Report."

"executive" implies a certain prestige, status, and importance. Employees who qualify under the definition are denied the protection of the act. It must be assumed that they enjoy compensatory privileges and this assumption will clearly fail if they are not paid a salary substantially higher than the wages guaranteed as a mere minimum under section 6 of the act. In no other way can there be assurance that section 13 (a) (1) will not invite evasion of section 6 and section 7 for large numbers of workers to whom the wage-and-hour provisions should apply. Indeed, if an employer states that a particular employee is of sufficient importance to his firm to be classified as an "executive" employee and thereby exempt from the protection of the act, the best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them. The reasonableness and soundness of this conclusion is sustained by the record.[25]

The experience of the Divisions since 1940 supports the soundness of the inclusion of the salary criteria in the regulations. The testimony at the hearing of many witnesses representing both employers and employees supported the experience of the Divisions with respect to the usefulness and propriety of a salary test for exemption.[26] In this long experience, the salary tests, even though too low in the later years to serve their purpose fully, have amply proved their effectiveness in preventing the misclassification by employers of obviously nonexempt employees, thus tending to reduce litigation. They have simplified enforcement by providing a ready method of screening out the obviously nonexempt employees, making an analysis of duties in such cases unnecessary. The salary requirements also have furnished a practical guide to the inspector as well as to employers and employees in borderline cases. In an overwhelming majority of cases, it has been found by careful inspection that personnel who did not meet the salary requirements would also not qualify under other sections of the regulations as the Divisions and the courts have interpreted them. In the years of experience in administering the regulations, the Divisions have found no satisfactory substitute for the salary test.

The relative ineffectiveness of these tests in recent years is the result of changed economic conditions rather than of any inherent weakness in the tests. The increase in wage rates and salary levels gradually weakened the effectiveness of the present salary tests as a dividing line between exempt and nonexempt employees. Enforcement experience gives evidence of increasing misclassification of employees by employers. The trend toward increasing misclassification as salary levels rose is itself evidence of the effectiveness of a salary test.[27] In fact, it was for that reason that the adequacy of the present salary levels in the regulations had been under consideration by the Divisions for some time prior to the hearing.

---

[25] Ibid., p. 19.
[26] For example, see transcript, pp. 996–997, 1272, 1342–1343, 3138. See also S. L. No. 132.
[27] In part this was due to the failure of some employers to realize that salary is not the sole test of exemption. The record contains testimony in several instances indicating that employees were classified as exempt as soon as their salaries were raised to $200 a month although from the description of duties it seemed doubtful whether the employees met the requirements of the regulations. Some witnesses in giving examples of "administrative" employees who would lose the exemption if the level of the salary test were increased, seemed to be describing clearly nonexempt employees.

The use of a salary test was supported by a very substantial number of management witnesses [28] in addition to the almost universal support it had from labor representatives.[29] Some of the management witnesses were sufficiently convinced of the desirability of salary tests to propose the adoption of a salary level as the sole basis of exemption.[30] There was testimony that, generally speaking, salary is the best single indicator of the degree of importance involved in a particular employee's job.[31] This is particularly true in the white-collar field.

Regulations of general applicability such as these must be drawn in general terms to apply to many thousands of different situations throughout the country. In view of the wide variation in their applicability the regulations cannot have the precision of a mathematical formula. The addition to the regulations of a salary requirement furnishes a completely objective and precise measure which is not subject to differences of opinion or variations in judgment. The usefulness of such a precise measure as an aid in drawing the line between exempt and nonexempt employees, particularly in borderline cases, seems to me to be established beyond doubt.[32] There was no evidence, moreover, that the salary tests had in the past resulted in defeating the exemption for any substantial number of individuals who could reasonably be classified for purposes of the act as bona fide executive, administrative, or professional employees.

Some witnesses expressed the fear that a general deflation in salary and wage levels may take place in the future and that any new salary tests adopted might have the effect of denying exemption to bona fide executive, administrative, and professional employees.[33] This is not an argument against using salary as a test, however, but rather against setting the salary test at an unreasonably high level. There is no reason why the salary tests may not be revised again, either upward or downward, in line with any future economic changes which may warrant such action. Section 541.6 of the regulations which provides a procedure for considering amendments to the regulations is available if changes in the salary requirements become desirable. Any necessary revisions in the salary requirements can be made promptly in the future if they are the only proposals under consideration.

It is my conclusion that the salary test is a vital element in the regulations. I am convinced that its abandonment would work very serious harm to the objectives of the act. Application of the regulations without a salary test would prove difficult for both management and labor and would increase enormously the difficulties of administration. I therefore recommend that the proposals to abolish the salary tests be rejected.

---

[28] For example, see transcript pp. 79, 81, 113, 314–316, 391–392, 411–414, 614, 843–844, 966, 1031–1032, 1272, 1323, 1342, 1347, 1769, 2071, 2077–G, 2299, 3350, 3670, and S. L. Nos. 8, 9, 28, 68, 87.
[29] However, one local union took the position that salaried employees should not be exempt from the overtime requirements of the act and urged the elimination of the salary requirement and the revision of the definition to exempt as "professional" only those employees whose compensation is limited to "fees, bonuses, dividends, or other emoluments." Local No. 119, Technical Engineers, Architects, and Draftsmen's Union, AFL, S. L. No. 121.
[30] Transcript, pp. 79, 427, 1030, and S. L. No. 42.
[31] For example, see transcript, pp. 1272–1273. The record indicated that many employers have adopted the plant practice of determining which employees should receive overtime pay on the basis of the amount of the employee's salary. For instance, there was testimony regarding one plant in which the dividing line between employees who receive overtime and those who do not was said to be $118 a week. Transcript, pp. 174, 237.
[32] One witness testified, for example, that all the "doubtful" or borderline cases of exemption in his plant were in the lower salary categories. Transcript, pp. 637–638.
[33] For example, see transcript, pp. 2096–2098. See also S. L. Nos. 32, 61.

9

**The Levels of the Salary Tests**

The notice of hearing raised generally the question whether the present salary requirements in the regulations are appropriate. The present salary levels in the regulations are $30 per week for exemption as an executive employee and $200 per month for exemption as an administrative or professional employee. As stated above, reexamination of these levels with a view to raising them to more realistic figures has been under consideration by the Divisions for some time because of the rapid rise of wage and salary levels generally and the increasing evidence of the inadequacy of these tests to accomplish their purpose.

The inadequacy, in the light of current conditions, of a $30 a week test for executives and a $200 a month test for administrative and professional employees is evident. A $30 a week test for "executive" is obviously obsolete, when office boys, for example, earn an average of $30.52 a week in New York City, $28.27 in Atlanta and $37.85 in San Francisco.[34] This conclusion is also supported by evidence in the record on wages and salaries in small towns in low-wage industries.[35] Obviously also a $200 a month test can be of little help in identifying "bona fide" administrative and professional employees when large numbers of ordinary hand-bookkeepers and large numbers of clerks in large cities receive salaries in excess of this amount.[36] These facts and considerable testimony and other evidence in the record show conclusively that an upward adjustment of these levels is essential.[37]

Various proposals to increase the level of the salary requirements in the regulations were made in the course of the hearing by both labor and management representatives. Most of the testimony of labor representatives supported either the $500 a month proposal or a $100 per week test for each of the three categories of exempt employees.[38] However, there was some support by labor representatives for tests ranging from $75 a week for executives to $425 a month for administrative and professional employees.[39] Many management representatives testified that increases would be appropriate and figures ranging from $45 or $50 a week to $300 a month for one or more of the three categories were suggested.[40] Some management witnesses who opposed the salary tests and urged their elimination from the regulations agreed, in the course of their testimony, that if the salary tests were retained, some increase was appropriate to restore their effectiveness.[41] A witness representing a government bureau proposed that the levels for executive, administrative and professional employees should be raised to some figure between $325 and $350 a month.[42]

There was some testimony at the hearing on the question of the appropriate "formula" to be applied in determining what the salary level should be at the present time. A readjustment of the salary levels in the present regulations based entirely or in part on the change in the cost-of-living index since 1940 was urged by a number of wit-

[34] *Salaries of Office Workers in Selected Large Cities*, Bureau of Labor Statistics, U. S. Department of Labor, 1948.
[35] See, for example, transcript, pp. 2663–2666.
[36] Loc. cit., note 34 supra.
[37] See the discussion of salary levels for administrative and professional employees, infra.
[38] Transcript, pp. 162, 327, 657, 1952, 2501, 2634, 2729, 2991, 3221, 3623; also S. L. Nos. 51, 62 and Supplementary Statement (hereinafter referred to as "S. S.") No. 16.
[39] Transcript, pp. 2540, 2589, 2654, 2776 and S. S. No. 13.
[40] See, for example, transcript, pp. 414, 614, 654, 3084, 3674, and S. L. Nos. 10, 15, 46, 56, 101.
[41] Transcript, pp. 728, 740–741, 1320–1321, 1773, 1775.
[42] Frieda S. Miller, Director, Women's Bureau, U. S. Department of Labor, transcript, p. 62.

nesses.[43] Some witnesses testified that the appropriate levels could be arrived at by applying to the present salary requirements of the regulations a formula based entirely or in part upon the increase in the general wage level,[44] or the earnings of nonexempt employees. One witness suggested as the principal factor to be considered the "minimum prevailing rate for presently exempt employees." [45]

A brief review of the function of the salary test in the regulations defining "executive," "administrative," and "professional" may be of help in determining what approach should be used in arriving at appropriate levels. The Administrator is not authorized to set wages or salaries for executive, administrative, and professional employees. Consequently, improving the conditions of such employees is not the objective of the regulations. The salary tests in the regulations are essentially guides to help in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these categories. Any increase in the salary levels from those contained in the present regulations must, therefore, have as its primary objective the drawing of a line separating exempt from nonexempt employees rather than the improvement of the status of such employees. It must be clear, moreover, that such a dividing line cannot be drawn with great precision but can at best be only approximate. This principle was accepted in 1940 by the presiding officer in the following statement contained in his report:

> Further, it should be recognized and admitted that the minimum salary qualification in the definitions of "executive," "administrative," and "professional" must be in each instance an approximation of what will best effectuate the purposes of the act. Like most laws of national application, the act itself and the regulations issued thereunder cannot pretend to be scientific in the sense of taking into account every small variation occurring over the length and breadth of the country. To make enforcement possible and to provide for equity in competition, a rate should be selected in each of the three definitions which will be reasonable in the light of average conditions for industry as a whole. In some instances the rate selected will inevitably deny exemption to a few employees who might not unreasonably be exempted, but, conversely, in other instances it will undoubtedly permit the exemption of some persons who should properly be entitled to the benefits of the act.[46]

The principles expressed in 1940 in the above quotation are clearly valid today. To be sure, salaries vary, industry by industry, and in different parts of the country, and it undoubtedly occurs that an employee may have a high order of responsibility without a commensurate salary. By and large, however, if the salary levels are selected carefully and if they approximate the prevailing minimum salaries for this type of personnel [47] and are above the generally prevailing

[43] See, for example, transcript, pp. 60, 63, 159, 253, 2660; but see pp. 1276–1277 for testimony opposing cost-of-living as a basis for a salary test.
[44] For example, see transcript, pp. 60, 362, 367, 1116, 1136–1137, 1302, 1685, and 2660; but see transcript, p. 1279, for testimony opposing such a formula.
[45] Transcript, p. 3024.
[46] Stein Report, p. 6.
[47] The "prevailing minimum salary" is not necessarily the same as the lowest salary received by such persons. The salary level selected for executives obviously cannot be the salary of the lowest paid supervisory person or the lowest paid person considered by an employer to be an "executive." This principle was recognized in the testimony at the hearing. For example, see transcript, p. 1684.

11

levels for nonexempt occupations, they can be useful adjuncts in satisfying employers and employees as well as the Divisions as to the exempt status of the particular individuals.

There was some testimony at the hearing that the $30 a week test for executives may have been too low in 1940. The presiding officer who recommended that the test be set at $30 was fully aware that it was a relatively low figure. His reasons for recommending a relatively low figure as the test rather than one higher in the range of prevailing salaries of executives are discussed at length in his report.[46] These reasons appear to have been valid in the light of conditions in 1940 and for the most part are still valid. It seems reasonable to assume, therefore, that the level of $30 was appropriate as a test in October 1940, and that any new figure to be recommended similarly should be somewhere near the lower end of the current range of prevailing salaries for executives. The $200 test also seems to have been somewhere near the lower end of the range of prevailing salaries for administrative and professional employees in 1940. The evidence discloses no valid reason for doubting the appropriateness of the $200 test at that time. Any new figure recommended should also be somewhere near the lower end of the range of prevailing salaries for these employees.

The current problem is one of determining an appropriate increase based on the $30 a week and $200 a month figures. Actual data showing the increases in the prevailing minimum salary levels of bona fide executive, administrative and professional employees since October 1940 would be the best evidence of the appropriate salary increases for the revised regulations. Where such data were available they have, of course, been analyzed and carefully considered in arriving at the levels recommended in this report. In the areas where no direct evidence was available or where the available data were fragmentary, other evidence indirectly indicating the amounts of the increases in the prevailing minimum salary levels of executive, administrative and professional employees since 1940 has been used. The change in the cost of living which was urged by several witnesses as a basis for determining the appropriate levels is, in my opinion, not a measure of the rise in prevailing minimum salary levels.

