# EXHIBIT E

## Part 2

words "who customarily and regularly exercises discretionary powers" the phrase "and who participates in the formulation of policy relating to his field of responsibility." [154] According to its proponents, this proposal was made because the present language of subsection 541.1 (D) of the regulations gives "very wide latitude in determining whether a particular person met the test of an executive" and because it was felt that no one is a bona fide executive unless he participates in the formulation of at least the fragment of policy that lies within his jurisdiction. In response to questions regarding the meaning and intent of this proposal the witnesses stated that it was intended to assure that the exemption would apply only to an executive who is actually making "decisions which can really stick * * *." [155] The witnesses admitted, however, that rephrasing might be needed to make the meaning and purpose clear.

The adoption of the proposed language would probably result in a material change in the present standards for exemption by defeating the exemption for many bona fide executives who under modern business organization execute rather than formulate policy. It is common knowledge that there are many executives in business organizations who are charged with the supervision of men and the management of departments but who carry out policy formulated by others. Moreover, the proposal suffers, by its nature, from indefiniteness which rephrasing will not cure. I also believe that, because of its indefiniteness, the adoption of this proposal even if rephrased, would create many new enforcement problems. I therefore recommend that it not be adopted.

### Executives-in-Training

It was proposed that a new subsection be added to section 541.1 extending the exemption to a person "who is in training for a particular executive position which satisfies the requirements of subsections (A) to (F) inclusive hereof, and who while engaged in such training does not replace a nonexempt employee." [156] The witness who advocated this change and others who made similar proposals [157] were concerned with employees who are hired to fill executive positions and are paid the salary of those positions during a training period. Such an "executive-in-training" may operate machines or perform other routine tasks for the purpose of learning the business or acquiring the basic knowledge believed essential for the proper performance of his executive duties. While so engaged, according to the witness who testified in favor of this proposal, the trainee does not displace any nonexempt employee; the employee whose work he is performing either stands by, or instructs him in the operations. The witness indicated, also, that exemption for such an employee was desired for only a limited period, sufficient to cover his basic training. It was argued that it is not reasonable to consider such an "executive-to-be" nonexempt and to compensate him for overtime work.

Aside from the legal aspects, the proposal appears to have merit, particularly if it were to be qualified by a time limitation, a require-

---

[154] American Federation of Labor, transcript, pp. 1954, 1984–1986, and Office Workers International Union, AFL, transcript, pp. 2733, 2746–2749.
[155] Transcript, p. 1987.
[156] Corning Glass Works, transcript, pp. 379–380.
[157] Industrial Advisors Bureau, Inc., S. L. No. 85; Pennsylvania Salt Manufacturing Co., S. L. No. 77. Similar proposals were also made for trainees for administrative and professional positions.

47

ment that the full executive salary be paid and assurances that the trainee would not replace another employee.[158] After careful consideration of all the problems, however, I am convinced that its adoption would create many new difficulties of interpretation, administration, and enforcement. These difficulties, it seems to me, overbalance the advantages to be gained from such a provision, particularly since the problem created by the "executive-in-training," as described by the proponent, does not appear to be widespread. At most, any problem created by the employment of such employees is solved after a short period when the trainee assumes his regular duties. During the relatively short periods, moreover, the problem can be minimized through control of the hours worked by the trainee and by adjustment in the rate of pay.

Administrative difficulties would result from the fact that the bona fides of the arrangement could not readily be established until after the training period is completed. In the case of a training period longer than that permitted by such a provision a serious question would be raised as to the status of the employee between the end of the permitted period and the assumption of his duties as an executive. Moreover, an employer who, in good faith, hired such an "executive-in-training" and subsequently determined that the trainee was not capable of performing the duties required by the position for which he was being trained, may find himself subject to suit for back wages.

I have been advised by the Office of the Solicitor of the Department of Labor that the adoption of the proposal is beyond the authority of the Administrator. According to the Solicitor's Office, one in training who has not yet assumed the responsibilities of an executive, cannot be defined to meet the congressional standard of an employee *employed* in a bona fide executive *capacity*.

In view of the legal objections and the administrative difficulties, I recommend that this proposal not be adopted.

#### "Sole Charge" Proviso

Subsection 541.1 (F) provides that the 20-percent limitation on the hours of nonexempt work of an executive "shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment." This proviso was adopted in 1940 because of the belief that if "an employee does have at least two other employees to supervise and is not himself supervised at the location where he works, he possesses a degree of executive freedom that would not be the case if he had a job of comparable importance in charge of a department inside a plant." It was concluded that such an employee is a bona fide executive even though he exceeds the 20-percent limitation on nonexempt work, and that there was "an adequate safeguard against abuse in the fact that only one person in any establishment can be classed as an 'executive' by the application of this proviso." [159]

Several different proposals were made with respect to this exception from the nonexempt work limitation. One management representative proposed the deletion of the word "sole" in order to provide exemption in the case of an employee who is in charge of a branch

---

[158] Transcript, pp. 393–395. These safeguards were suggested by the witness making the proposal.
[159] Stein Report, pp. 17–18.

establishment but whose superior also makes his office on the premises.[160] This type of situation has previously been brought to the attention of the Divisions. It has generally involved a district manager who has over-all supervisory functions in relation to a number of the company's branch offices. Although such a district manager has his office at one of the branch offices it is said that he exercises no more control or supervision over the employee in charge of the office where he makes his headquarters than he does over any of the employees of the other branch offices in his district. The argument is made that under such circumstances the local branch manager has as much freedom from supervision and as much executive responsibility as the one whose superior is not located on the premises and that, therefore, the exception should apply to him since he is actually in sole charge.

It has been the experience of the Divisions, however, that the person in charge of the office where his superior makes his headquarters, in most instances does not have the same freedom from supervision as the other local managers since there is a tendency to rely for some decisions on the presence of the superior. While this is not true in all cases, it is my conclusion, based on all the evidence, that such a relaxation of the requirement that the employee must be in sole charge at a particular location would open the door to the exemption under this proviso of individuals who do not have the same freedom from supervision and the same high degree of executive responsibility as a person who does not have his superior on the premises.

This conclusion should not be construed to mean that the "sole charge" status of an employee will be considered lost because of an occasional visit to the branch office of the superior of the person in charge, or, in the case of an independent establishment, by the visit for a short period on 1 or 2 days a week of the proprietor or principal corporate officer of the establishment. In these situations, the sole charge status of the employee in question will appear from the facts as to his functions, particularly in the intervals between visits. If, during these intervals, the decisions normally made by an executive in charge of a branch or an independent establishment are reserved for the superior, the employee is not in sole charge. If such decisions are not reserved for the superior, the sole charge status will not be lost merely because of the superior's visits.

Another management representative proposed the deletion of the word "sole" for a different purpose: to exempt persons in charge of only part of the activities at a particular establishment, while someone else is in charge of another important function in which several persons are employed. It was urged that such a person should be exempt even if he has no employees under his supervision.[161] I believe that this proposal is inconsistent with the basic concept of an executive as a supervisor of employees, as well as with the fundamental objectives of the "sole charge" proviso.

A similar purpose was indicated by the proponent of a proposal to insert the word "organizationally" before the phrase "independent establishment" so that the requirement of geographical separability from other company property would be eliminated.[162] The employer who made this proposal contended that "in a large company where the functions are broken down into separate divisions, a representa-

[160] Standard Oil Co. (Ohio), transcript, pp. 1358, 1400–1402.
[161] U. S. Independent Telephone Association, transcript, pp. 83–85, 89.
[162] H. J. Heinz Co., S. L. No. 87.

tive of one division might be in the same location as the employees from another division but because of organizational lines, be as separated as if he were located in another city." The employer sought extension of the exception from the nonexempt work limitation to all supervisors of such functionally separated departments.

The "sole charge" proviso, when adopted, was based upon the conclusion that while occasionally the supervisor of one of a number of functionally separated departments in a branch establishment may have the same degree of executive responsibility as if the other departments were geographically separated, this is generally not true. The experience of the Divisions since that time has established the validity of that conclusion. The Divisions' experience has also demonstrated the value of the basic principle that not more than one person in any establishment should have the exception from the nonexempt work limitation. Adoption of this proposal would, of course, be inconsistent with this principle.

In exceptional cases the Divisions have found that an executive employee may be in sole charge of all activities at a branch office except that one independent function which is not integrated with those managed by the executive is also performed at the branch. This one function is not important to the activities managed by the executive and constitutes only an insignificant portion of the employer's activities at that branch. A typical example of this type of situation is one in which "desk space" in a warehouse otherwise devoted to the storage and shipment of parts is assigned a salesman who reports to the sales manager or other company official located at the home office. This situation is readily distinguishable from that contemplated by the proposal to add the word "organizationally" because normally only one employee (at most two or three, but in any event an insignificant number when compared with the total number of persons employed at the branch) is engaged in the nonintegrated function for which the executive whose sole charge status is in question is not responsible. It seems apparent to me that under such circumstances the employee should not lose his "sole charge" status merely because of the desk-space assignment. In addition, under these circumstances, only one employee in the branch establishment may qualify for exemption on the basis of the proviso. It does not appear necessary to make any change in the present regulations to make it clear that the proviso is applicable in such cases because the employee is actually and for all practical purposes in sole charge.

I recommend that both the proposal to delete the word "sole" from the regulations and the proposal to insert "organizationally" be rejected, and that "sole charge" be interpreted as indicated above.

A representative of a labor organization proposed that the proviso be deleted entirely from the regulations. The witness who made this proposal argued that no employee who spends more than a substantial amount of time in nonexempt work is a bona fide executive, since such employee cannot have as his "primary duty" the management of the establishment in which he is employed. It is apparent that this witness considered the term "primary duty" to be synonymous with 80 percent of the employee's time. The testimony implied, therefore, that the exception from the limitation on nonexempt work also exempted the employee from the requirement that he have as his pri-

mary duty the management of the establishment. It was this consideration which was the basis of the proposal to abolish the proviso since it was feared that under the proviso an employee could spend all his time in nonexempt work and meet the requirements for exemption. The witness agreed that it might be reasonable to allow an employee who is in "sole charge" to have some additional leeway with respect to the amount of nonexempt work that could be performed, but was opposed to the complete removal of the limitation with the apparent result of abolishing the "primary duty" test.[163]

Because of this apparent misunderstanding an explanation of how the proviso is applied in relation to the other tests of the regulations, particularly the primary duty test, is appropriate. If "primary duty" means 80 percent of the employee's time it follows that an employee who spends a substantial amount of time in nonexempt work cannot have the management of the establishment as his primary duty. If this were true the proviso would have the effect of nullifying the "primary duty" test by implication, although it is clear that it is not expressly waived any more than are the other requirements of the regulations. I can see no justification for such an extreme construction of the term "primary duty." Such a meaning has not been given to the phrase "primary duty" by the Divisions and I doubt whether it can reasonably be given that meaning.

The suggestion made at the hearing that primary duty means the major part, or over 50 percent, of the employee's time,[164] while a good rule of thumb in the ordinary case, does not seem reasonable in all situations.[165] An employee in sole charge of an establishment who spends over 50 percent of his time in managerial duties would certainly have management as his primary duty. On the other hand, I do not believe it is logical to say that an employee who spends 40 percent of his time in one kind of duty and 30 percent in each of two additional kinds of work does not have *any* of these duties as his primary one. The measure of time spent in the managerial duties is a useful guide in determining whether management is the primary duty of a particular employee. However, it cannot be the sole test in situations where the employee does not spend over 50 percent of his time in managerial duties, but must be considered along with other pertinent factors. Some of these pertinent factors are the relative importance of the managerial duties as compared with other types of duties, the frequency with which the employee exercises discretionary power, his relative freedom from supervision, and the relationship between his salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.[166]

I recommend that the proposal to delete the "sole charge" proviso from the regulations not be adopted and that it be made clear in the official explanation of the regulations that it does not waive any of the other requirements of the regulations, and that the "primary duty" test is to be applied as indicated above.

---

[163] Communications Workers of America, transcript, pp. 2669, 2704–2705.
[164] Transcript, pp. 81–82, 328, 344, 3205.
[165] One labor witness who favored a 50-percent test for "primary duty" testified that it should not be applied in all instances and that some flexibility in determining the "primary duty" was needed. See transcript, pp. 345–346.
[166] At least one witness suggested that the primary duty of an executive could be determined on the basis of a combination of time and responsibility. Transcript, pp. 3141–3142.

51

## V. SECTION 541.2. THE DEFINITION OF "ADMINISTRATIVE"

The changes which would be made in the definition of "administrative," if the specific proposals contained in the notice of hearing were adopted, have been indicated below by setting out section 541.2 of the present regulations, together with the proposed revisions. New language is shown in italics while deleted language has lines drawn through it.

"SECTION 541.2. Administrative.

The term 'employee employed in a bona fide * * * administrative * * * capacity' in section 13 (a) (1) of the act shall mean any employee—

(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) who performs under only general supervision, responsible ~~nonmanual~~ office or *nonmanual* field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; *and*

~~(4) who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment.~~

(*C*) *who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (B) (1), (B) (2), and (B) (3) of this section.*"

The proposals in the notice of hearing would, if adopted, change the present regulations in three respects: (1) the addition of a new subsection (C) would provide a tolerance of 8 hours a week for the performance of nonexempt work by an administrative employee, and at the same time furnish a guide for determining nonexempt work in terms of the functions of the administrative employee; (2) by transferring the word "nonmanual" from its position in the present regulations where it directly precedes the word "office" and making it qualify the words "field work," it was intended to make it clear that it is immaterial whether office work is manual or nonmanual; and (3) subsection 541.2 (B) (4) which was adopted in 1942 to provide

exemption for certain types of flight personnel engaged in ferrying aircraft would be deleted.

These proposals raise two of the most important questions in relation to the exemption of administrative employees: (1) What is "nonexempt" work? and (2) How much nonexempt work may an employee perform and still retain the exemption? The problems involved are similar to those raised in connection with the definition of "executive," with the additional complication that in the present regulations the definition of "administrative" includes no reference to "nonexempt" work. The experience of the Divisions reveals that there is considerable confusion as to the significance of the omission.[167] The proposals contained in the notice of hearing attempted to solve the problems by (1) defining nonexempt work as work which is not an "integral" part of the functions described in the regulation, and (2) by limiting such nonexempt work to 8 hours a week.

The testimony at the hearing substantiated the experience of the Divisions that confusion and misunderstanding have resulted from the omission of a specific rule with respect to the performance of nonexempt work by an administrative employee and also because of the lack of clarity with respect to the kind of work which would defeat the exemption.[168] The proposal in the notice of hearing to adopt a provision allowing a maximum of 8 hours a week of nonexempt work was supported in principle by witnesses representing management and labor (a 20-percent rule was preferred by some).[169] Most representatives of both industry and labor opposed the change, however, usually for different reasons.

Management opposition to the change was based on the belief that under the existing regulations a greater tolerance than 8 hours a week is available. In some instances, the testimony of these witnesses indicated their firm belief that there is no limitation under the regulations on the amount of nonexempt work that may be performed by an administrative employee.[170] Some representatives of management stated that they did not know of the Divisions' position that the performance of any "nonexempt" work which is not incidental to the exempt functions described in section 541.2 of the regulations will defeat the exemption. Other industry witnesses indicated familiarity with the Divisions' position but considered it to be inconsistent with certain court decisions,[171] and some of the language contained in the report made by the presiding officer after the 1940 hearings.[172]

The evidence disclosed, moreover, that for the reasons given above some of the employers represented at the hearing were not following the Divisions' interpretation and were considering employees exempt

---

[167] It is clear, however, that the omission was deliberate, since it was recommended by the presiding officer after the hearings in 1940 with the statement that "It is believed that the employees in the administrative group are so heterogeneous in function that it would present a disproportionately weighty problem in administration to determine what constitutes nonexempt work." Stein Report, p. 26.

