**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

STATE OF NEVADA, *et al.*,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF LABOR,
    *et al.*,

                Defendants.

No. 4:16-CV-731-ALM
LEAD

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' EXPEDITED MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

RESPONSE TO BUSINESS PLAINTIFFS' STATEMENT OF ISSUES ................................... 2

BACKGROUND ................................................................................................................... 2

RESPONSE TO BUSINESS PLAINTIFFS' STATEMENT OF MATERIAL FACTS ................ 3

LEGAL STANDARD ............................................................................................................. 8

ARGUMENT ........................................................................................................................ 9

I.     The Final Rule is Entitled to *Chevron* Deference and Must be Upheld ............................. 9

     A.     The Salary Level Test is Consistent With the Statutory Test and Purpose .......... 11

     B.     The Final Rule Salary Level Test is Reasonable and Must be Upheld ................. 15

     C.     The Automatic Updating Component is Entitled to *Chevron* Deference ............. 26

II.     The Rule's Automatic Updating Component is Procedurally Sound ................................ 30

III.     Plaintiffs' Remaining Claims Lack Merit ...................................................................... 34

     A.     The Department Thoroughly Explained the Change It Made to the Salary Level Test, Which Did Not Reverse Longstanding Policy .................................... 35

     B.     The Rule Responded to Concerns of the Business Community ........................... 35

     C.     The Agency's Decision Regarding Bonus Compensation is Entitled to Deference ............................................................................................................. 38

CONCLUSION .................................................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*10 Ring Precision v. Jones*,
    722 F.3d 711 (5th Cir. 2013) ................................................................. 33

*Alvarado Parkway Inst., Inc. v. Mendez*,
    789 F. Supp. 1190 (D.D.C. 1992) .......................................................... 12

*Am. Petroleum Inst. v. E.P.A.*,
    661 F.2d 340 (5th Cir. 1981) ................................................................. 32

*Assoc. Builders & Contractors of Texas, Inc. v. Nat'l Labor Relations Bd.*,
    826 F.3d 215 (5th Cir. 2016) ................................................................. 15

*Auer v. Robbins*,
    519 U.S. 452 (1996) ...................................................................... 14, 29

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ............................................................................... 11

*BNSF Ry. Co. v. United States*,
    775 F.3d 743 (5th Cir. 2015) ................................................................. 10

*Buckner v. Armour & Co.*,
    53 F.Supp. 1022 (N.D. Tex. 1942) ........................................................ 13

*Caritas Med. Ctr. v. Johnson*,
    603 F. Supp. 2d 81 (D.D.C. 2009) ........................................................ 36

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................... 1

*Chevron U.S.A. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984) .................................................................. 14, 15, 27

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ........................................................................... 9

*ConocoPhillips Co. v. U.S. EPA*,
    612 F.3d 822 (5th Cir. 2010) ................................................................. 10

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) ................................................................. 27

*Delta Foundation, Inc. v. United States*,
    303 F.3d 551 (5th Cir.2002) .................................................................. 36

*Devoe v. Atlanta Paper Co.*,
   40 F.Supp. 284 (N.D. Ga. 1941) ........................................................................ 13

*Encino Motorcar, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ............................................................................... 31, 32

*F.D.A. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...................................................................................... 30

*Fanelli v. U.S. Gypsum Co.*,
   141 F.2d 216 (2d Cir. 1944) ............................................................................. 14

*Gaughf Props., L.P. v. C.I.R.*,
   738 F.3d 415 (D.C. Dir. 2013) ......................................................................... 40

*Handley v. Chapman*,
   587 F.3d 273 (5th Cir. 2009) ........................................................................... 34

*Harris v. United States,*
   19 F.3d 1090 (5th Cir. 1994) ........................................................................... 35

*Hasie v. Office of Comptroller of Currency*,
   No. 5:07-CV-208-C, 2008 WL 4549881  (N.D. Tex. May 9, 2008) ........................................ 8

*Hayward v. U.S. Dep't of Labor*,
   536 F.3d 376 (5th Cir. 2008) ....................................................................... 16, 25

*Home Care Ass'n of Am. v. Weil*,
   799 F.3d 1084 (D.C. Cir. 2015) ....................................................................... 27

*Hunt v. Wash. State Apple Advertising Comm'n*,
   432 U.S. 333 (1977) ..................................................................................... 10

*Krill v. Arma Corp.*,
   76 F.Supp. 14 (E.D.N.Y. 1948) ......................................................................... 14

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ................................................................................. 15, 27

*Lujan v. Defenders of Wildlife*,
   504 U.S 555 (1992). ..................................................................................... 10

*Mayo Found. for Med. Educ. & Research v. United States*,
   131 S. Ct. 704 (2011) ................................................................................... 40

*Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ............................................................................ 9

*Morris v. McComb*,
    332 U.S. 422 (1947) ................................................................................................. 13

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................... 29

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ................................................................................................. 12

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
    538 U.S. 803 (2003) ........................................................................................... 33, 34

*Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hospital*,
    374 F.3d 362 (5th Cir. 2004) ................................................................................... 34

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
    245 F.3d 434 (5th Cir. 2001) ................................................................................... 12

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................................... 4

*Texas Clinical Labs., Inc. v. Sebelius*,
    612 F.3d 771 (5th Cir. 2010) ............................................................................. 34, 35

*Texas Office of Pub. Util. Counsel v. F.C.C.*,
    265 F.3d 313 (5th Cir. 2001) ................................................................................... 36

*Thompson v. Clark*,
    741 F.2d 401 (D.C. Cir. 1984) ................................................................................. 36

*TIG Ins. Co. v. Sedgwick James of Washington*,
    276 F.3d 754 (5th Cir. 2002) ..................................................................................... 9

*U.S. Satellite Broad. Co., Inc. v. FCC*,
    740 F.2d 1177 (D.C. Cir. 1984) ............................................................................... 36

*Walling v. Morris*,
    155 F.2d 832 (6th Cir. 1946) ................................................................................... 13

*Walling v. Yeakley*,
    140 F.2d 830 (10th Cir. 1944) ................................................................................. 13

*Wirtz v. Mississippi Publishers Corp.*,
    364 F.2d 603 (5th Cir. 1966) ........................................................................... *passim*

*Yellow Transp., Inc. v. Michigan*,
    537 U.S. 36 (2002) ................................................................................................... 11

## Statutes

5 U.S.C. § 553 ................................................................................................ 30

5 U.S.C. § 706 ............................................................................................. 9, 14

16 U.S.C. § 497c ............................................................................................ 29

29 U.S.C. § 206 .............................................................................................. 29

29 U.S.C § 213 ........................................................................... 14, 26, 28, 29

29 U.S.C. § 1083 ............................................................................................ 29

43 U.S.C. § 1337 ............................................................................................ 29

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................ 8

## Other Authorities

5 Fed. Reg. 4077 (Oct. 15, 1940) .................................................................. 28

14 Fed. Reg. 7705 (Dec. 24, 1949) ............................................................. 4, 28

35 Fed. Reg. 883 (Jan. 22, 1970) ................................................................ 4, 22

68 Fed. Reg. 15,560 (Mar. 31, 2003) .............................................................. 5

69 Fed. Reg. 22,122 (Apr. 23, 2004) ...................................................... *passim*

80 Fed. Reg. 38,516 (July 6, 2015) ............................................................. 6, 30

81 Fed. Reg. 32, 391 (May 23, 2016) ...................................................... *passim*

Oxford English Dictionary
   (2d. ed. 1933) ............................................................................................ 11

Webster's Dictionary
   (1st ed. 1942) ............................................................................................ 12

## INTRODUCTION

It is well settled that a Court must defer to an agency's reasonable interpretation of a statute when Congress expressly delegates to the agency the authority to address statutory gaps, particularly where the agency adopts a regulation after careful consideration of a thorough record.  That is precisely what the Department of Labor ("Department") did here when responding to the compelling reality of economic changes over the course of time, it revised certain aspects of its overtime rules.  That rule, *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales, and Computer Employees*, 81 Fed. Reg. 32,391 (May 23, 2016) (the "Final Rule" or "Rule"), revises regulations under the Fair Labor Standards Act implementing the exemption from minimum wage and overtime pay for executive, administrative, and professional employees ("EAP employees" or "EAP exemption").  For more than 75 years, the Department has used, in conjunction with an analysis of an employee's work duties, a minimum salary level that an employee must receive to qualify for the EAP exemption.  After a robust notice-and-comment rulemaking—in which more than 270,000 comments were reviewed—the Department promulgated the Final Rule to update the standard salary level and provide a method to keep that salary level current.

Plaintiffs here ("Business Plaintiffs") challenge the Rule under the Administrative Procedure Act ("APA"), arguing that the salary level test should have been set differently, that the automatic updating provision exceeds the Department's authority under the FLSA and violates the APA's procedural protections, and that the Rule is otherwise arbitrary and capricious.  But Congress expressly granted the agency broad authority to define and delimit the terms in the EAP exemption, and the Department promulgated the Final Rule pursuant to that authority.  The salary level test in the Final Rule, which is aligned historically with previous levels used by the Department, is a reasonable interpretation of the EAP exemption.  It is

1

therefore entitled to *Chevron* deference and must be upheld.  So too is the automatic updating component well within the broad authority which Congress delegated to the agency to ensure that bona fide EAP employees are effectively distinguished by operation of regulation.  And Business Plaintiffs' challenge to the mechanism that automatically updates the salary level, which was adopted after notice and comment in the Final Rule, is not only unavailing, it is unripe.  The Business Plaintiffs identify no basis to overturn the Department's reasoned decision. Accordingly, their motion must be denied.

## RESPONSE TO BUSINESS PLAINTIFFS' STATEMENT OF ISSUES

In response to the Business Plaintiffs' Statement of Issues, Defendants submit the following statement of the issues properly before the Court on summary judgment.