Data on increases in wage rates and earnings of nonexempt employees are probably the best and most useful evidence available. These data not only are direct evidence of the levels reached by the nonexempt employees who should be excluded but also indicate approximately what has happened to the salaries of exempt employees. These data have been relied upon to a considerable extent, though not exclusively, although they obviously do not reflect the precise increases in the prevailing minimum salaries of exempt employees. Since these data furnish only rough approximations they have been considered in the light of, and together with, the large amount of testimony at the hearing, the exhibits filed, and other evidence bearing on the question.

The data on general increases in wage rates and earnings of nonexempt employees, moreover, are particularly appropriate in reaching an approximation of the changes in prevailing minimum salary levels of executive employees. This is true because these prevailing minimum salaries are the salaries of the low-level executives who are to a large extent the foremen and immediate supervisors of the

46 Stein Report, pp. 21–23.

12

nonexempt employees whose wage rates and earnings make up the data on general increases.[49]

## Salary Test for Executives

Published data of the Bureau of Labor Statistics show that there was a very large upward adjustment in levels of average hourly earnings and average weekly earnings of employees in all manufacturing industries between October 1940 and April 1949, with wide variation among industries in the percentage increases.[50]

In October 1940 the average hourly earnings of all manufacturing employees were 66.5 cents and average weekly earnings were $26.20. By April 1949 average hourly earnings for all manufacturing were $1.38, while average weekly earnings stood at $52.70, an increase in both of more than 100 percent over October 1940. While wages and salaries in various industries did not rise at a uniform rate, the increases were large in all industries. Percentage increases were much greater in low-wage industries than in high-wage industries, but these increases tend to be more nearly equal for all industries when they are compared on a straight dollars-and-cents basis rather than as percentages. For example, average weekly earnings for all durable goods manufacturing (a group containing a relatively large proportion of high-wage industries) rose from $30.12 in October 1940 to $56.86 in April 1949, an increase of 89 percent. The dollars-and-cents increase during this period was $26.74. Average weekly earnings for nondurable goods manufacturing (a group containing a relatively large proportion of low-wage industries) rose from $22.52 in October 1940 to $48.35 in April 1949, an increase of 115 percent, but only $25.83 in dollars and cents. For textiles and their products, a typical low-wage industry, average weekly earnings increased from $18.05 in October 1940 to $41.68 in April 1949, a percentage increase of 131 percent but a dollars-and-cents increase of $23.63. In iron and steel and their products, a high-wage group, average weekly earnings increased from $30.82 to $58.56, an increase of $27.74, compared with a percentage increase of 90 percent.

The general trend in other words has been for increases in earnings to take place in comparable magnitude of dollars and cents in the various industries rather than upon a percentage basis. There is evidence in the record to the effect that in general the increases of executives have taken place on a dollars-and-cents basis in approximately the same amounts as the increases of the employees they supervised.[51] The experience of the Wage Stabilization Board and of the Salary Stabilization Unit of the Treasury Department indicates that to a

[49] This relationship between earnings of factory workers and the salaries of their supervisors was recognized by witnesses at the hearing. Transcript, pp. 1398–1399, 2686–2687.
[50] Figures on average weekly earnings for April 1949 are taken from *Hours and Earnings, Industry Report*, Bureau of Labor Statistics, April 1949. Similar figures for October 1940 are based on revised summary statements of *Employment, Payrolls, Hours and Earnings*, issued by the Bureau of Labor Statistics, June 1948.
[51] See the statement of the H. J. Heinz Co., S. L. No. 87. See also Statistical Service Bulletin No. 31, December 19, 1947, submitted by the National Association of Motor Bus Operators, S. S. No. 7. The information in this bulletin shows that the index of average annual earnings of bus drivers was 172.9 in 1946 (1939=100) while the index for their supervisors was only 154.3. The actual annual earnings for these periods had increased from $1,784 to $3,084 for the drivers, an increase of $1,300, while the earnings of their supervisors had increased from $2,285 to $3,526, an increase of $1,241. Converted to a weekly basis, the average earnings of drivers had increased by $25 a week and supervisors, by about $23.86 a week. Another witness testified that in the southern textile industry the dollars-and-cents increases in the wages of executive and administrative employees were greater than the increases received by the machine tenders, though the percentage increases were smaller. Testimony of William P. Jacobs, American Cotton Manufacturers Association, transcript, p. 784.

very considerable extent adjustments in the pay of executives in the lower categories, those closest to the nonexempt employees, tended to be made on a dollars-and-cents basis paralleling that of hourly paid employees when the plant wages were raised.[52] It seems to be a reasonable assumption from the evidence that executives in the lower ranges in manufacturing establishments have received salary increases fairly comparable in dollars and cents to those of their subordinates.

The application of the percentage increase in average weekly earnings for all manufacturing to the $30 a week test would raise the salary level for executives to something over $60. The application of the dollars-and-cents increase in average weekly earnings for all manufacturing to the $30 a week salary requirement for executives, would make the test $56.50 per week. Applying the percentage increases for durable and nondurable goods would raise the $30 a week to $56.70 and $64.50, respectively. Applying the dollars-and-cents increase for durable and nondurable goods would raise the $30 a week to $56.74 and $55.83. Thus, the available statistical data point to an increase in excess of $25 a week in the test for executive employees, or a salary test of about $55 a week.

This approximate figure is supported by considerable testimony in the record of the hearing as well as by exhibits submitted by employer groups. Testimony of witnesses representing a great variety of industries indicates that although in some instances starting salaries of supervisory employees may be below $55, generally salaries for such employees are at least at that level, and therefore a $55 a week test would not defeat the exemption for any significant number of individuals who might be classified as bona fide executives.[53] A $55 a week test would be somewhat lower in relation to average weekly earnings for all manufacturing of $52.70 in April 1949 than the $30 test was in relation to comparable average weekly earnings of $26.20 in October 1940.

It might be argued with some merit that the salary test for bona fide executive employees should be higher than $55 a week. There are important considerations, however, that make it desirable to set the figure slightly lower than might be indicated by the data on increases in the earnings of nonexempt workers in industry. There is evidence in the record suggesting that in some areas and some industries the pay increases of executives have tended to lag behind the increases of nonexempt employees. Consideration must also be given to the fact that executives in many of the smaller establishments are not as well paid as executives employed by larger enterprises.[54] Due allowance must also be made for the possible under-representation of small enterprises among the witnesses at the hearing. To the extent that small enterprises were represented, the testimony on their behalf

[52] See, for example, Bureau of National Affairs, *Wartime Wage Control and Dispute Settlement*, March 1, 1945, p. 487, reporting comments of A. D. Burford, Deputy Commissioner of Internal Revenue, Salary Stabilization Unit, at the Conference on Wage and Salary Administration, University of Pennsylvania, April 19, 1944 ; see also pp. 462–467, dealing with supervisors in the coal industry.
[53] Transcript, pp. 27–28, 44–45, 97, 414, 614–619, 743, 836–837, 992, 1081–1082, 1302–1303, 1327, 1334–1335, 1347–1349, 1451, 1518–1519, 1554, 1744, 1769–1770, 2083, 2213, 2269, 3030, 3046–3048, 3084, 3096–3097, 3103, 3108–3109, 3143–3144, 3189, 3502–3506, 3670. See also S. L. No. 68, S. S. No. 21, and Exhibit Nos. 5, 37.
[54] The difference may not always be very great, however. For example, a study of the earnings of supervisory employees in the intercity bus industry for 1946 showed that "in general, differentials between the earnings of supervisors employed by large and small companies are small" ; S. S. No. 7.

14

tended to indicate that prevailing minimum levels of executives in small establishments were lower than in the larger establishments.[55] The importance of giving careful consideration to the effect of a higher salary test on small establishments should be apparent when it is realized that about 500,000 of the 638,000 establishments covered by the act have less than 20 employees. The salary test for bona fide executives must not be so high as to exclude large numbers of the executives of small establishments from the exemption. In these establishments, as in the large ones, the level selected must serve as a guide to the classification of bona fide executive employees and not as a barrier to their exemption.

On the basis of the whole record, it is my conclusion that the objectives of a salary test for executives will best be accomplished if the level is increased to $55 a week. I therefore recommend that the regulations defining "any employee employed in a bona fide executive * * * capacity" be amended to require payment on a salary basis at a rate of not less than $55 per week. The inclusion of the phrase "at a rate of" is recommended in order to make clear the Divisions' position that the $55 a week may be translated into equivalent amounts for periods longer than one week.[56] The requirement will be met if the employee is compensated biweekly on a salary basis of $110, semimonthly on a salary basis of $119.17, or monthly on a salary basis of $238.33. It is not intended to make any change in the present rule that the shortest period of payment which will meet the requirement of payment "on a salary basis" is a week.

### Salary Test for Administrative and Professional Employees

It will be recalled that most labor representatives argued that a salary of $500 a month or $100 a week ($433.33 a month) is necessary as a test of the bona fides of administrative and professional employment. While management representatives opposed an increase to levels as high as those proposed by labor representatives, and in many cases urged the retention of the present $200 level, some agreed that an increase is necessary and suggested levels up to $300 a month.[57] Neither the representatives of management nor labor presented convincing evidence of the appropriateness of the figures they suggested. It will be seen from the discussion below that the available evidence establishes the propriety of a figure at some intermediate level between the extremes proposed.

The record of the hearing contains ample evidence that the $200 a month test (or the $50 a week required when payment is on a weekly basis) for administrative and professional employees is too low to accomplish the objectives of the salary test. Data published by the Bureau of Labor Statistics, the National Industrial Conference Board, the Commerce and Industry Association of New York and data compiled by the Wage Determinations and Exemptions Branch of the Divisions show how ineffective the present $200 a month test has become as a means of separating clerical and other nonexempt employees from bona fide administrative and professional employees.

The obsolescence of the $200 a month test is shown by Bureau of Labor Statistics data on hand-bookkeepers in 10 cities in December

[55] See, for example, transcript, pp. 149–153, 2238 A. 3409–3411.
[56] See Stein Report, p. 23. See also the discussion of the term "salary basis", infra.
[57] See, for example, transcript, pp. 414, 614, 651–654, 3084, 3674, and S. L. Nos. 10, 15, 46, 56.

1947, January 1948, and February 1948. Bookkeeping was described in 1940 in the report of the presiding officer as one of the most routine of all the normal business operations, and bookkeepers as one group of employees who only in the most exceptional instances could be properly described as employed in an administrative or professional capacity.[58] These Bureau of Labor Statistics data show that in 10 cities the percentage of hand-bookkeepers earning at least $50 a week ranged from about 40 percent (in Buffalo, N. Y.) to about 82 percent (in San Francisco, Calif.). The average hand-bookkeeper's salary in 8 of these 10 cities was over $50 a week. The average weekly salary of hand-bookkeepers in New York City was $60.21, while 76 percent received salaries of at least $50 a week. This information may be compared with the figures of a survey of hand-bookkeepers in New York City referred to by the presiding officer in 1940 in which only about 8 percent of them met a $50 a week test.[59] Similarly the Bureau of Labor Statistics data on accounting clerks and payroll clerks show that large numbers of them are paid more than $50 a week.[60]

A survey of approximately 51,000 clerical employees working in New York City also illustrates the ineffectiveness of a $50 a week test as the dividing line between clerical and administrative employees.[61] In addition these data point in a general way to the appropriate salary level. For example, the middle 50 percent of accountants received between $69 and $93 a week. These accountants are described as working under the general direction of "an accountant of professional grade" and it is therefore likely that many of the accountants described in the survey do not meet the requirements for exemption. The same survey also indicated that the middle 50 percent of junior accountants, a category which from the job description accompanying the survey appears to be clearly nonexempt, earned between $47 and $75 a week as of September 1, 1947. Ranges for the average minimum and average maximum for some clerical occupations included in the survey are: senior statistical clerk, $43 to $61 a week; senior rate clerk, $53 to $74; senior cost clerk, $51 to $71; senior accounting clerk, $48 to $68; senior bookkeeper, $49 to $69. While the figures shown may be higher in large companies in New York City than in some small companies operating in smaller communities, the differences would not impair the conclusion that the $200 a month line is no longer appropriate to distinguish between exempt and nonexempt employees in the white-collar field. The evidence referred to above, as well as other evidence in the record,[62] conclusively demonstrates the need for an increase to a level which will restore the effectiveness of the salary test.