[168] For example, see transcript, pp. 18, 29, 80, 102-103, 299-301, 592, 1060-1068, 1177-1178, 1192-1197, 1280, 1565-1567, 1919-1920, 3081-3083, 3090, 3107, 3113, 3121-3123, 3369-3370, 3449-3450, and S. L. Nos. 28, 29, 31, 37, 45.

[169] Transcript, pp. 627-630, 1714, 2018-2019, 2712-2713, 3635. See also S. L. No. 102 and S. S. Nos. 10, 13.

[170] See, for example, the testimony on behalf of the National Association of Manufacturers, transcript, pp. 1119-1126, 1204, and of a witness representing several employers, transcript, pp. 1281-1283.

[171] For example, see transcript, pp. 1281-1282, 3498-3499, and Exhibit No. 17. The witnesses relied on the following cases: *Walling* v. *Newman*, 61 F. Supp. 971; *Stanger* v. *Glenn L. Martin*, 56 F. Supp. 460; *Gorchakoff* v. *California Shipbuilding Corp.*, 63 F. Supp. 509; *Vechiola* v. *Western Foundry Co.*, 7 W. H. Cases 311.

[172] For example, see transcript, pp. 1854-1856. The language relied on by the witnesses is found on p. 26 of the Stein Report.

as administrative employees even though they performed nonexempt work which was not incidental to the exempt functions.[173] For these reasons some management representatives took the position that the proposal for an 8-hour nonexempt work tolerance contained in the notice of hearing would, if adopted, have the effect of restricting the amount of nonexempt work that could be performed by an employee without losing the exemption.

On the other hand, some labor representatives opposed the 8-hour provision on the ground that, in view of the Divisions' present position, it would broaden the exemption. Some of the opposition by labor representatives seemed to be based on the assumption that under the present rule the performance of "routine" work disqualified an administrative employee for exemption under all circumstances.[174] This view is not in accord with the Divisions' position that the exemption is not defeated by the performance of routine work which is "incidental" to the exempt functions.

It was clear from the testimony at the hearing that the confusion and misunderstanding concerning the meaning of the present regulations as they relate to the performance of nonexempt work by administrative employees establish the need for the formulation of a definite rule which can be readily applied by employers, employees, and the Divisions' inspectors.

### The Nature of "Exempt" and "Nonexempt" Work in Relation to the Exemption of Administrative Employees

Before recommending a rule with respect to the amount of nonexempt work that may be performed by an administrative employee without losing the exemption it is necessary to establish guides as to what constitutes exempt and nonexempt work. The presiding officer in his report following the hearings in 1940 did not attempt to establish such guides, because he concluded that it was administratively impracticable.

Although such a conclusion appeared fully justified in 1940 it is questionable whether it is true today. The term "administrative" was defined separately for the first time after the hearings in 1940. In 1938, the original regulations had provided a single definition of the term "employee employed in a bona fide executive (and) administrative * * * capacity." The decision to define "administrative" separately was based upon a showing that a separate definition was needed to provide, among other things, for the "increasing use of persons whose authority is functional rather than departmental." [175] The definition which was adopted in 1940 recognized this change and introduced a concept with which there had been little, if any, experience and the full implications of which were as yet unknown. Moreover, the Divisions' total experience in enforcement of section 13 (a) (1) of the act and the regulations issued thereunder was still very limited in 1940. Under these circumstances it was not practicable at that time to attempt a separation of exempt from nonexempt work.

The Divisions have now had more than 8 years of experience in enforcing separate definitions. During that period, these separate meanings of executive and administrative have come into common

[173] One employer representative indicated that nothing less than a decision of the Supreme Court would induce him to accept the Divisions' position. Transcript, pp. 1380–1383.
[174] For example, see transcript, pp. 2731–2732.
[175] Stein Report, p. 4.

usage. Moreover, the courts have had the opportunity to construe the separate definitions and in doing so have recognized the difference between exempt and nonexempt work. This experience in the administration of the regulations defining the term "administrative" has shown that it is practicable to establish general guides as to what constitutes exempt and nonexempt work. It has also been the Divisions' experience that it is often not possible to determine whether an employee is exempt as an administrative employee unless his work is analyzed for the purpose of determining whether some or all of it is exempt or nonexempt in nature.

The evidence submitted in connection with this proceeding as well as the experience of the Divisions in the administration of the present regulations indicate that the work generally performed by employees who perform administrative tasks may be classified into the following general categories for purposes of analysis:[176] (1) The work specifically described in the regulations; (2) routine [177] work which is directly and closely related to the performance of the work which is described in the regulations; and (3) routine work which is not related or is only remotely related to the administrative duties.·

The work in category 1—that which is specifically described in the regulations as requiring the exercise of discretion and independent judgment—is clearly exempt in nature. The evidence showed, however, that the instances in which all the work of an administrative employee requires the exercise of discretion and independent judgment would be rare.

Administrative employees normally spend a considerable part of their time performing work which if separated from their other duties would appear to be routine, or on a fairly low level, and which does not itself require the exercise of discretion and independent judgment, but which has a direct and close relationship to the performance of the more important duties. The directness and closeness of this relationship may vary depending upon the nature of the job and the size and organization of the establishment in which the work is performed. This "directly and closely related" work includes routine work which necessarily arises out of the administrative duties, and routine work without which the employee's more important work cannot be performed properly. Such work is essential to the administrative work requiring the exercise of discretion and independent judgment and must be considered as exempt administrative work. It also includes a variety of routine tasks which may not be essential to the proper performance of the more important duties but which are functionally related to them directly and closely. In this latter category are activities which an administrative employee may reasonably be expected to perform in connection with carrying out his administrative functions including duties which either facilitate or arise incidentally from the performance of such functions and are commonly performed in connection with them.

These "directly and closely related" duties are distinguishable from the last group—those which are remotely related or completely unrelated to the more important tasks. If the definition of nonexempt

---

[176] This classification is without regard to whether the work is manual or nonmanual. The problem of manual work as it affects the exemption of administrative employees is discussed later in this report.
[177] As used in this report the word "routine" means work which does not require the exercise of discretion and independent judgment. It is not necessarily restricted to work which is repetitive in nature.

work is limited to work which is entirely unrelated, or only remotely related, to the administrative work, any difficulty involved in separating exempt from nonexempt work will largely disappear. Moreover, it is my conclusion, on the basis of all the evidence, that it is entirely proper to class as exempt work all work which can reasonably be considered directly and closely related to the performance of the administrative duties.

I recommend that for the purposes of the definition of "bona fide * * * administrative * * * capacity," exempt work should be considered to include the work described in the regulations and any routine work which is "directly and closely related" to its performance, but should not include work which is unrelated or only remotely related to the responsible work. The adoption of the phrase "directly and closely related" is recommended in preference to the term "an integral part" which was proposed in the notice of hearing for reasons similar to those discussed in connection with the definition of "executive." In my opinion the phrase "directly and closely related" more accurately describes the relationship between the exempt administrative work as outlined in the regulations and the routine work which should also be considered exempt. In this respect the recommendation makes the definition of "administrative" comparable to the definition of "executive" and the standards for determining what is exempt work for the executive, insofar as they are pertinent, will be applicable to the administrative employee.

Some illustrations may be helpful in clarifying the differences between work which is directly and closely related to the performance of the administrative duties and work which is unrelated or only remotely related to them. For purposes of illustration we may take the case of a high-salaried management consultant about whose exempt status as an administrative employee there is no doubt. The particular employee is employed by a firm of consultants and performs work in which he customarily and regularly exercises discretion and independent judgment. The work consists primarily of analyzing, and recommending changes in, the business operations of his employer's client. This work falls in the category of exempt work described in the regulations.

In the course of performing that work, the consultant makes extensive notes recording the flow of work and materials through the office and plant of the client. Standing alone or separated from the primary duty such note-making would be routine in nature. However, this is work without which the more important work cannot be performed properly. It is "directly and closely related" to the administrative work and is therefore exempt work. Upon his return to the office of his employer the consultant personally types his report and draws, first in rough and then in final form, a proposed table of organization to be submitted with it. Although all this work may not be essential to the proper performance of his more important work, it is all directly and closely related to that work and should be considered exempt. While it is possible to assign the typing and final drafting to a nonexempt employee and in fact it is frequently the practice to do so, I do not believe it is reasonable to require as a condition of exemption that it be so delegated.

Finally, if because this particular employee has a special skill in

such work, he also drafts tables of organization proposed by other consultants, he would then be performing routine work wholly unrelated, or at best only remotely related, to his more important work. The unrelated or remotely related character of this last category of work is easily recognized. No valid reason appears why this work should not be separated from the other duties and considered to be nonexempt work.

Another illustration is the credit manager who makes and administers the credit policy of his employer. Establishing credit limits for customers and authorizing the shipment of orders on credit, including the decisions to exceed or otherwise vary these limits in the case of particular customers, would be exempt work of the kind specifically described in the regulations. Work which is directly and closely related to these exempt duties may include such activities as checking the status of accounts to determine whether the credit limit would be exceeded by the shipment of a new order, removing credit reports from the files for analysis, and writing letters giving credit data and experience to other employers or credit agencies. On the other hand, any general office or bookkeeping work is nonexempt work. For instance, posting to the accounts receivable ledger would be only remotely related to his administrative work and must be considered nonexempt.

One phase of the work of an administrative assistant to a bona fide executive or administrative employee provides another illustration. The work of determining whether to answer correspondence personally, call it to his superior's attention, or route it to someone else for reply requires the exercise of discretion and independent judgment and is exempt work of the kind described in the regulations. Opening the mail for the purpose of reading it to make the decisions indicated will be directly and closely related to the administrative work described. However, merely opening mail and placing it unread before his superior or some other person would be related only remotely, if at all, to any work requiring the exercise of discretion and independent judgment.

The following additional examples may also be of value in applying these principles. A traffic manager is employed to handle the company's transportation problems. The exempt work performed by such an employee would include planning the most economical and quickest routes for shipping merchandise to and from the plant, contracting for common carrier and other transportation facilities, negotiating with carriers for adjustments for damages to merchandise in transit and making the necessary rearrangements resulting from delays, damages or irregularities in transit. This employee may also spend part of his time taking "city orders" (for local deliveries) over the telephone. The order-taking is a routine function not "directly and closely related" to the exempt work and must be considered nonexempt.

An office manager who does not supervise two or more employees would not meet the requirements for exemption as an executive employee but may possibly qualify for exemption as an administrative employee. Such an employee may perform administrative duties, such as the execution of the employer's credit policy, the management of the company's traffic, purchasing, and other responsible office work, requiring the customary and regular exercise of discretion and judgment, which are clearly exempt. On the other hand, this office manager may perform all the bookkeeping, prepare payrolls, and

57

send out monthly statements of account. These latter activities are not "directly and closely related" to the exempt functions and are not exempt.

## The Tolerance for Nonexempt Work

The notice of hearing proposed an 8-hour weekly tolerance for nonexempt work. As I have stated above, this proposal was opposed by some representatives of both management and labor because they held opposing views as to what rule is followed by the Divisions and what rule the courts would follow. Some management representatives urged that no limitation be placed on the amount of nonexempt work which may be performed by administrative employees,[178] while labor representatives took the position that the performance of any nonexempt work should defeat the exemption.[179]

It seems clear to me from all the evidence that the continued application of the rule that the performance of any amount of nonexempt work defeats the exemption of an administrative employee is impracticable and undesirable. The evidence shows that many bona fide administrative employees do not spend *all* their time in the performance of exempt work even under the construction of exempt work recommended above. The variety of functions included in the normal jobs of many administrative employees, and the fact that highly paid employees holding important administrative positions may well perform some unrelated routine work, make it apparent that there should be some tolerance for work which is unrelated or only remotely related to the administrative duties.

It is equally clear that if the recommendation of some management representatives is followed and no limitation is placed on the amount of nonexempt work which may be performed by an administrative employee, the exemption will be applicable to employees who spend practically all their time performing duties of a routine or purely clerical nature unrelated to the exempt work described in the regulations. Such a rule would be entirely inconsistent with the intent of Congress in exempting employees "employed in a bona fide * * * administrative * * * capacity." I believe it is improper to classify as a bona fide administrative employee one who is not required to perform exempt work at least as a primary characteristic of his job. I therefore recommend the rejection of the proposal to omit any limitation on the performance of nonexempt work, as well as the proposal to allow no nonexempt work.

A number of witnesses proposed that the test of exemption be the "major" duties of the employee.[180] In effect, this would allow a 50-percent tolerance for nonexempt work. Such a broad tolerance, superimposed upon the interpretation recommended in connection with determining whether a particular kind of work is exempt or nonexempt would have the effect, in many instances, of exempting primarily clerical employees. These proposals must also be rejected.

The proposal in the notice of hearing for an 8-hour weekly, rather than a percentage, tolerance for nonexempt work, was made to provide certainty in the rule. As indicated in the discussion of the nonexempt work tolerance for executives, the certainty of an 8-hour rule is less desirable than the flexibility of a 20-percent rule. The pro-

[178] See, for example, transcript, pp. 87–89, 1060–1065, 1280, 1565–1567.
[179] See, for example, transcript, pp. 1942, 2732.
[180] Transcript, pp. 96, 1774, 1883, and 1921. See also S. L. No. 126.

posal to state the tolerance for administrative employees in terms of a definite number of hours a week is therefore not recommended.

Basically, however, the proposal in the notice of hearing was intended to provide a tolerance of approximately 20 percent. There was substantial support for such a 20-percent nonexempt work tolerance at the hearing.[181] The experience of the Divisions in applying a 20-percent tolerance for executive and professional employees has proved that such a tolerance is reasonable and has worked well. There appears to be no persuasive reason, on the basis of the record or the Divisions' experience, why the tolerance for the amount of nonexempt work which may be performed by administrative employees should be materially different from that allowed executive or professional employees.

Among employees performing administrative work, as in the case of supervisory employees, there are many holding jobs which consist of both exempt and purely clerical duties. An "administrative" employee whose more important duties do not take up all his time may typically be assigned a routine function, such as keeping one of the ledgers or making up payrolls. While it is entirely reasonable to exempt an employee who performs a small amount of such unrelated clerical or other low-level work, it would be contrary to the purposes of sections 7 (a) and 13 (a) (1) of the act to extend the exemption to employees who spend a substantial amount of time in such activities.

I recommend that the definition of "employee employed in a bona fide * * * administrative * * * capacity" include a provision limiting the amount of nonexempt work that he may perform to 20 percent of his hours worked in the workweek. The recommendation to base the tolerance on the employee's own time is made for reasons similar to those indicated in the discussion of "executive" above.