I.    Whether the Court must give *Chevron* deference to the Department's Final Rule setting a salary level methodology, as well as an automatic updating mechanism consistent with that methodology, to distinguish bona fide EAP employees from those employees entitled to the minimum wage and overtime protections of the FLSA, in light of the fact that the rule was promulgated pursuant to the broad authority Congress granted the Department to define and delimit the terms of the EAP exemption, and because the rule is not arbitrary, capricious, or contrary to law.

II.    Whether the Rule's automatic updating provision that maintains the effectiveness of the salary level test over time, and which was adopted by the Department pursuant to its broad authority to administer the EAP exemption and was promulgated via notice and comment, is reasonable and comports with the APA.

III.    Whether the Final Rule, adopted after the Department's review of more than 270,000 comments, comports with the APA.

## BACKGROUND

The Fair Labor Standards Act of 1938, 75 Cong. Ch. 676, 52 Stat. 1060 ("FLSA") generally requires covered employers to pay their employees overtime premium pay of one and one-half times the employee's regular rate of pay for any hours worked over 40 in a workweek. *See* 29 U.S.C. 207(a)(1).  However, the FLSA exempts from overtime protection "any employee

employed in a bona fide executive, administrative, or professional capacity . . . as such terms are

defined and delimited from time to time by regulations of the Secretary" of Labor. 29 U.S.C. §

213(a)(1).  The FLSA does not define the terms "bona fide executive, administrative, or

professional capacity," but instead delegates to the Secretary of Labor the power to define and

delimit these terms through regulation.  *Id.*  For more than 75 years, the Department has

exercised this broad authority by using together a salary basis test, a salary level test, and a duties

test to distinguish bona fide EAP employees from overtime-protected employees.  *See* 81 Fed.

Reg. 32,392, AR 100.[1]

## RESPONSE TO BUSINESS PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Much of what Business Plaintiffs have included in their Statement of Material Facts

consists not of facts, but of law or characterizations of law, and/or is not material.  Defendants

dispute those statements on that ground.  But assuming that everything in Business Plaintiffs'

Statement of Material Fact is a statement of material fact, Defendants respond as follows:

1-2.  Defendants do not dispute Business Plaintiffs' Facts No. 1 and 2.

3-5.  Defendants do not dispute Business Plaintiffs' Fact Nos. 3-5; however, these facts

provide an incomplete understanding of the regulatory history.  In particular, between 1949 and

2004, the Department used a two-tier structure for assessing compliance with the salary level and

duties tests.  *See* 81 Fed. Reg. 32,401, AR 109.  Employers could either satisfy a "long" test—

combining a rigorous duties test with a lower salary level—or a "short" test—combining an

easier duties test and a higher salary level.  *See id.*  The long duties test was more rigorous

---

[1] With some exceptions, for an employee to be exempt: (1) the employee must be paid on a salary basis ("salary basis test"); (2) the employee must receive a minimum salary amount ("salary level test"); and (3) the employee's job must primarily involve executive, administrative, or professional duties ("duties test"). *See* 29 C.F.R. Part 541.

because it contained a bright-line, twenty percent limit on the amount of time an employee could spend performing nonexempt work.  *See id.*; 14 Fed. Reg. 7,705, 7,706 (Dec. 24, 1949).  The short duties test, in contrast, did not limit the amount of time an exempt employee could spend on nonexempt duties.  *See id.*; 81 Fed. Reg. 32,401, AR 109.  The long salary test methodology excluded from the exemption a low percentage of employees who satisfied the long duties test.  For example, in 1958, the Department set the long test salary level to exclude approximately ten percent of salaried employees in low wage regions, low wage industries, small establishments, and small towns who passed the long duties test.  *See* Kantor Report at 6-7, AR 334-35; *see also* 81 Fed. Reg. 32,402, AR 110.  In 1970, the Department set the long test salary level for executive employees to $125 per week when the salary data showed that 20 percent of employees in establishments investigated by the Department who passed the long duties test earned less than $130 per week.  *See* 35 Fed. Reg. 884-85; *see also* 81 Fed. Reg. 32,402, AR 110.  The short test salary level from 1949 to 2004 was 30 to 80 percent higher than the long test salary level.  *See* 81 Fed. Reg. 32,402, AR 110; *see also* Table A., 81 Fed. Reg. 32,401, AR 109.  Such salaries were high enough that employees who earned them would likely meet the requirements of the long duties test, including the twenty percent limit on performing nonexempt work, even though they were subject only to the less rigorous short duties test.  *See* Weiss Report at 23, AR 367.

In 2004, the Department eliminated the "long" and "short" test structure and created a new "standard" test.  *See* 69 Fed. Reg. 22,122, 22,164 (Apr. 23, 2004); *see also* 81 Fed. Reg. 32,403, AR 111.[2]  The standard duties test resembled the old short duties test and did not limit

---

[2] By this point, the passage of time had eroded the long test salary levels below the amount a minimum wage employee earned for a 40-hour week, and even the short test salary levels were not far above the minimum wage.  *See* 69 Fed. Reg. 22,122, 22,164; 81 Fed. Reg. 32,403, AR

the amount of nonexempt work an employee could perform.  The Department paired this duties

test with a salary level of $455 per week ($23,660 annually), which was equal to the 20th

percentile of earnings for salaried workers in the South and the retail industry.  *See id.*  In so

doing, the Department "set the standard salary level using a methodology that yielded a result

consistent with the methodology [it] had historically used to set the salary level paired with the

long duties test, even though the new standard duties test was based on the short duties test."  81

Fed. Reg. 32,412, AR 120.

6. Business Plaintiffs are incorrect when they state that the standard salary level set by the

Department in 2004 accounted for both "changes in the structure of the Department's duties test"

and the fact that "the data included nonexempt salaried employees."  Bus. Pls' Mot. at 6 (Fact

#6), ECF No. 35.  In fact, the standard salary level methodology only accounted for the change

the Department made to the data set in 2004.  In previous rulemakings, the Department had

looked only at salary data on employees who met the criteria for the EAP exemption, but in

2004, the Department set the salary level "based on the earnings of exempt *and* nonexempt full-

time salaried employees."  81 Fed. Reg. 32,411, AR 119.  Specifically, the Department set the

standard salary level to exclude from exemption "approximately the lowest *20* percent of *all*

salaried employees," where it had previously set the long test salary level to exclude

"approximately the lowest-paid *10* percent of *exempt* salaried employees."  69 Fed. Reg. 22,168

(emphases added and in original); 69 Fed. Reg. 22,166 (emphases added); *see also* 81 Fed. Reg.

32,412, AR 120.  "By setting the salary threshold at a higher percentile of a data set that included

employees likely to earn lower salaries, the Department explained that [it] reached a final salary

---

111.  Thus, as a practical matter, employers used the short test, with its less rigorous duties
requirement, and the long test fell out of operation.  *See* 68 Fed. Reg. 15,560, 15,564-65; 69 Fed.
Reg. 22,126.

level that was 'very consistent with past approaches' to setting the long test salary threshold." *Id.* (citing 69 Fed. Reg. 22,167).  While the Department "recognized the need" to further adjust for the fact that the standard salary level would be paired with a less rigorous duties test (based on the short test), the 2004 Final Rule "ultimately did not do so."  *Id.* Defendants do not dispute the remainder of Business Plaintiffs' Fact No. 6.

7. Defendants do not dispute Business Plaintiffs' Fact No. 7.

8. The description of the Notice of Proposed Rulemaking is incomplete.  The proposal also addressed the duties test. *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 80 Fed. Reg. 38,516, 38,542 (July 6, 2015).  In particular, the Department invited input on whether it should strengthen the test by returning to the "long" and "short" test structure, or by otherwise restoring a quantitative limitation on nonexempt work. *See id.*

9. The Department carefully considered the more than 270,000 timely submitted comments on the NPRM, *see* 81 Fed. Reg. 32,432, AR 140; 32,526, AR 234, including the comments submitted by plaintiffs and listed in Business Plaintiffs' Fact No. 9.  Most of their comments requested that the Department lower the proposed salary level but strongly opposed any changes to the duties test. *See* 81 Fed. Reg. 32,446, AR 154.  For example, the Chamber of Commerce stated that "a quantitative requirement [as part of the duties test] would only create tremendous recordkeeping burdens on employers and add to employers' uncertainty over classifications." *See* AR 1470.  NRF stated that a "duties test requiring employees to spend a strict quantitative percentage of time on exempt work is not workable as a practical matter, *see* AR 1212, and AH&LA stated that a "quantitative element would create an administrative nightmare." *See* AR 1608.  Defendants do not dispute the remainder of Business Plaintiffs' Fact

No. 9.

10. Defendants dispute Fact 10's characterization because it is incomplete.  Although Business Plaintiffs correctly note that the Final Rule adopts a salary level based on the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region (the South), they fail to inform the court of the justification provided in the Final Rule for the salary test methodology.  The Department set the salary level equal to the low end of the historical range of short test salary levels, based on the historical ratios between the short and long test salary levels.  *See* 81 Fed. Reg. 32,405, AR 113.  The salary level test methodology thus both "reflect[s] increases in actual salary levels nationwide since 2004 and correct[s] the 2004 Final Rule's mismatch between the standard duties test and the standard salary level based on the long duties test level."  *See* 81 Fed. Reg. 32,415, AR 123.  A salary level "lower than the bottom of the historical short test salary range" would "necessitate changes to the duties test."  81 Fed. Reg. 32,411, AR 119.