One guide relied upon to a considerable extent by the presiding officer in 1940, and still largely valid, is the level of salaries in the fed-

---
[58] Stein Report, p. 32.
[59] Ibid. The figures referred to are contained in *Report on Proposal to Exempt Clerical Employees from the Hours Provisions of the Fair Labor Standards Act*, table 4, issued by the Wage and Hour Division, U. S. Department of Labor, 1940.
[60] Loc. cit. note 34, supra.
[61] Exhibit No. 35. Personnel Management Service, Clerical Salary Survey, edited by the Personnel Management Bureau of the Commerce and Industry Association of New York, Inc., survey date September 1, 1947. For data on salaries of bookkeepers and other clerical employees in Brooklyn, N. Y., see *Prevailing Wages in Brooklyn Industry and Commerce as of November 1947*, issued January 5, 1948, by the Bureau of Employee Relations, Brooklyn Chamber of Commerce, Brooklyn, N. Y., S. L. No. 192.
[62] For example, there was testimony that the average clerical salaries in New York City banks was $3,100 per year. Transcript, p. 3305. There was also evidence indicating that many nonexempt white-collar employees in small towns received salaries in excess of $200 a month. See, for example, transcript, pp. 3327-3328.

eral government service for the lower grades of administrative and professional employees. The dividing line between administrative employees and clerical employees in the government service was found by the presiding officer to be between the grades CAF–6 and CAF–7, with grade 6 at the top of the clerical group and grade 7 at the bottom of the "administrative" category. The dividing line between sub-professional and professional employees was found by the presiding officer to be somewhere between P–1, the junior professional grade, and SP–8, the highest of the subprofessional grades. The dividing line based on the midpoint salaries for these grades was found to be about $2,750 for administrative employees and about $2,550 or $2,600 in the case of professional employees. It is not apparent why the clearly nonprofessional (junior professional, trainee, and subprofessional) grades were selected in 1940 or why the obviously clerical grade (CAF–6) was included. In my opinion, the lowest appropriate grades which should be taken for purposes of arriving at an indication of what has happened to the salaries of lower level administrative and professional employees in the government service since 1940, are grade CAF–7, the lowest administrative grade (really the "assistant" administrative grade) and P–2, the lowest grade of the "professional" service requiring the exercise of independent judgment.[63]

The starting salary for both grades CAF–7 and P–2 in 1940 was $2,600 per annum. Today these grades start at $3,727.20, an increase of $1,127.20 a year or $21.68 a week. The maximum for these grades was $3,200 in 1940. The present maximum salaries are $4,479.60, an increase of $1,279.60 a year or $24.60 a week. It should be noted that grade P–2 probably represents the equivalent of the borderline grades of exempt professional employees under section 541.3 of the regulations, since the definition of that grade contained in the Classification Act of 1923[64] requires the exercise of independent judgment only "to a limited extent" while section 541.3 of the regulations defining the term "professional" requires the consistent exercise of discretion and judgment. It can be argued, therefore, that grade P–3 in the Government service is the equivalent of the lowest level professional employee as defined under the regulations because grade P–3 requires that the work involve "considerable latitude for the exercise of independent judgment." The beginning salary for grade P–3 has risen by the same amount as the top of grade P–2, from $3,200 in 1940 to $4,479.60. The top of the P–3 grade went from $3,800 per annum to $5,232, an increase of $1,432 per annum or about $27.50 a week. Consideration has been given in evaluating these data on Government salaries to the well-known fact, which has been amply demonstrated at hearings before congressional committees concerned with the question, that Federal Government pay scales for professional and administrative employees have lagged behind the scale in private industry.[65] Adjustments in salaries for Government employees have

    [63] One witness testified that an employee in the Government service does not become a bona fide professional employee until he reaches grade P–4 when he acquires the full professional title. The lower grades: junior professional, P–1 (e. g., junior architect, junior engineer, etc.), assistant professional, P–2, and associate professional, P–3, it was argued, are subprofessional grades. Testimony of Foster J. Pratt, International Federation of Technical Engineers, Architects and Draftsmen's Unions, AFL. Transcript, pp. 2820–2821, 2830–2831. The present salary range for grade P–4 in the Government is $5,232 to $6,235.20 per annum.
    [64] 5 U. S. Code 663 ; 42 Stat. 1488. The Classification Act of 1923 defines, classifies, and sets rates of pay for a large body of federal employees.
    [65] See also transcript, pp. 2820–2821.

17

been made later than in private industry and have been much smaller when they were finally adopted.

Another guide of value in determining the appropriate levels of a salary test for administrative and professional employees is the probable percentage of persons in clerical, subprofessional, or other nonexempt occupations who would meet the various salary requirements. The salary level adopted must exclude the great bulk of nonexempt persons if it is to be effective. This point was made by the presiding officer in 1940 when he stated: "Obviously if a large percentage of persons in a highly routinized occupation would be exempted, the salary qualification fails to act as a differentiating factor between the clerical employee and the administrative employee." [66] It was pointed out in the report in 1940, for example, that less than 1 percent of all stenographers, typists, and secretaries earned more than $2,400 a year. Exactly comparable present data are not available but it is significant to note that a survey in New York City as of June 1, 1948, showed the middle 50 percent of "secretary-stenographers" earning between $44 and $52 a week. The middle 50 percent of senior stenographers earned between $40 and $49 and the middle 50 percent of secretaries between $50 and $63. [67] As stated above, the presiding officer in 1940 cited a survey which showed that only 8 percent of bookkeepers in New York City could meet a $50 a week test. The Bureau of Labor Statistics data on salaries of hand-bookkeepers in New York City mentioned above indicate that if a salary test which could be met by only 8 percent of the hand-bookkeepers were adopted it would have to be set at about $80 a week. An $80 test, moreover, would be met by some hand-bookkeepers in all but one of the cities surveyed. A $75 a week test would be met by some hand-bookkeepers in each of the 10 cities surveyed. These data, including the data for accountants and junior accountants in the survey of the Commerce and Industry Association mentioned above, all tend to indicate that a salary requirement of about $75 or $80 a week for administrative employees is necessary in order to provide adequate protection against misclassification since many obviously nonexempt employees earn salaries at or near these figures.

There is evidence in the record which indicates that the increases in salaries of bona fide administrative and professional employees are related to the increases received by white-collar employees generally. [68] Some evidence of what has happened to salaries in the "white-collar" industries generally is found in the Bureau of Labor Statistics data on average weekly earnings in the brokerage and insurance industries, which employ large numbers of white-collar employees. [69] In October 1940 average weekly earnings in the brokerage industry were $37.70 while in April 1949, average weekly earnings in this industry were $65.84, an increase of $28.14 a week or 75 percent. In insurance, average weekly earnings rose from $36.32 in October 1940 to $56.45 in April 1949, an increase of $20.13 a week or approximately 55 percent.

---

[66] Stein Report, p. 31.
[67] S. S. No. 24.
[68] There was some evidence which indicated that comparable percentage increases in the salaries of upper-bracket employees follow from increases in the salaries of clerical employees. See, for example, special bulletin dated June 15, 1948, of the Personnel Management Bureau, Commerce and Industry Association of New York, S. S. No. 24. See also the testimony of Paul R. Hutchings, President, Office Employees International Union, AFL, to the effect that increases obtained for nonexempt white-collar personnel through collective bargaining were also passed on percentagewise to exempt personnel by management. Transcript, pp. 2739–2740, 2748.
[69] See note 50, supra.

18

Federal Security Agency data on average weekly earnings of white-collar groups covered by State unemployment compensation laws show an increase of 72.8 percent from the period January–March 1941 to October–December 1946.[70] The finance, insurance and real estate group showed an increase in average weekly earnings from $33.51 to $54.10 or 61.4 percent. The data on employees of security dealers and investment banking showed an increase of 105.5 percent, from $44.91 to $92.28 a week. Average weekly wages of employees of real estate dealers, agents and brokers rose 78.7 percent. The smallest increase, and the only one below 50 percent, listed in this group of white-collar industries was 43.3 percent for employees of insurance carriers. Other evidence of the trend in white-collar salaries appears in a collection of data compiled by the Wage Determinations and Exemptions Branch of the Divisions and made a part of the record of the hearing.[71]

Another indication of what has happened to the salaries of administrative and professional employees will be found in a report of the National Industrial Conference Board issued in 1948 on college graduates in industry.[72] According to this report beginners, referred to in the report as "trainees," were paid about $140 a month in 1940. The report shows that in 1947 the trainees were being paid about $240 a month, an increase of $100 a month, or about 71 percent. The report goes on to state that some companies are paying $300 to $400 a month for engineering graduates, chemists, and others who have just completed their education in a field of specialized training. According to the Conference Board, 74 percent of the college graduates starting work in 1940 in reporting companies were paid less than $150 and none received as much as $200 a month, while in 1947, 65 percent were paid $200 to $249 a month, and 19 percent were paid $250 to $400 a month.

These were the pay scales for college graduates just starting on their working careers in 1947.[73] These are the persons taking sub-professional and training positions leading eventually to employment in a bona fide professional or administrative capacity. These beginners and trainees normally have not achieved bona fide administrative or professional status, nor are their salaries commensurate with those of fully trained and experienced professional or administrative employees. The change in the salaries received by them furnishes some evidence, however, of the change that has taken place generally in salaries of administrative and professional employees. It is not unreasonable to conclude from these data that salaries of fully trained administrative and professional employees have increased comparably with those of young and inexperienced college graduates. Moreover, when the average college graduate starting work receives a salary of $240 a month, it is clear that the salary tests for bona fide administrative and professional employees must be considerably higher in order to restore their effectiveness.[74]

Some information is also available with respect to one important group of professional employees in an exhibit entered in evidence by

[70] Trends in White Collar Compensation, *Business Record*, May 1948, published by the National Industrial Conference Board. This article is based partly on data obtained from the Federal Security Agency.
[71] Exhibit No. 3.
[72] National Industrial Conference Board, *Studies in Personnel Policy No. 89*, "College Graduates in Industry," 1948.
[73] See also Exhibit No. 6.
[74] See transcript, pp. 1248–1249, 1341–1351, 1409–1410.

19

the National Society of Professional Engineers.[75] The data submitted show earnings of engineers in 1939, 1943, and 1946, classified, among other things, according to length of experience, whether they were graduate or nongraduate engineers, and private or public employees. The report shows that no State requires less than 4 years of working experience for a license in the engineering field, and some States require a longer period. The 5-year experience group is singled out for reference in a number of places in the report, and in view of the licensing requirements that class can reasonably be taken as representing the engineer whose work in general has become predominantly professional in character.[76]

The data on the engineers show that graduate engineers with the 5-year level of experience averaged $212 a month in 1939 and $324 in 1946, an increase of better than 50 percent. It may be assumed that levels of pay for engineers have risen since 1946, as have the wages and salaries of others. Other testimony in the record supported this evidence of a sharply higher level in professional earnings at the present time compared with salaries paid for comparable work in 1940. A representative of the coal industry, for example, testified that salaries of chemists in the industry started at $325 to $350 a month and that salaries of mining engineers ranged from $350 to $550 a month.[77]

There is not sufficient statistical or other evidence to make possible any determination of whether the rise in the salaries of bona fide administrative employees has exceeded the rise in professional salaries or whether the reverse is true. The evidence tends to indicate that in some industries and some areas prevailing minimum salaries for bona fide administrative employees exceed those of bona fide professional employees. The presiding officer in 1940 found that a higher salary requirement for administrative employees than for professional employees might be warranted but recommended the same level for both categories. A higher salary test for administrative employees might be warranted on the basis of evidence contained in the record which shows that employers more frequently misclassify clerical and other nonexempt workers as "administrative" than as "professional" employees. The evidence tends to indicate, however, that the differences, if any, are not sufficiently well defined to warrant different salary requirements for administrative and professional employees.

I believe, therefore, that the general purpose of the salary test can best be effectuated by using the same figure for both professional employees and administrative employees, as in the present regulations. I am recommending also that the salary tests for both administrative and professional employees be expressed in terms of weekly rather than monthly requirements in order to make them consistent with the requirement for "executives" and to eliminate a number of problems of interpretation which have arisen in the past as a result of the fact that the salary requirement is $200 a month while if payment is made on a weekly basis, $50 a week is required.

On the basis of the whole record it is my conclusion that a salary test of $75 a week for both administrative and professional employees is necessary to restore the salary tests to approximately the same effective-

[75] Exhibit No. 29. *The Engineering Profession in Transition.* A Report of the Engineers Joint Council on the 1946 Survey of the Engineering Profession, 1947.
[76] See also transcript, pp. 2820, 2831.
[77] Ohio Coal Association, transcript, pp. 1463–1464. It is not entirely clear whether the "chemists" are employed in a professional capacity within the meaning of the regulations; see transcript, pp. 1577–1578.

ness that they had in October 1940. I therefore recommend that the regulations defining "any employee employed in a bona fide * * * administrative, professional * * * capacity" be amended to require payment on a salary or fee basis at a rate of not less than $75 per week. This requirement will be met if the employee is compensated biweekly on a salary basis of $150, semimonthly on a salary basis of $162.50, or monthly on a salary basis of $325.

### Puerto Rico and the Virgin Islands

None of the available data relate to the prevailing minimum salaries for executive, administrative, or professional employees in Puerto Rico or the Virgin Islands. There were no representatives of these Territories at the hearing.[78] The considerably lower wage and salary structures in Puerto Rico and the Virgin Islands, which have been recognized by the Congress in special legislation permitting lower wage rates to be established for these Territories than on the continent, may make it necessary to establish special salary tests for these Territories. There is reason to believe that salary tests of $55 a week for executives and $75 a week for administrative and professional employees may be entirely unrealistic in Puerto Rico and the Virgin Islands, and may fail to reflect a reasonable dividing line between exempt and nonexempt employees. I therefore recommend that the $55 a week test for executives and the $75 a week test for administrative and professional employees should not be extended to Puerto Rico and the Virgin Islands, and that the present requirements of $30 a week for executives and $200 a month for administrative and professional employees should be retained in these Territories until a study is made of prevailing conditions and further opportunity has been afforded to interested parties in these Territories to present their views.