### Nonmanual Work

The proposal in the notice of hearing would change the phrase "nonmanual office or field work" contained in the present regulations to read "office or nonmanual field work." It was the purpose of this proposal to make it clear that office work regardless of whether it is manual or nonmanual in nature is exempt work if it has the other characteristics of exempt work described in the regulations. The language of the present regulation has led to misunderstanding because it implies that only "nonmanual" office work may be considered exempt. This has not been the interpretation followed by the Divisions. The revised language was proposed in order to make it clear that with respect to office work the question whether it is manual or nonmanual is immaterial. The Divisions' interpretation and the proposed language recognizes the accepted usage of the term "white-collar" to include all office workers and is consistent with the purpose of including in the administrative exemption only employees who are basically "white-collar" employees.[182]

This proposed change met with the approval of many witnesses at the hearing. There was some opposition to the change, but this opposition appeared to be based on a misunderstanding of the Di-

[181] See, for example, transcript pp. 627–630, 1714, 2018–2019, 2712–2713, and 3635. See also S. L. No. 102 and S. S. Nos. 10, 13.
[182] See Stein Report, p. 28.

visions' present rule.[183] Some witnesses apparently believed that the proposed change would have the effect of exempting persons employed in the routine operation of office machines, such as bookkeeping machine operators, calculating machine operators, typists, sorting machine operators, punch card operators, mimeograph machine operators, or other employees doing similar routine office work. It is difficult to see how such a conclusion can be drawn from the transfer of the word "nonmanual," in view of the remaining language of the regulations. While it is true that such employees would be engaged in office work within the meaning of the proposed regulations they would not qualify for exemption since they could not meet the other requirements of the regulations. The recommendation, made elsewhere in this report, with respect to the meaning to be given the phrase "directly related to management policies or general business operations" furnishes additional assurance that machine operators or other office employees doing low-level work will not qualify for exemption. The routine nature of the office machine operator's work is sufficient to make the exemption inapplicable. Under the circumstances, there is no valid reason why office work should be classified as manual or nonmanual in nature for purposes of the exemption.

A number of management representatives proposed the deletion of the word "nonmanual" from the regulations thereby making it possible to extend the exemption to persons performing manual work.[184] The adoption of such proposals to delete the word "nonmanual" would change the character of the "administrative" exemption and might even make it possible to extend it to include craftsmen and highly skilled manual workers of various kinds who may also exercise discretion and judgment in their work. This would be entirely inconsistent with the principle followed by the Divisions that the "administrative" exemption is basically an exemption for "white-collar" employees. No persuasive reasons for adopting such a basic change were presented, nor was there any evidence that the present rule limiting this exemption to office workers and other "white-collar" employees works unfairly or is inconsistent with the general understanding of the term. I therefore recommend that the proposal to delete the word "nonmanual" from the definition of the term "administrative" be rejected.

The recommendations made above should not be interpreted as a complete prohibition against the performance of any manual work by an "administrative" employee. The performance by an otherwise exempt administrative employee of some manual work which is directly and closely related to the work requiring the exercise of discretion and independent judgment is not inconsistent with the principle that the exemption is limited to "white-collar" employees. However, if the employee performs so much manual work that he cannot be said to be primarily engaged in office or nonmanual field work, he is not basically a "white-collar" employee and should not qualify for exemption as a bona fide administrative employee, even if the manual work he performs is directly and closely related to the work requiring the exercise of discretion and independent judgment. Thus, it is obvious that employees who spend most of their time in using

[183] For example, see transcript, pp. 109–110, 390–391, 534–537, 1063–1066, 1313–1314, 1455–1456, 1482–1483, 2733, 2755–2756.
[184] Chicago Association of Commerce and Industry, S. L. No. 88; Northern Natural Gas Co., S. L. No. 56; National Gas Pipeline Co. of America, S. L. No. 64. See also S. L. Nos. 33, 132.

tools, instruments, machinery, or other equipment, or in performing repetitive operations with their hands, no matter how much skill is required, would not be bona fide administrative employees within the meaning of these regulations. An office employee, on the other hand, is a "white-collar" worker. Under the proposed regulations an office employee would not lose the exemption on the grounds that he is not primarily engaged in "nonmanual" work although he would lose the exemption if he failed to meet any of the other requirements.

Exemption as an administrative employee is not inconsistent, moreover, with the performance of a small amount of manual work of the kind which is unrelated or only remotely related to the administrative duties. The recommended language providing a tolerance for non-exempt work will therefore allow the performance of nonexempt *manual* work within the 20 percent allowed for all types of nonexempt work.

I recommend that the phrase "nonmanual office or field work" in the present regulations be amended to read "office or nonmanual field work" and that this phrase be interpreted as explained.

There have been instances in the experience of the Divisions of "bona fide" administrative employees who performed nonmanual work involving considerable responsibility and requiring the exercise of discretion and independent judgment but who performed their work in a place which conceivably might not be characterized as either "office" or "field." Assuming such employees otherwise meet the requirements of the regulations, there appears to be no reason for denying them the exemption. For example, an otherwise exempt efficiency expert should not be denied the exemption merely because he does a large part of his work in the plant, rather than in an office. I therefore recommend that the phrase "field work" be interpreted to include all work which is not "office" work, regardless of whether it is performed at or away from the employer's plant or other place of business.

**Primary Duty * * * Directly Related to Management Policies or General Business Operations**

In recommending the interpretation of exempt work explained above, it is intended to provide exemption only for employees who are primarily engaged in the responsible work which is characteristic of employment in a bona fide administrative capacity. There seems to be a need to incorporate in the regulations language which will emphasize the primary characteristic of a bona fide administrative employee's employment. The present definition of "executive" requires that the exempt employee have management as his primary duty. This requirement has been effective in emphasizing the primary characteristic of a bona fide executive as a manager. The addition of a similar requirement to the definition of "administrative" will clarify the definition by placing the major emphasis on the character of the employee's job as a whole.

In view of the meaning which I am recommending below to be given to the phrase "directly related to management policies or general business operations," it is apparent that the word "responsible" as it appears in subsection 541.2 (B) (2) of the present regulations is unnecessary. Moreover, it should be made clear that the same standard is applicable to all three types of administrative employee. The inclusion of the word "responsible" in one subsection, while omitting it from the other two subsections, might lead to confusion.

61

I therefore recommend that the definition of "bona fide * * * administrative" include a requirement that the employee must have as his *primary duty* office or nonmanual field work directly related to management policies or general business operations (as that phrase is modified and explained below). I also recommend the deletion of the word "responsible" in subsection 541.2 (B) (2).

A number of proposals were made to change in various ways, or to delete in whole or in part, the phrase "directly related to management policies or general business operations" which appears in paragraphs 541.2 (B) (2) and 541.2 (B) (3) of the regulations.[185] The nature of these proposals and the reasons given to support them indicated that in general the phrase was interpreted differently by labor and management.[186] Both groups criticized the phrase. Labor representatives thought it was too broad, while management representatives generally considered it too restrictive.

Witnesses representing labor proposed that the phrase be altered in various ways. It was proposed that the phrase "general business operations" be deleted, leaving the language "directly related to management policies."[187] The reason given for this proposed change was that the present language is "too broad." Another witness urged that the phrase be revised to require that the administrative employee "carry on * * * work directly related to the administrative rather than the production operations of the company."[188] It was also proposed that the phrase be changed to read "general business policies" or "general business policy operations" because the present language gives the exemption a scope "so wide that it has almost no meaning."[189]

Some industry representatives also urged that the phrase be deleted, while others proposed various modifications. One industry representative urged its deletion for the reason that it is "more or less obscure and not susceptible to precise definition",[190] another for the reason that it "actually imposes no restrictions and tends therefore to confuse the proper application by employers of the otherwise readily understood provisions of these subsections".[191] On the other hand, one employer representative urged that the phrase be deleted "for the reason that the phrase in the existing regulations, as it has heretofore been construed, renders it too narrow and restrictive and, in fact, limits the exemption for administrative employees to those who are in the top levels of management, where they are engaged in the determination of basic policies."[192] One witness representing employer groups urged that the phrase be "applied broadly, so as to include any department of work which forms an integral part of the business activity involved, whether affecting production, development or administrative responsibilities."[193] Another employer representative, also because he believed the present language to be unduly restrictive, urged that the phrase be revised to "directly related to management policies or in the regular course of business of his employer, or of a supplier or customer of his employer." This employer also submitted a brief directed in

---

[185] The phrase is not contained in paragraph 541.2 (B) (1) which describes the "direct assistant" type of administrative employee.
[186] See, for example, transcript, pp. 36, 347–348, 1263–1264, 1896–1899, and 3353–3357.
[187] National Federation of Salaried Unions, transcript, p. 2776.
[188] Sylvia Gottlieb, Communications Workers of America, transcript, p. 2677.
[189] International Ladies Garment Workers Union, AFL, transcript, pp. 828–829.
[190] Northern Natural Gas Company, S. L. No. 56.
[191] Standard Oil Company (Ohio), transcript, p. 1359 ; also p. 1399.
[192] Petroleum Equipment Suppliers Association, transcript, p. 3514.
[193] Francis S. Walker, representing the American Merchant Marine Institute, Inc., and the New York Shipping Association, transcript, pp. 1771, 1776.

its entirety at the Divisions' construction of the phrase, contending that it is "neither a reasonable interpretation of the language of sub-divisions (B) (2) and (B) (3) nor consistent with the purpose of the subdivision as disclosed by  *  *  *  the Stein Report." [194]

It is evident that the purpose and meaning of the phrase "directly related to management policies or general business operations" as it is used in the regulations has been the subject of some misunderstanding. However, I do not believe that this fact in itself warrants extensive changes in the language of the regulations, but it does indicate a need for explanation and clarification.

The phrase "directly related to management policies or general business operations" should describe those types of activities relating to the administrative as distinguished from the "production" operations of a business. In addition to describing the types of activities, the phrase should limit the exemption to persons who perform work of substantial importance to the management or operation of the business.

The administrative operations of the business include the work performed by so-called white-collar employees engaged in "servicing" a business as, for example, advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control.

As used to describe work of substantial importance to the management or operation of the business, the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those whose work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments or tasks relate to the operation of a particular segment of the business.

It is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business. It should be clear that the cashier of a bank performs work at a responsible level and may therefore be said to be performing work directly related to management policies or general business operations. On the other hand, the bank teller does not. Likewise it is clear that bookkeepers, secretaries and clerks of various kinds hold the run-of-the-mine positions in any ordinary business and are not performing work directly related to management policies or general business operations. On the other hand, a tax consultant employed either by an individual company or by a firm of consultants is ordinarily doing work of substantial importance to the management or operation of a business.

An employee performing routine clerical duties obviously is not performing work of substantial importance to the management or operation of the business even though he may exercise some measure of discretion and judgment as to the manner in which he performs his clerical tasks. A messenger boy who is entrusted with carrying large sums of money or securities cannot be said to be doing work of impor-

---

[194] American Locomotive Company, transcript, pp. 1258–1270 and S. S. No. 3.

tance to the business even though serious consequences may flow from his neglect. An employee operating very expensive equipment may cause serious loss to his employer by the improper performance of his duties. An inspector as, for example, for an insurance company, may cause loss to his employer by the failure to perform his job properly. But such employees, obviously, are not performing work of such substantial importance to the management or operation of the business that it can be said to be "directly related to management policies or general business operations" as that phrase is used here.

Some firms employ persons whom they describe as "statisticians". If all such a person does, in effect, is to tabulate data, he clearly should not be treated as exempt. However, if such an employee makes analyses of data and draws conclusions which are important to the determination of, or which, in fact, determine financial or other policy, clearly he should be regarded as doing work directly related to management policies or general business operations. Similarly, a personnel employee may be a clerk at a hiring window of a plant, or he may be a man who determines or affects personnel policies affecting all the workers in his plant. In the latter case, he is clearly doing work directly related to management policies or general business operations. These examples illustrate the two extremes. In each case, between these extreme types there are many employees whose work may be of substantial importance to the management or operation of the business, depending upon the particular facts.

Another example of an employee whose work may be important to the welfare of the business is a buyer of a particular article or equipment. Where such work is of substantial importance to the management or operation of the business, even though it may be limited to purchasing for a particular department of the business, it is directly related to management policies or general business operations.

Typically, the test of "directly related to management policies or general business operations" will also be met by such persons as advisory specialists and consultants of various kinds, credit managers, safety directors, claim agents and adjusters, auditors, wage-rate analysts, tax experts, account executives of advertising agencies, customers' brokers in stock exchange firms, promotion men, and many others. It should be noted in this connection that an employer's volume of activities may make it necessary to employ a number of employees in some of these categories. The fact that there are a number of other employees of the same employer carrying out assignments of the same relative importance or performing identical work should not affect the determination of whether they meet this test so long as the work of each such employee is of substantial importance to the management or operation of the business.

A word of caution appears necessary in connection with the examples given here. The use of illustrative job titles of employees ordinarily doing work of substantial importance to the management or operation of the business should not be construed as a finding that employees holding such titles are exempt or even that they are performing work directly related to management policies or general business operations under all circumstances. They are intended only to indicate, in general, the types of employees who might be expected to meet this particular requirement under the usual circumstances of their employment. In any specific case, it is the actual work performance

which determines whether the test is met. In order to qualify for exemption such employees would also have to meet the other requirements of the regulations including the salary requirement, the requirement with respect to discretion and judgment, and the limitation on nonexempt work.

The phrase "directly related to management policies or general business operations" as used in the recommended regulations should not exclude from the exemption employees whose duties relate directly to the management policies or to the general business operations of their employers' customers. For example, many bona fide administrative employees perform important functions as advisors and consultants but are employed by a concern engaged in furnishing such services for a fee. Typical instances are tax experts, labor relations consultants, financial consultants, or resident buyers. Such employees, if they meet the other requirments of the regulations, should qualify for exemption regardless of whether the management policies or general business operations to which their work is directly related are those of their employers' clients or customers, or those of their employer.

I recommend that the phrase "directly related to management policies or general business operations" be amended to read "directly related to management policies or general business operations of his employer or his employer's customers" and that the phrase be interpreted as explained above.

### Discretion and Independent Judgment

Testimony at the hearing and the experience of the Divisions indicate that there is need for clarification and definition of the phrase "the exercise of discretion and independent judgment" which appears in each of the three paragraphs in subsection 541.2 (B) of the present regulation.[195]

In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered. The term as used in the regulations, moreover, implies that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of some significance.

The term is not as precise and objective as some other terms in the regulations. It must be applied in the light of all the facts involved in the particular employment situation in which the question arises. In general, the Divisions, the courts, and employers and employees have been able to apply the term to particular factual situations in a reasonable manner. In so applying it, the Divisions have given it the meaning indicated above. Similarly, without actually attempting to define the term, the courts have given it the meaning suggested above in applying it in particular cases.[196]

There have been instances in the experience of the Divisions, however, in which the term "discretion and independent judgment" has been misunderstood and misapplied by employers and employees. Difficulty has been encountered most frequently in cases involving the

---

[195] Transcript, pp. 1333, 1564, 2226.  See also transcript, pp. 569-574, 639-644.
[196] See, for example, *Walling* v. *Sterling Ice Co.*, 69 F. Supp. 665, reversed on other grounds, 165 F. (2d) 265 (CCA 10).  See also *Connell* v. *Delaware Aircraft Industries*, 55 Atl. (2d) 637.

following: (1) confusion between the exercise of discretion and independent judgment and the use of skill in applying techniques, procedures or specific standards; (2) misapplication of the term to employees making decisions relating to matters of little consequence; (3) misunderstanding with respect to the frequency with which discretion and independent judgment must be exercised.

Perhaps the most frequent cause of misapplication of the term "discretion and independent judgment" is the failure to distinguish it from the use of skill in various respects. An employee who merely applies his knowledge in following prescribed procedures or determining which procedure to follow, or who determines whether specified standards are met or whether an object falls into one or another of a number of definite grades, classes or other categories, with or without the use of testing or measuring devices, is not exercising discretion and independent judgment within the meaning of the regulations. This is true even if there is some leeway in reaching a conclusion, as when an acceptable standard includes a range or a tolerance above or below a specified standard.