11. Defendants do not dispute Business Plaintiffs' Fact No. 11.

12. Defendants dispute the Business Plaintiffs' statement that "DOL projects that when the Rule takes effect 4.2 million employees all over the country *who otherwise may reasonably be classified as bona fide executive, administrative, or professional employees* 'will no longer fall within' the white-collar exemption 'and therefore will be overtime protected.'"  *See* Bus. Pls. Br. at 8 (Fact #12) (emphasis added) (citing 81 Fed. Reg. 32,405).  In fact, the Department estimated that "4.2 million employees *who meet the standard duties test* will no longer fall within the EAP exemption and therefore will be overtime-protected."  81 Fed. Reg. 32,405, AR 113 (emphasis added).  The Department also explained that the "fact that an employee satisfies the duties test, especially the more lenient standard duties test, does not alone indicate that he or

she is a bona fide executive, administrative, or professional employee."  81 Fed. Reg. 32,413,

AR 121.  And the Department further noted that it "believes that many of the workers who will

no longer be exempt as a result of this rulemaking would have failed the long duties test and are

currently inappropriately classified [as exempt] because of the mismatch between the current

standard duties test and the standard salary level."  *Id.*

Next, Defendants dispute Business Plaintiffs statement that an "*additional* 3.9 million

employees will no longer be covered by the white-collar exemption in the second year."  Bus.

Pls. Br. at 8 (Fact #12).  In the second year, a *total* of 3.9 million employees who would have

been exempt under the outdated salary level will be overtime protected, not 8.1 million (4.2

million + 3.9 million).  *See* 81 Fed. Reg. 32,394, AR 102; 81 Fed. Reg. 32,451-52 n.94, AR 159-

60.  Likewise, by the tenth year, a *total* of approximately 5.2 million employees will be overtime

protected on account of the Final Rule, *see id.*, not an "*additional* 5 million employees," as

Business Plaintiffs claim.  *See* Bus. Pls. Br. at 8 (Fact #12).

## LEGAL STANDARD

Summary judgment is proper only when (1) "the movant shows that there is no genuine

dispute as to any material fact" and (2) "the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).[3]  In a case involving the Administrative Procedure Act, 5 U.S.C. § 551 e*t*

*seq.* ("APA"), "the standard of review is whether the agency decision is 'arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with the law.'"  *Hasie v. Office of the*

*Comptroller of Currency*, No. 5:07-CV-208-C, 2008 WL 4549881, at *2 (N.D. Tex. May 9,

---

[3] In deference to the schedule set by the Court in its October 17 and 31 Orders, ECF Nos. 11,
33—and the Court's efforts to decide the Business Plaintiffs' claims by December 1 as they have
requested—Defendants have not filed a cross-motion for summary judgment on the Business
Plaintiffs' claims.  However, because this opposition demonstrates that the Business Plaintiffs'
claims are meritless, the Court may sua sponte grant summary judgment on those claims in
Defendants' favor.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

2008) (quoting 5 U.S.C. § 706(2)(A)) (citations omitted), *aff'd*, 633 F.3d 361 (5th Cir. 2011).

When reviewing agency action under the APA, "the general presumption [is] that review is limited to the record compiled by the agency." *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010); *see also* 5 U.S.C. § 706.

## ARGUMENT

### I.     The Final Rule is Entitled to *Chevron* Deference and Must be Upheld

Because Section 213(a)(1) explicitly grants authority to the Department to "define[] and delimit[]" the terms "bona fide executive, administrative, or professional capacity," and the Department did so reasonably and through a robust notice-and-comment rulemaking process, the Court must defer to the agency's interpretation of the statute set forth in the Final Rule. *See Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43 (1984).

To begin, the Court should not even reach the merits because the Business Plaintiffs fail to establish Article III standing. A plaintiff, by competent proof, must show that it faces a concrete, particularized injury traceable to defendants' action that is redressable by the court. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013). Their conclusory statements unsupported by competent evidence are not enough. *See TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). And their citation to more than 500 pages of comments, without even a pin cite, is plainly improper, see Local Rule CV-56(d) ("'appropriate citations' means that any excerpted evidentiary materials that are attached to the motion or the response should be referred to by page and, if possible, by line."), and cannot excuse their failure to establish standing, see Local Rule CV-56(c) ("The court will not scour the record in an attempt to determine whether the record contains an undesignated genuine issue of material fact for trial before entering summary judgment."). Nor have they established that they have

associational standing.  *See Summers v. Earth Island Inst*., 555 U.S. 488, 498 (2009).  *See Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

Turning to the substance, in evaluating the validity of an agency's interpretation of a statute, "'[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous[ly] expressed intent of Congress.'"  *BNSF Ry. Co. v. United States*, 775 F.3d 743, 751 (5th Cir. 2015), quoting *Chevron*, 467 U.S. at 842-43.  However, where "Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation."  *Chevron*, 467 U.S at 843-44.  Such "legislative regulations" must be upheld "unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id*. at 844. "An agency's interpretation is permissible if it is reasonable.  The question of reasonableness is not whether the agency's interpretation is the only possible interpretation or whether it is the most reasonable, merely whether it is reasonable *vel non*."  *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 831 (5th Cir. 2010) (citation omitted).   Indeed, the Fifth Circuit counsels that the Court should simply "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (internal citation omitted).

Considerable deference is required under *Chevron* in this case, because: (1) Congress expressly granted authority to the agency to define and delimit the terms of the EAP exemption; and (2) the agency promulgated the Final Rule pursuant to that authority.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) (explaining that an agency qualifies for *Chevron* deference where the statute delegates powers to execute the statute as well as to prescribe rules and regulations under the statute); *Yellow Transp., Inc. v. Michigan*,

537 U.S. 36, 45 (2002) (upholding regulations where Congress made an express delegation to promulgate standards for implementing statute, which agency did after notice-and-comment rulemaking).  That the Final Rule was promulgated by a thorough notice-and-comment procedure, as reflected in the comprehensive response to comments in the Final Rule, *see, e.g., infra* at 35-38, also counsels in favor of upholding the Rule.

Indeed, the Court must uphold the Department's action, because "[the Department] has considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 105 (1983).  The Final Rule "update[s] the standard salary requirement, both in light of the passage of time since 2004," and to correct the "inappropriate classification of employees as . . . overtime exempt" caused by the fact that the salary level test set in 2004 was too low to effectively identify EAP employees when paired with standard duties test.  81 Fed. Reg. at 32,392, AR 100. The Final Rule also provides a mechanism to keep this level current in light of changing economic conditions.  *See* 81 Fed. Reg. 32,430, AR 138.  The Final Rule is reasonable and is well within the broad scope of authority given to the Department by Congress.

## A.  The Salary Level Test is Consistent With the Statutory Text and Purpose

For more than 75 years, the Department has interpreted the phrase "bona fide executive, administrative, or professional capacity" to mean that an employee's placement within or outside the exemption is determined by use of the salary basis test, the salary level test, and the duties test.  *See* 81 Fed. Reg. 32,394-403, AR 102-11.[4]  While it is true that Section 213(a)(1) does not

---

[4] The term "capacity" was understood in the 1930s to mean "position, condition, character, relation," "to be in, put into . . . a position which enables, or renders capable," or "legal competency or qualification." *Capacity*, The Oxford English Dictionary 89 (2d ed. 1933 ed.). And the term "position" was understood to mean "relative place, situation, or standing; specif[ically], social or official rank or status," and "office; employment; situation."  *Position*,

specifically reference salary (just as it does not specifically reference duties), status and income

are necessarily tied.   Notably, before the Department adopted the salary level test for all three

types of exempt employees in 1940, it held extensive hearings and published a report that

discussed, among other things, the relationship between the salary level test and the terms of

Section 13(a)(1).  *See* Stein Report at 1-2, AR 268-69.[5]  In particular, hearing participants

recognized that the language of Section 213(a)(1) implies a "status" not attained by workers

whose pay is close to the minimum wage.  Stein Report at 5, AR 272.  Moreover, Section

213(a)(1)'s use of the term "bona fide" specifically requires an employer's good faith, which is

best demonstrated through the salary an employer pays.  *See id.* (explaining that "the good faith

specifically required by the act is best shown by the salary paid"); *id.* at 19, AR 286 (explaining

that the salary an employer pays an employee provides "a valuable and easily applied index to

the 'bona fide' character of the employment for which exemption is claimed"); *id.* at 26, AR 293

("[A] salary criterion constitutes the best and most easily applied test of the employer's good

faith in claiming that the person whose exemption is desired is actually of such importance to the

firm that he is properly describable as an employee employed in a bona fide administrative

capacity.").  As the Department explained, "if an employer states that a particular employee is of

Webster's Dictionary (1st ed. 1942).  Likewise, as the Department explained in the 1940 Stein
Report, the "term 'executive' implies a certain prestige, status, and importance."  Stein Report at
19, AR 286; *see also id.* at 33, AR 300 (discussing the "status implied by the term
'administrative'").

[5] In 1940, 1949, and 1958, the Department published reports along with its revised Part 541
regulations. *See* Wage and Hour Division, U.S. Department of Labor, *Executive, Administrative,
Professional . . . Outside Salesman Redefined: Report and Recommendations of the Presiding
Officer (Harold Stein) at Hearings Preliminary to Redefinition* (Oct. 10, 1940) ("Stein Report"),
AR 264-327; Wage and Hour Division, United States Department of Labor, *Report and
Recommendation on Proposed Revisions of Regulations, Part 541, by Harry Weiss, Presiding
Officer* (June 30, 1949) ("Weiss Report"), AR 341-444; Wage and Hour Division, United States
Department of Labor, *Report and Recommendation on Proposed Revision of Regulations, Part
541, by Harry S. Kantor, Presiding Officer* (Mar. 3, 1958) ("Kantor Report"), AR 328-40.

sufficient importance to be classified as an 'executive' employee," for example, "and thereby exempt from the protection of the act, the best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them." *Id.* at 19; *see also* Weiss Report at 9, AR 353 ("salary is the best single indicator of the degree of importance involved in a particular employee's job").  The salary test thus ensures that the Section 213(a)(1) exemption does not "invite evasion" of the minimum wage and overtime requirements for "large numbers of workers to whom the wage-and-hour provisions should apply."  Stein Report at 19, AR 286.