### Salary Exclusive of Board, Lodging, or Other Facilities

Under the present regulations, board, lodging, or other facilities furnished to an executive, administrative, or professional employee may not be considered part of the salary for purposes of determining compliance with the regulations. The proposal was made that this provision be changed and that deductions from the salary be permitted for such items on the basis of the "reasonable cost." [79]

There was no evidence to indicate that the present requirement of the regulations with respect to the exclusion of board, lodging, or other facilities has resulted in any substantial hardship. The experience of the Divisions indicates that the requirement that the salary be paid free and clear has not created any difficulty. The question was raised by representatives of the coal industry with respect to executives who may rent a house from the management or may make purchases at company owned stores and who authorize deductions from their salaries to pay for the goods purchased.[80] A considerable administrative burden might be imposed upon the Divisions in making determinations of reasonable cost in the event that the proposal were adopted. Moreover, there appears to be no reason why transactions involving

---

[78] A statement in lieu of personal appearance was received from the Chamber of Commerce of Puerto Rico. This statement urged that consideration be given to the fact that Congress had amended the Fair Labor Standards Act to accord special treatment to Puerto Rico in establishing minimum wage rates. S. L. No. 137.
[79] National Coal Association, transcript, p. 1479. See also statement of the Great Northern Paper Co., S. L. No. 20.
[80] Transcript, pp. 1555-1556.

21

the sale of facilities to executives should not be placed upon a cash basis, and negotiated in the same manner as similar transactions with third persons. The regulations do not prohibit such transactions. They require only that the minimum salary be paid free and clear, without deductions for board, lodging, and other facilities, if exemption is to be claimed for the employee.

I recommend that the proposal to permit deductions from the required salary on a reasonable cost basis be rejected.

### Special Provisos for High Salaried Executive, Administrative, or Professional Employees

One type of proposal made in various forms by a number of witnesses was for a test of exemption based solely or principally on the receipt of a higher salary than the salary requirement contained in the other sections of the regulations. Under one·form of this proposal the receipt of the specified higher salary would alone suffice to establish exemption.[81] In a number of instances it was suggested that payment of such a higher salary should be "prima facie" evidence or create a rebuttable presumption that the employees are exempt.[82] Another form of this proposal combined the higher salary with other requirements which were, however, of a more general nature than those contained in the major descriptive sections of the regulations. For example, one proposal was made that the exemption apply to employees who receive guaranteed compensation of a specified sum each week "and who exercise a substantial amount of discretion and independent judgment."[83] Another proposal was to exempt persons who receive a specified weekly salary and "who customarily and regularly exercise discretionary powers of a supervisory nature."[84] Although the suggested language of these proposals was different in each case they had the common purpose of providing a short-cut determination of exemption for executive, administrative or professional type employees who receive salaries higher than those established in the regulations.[85]

The adoption of a provision with an objective similar to that of these proposals has previously been under consideration by the Divisions.[86] The experience of the Divisions has shown that in the categories of employees under consideration the higher the salaries paid the more likely the employees are to meet all the requirements for exemption, and the less productive are the hours of inspection time spent in analysis of.the duties performed. At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all the other requirements of the regulations for exemption. In the rare instances when these employees do not meet all the other requirements of the regulations, a determina-

[81] Corning Glass Works, transcript, pp. 381–382; Rowan Drilling Co., transcript, p. 2073.
[82] Goodyear Tire & Rubber Co., transcript, p. 16; Petroleum Equipment Suppliers Association, transcript, pp. 3537–3541.
[83] Western Pennsylvania Coal Association, transcript, p. 1529.
[84] National Coal Association, transcript, p. 1473. See also S. L. No. 10, Pittsburgh Plate Glass Co.
[85] The following language was proposed on behalf of the National Association of Manufacturers (transcript, p. 1130) :
"*Provided*, That any employee performing managerial, administrative or professional duties of the general character described in the foregoing definitions, and who is paid the equivalent of $300 or more per month on a salary basis is deemed an 'executive', 'administrative,' or 'professional' employee within the meaning of these regulations even though he may not otherwise strictly qualify for exemption under all the specifications of the applicable definition."
[86] The Divisions for a time followed a somewhat similar practice as an inspection technique on a trial basis.

tion that such employees are exempt would not defeat the objectives of section 13 (a) (1) of the act. The evidence supported the experience of the Divisions, and indicated that a short-cut test of exemption along the lines suggested above would facilitate the administration of the regulations without defeating the purposes of section 13 (a) (1). A number of management representatives stated that such a provision would facilitate the classification of employees and would result in a considerable saving of time for the employer.[87]

The definition of bona fide "executive," "administrative," or "professional" in terms of a high salary alone is not consistent with the intent of Congress as expressed in section 13 (a) (1) and would be of doubtful legality since many persons who obviously do not fall into these categories may earn large salaries.[88] The Administrator would undoubtedly be exceeding his authority if he included within the definition of these terms craftsmen, such as mechanics, carpenters, or linotype operators, no matter how highly paid they might be. A special proviso for high salaried employees cannot be based on salary alone but must be drawn in terms which will actually exclude craftsmen while including only bona fide executive, administrative, or professional employees. The evidence indicates that this objective can best be achieved by combining the high salary requirements with certain qualitative requirements relating to the work performed by bona fide executive, administrative or professional employees, as the case may be. Such requirements will exclude craftsmen and others of the type not intended to come within the exemption.

It is clear that such a special proviso must be based on a salary considerably higher than the minimum salary levels established in the regulations. An appropriate salary level for such a test should not, of course, be so high as to be ineffective in accomplishing its purpose. On the other hand, the salary level must be high enough to include only those persons about whose exemption there is normally no question. It is my opinion that such a test will not lead to injustice since a bona fide executive, administrative or professional employee who does not meet the higher salary test would qualify nevertheless under the basic regulations.

It has been the experience of the Divisions, and this experience is supported by the evidence at the hearing,[89] that with only minor or insignificant exceptions, persons who earn salaries of $100 a week or more and who have as their primary duty the performance of work which is characteristic of employment in a bona fide executive, administrative or professional capacity, as the case may be, meet all of the requirements of the Administrator's basic definitions of exempt employees, including the requirements with respect to nonexempt work. This combination of monetary and qualitative requirements assures the exclusion from the provisos of persons who are not employed in bona fide executive, administrative or professional capacities.

On the basis of all of the evidence in the record and a review of the experience of the Divisions, I find that the most appropriate test of exemption under such a special proviso is payment on a salary or fee basis at a rate of not less than $100 per week combined with the quali-

[87] See, for example, transcript, pp. 1225–1226, 1886. See also S. L. Nos. 10, 81.
[88] The doubtful legality of a definition based solely on receipt of a specified salary was recognized by some witnesses at the hearing. For example, see transcript, pp. 1928–1929.
[89] See, for example, transcript, pp. 427–428, 1247–1250, 1530, and S. L. No. 10. Various figures as high as $400–$500 a month were suggested by management representatives at the hearing.

tative requirements indicated above. I therefore recommend that the regulations be amended to include such provisos. Appropriate language to accomplish this purpose is included in the section of this report containing the complete text of the recommended regulations.

### "On a Salary * * * Basis"

The notice of hearing invited evidence on the need for revision or definition of the term "on a salary * * * basis." In response to this notice, a number of proposals relating to the "salary basis" requirements in the regulations were made in the course of the hearing. One of these was that the requirement of payment "on a salary * * * basis" be eliminated and that "average compensation" be used instead;[90] another, that employees be permitted to qualify for exemption even if paid an hourly wage.[91] Some witnesses suggested that the term "salary basis" be defined to mean payment of a fixed or guaranteed sum.[92] The evidence at the hearing showed clearly that bona fide executive, administrative, and professional employees are almost universally paid on a salary or fee basis. Compensation on a salary basis appears to have been almost universally recognized as the only method of payment consistent with the status implied by the term "bona fide" executive.[93] Similarly, payment on a salary (or fee) basis is one of the recognized attributes of administrative and professional employment. The proposals to eliminate the requirement and to apply an hourly rate or average earnings test may therefore be rejected as inconsistent with true executive, administrative or professional status.

A number of questions have arisen in the past in connection with the interpretation of the phrase "on a salary * * * basis" particularly with respect to the effect of deductions on the salaried status of an employee. The problem became of some importance during the war when the practice of making such deductions was adopted by some companies engaged in war production as a disciplinary measure to discourage absenteeism among executive and administrative employees.[94] This practice raised serious questions as to whether any employees to whom it was applied were actually employed "on a salary * * * basis" in accordance with the provisions of the regulations. Investigation by the Divisions indicated that this changed practice had become sufficiently widespread to warrant the conclusion that the wartime industrial practice differed from the pre-war practice and that such disciplinary deductions were no longer inconsistent with payment "on a salary * * * basis." In an effort to meet the wartime problems and to clarify the meaning of the term "on a salary * * * basis" the Divisions issued a restatement of position, the pertinent portion of which follows:

> An employee will be considered to be paid on a "salary basis" within the meaning of sections 541.1, 541.2, or 541.3 of Regulations, Part 541, if under his employment agreement he regularly receives each pay period, on a weekly, biweekly, semimonthly,

[90] National Association of Motor Bus Operators, transcript, p. 1792.
[91] Lennox Furnace Co., S. L. No. 9.
[92] Office Employees International Union, AFL, transcript, p. 2734; National Coal Association, transcript, p. 1473; and Central Pennsylvania Coal Producers' Association, transcript, p. 1581.
[93] See, for example, transcript, pp. 99–100, 134–135, 399, 707, 771–772, 999–1000, 1431–1432. The argument was also made, however, that the requirement of payment on a salary basis is illegal. See Exhibit No. 15.
[94] Transcript, pp. 28, 1253–1254.

monthly, or annual basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked or in the quantity or quality of the work performed during the pay period. However, the fact that less than this amount is paid for a particular pay period because disciplinary deductions are made for unreasonable absences would not in itself prove that the employee is not employed on a salary basis. On the other hand, since it is well recognized that bona fide executive, administrative, and professional employees are normally allowed some latitude with respect to the time spent at work, an employee will not be regarded as being paid on a salary basis if deductions are made for those types of absences ordinarily allowed such employees. For example, an employee is not being paid on a salary basis, if the employer makes deductions from his salary for an afternoon when he goes home early or when he occasionally takes a day off, unless, under the circumstances of a particular case, such absences must be considered unreasonable.[95]

As a result of this statement of position the problems created by the peculiar wartime conditions in many plants were solved but as an incident thereof, numerous administrative difficulties were encountered. For example, employers as well as the Divisions were faced with the need for determining in particular cases whether absences were reasonable or unreasonable and whether unreasonable absences included absences for longer periods than were allowed under established company plans for sick leave and "annual" leave. Since the answer to this latter question was determined to depend upon the reasonableness of the particular leave plan, employers had to decide for themselves and the Divisions in many instances were compelled to rule on specific leave plans to determine whether the leave plans were "reasonable" in nature. Employers were thus subject to considerable uncertainty prior to obtaining the opinion of the Divisions and the Divisions were faced with an undesirable administrative burden in giving such opinions. In my opinion, moreover, the building of such an elaborate structure of interpretation upon the simple phrase "on a salary * * * basis" should be avoided if possible in the interests of good administration.

The testimony at the hearings indicated that the practice of disciplining bona fide executive, administrative, and professional employees by making deductions from their salaries had been a wartime phenomenon, resulting from rapid upgrading, the pressure of long hours, and other temporary conditions. Such deductions are rarely made today. The disciplining of such employees in the rare instances where it is needed is usually accomplished in other ways than by deductions from salary.[96] There appears to be no present need for a definition of "salary basis" as difficult to apply as the one now followed by the Divisions, particularly since it is not consistent with the common understanding of the phrase as it applies to bona fide executive, administrative, and professional employees.[97] In view of the changed conditions, payment of anything less than the full salary

[95] Release A–9 dated August 24, 1944, "Payment on 'Salary Basis' for Executive, Administrative and Professional Employees Clarified."
[96] See, for example, transcript, pp. 23, 134–185, 399, 630–632, 1001, 1336–1337, 2759.
[97] Some representatives of employers urged that provision for deductions be retained. For example, see transcript, p. 1359.

seems to cast doubt upon the bona fide character of the employee's executive, administrative, or professional status.

I recommend that the official explanation of the regulations[98] make it clear that the term "on a salary * * * basis" requires that the employee receive his full salary for any week in which he performs any work without regard to the number of days or hours worked.[99] This recommendation may be accomplished by defining the term in the following language:

> An employee will be considered to be paid on a salary basis within the meaning of these regulations, if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the number of hours worked in the workweek or in the quality or quantity of the work performed.

The question may be raised in connection with the above recommendation whether the proposed definition of "salary basis" in all cases excludes employment on a commission basis, hourly rate, percentage of profit, or similar methods of payment resulting in varying amounts of weekly earnings. It should be noted that the language "a predetermined amount constituting all or part of his compensation" is used in the proposed definition. It is the purpose of this phrase to make it clear that additional compensation besides the salary is not inconsistent with the salary basis of payment. The requirement will be met, for example, by a branch manager who receives a salary of $75 or more per week and, in addition, a commission of 1 percent of the branch sales. The requirement will also be met by a branch manager who receives a percentage of the sales or profits of his branch, if the employment arrangement also includes a guarantee of at least the minimum weekly salary (or the equivalent for a monthly or other period) required by the regulations. Another type of situation in which the requirement will be met is that of an employee paid on a daily or shift basis, if the employment arrangement includes a provision that he will receive not less than the amount specified in the regulations in any week in which he performs any work.[100] The test of payment on a salary basis will not be met, however, if the salary is divided into two parts for the purpose of circumventing the requirement that the full salary must be paid in any week in which any work is performed. For example, a salary of $100 a week may not arbitrarily be divided into a guaranteed minimum of $75 paid in each week in which any work is performed, and an additional $25 which is made subject to deductions.