A typical example of the application of skills and procedures is ordinary inspection work of various kinds. Inspectors normally perform specialized work along standardized lines involving well established techniques and procedures which may have been catalogued and described in manuals or other sources. Such inspectors rely on techniques and skills acquired by special training or experience. They may have some leeway in the performance of their work but only within closely prescribed limits. Employees of this type may make recommendations on the basis of the information they develop in the course of their inspections (as for example to accept or reject an insurance risk or a product manufactured to specifications), but these recommendations are based on the development of the facts as to whether there is conformity with the prescribed standards. In such cases a decision to depart from the prescribed standards or the permitted tolerance is typically made by the inspector's superior. The inspector is engaged in exercising skill rather than discretion and independent judgment within the meaning of the regulations.

A related group of employees usually called examiners or graders perform similar work involving the comparison of products with established standards which are frequently catalogued. Often, after continued reference to the written standards, or through experience, the employee acquires sufficient knowledge so that reference to written standards is unnecessary. The substitution of the employee's memory for the manual of standards does not convert the character of the work performed to work requiring the exercise of discretion and independent judgment as required by the regulations. The mere fact that the employee uses his knowledge and experience does not change his decision, i. e., that the product does or does not conform with the established standard, into a real decision in a significant matter.

For example, certain "graders" of logs or lumber turn over each "stick" to see both sides, after which a crayon mark is made to indicate the grade. These lumber grades are well established and the employee's familiarity with them stems from his experience and training. Skill rather than discretion and independent judgment is exercised in grading the lumber. This does not necessarily mean, however, that all employees who grade lumber or other commodities are not

66

exercising discretion and independent judgment. Grading of commodities for which there are no recognized or established standards may require the exercise of discretion and independent judgment as contemplated by the regulations. In addition, in those situations in which an otherwise exempt buyer does grading, the grading, even though routine work, may be considered exempt if it is directly and closely related to the exempt buying.

Another type of situation where skill in the application of techniques and procedures is sometimes confused with discretion and independent judgment is the "screening" of applicants by a personnel clerk. Typically such an employee will interview applicants and obtain from them data regarding their qualifications and fitness for employment. These data may be entered on a form specially prepared for the purpose. The "screening" operation consists of rejecting all applicants who do not meet standards for the particular job or for employment by the company. The standards are usually set by the employee's superior or other company officials, and the decision to hire from the group of applicants who do meet the standards is similarly made by other company officials. It seems clear that such a personnel clerk does not exercise discretion and independent judgment as required by the regulations. On the other hand an exempt personnel manager will often perform similar functions; that is, he will interview applicants to obtain the necessary data and eliminate applicants who are not qualified. The personnel manager will then hire one of the qualified applicants. Thus, when the interviewing and screening are performed by the personnel manager who does the hiring they constitute exempt work, because, as has been indicated previously, this work is directly and closely related to the employee's exempt functions.

The second type of situation in which some difficulty with this phrase has been experienced was pointed up by the suggestion made by a witness at the hearing that the regulations be amended to require the exercise of "substantial" discretion and independent judgment.[107] This difficulty relates to the level or importance of the matters with respect to which the employee may make decisions. In one sense almost every employee is required to use some discretion and independent judgment. Thus, it is frequently left to a truck driver to decide which route to follow in going from one place to another; the shipping clerk is normally permitted to decide the method of packing and the mode of shipment of small orders; and the bookkeeper may usually decide whether he will post first to one ledger father than another. Yet it is obvious that these decisions do not constitute the exercise of discretion and independent judgment at the level contemplated by the regulations. The Divisions have consistently taken the position that decisions of this nature concerning relatively unimportant matters are not those intended by the regulations, but that the discretion and independent judgment exercised must be real and substantial, that is, they must be exercised with respect to matters of consequence. This interpretation has also been followed by courts in decisions involving the application of the regulations to particular cases.

It is not possible to state a general rule which will distinguish in each of the many thousands of possible factual situations between the making of real decisions in significant matters and the making of choices

---

[107] Transcript, p. 1528.

67

involving matters of little or no consequence. It should be made clear, however, that the term "discretion and independent judgment," within the meaning of the regulations, does not apply to the kinds of decisions normally made by clerical and similar types of employees. The term does apply to the kinds of decisions normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their employer in substantial respects financially or otherwise. The regulations, however, do not require the exercise of discretion and independent judgment at so high a level. The regulations also contemplate the kind of discretion and independent judgment exercised by an administrative assistant to an executive, who without specific instructions or prescribed procedures, arranges interviews and meetings, and handles callers and meetings himself where the executive's personal attention is not required. It includes the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities. It may include the kind of discretion and judgment exercised by buyers, certain wholesale salesmen, representatives, and other contact persons who are given reasonable latitude in carrying on negotiations on behalf of their employers.

It is desirable at this point to emphasize that the term "discretion and independent judgment" as used in the regulations does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review. The decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action. The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment within the meaning of the regulations. For example, the executive secretary of the president of a large corporation may regularly reply to correspondence addressed to the president. Typically, such a secretary will submit the more important replies to the president for review before they are sent out. Upon occasion, after review, the president may alter or discard the prepared reply and direct that another be sent instead. This action by the president would not, however, destroy the exempt character of the executive secretary's function, and does not mean that he does not exercise discretion and independent judgment in answering correspondence and in deciding which replies may be sent out without review by the president.

The policies formulated by the credit manager of a large corporation may be subject to review by higher company officials who may approve or disapprove these policies. The management consultant who has made a study of the operations of a business and who has drawn a proposed change in organization, may have the plan reviewed or revised by his superiors before it is submitted to the client. The purchasing agent may be required to consult with top management officials before making a purchase commitment for raw materials in excess of the contemplated plant needs for a stated period, say six months. These employees exercise discretion and independent judgment within the meaning of the regulations despite the fact that their decisions or recommendations are reviewed at a higher level.

A distinction must also be made between the exercise of discretion and independent judgment with respect to matters of consequence and the cases where serious consequences may result from the negligence of an employee, the failure to follow instructions or procedures, the improper application of skills or the choice of the wrong techniques. The operator of a very intricate piece of machinery, for example, may cause a complete stoppage of production or a break-down of his very expensive machine merely by pressing the wrong button. A bank teller who is engaged in the receipt and disbursement of money at a teller's window and in related routine bookkeeping duties may, by crediting the wrong account with a deposit, cause his employer to suffer a large financial loss. An inspector charged with responsibility for loading oil on to a ship may, by not applying correct techniques, fail to notice the presence of foreign ingredients in the tank with resulting contamination of the cargo and serious loss to his employer. In these cases the employee is not exercising discretion and independent judgment as required by the regulations.

In connection with the discussion of the level of discretion and independent judgment required by the regulations, attention is directed to the recommendation made above that the characteristic work of an administrative employee must be work "directly related to management policies or general business operations of his employer or his employer's customers." This requirement will supplement and reinforce the requirement that the employee must exercise discretion and independent judgment.

In view of the explanation above of how the term "discretion and independent judgment" has been interpreted, there appears to be no need to recommend the adoption of the proposal to add the word "substantial" to the regulations. Moreover, I recommend that this interpretation be followed in the future.

The other common basis of misunderstanding arises from the fact that the present language does not indicate clearly enough that the requirement is not met by the occasional exercise of discretion and independent judgment. This defect was recognized by both management and labor witnesses at the hearing. As a remedy, it was suggested that the language be changed to indicate that it is required that discretion and independent judgment be exercised "customarily and regularly," [198] and also that appropriate language be added to make certain that the exercise of discretion and independent judgment is an "intrinsic rather than an occasional function" of a bona fide administrative employee.[199] These suggestions are essentially similar and, in my opinion, sound.

Adoption of the phrase "customarily and regularly" will accomplish the purpose intended and will eliminate, in part, misunderstanding of the phrase "discretion and independent judgment." The Divisions have had long experience in the enforcement of the phrase "customarily and regularly" in connection with two of the requirements in the definition of "bona fide executive": those relating to the direction of the work of other employees and to the exercise of discretionary powers. In its generally accepted meaning, which has been used by the Divisions and the courts, the phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which, of course, may be less than constant. The require-

[198] Transcript, p. 2045.
[199] Transcript, p. 2677.

ment will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretion and independent judgment in the day-to-day performance of his duties.

I recommend that the regulations be amended to provide that a bona fide administrative employee must "customarily and regularly" exercise discretion and independent judgment.

### The Exemption for Ferry Pilots

Subsection 541.2 (B) (4) of the regulations was adopted in 1942 to provide exemption for pilots, copilots and navigators who were engaged in ferrying aircraft from the United States to points outside the country. Information available to the Divisions indicated that the peculiar conditions which made the adoption of this regulation advisable have disappeared. Since the subsection of the regulations appeared to have outlived its purpose it was proposed that it be revoked.

A letter from the Secretary of the Air Force, which has been made a part of the record, stated that there was no present need for this exemption, but urged that it be retained for possible future use.[200] It was evident from the testimony of the witnesses, however, that the purpose and effect of this subsection are obscure and that it has resulted in some misunderstanding. In general, until it was explained, the witnesses did not appear to see the relationship between the language of the regulation and the ferrying of aircraft. One witness testified that he understood that the subsection exempted "outside delivery, service or demonstration employees" as administrative employees, while another believed it applied to truck drivers.[201]

In view of the fact that there is no present need for the exemption, and because of the misunderstanding created by the present language, I recommend that subsection 541.2 (B) (4) be deleted and that at such time as the Secretary of the Air Force indicates a need for it, a revised regulation be drafted in more appropriate terms to accomplish the desired objective.

A proposal to amend the definition of "administrative" or "professional" to include pilots of privately owned airplanes was also made.[202] The proponent of this proposal argued, among other things, that the provision exempting ferry pilots was discriminatory. The evidence presented, however, was insufficient to support a finding that pilots of privately owned airplanes can properly be classified as bona fide administrative or professional employees.

### Administrative Assistant to a Proprietor

The proposal was made at the hearing that subsection 541.2 (B) (1), describing the "assistant" type of administrative employee, be revised to permit the exemption to apply to an administrative assistant to a *proprietor*.[203] The present language of the regulations exempts an employee "who regularly and directly assists an employee employed in a bona fide executive or administrative capacity." If the language of the present regulations were applied literally, an administrative assistant to a person who manages his own business would not qualify

[200] U. S. Department of the Air Force, S. L. No. 24.
[201] Transcript, pp. 591, 2215–2216. See also S. L. Nos. 7, 32.
[202] Olin Industries, Inc., S. L. No. 22. See also the statements submitted by the Ohio Chamber of Commerce and National Association of State Chambers of Commerce, Exhibit No. 17.
[203] National Institute of Cleaning and Dyeing, transcript, p. 1661.

under this subsection of the regulations, since he is not assisting an *employee*.

There appears to be no valid reason for distinguishing between an administrative assistant to a bona fide executive or administrative *employee* and an administrative assistant to a proprietor acting in a bona fide executive or administrative capacity in his own business. I therefore recommend that the language of subsection 541.2 (B) (1) be revised to permit the exemption of an administrative assistant to a proprietor who is not an employee if such assistant meets the other requirements of the regulations.

## VI. SECTION 541.3. THE DEFINITION OF "PROFESSIONAL."

The changes which would be made in section 541.3 of the regulations if the proposals contained in the notice of hearing were adopted are indicated below. The proposed language is shown in italics and the deleted language has been lined through.

(4) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees, provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and

(4) *who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) (1), (2), (3) and 5 (a) or (b) of this section.*

This language, if adopted, would make two changes in the present regulations: (1) it would place the nonexempt work limitation on an 8-hour basis; and (2) it would change the designation of nonexempt work from "work of the same nature as that performed by nonexempt employees" to "work which is not an integral part of the functions described in" the subsections of the regulations describing the professional duties. These proposals had the same general objectives as the comparable proposals in relation to the definitions of "executive" and "administrative": to standardize the amount of nonexempt work at 8 hours rather than "20 percent of the hours worked in the workweek by nonexempt employees"; and to make it possible to identify exempt and nonexempt work by reference to the employee's own duties rather than by reference to "nonexempt" employees generally.

The testimony at the hearing in general supported the experience of the Divisions that the definition of "professional" contained in section 541.3 of the regulations has caused relatively little difficulty in administration and generally has been more easily applied by employers and employees than the definitions of "executive" and "administrative." There were few general criticisms at the hearing of the way in which the definition of "professional" has worked in the past. Most of the proposals for changes were advanced by organizations which sought special consideration for their own occupational groups because of their specialized problems.

The question of determining whether a particular duty constitutes nonexempt work has been encountered relatively infrequently in cases involving employees in the professions which require "knowledge of

71

an advanced type in a field of science or learning." There have been relatively few instances in which professional employees of this type were found to perform a sufficient amount of nonexempt work to raise the question of whether the 20-percent tolerance has been exceeded. In general, the same is true of the "artistic" professions, though difficulty has been encountered in some instances in determining whether the work of a particular employee requires "invention, imagination or talent" so that it may be said to be "predominantly original and creative in character" as required by the regulations. There have been some problems of administration and interpretation of the definition of "professional," of course, but to some extent problems of this kind must inevitably occur whenever there is a general law or regulation designed to cover a large variety of specific situations. In short, it has been the Divisions' experience that the definition of "professional" has worked well and that there has been relatively little real need for change.

While some revisions in the language defining "professional" are being recommended in this report, these are designed principally to clarify the present regulations, remove minor ambiguities and otherwise improve the language in minor respects rather than to make major changes. The one change I am recommending in the definition which is not of a minor nature is the proviso for high salaried employees. This recommendation was discussed above in the section devoted to the salary requirements.

**The 8-Hour Proposal**

Extended discussion of the 8-hour nonexempt work proposal is unnecessary. The arguments against substituting 8 hours for the 20-percent requirement contained in the present regulations have been discussed in connection with the other sections of the regulations. In addition, one of the reasons for proposing an 8-hour test for professional employees was the apparent desirability of uniformity in the various sections of the regulations in this respect. There seem to be no good reasons for adopting an 8-hour limitation for professional employees while retaining a 20-percent rule for other exempt categories. As indicated above there was relatively little criticism of the present regulations defining "professional," including the provision limiting nonexempt work to 20 percent. Most of the criticism of the 20-percent limitation came from proponents of the Taft-Hartley definition of "professional employee" which does not contain such a limitation. No convincing reason appeared from all the evidence for changing the 20-percent test in the definition of "professional."

The present definition of "professional" limits the nonexempt work to "20 percent of the hours worked in the workweek by nonexempt employees." Difficulty has been encountered in some instances in applying this test since it is not always clear which nonexempt employees' hours should be taken as a base. The present definition of "executive" is different in this respect in that it bases the 20 percent computation on the hours worked by the executive's subordinates. I have recommended above in connection with the definitions of "executive" and "administrative" that computation of the 20 percent be based on the employee's own hours of work. The most practical base in the case of the professional employee also appears to be his own time. The possibility of lengthening the total hours worked in order to allow a greater amount of nonexempt work seems as remote in the case of the profes-

sional employee as it is in the case of the executive or administrative employee.

I recommend that the proposal to limit the nonexempt work of professional employees to 8 hours a week be rejected, that the regulations defining "professional" retain a 20-percent tolerance for nonexempt work, and that they be revised to base the tolerance for nonexempt work upon the hours worked in the workweek by the professional employee.