Section 213(a)(1) does not, as the Business Plaintiffs contend, unambiguously direct the Department to "issue regulations that clarify the *job functions*" of exempt employees.  Bus. Pls.' Br. at 1-2. [6]  Nor is there any support for the Business Plaintiffs' argument that "DOL's regulatory authority extends only to setting standards that help resolve cases in which the classification of an employee's job functions is unclear." *Id.* at 19.  In fact, the Fifth Circuit has

---

[6] The "number of federal court decisions" that the Business Plaintiffs assert "[have] concluded that the EAP exemptions must be defined by reference to job functions" are not persuasive, much less controlling.   Bus. Pls.' Br. at 16, 18; *see Buckner v. Armour & Co.*, 53 F. Supp. 1022, 1024 (N.D. Tex. 1942); *Devoe v. Atlanta Paper Co.*, 40 F. Supp. 284, 286-87 (N.D. Ga. 1941).  The reasoning in *Buckner* and *Devoe* was superseded by *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966), in which the court held that the FLSA grants the Secretary "broad latitude" to define and delimit the section 213(a)(1) exemption—including by adopting a salary level test that excludes from exemption some employees who satisfy the duties test.  Similarly, the Business Plaintiffs cite to dicta in *Krill v. Arma Corp.*, 76 F. Supp. 14, 18 (E.D.N.Y. 1948), but this view is seemingly at odds with the Second Circuit's conclusion in *Fanelli v. U.S. Gypsum Co.*, 141 F.2d 216, 218 (2d Cir. 1944), that "Section 13(a) explicitly authorizes the Administrator to 'define and delimit,' by regulations, the terms used in that section [and that] [a]s his regulations are reasonable, they are as binding on the courts as if they had been directly enacted by Congress."  Other circuit court decisions similarly conflict with the Business Plaintiffs' position.  *See Walling v. Morris*, 155 F.2d 832, 836 (6th Cir. 1946) ("The validity and binding effect of [the section 213(a)(1)] regulations are well established."), *vacated sub nom. Morris v. McComb*, 332 U.S. 422 (1947); *see also Walling v. Yeakley*, 140 F.2d 830 (10th Cir. 1944).

recognized that Section 213(a)(1) "gives the Secretary broad latitude" to use a salary level test to determine which employees are employed in a "bona fide executive, administrative, or professional capacity." *Mississippi Publishers Corp.*, 364 F.2d at 608; *accord Auer v. Robbins*, 519 U.S. 452, 456 (1996) ("The FLSA grants the Secretary broad authority to 'defin[e] and delimi[t]' the scope of the exemption for executive, administrative, and professional employees.").  If Congress had intended to direct the Department to define and delimit the terms "*performing* 'bona fide executive, administrative, or professional' *duties*," Bus. Pls. Br. at 21 (emphasis added), it could have used those words.  Nowhere, however, does the statutory text include the terms "perform," "duties" or, even, "functions."  Plaintiffs' attempt to limit the terms of the statute to only these concepts by vague reference to definitions of the words "administrative," "executive," and "professional," *id*. at 13, ignores the statutory language exempting only employees employed in a "bona fide" EAP "capacity."  29 U.S.C. 213(a)(1). Congress used general terms to set forth the Section 213(a)(1) exemption and left it to the Department to define and delimit them.  The Department has long done so through a salary level test and duties test that work in "tandem to distinguish those who Congress intended the FLSA to protect from those who are 'bona fide' EAP employees."  81 Fed. Reg. 32,413, AR 121.

To be sure, the Department's authority to define and delimit the terms of the Section 213(a)(1) exemption is not boundless.  Of course, the Department could not tie the exemption to an employee's level of educational debt or advanced age, or to some other criterion that lacks any reasonable relationship to the language of the exemption.  *See* Bus. Pls. Br. at 13.  Moreover, the APA confines the Department's authority to adopt interpretations that are reasonable, and are not arbitrary or capricious or contrary to law.  *See Chevron*, 467 U.S. at 843; *see also* 5 U.S.C. § 706(2)(a).  There can be no question—particularly in this Circuit—that the Final Rule's salary

level test passes this deferential bar.  Indeed, the Fifth Circuit has already held that a salary level test—including one that denies the exemption to some employees who pass the duties test—is "rationally related to the determination of whether an employee is employed in a 'bona fide executive [. . . ] capacity.'" *Mississippi Publishers Corp*., 364 F.2d at 608.  Though *Mississippi Publishers* predated *Chevron*, the court correctly recognized the broad grant of authority under which the Department had made its decision, and deferred to that decision because it was reasonable.  *Id.; see Chevron*, 467 U.S. at 842-4; *Assoc. Builders & Contractors of Texas, Inc. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 224-25 (5th Cir. 2016) ("To affirm an agency's action, we need only find a rational explanation for *how* the [agency] reached its decision.") (citation omitted).

### B.   The Final Rule Salary Level Test is Reasonable and Must be Upheld

Not only is the salary level test set in the Final Rule consistent with Congressional intent, it is reasonable and supported by carefully examined evidence and a thoroughly explained rationale.  The Business Plaintiffs' attempts to convince the Court to second guess the agency's decision to set the salary level test as it did must be rejected, because the Court "cannot substitute [its] judgment or preferences for that of the agency."  *See Assoc. Builders*, 826 F.3d at 224.  Indeed, the decision of how to set the salary test at a level that most effectively distinguishes EAP employees from others when read in tandem with the duties test is exactly the kind of decision that the Department is best situated to answer.  *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 165 (2007) (upholding under *Chevron* step two a different regulation interpreting another statutory exemption to the FLSA's minimum wage and overtime protections and explaining that "[t]he subject matter of the regulation in question concerns a matter in respect to which the agency is expert, and it concerns an interstitial matter, *i.e.*, a portion of a

broader definition, the details of which, as we said, Congress entrusted the agency to work out"). Therefore, the Court's "mandate is not to weigh the evidence pro and con but to determine whether the agency decision was based on a consideration of relevant factors and whether there was a clear error of judgment." *Hayward v. U.S. Dep't of Labor*, 536 F.3d 376, 380 (5th Cir. 2008) (citation omitted).  The Final Rule must be upheld under this standard.

Under the Final Rule, the Department continues the well-established practice of relying on both a duties test and a salary test to define and delimit the reach of the EAP exemption.  To be clear, the Final Rule changed the methodology for calculating the salary level threshold so that it better identifies, when read in tandem with the less rigorous standard duties test adopted in 2004, the bona fide EAP employees that Congress intended to fall within the scope of the exemption that Congress created, the precise bounds of which Congress intended the Department to demarcate.  But this change was necessary because the methodology used to set the 2004 salary level was derived from the old "long" salary test—which the Department set at the low end of salaries and paired with a rigorous duties test that imposed a cap on nonexempt work. Conversely, the standard duties test established in 2004 was based on the old "short" duties test, which did not impose such a cap, and with which the Department historically paired a higher salary level that was between 130 and 180 percent of the long test salary level.

Specifically, while the Final Rule does not make changes to the 2004 duties test (which employer commenters, including several of the Business Plaintiffs opposed changing, *see infra* at 18 n.8), it adopts a methodology for calculating the salary level test that results in a salary level threshold at the low end of the historical range of short test salary levels, based on the historical ratios between the short and long test salary levels.  *See* 81 Fed. Reg. 32,405, AR 113.  This methodology corrects the "mismatch in the 2004 Final Rule between a low salary threshold and a

less rigorous duties test," which resulted in an ineffective mechanism for identifying EAP employees.  *Id.* at 32,409, AR 117.  Thus, to the extent the Final Rule changes the salary level test methodology set forth in the 2004 final rule, it did so to ensure that the test (when read with the duties test adopted in 2004) more accurately identifies bona fide EAP employees.

The Department considered a range of alternatives before setting the salary level methodology in the Final Rule, including methodologies that would result in a lower salary level.  *See* 81 Fed. Reg. 32,410, AR 118; 81 Fed. Reg. 32,504 (Table 32), AR 212.  Each of these methodologies, however, resulted in "a salary level lower than the bottom of the historical range of short test salary levels, based on the historical ratios between the short and long test salary levels," and therefore would not work appropriately with the standard duties test (which is based on the short duties test).  81 Fed. Reg. 32,410, AR 118; *see also* 81 Fed. Reg. 32,467, AR 175. [7] In other words, if the Department chose to retain the standard duties test (which was based on the short duties test)—and not to return to a long duties test or something similar—the Department needed to adopt a methodology that resulted in a salary level between $889 to $1,231, because this is the range of salaries (updated to present time), that worked appropriately with the short duties test for *most of the history of the Part 541 regulation.  See* 81 Fed. 32,410, AR 118; 81 Fed. Reg. 32,463, AR 171.  If the Department chose a salary level below this range, it would

---

[7] Setting the salary level by using the 2004 methodology or adjusting the 2004 salary level for inflation would produce an especially poor fit with the standard duties test.  Although the 2004 method and the old long test method (based on 1958) produced similar salaries in 2004, "the salary levels yielded by these methods now diverge significantly."  81 Fed. Reg. 32,412 n.43, AR 120.  "Thus, not only would using the 2004 methodology today fail to account for elimination of the long duties test, it would result in a noticeably lower salary level than the average long test salary level between 1940 and 2004 in 2015 dollars."  *Id.*  And adjusting the 2004 number (an already too low number) for inflation would be particularly problematic, because, as the Department has recognized, inflation-based indicators are less effective at accounting for changes in working conditions.  *See, e.g.*, 81 Fed. Reg. 32,440-41, AR 148-49.

need to return to a more rigorous duties test, likely by imposing a quantitative cap on nonexempt work to ensure that employees who would have historically been overtime protected would have those protections.  The employer community, including many of the Business Plaintiffs, strenuously opposed this option.  81 Fed. Reg. 32,446, AR 154.[8]

Likewise, that the Final Rule salary level roughly doubles the existing salary level is not a reason to upset the Department's rulemaking.  The Department's decision to set the salary level as it did reflects the fact that the 2004 salary level had been set too low—when used together with the standard duties test set in 2004—and had become ineffective due to changes in employee salaries in the intervening 12 years.  And the salary level adopted by the Final Rule is well within the range of historical precedent.  For example, the level adopted for executive and administrative employees in 1938 was 120 times the hourly minimum wage then in effect, *see* 52 Stat. 1060, while the weekly salary level adopted by the Final Rule is about 126 times the current hourly minimum wage ($7.25 per hour), *see* 29 U.S.C. § 206(a)(1)(C); *see also* 81 Fed. Reg. 32,410, AR 118.  Figure 1 in the economic analysis section of the Rule shows how the real values of the salary levels have changed since 1938, measured in 2015 dollars. The Final Rule's standard salary level is below the real value of the short test salary level in *all* previous years when it was updated, and is only slightly above the real value of the long test salary level in several years when it was updated.  *See* 81 Fed. Reg. 32,450, AR 158.