Failure to pay the full salary in the initial or terminal week of employment is not considered inconsistent with the salary basis of payment. In such weeks the payment of a proportionate part of the employee's salary for the time actually worked will meet the requirement. However, this should not be construed to mean that an employee is on a salary basis within the meaning of the regulations if he is employed occasionally for a few days and is paid a proportionate part of the

---

[98] Later in this report the recommendation is made to issue an explanatory bulletin together with the revised regulations.
[99] This recommendation is not intended to affect the Divisions' general position under the act that payment is not required in any week in which no work is performed.
[100] A representative of the coal industry testified that section foremen who are paid on a daily basis plus a minimum weekly guarantee enjoy all the privileges of salaried employees. Transcript, pp. 1522–1524.

weekly salary when so employed. Moreover, even payment of the full weekly salary under such circumstances would not meet the requirement, since casual or occasional employment for a few days at a time is inconsistent with employment on a salary basis within the meaning of the regulations.

## Payment on a "Fee Basis"

The notice of hearing invited testimony on the need for revision or definition of the phrase "fee basis."[101] In the recommended regulations as in the present regulations, the requirements for exemption as an administrative or professional employee may be met by an employee who is compensated on a fee basis as well as by one who is paid on a salary basis.

Little or no difficulty arises in determining whether a particular employment arrangement is on a fee basis. Such arrangements are characterized by the payment of an agreed sum for a single job regardless of the time required for its completion. These payments in a sense resemble piecework payments with the important distinction that generally speaking a fee payment is made for the kind of job which is unique rather than for a series of jobs which are repeated an indefinite number of times and for which payment on an identical basis is made over and over again. Payments based on the number of hours or days worked and not on the accomplishment of a given single task are not considered payments on a fee basis. The type of payment contemplated in the regulations is thus readily recognized.

In the discussion of the term "on a salary basis" I have recommended that translation of the salary test into equivalent amounts for periods shorter than a week should not be permitted. Under this recommendation, an employee on a salary basis receives his full salary for each week in which he performs any work. This is in accord with the testimony that such employees receive their salaries in weeks in which they work less than 40 hours as well as in weeks in which they work more than 40 hours. Payments on a fee basis, on the other hand, are frequently made for work accomplished in less than a week or for work done in relatively short periods of time in each of several weeks. Moreover, an employee who is employed on a fee basis is not paid a predetermined amount regularly over a relatively long period of employment as is an employee on a salary basis. Obviously, therefore, a different rule is required for fee basis payments.

The adequacy of a fee payment—whether it amounts to payment at a rate of not less than $75 per week—can ordinarily be determined only after the time worked on the job has been determined. In my opinion, the only administratively feasible way of determining whether payment is at the rate specified in the regulations is by reference to a standard workweek. I believe that a 40-hour standard is the most practicable for this purpose. I therefore recommend that the determination of whether payments on a fee basis are at a rate of not less than $75 per week be related to the standard 40-hour week. Thus, compliance will be tested in each case of a fee payment by determining whether the payment made is at a rate which would amount to at least $75 if 40 hours were worked.

The following examples will illustrate the principle stated above:

A singer receives $25 for a song on a 15-minute program (no rehears-

[101] See appendix I.

27

al time is involved). Obviously the requirement will be met since the employee would earn $75 at this rate of pay in far less than 40 hours.

An artist is paid $40 for a picture. Upon completion of the assignment, it is determined that the artist worked 20 hours. Since earnings at this rate would yield the artist $80 if 40 hours were worked, the requirement is met.

An illustrator is assigned the illustration of a pamphlet at a fee of $100. When the job is completed, it is determined that the employee worked 60 hours. If he worked 40 hours at this rate, the employee would have earned only $66.67. The fee payment of $100 for work which required 60 hours to complete therefore does not meet the requirement of payment at a rate of $75 per week and the employee must be considered nonexempt. It follows that if in the performance of this assignment the illustrator worked in excess of 40 hours in any week, overtime rates must be paid. Whether or not he worked in excess of 40 hours in any week, records for such an employee would have to be kept in accordance with the regulations covering records for nonexempt employees.

I recommend that the official explanation of the regulations include the interpretation set forth above.

## IV. SECTION 541.1. THE DEFINITION OF "EXECUTIVE"

The specific proposals contained in the notice of hearing, for amending the present definition of the term "executive," related to the language of subsection 541.1 (F) which deals with the amount of nonexempt work that may be performed. The present language is set out below with the words which the proposal would eliminate stricken through, and the new language proposed in the notice of hearing shown in italics:

(F) ~~whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction;~~

*who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) through (D) above; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who is an officer and shareholder, owning at least 20 percent of the outstanding shares in the enterprise in which he is employed.*

This proposed amendment, if adopted, would change the present regulation in three respects:

1. It would substitute for the 20-percent limitation on nonexempt work a flat allowance of 8 hours a week.

2. It would change the designation of nonexempt work from "work of the same nature as that performed by nonexempt employees" to "work which is not an integral part of the functions described" in the main descriptive portions of the regulation.

3. It would extend to "an officer and shareholder owning at least 20 percent of the outstanding shares of the enterprise" the exception to

the 20-percent limitation on nonexempt work now available only to employees "in sole charge of an independent establishment or a physically separated branch establishment."

The proposals contained in the notice of hearing point up two important questions in connection with the definition of executive: (1) What is "nonexempt work?" and (2) How much nonexempt work may an executive perform without losing the exemption? The answers to these questions have been sought in the light of the purpose of the act, the legislative history of the particular exemption and the realities of industrial life.

In the exercise of his authority to delimit as well as to define the term "bona fide executive * * * capacity," the Administrator in issuing the original definition in 1938 adopted the principle that the exemption will not be defeated by the performance of an insubstantial amount of nonexempt work by an otherwise exempt employee. This definition included the test, among others, that a bona fide "executive (and) administrative" employee was one "who does no substantial amount of work of the same nature as that performed by nonexempt employees." The term "substantial" was translated into the present 20 percent rule in 1940 after extensive hearings and months of careful study. This study indicated that working foremen, frequently designated as supervisors, should not qualify under the term bona fide executive and that it is necessary in order to prevent their qualification to retain a limitation on the amount of nonexempt work which an executive may perform without defeating the exemption.[102]

The major criticism of the present definition of "executive" during the course of the hearing was directed against the provision limiting to 20 percent the amount of nonexempt work which a supervisory employee may perform and still be considered a "bona fide" executive.[103] Many witnesses proposed that the limitation be abolished entirely;[104] others that the amount of permissible nonexempt work be increased to 50 percent of the employee's time. Before discussing these proposals to abolish or change the limitation drastically it is necessary to examine, in the light of the evidence presented at the hearing, the present meaning of "nonexempt" work and the proposal in the notice of hearing to change the designation of nonexempt work to "work which is not an integral part of the functions described."

### The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Executive Employees

There was evidence at the hearing of considerable misunderstanding of the meaning of the phrase "work of the same nature as that performed by nonexempt employees." The testimony indicated that many of the difficulties of employers in applying the regulations defining "executive" are encountered in deciding whether particular kinds of work are exempt or nonexempt in nature. Evidence of this misunderstanding and of difficulty in applying the test appeared not only from the testimony of witnesses on this subject [105] but also in-

---

[102] Stein Report, pp. 13–17. The translation of the term "insubstantial" into "20 percent" was upheld as early as 1943 by the U. S. Circuit Court of Appeals, 8th Circuit, in *Knight* v. *Mantel*, 135 F. (2d) 514.

[103] The proposal to change this 20-percent limitation to 8 hours a week was opposed by many employers as a further restriction in the amount of permissible nonexempt work. This proposal is discussed later in the report.

[104] United States Chamber of Commerce, S. L. No. 86; United States Independent Telephone Association, transcript, p. 88; Allegheny Ludlum Steel Corporation, transcript, p. 614.

[105] For example, see transcript, pp. 2089–2091, 8085.

directly from the testimony in support of the proposals to abolish the limitation on nonexempt work and the proposals to increase the present tolerance to a greater percentage than 20 percent. The evidence showed a genuine need for definition, clarification, explanation and illustration of the concept of "nonexempt work."

The problem of determining what kind of work is "nonexempt work" is not a new one. It has been frequently encountered by the Divisions in the application of the definition of "bona fide executive," particularly in borderline cases. Since the question is necessarily one of fact depending upon the particular situation involved there have been instances of disagreement between the Divisions and employers as to the applicability of the regulations to particular employees. Similar instances of disagreement have occurred between the Divisions and employees, some of whom have instituted suits for back wages. Nevertheless, in the usual situation the determination of whether a particular kind of work is exempt or nonexempt in nature is not difficult. In the vast majority of cases the bona fide executive employee performs managerial and supervisory functions which are easily recognized as within the scope of the exemption.

For example, it is generally clear that work such as the following is exempt work when it is performed by an employee in the management of his department or the supervision of the employees under him: interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining records covering their hours worked and productivity; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used; controlling the flow and distribution of materials and supplies; providing for the safety of the men and the property.

Nonexempt work is easily identifiable where, as in the usual case, it consists of work of the same nature as that performed by the nonexempt subordinates of the "executive." Most difficulties arise in the borderline cases where supervisory employees spend a significant amount of time in activities not performed by any of their subordinates and not consisting of actual supervision and management. It is in this field that the Divisions' experience has indicated the greatest need for clarification, explanation, and illustrative examples. The testimony at the hearing corroborated the facts that the experience of the Divisions had uncovered. There was evidence that some employers were considering employees nonexempt on the basis of work which appears to be clearly executive in nature.[106]

Under the present regulations work is "nonexempt" if it is performed by "nonexempt employees" generally, that is, *any* nonexempt employees. Although the courts have made this clear in a number of cases, the evidence showed that some employers have misunderstood the language of the regulations and have considered as nonexempt work only work of the same kind as that performed by subordinates of the "executive" whose exemption was being determined. Other employers, who did not misunderstand the regulations, have

[106] For example, see transcript, pp. 1003-1004, 1721-1723, 1731-1732. See also S. L. No. 7.

found it difficult to determine whether or not a particular kind of work is exempt because they did not have available the information needed to determine whether such work was performed by "nonexempt employees" generally. In either case, the major difficulty under the present regulations is the result of testing the status of particular work by whether it is of the same nature as that performed by nonexempt employees generally, rather than by any specific employees.

The proposed change in the regulations published in the notice of hearing sought to meet these problems by abandoning the concept of nonexempt work as "work of the same nature as that performed by nonexempt employees." This proposal in effect defined nonexempt work as work which is not "an integral part" of the functions described in the other sections of the regulations defining the term "executive." This language was intended to make it possible to base a determination of whether any particular kind of work is exempt or nonexempt upon an examination of its relationship to the employee's functions as a supervisor and manager rather than to "nonexempt employees" in general. The basic principle involved in this approach received considerable support at the hearing. Several of the witnesses who testified that the present 20-percent rule is impracticable agreed, after the intent of the proposed revision was explained to them, that they would find it helpful, or that some or all of their problems under the present regulations would be solved [107] if the proposed language were adopted and given the application suggested by the presiding officer.[108]

The evidence indicated that there is a definite need for a change in the basis of distinguishing exempt from nonexempt work along the general lines of the proposal discussed above. A number of witnesses indicated general agreement as to the desirability of the approach suggested by the language in the proposal but expressed doubt whether the phrase "an integral part of" would be construed by the Divisions and the courts so as to accomplish the stated objective. Various substitutes were suggested. One proposal was made that nonexempt work be defined as "work of the same nature as that performed by employees under his direction." [109] This phrase is similar to though somewhat narrower than the phrase "work of the same nature as that performed by nonexempt employees of the employer" which was included in the regulations originally adopted in 1938. The latter phrase was modified after careful consideration following the hearings in 1940.

Other proposals were made for substituting language which would make it clear that exempt work would include all activities which were a part of or closely connected with the supervisory functions of the executive employee. Substitutes for the word "integral" proposed by witnesses at the hearing were: an essential part of and necessarily incidental to;[110] incidental to and in conjunction with;[111] an integral part of and incident to.[112] Careful consideration of the objections to

[107] Transcript, pp. 98, 560–563, 619–620, 792–793, 877, 1004–1005, 1040–1041, 1239, 1377, 1433–1435, 1506, 1549–1550, 2015–2016, 3281. See also S. L. No. 87.
[108] Several times in the course of the hearing I suggested for the purpose of obtaining the views of the witness that the word "integral" would be construed to include work, no matter how routine, which may reasonably be considered a part of the executive functions. Transcript, pp. 98, 560, 1002–1004, 1175–1176, 1434, 1689, 2029–2030.
[109] New England Shoe and Leather Association, S. L. No. 49.
[110] National Canners Association, transcript, p. 3190.
[111] Indianapolis Chamber of Commerce, Manufacturers' Committee, transcript, p. 1713.
[112] Transcript, p. 1884.

the use of the word "integral" leads me to the conclusion that they may be justified in view of the restricted meaning which this word has sometimes been given for other purposes, as compared with the meaning I would recommend in connection with determining whether work under these regulations is exempt or nonexempt. I believe the evidence shows that it is desirable to adopt a less restrictive term than may be implied by "integral." The language selected for this purpose should indicate that all work which an executive may reasonably be expected to perform in carrying out his supervisory and managerial functions is exempt work. After careful consideration of all the alternatives suggested the phrase which appears to me most nearly to accomplish the desired objectives is "directly and closely related" to the performance of the exempt work. This phrase should meet the objections to the term "integral" as well as to the other suggested terms and make it clear that exempt work includes not only the actual management of the department and the supervision of the employees therein, but also activities which are closely associated with the performance of the duties involved in such managerial and supervisory functions or responsibilities.