### Proposal to Define Nonexempt Work in Terms of the "Professional" Functions

The advantages of determining whether or not a particular type of work is exempt on the basis of its relationship to the professional duties of the employee, rather than by reference to the duties of "nonexempt" employees generally, should be apparent from the discussions in the sections dealing with the definitions of "executive" and "administrative." It will be recalled that with respect to those definitions I recommended the rejection of the phrase "integral part of" to describe the relationship which must exist between routine work which should be considered exempt and the exempt functions specifically described in the regulations. I also recommend that the phrase "integral part of" not be adopted in the definition of "professional," since the meaning given to the phrase for other purposes may be different from the one it was intended to have in connection with these exemptions. Moreover, in view of the evidence in the record, there appears to be no reason for making any change from the present standard of considering as exempt work any work which is "an essential part of and necessarily incident to" work of a professional nature. I therefore recommend that this phrase be retained.

### Primary Duty

In the section dealing with the definition of "administrative," I recommended the addition of language which would make it clear that the work which is characteristic of bona fide administrative employment must be the "primary duty" of the employee. It will be recalled that management, which is the characteristic function of an executive, must be the primary duty of the employee under the definition of that term. The experience of the Divisions with the primary duty test in the definition of "executive," and the testimony at the hearing, indicate that such a test is readily understandable and has worked well. A similar change in the definition of "professional" will make it clear that in the definition of that term, as in the definitions of "executive" and "administrative," the major emphasis is on the employee's primary duty. Some benefit in administration will also be gained from the adoption of consistent language in the definitions of executive, administrative and professional.

I recommend that the definition of "employee employed in a bona fide * * * professional * * * capacity" be amended to require that the employee's primary duty consist of the performance of the work described in the regulations as characteristic of professional employment. Appropriate language to accomplish this purpose is contained in the recommended regulations.

### Exemption of Occupational Groups

A number of proposals were made by representatives of industries which employ substantial numbers of professional employees as well



73

as many nonprofessional employees for the exemption of entire occupational groups regardless of the specific duties of the particular individual. Thus, representatives of the newspaper publishers proposed that the Administrator rule "that all persons engaged in gathering news and editorial content of newspapers are professional and that the business itself is essentially professional in nature." [204] A witness speaking for employers engaged in public accounting work urged that the regulations be revised to exempt all persons employed by firms of public accountants who are engaged in work of the nature performed by staff accountants. The exemption of junior accountants as well as seniors and certified public accountants was urged regardless of the work performed by the individuals, provided that they were employees of public accounting firms.[205] Witnesses representing the radio broadcasting industry took the position that the Administrator, by interpretation of the present regulations, could hold all radio announcing work to be exempt *per se*, and urged that he do so.[206]

Representatives of newspaper employees, radio announcers and accountants, however, expressed views which were directly contrary to those of the industry witnesses. The representative of the organized newspaper employees testified to the effect that only top flight newspaper employees were employed in a professional capacity,[207] while the representative of the radio announcers argued that no staff announcer could qualify as a professional employee.[208]

Section 13 (a) (1) exempts "any employee employed in a bona fide * * * professional * * * capacity." It does not exempt employees of professional employers, as such, or employees in industries having large numbers of professional members, or employees in any particular occupation, or those learning a profession. The Divisions have consistently held to the position that exemption under section 13 (a) (1) of the act must depend upon the duties and other qualifications of the individual employee, and that the regulations must reflect this view.

Proposals such as those made with respect to accountants, newspaper employees, and radio announcers are inconsistent with the language and purpose of section 13 (a) (1) of the act. Employment as a reporter, writer, radio announcer, or accountant does not assure the "bona fide" professional character of the employment. The exemption of such employees solely on the basis of their employment in a specified occupational group would discriminate against other occupations which include large numbers of professional employees, but in which each individual is required to meet the standards set in the regulations in order to qualify for exemption. No valid reason appears for applying different standards to radio announcers, journalists or accountants than to other groups in which individual members may or may not be exempt as bona fide professional employees depending upon the particular duties they perform and upon whether they meet the other requirements of the regulations. I therefore recommend that the proposals to exempt special occupational groups as professional employees be rejected.

[204] American Newspaper Publishers Association, transcript, pp. 2893, 2966–2967. See also S. L. Nos. 1, 78.
[205] American Institute of Accountants, Exhibit No. 86 and transcript, pp. 3644–3668.
[206] National Association of Broadcasters, transcript, pp. 2325–2358. A representative of the industry testified, however, that this position was not intended to mean that every radio announcer is a professional employee regardless of his duties. Transcript, p. 2438.
[207] American Newspaper Guild, CIO, transcript, pp. 3001–3004, 3016–3018.
[208] American Federation of Radio Artists, AFL, transcript, p. 2504.

The recommendation not to consider these occupational groups exempt as such, should not be construed to mean that journalists, accountants, and radio announcers may not qualify for exemption as professional employees in many instances or, under other appropriate sections of the regulations, as executive or administrative employees, depending upon the duties of the particular employee. Many newspaper employees will undoubtedly qualify for exemption under the proposed regulations, as they do under the present regulations. Moreover, the changes recommended above with respect to the definitions of "executive" and "administrative" should solve some of the problems related to the classification of editorial employees. It should be noted that the application of the present regulations to journalistic employees is explained in detail in a manual of newspaper job classifications issued by the Divisions in 1943.[209] This manual will have to be reviewed by the Divisions to determine to what extent the classifications contained therein have been made obsolete by the recommended regulations. In my opinion, however, the descriptions and classifications of exempt and nonexempt *reporters* and exempt and nonexempt *newspaper writers* generally, as outlined in that manual, will be valid under the proposed definition of "professional."

Many accountants are exempt as professional employees (and some as administrative employees) regardless of whether they are employed by public accounting firms or by other types of enterprises. The basis of distinction between exempt and nonexempt accountants, however, cannot be the nature of the enterprise in which they are employed; that is, whether they are employed by public accounting firms or by industrial or other kinds of business organizations. Exemption of accountants, as in the case of other occupational groups, must be determined on the basis of the individual employee's duties and the other criteria in the regulations. It has been the Divisions' experience that certified public accountants, who meet the salary requirement of the regulations will, except in unusual cases, meet the requirements of the professional exemption since they meet the tests contained in section 541.3 of the regulations. Similarly, accountants who are not certified public accountants may also be exempt as professional employees if they actually perform work which requires the consistent exercise of discretion and judgment and otherwise meet the tests prescribed in the definition of "professional" employee. Accounting clerks, junior accountants, and other accountants, on the other hand, normally perform a great deal of routine work which is not an essential part of and necessarily incident to any professional work which they may do. Where these facts are found such accountants are not exempt, regardless of whether their employment is in a public accounting firm or other kind of business organization.[210] The title "Junior Accountant," however, is not determinative of failure to qualify for exemption any more than the title "Senior Accountant" would necessarily imply that the employee is exempt. In the field of accounting, as in other fields, exemption in each case must

[209] *Manual of Newspaper Job Classifications*, Wage and Hour and Public Contracts Divisions. U. S. Department of Labor, April 1943.
[210] The representative of the American Institute of Accountants agreed in the course of his testimony that junior accountants employed by department stores or other kinds of business are not doing "professional" work and are not exempt, but insisted that junior accountants performing similar work while employed by public accounting firms are employed in a professional capacity and should be exempt. Transcript, pp. 3660–3666.

be determined on the basis of the individual's duties, responsibilities, and salary, and not on the basis of his title.

The determination of the exempt or nonexempt status of radio announcers as professional employees has been relatively difficult because the radio broadcasting industry is comparatively new in the field of entertainment and because of the merging of the artistic aspects of the job with the commercial. The problem has been complicated also by the novel system of payment for work performed by radio announcers. This is the "talent fee" basis of payment under which sponsors of radio programs pay special fees for the services of announcers whose special announcing talents they particularly desire.[211]

Some of the evidence related to the special functions which many announcers are called upon to perform. These include functioning as a master of ceremonies; playing dramatic, comedy or straight parts in a program; interviewing; conducting farm, fashion, and home economics programs; covering public events, such as sports programs, in which the announcers may be required to "ad lib" and describe current changing events; and acting as narrator and commentator. Such work is generally exempt. Work such as giving station identification and time signals, announcing the names of programs, and similar routine work is nonexempt work. In the field of radio entertainment as in other fields of artistic endeavor, the status of an employee as a bona fide professional under the regulations is in large part dependent upon whether his duties are original and creative in character, and whether they require invention, imagination or talent.

The testimony indicated quite clearly that no general conclusion could be reached that all announcers are exempt, or that all are nonexempt. It is apparent that there is considerable variation in the type of work performed by various radio announcers, ranging from predominantly routine to predominantly exempt work.[212] The wide variation in earnings as between individual radio announcers, from the highly paid "name" announcer on a national network who is greatly in demand by sponsors to the staff announcer paid a comparatively small salary in a small station, indicates not only great differences in personality, voice and manner, but also in some inherent special ability or talent which, while extremely difficult to define is nevertheless real. The determination of whether a particular announcer is exempt as a professional employee must be based upon his individual duties and the amount of exempt and nonexempt work performed, as well as his compensation.

### Proposed Exception for Architects, Engineers, and Librarians

Representatives of organizations of architects, engineers, and librarians proposed that the regulations be revised to except persons employed in these occupations from the salary requirement of the definition of "professional." The librarians proposed that all members of their profession be excepted from the salary requirement.[213] The

[211] Transcript, p. 2844.
[212] For example, see transcript, pp. 2432-2434, 2438, 2446, 2478-2484. Considerable variation in duties is also found, not only among radio announcers, but among other categories of employees of radio stations who are employed under similar titles. See, for example, the statement filed by the Radio Workers Guild of the Authors League of America, Inc., dealing with the radio news editor, S. L. No. 39. For descriptions of the duties performed by radio announcers under varying conditions, see transcript, pp. 2327 ff. and pp. 2501-2525.
[213] Testimony on behalf of the American Library Association and the Special Libraries Association, transcript, pp. 2792-2795.

architects and engineers proposed that this exception apply only to those members of the profession who were licensed by the state to practice their profession.[214]

In making these proposals the proponents sought the same special consideration that members of the medical and legal professions receive under the present regulations. Holders of licenses or certificates to practice law or medicine who are actually practicing their professions were excepted from the salary requirement applicable to other professional groups in accordance with the recommendation of the presiding officer after the hearings in 1940. That recommendation was based upon the traditional standing of these professions, the recognition of doctors and lawyers as quasi-public officials, and the universal requirement of licensing by the various jurisdictions. Consideration was also given to the relatively simple problems of classification presented by these professions.

The field of library science is a relatively recent addition to the list of professions. In it are large numbers of employees who are trained librarians but who nevertheless, do not perform professional work or receive salaries commensurate with recognized professional status.[215] The elimination of the salary requirement for these employees, moreover, would not relieve them of the other requirements of the regulations just as they do not relieve doctors and lawyers of these other requirements. Many of these low-paid employees do not meet the other requirements of the regulations because they perform a great deal of nonexempt work or because their work does not require the consistent exercise of discretion and independent judgment. The elimination of the salary test for such nonexempt employees would merely complicate the problem of classifying them and may lead to misclassification with resulting violation of the act. It should be noted also that states do not generally license the practice of library science, so that in this respect also the profession is not comparable to that of law or medicine.

I believe there is more merit in the proposals made on behalf of the architects and the engineers since these proposals seek to limit the exception to holders of valid state licenses to practice these professions. After careful consideration, however, I have concluded that their adoption at this time should not be recommended. The practice of law and medicine has a long history of state licensing and certification; the licensing of engineers and architects is relatively recent. While it is impossible for a doctor or lawyer legally to practice his profession without a certificate or license, many architects and engineers perform work in these fields without possessing licenses, although failure to hold a license may limit their permissible activities to those of lesser responsibilities.[216] The adoption of the proposals made by the architects and engineers would, therefore, result in extending the exception to only a portion of those who are engaged in these professions. There are many architects and engineers who do not hold licenses or certificates but who qualify for exemption under our regulations on the basis

[214] American Institute of Architects, S. L. No. 76; National Society of Professional Engineers, transcript, pp. 2850–2851; American Society of Civil Engineers, S. L. No. 101.
[215] Transcript, pp. 2799–2816.
[216] See, for example, Exhibit No. 30. *Digest of State Laws Governing the Practice of Engineering and Land Surveying, and of State Board Procedures*, National Council of State Boards of Engineering Examiners, August 1947.

of their duties and salaries.[217] Furthermore, I believe that no hardship will follow from the failure to adopt the proposals of the architects and engineers since the evidence shows that the type of engineer or architect who holds a state license to practice the profession and who is actually performing the work which his license authorizes him to perform will, except in the most unusual cases, meet the salary requirement contained in the regulations.

The stated objectives of the architects, engineers and librarians in seeking exceptions from the salary requirement for exemption as professional were to achieve recognition for these fields of endeavor as professional and the desire to place them on a par with medicine and law as professions.[218] These are worthy objectives with which I sympathize but they are, of course, unrelated to the purposes of section 13 (a) (1) of the Fair Labor Standards Act. In any event, I do not see how deleting the salary requirement would advance the recognition of these activities as professions or for that matter, that any such action is necessary to prove that these are bona fide professions. The Divisions in their enforcement have always recognized engineering, architecture and library science as professional fields of endeavor. However, the regulations contemplate, and the witnesses who testified at the hearing in favor of these proposals recognized, that there are within these professional fields many employees with titles such as architect, engineer, or librarian who are not employed in a bona fide professional capacity because they are performing work which utilizes little, if any, professional training. The inclusion of a salary test in the regulations is of great assistance in making a ready separation between such nonexempt employees and the bona fide professional employees whose professional status is recognized by the salary paid.

I recommend the rejection of the proposals to except librarians, architects, and engineers from the salary requirement of the definition of "professional." This recommendation is without prejudice, however, to reopening the question with respect to architecture, engineering, or any other profession, at any time such profession achieves universal state licensing or certification of all its practicing members on the basis of standards comparable to those in effect for the licensing of physicians and lawyers.

### Or Any of Their Branches

The exception from the salary requirement is extended by the regulations to "an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches * * *."

Questions have been raised as to the meaning of the phrase "or any of their branches." It is therefore advisable to restate the Divisions' position that this exception applies only to the traditional professions of law and medicine and not to employees in related professions which merely service the professions of law or medicine. For example, in the case of medicine, the exception applies to physicians and other practitioners in the field of medical science and healing, such as dentists, or any of the medical specialties, but it does not include pharmacists, nurses, or other professions which service the medical profession.

---

[217] See, for example, transcript, pp. 2837–2841, 2853–2854, 2856–2857.
[218] For example, see transcript, pp. 2866–2867.

## VII. SECTION 541.5. THE DEFINITION OF "OUTSIDE SALESMAN"

The changes which would be made in section 541.5 of the regulations if the proposals contained in the notice of hearing were adopted are indicated below. The new language is shown in italics while the deleted language has been lined through.

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in

(1) making sales within the meaning of section 3 (k) of the act; or

(2) obtaining orders or contracts *for services* or for the use of facilities for which a consideration will be paid by the client or customer, and

(B) ~~whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees;~~ *whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above, do not exceed 8 hours in the workweek;* provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, ~~shall not be regarded as nonexempt work.~~ *shall not be included in computing the 8 hours.*

The new language, if adopted, would make the following changes in the present regulations: (1) it would change the present 20-percent limitation on nonexempt work to a ~~fixed~~ 8 hours a week; (2) it would describe "nonexempt work" in terms of the sales activities; and (3) it would permit the exemption to apply to outside salesmen engaged in selling "services" as well as to those selling tangible commodities and the use of facilities.