Figure 1: Real Values of the Salary Level Tests using the Long, Short, and Standard Duties Tests, 1938-2016

---

[8] *See, e.g.*, Comments of United States Chamber of Commerce, AR 1424-1576; National Automobile Dealers Association, AR 1636-41; National Federation of Independent Business, AR 1416-23; National Retail Federation, AR 1203-1415; Associated Builders and Contractors, AR 1593-1598; International Franchise Association, AR 1613-35; Partnership to Protect Workplace Opportunity (joined by International Warehouse and Logistics Association), AR 1642-71.



Because the Department has never adopted a practice of defining the Section 213(a)(1) exemption only "by reference to the job functions of employees" or only used "salary as a proxy for those job functions," the Final Rule cannot be a reversal of such a practice as Business Plaintiffs suggest.  Pls. Br. at 14.[9]  As an initial matter, Business Plaintiffs' claim that the Department has historically used the salary test as a mere proxy for the duties test, Bus. Pls.' Br. at 14, grossly oversimplifies the role that the salary level test has played for over 75 years.  Since 1940, the salary level test and the duties test have worked together to distinguish those whom Congress intended to have minimum wage and overtime protection from those who are "bona fide" EAP employees, which Congress intended the agency to demarcate.  *See* 81 Fed. Reg.

_____

[9] Business Plaintiffs not only mischaracterize the Department's past administrative practice, they go further to suggest that Congress's acceptance of the salary and duties tests as they have evolved over time somehow cabins the Department's authority to use the salary level test as anything beyond a proxy for the duties test.  Bus. Pls.'s Br. at 18-19.  To be sure, Congress specifically amended Section 213(a)(1) several times between 1961 and 1990, but it did so without limiting the Department's authority to enact a salary level test to delineate those workers who are bona fide EAP employees.  *See* Def. Resp. in Opp. to State Pls.' Mot. for Prelim. Inj. at 30, ("Defs.' Br.") ECF No. 37.  These actions affirm the Department's authority to set a salary level test—including one that is dispositive of non-exempt status for some employees who pass the corresponding duties test.  But nothing about this amendment history (all of which occurred prior to 2004) suggests that the Department cannot change the salary level test methodology set forth in the 2004 Final Rule, so that it works more appropriately with the duties test adopted in 2004 to identify bona fide EAP employees.

32,413, AR 121.  A less extensive examination of an employee's duties has required a higher salary level, while a more extensive examination of an employee's duties permitted a lower salary level to effectively distinguish bona fide EAP employees.  *See id.*  This "inverse correlation between the salary level and the duties requirements was the basis of the separate short and long tests, which co-existed until 2004."  *Id.*  It is also the basis for the highly compensated employee test first established in the 2004 rulemaking, which pairs a very high salary level ($134,004 under the Final Rule) with a very minimal duties test.  *See* 81 Fed. Reg. 32,427, AR 135; 81 Fed. Reg. 32,429, AR 137.

In support of their claim that the Department historically used the salary level test only as a proxy for the duties test, the Business Plaintiffs fail to provide proper context for statements the Department made when setting the long test salary level in 1949 and 1958.  These reports explained that the long test salary level should not defeat the exemption for "any substantial number of individuals who could reasonably be classified for purposes of the Act as bona fide executive, administrative, or professional employees," and should work to  "screen[] out the obviously nonexempt employees." *See* Bus. Pls.' Br. at 15-16 (citing Weiss Report at 8-9, AR 352-53; Kantor Report at 2-3, AR 330-31).  It is true that the methodology that the Department used to set the lower long test salary level was designed to minimize the number of employees who satisfied the long duties test but who would be overtime-eligible because they failed the salary level test.  *See* 81 Fed. Reg. 32,413, AR 121.  But the Department took a different approach in setting the short test salary level: it set the salary level high enough so that those who earned above it would likely meet the requirements of the (more rigorous) long duties test— including the limit on performing nonexempt work—"with only minor or insignificant

exceptions." *Id.* (citing Weiss Report at 23).[10]  The Final Rule salary level methodology produces a salary level that is higher than the salary level that would result from the long test salary level methodology, but is at the low end of the historical range of short test salary levels. *See* 81 Fed. Reg. 32,409, AR 117.

It is clear then that the Final Rule does not "fundamentally alter" the exemption analysis, as Business Plaintiffs' claim.  *See* Bus. Pls.'Br. at 1.  It adopts a new methodology to set the salary level to better effectuate Congress's intent in creating the exemption.  The Department's approach strikes an "appropriate balance between protecting overtime-eligible workers and reducing" the number of employees inappropriately excluded from exemption.  *See* 81 Fed. Reg. 32,414, AR 122.  A lower salary level akin to the 2004 standard salary level or old long test salary level methodologies would have required strengthening the duties test (either through a return to the "long" and "short" test structure or imposing a quantitative limit on nonexempt work)—an option that many of the Business Plaintiffs and other employer commenters strenuously opposed.  *See* 81 Fed. Reg. 32,446, AR 154.  The Department ultimately concluded that the Final Rule salary level will "work effectively in combination with the current duties test."  *Id.*

Moreover, the Business Plaintiffs mischaracterize the Department's past position when

---

[10] The Business Plaintiffs' citation to the 1940 Stein Report is misleading.  Business Plaintiffs claim that the Department stated that "the minimum salary test should impact only 'a few' otherwise exempt employees, since it would be contrary to the mandate of Congress if it set the minimum salary level for exemption at a level that excluded from the exemption many employees who would meet the duties requirements."  Bus. Pls.' Br. at 15.  In fact, on the page of the Stein Report cited by the Business Plaintiffs, the Department is explaining its decision to set a single national salary level (rather than multiple regional salary levels), by noting that while the national threshold "will inevitably deny exemption to a few employees who might not unreasonably be exempted," it "will undoubtedly permit the exemption of some persons who should properly be entitled to the benefits of the act."  Stein Report at 6, AR 273.

they claim that the Department has previously recognized that it cannot adopt a "salary only" test.  *See* Bus. Pls.' Br. at 14.  The Department has never suggested that it lacks authority to set a salary test that is dispositive of non-exempt status for some employees (even though they pass the duties test).  Rather the Department has taken the position that it cannot exempt from overtime protections employees who *do not* perform EAP duties—such as mechanics, carpenters, and other blue collar workers—*merely* because they are well paid.  For example, during the 2004 rulemaking, the Department rejected requests from the Chamber of Commerce and other commenters that it eliminate the duties test entirely and create a "salary only" test for highly compensated employees.  *See* 69 Fed. Reg. 22,173; *see also* 69 Fed. Reg. 22,174.

To the extent the salary level has operated as a floor, it continues to do so today. Historically, there have always been a percentage of employees who passed not only the short duties test but also the long duties test, and failed the salary level tests.  *See* 81 Fed. Reg. 32,413, AR 121; Kantor Report at 5.  Indeed this was precisely the issue before the Fifth Circuit in *Mississippi Publishers*.  The employees in that case passed the duties test, but earned below the long salary level.  *See Mississippi Publishers*, 364 F.2d at 607.  As another example, in 1970, the Department set the long test salary level for executive employees to $125 per week when the salary data showed that 20 percent of employees in establishments investigated by the Department who passed the more rigorous long duties test then in place would fail the new salary level test because they earned less than $130 per week, and thus would be overtime eligible.  *See* 35 Fed. Reg. 884-85.  Under the Final Rule, 22 percent of salaried white collar workers who currently pass the less rigorous standard duties test earn less than $913 per week.  *See* 81 Fed. Reg. 32413, AR 121, 81 Fed. Reg. 32465, AR 173.  At the same time, there have always been employees who earned above (even well above) the salary level but failed the duties test.  *See*

Weiss Report at 23, AR 367.  Likewise, under the Final Rule, nearly 50 percent (6.5 million) of the total number of salaried white collar workers who fail the duties test earn *above* the salary level threshold set in the Rule; for these workers, the duties test rather than the salary test is the basis for their non-exempt status.  *See* 81 Fed. Reg. 32,413, AR 121.  Thus, as the data the agency relied on in making its decision shows, the Department has not created a "salary only" test.

Moreover, the Business Plaintiffs' reliance on the fact that the Final Rule salary excludes from exemption 4.2 million employees who pass the standard duties test but fail the salary level under the Rule is unavailing.  *See* Bus. Pls.' Br. at 20, 21.  As the Department explained in the Final Rule, "the fact that an employee satisfies the duties test, especially the more lenient standard duties test, does not alone indicate that he or she is a bona fide executive, administrative, or professional employee."  81 Fed. Reg. 32,413, AR 121.  In other words, an employee who passes the standard duties test does not, contrary to the Business Plaintiffs' claim, "unambiguously qualify . . . to be treated as exempt."  *See* Bus. Pls.' Br. at 11.  Rather, as discussed above, the salary level test and the duties test work together to identify bona fide EAP employees; when the duties test is less rigorous—like the standard duties test left in place by the Final Rule—a higher salary level is necessary.