Illustration will serve to make clear the meaning to be given this phrase and the objectives sought. The primary purpose of the exclusionary language placing a limitation on the amount of nonexempt work is to distinguish between the bona fide executive and the "working" foreman,[113] or "working" supervisor who regularly performs "production" work or other work which is unrelated or only remotely related to his supervisory activities. One type of working foreman or working supervisor most commonly found in industry works alongside his subordinates, performing the same kind of work that they perform, and also carries on supervisory functions. Clearly, the work of the same nature as that performed by the employee's subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption should not apply.

A foreman in a dress shop, for example, who operates a sewing machine to show his subordinates how to make a new product, such as a garment before it goes into production, would be performing exempt work. On the other hand, a foreman who operates a machine to produce the product is performing clearly nonexempt work.[114]

Another type of working foreman or working supervisor who cannot be classed as a bona fide executive is one who spends a substantial amount of time in work which, although not performed by his own subordinates, consists of ordinary production work or other routine, recurrent, repetitive tasks which are a regular part of his duties. Such an employee is in effect holding a dual job. He may be, for example, a combination foreman-production worker, supervisor-clerk, or foreman combined with some other skilled or unskilled occupation. His nonsupervisory duties in such instances are unrelated to anything he must do to supervise the employees under him or to manage the department. They are in many instances mere "fill-in"

---

[113] The term "working" foreman is used in this report in the sense indicated in the text and should not be construed to mean only one who performs work similar to that performed by his subordinates.
[114] In some industries the foreman would be prohibited by the collective bargaining agreement from performing such production work. See, for example, transcript, pp. 359–361, 600, 1004, 1117–1118, 1568. There was testimony also to the effect that it is considered bad personnel practice in industry to allow bona fide managerial persons to perform nonexempt work except where such work is "incidental" to the executive responsibilities or in case of emergency. For example, see transcript, p. 2129.

tasks performed because the job does not involve sufficient executive duties to occupy an employee's full time. In other instances the non-supervisory, nonmanagerial duties may be the principal ones and the supervisory or managerial duties are subordinate and are assigned to the particular employee because it is more convenient to rest the responsibility for the first line of supervision in the hands of the person who performs these other duties.

Typical of such dual jobs are: (1) foremen or supervisors who also perform one or more of the "production" or "operating" functions, though no other employees in the plant perform such work. An example of this kind of employee is the foreman in a millinery plant who is also the cutter, or the foreman in a garment factory who operates a multiple needle machine not requiring a full time operator; (2) foremen or supervisors who have as a regular part of their duties the adjustment, repair, or maintenance of machinery or equipment. Examples in this category are the foreman-fixer in the hosiery industry who devotes a considerable amount of time to making adjustments and repairs to the machines of his subordinates, or the planer-mill foreman who is also the "machine man" who repairs the machines and grinds the knives; (3) foremen or supervisors who perform clerical work other than the maintenance of the time and production records of their subordinates; for example, the foreman of the shipping room who makes out the bills of lading and other shipping records, the warehouse foreman who also acts as inventory clerk, the head shipper who also has charge of a finished goods stock room, assisting in placing goods on shelves and keeping perpetual inventory records, or the office manager who performs general bookkeeping. These are all employees whose exemption (if the nonexempt work is substantial) would be contrary to the objectives of the Fair Labor Standards Act and who are not properly classified as bona fide executives within the meaning of section 13 (a) (1) of the act.

On the other hand, I believe it is clear that the term "bona fide executive" was not intended to apply solely to the type of executive who spends his time behind a desk constantly making decisions and directing his subordinates. The supervision of employees and the management of a department include a great many tasks which are different from the work performed by subordinates and are commonly performed by persons who are supervisors because they are helpful in supervising the employees or contribute to the smooth functioning of the department for which they are responsible. Frequently such exempt work is of a kind which in establishments that are organized differently, or which are larger and have greater specialization of function, may be performed by a nonexempt employee hired especially for that purpose.

Keeping basic records of working time, for example, is frequently performed by a timekeeper employed for that purpose. In such cases the work is clearly not exempt in nature. In other plants which are not large enough to employ a timekeeper, or in which the timekeeping function has been decentralized, the supervisor of each department keeps the basic time records of his *own* subordinates. In these instances, as indicated above, the timekeeping is directly related to the function of managing the particular department and supervising its employees. However, the preparation of a payroll by a supervisor, even the payroll of the employees under his supervision, cannot be con-

33

sidered to be exempt work, since the preparation of a payroll does not aid in the supervision of the employees or the management of the department. Similarly, the keeping by a supervisor of production records of his own subordinates would be exempt work, while the maintenance of production records of employees not under his direction would not be exempt work.

Another example is the distribution of materials and supplies. Maintaining control of the flow of materials and supplies in a department is ordinarily a responsibility of the managerial employee in charge. In many establishments the actual distribution of materials is performed by nonexempt employees under the supervisor's direction. In other establishments it is not uncommon to leave the actual distribution of materials and supplies in the hands of the supervisor. In such cases it is exempt work since it is directly and closely related to the managerial responsibility of maintaining the flow of materials.

Set-up work is another illustration of work which may be exempt under certain circumstances if performed by a supervisor. The nature of set-up work differs in various industries and for different operations. Some set-up work is typically performed by the same employees who perform the "production" work; that is, the employee who operates the machine also "sets it up" or adjusts it for the particular job at hand. Such set-up work is part of the production operation and is not exempt. In other instances the setting up of the work is a highly skilled operation which the ordinary production worker or machine tender typically does not perform. In some plants, particularly large ones, such set-up work may be performed by employees whose duties are not supervisory in nature. In other plants, however, particularly small plants, such work is a regular duty of the executive and is directly and closely related to his responsibility for the work performance of his subordinates and for the adequacy of the final product. Under such circumstances it is exempt work.

Similarly, a supervisor who spot checks and examines the work of his subordinates to determine whether they are performing their duties properly, and whether the product is satisfactory, is performing work which is directly and closely related to his managerial and supervisory functions. However, this kind of examining and checking must be distinguished from the kind which is normally performed by an "examiner", "checker", or "inspector" and which is really a production operation rather than a part of the supervisory function.

Watching machines is another duty which is exempt when performed by a supervisor under proper circumstances. Obviously the mere watching of machines in operation cannot be considered exempt work where, as in certain industries in which the machinery is largely automatic, it is an ordinary production function. On the other hand, a supervisor who watches the operation of the machinery in his department in the sense that he "keeps an eye out for trouble" is performing work which is directly and closely related to his managerial responsibilities. Making an occasional adjustment in the machinery under such circumstances is also exempt work.

A word of caution is necessary in connection with these illustrations. The set-up work, machine watching and adjusting, and inspecting, examining and checking referred to in the examples of exempt work are presumably the kind which are supervisory and managerial functions rather than merely "production" work. Frequently it is diffi-

cult to distinguish the managerial type from the type which is a production operation. In deciding such difficult cases the objective stated above of excluding from the definition foremen who hold "dual" or combination jobs should be borne in mind. Thus, if the nature of the set-up work, machine watching and adjusting or examining is such that it takes up a large part of the employee's time it would be evidence that management of the department is not the primary duty of the employee, that such work is a production operation rather than a function directly and closely related to the supervisory or managerial duties, and that the employee is in reality a combination foreman-"set-up" man, foreman-machine adjuster (or mechanic) or foreman-examiner, rather than a bona fide executive.

In addition to the type of work which by its very nature is readily identifiable as being directly and closely related to the performance of the supervisory and management duties, there is another type of work which may be considered directly and closely related to the performance of these duties. In many establishments the proper management of a department requires the performance of a variety of occasional, infrequently recurring tasks which cannot practicably be performed by the production workers and are usually performed by the executive.[115] These small tasks when viewed separately without regard to their relationship to the executive's over-all function might appear to constitute nonexempt work. In reality they are the means of properly carrying out the employee's management functions and responsibilities in connection with men, materials, and production. The particular tasks are not specifically assigned to the "executive" but are performed by him in his discretion.

It might be possible for the executive to take one of his subordinates away from his usual tasks, instruct and direct him in the work to be done, and wait for him to finish it. It would certainly not be practicable, however, to manage a department in this fashion, and the evidence shows that with respect to such occasional and relatively inconsequential tasks, it is the practice in industry generally for the executive to perform them rather than to delegate them to other persons. When any one of these tasks is done frequently, however, it takes on the character of a regular production function which could be performed by a nonexempt employee and should be counted as nonexempt work. In determining whether such work is directly and closely related to the performance of the management duties, consideration should be given to whether it is (1) the same as the work performed by any of the subordinates of the executive; or (2) a specifically assigned task of the executive employee; or (3) practicably delegable to nonexempt employees in the establishment; or (4) repetitive and frequently recurring. The suggested interpretation will take into account the realities of industrial practice with regard to the work performed by nonworking foremen and other bona fide executives.[116]

### The Limitation on Nonexempt Work

Many witnesses at the hearing proposed that the limitation on the amount of nonexempt work that may be performed by an executive be

---

[115] See transcript, pp. 621–624, 2029. See also S. L. No. 87.
[116] The need for sufficient flexibility in the regulations to permit a common sense approach to the situations found in different plants and different industries was recognized by the representative of the American Federation of Labor in his testimony. Transcript, pp. 1944, 1969–1970, 1973–1974, 1995–1996, 2000–2003. See also transcript, pp. 2750–2754.

deleted from the regulations so as to permit the performance of an unlimited amount of nonexempt work. The proposal to delete the limitation was made directly by some witnesses [117] while others sought to achieve its elimination by advocating the adoption of the definition of "supervisor" contained in the Taft-Hartley Act.[118] Some witnesses who recognized that it is impracticable to exempt as an executive one who performs executive duties for only a small proportion of his time, sought an expansion to 50 percent in the amount of nonexempt work permitted.[119] The arguments in support of these proposals were that the 20-percent rule was "too restrictive" because it failed to exempt persons considered by the particular witness to be bona fide executives, or that it was "arbitrary and illogical," or quite frankly that it did not exempt particular groups of employees whom the particular witnesses believed to be entitled to exemption. Some management representatives, however, testified in favor of retaining a 20-percent limitation.[120] At least one labor representative urged that nonexempt work not to exceed 1 hour a day was sufficient tolerance for a "bona fide" executive,[121] while others urged that the regulations defining "executive" be amended to permit the performance of no nonexempt work.[122]

Many of the witnesses who urged that there be no limitation on the amount of nonexempt work agreed in response to questions that it was not feasible to remove the limitation entirely, since it would then be possible for an employee to spend 90 percent of his time in production work and still qualify as an executive.[123] Other witnesses who sought an expansion in the amount of nonexempt work permitted indicated that their problems would be largely solved if an interpretation of the meaning of "nonexempt work" similar to that recommended above is adopted. The statement was made in the course of the hearing that the 20-percent rule excluded bona fide executive employees from the exemption. Although a great many witnesses testified on this phase of the regulations, there was no substantial evidence that the present 20-percent rule resulted in defeating the exemption for any significant number of persons who could otherwise be classified as bona fide executives. Analysis of the facts indicated that employees for whom exemption was sought under a broader tolerance were, in fact, working foremen, group leaders, straw bosses, or lead men, rather than bona fide executives in the sense that the term is commonly understood.[124] In a few instances at the hearing, borderline cases were described where the employee appeared to be a bona fide executive on the basis of the brief description presented. In these instances it usually appeared that the uncertainty with regard to the particular employee's right to exemption as an executive arose not from the limitation on the amount of nonexempt work, but from a failure to understand clearly the meaning of the term "work of the

[117] See, for example, transcript, pp. 1479, 2061, 2128, and S. L. Nos. 86, 133.
[118] See, for example, transcript, pp. 41, 532, 704, and S. L. Nos. 68, 71, 88.
[119] For example, see transcript, p. 1810. See also S. L. Nos. 49, 126, 132, and transcript, p. 3572.
[120] For example, see transcript, pp. 1329–1330, 1353, 1372.
[121] Transcript, p. 327.
[122] Transcript, pp. 1944, 2731. One of these witnesses testified, however, that this proposal was not intended to prohibit the occasional performance of functions which are "incidental to the performance of duties in an exempt position * * *."
[123] For example, see transcript, pp. 17, 82, 147, 1163–1167, 1197–1203, 1726, 3289–3296, 3413–3414. See also S. L. No. 56.
[124] For example, see transcript, pp. 761, 797–801, 1420–1421, 1495–1497, 1853–1856, 2210, 2934, 2951–2953.

same nature as that performed by nonexempt employees" or from a too restrictive interpretation of that phrase.[125]

Some testimony by employer representatives indicated that fear of possible unjustified suits by employees and the difficulties involved in sustaining the burden of proof which is placed on the employer in any case where an exemption is claimed motivated the proposals to remove the nonexempt work limitation.[126] In these instances the employer witnesses seemed to feel that the elimination of the limitation on non-exempt work, or an increase in the amount allowed, would facilitate proving the bona fide executive status of employees who bring suits which the witnesses believe are not justified. There is merit, of course, in the desire of employers to be protected from unjust suits. The remedy for this evil, however, will not be found in increasing the amount of nonexempt work permitted, since unjust suits can be brought as readily under an increased tolerance. The objective of preventing misguided employees from resorting to court action, more-over, would not justify such a basic change in the regulations as the elimination of the limitation on nonexempt work which would have the effect of opening the door to the exemption of persons who are not employed in a bona fide executive capacity. The way in which the Administrator can properly help in preventing unjustified or unneces-sary litigation in connection with this exemption appears to be by clarifying and explaining the meaning of the terms used in the defini-tion, particularly with respect to what is nonexempt work, so that the area of possible disagreement as to the meaning of the terms will be reduced to a minimum. The discussion above of the meaning of non-exempt work and the recommendation to change the basis for deter-mining whether work is exempt or nonexempt should be particularly helpful in this respect.