### The 20-Percent Limitation on Nonexempt Work

Proposals for changing the 20-percent limitation on nonexempt work to 8 hours have been discussed in connection with the other sections of the regulations and recommendations have been made to abandon these proposals. For similar reasons the adoption of an 8-hour limitation for outside salesmen, except under circumstances described below, is not recommended.

Retaining the 20-percent provision raises the question of the base upon which the percentage is to be computed. The present regulations provide that the hours of work of the same nature as that performed by nonexempt employees shall not exceed 20 percent of the number of hours worked in the workweek by "such nonexempt employees." The Divisions' present position with respect to the method of computing the 20 percent is as follows:

Whenever the outside salesman is performing work which is likewise performed by other employees of his employer the stand-

79

ard to be adopted is of course the workweek of those employees. When, however, he is the only employee of his employer who performs such work, the customary working hours of employees of other employers who perform similar nonexempt work may be taken as the standard. For example, if the outside salesman spends a certain amount of time each week in the occupation of bookkeeper and he is the only bookkeeper employed by his employer, the standard may be the customary hours of work of bookkeepers in similar establishments where full time bookkeepers are employed. In all doubtful cases, for the purpose of simplicity and in default of evidence to the contrary, the standard may be taken as 40 hours a week and the amount of nonexempt work allowed, therefore, will be 8 hours per week.[219]

It was proposed that section 541.5 be amended to provide that the 20-percent nonexempt work tolerance be based on the employee's own time.[220] This change was urged because such a rule is more easily applied than the present rule. In considering a similar proposal in connection with the amendment of sections 541.1, 541.2, and 541.3, I have indicated my belief that the possibility of abuse is so remote, and the benefits to be gained from the provision so great, as to warrant its adoption. The situation for outside salesmen, however, is different. Unlike these other sections, section 541.5 does not contain a salary test, which is an effective test for determining whether an employee is employed in a bona fide executive, administrative or professional capacity. An outside salesman works away from his employer's place of business, typically alone. His exempt work (selling) may be carried on even when the office or plant is closed and does not depend upon the working hours of other employees. If he exceeded the 20-percent allowance for nonexempt work in any week he could easily be required to work additional hours at selling in order to restore the 20-percent relationship. It is my opinion that the possibility of lengthening a salesman's total hours of work in this manner is sufficiently real so that it must be recognized in the regulations. I therefore recommend rejection of the proposal to base the 20-percent tolerance for "outside salesman" on the employee's own hours of work.

The present rule explained in the quotation above seems to me reasonably practicable except in situations where the salesman is the only employee of his employer who performs a certain type of nonexempt work. In such cases it does not appear to be reasonable to base the limitation on the hours customarily worked by employees in other establishments, since the employer cannot be expected to know the practice in other establishments. It should be possible under any rule adopted for the employer to determine the permissible amount of nonexempt work by reference to the time worked by his own employees.

I recommend that the 20-percent nonexempt work limitation be based upon the hours worked by the nonexempt employees of the employer who perform the kind of nonexempt work performed by the outside salesman. If there are no other employees of the employer performing such nonexempt work, the base to be taken will be 40 hours a week. Thus, the amount of nonexempt work allowed in such cases will be 8 hours a week.

---

[219] Stein Report, p. 49.
[220] See, for example, S. L. No. 6, National Beer Wholesalers Association.

#### Work Performed Incidental to and in Conjunction With Sales Work

The proposal in the notice of hearing to relate the nonexempt work to the activities described in the regulations does not present the same kind of problem that was presented in the similar proposals for executive, administrative, and professional employees. The language of the present regulations excluding from the computation of nonexempt work "work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections" was retained under the proposed language. The change in form proposed in the notice of hearing was not intended to change the substance of the regulation. This change was proposed because the suggested language expresses the intent more clearly and also results in consistency in approach between this section of the regulations and the others. A proposal to delete the 20-percent limitation [221] was made but there appears to be no persuasive reason for recommending its adoption.

I recommend that subsection 541.5 (B) be revised to read as follows:

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

#### Obtaining Orders for "Services"

The proposal to revise the definition of "outside salesman" to include persons engaged in obtaining orders or contracts for "services" received the support of industry witnesses generally.[222] Opposition to the change was expressed by a representative of labor who apparently believed it might be applicable to service men.[223] There was no such intention in making the proposal. To avoid misunderstanding it appears advisable to make it clear that inclusion of the word "services" in the regulations is not intended to exempt persons who, in a very loose sense, are sometimes described as selling "services." For example, it does not include "outside buyers" whose exemption as outside salesmen was at one time urged upon the Divisions.[224] It does not include persons such as service men even though they may sell the service which they themselves perform. Selling the service in such cases would be incidental to the servicing rather than the reverse. The addition of the word "services" is intended only to extend the exemption as outside salesmen to employees who sell or take orders for a service, such as window cleaning, which is performed for the customer by someone other than the person taking the order. For example, it is intended that the exemption shall include otherwise exempt outside salesmen who obtain orders for the laundering of the customer's own linens as well as those who obtain orders for the rental of the laundry's linens.

I recommend that section 541.5 of the regulations be amended to

---
[221] Associated Tobacco Manufacturers, transcript, pp. 402–403.
[222] Exhibit No. 7, American Institute of Laundering, contains an exchange of correspondence indicating the nature of the problem leading to the suggested change in language.
[223] Transcript, pp. 1953, 1982–1984.
[224] See Stein Report, pp. 45–46.

81

include within the definition of "outside salesman" persons engaged in obtaining orders or contracts for "services" as well as for the use of facilities for which a consideration will be paid by the client or customer.

## Promotion Men

A number of proposals were made at the hearing that promotion men and others engaged in "indirect sales" be included within the definition of "outside salesmen" under section 541.5 of the regulations. Similar proposals were made in 1940 and were rejected by the presiding officer at that time for reasons stated in his report.[225] The principal reason for rejecting the proposals in 1940 was that these promotion men are not employed for the purpose of making sales. No evidence which would support a different conclusion was developed in the present proceeding. I therefore recommend that the proposals to revise the definition of "outside salesman" to include promotion men within that term should not be adopted. Of course, under the recommended definition of "administrative" (as well as under the present definition), an employee whose primary duty is the performance of responsible promotion work and who meets the other requirements will be exempt.

A proposal also was made that the definition of "outside salesman" be amended to include promotional work among the incidental activities, such as deliveries and collections, which need not be counted in computing the time spent in nonexempt work if they are performed "incidental to and in conjunction with the employee's own outside sales or solicitations."[226] To the extent that it seeks to include as exempt work all activities which are incidental to the employee's own sales, this proposal appears to be unnecessary since any promotional work which is actually performed incidental to and in conjunction with the employee's *own* outside sales or solicitations is clearly exempt work. However, promotional work which is incidental to sales made, or to be made, by someone else cannot be considered as exempt work.

A number of proposals were also presented to revise the definition of "outside saleman" to include persons engaged in certain combinations of sales and promotional work or in certain types of promotional work having some of the characteristics of sales work while lacking others.[227] The types of work involved include activities in borderline areas in which it is difficult to determine whether the work is sales or promotional. Where the work is promotional in nature it is sometimes difficult to determine whether it is incidental to the employee's own sales work.

Typically, the problems presented involve distribution through jobbers (who employ their own salesmen) or through central warehouses of chain-store organizations or cooperative retail buying associations. The difficulty arises when the manufacturer's representative visits the retailer either alone or accompanied by the jobber's salesman. In some instances the manufacturer's representative may sell directly to the retailer; in others, he may urge the retailer to buy from the jobber.

These manufacturer's representatives may perform various types of promotional activities such as putting up displays and posters, re-

[225] Ibid., pp. 46-47.
[226] Associated Tobacco Manufacturers, transcript, pp. 402, 428-432. A similar proposal was made on behalf of the Cigar Manufacturers' Association, transcript, pp. 2019, 2051-2057.
[227] Consolidated Cigar Corporation, transcript, p. 2055; Petroleum Equipment Suppliers Association, transcript, pp. 3521-3522. See also transcript, p. 2912.

moving damaged or spoiled stock from the merchant's shelves or rearranging the merchandise. It seems clear to me that such persons can be considered salesmen only if they are actually employed for the purpose of and are engaged in making sales or obtaining orders or contracts as required by the present regulations. To the extent that they are engaged in promotional activities designed to stimulate sales which will be made by someone else the work must be considered nonexempt. With such variations in the methods of selling and promoting sales each case must be decided upon its facts. In borderline cases the test is whether the person is actually engaged in activities directed toward the consummation of his own sales, at least to the extent of obtaining a commitment to buy from the person to whom he is selling. If his efforts are directed toward stimulating the sales of his company generally rather than the consummation of his own specific sales his activities are not exempt. Incidental promotional activities may be tested by whether they are "performed incidental to and in conjunction with the employee's own outside sales or solicitations" or whether they are incidental to sales which will be made by someone else.

A few illustrations of typical situations will be of assistance in determining whether a particular type of work is exempt or nonexempt under section 541.5 of the regulations. One situation involves a manufacturer's representative who visits the retailer for the purpose of obtaining orders for his employer's product, but transmits any orders he obtains to the local jobber to be filled. Since this representative sells a specific commodity which is the property of the jobber rather than his employer the question has been raised whether he may be said to be engaged in making "sales" within the meaning of section 3 (k) of the act.[228] Applying the test recommended above, it is clear that the employee is performing sales work regardless of the fact that the order is filled by the jobber rather than directly by his own employer. The sale in this instance has been "consummated" in the sense that the salesman has obtained a commitment from the customer.

Another typical situation involves facts similar to those described in the preceding illustration with the difference that the jobber's salesman accompanies the representative of the company whose product is being sold. The order in this instance is taken by the jobber's salesman after the manufacturer's representative has done the preliminary work which may include arranging the stock, putting up a display or poster, and talking to the retailer for the purpose of getting him to place the order for the product with the jobber's salesman. In this instance the sale is consummated by the jobber's salesman. The work performed by the manufacturer's representative is not incidental to sales made by himself and is not exempt work. Moreover, even if in a particular instance the sale is consummated by the manufacturer's representative it is necessary to examine the nature of the work performed by the representative to determine whether his promotional activities are directed toward paving the way for his own present and future sales, or whether they are intended to stimulate the present and future sales of the jobber's salesman. If his work is related to his own sales it would be considered exempt work, while if it is directed

[228] See, for example, transcript, pp. 402, 419–420, 430–433. An amendment proposed by the Associated Tobacco Manufacturers would specifically include as exempt work "making sales * * * whether directly for the account of his employer or an immediate customer of his employer." Transcript, p. 402.

toward stimulating sales by the jobber's representative it must be considered nonexempt work.

Another type of situation involves a representative employed by utility companies engaged in furnishing gas or electricity to consumers. The utility companies contend that these representatives should be exempt as outside salesmen since they are employed for the purpose of "selling" the consumer an increased volume of the product of the utility. This "selling" is accomplished indirectly by persuading the consumer to purchase appliances which will result in a greater use of gas or electricity.[229] Different methods are used by various companies. In some instances the utility representative after persuading the consumer to install a particular appliance may actually take the order for the appliance which is delivered from stock by his employer, or he may forward the order to an appliance dealer who then delivers it. In such cases the sales activity would be exempt, since it is directed at the consummation of a specific sale by the utility representative, the employer actually making the delivery in the one case, while in the other the sale is consummated in the sense that the representative obtains an order or commitment from the customer. In another type of situation the utility representative persuades the consumer to buy the appliance and he may even accompany the consumer to an appliance store where the retailer shows the appliance and takes the order. In such instances the utility representative is not an outside salesman since he does not consummate the sale or direct his efforts toward making the sale himself. Similarly, the utility representative is not exempt as an outside salesman if he merely persuades the consumer to purchase an appliance and the consumer then goes to an appliance dealer and places his order.

Still another type of situation involves the company representative who visits chain stores, arranges the merchandise on shelves, replenishes stock by replacing old with new merchandise, consults with the manager as to the requirements of the store, fills out a requisition for the quantity wanted and leaves it with the store manager to be transmitted to the central warehouse of the chain-store company which later ships the quantity requested. The arrangement of merchandise on the shelves or the replenishing of stock is not exempt work unless it is incidental to and in conjunction with the employee's own outside sales. Since the manufacturer's representative in this instance does not consummate the sale nor direct his efforts toward the consummation of a sale (the store manager often has no authority to buy) this work must be counted as nonexempt.

## VIII. SECTION 541.4. THE DEFINITION OF "LOCAL RETAILING CAPACITY"

The changes which would be made in the definition of "local retailing capacity" if the proposals contained in the notice of hearing were adopted are indicated below.

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee—

---

[229] See the statement and exhibits submitted by the Edison Electric Institute, S. L. No. 111.

84

(A) who customarily and regularly is engaged in
    (1) making retail sales the greater part of which are in intrastate commerce; or
    (2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and
(B) ~~whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees.~~ *who does not devote more than 8 hours in the workweek to work which is not described in subsection (A) (1) or (A) (2) above.*

The only changes which would be accomplished if the revised language were adopted are (1) the substitution of an 8-hour weekly limit on nonexempt work for the present 20 percent; and (2) the elimination of the phrase "work of the same nature as that performed by nonexempt employees," and the substitution of a phrase describing nonexempt work in terms of the making of retail sales and the work immediately incidental thereto. These proposed changes are similar to the changes proposed in the notice of hearing in connection with the other sections of the regulations.

### The Nonexempt Work Limitation

The adoption of the proposal to limit nonexempt work to 8 hours a week is not recommended for the same reasons that adoption of the similar proposals in connection with the other sections of the regulations is not being recommended. However, I recommend adoption of the proposal to substitute the phrase "work which is not described in subsection (A) (1) and (A) (2) above" for the phrase "work of the same nature as that performed by nonexempt employees." This recommended change does not affect the substance of the definition of "local retailing capacity" but revises the form of the definition to make it clear and to bring it into conformity with the form recommended for the other definitions.

I also recommend that the basis for computing the 20 percent for employees employed in a local retailing capacity be the same as for outside salesmen, discussed above. This recommendation is intended to provide a more practicable base for determining the permissible amount of nonexempt work in situations where the local retailing employee is the only one of the employer's employees who performs a certain type of nonexempt work. As in the case of outside salesmen, the possibility of lengthening the total hours of work of a local retailing employee in order to allow a greater amount of nonexempt work is sufficiently real so that I cannot recommend the adoption of a provision to base the nonexempt work tolerance on the employee's own time.

The 20-percent limitation on nonexempt work will be computed on the basis of the hours worked by the nonexempt employees of the employer who perform the same kind of nonexempt work as that performed by the local retailing employee. In cases where the employer has no other employees performing such nonexempt work, 40 hours a week will be taken as the base and the amount of nonexempt work allowed will be 8 hours a week. Accordingly, I recommend that subsection 541.4 (B) be revised to read as follows:

whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the number of hours worked in the workweek by nonexempt employees of the employer.