The fact that 4.2 million workers who are today exempt become overtime eligible as a result of the Final Rule in no way suggests that the Final Rule salary level is arbitrary or capricious (or marks a serious departure from the regulatory history).  It has always been the case, as the Department explained in the Final Rule, that "[w]henever the Department increases the salary level," to reflect changes in economic conditions or for any other reason, "it is inevitable that 'some employees who have been classified as exempt under the present salary

23

tests will no longer be within the exemption under any new tests adopted.'"  81 Fed. Reg.

32,413, AR 121 (citing Kantor Report at 5, AR 333).  As the Department has long explained,

such employees include "some whose status in management or the professions is questionable in

view of their low salaries," and some "whose exempt status, on the basis of their duties and

responsibilities, is questionable."  Kantor Report at 5, AR 333; *see* 81 Fed. Reg. 32,413, AR 121.

Indeed, when the Department updated the salary level in 2004, 1.3 million workers who were

previously classified as exempt became overtime eligible on the day the rule went into effect.

*See* 69 Fed. Reg. 22,123.

The 4.2 million number reflects both the fact that the salary level is twelve years out of

date and the fact that the 2004 Final Rule paired too low a salary level with a less rigorous duties

test, resulting in employees who should have been entitled to overtime protections being denied

those protections.  Even if the Department had set the salary level based on the old long test

methodology (resulting in a salary level of $684 per week or $35,568 for a full year worker),

1.44 million workers who are today classified as exempt would become overtime eligible on

December 1st.  *See* 81 Fed. Reg. 32,504, Table 32, AR 212.  Of the 2.76 million remaining

workers who will be affected by the Final Rule salary level, some number—and the Department

believes, many—would fail the long duties test, *see* 81 Fed. Reg. 32, 413, AR 121, and would

therefore have been overtime eligible under the regulatory framework that existed prior to 2004.

Finally, while 4.2 million workers stand to be affected by the Final Rule, an employer

whose previously exempt employees earn less than the salary level has a range of options for

compliance.  These options include, but are not limited to, modifying employee pay rates and

hours to minimize overall cost, continuing to pay the same salary to newly nonexempt workers

who do not work overtime (60.4% of the 4.2 million affected workers), or raising the salaries of

employees who earn close to the new salary level so that they remain exempt.  *See* 81 Fed. Reg. 32417-18, AR 125-26.  The Department expects that employers will respond to the Final Rule in ways that makes the most sense to them individually; their responses are in no way dictated by the Rule.

The Business Plaintiffs attempt to support their challenge by cherry-picking a few examples of occupations with median annual incomes within about $2,000 of the Final Rule salary level, including  "Lodging Manager" ($49,720), "Food Service Manager" ($48,690), and "Preschool and Childcare Center Director" ($45,670).  The Business Plaintiffs claim—with no factual support, other than the Bureau of Labor Statistics' classification of these occupations as management occupations—that such jobs "clearly involve the duties associated with an 'Administrative' position."  *See* Bus. Pls.' Br. at 20.  In fact, the Department estimated in the Final Rule that employees given the title "Lodging Manager" and "Food Service Manager" have only a 10 to 50 percent likelihood of satisfying the standard duties test, *see* 81 Fed. Reg. 32,458, AR 256; 81 Fed. Reg. 32,516, AR 224.  If anything, therefore, these examples illustrate the appropriateness of the Final Rule salary level to accurately distinguish bona fide EAP employees.

In any event, even if this data supported the Business Plaintiffs' arguments, it would be insufficient to enable this Court to revisit a complicated and technical decision that the Department made based on economic data and a broad understanding of the interests of a wide array of stakeholders.  Rather, the court "must look at the decision not as a . . . statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality."  *Hayward*, 536 F.3d at 380.  Therefore, Plaintiffs claims must fail.

**C.  The Automatic Updating Component is Entitled to *Chevron* Deference**

Recognizing that "[l]apses between rulemakings have resulted in EAP salary levels that are based on outdated salary data," and thus are ill-equipped to distinguish between bona fide EAP employees and those who should have minimum wage and overtime protections, the Department included a mechanism for automatically updating the salary level every three years using the same methodology used to set the initial salary level (of $913 per week) in the Final Rule.  81 Fed. Reg. 32,430-33, AR 138-41.  Under 29 U.S.C. § 213(a)(1)'s broad grant of authority, which permits establishing the salary level test, the Department similarly has authority to include this updating mechanism to ensure that the salary level test remains effective.  Under the automatic updating mechanism, salary level changes will occur at regular intervals using a publicly available data source, which will in turn benefit employers and employees by replacing infrequent, and thus more drastic, salary level changes with gradual changes occurring at predictable intervals.  81 Fed. Reg. 32,435, AR 143.

The Business Plaintiffs' arguments against the automatic updating provision must fail.  First, the Business Plaintiffs' arguments are based on the misapprehension that the automatic updating mechanism is "unmoored from the functions specified in the FLSA."  Bus. Pls.' Br. at 22.  In the Final Rule, the Department established a methodology for the salary level test that works appropriately with the standard duties test to distinguish between bona fide EAP employees and overtime-protected employees.  The automatic updating component merely recalculates this salary threshold every three years based on current data using the same methodology established through notice-and-comment rulemaking so that the salary level test continues to work appropriately with the duties test to adequately identify bona fide EAP employees, and continues to define the scope of the exemption in a way that is consistent with

the FLSA's purpose.  Because the methodology—which takes into account the coordinated duties test—remains the same, the automatic updating component simply keeps the salary threshold accurate in light of changing salary levels in the workplace.

Second, it is of no moment that the FLSA does not explicitly mention automatic updating in such terms.  The Supreme Court has long recognized that the "'power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" *Coke*, 551 U.S. at 165, quoting *Chevron*, 467 U.S. at 843.  In addressing the same exemption as *Coke*, the D.C. Circuit in *Home Care Association* upheld a regulation in which the Department changed its position on the question central to the challenge in *Coke*: whether domestic service employees employed by third-party agencies are exempt from the FLSA's minimum wage and overtime protections.  799 F.3d at 1089.  Recognizing the ambiguity in the statute and the authority granted to the Department to interpret the relevant statutory terms, the D.C. Circuit upheld the changed regulation.  *Id.* at 1090-93.  Indeed it is because the exemption at issue in *Coke* and *Home Care Association* "refers broadly to 'domestic service employment' and to 'companionship services,'" and makes no reference to third party employers, that the Court held that Congress "expressly instruct[ed]" the agency to work out the details of "whether to include workers paid by third parties within the scope of the definitions."  Coke, 551 U.S. at 167.

Here, Congress expressly delegated authority to the Department to "define and delimit" the terms in Section 213(a)(1), and left to the agency's discretion how to make that determination.  Thus, contrary to the Business Plaintiffs' assertion, Bus. Pls.' Br. at 23, this is not a case in which the Court must "presume that a power is delegated," *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015), or interpret "cryptic" statutory language,

*F.D.A. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000), to determine if Congress delegated such authority.  Under this broad delegation of authority, the Department has established a salary level test, a duties test, and a salary basis requirement, none of which is specifically mentioned in the statutory text.    Similarly, establishing an updating mechanism to keep the salary level up to date is within the agency's broad authority under Section 213(a)(1).

Indeed, the Department has made significant changes to the EAP regulations over the past 75 years.  It added separate salary level requirements for professional and administrative employees in 1940, *see* 5 Fed. Reg. 4,077; adopted the short and long tests in 1949, *see* 14 Fed. Reg. 7,705-07; and eliminated the long duties test, created a standard duties test, and established a test for highly compensated employees in 2004, *see* 69 Fed. Reg. 22,122.  Yet none of these changes is explicitly mentioned in the FLSA.  Just as establishing and recalibrating the various tests for the exemption over the decades is within the Department's "broad latitude," *see Mississippi Publishers Corp.*, 364 F.2d at 608, to "define and delimit" the exemption, so too is establishing a mechanism through notice and comment rulemaking to keep the salary level current with changes in the labor market consistent with the salary level methodology.  Notably, promulgating the automatic updating mechanism in no way prevents the Department from using notice and comment rulemaking to revisit the salary level test methodology, or any other aspect of the EAP exemptions (including the automatic updating mechanism), from "time to time," 29 U.S.C. § 213(a)(1), as cumulative changes in job duties, compensation practices, and other relevant working conditions indicate that changes may be warranted.  *See* 81 Fed. Reg. 32,431, AR 139.

Third, the Business Plaintiffs' reliance on the fact that the FLSA does not index the minimum wage rate, the hourly wage for computer employees, or the annual compensation for

28

"nonprofit parents" is misplaced.  *See* Bus. Pls.' Br. at 24, citing 29 U.S.C. §§ 206, 213(a)(17),

213(b)(24).  Congress explicitly established the minimum wage, hourly wage for computer

employees, and the annual compensation for "nonprofit parents" in their respective statutory

provisions and did not delegate to the Department the authority to define those figures.  By

contrast, Section 213(a)(1)'s broad grant of discretion expressly contemplates that the

Department will interpret the scope of the exemption through duly promulgated regulations, as it

did with the Final Rule.  Moreover, the Business Plaintiffs' reliance on statutes adopting

automatic updating—to argue that Congress must explicitly authorize such mechanisms—is

inapposite; in each cited instance where Congress expressly provided for updating, it also

established the underlying rate in the statutory provision.  *See* Bus. Pls.' Br. at 23-24; *see also* 29

U.S.C. § 1083(c)(7)(C)(i)(II)(setting limitation of "excess employee compensation" that is

indexed under 29 U.S.C. § 1083(c)(7)(D)(vii)); 16 U.S.C. § 497c(a)-(b)(establishing "ski area

permit rental charge" formula that is indexed in 16 U.S.C. § 497c(b)(3)); 43 U.S.C. §

1337(a)(3)(C)(v)-(vi)(establishing oil and natural gas royalty prices that are indexed in 43 U.S.C.