The Divisions' experience during approximately 9 years of adminis-tration of the present regulations has also demonstrated quite con-clusively that the 20-percent rule has not caused widespread hardship and has not resulted in the loss of the exemption, in any significant number of cases, for persons who might otherwise be classed as "bona fide" executives. On the contrary, the Divisions' experience has proved that this requirement is an effective means of testing "bona fides." Moreover the 20-percent limitation has been uniformly ac-cepted by the courts. Difficult problems have arisen but these were principally in borderline cases and to a great extent have been the re-sult of insufficient clarification of what is meant by nonexempt work. The evidence presented at the hearing did not show that the present rule is inconsistent with the generally accepted understanding of the term "bona fide executive" nor was there any other evidence which would justify the complete removal of the limitation on the amount of nonexempt work. It seems quite clear that the removal of this limi-tation would do away with one of the most effective means of testing "bona fides" and would tend to defeat the policy of the act by removing from its protection many employees who were intended to be within it. The evidence did not disclose any valid reasons which would justify an increase in the tolerance for nonexempt work to 50 percent of the employee's time, as was suggested by several of the witnesses, particu-

---

[125] For example, see transcript, pp. 613, 1548–1549, and S. L. No. 32.
[126] For example, see transcript, pp. 528–531, 957–964, 978–986, 1006–1008, 1101–1103, 1229–1232, 1289–1292, 1665, 1687, and S. L. No. 133.

larly in the light of the recommended changes in the meaning of non-exempt work. On the contrary, I am convinced from all the available information that a 50-percent tolerance for nonexempt work would include within the exemption large numbers of employees who perform some work of a supervisory type but who are, nevertheless, working foremen rather than "bona fide" executives within the meaning of the act. The evidence at the hearing was not such as to justify any material departure from the 10-year-old principle that an employee who performs a "substantial" amount of nonexempt work is not a "bona fide" executive.

## Proposal for an 8-Hour Weekly Limitation on Nonexempt Work

The proposed change to an 8-hour limit on the amount of nonexempt work from the present 20-percent rule was intended to simplify, clarify, and standardize the determination of the amount of nonexempt work which an executive employee may perform. There was no intent in making this proposal to introduce any material departure from the present rule which distinguishes between a "bona fide" executive and a working foreman on the basis of the performance of a substantial amount of nonexempt work. However, the experience of the Divisions had indicated some misunderstanding as to the meaning of the limitation on nonexempt work in the present regulation to "20 percent of the hours worked in the workweek by nonexempt employees under his direction." Where the subordinates of the executive did not all work the same number of hours during any week questions were raised in many instances as to the appropriate yardstick for determining the permissible amount of nonexempt work. The "8 hours" was selected not because of any desire to make a real change in the number of permissible hours of nonexempt work, but because it seemed to be the logical translation of the present 20 percent into a fixed number of weekly hours, in the light of the general recognition of the 40-hour week as a standard throughout industry.

The advantages of a specified standard number of hours of tolerance for nonexempt work were recognized by some of the witnesses who testified at the hearing.[127] Some witnesses pointed out, however, that it amounted to a reduction in the tolerance allowed.[128] Others made the point that while it eliminated a number of administrative problems, and in general made for simplicity and clarity in the regulations, it lost a great deal of the flexibility of a percentage test. A convincing argument against adopting a rigid number of hours as a test was that made on behalf of the industries with fluctuating hours of work, such as seasonal industries, which have widely varying hours as a result of natural factors over which there is no control.[129] The testimony indicated that in such industries the number of hours of nonexempt work that must be performed by the executive personnel customarily increases in the busy season.[130]

On the basis of all the evidence it is my conclusion that while a flat 8-hour weekly limitation on nonexempt work may have merit from the standpoint of ease of application, its advantages in this respect are overbalanced by the need for flexibility to allow for differences in

---

[127] Transcript, pp. 44, 51, 147, 632, 1798.
[128] One labor representative who opposed the change stated that it amounted to an increased tolerance for nonexempt work for white-collar workers in view of the trend toward a shorter workweek. Transcript, pp. 2618–2619.
[129] For example, see transcript, pp. 1789–1790, and S. L. No. 28.
[130] See, for example, transcript, p. 202.

industrial practice and the needs of seasonal industries. I therefore recommend that the proposal to limit the tolerance to 8 hours a week be rejected.

It is appropriate to consider whether some other way can be found to achieve, at least in part, the clarification and simplification in the language of subsection 541.1 (F) which was sought by the 8-hour proposal. Under the present language the nonexempt work must "not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under" the executive's direction. This language does not indicate clearly that the base intended to be used is the "standard workweek" of the employees and that the strict arithmetical application of the 20-percent rule is intended to apply only in "unusual cases." [131] Difficulties have also been encountered in applying the 20-percent tolerance in cases where different numbers of hours are worked by the employees under the supervision of the executive or where the hours of these subordinates vary from day to day.

That these difficulties are real is indicated by the testimony on this subject and by the fact that there were several proposals to base the computation of the nonexempt work tolerance on the employee's own time.[132] The testimony indicated that such a rule would be simple, clearly understandable, and more easily applied than the present rule. It is my opinion that much of the difficulty with the present language of subsection 541.1 (F) would be eliminated if the 20-percent tolerance were computed on the basis of the executive's own time.

In evaluating this proposal, serious consideration must be given to the fact that the adoption of such a rule was considered by the presiding officer in 1940 but was not recommended by him because of the possibility of abuse. The presiding officer, in his report, stated his belief that such a rule would encourage excessive hours of work, since it would be possible to obtain the exemption for some employees by increasing their hours of exempt work.[133] I have carefully inquired into the possibility of abuse and have consulted members of the field staff of the Divisions, as well as the staff of the National Office who are responsible for the enforcement activities. If any real possibilities of abuse existed these persons, because of their extensive experience in enforcing these regulations, would be most likely to be aware of it and would be alert to point out the dangers.

According to the best available information, including the evidence in the record, abuse would rarely, if ever, be encountered in practice although some abuse would theoretically be possible. Adequate safeguards against abuse would be found, in my opinion and in the opinion of the persons consulted, not only in the natural resistance of bona fide executives to working 5 hours in order to perform nonexempt work for 1 hour, but also in the fact that 4 of every such 5 hours of work must in fact be exempt work; that is, work which is supervisory or managerial in nature, in the executive's own department or sub-

---

[131] The pertinent language is as follows: "As a matter of administrative convenience, it will be proper in all normal situations, where the hours of work approximate 40, to take as a base for computation the 40-hour week that is established as the permanent standard under the act and consider 8 hours per workweek as the maximum allowance of nonexempt work. Unusual situations can be handled by the strict arithmetical application of the 20-percent rule; thus where the nonexempt employees work, for example, 30 or 50 hours, the allowance would be 6 and 10 hours respectively." Stein Report, p. 15.

[132] American Trucking Association, transcript, pp. 1814, 1821; Cigar Manufacturers Association, transcript, pp. 1890–1891, 2033–2034; Petroleum Equipment Suppliers Association, transcript, p. 3520; Northwest Packers and Growers Association, S. L. No. 28. See, in addition, S. L. Nos. 6 and 139 urging the adoption of such a rule in the other sections of Regulations, Part 541.

[133] Stein Report, p. 15.

39

division, and with respect to his own subordinates. Moreover, if the "executive" has already exceeded the nonexempt work tolerance at the end of the week, it would be necessary that hours of work be added in the ratio of 5 hours of exempt work for every hour of nonexempt work by which the tolerance has been exceeded. For example, an employee who has performed 30 hours of exempt work and 10 hours of nonexempt work (an excess of 2 hours over the 8 permitted for a 40-hour week) would have to perform 10 additional hours of exempt work to achieve the 20-percent relationship. Although it might not be difficult to find additional nonexempt work for an executive to perform I cannot believe that under ordinary circumstances it would be practicable to stretch an executive's hours of exempt work.

I recommend that the definition of "executive" be amended to base the 20-percent tolerance on the employee's own hours of work. Such a change will eliminate the uncertainty in the present regulations while retaining the flexibility needed.

### Emergencies

Some of the criticism of the definition of the term "bona fide executive" related to its lack of flexibility in failing to make any provision for work which is normally considered nonexempt but which must be performed by an executive as the result of an emergency.[134] The point was made that many bona fide executives found it necessary to pitch in and perform ordinary manual labor or other nonexempt work when conditions beyond control arose which threatened the safety of the employees, or a complete cessation of production, or serious damage to the employer's property. It was the contention of these witnesses that the responsibilities of a bona fide executive included prevention of widespread break-down in production, the safeguarding of the property of the employer, and responsibility for the safety of the men in emergency situations, and that the performance of normally nonexempt work under such circumstances did not affect the bona fides of the employee's executive capacity. Illustrative examples were presented at the hearing of employees who appeared to be bona fide executives and who were exempt most of the time but who in 2 or 3 weeks during the year, because of the requirements of such emergencies, performed manual or routine duties in excess of the 20-percent limitation. The witnesses argued that it was impracticable to treat an obviously bona fide executive as nonexempt during the periods of emergency, and urged that provision be made in the regulations for such emergency work.

Several proposals designed to disregard normally nonexempt work performed under emergency conditions were made by interested parties. One proposal was made that "the time spent  * * * in emergency work  * * * shall not be included in computing the 20-percent limitation  * * *."[135] Some witnesses proposed that the word "customarily" or "usually" be inserted so as to qualify the 20-percent nonexempt work limitation.[136] The effect of this would be that emergency work (but also work that is not of an emergency nature) would not result in defeating the exemption. One witness proposed that provision be made for emergencies generally, or for a specific

---

[134] For example, see transcript, pp. 1057–1058. and S. L. Nos. 32, 87.
[135] American Pulpwood Association, S. L. No. 32.
[136] National Canners Association, transcript, p. 3182; Manufacturers' Association of Connecticut, Inc., transcript, pp. 1057–1059.

kind of emergencies, such as break-down, without indicating how this could be accomplished. One brief which was received proposed a special tolerance for nonexempt work during emergencies and defined emergency work as "any work necessary to be done immediately for the protection or preservation of life or health or for the prevention of damage to property or for the maintenance or repair of property or equipment to avoid undue disruption of business."[137] Some of the proposals, in my opinion, go beyond reasonable provision for true emergencies.

It seems obvious that a mine superintendent who pitches in after an explosion and digs out the men who are trapped in the mine is still a bona fide executive during that week. There is also much to be said for the view that an executive ought not to be considered to be exempt one week and nonexempt the next as a result of circumstances beyond his or the employer's control. The record seems to sustain the view that bona fide executives generally include among their responsibilities the safety of the men under their supervision, and the preservation and protection from damage due to unforseen circumstances of the machinery or other property of the department or subdivision in their charge, as well as preventing widespread break-down in production. Employers were not alone in urging such a view. The testimony of representatives of organized labor supported the view that emergency work directed toward stopping extremely serious damage should not defeat the exemption.[138]

On the other hand, it is clear that any provision in the regulations for "emergencies" needs to be carefully circumscribed.[139] Some of the proposals made at the hearing, if adopted, could result in the exemption of persons who spend a large part of their time in nonexempt work. Some of the "emergencies" described by the witnesses were of the kind for which the employer could reasonably provide in the normal course of his business. They are not occurrences which are beyond control. There seemed to be no valid reason why the particular work described should not be performed by nonexempt employees, or if performed by a supervisory employee, why it should not be considered as nonexempt work to be included in the 20-percent tolerance provided for such work.