### Employees Making Retail Sales of "Services"

A proposal was made at the hearing that the definition of "local retailing capacity" be revised to extend the exemption to employees engaged in making retail sales of "services" as well as commodities. It was the purpose of this proposal to extend the exemption to employees such as counter clerks in establishments accepting clothing for cleaning and pressing. These persons, according to the witness making the proposal, are engaged in selling a dry-cleaning service. It was contended that such persons are employed in a bona fide local retailing capacity just as much as if they were selling a tangible commodity. It was proposed that the change be effected by inserting the words "of commodities or services" in subsection 541.4 (A) (1), so that the subsection would read "in making retail sales of commodities or services." [230]

It is difficult to distinguish in principle between a clerk in a store selling commodities and one in a local dry-cleaning establishment, for example, engaged in selling the employer's "service" of cleaning and pressing. The proposal therefore appears to have merit. I am advised by the Office of the Solicitor of the Department of Labor, however, that the adoption of the proposal is beyond the authority of the Administrator to define and delimit the term "employee employed in a bona fide * * * local retailing capacity." In section 13 (a) (2), the Congress provided exemption for employees in "retail or service" establishments. Thus, I am advised, where it was intended that exemption extend to both "retail" and "service," both words were used. Since, in section 13 (a) (1) the Congress used only the word "retailing," the Administrator is without authority to add "servicing." I therefore recommend that the proposal be rejected.

## IX. MISCELLANEOUS PROBLEMS

A variety of proposals in addition to those discussed above were made at the hearing. These are not discussed in this report because of the necessity of keeping it within reasonable limits. Each of these proposals, however, was given very careful consideration before the decision was finally made not to recommend its adoption. Some of these proposals were clearly outside the scope of the Administrator's authority to define and delimit the term "any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman." One of them, for example, would have permitted the employer and employee to agree between themselves as to whether the exemption applied. [231] Another would exempt all employees who do not work under direct supervision. [232] Other proposals were made to exempt some industries from the salary requirement. [233] These are of doubtful validity and would have been discriminatory. Others, like a proposal to adopt the defini-

[230] National Institute of Cleaning and Dyeing, transcript, p. 1667.
[231] Transcript, p. 1716.
[232] S. L. No. 69.
[233] Transcript, pp. 1660, 2181.

tions given in the "Dictionary of Occupational Titles" issued by the United States Employment Service, were impracticable.[234]

One type of proposal, made by representatives of two different industries, was not supported by sufficient information to enable me to make a recommendation, but I consider it of sufficient interest and merit to warrant further study and consideration. This is the proposal to set up advisory committees for industries presenting special problems under section 13 (a) (1) of the act.[235] These committees, according to the proponents, because of their familiarity with the industries would be able to advise the Administrator on special industry problems. I am calling this proposal to the attention of the Administrator as one which is worthy of further consideration.

**"Tacking" of Exempt Work**

The question of combination exemptions under section 13 (a) (1) of the act needs clarification. In the recommendations made above nonexempt work is defined in terms of its relationship to the executive, administrative, professional, local retailing or outside sales functions. For example, in the recommended definition of "executive" it is work which is "not directly and closely related to the performance of the work described in subsections (A) through (D)" of that definition. A question was raised by several witnesses as to whether it was intended by this approach to consider as nonexempt under one section of the regulations work which is exempt under another section. It was suggested that provision be made for "tacking" or combining work which is exempt under one section of the regulations with work which is exempt under another section to allow the exemption to apply.[236]

The Divisions' position under the present regulations permits the "tacking" of exempt work under one section of the regulations to exempt work under another, so that a person who, for example, performs a combination of executive and professional work may qualify for exemption. The recommended revisions are not intended to prevent such combination exemptions. There appears to be no reason why an employee who spends part of his time in executive work, for example, and part in administrative, professional or outside sales work or work in a local retailing capacity, should not qualify for exemption provided that he meets the stricter of the requirements on salary and nonexempt work.

For instance, an employee who devotes half of his time to work meeting the requirements of section 541.1 of the regulations defining "executive" and the other half to work which is "administrative" in nature under the regulations would qualify for exemption if he meets the $75 a week test, which is the higher of the two salary requirements. Similarly, if the employee performs a combination of an executive's and an outside salesman's functions (regardless of which occupies most of his time) he must meet the salary requirement for executives ($55 a week). Also, the total hours of nonexempt work under the definition of "executive" together with the hours of work which would not be exempt if he were clearly an outside salesman, must not exceed either 20 percent of his own time or 20 percent of the "hours

[234] Transcript, p. 944.
[235] National Association of Radio Broadcasters, transcript, pp. 2821–2823; and National Association of Mutual Savings Banks, transcript, pp. 3275–3276.
[236] See, for example, transcript, pp. 120–122, 1779–1780, 1945, 2179–2180, 2258; and S. L. No. 126. See also statements of the National Beer Wholesalers Association of America, Inc., S. L. No. 6; National Council of Private Motor Truck Owners, Inc., S. L. No. 3; Standard Brands, Inc., S. L. No. 57.

worked 'in the workweek by the nonexempt employees of the employer," whichever is the smaller amount.

Under these principles combinations of exemptions under the other sections of the regulations are also permissible. In short, under the revised regulations, work which is "exempt" under one section of the regulations will not defeat the exemption under any other section.

**Need for an Explanatory Bulletin**

Reference has been made in this report to an explanatory bulletin or an "official explanation" to be issued in connection with the regulations. Explanation or clarification of various portions of the regulations was suggested by many witnesses in the course of the hearing.[287] Some witnesses showed a lack of familiarity with rulings made by the Divisions and a lack of knowledge of how the Divisions applied the regulations in certain kinds of cases.[288] The issuance of such explanatory material has been repeatedly urged by the Divisions' regional directors who believe that it would be of great value not only to employers and employees but also to the Divisions' field staff. It is also clear that the material in the report of the presiding officer in 1940 (the Stein Report), which has been the Divisions' explanatory bulletin on these regulations, needs revision in the light of the Divisions' rulings and the court decisions since its issuance. If the recommendations made above with respect to revisions in the regulations are adopted, it will be necessary to issue material illustrating their application in various situations. The issuance of some explanatory material is also essential in order to give effect to certain recommendations made in this report which do not involve changes in the language of the regulations, but are based on the meaning to be given the terms used in the regulations.

I recommend that simultaneously with the final action taken on the recommendations in this report the Divisions issue a bulletin explaining and illustrating the meaning of the terms used in the regulations, and containing, among other things, the material included in this report. I also recommend that this report be designated as the official interim explanation of the regulations if it does not prove practicable to issue such a bulletin simultaneously with the regulations.

# X. RECOMMENDED REGULATIONS

I recommend the adoption of the following regulations together with the interpretations set forth in this report:

**Section 541.1. Executive**

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof; *and*

(B) who customarily and regularly directs the work of two or more other employees therein; *and*

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as

---

[287] See, for example, transcript, pp. 562, 679, 1129, 1177, 1441, 2226, 2766, 3134–3135. See also S. L. No. 85.
[288] For example, see transcript, pp. 3675–3676, 3678–3679.

88

to the advancement and promotion o: any other change of status of other employees will be given particular weight; *and*

(D) who customarily and regularly exercises discretionary powers; *and*

(E) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subsections (A) through (D) above; provided that this subsection (E) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment, or who owns at least a 20-percent interest in the enterprise in which he is employed; *and*

(F) who is compensated for his services on a salary basis at a rate of not less than $55 per week (or $30 per week if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

*Provided,* That an employee who is compensated on a salary basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all of the requirements of this section.

### Section 541.2. Administrative

The term "employee employed in a bona fide * * * administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers; *and*

(B) who customarily and regularly exercises discretion and independent judgment; *and*

(C) (1) who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), *or*

(2) who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, *or*

(3) who executes under only general supervision special assignments and tasks; *and*

(D) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subsections (A) through (C) above; *and*

(E) who is compensated for his services on a salary or fee basis at a rate of not less than $75 per week (or $200 per month if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities:

*Provided,* That an employee who is compensated on a salary or fee basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of office or nonmanual field work directly related to management policies or general business operations of his employer or his employer's customers, which includes work requiring the exercise of

89

discretion and independent judgment, shall be deemed to meet all of the requirements of this section.

### Section 541.3. Professional

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the performance of work—

(1) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes, *or*

(2) original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee; *and*

(B) whose work requires the consistent exercise of discretion and judgment in its performance; *and*

(C) whose work is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work) and is of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; *and*

(D) who does not devote more than 20 percent of his hours worked in the workweek to activities which are not an essential part of and necessarily incident to the work described in subsections (A) through (C) above; *and*

(E) who is compensated for his services on a salary or fee basis at a rate of not less than $75 per week (or $200 per month if employed in Puerto Rico or the Virgin Islands) exclusive of board, lodging, or other facilities: *Provided*, That this subsection (E) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof:

*Provided*, That an employee who is compensated on a salary or fee basis at a rate of not less than $100 per week (exclusive of board, lodging, or other facilities), and whose primary duty consists of the performance of work *either* requiring knowledge of an advanced type in a field of science or learning, which includes work requiring the consistent exercise of discretion and judgment, *or* in a recognized field of artistic endeavor, which includes work requiring invention, imagination, or talent, shall be deemed to meet all of the requirements of this section.

### Section 541.4. Local retailing capacity

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who customarily and regularly is engaged in—

(1) making retail sales the greater part of which are in intrastate commerce, *or*

(2) performing work immediately incidental thereto, such as the wrapping or delivery of packages; *and*

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer.

### Section 541.5. Outside salesman

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in—

(1) making sales within the meaning of section 3 (k) of the act, or

(2) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above do not exceed 20 percent of the hours worked in the workweek by nonexempt employees of the employer: *Provided,* That work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

### Section 541.6. Petition for amendment of regulations

Any person wishing a revision of any of the terms of the foregoing regulations may submit in writing to the Administrator a petition setting forth the changes desired and the reasons for proposing them. If, upon inspection of the petition, the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provision for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes. In determining such future regulations, separate treatment for different industries and for different classes of employees may be given consideration.

# APPENDIX I

NOTICE OF HEARING ON PROPOSED AMENDMENTS TO PART 541 OF
REGULATIONS WITH RESPECT TO THE DEFINITION OF THE TERMS
"EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL, OR LOCAL RETAIL-
ING CAPACITY, OR • • • OUTSIDE SALESMEN" AS THEY AFFECT
EMPLOYEES COVERED BY THE PROVISIONS OF THE FAIR LABOR
STANDARDS ACT

WHEREAS, Section 13 (a) (1) of the Fair Labor Standards Act, as amended,
provides that the provisions of Section 6 and Section 7 of the Act shall not apply
to any employee "employed in a bona fide executive, administrative, professional,
or local retailing capacity, or in the capacity of outside salesman (as such
terms are defined and delimited by regulations of the Administrator)"; and

WHEREAS, the Administrator of the Wage and Hour Division, on October 15,
1940, issued Part 541 of Chapter V, Title 29, Code of Federal Regulations, as
amended (5 F. R. 4077), entitled "Regulations Defining and Delimiting the Terms
Any Employee Employed in a Bona Fide Executive, Administrative, Profes-
sional, or Local Retailing Capacity, or in the Capacity of Outside Salesman"
pursuant to Section 13 (a) (1) of the Fair Labor Standards Act of 1938 (52
Stat. 1060); and

WHEREAS, it appears advisable, in the light of the experience of the Divisions
in the application of these regulations and because of changes in economic con-
ditions which have taken place since their issuance, to consider amendments to
the regulations which will more effectively carry out the purposes of the exemp-
tions provided in Section 13 (a) (1); and

WHEREAS, a petition has been filed by the United Electrical Radio & Machine
Workers of America pursuant to Section 541.6 of the regulations, for amendment
of Sections 541.1, 541.2, and 541.3 of the regulations to require that an employee
must be compensated for his services on a salary or fee basis at a rate of not
less than $500 per month (exclusive of board, lodging, and other facilities) in
order to qualify as an executive, administrative, or professional employee;

Now, THEREFORE, notice is hereby given of public hearing to be held beginning
on Tuesday, December 2, 1947, at 10 a. m. in the Departmental Auditorium, Con-
stitution Avenue, between Twelfth and Fourteenth Streets NW., Washington,
D. C., before a representative to be designated by the Administrator, at which
interested persons will be heard on the following questions:

1. What, if any changes should be made in the provisions contained in subsec-
tions 541.1 (E), 541.2 (A), and 541.3 (B) of the regulations with respect to
salary criteria for exemption as executive, administrative, and professional
employees?

2. Should the following proposed amendments to Regulations Part 541 be
adopted?

(a) Amend subsection 541.1 (F) of the regulations to read as follows:

"(F) Who does not devote more than 8 hours in the workweek to work which
is not an integral part of the functions described in subsections (A) through
(D) above; provided that this subsection shall not apply in the case of an em-
ployee who is in sole charge of an independent establishment or a physically
separated branch establishment, or who is an officer and shareholder owning at
least 20 percent of the outstanding shares of the enterprise in which he is
employed.

(b) Amend Section 541.2 by deleting subsection 541.2 (B) (4) which reads:

"(4) Who is engaged in transporting goods or passengers for hire and who
performs, under only general supervision, responsible outside work of a spe-
cialized or technical nature requiring special training, experience, or knowl-
edge, and whose duties require the exercise of discretion and independent
judgment."

(c) Amend subsection 541.2 (B) (2) to read as follows:

(2) who performs under only general supervision, responsible office or non-manual field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(d) Amend section 541.2 by adding a new subsection "C" as follows:

(C) and who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (B) (1), (B) (2) and (B) (3) of this section.

(e) Amend subsection 541.3 (A) (4) to read as follows:

(4) who does not devote more than 8 hours in the workweek to work which is not an integral part of the functions described in subsections (A) (1), (2), (3), and 5 (a) or (b) of this section.

(f) Amend subsection 541.4 (B) to read as follows:

(B) who does not devote more than 8 hours in the workweek to work which is not described in subsections (A) (1) or (A) (2) above.

(g) Amend subsection 541.5 (A) (2) to read as follows:

(2) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer, and

(h) Amend subsection 541.5 (B) to read as follows:

(B) whose hours of work of a nature other than that described in subsections (A) (1) or (A) (2) above, do not exceed 8 hours in the workweek; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be included in computing the 8 hours.

3. What, if any, other amendments should be made in Regulations Part 541? Interested persons are invited to present evidence as to the need for revision or definition of any of the terms used in the regulations, particularly with respect to the following:

1—"primary duty" as used in subsection 541.1 (A).
2—"a customarily recognized department or subdivision thereof" as used in subsection 541.1 (A).
3—"sole charge" as used in subsection 541.1 (F).
4—"a physically separated branch establishment" as used in subsection 541.1 (F).
5—"salary basis" and "salary or fee basis" as used in subsections 541.1 (E), 541.2 (A) and 541.3 (B).
6—"general business operations" as used in subsections 541.2 (B) (2) and 541.2 (B) (3).

All persons wishing to be heard shall file with the Administrator, Wage and Hour Division, United States Department of Labor, Washington 25, D. C., not later than November 20, 1947, notice of intention to appear which shall contain the following information:

1. Name and address of the person appearing.
2. If such person is appearing in a representative capacity, the name and address of the persons or organizations he is representing.
3. The branch of industry in which he is interested.
4. The particular sections of the regulations or the proposed amendments on which he proposes to testify.
5. If he proposes to appear in support of any amendment not proposed in this notice, the general nature and purpose of such suggested amendment.
6. The approximate length of time requested for his presentation.

In the event that a large number of persons indicate a desire to be heard and it appears that the hearing will extend over a considerable period of time, persons scheduled to testify will be notified through the mails of the approximate date and time set aside for their appearance.

Written statements may be filed in lieu of personal appearances at any time before the date of the hearing.