§ 1337(a)(3)(C)(vii)). By contrast, the salary level test was not set by Congress, but was

developed over the course of the previous 75 years through regulation under an express grant of

authority. It therefore makes sense that Congress would not have addressed automatic updating

in Section 213(a)(1), as it too falls within the scope of the Department's authority to define and

delimit its terms. *Cf. Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("Because the salary-basis test is

a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence,

controlling unless plainly erroneous or inconsistent with the regulation.") (internal quotation

marks and citation omitted).  The Business Plaintiffs have simply failed to identify any basis on

which the Court could overturn the Department's reasonable decision to include a procedure to

keep the salary level test up to date, particularly in light of the substantial deference owed to the agency's reasonable interpretation of this statutory provision.  Therefore, the Business Plaintiffs have failed to show that the automatic updating mechanism exceeds the Department's statutory authority.

## II.      The Rule's Automatic Updating Component Is Procedurally Sound

The Business Plaintiffs' claim that the automatic updating component of the salary level test violates the APA's procedural requirements is similarly unavailing.  The APA imposes on an agency engaging in rulemaking certain procedural requirements, including publication in the Federal Register; a comment period for public participation; and publication of a final rule that presents "a concise general statement of [its] basis and purpose."  5 U.S.C. § 553(b), (c).  The Department promulgated the Final Rule—including the automatic updating provision—through a robust notice-and-comment process that was fully consistent with these requirements.  The NPRM expressly suggested the use of an automatic updating mechanism to preserve the accuracy of the salary level test.  80 Fed. Reg. 38,537-42. The Department provided a sixty-day comment period and received over 270,000 comments in response to the NPRM from a broad array of constituencies.  *Id.*  Many of these comments addressed the proposed automatic update to the salary level test.  *See id.* at 32,430. The Department carefully considered the comments and addressed them in the Final Rule, which provides extensive reasoning to support the Department's decisions, including the automatic updating provision.  *See id.* at 32,430-33. Indeed, the Department made several changes to the automatic updating provision in response to the comments:  it selected the "fixed percentile" updating method; increased the updating frequency from annually to triennially; and increased the notice before the updated salary level takes effect from at least 60 days to at least 150 days.  *See* 81 Fed. Reg. 32,430, AR 138.

30

Thus, the Business Plaintiffs' reliance on *Encino Motorcars* is unfounded.  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016).  In that case, the Department completed a notice-and-comment rulemaking by "issuing a final rule that took the opposite position from the proposed rule," and "abandon[ing] its decade-old practice," but provided "little explanation for its decision."  *Id.* at 2123.  "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions."  *Id.* at 2125.  Specifically, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*.  The Final Rule establishing automatic updating easily meets this standard.  The agency provided a detailed discussion of the relevant regulatory history, explained the need for an updating mechanism, addressed issues and concerns raised in the comments, considered the equities for various groups of stakeholders, provided an explanation for departures from the NPRM, and relied on empirical data.  *See* 81 Fed. Reg. 32,430-43, AR 138-41.

The automatic updating procedure does not change the salary level test—which requires that exempt employees be paid a salary equal to at least the 40th percentile of full-time salaried workers in the lowest-wage Census region.  Nor does it "reverse[] longstanding regulatory policy" of the salary level being data dependent. Bus. Pls.' Br. at 25.  The salary level test methodology is set in the Final Rule, and will remain in place until the next time the Department determines it needs to reassess it.  It is important to note that the announcement of the first automatic update—through publication in the Federal Register at least 150 days before to provide ample notice to stakeholders—will simply notify the public about the new salary level, recalculated based on 2019 data.  It will not make any substantive changes to the salary level test or the Final Rule, *see* 81 Fed Reg. at 32432, AR 140, and therefore it is not a rulemaking that

would trigger the APA's procedural requirements.  It merely adjusts the salary level based on

current data.  Indeed, the salary level may not necessarily increase, as the Business Plaintiffs

assume.  "[M]aintaining the salary level at a fixed percentile of earnings will help ensure the test

continues to reflect prevailing wage conditions."  81 Fed. Reg. 32,431-32, AR 139-40.  Thus, for

example, if a recession caused the 40th percentile of salaried worker earnings in the lowest wage

census region to decrease between updates, the salary level itself would decrease accordingly.

*Cf. Alvarado Parkway Inst., Inc. v. Mendez*, 789 F. Supp. 1190, 1196 (D.D.C. 1992) ("The Court

is satisfied that the recalculation announced on November 28, 1989, did not so alter the

methodology promulgated in 1988 as to constitute a substantive rule, subject to the APA's

notice-and-comment requirements.").

Although it is true that the Department has previously declined commenter requests to

institute automatic updating, *see* 81 Fed. Reg. 32,432, AR 140, "[n]othing in the [APA] prohibits

an agency from changing its mind, if that change aids it in its appointed task," *Am. Petroleum

Inst. v. E.P.A.*, 661 F.2d 340, 355 (5th Cir. 1981), and, as is the case here, the agency "provide[s]

a reasoned explanation for the change."  *Encino Motorcars*, 136 S. Ct. at 2125.  Here, the length

of time since the 2004 rulemaking prompted the Department to reexamine its position on this

matter, *see* 81 Fed. Reg. 32,432, AR 140, and the Final Rule explains in considerable detail the

Department's reasons for instituting an automatic updating mechanism.  *See id.* at 32,430-43, AR

138-41.  As to the Business Plaintiffs' reference to the Department's statement in the 2004 final

rule that automatic updating "is contrary to congressional intent," Bus. Pls.' Br. at 22 (quoting 69

Fed. Reg. 22,171-72), as explained in the Final Rule, *see* 81 Fed. Reg. 32,432, AR 140, this

language simply reflected the Department's conclusion at that time that an inflation-based

updating mechanism that unduly impacted low-wage regions and industries would be

inappropriate.  Such concerns do not arise here because the methodology used to set (and thus automatically update) the salary level accounts for these low-wage groups.

Moreover, to the extent the Business Plaintiffs are challenging the updated salary threshold that will be announced prior to January 1, 2020, such a challenge is not yet ripe.   The first automatic update will be based on data from 2019, and will not take effect until January 1, 2020.  See 81 Fed. Reg. 32,443, AR 151.  A proper challenge (if any) to this adjusted salary threshold would arise only when it is published in the Federal Register at least 150 days before its effective date, as required by the Rule.  *See id.* 32,430; *see also Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").  In determining whether the Business Plaintiffs' claim is ripe, the Court should consider "the fitness of the issues for judicial decision," and "the hardship to the parties of withholding court consideration."  *Id.* at 808.  The Business Plaintiffs should have to wait at least until the updated salary level has been published, if not until they can show that they have been or will be harmed by that salary level, to raise a procedural challenge to its publication. And the Business Plaintiffs have not alleged, let alone demonstrated, any harm resulting from any 2020 salary level update that would weigh in favor of deciding this question before "the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out."  *Id.*  Any challenge the Business Plaintiffs raise to the form or content of the first automatic update is premature, where, as here, there has been no "concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm

him."  *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808.

Thus, the Business Plaintiffs' procedural APA claim lacks merit.  The agency adopted the salary level test methodology and the automatic updating mechanism in the Final Rule through an extensive notice-and-comment process, and in the Rule the agency provides a thorough explanation for its decision to implement automatic updating based on that methodology.  Any procedural challenge with respect to the Final Rule must therefore fail, and any such challenge to the announcement of the first automatic update, which will be published in 2019, is not yet ripe.

### III.    Plaintiffs' Remaining Claims Lack Merit

The Business Plaintiffs argue that the Rule is arbitrary and capricious for three additional reasons.  First, they allege that the Department did not "meaningfully address" its alleged "shift" from "decades of regulatory and judicial precedent" holding that the exemption hinges on job functions.  Bus. Pls.' Br. at 27.  Second, the Business Plaintiffs assert that the Department did not consider and address "reliance interests" during the notice-and-comment phase.  *Id.* at 27-30.  And third, the Business Plaintiffs argue that the Department's "treatment of bonuses, incentives, and commissions" with respect to the salary level test illustrates "the arbitrary and capricious nature of the Rule."  *Id.* at 30.  Each argument fails.

As discussed above, the Final Rule is entitled to the "highly deferential" review under *Chevron*, which forbids a court "from substituting [its] judgment for that of the agency." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.,* 374 F.3d 362, 366 (5th Cir. 2004) (citations and quotations omitted); *accord Handley v. Chapman*, 587 F.3d 273, 281 (5th Cir. 2009) ("This is a narrow and highly deferential standard.").  A reviewing court starts from "a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Texas Clinical Labs., Inc. v. Sebelius*,

34

612 F.3d 771, 775 (5th Cir. 2010).  So long as the agency "gave at least minimal consideration to relevant facts contained in the record," and "articulate[d] a rational relationship between the facts found and the choice made, its decision is not arbitrary and capricious." *Harris v. United States,* 19 F.3d 1090, 1096 (5th Cir. 1994) (citations and footnotes omitted).

### A.  The Department Thoroughly Explained the Change It Made to the Salary Level Test, Which Did Not Reverse Longstanding Policy

Although Business Plaintiffs argue that the Department did not "meaningfully address" its alleged "reversal" of "longstanding regulatory policy" in which the exemption hinged primarily on job functions, Bus. Pls.' Br. at 26-27, that has not been the Department's policy, so no "reversal" occurred, *see supra* at 11-25.  Relatedly, they argue that the Department relied on forbidden factors because it allegedly excluded "millions of employees who are performing bona fide exempt job duties on the basis of their salary alone."  Bus. Pls.' Br. at 27.  But Business Plaintiffs offer nothing in support of this assertion, save for a misunderstanding of the relationship between the salary level test and standard duties test.  Again, the "fact that an employee satisfies the duties test, especially the more lenient standard duties test, does not alone indicate" EAP status.  81 Fed. Reg. 32,413, AR 121; Defs.' Br. at 27-28.  But although the Rule is presumptively valid and the Business Plaintiffs bear the burden of showing that it is arbitrary and capricious, *Texas Clinical Labs, Inc. v. Sebelius,* 612 F.3d 771, 775 (5th Cir. 2010), they *entirely* ignore the Department's extensive discussion in which it explained and justified this change.  *See* 81 Fed. Reg. 32,408-15, AR 116-23; *see also* 81 Fed. Reg. 32,392, AR 100; 32,400, AR 107; 32,403-04, AR 111-12; 32,406, AR 114; 32,463, AR 171.  The Department fully explained its change to the salary level test and did not rely on any factors that Congress did not intend it to consider.