The example of the manager of a cleaning establishment who personally performs the cleaning operations on the expensive dresses because he fears damage to the fabrics if he allows his subordinates to handle them is typical of the kind of thing which is not an "emergency" for which special consideration is needed.[140] The performance of nonexempt work by executives during inventory-taking, during other periods of heavy work-load, or the handling of rush orders are the kinds of activities which the 20-percent tolerance is intended to cover. For example, pitching in on the production line in a canning plant during seasonal operations is not exempt "emergency" work even if the objective is to keep the food from spoiling.[141] Relieving subordinates during vacation periods cannot be considered in the

[137] Evaporated Milk Association, S. L. No. 29.
[138] See the statement of Boris Shishkin on behalf of the American Federation of Labor, transcript, pp. 1944, 1993–1995; also testimony of Harrison Combs, for the United Mine Workers of America, transcript, p. 1609. Collective bargaining agreements which prohibit the performance of "production" work by foremen frequently permit such work in case of emergency. See, for example, transcript, pp. 3239–3241.
[139] See transcript, pp. 582–583.
[140] See transcript, p. 1664.
[141] See transcript, p. 3186.

nature of "emergency" work since the need for vacation replacements can be anticipated. Whether replacing the subordinate at the work bench or production line during the first day or partial day of an illness would be considered exempt emergency work would depend upon the circumstances in the particular case. Such factors as the size of the establishment and of the executive's department, the nature of the industry, the consequences that would flow from the failure to replace the ailing employee immediately, and the feasibility of filling the employee's place promptly would all have to be weighed.[142]

The regular cleaning up around machinery, even when necessary to prevent fire or explosion, is not "emergency" work.[143] However, the removal by an executive of dirt or obstructions constituting a hazard to life or property need not be included in computing the 20-percent limitation if it is not reasonably practicable for anyone but the supervisor to perform the work and it is the kind of "emergency" which has not been recurring. The occasional performance of repair work in case of a break-down of machinery may be considered exempt work if the break-down is unanticipated. However, recurring break-downs requiring frequent attention, such as that of an old belt or machine which breaks down repeatedly, are the kind for which provision could reasonably be made and repair of which must be considered as non-exempt.

It seems clear that there is a need for flexibility in the regulations to provide for real emergencies of the kind for which no provision can practicably be made by the employer in advance of their occurrence. Both the courts and the Divisions have recognized this to some extent in interpreting the present regulations. Moreover, the recommendation made above for the clarification of the meaning of "non-exempt work" by the use of the phrase "directly and closely related" furnishes further assurance that a bona fide executive who performs work of a normally nonexempt nature on rare occasions because of the existence of a real emergency will not, because of the performance of such emergency work, lose the exemption. Such emergency work is within the scope of the responsibilities of an executive and is "directly and closely related" to the executive function of management and supervision. As such, it is exempt work and need not be included in determining whether the 20-percent nonexempt work limitation has been exceeded.

### Employees With a Substantial Proprietary Interest

The notice of hearing proposed the addition to subsection 541.1 (F) of the phrase "or who is an officer and shareholder owning at least 20 percent of the outstanding shares of the enterprise in which he is employed." This proposal would exempt from the 20-percent limitation on nonexempt work persons having a substantial proprietary interest in the business in which they are employed. The change was intended to recognize the special status of an owner, or partial owner, of an enterprise who is actively engaged in its management. Because of the corporate structure of the enterprise, or for other reasons, such proprietors are frequently employees of the business, rather than employers. Such persons were found by the Divisions

---

[142] See transcript, pp. 2001–2002.
[143] See transcript, pp. 1106–1107.

42

to have the same freedom from direct supervision and the same high degree of executive responsibility that is enjoyed by the person in sole charge of an independent establishment or a physically separated branch establishment. Under the present regulations, a special exception from the 20-percent nonexempt work limitation is available for executives in sole charge of such establishments in recognition of their freedom from supervision and of their high degree of executive responsibility.

There was general agreement among the witnesses who testified on the subject that the suggested change was desirable. Some misunderstanding was indicated with respect to the meaning and intent of the word "shareholder" which to some witnesses implied a corporate form of enterprise.[144] One trade association, for that reason, proposed that the exception be extended to persons with a proprietary interest regardless of whether "by stockholdings or otherwise." [145]

I can see no valid reason for limiting this exception to shareholders of corporations, if there are any other types of enterprise to which it could apply, and it was not the intent of the Divisions in making the proposal to so limit it. The word "shareholder" is commonly understood to apply also to owners of shares in enterprises other than corporations. Moreover, the use of the word "enterprise" rather than "corporation" in the proposal reflects the intent by the Divisions to have the exception apply to other than corporate enterprises. It was intended to have the exception apply to "executives" owning a bona fide 20-percent equity in the enterprise, regardless of whether corporate or other. Since there appears to have been some misunderstanding, however, and since the use of the word "shareholder" is unnecessary, I am recommending the adoption of other language which will make the intent clear.

The proposal in the notice of hearing that the shareholder be an "officer" of the enterprise in order that the exception apply also needs reconsideration. Nothing seems to be contributed to the objective of allowing special consideration for ownership by requiring the shareholder to be an "officer." The variation in number, type, and responsibilities of corporate and other officers, and the fact that frequently the officer is merely the holder of an honorary title convinces me that the additional requirement is unnecessary. Protection against abuse of this exception may be found in the fact that only the limitation on nonexempt work is eliminated. The employer is not relieved of any of the other requirements of the regulations. For example, the employee would not qualify if he does not have management as his primary duty. Moreover, the proprietary interest must be a bona fide ownership of 20 percent of the business.

I recommend that the regulations be amended to except from the nonexempt work limitation an otherwise exempt executive "who owns at least a 20-percent interest in the enterprise in which he is employed."

### Recognized Department or Subdivision Thereof

One witness at the hearing proposed the deletion of subsection 541.1 (A).[146] The objective of this proposal was stated to be the elimination of the requirement that an executive employee must manage the establishment in which he is employed or a customarily recognized depart-

[144] See, for example, transcript, pp. 754–756.
[145] American Pulpwood Association, S. L. No. 32.
[146] Standard Oil Co. (Ohio), transcript, pp. 1357–1358.

ment or subdivision thereof.[147] The witness testifying on behalf of this proposal stated that it is often difficult to determine what a department is and expressed the view that an employee who meets all the other tests in section 541.1 should be exempt as an executive even though he is not in charge of a department or a subdivision. The record on the whole, however, revealed no persuasive reason why this subsection should be deleted from the regulations, though there was evidence that the meaning of the phrase needs some clarification.

The basic purpose of the requirement that an executive have as his primary duty the management of an establishment or a customarily recognized department or subdivision thereof, as pointed out in the report of the presiding officer issued in 1940,[148] is to distinguish between mere supervision of a collection of men assigned from time to time to a specific job or series of jobs and the direction of a unit with permanent status and function. In order properly to classify an individual as an executive he must be more than merely a supervisor; he must be in charge of and have as his primary duty the management of a recognized unit which has a continuing function.

In the vast majority of cases there is no difficulty in determining whether an individual is in charge of a recognized department or a subdivision of a department. Questions arise principally in cases involving supervisors who work outside the employer's establishment, move from place to place, or have different subordinates at different times. The points that need clarification most are (1) that the unit supervised need not be physically within the employer's establishment and may move from place to place, and (2) that continuity of the same subordinate personnel is not absolutely essential to the existence of a recognized unit with a continuing function, although in the ordinary case a fixed location and continuity of personnel are both helpful in establishing the existence of such a unit. I believe the substitution of the word "enterprise" for "establishment" will help make it clear that the unit need not be located within an establishment and that the unit need not have a fixed location. It is clear that where an enterprise comprises more than one establishment, each establishment may be considered a subdivision of the enterprise. No language change appears to be needed to make it clear that continuity of the same subordinate personnel is not essential. The following examples will illustrate these points.

The projects on which an individual in charge of a certain type of construction work is employed may occur at different locations, and he may even hire most of his work force at these locations. The mere fact that he moves his location would not invalidate his exemption if there are other factors which show that he is actually in charge of a recognized unit with a continuing function in the organization.

Nor will an otherwise exempt employee lose the exemption merely because he draws the men under his supervision from a pool, if other factors are present which indicate that he is in charge of a recognized unit with a continuing function. For instance, if this employee is in charge of the unit which has the continuing responsibility for making all installations for his employer, or all installations in a particular city or a designated portion of a city, he would be in charge of a department or subdivision despite the fact that he draws his subordinates from a pool of available men.

---

[147] Ibid., pp. 1883–1889.
[148] Stein Report, p. 10.

44

It cannot be said, however, that a supervisor drawn from a pool of supervisors who supervises employees assigned to him from a pool and who is assigned a job or a series of jobs from day to day or week to week has the status of an executive. Such an employee is not in charge of a recognized unit with a continuing function.

I recommend that subsection 541.1 (A) be amended to change the word "establishment" to "enterprise" and that the phrase "a customarily recognized department or subdivision thereof" be interpreted as explained above.

### Number of Employees Who Must Be Supervised by an Executive

Under the present regulations a bona fide executive employee is one who, among other things, "customarily and regularly directs the work of other employees." The use of the plural "employees" precludes the application of the exemption as an executive to an employee who does not supervise at least two other employees. Two different types of proposals were made with respect to this requirement of the regulations, both by employers: to increase the minimum number of employees required to be under the supervision of the "executive" to six; and to permit the exemption to apply to employees who supervise fewer than two subordinates.

No specific supporting reasons were given by the employer who advanced the proposal to increase to six the number of persons who must be supervised before an employee may qualify as a bona fide executive.[14] The proposal may have been based on knowledge that in many cases an employee who has only two subordinates does not devote a sufficient amount of his time to supervisory and managerial duties to qualify as a bona fide executive. This would be in accord with the Divisions' experience that an employee who has relatively few subordinates is less likely to meet the other requirements of the regulations than an employee who supervises a larger number of other employees. The proposal has considerable merit from an administrative point of view since it would simplify enforcement by making it unnecessary to analyze the duties of such employees only to find, for example, that they spend so large a part of their time in work unrelated to the management functions that they are not exempt.

It seems clear, however, that there are many situations in which employees are bona fide executives even though they supervise only a few other employees. This situation is found most commonly in very small enterprises where the only executive is actually the "top management" or where because of the small size of the organization the supervisor of even as few as two employees is very close to the top management, with the result that frequently he has greater responsibilities than an employee with many subordinates in a large establishment. An increase in the number of employees required to be supervised would therefore work to the detriment of the small employer. It would render less effective the special exception from the nonexempt work limitation for persons in sole charge of an independent establishment by making it impossible for the top person in a very small establishment to qualify for exemption. It would nullify in part the recommended exception from the nonexempt work limitation for employees who have a substantial proprietary interest in the business, since this exception also is designed to benefit principally the small business-

---

[14] Pittsburgh Plate Glass Co., S. L. No. 10.

45

man. In view of these possible adverse effects on small business, I recommend that there be no increase in the number of employees who must be supervised by an "executive."

Proposals to permit the exemption for executives to apply to employees who regularly supervise fewer than two subordinates were made by a number of employers. The objective in each instance appeared to be to assure the exemption of a particular class of employees of the employer making the proposal: in one case persons in charge of small departments, such as an "electrical foreman" with only one electrician under his supervision;[150] in another case managers of oil field supply stores who operated the stores alone, or with the help of only a single clerk;[151] while a third proposal sought exemption as executives for "managers" of small telephone exchanges who were not in charge of the telephone operators and in many instances supervised no employees.[152]

As I have indicated above in the discussion of the proposal to increase the number of employees who must be supervised, an increase was not recommended principally because of the possible adverse effects on small business where it often occurs that bona fide executives supervise as few as two employees. All the available evidence indicates quite clearly that, except in small establishments, few persons with only two subordinates will meet the other tests for exemption. It is very unlikely that any persons with only one subordinate will meet these tests. The record substantiates the conclusion reached by the presiding officer after the hearings in 1940 that a person who does not supervise at least two others is not a true "executive."[153] It seemed clear from the description of the duties of the employees in whose exemption the witnesses were particularly interested that they spent relatively little time in supervision and management and a relatively large amount of time in work unrelated to their managerial and supervisory duties. The testimony did not establish that the employees in question were bona fide executives, nor did any persuasive reason appear why there should be a reduction in the present requirements that no fewer than two subordinates be required for qualification as a bona fide executive.

I recommend that the plural form "employees" be retained in the language of subsection 541.1 (B) of the regulations. I also recommend that subsection 541.1 (B) be amended to read "who customarily and regularly directs the work of two or more other employees therein". The addition of the phrase "two or more" should avoid any future misunderstanding as to the requirement that an employee qualifies as an "executive" under these regulations only if he regularly supervises at least two full-time employees or the equivalent.

**Proposal to Require Participation in the Formulation of Policy**

The proposal was made by representatives of organized labor that subsection 541.1 (D) of the regulations be amended by adding after the

---

[150] Borg-Warner Corp., transcript, pp. 123, 143–146. An exception from the 20-percent nonexempt work limitation was also asked for such employees.
[151] Petroleum Equipment Suppliers Association, transcript, p. 3519. Since the employees were in "sole charge" of the stores, they would probably have qualified for exemption despite the fact that they performed a large amount of nonexempt work were it not for the fact that they did not supervise two or more other employees.
[152] U. S. Independent Telephone Association, transcript, pp. 83–84. This proposal also involved an exception from the 20-percent nonexempt work limitation.
[153] "The plural form was used deliberately in the original drafting of this section of the regulations because it was felt that an employer, to be a true 'executive,' should direct the work of at least two other persons." Stein Report, p. 12. See also pp. 17–18.

46