Signed at Washington, D. C., this 16th day of October 1947.

/s/ Wm. R. McComb,
Wm. R. McComb, *Administrator,*
*Wage and Hour Division,*
*United States Department of Labor.*

Published in Federal Register October 22, 1947.

# APPENDIX II

## PRESENT REGULATIONS

### Section 541.1. Executive

The term "employee employed in a bona fide executive * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) whose primary duty consists of the management of the establishment in which he is employed or of a customarily recognized department or subdivision thereof, and

(B) who customarily and regularly directs the work of other employees therein, and

(C) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular weight, and

(D) who customarily and regularly exercises discretionary powers, and

(E) who is compensated for his services on a salary basis at not less than $30 per week (exclusive of board, lodging, or other facilities), and

(F) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by the nonexempt employees under his direction; provided that this subsection (F) shall not apply in the case of an employee who is in sole charge of an independent establishment or a physically separated branch establishment.

### Section 541.2. Administrative

The term "employee employed in a bona fide * * * administrative * * * capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities), and

(B) (1) who regularly and directly assists an employee employed in a bona fide executive or administrative capacity (as such terms are defined in these regulations), where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment; or

(2) who performs under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or

(3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operations involving the exercise of discretion and independent judgment; or

(4) who is engaged in transporting goods or passengers for hire and who performs, under only general supervision, responsible outside work of a specialized or technical nature requiring special training, experience, or knowledge, and whose duties require the exercise of discretion and independent judgment.

### Section 541.3. Professional

The term "employee employed in a bona fide * * * professional * * * capacity" in section 13 (a) (1) of the act shall mean any employee who is—

(A) engaged in work—

(1) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and

(2) requiring the consistent exercise of discretion and judgment in its performance, and

(3) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and

94

(4) whose hours of work of the same nature as that performed by non-exempt employees do not exceed 20 percent of the hours worked in the workweek by the nonexempt employees; provided that where such nonprofessional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and

(5) (a) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes; or

(b) predominantly original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training, and the result of which depends primarily on the invention, imagination, or talent of the employee, and

(B) who is compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities); provided that this subsection (B) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof.

## Section 541.4. Local retailing capacity

The term "employee employed in a bona fide * * * local retailing capacity" in section 13 (a) (1) of the act shall mean any employee—

(A) who customarily and regularly is engaged in

(1) making retail sales the greater part of which are in intrastate commerce; or

(2) performing work immediately incidental thereto, such as the wrapping or delivery of packages, and

(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees.

## Section 541.5. Outside salesman

The term "employee employed * * * in the capacity of outside salesman" in section 13 (a) (1) of the act shall mean any employee—

(A) who is employed for the purpose of and who is customarily and regularly engaged away from his employer's place or places of business in

(1) making sales within the meaning of section 3 (k) of the act; or

(2) obtaining orders or contracts for the use of facilities for which a consideration will be paid by the client or customer, and

(B) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 percent of the number of hours worked in the workweek by such nonexempt employees; provided that work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall not be regarded as nonexempt work.

## Section 541.6. Petition for amendment of regulations

Any person wishing a revision of any of the terms of the foregoing regulations may submit in writing to the Administrator a petition setting forth the changes desired and the reasons for proposing them. If, upon inspection of the petition, the Administrator believes that reasonable cause for amendment of the regulations is set forth, the Administrator will either schedule a hearing with due notice to interested parties, or will make other provision for affording interested parties an opportunity to present their views, either in support of or in opposition to the proposed changes. In determining such future regulations, separate treatment for different industries and for different classes of employees may be given consideration.

# APPENDIX III

## DEFINITIONS OF "SUPERVISOR" AND "PROFESSIONAL EMPLOYEE" LABOR MANAGEMENT RELATIONS ACT, 1947 (TAFT-HARTLEY ACT)

Sec. 2. When used in this Act—

* * * (11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

(12) The term "professional employee" means—

(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the exercise of such authority is not accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes, or

(b) any employee, who (1) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

# APPENDIX IV

## APPEARANCES

Personal appearances were made on behalf of the following:

Agricultural Producers Labor Committee of California and Arizona.
Allegheny Ludlum Steel Corp.
Allen & Morris.
American Bankers Association.
American Butter Institute.
American Coal Sales Association.
American Cotton Manufacturers Association.
American Federation of Labor.
American Federation of Radio Artists, AFL.
American Institute of Accountants.
American Institute of Laundering.
American Library Association.
American Life Convention.
American Locomotive Co.
American Merchant Marine Institute, Inc.
American Mutual Alliance.
American National Retail Jewelers Association.
American Newspaper Guild, CIO.
American Newspaper Publishers Association.
American Nurses Association.
American Steel Foundries.
American Trucking Association, Inc.
American Warehousemen's Association, Merchandise Division.
American Window Glass Co.
Associated Industries of Missouri.
Associated Tobacco Manufacturers.
Association of American Ship Owners.
Association of Buying Offices, Inc.
Aviation Manufacturing Corp., The Lycoming Division.
Bell Aircraft Corp.
Bendix Aviation Corp.
Bicycle Institute of America, Inc.
Boeing Aircraft Co.
Borg-Warner Corp.
Burdman Auto Parts, Inc.
Central Pennsylvania Coal Producers' Association.
Cigar Manufacturers Association of America, Inc.
Colorado & Denver Dairy Products Association.
Commerce & Industry Association of New York, Inc.
Communications Workers of America.
Consolidated Vultee Aircraft Corp.
Corning Glass Works.

Cotton Textile Institute, Narrow Fabrics Division.
Crucible Steel Co. of America.
Curtiss-Wright Corp.
Delta Drilling Co.
Douglas Aircraft Co., Inc.
Douglas-Guardian Warehouse Corp.
Drilling & Exploration Co.
Engineers & Salaried Employees Association.
Fairchild Aircraft.
Food, Tobacco, Agricultural, and Allied Workers Union of America, CIO.
Gerber Products Co.
Glenn L. Martin Co.
Goodyear Tire & Rubber Co.
Hawaiian Sugar Planters Association.
Heating, Piping & Air Conditioning Contractors National Association.
Illinois Dairy Products Association.
Independent Unions of the State of New Jersey.
Indianapolis Chamber of Commerce (Manufacturer's Committee).
Institute of Cooking & Heating Appliance Manufacturers.
Institute of Distribution.
International Apple Association.
International Brotherhood of Electrical Workers, AFL.
International Brotherhood of Teamsters and Chauffeurs, AFL.
International Federation of Technical Engineers, Architects, and Draftsmen's Unions, AFL.
International Ladies Garment Workers Union, AFL.
International Longshoremen's and Warehousemen's Union, CIO
Iowa Creamery Butter Manufacturers Association.
Jersey City Tobacco Co.
Kansas Butter Institute.
Kansas City Chamber of Commerce.
Life Insurance Association of America.
Limited Price Variety Stores Association.
Lockheed Aircraft Corp.
Mail Order Association of America.
Manufacturers' Association of Connecticut, Inc.
Manufacturers Protective and Development Association.
Mesta Machine Co.

97

Mid-Continent Oil & Gas Association.
Missouri Butter & Cheese Institute.
Moore Electric Co., Inc.
Motor & Equipment Wholesalers' Association.
National-American Wholesale Lumber Association.
National Association of Bedding Manufacturers.
National Association of Broadcast Engineers and Technicians.
National Association of Broadcasters.
National Association of Cotton Manufacturers.
National Association of Furniture Manufacturers.
National Association of Manufacturers.
National Association of Motor Bus Operators.
National Association of Mutual Savings Banks.
National Association of Refrigeration Contractors.
National Association of Retail Clothiers and Furnishers.
National Association of Shoe Chain Stores.
National Association of State Chambers of Commerce.
National Association of Tobacco Distributors.
National Association of Wholesalers, Inc.
National Canners Association.
National Cheese Institute.
National Coal Association.
National Cotton Compress & Cotton Warehouse Association, Inc.
National Editorial Association.
National Federation of Salaried Unions.
National Furniture Warehousemen's Association.
National Institute of Cleaning & Dyeing.
National League of Wholesale Fresh Fruit and Vegetable Distributors.
National Lumber Manufacturers Association.
National Petroleum Association.
National Ready Mixed Concrete Association.
National Retail Dry Goods Association.
National Retail Farm Equipment Association.
National Retail Furniture Association.
National Retail Hardware Association.
National Sand & Gravel Association.
National Shoe Retailers Association.
National Society of Professional Engineers.
National Tool & Die Manufacturers Association.
National Wall Paper Wholesalers' Association.
National Wholesale Druggists' Association.
National Wholesale Furniture Association.
Nebraska Butter Institute.

Nebraska Small Business Men's Association.
New York Shipping Association.
New York State Publishers' Association.
North American Aviation, Inc.
Northrop Aircraft, Inc.
Office Employees International Union, AFL.
Ohio Chamber of Commerce.
Ohio Coal Association.
Ohio Dairy Products Association.
Oklahoma Butter Institute.
Oregon Creamery Manufacturers Association.
Pacific American Steamship Association.
Pennsylvania Newspaper Publishers' Association.
Petroleum Equipment Suppliers Association.
Piper Aircraft Corp.
Pittsburgh Clearing House Association.
Pittsburgh Reflector Co.
Publishers Bureau of New Jersey, Inc.
Ranger Aircraft Co.
Reliance Life Insurance Co.
Republic Aviation Corp.
Retail Credit Institute of America.
Rochester Ropes, Inc.
Rowan Drilling Co.
Service Machine Co.
Shellmar Products Corp.
South Dakota Dairy Association.
Special Libraries Association.
Sperry Gyroscope Co., Inc.
Standard Oil Co. (Ohio).
St. Joseph Lead Co.
St. Louis Chamber of Commerce.
Telephone Workers Organizing Committee, CIO.
Texas Dairy Products Association.
Texas Manufacturers Association.
Tidewater Field Warehouses, Inc.
Tugman, Edgar A.
Underwear Institute.
United Aircraft Corp.
United Automobile, Aircraft & Agricultural Implement Workers of America, CIO.
United Electrical, Radio & Machine Workers of America, CIO.
United Fresh Fruit & Vegetable Association.
United Mine Workers of America.
United Office and Professional Workers of America, CIO.
U. S. Independent Telephone Association.
U. S. Wholesale Grocers' Association, Inc.
Utility Co-Workers' Association.
Western Pennsylvania Coal Operators Association.
Western Petroleum Refiners' Association.
Weston Electrical Instrument Corp.

Wholesale Dry Goods Institute.
Wisconsin Creameries Association.

Women's Bureau, U. S. Department of Labor.

Statements in lieu of personal appearance were filed on behalf of the following:

Afro-American Newspapers.
Amalgamated Clothing Workers of America, CIO.
American Association of Schools and Departments of Journalism.
American Bakers Association.
American Sugar Cane League.
American Council on Education for Journalism.
American Institute of Architects, The
American Mining Congress.
American Paper and Pulp Association.
American Pulpwood Association.
American Screw Co.
American Society of Civil Engineers.
Animal Health Institute.
Architectural and Engineering Guild, AFL—Local 66.
Associated Cigar Box Manufacturers of America, Inc.
Associated Equipment Distributors.
Associated General Contractors of America, Inc., The.
Association of Motion Picture Producers, Inc., The.
Bartlett State Bank.
Billings Gas Co.
Bobrich Manufacturing Co.
Bristol Co., The.
Bristol-Myers Co.
Broken Bow State Bank.
Brooklyn Chamber of Commerce.
Business Advisory Council for the Department of Commerce.
Butler Specialty Co.
Chamber of Commerce of Philadelphia.
Chamber of Commerce of Puerto Rico.
Chamber of Commerce of the United States.
Chicago Association of Commerce and Industry, The.
Cinder Block, Inc. of Roanoke.
Coating Materials Inc.
Coleman Co., Inc., The.
Commercial Furniture Co.
Continental Baking Co.
Copperweld Steel Co.
Corset and Brassiere Association of America, Inc.
Courier-Journal Job Printing Co., Inc.
Cravath, Swaine & Moore.
Credit Bureau, The.
Crosman, Ralph L.
Douglas Printing Co.
Duncan Coffee Co.
Eastern Machine Screw Corp., The.
Edison Electric Institute.
Electrical Facilities, Inc.
Evaporated Milk Association.
Fairmont Canning Co.
Falls City Creamery Co.
Foster Motor Co.

Frisch, Norman H.
General Electric Co.
Geometric Tool Co., The.
Gilbert Co., The A. C.
Great Northern Paper Co.
Hammond Chamber of Commerce, The.
H. J. Heinz Co.
Ideal School Supply Co.
Illinois Manufacturers' Association.
Industrial Advisors Bureau, Inc.
Inland Daily Press Association.
Instant Products Manufacturing Co., The.
International Association of Ice Cream Manufacturers.
International Federation of Technical Engineers, Architects and Draftsmen's Union, AFL—Local 119.
Johnson Co., E. J.
Johnson, Wilmer G.
Lennox Furnace Co., The.
Lewis-Leidersdorf Co.
Linen Supply Association of America.
Los Angeles Editorial Association, AFL.
Manufacturers Association of New Haven County, The.
McClean, C. M.
Milk Industry Foundation.
Mott, Frank L.
National-American Wholesale Grocers' Association
National Beer Wholesalers Association of America, Inc.
National Candy Wholesalers Association, Inc.
National Cooperative Milk Producers Federation.
National Council of Private Motor Truck Owners, Inc., The.
National Dehydrators Association.
National Door Manufacturers Association.
National Fisheries Institute, Inc.
National Knitted Outerwear Association.
National Livestock Exchange, The.
National Retail Tea & Coffee Merchants Association.
Natural Gas Pipeline Co. of America.
Negro Newspaper Publishers Association.
New England Shoe and Leather Association.
Norfolk Daily News, The.
Northern Natural Gas Co.
Northwest Packers & Growers, Inc.
Northwestern Mutual Life Insurance Co. of Milwaukee, The.
Ohio Oil Co.
Olin Industries, Inc.
Pacific Gamble Robinson Co.
Paxton & Vierling Iron Works.

99

Peet Packing Co.
Penn Hardware Co.
Pennsylvania Salt Manufacturing Co. of Washington.
Pineapple Growers Association of Hawaii.
Pittsburgh Plate Glass Co.
Pollaci, Jr., Edward H.
Porcelain Products, Inc.
Printing Industry of America, Inc., The Industrial Relations Section.
Protective Coating Corp.
Pullman Couch Co.
Puritan Co., Inc.
Purity Bakeries Corp.
Pyrites Co., Inc., The.
Radio Writers Guild of the Authors League of America, Inc., The.
Refinite Corp., The.
Rheem Manufacturing Co.
Robert E. Schweser Co.
Roberts Dairy Co.
Rockwell Manufacturing Co.
Scott Foot Appliance Co.

Security State Bank.
Southern Coal Producers' Association.
Southern Sash and Door Jobbers Association.
St. Croix Paper Co.
Standard Brands, Inc.
Textile Fabrics Association.
Textile Workers Union of America, CIO.
Thayer County Bank.
Turpin, Dick.
Turpin, Gerry.
United Electrical, Radio and Machine Workers of America, CIO, Salaried Unit—Local 710.
Universal Leaf Tobacco Co., Inc.
U. S. Department of Agriculture.
U. S. Department of the Air Force.
Virginia Road Builders Association.
Ward Baking Co.
Watertown Manufacturing Co., The.
Wilson, Maddison & Co.
Wholesalers' Food Institute of Iowa.
Woodwork Jobbers Service Bureau.