### B.  The Rule Responded to Concerns of the Business Community

Next, the Business Plaintiffs single out a few of the 270,000-plus comments received by the Department that were allegedly not "meaningfully address[ed]" in the Rule.  Bus. Pls.' Br. at 30.  This argument is not supported by the law or the record.  As to the law, "[a]n agency need not respond to every study, and only has to address 'significant comments.'"  *Texas Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 328 n.7 (5th Cir. 2001); *see also Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (similar); *see also Delta Foundation, Inc. v. United States*, 303 F.3d 551, 567 (5th Cir.2002) ("To pass the 'arbitrary and capricious' test, the agency must give at least minimal consideration to relevant facts contained in the record. An agency need not respond to every stray comment in the record, however, in order to pass the 'arbitrary and capricious' test.").  "An agency need not respond to or explicitly discuss every comment received 'so long as it responds in a reasoned manner to significant comments received' or explains the rule in a way that implicitly rejects significant comments received."  *Caritas Med. Ctr. v. Johnson*, 603 F. Supp. 2d 81, 92 (D.D.C. 2009) (*quoting U.S. Satellite Broad. Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984)); *see also Thompson*, 741 F.2d at 408 ("The failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors.") (intenral quotation marks omitted).  This principle is especially applicable here, where the agency received 270,000 comments and could not, as a practical matter, respond to each one.

And as to the record, any reasonable review of the Final Rule amply demonstrates that the views highlighted by the Business Plaintiffs were addressed.  They point to NAM's comment concerning employees' differing salaries by region that may cause employees with similar duties to nevertheless be treated differently under the Rule.  Bus. Pls.' Br. at 28.  But the Department highlighted this specific concern, 81 Fed. Reg. 32,407, AR 115, explained that "this has always

36

been the case and may occur at any salary level," and reiterated its conclusion from the 2004 rule

that adopting regional salary levels was not administratively feasible, *see* 81 Fed. Reg. 32,410-

411, AR 118-19. The National Association of Wholesaler-Distributors said that increasing

salaries for middle managers or reducing work hours would slow business growth and lead to

reductions in employment, Bus. Pls.' Br. at 28, but the Department explained that in some

instances the Final Rule may result in expanded employment opportunities, as several other

commenters predicted, *see* 81 Fed. Reg. 32,503, AR 211. NFIB "challenge[d] DOL's

assumption that employees will be paid more" instead of businesses reducing work hours and

therefore productivity, Bus. Pl.'s Br. at 28, yet the Department did not assume that all employees

would be paid more under the Rule, as it repeatedly explained how employers will likely respond

in a variety of ways, including decreasing hours for newly non-exempt workers in some

instances, *see, e.g.*, 81 Fed. Reg. 32,418, AR 126; 32,501-03, AR 209-211, and also explained

how the Rule may increase or decrease productivity, 81 Fed. Reg. 32,479, AR 187; 32,502-03,

AR 210-11. NRF's concerns that the Rule "would hollow out middle management ranks and

negatively impact employee morale," Bus. Pls.' Br. at 29, were also addressed, *see* 81 Fed. Reg.

32,416, AR 124, as the Department explained that employers can allow employees to stay late to

"get the job done" (i.e., to establish their management bona fides), but would have pay

nonexempt employees overtime, 81 Fed. Reg. 32,418-19, AR 126-27; *see also* 81 Fed. Reg.

32,419, AR 127 (explaining, in part, Department's belief that "for most employees their feelings

of importance and worth come not from their FLSA exemption status but from the increased pay,

flexibility and fringe benefits that traditionally have accompanied exempt status, as well as from

the job responsibilities they are assigned."); *accord* 81 Fed. Reg. 32,417, AR 125 (referencing

employee commenters stating they would not view becoming overtime eligible as demotion). As

for NRF's concern that litigation will "inexorably flow from the Rule," Bus. Pls.' Br. at 29, the

Department explained its view that the Rule would, in fact, reduce litigation because fewer

employees' exempt status turn on application of the duties test, 81 Fed. Reg. 32,419-20, AR 127-

28.  Although AH&LA feared that employers would respond to the Rule with increased

automation, Bus. Pls.' Br. at 29, the Department explained that it was unlikely that those

performing jobs that can be easily automated would satisfy the duties test.  81 Fed. Reg. 32,480,

AR 188.  And as for ASAE's concern that non-exempt employees would be excluded by non-

profit employers from after-hour conferences, Bus. Pls.' Br. at 29, the Department addressed

such concerns and explained that employers have a wide range of options if they want employees

to attend such trainings and meetings, *see* 81 Fed. Reg. 32,418-19, AR 126-27; 32,479, AR 187;

*see also* 32,420-21, AR 128-29 (detailing application of Rule to non-profit employers, including

how reducing salary level from initial NPRM offers non-profit employers relief and how it is

inappropriate and not necessary to treat non-profit employers differently).

### C.  The Agency's Decision Regarding Bonus Compensation is Entitled to Deference

Last, the Business Plaintiffs argue that the Final Rule is arbitrary and capricious because

it allows employers to satisfy "only" up to ten percent of the salary level with nondiscretionary

bonuses, incentives, and commissions, if such payments are made quarterly or more frequently,

and that "such distinctions bear no rational relationship to the statutory task of defining exempt

job functions."  Bus. Pls.' Br. at 30.  At the behest of employer commenters, the Department

decided to include (for the first time) nondiscretionary bonuses, incentives, and commissions as

part of the salary level test because "nondiscretionary bonuses are an important part of many

employer compensation systems that cover EAP employees," and "the provision of

nondiscretionary bonus and incentive payments has become sufficiently correlated with exempt

status (for example, as evidence of the overtime exempt employee's exercise of management skill or exercise of independent judgment)."  81 Fed. Reg. 32,426, AR 134.

The Department had good reason to allow employers to satisfy only up to ten percent of the salary level with such payments made on a quarterly (or more frequent) basis—to preserve the integrity of the of the salary basis test.  The Department "has long found that the payment of a fixed predetermined salary not subject to change based on the quantity or quality of work is a strong indicator of exempt EAP status," and nondiscretionary bonuses "also correlate directly or indirectly in many instances with either the quantity or quality of work performed."  81 Fed. Reg. 32,426, AR 134.  Permitting nondiscretionary bonus payments to satisfy more than ten percent of the salary level "could undermine the premise of the salary basis test by depriving workers of a predetermined salary that does not fluctuate because of variations in the quality or quantity of their work and thus is indicative of their exempt status."  Id.[11]  For similar reasons, the Department needed to limit "the maximum time period between such payments" (to no less often than quarterly).  81 Fed. Reg. 32,423, AR 131.  And the Department broadened the permissible bonus payments from monthly, as initially proposed, to quarterly in response to employer requests in order to give employers adequate "opportunity to measure, quantify, and calculate payments tied to productivity or profits," as well as to "limit the compliance costs that some commenters suggested employers would incur from having to review payroll on a monthly

---

[11] The Department also recognized such a limit was appropriate given that these payments were included as part of the salary level test for the first time and therefore their impact is unknown; the threshold could be revised based on future experience.  81 Fed. Reg. 32,426, AR 134.  Also, government employers expressed concern that including these payments may competitively disadvantage them, and the ten percent cap strikes the appropriate balance of allowing "employers to use expanded sources of income to meet the required salary level, does not unduly harm government employers, and ensures that the salary basis requirement remains 'valuable and easily applied criterion that is a hallmark of exempt status."  Id. (citation omitted).

(or more frequent) basis to determine which employees satisfied the salary level test." 81 Fed.

Reg. 32,427, AR 135.  *See Gaughf Properties, L.P. v. C.I.R.*, 738 F.3d 415, 425 (D.C. Cir. 2013)

("'Regulation, like legislation, often requires drawing lines'" and holding the "[t]he Secretary's

lines are reasonably drawn.") (quoting *Mayo Found. for Medical Educ. & Research v. United*

*States*, 562 U.S. 44, 59 (2011)).

## CONCLUSION

The Court should deny Business Plaintiffs' motion and enter judgment for Defendants.


Dated:  November 18, 2016                     Respectfully submitted,

M. PATRICIA SMITH                             BENJAMIN C. MIZER
Solicitor of Labor                            Principal Deputy Assistant Attorney General

JENNIFER S. BRAND                             BRIT FEATHERSTON
Associate Solicitor                           Acting United States Attorney

PAUL L. FRIEDEN                               JUDRY L. SUBAR
Counsel for Appellate Litigation              Assistant Branch Director
                                              Federal Programs Branch

STEVEN W. GARDINER                              _/s/ Julie S. Saltman_____ _
Senior Attorney                               JULIE S. SALTMAN
                                              KEVIN SNELL
                                              Trial Attorney
ERIN M. MOHAN                                 United States Department of Justice
Attorney                                      Civil Division, Federal Programs Branch
U.S. Department of Labor                      20 Massachusetts Avenue N.W., Room 7111
200 Constitution Ave NW, N-2716               Washington, D.C.  20530
Washington, DC  20210                         Tel: (202) 532-4252
                                              Fax: (202) 616-8470
                                              Email: Julie.saltman@usdoj.gov

                                              *Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 18, 2016, I filed the foregoing electronically with the

Clerk of the United States District Court for the Eastern District of Texas through the CM/ECF

system, which caused the all counsel of record to be served by electronic means.


*/s/ Julie Saltman*
JULIE SALTMAN