# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| STATE OF NEVADA, ET AL | § | |
| | § | |
| v. | § | Civil Action No.  4:16-CV-00731 |
| | § | Judge Mazzant |
| UNITED STATES DEPARTMENT OF | § | |
| LABOR, ET AL | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the Emergency Motion for Preliminary Injunction (Dkt. #10) filed by the State of Nevada and twenty other states (the "State Plaintiffs").  After considering the relevant pleadings, exhibits, and argument at the preliminary injunction hearing, the Court enters the findings of fact and conclusions of law set forth below.  Based on these findings and conclusions, the Court grants the State Plaintiffs' motion.

## BACKGROUND

Congress enacted the Fair Labor Standards Act ("FLSA") in 1938.  The FLSA requires that employees engaged in commerce receive not less than the federal minimum wage (currently, $7.25 per hour) for all hours worked.  Employees are also entitled to overtime pay at one and one-half times the employee's regular rate of pay for all hours worked above forty in a week.  When enacted, the FLSA contained a number of exemptions to the overtime requirement.  Section 213(a)(1) of the FLSA exempts from both minimum wage and overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  This exemption is commonly referred to as the "white collar" or "EAP" exemption.  While the FLSA did not define the terms "bona fide executive, administrative, or professional capacity," Congress delegated to the Secretary of Labor the power to define and

delimit these terms through regulations.  The Secretary of Labor authorized the Department of Labor (the "Department") to issue regulations to interpret the EAP exemption.

The Department's initial regulations, found in 29 C.F.R. § 541, defined "executive," "administrative," and "professional" employees based on the duties they performed in 1938. Two years later, the Department revised the regulations to require EAP employees to be paid on a salary basis.

In 1949, the Department again amended the regulations.  These regulations established the "long" test and the "short" test for assessing whether an employee qualified for the EAP exemption.  The long test combined a low minimum salary level with a rigorous duties test, which restricted the amount of nonexempt work an employee could do to remain exempt.  The short test combined a higher minimum salary level with an easier duties test that did not restrict amounts of nonexempt work.  After the Department implemented the long and short tests, Congress amended 29 U.S.C. § 213(a)(1) in 1961.  This amendment permitted the Department to define and delimit the EAP categories "from time to time."

In 2004, the Department eliminated the long and short tests, replacing them with the "standard" duties test that did not restrict the amount of nonexempt work an exempt employee could perform.  The Department also set a salary level equivalent to the lower salary that the Department previously used for the long test.  The 2004 regulations, which are currently in effect, require an employee to meet the following three criteria to qualify for the EAP exemption. First, the employee must be paid on a salary basis (the "salary-basis test").  Second, an employee must be paid at least the minimum salary level established by the regulations (the "salary-level test").  The current minimum salary level to qualify for the exemption is $455 per week ($23,660

2

annually).   And third, an employee must perform executive, administrative, or professional duties (the "duties test").

On March 23, 2014, President Obama issued a memorandum directing the Secretary of Labor to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees."   Presidential Memorandum of March 13, 2014; Updating and Modernizing Overtime Regulations, 79 Fed. Reg. 18,737, 18,737 (Mar. 13, 2014). Although the Department revised the regulations in 2004, the President opined, "regulations regarding . . . overtime   requirements . . . for   executive,   administrative,   and   professional employees . . . have not kept up with our modern economy."   *Id.*   In response to the President's memorandum, the Department published a Notice of Proposed Rulemaking to revise 29 C.F.R. Part 541.   The Department received more than 293,000 comments on the proposed rule, including comments from businesses and state governments, before publishing the final version of the rule (the "Final Rule") on May 23, 2016.

Effective December 1, 2016, the Final Rule will increase the minimum salary level for exempt employees from $455 per week ($23,660 annually) to $921 per week ($47,892 annually). The new salary level is based upon the 40th percentile of weekly earnings of full-time salaried workers in the lowest wage region of the country, which is currently the South.   The Final Rule also establishes an automatic updating mechanism that adjusts the minimum salary level every three years.  The first automatic increase will occur on January 1, 2020.

The State Plaintiffs filed suit against the Department, the Wage and Hour Division of the Department, and their agents (collectively, "Defendants") challenging the Final Rule (Dkt. #1). On October 12, 2016, the State Plaintiffs moved for emergency preliminary injunctive relief (Dkt. #10).  Defendants filed their response on October 31, 2016 (Dkt. #37).  The State Plaintiffs

filed their reply on November 10, 2016 (Dkt. #50).  Defendants filed their sur-reply on November 15, 2016 (Dkt. #51).

The Plano Chamber of Commerce and over fifty other business organizations (the "Business Plaintiffs") challenged the Final Rule in *Plano Chamber of Commerce et al. v. Perez et al.*, No. 4:16-cv-732 (E.D. Tex. Sept. 20, 2016).  On October 14, 2016, the Business Plaintiffs moved for expedited summary judgment (No. 4:16-cv-732, Dkt. #7; No. 4:16-cv-731, Dkt. #35). The Court consolidated the Business Plaintiffs' action with the State Plaintiffs' action on the unopposed motion from the Business Plaintiffs.  In evaluating the merits of the State Plaintiffs' preliminary injunction, the Court considered the Business Plaintiffs' summary judgment motion as an amicus brief in support of the preliminary injunction for overlapping issues (Dkt. #33). The Court also considered Defendants' opposing amicus brief (Dkt. #46).

On November 16, 2016, the Court held a preliminary injunction hearing to consider oral argument regarding the State Plaintiffs' motion.

## JURISDICTION

This matter presents a federal question and therefore the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has authority to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure and review administrative decisions pursuant to 5 U.S.C. § 702 of the Administrative Procedures Act ("APA").

The Court begins by examining whether the State Plaintiffs have standing to sue in federal court.  Article III of the Constitution limits federal jurisdiction to "Cases" and "Controversies."  A party that cannot present a case or controversy within the meaning of Article III does not have standing.  Under the three-part test for Article III standing, a plaintiff must show an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the

challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citation omitted). The State Plaintiffs face imminent monetary loss that is traceable to the Department's Final Rule. They would also receive redress if the Court determines the Final Rule is unlawful. Defendants do not contest standing. Therefore, the Court confirms that the State Plaintiffs have Article III standing.

Defendants claim the State Plaintiffs' challenges to the automatic updating mechanism are not ripe for adjudication. The Court is not persuaded by this argument. A challenge to administrative regulations is fit for review if "(1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the Court's] ability to deal with the legal issues presented.'" *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (internal quotation marks omitted) (citing *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)). Here, the State Plaintiffs make only legal arguments. They question the lawfulness of the Final Rule, the Department's authority to promulgate it, and whether the automatic updating mechanism complies with APA requirements. All parts of the Final Rule constitute final agency action because the rule was published and is set to go into effect on December 1, 2016. Further, the Final Rule creates new legal obligations for employers who must pay a higher salary level for certain employees to be exempt from overtime. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (stating the two-part test for "final agency action" to include an action that marks the consummation of the agency's decision-making process and an action where "rights or obligations have been determined, or from which legal consequences will flow"). The facts of this case have sufficiently developed to address the legality of the Department's Final Rule at this stage in the litigation. Accordingly, the automatic updating mechanism is ripe for review.

## LEGAL STANDARD

A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.* Nevertheless, a movant "'is not required to prove its case in full at a preliminary injunction hearing.'" *Fed. Sav. & Loan Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1985) (quoting *Univ. of Tex. v. Comenisch*, 451 U.S. 390, 395 (1981)). The decision whether to grant a preliminary injunction lies within the sound discretion of the district court. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

## ANALYSIS

A. Likelihood of Success on the Merits

To prevail on their motion for preliminary injunction, the State Plaintiffs must demonstrate a substantial likelihood of success on the merits. This requires a movant to present a prima facie case. *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)). A prima face case does not mean the State Plaintiffs must prove they are entitled to summary judgment. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).

1. The FLSA's Application to the States

The State Plaintiffs argue the FLSA's overtime requirements violate the Constitution by regulating the States and coercing them to adopt wage policy choices that adversely affect the

States' priorities, budgets, and services.  The State Plaintiffs rely on *National League of Cities v. Usery*, which held the Tenth Amendment limited Congress's power to apply the FLSA's minimum wage and overtime protections to the States.  426 U.S. 833, 851–52 (1976).  The Supreme Court recognized:

> One undoubted attribute of state sovereignty is the States' power to determine the wages which shall be paid to those whom they employ in order to carry out their governmental functions, what hours those persons will work, and what compensation will be provided where these employees may be called upon to work overtime.

*Id.* at 845.  The State Plaintiffs acknowledge that the Supreme Court overruled *Usery* in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985).  However, they urge *Garcia* has been, or should be, overruled because subsequent decisions have called into question *Garcia*'s continuing validity.  Accordingly, the State Plaintiffs claim the Department's Final Rule displaces the State Plaintiffs' independence to set employee compensation, similar to the FLSA amendments at issue in *Usery*.

Defendants contend that Supreme Court precedent in *Garcia* forecloses the State Plaintiffs' argument.

*Garcia* controls the disposition of this issue.  The Supreme Court in *Garcia* established that Congress had authority under the Commerce Clause to impose the FLSA's minimum wage and overtime requirements on state and local employees.  469 U.S. at 554.  The Supreme Court overruled *Usery* because it found rules based on the subjective determination of "integral" or "traditional" governmental functions provide little or no guidance in determining the boundaries of federal and state power.  *Id.* at 546–47.  In the line of cases following *Garcia*, the Supreme Court has imposed limits on the power of Congress to enact legislation that affects state and local governments.  *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997) (holding Congress

cannot compel the states to enact or administer a federal regulatory program).  However, no Supreme Court case has specifically overruled *Garcia*.  The Supreme Court has declared that lower courts must follow precedent and allow the Supreme Court to overrule its decisions.  *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

Therefore, the Court will follow *Garcia* and apply the FLSA to the States.

The State Plaintiffs also argue the FLSA does not apply to the States based on the clear statement rule.  This argument likewise does not succeed.  Under the FLSA, employers are required to pay the federal minimum wage to their employees or those "employed in an enterprise engaged in commerce or in the production of goods for commerce."  29 U.S.C. § 206.  "Enterprise engaged in commerce or in the production of goods for commerce" is defined to include the "activity of a public agency."  *Id.* § 203(s)(1)(C).  A "public agency" means "the government of a State or political subdivision thereof; any agency of . . . a State, or a political subdivision of a State."  *Id.* § 203(x).  Thus, Congress was clear in its intention for the FLSA to apply to States.

### 2.  Statutory Construction and *Chevron* Deference

When reviewing an agency's construction of a statute, the Court applies a two-step process.  The Court first determines "whether Congress has directly spoken to the precise question at issue."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842–43.

Second, if Congress has not unambiguously expressed its intent regarding the precise question at issue, then the Court will defer to the agency's interpretation unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844.

At the first step, the Court must apply "traditional tools of statutory construction" to determine whether the statute is ambiguous. *Id.* at 843 n.9. A statute is ambiguous if it is susceptible to more than one reasonable interpretation or more than one accepted meaning. *United Servs. Auto Ass'n v. Perry*, 102 F.3d 144, 146 (5th Cir. 1996). Statutory construction begins with the language of the statute, "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). The Court may also consider the statute's legislative history and its purpose to ascertain Congress's intent. *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005). "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent." *Chevron*, 467 U.S. at 843 n.9.

Section 213(a)(1) provides, in relevant part, that "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited from time to time by regulations of the Secretary" shall be exempt from minimum wage and overtime requirements. 29 U.S.C. § 213(a)(1).

The State Plaintiffs assert the plain language of the EAP exemption is clear and illustrates Congress's intent. They argue Congress directly and unambiguously spoke about the type of employees that must be exempt from overtime and the considerations to evaluate such employees. Thus, the State Plaintiffs maintain that the Court should decide this issue at the first step of the *Chevron* analysis.

Defendants respond that Section 213(a)(1) is ambiguous because Congress did not address or define the terms "bona fide executive, administrative, or professional capacity." Instead, Congress delegated to the Department the broad authority to interpret the terms through regulations.[1]  Defendants contend the Final Rule is within its delegated authority and should be reviewed under the deferential standard applied at the second step of *Chevron*.

The precise question at issue here is: What constitutes an employee employed in an executive, administrative, or professional capacity?  The statute is not silent in answering this question.  The Court assumes Congress's intent from the plain meaning of a word when the statute does not define a term.  *INS v. Phinpathya*, 464 U.S. 183, 189 (1984).  Because Section 213 does not define the terms "executive," "administrative," and "professional," the Court considers their plain meaning at or near the time the statute was enacted.  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012).  "Beyond the law itself, dictionary definitions inform the plain meaning of a statute."  *United States v. Radley*, 632 F.3d 177, 182–83 (5th Cir. 2011) (citing *United States v. Ferguson*, 369 F.3d 847, 851 (5th Cir. 2004)).

The Oxford English Dictionary defines "executive" as someone "[c]apable of performance; operative . . . [a]ctive in execution, energetic . . . [a]pt or skillful in execution." *Executive*, 8 *The Oxford English Dictionary* (1st ed. 1933).  "Administrative" is defined as "[p]ertaining to, or dealing with, the conduct or management of affairs; executive." *Administrative*, 1 *The Oxford English Dictionary* (1st ed. 1933).  And the dictionary defines "professional" as "[p]ertaining to, proper to, or connected with a or one's profession or calling . . . [e]ngaged in one of the learned or skilled professions . . . [t]hat follows an occupation

---

[1] Defendants repeatedly quote *Auer v. Robbins*, which states "[t]he FLSA grants the Secretary broad authority to 'defin[e] and delimi[t]' the scope of the exemption for executive, administrative, and professional employees." 519 U.S. 452, 456 (1997).  This case analyzed the *application* of the salary-basis test to police sergeants.  But the validity of the salary-basis test was not challenged.  *Auer*, 519 U.S. at 457.  Further, establishing a salary-basis test does not supplant the duties test and Congress's intent.

as his (or her) profession, life-work, or means of livelihood." *Professional*, 8 *The Oxford English Dictionary* (1st ed. Supp. 1933). These words relate to a person's performance, conduct, or function without suggesting salary.

After reading the plain meanings together with the statute, it is clear Congress intended the EAP exemption to apply to employees doing actual executive, administrative, and professional duties. In other words, Congress defined the EAP exemption with regard to duties, which does not include a minimum salary level. The statute's use of "bona fide" also confirms Congress's intent. "Bona fide" modifies the terms "executive, administrative, and professional capacity." The Oxford English Dictionary defines "bona fide" as "[i]n good faith, with sincerity; genuinely." *Bona fide*, 1 *The Oxford English Dictionary* (1st ed. 1933). The plain meaning of "bona fide" and its placement in the statute indicate Congress intended the EAP exemption to apply based upon the tasks an employee actually performs. Therefore, Congress unambiguously expressed its intent for employees doing "bona fide executive, administrative, and professional capacity" duties to be exempt from overtime.

Defendants do not dispute or contest the plain meanings of "executive, administrative, and professional" but argue the EAP exemption carries a status as well as function component. Defendants offer the definitions of "capacity" and "position." In 1930, "capacity" was understood to mean "position, condition, character, relation," or "to be in, put into . . . a position which enables or renders capable." (Dkt. #51 at p. 6 (citing *Capacity*, 2 *The Oxford English Dictionary* (1st ed. 1933))). "Position" was understood to mean "relative place, situation, or standing; specif[ically], social or official rank or status." (Dkt. #51 at p. 7 (citing *Position*, *Webster's Dictionary* (1st ed. 1942))). Despite the reference to "status" in the definition of "position," the Court is not convinced the plain meanings of "capacity" and "position" reference

11

or imply a salary requirement as set out in the Final Rule.[2]   The Supreme Court interprets "capacity" to counsel "in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities in the context of a particular industry in which the employee works." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2170 (2012).  The plain meanings of the terms in Section 213(a)(1), as well as Supreme Court precedent, affirms the Court's conclusion that Congress intended the EAP exemption to depend on an employee's duties rather than an employee's salary.

Section 213(a)(1) authorizes the Department to define and delimit these classifications because an employee's duties can change over time.[3]   The plain meaning of "define" is to "state explicitly; to limit; to determine the essential qualities of; to determine the precise signification of; to set forth the meaning or meanings of," and the plain meaning of "delimit" is "to fix or mark the limits of: to demarcate; bound."   *Walling v. Yeakley*, 140 F.2d 830, 831 (10th Cir. 1944) (internal quotation marks omitted).   While this explicit delegation would give the Department significant leeway to establish the types of duties that might qualify an employee for the exemption, nothing in the EAP exemption indicates that Congress intended the Department to define and delimit with respect to a minimum salary level.  Thus, the Department's delegation is limited by the plain meaning of the statute and Congress's intent.  Directly in conflict with Congress's intent, the Final Rule states that "[w]hite collar employees subject to the salary level test earning less than $913 per week will not qualify for the EAP exemption, and therefore will be eligible for overtime, irrespective of their job duties and responsibilities."  With the Final

---

[2] The Court is not making a general statement on the lawfulness of the salary-level test for the EAP exemption.  The Court is evaluating only the salary-level test as amended under the Department's Final Rule.

[3] The Fifth Circuit dealt with a challenge to the EAP exemption in *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603 (5th Cir. 1966).  The Fifth Circuit stated the EAP exemption "gives the Secretary broad latitude to 'define and delimit' the meaning of the term 'bona fide executive . . . capacity.'"  *Id.* at 608.  *Wirtz* is distinguishable from this case and thus is not binding.  *Wirtz* did not evaluate the lawfulness of a salary-level test under *Chevron* step one, as *Wirtz* predated *Chevron*.  Further, *Wirtz* offers no guidance on the lawfulness of the Department's Final Rule salary level.

Rule, the Department exceeds its delegated authority and ignores Congress's intent by raising the minimum salary level such that it supplants the duties test.[4]  Consequently, the Final Rule does not meet *Chevron* step one and is unlawful.[5]  The Department's role is to carry out Congress's intent.  If Congress intended the salary requirement to supplant the duties test, then Congress, and not the Department, should make that change.

Moreover, even if Section 213(a)(1) is ambiguous, the Department's Final Rule does not deserve deference at *Chevron* step two.  The Final Rule is not "based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  Specifically, the Final Rule does not comport with Congress's intent.  The broad purpose of 213(a)(1) was to exempt from overtime those engaged in executive, administrative, and professional capacity duties.  Since the FLSA was enacted, the Department has promulgated regulations to define and delimit the EAP exemption.  To be exempt from overtime, the regulations require an employee to (1) have EAP duties; (2) be paid on a salary basis; and (3) meet a minimum salary level.  The Final Rule raises the salary level from $455 per week ($23,660 annually) to $913 per week ($47,476 annually).  The salary level was purposefully set low to "screen[] out the obviously nonexempt employees,

---

[4] The Supreme Court has decided cases in which an agency has overstepped its bounds and offered an interpretation of a statute that "goes beyond the meaning that the statute can bear" without conducting a *Chevron* analysis.  *MCI Telecomm. Corp.*, 512 U.S. at 229; *see also Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2040 (2012) ("We need not resolve that dispute—or address whether, if *Chevron* deference would otherwise apply, it is eliminated by the policy statement's palpable overreach with regard to price controls.").

[5] The Fifth Circuit and the Supreme Court routinely strike down agency interpretations that clearly exceed a permissible interpretation based on the plain language of the statute, particularly if they have great economic or political significance.  A recent Supreme Court case, *King v. Burwell*, involved an interpretation of a statute that would affect millions of people and cost billions of dollars.  135 S. Ct. 2480 (2015).  The Supreme Court determined that the interpretation was an issue of deep "economic and political significance," and "had Congress wished to assign that question to an agency, it surely would have done so expressly."  *Id.* at 2489 (citation omitted).  The Supreme Court rejected the agency's interpretation, finding it "implausible that Congress meant the Act to operate in this manner."  *Id*. at 2494; *see also Util. Air Regulatory Grp. v. E.P.A.*, 134 S. Ct. 2427, 2444 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate 'a significant portion of the American economy' . . . we typically greet its announcement with a measure of skepticism.  We expect Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.'"); *Texas*, 497 F.3d at 501 n.6 ("Additionally, courts 'must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.'" (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000))).

making an analysis of duties in such cases unnecessary." Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 7–8 (1949). The Department has admitted that it cannot create an evaluation "based on salary alone." *Id.* at 23. But this significant increase to the salary level creates essentially a de facto salary-only test. For instance, the Department estimates 4.2 million workers currently ineligible for overtime, and who fall below the minimum salary level, will automatically become eligible under the Final Rule without a change to their duties. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32,391, 32,405 (May 23, 2016). Congress did not intend salary to categorically exclude an employee with EAP duties from the exemption.[6] Therefore, the Final Rule should not be accorded *Chevron* deference because it is contrary to the statutory text and Congress's intent.

3.   The Automatic Updating Mechanism Under the APA

Under the Final Rule, the automatic updating mechanism will change the minimum salary level based on the 40th percentile of weekly earnings of full-time salaried workers in the lowest wage region of the country. The State Plaintiffs claim the mechanism violates the APA because the salary level is adjusted without a notice and comment period.

---

[6] The Supreme Court reasoned:

> Since an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear . . . the Commission's permissive detariffing policy can be justified only if it makes a less than radical or fundamental change in the Act's tariff-filing requirement . . . authority to 'modify' does not contemplate fundamental changes.

*MCI Telecomm. Corp.*, 512 U.S. at 228–29. As in *MCI*, authority to define and delimit does not contemplate fundamental changes or justify a radical change in the statute's operation. Congress gave the Department the authority to define what type of duties qualify—it did not give the Department the authority to supplant the duties test and establish a salary test that causes bona fide EAP's to suddenly lose their exemption "irrespective of their job duties and responsibilities."

Because the Final Rule is unlawful, the Court concludes the Department also lacks the authority to implement the automatic updating mechanism.  Thus, there is no need to address the State Plaintiffs' other arguments.

For the reasons set forth above, the State Plaintiffs have shown a likelihood of success on the merits because the Final Rule exceeds the Department's authority under *Chevron*.

B.  Likelihood of Irreparable Harm

The State Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey*, 647 F.3d at 600.  An injunction is appropriate only if the anticipated injury is imminent and not speculative. *Winter*, 555 U.S. at 22.

Defendants suggest the State Plaintiffs allege only financial injury, which is not enough to justify a preliminary injunction.  Defendants also take issue with the State Plaintiffs' estimates of costs incurred under the Final Rule.

The State Plaintiffs' proposed preliminary injunction seeks to enjoin the Department from implementing its Final Rule on December 1, 2016.  The State Plaintiffs allege that, in the absence of a preliminary injunction, the significant cost of complying with the Final Rule will cause irreparable injury.  The State Plaintiffs offer many examples of such costs.  They submit declarations from seven state officials who estimate it will cost their respective states millions of dollars in the first year to comply with the Final Rule.  The Department agrees the Final Rule will cause increased costs.   Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. at 32,547. Besides costs, the State Plaintiffs also allege that compliance costs will impact governmental programs and services.  As one example, the State of Kansas must evaluate whether its agencies

15

should increase the salaries of their employees to the new minimum salary level or allow these employees to become non-exempt and eligible for overtime (Dkt. #10, Exhibit #3 at ¶ 7).   In particular, the Kansas Department for Children and Families and the Kansas Department of Corrections have over fifty percent of employees affected by the Final Rule (Dkt. #10, Exhibit #3 at ¶ 11).   The Kansas Department for Children and Families and the Kansas Department of Corrections are unable to increase salaries to comply with the Final Rule, as "limited resources of both agencies are already being prioritized toward . . . critical, public safety-related functions."   (Dkt. #10, Exhibit #3 at ¶ 12–13).   As a result, agencies with budgets constraints, such as the two in Kansas, have relatively few options to comply with the Final Rule—all of which have a detrimental effect on government services that benefit the public.   Should the State Plaintiffs ultimately prevail on the merits of their suit, this type of injury cannot be redressed through a judicial remedy after a hearing on the merits.

Accordingly, State Plaintiffs have shown they will suffer irreparable harm if the preliminary injunction is not granted.

## C.  Balance of Hardships

When deciding whether to grant an injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."   *Winter*, 555 U.S. at 9 (citation omitted).

The State Plaintiffs contend the balance of hardships favors granting a preliminary injunction because: (1) the States will be required to spend substantial sums of unrecoverable public funds if the Final Rule goes into effect; and (2) the Final Rule causes interference with government services, administrative disruption, employee terminations or reclassifications, and

harm to the general public.  Defendants respond that the balance of hardships weighs in favor of Defendants because the State Plaintiffs have not established irreparable harm.

Here, as discussed above, the State Plaintiffs have shown a likelihood of success on the merits and irreparable harm.  Defendants have not articulated any harm they will suffer from delaying an implementation of the Final Rule.

Accordingly, the State Plaintiffs have demonstrated that the balance of hardships weighs in favor of preliminary injunctive relief.

### D.  The Public Interest

"'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Winter*, 555 U.S. at 24 (quoting *Weinberger*, 465 U.S. at 312).  This factor overlaps substantially with the balance-of-hardships requirement.  *Id.*

The State Plaintiffs assert the public interest necessitates an injunction.  They argue the Final Rule harms the public by increasing state budgets, causing layoffs, and disrupting governmental functions.

Defendants maintain injunctive relief would harm the public.  Defendants point out that enjoining the Final Rule would deny additional pay, either from an increased salary or from overtime payments, to those who are misclassified.

The Court finds the public interest is best served by an injunction.  If the Department lacks the authority to promulgate the Final Rule, then the Final Rule will be rendered invalid and the public will not be harmed by its enforcement.  However, if the Final Rule is valid, then an injunction will only delay the regulation's implementation.  Due to the approaching effective date of the Final Rule, the Court's ability to render a meaningful decision on the merits is in jeopardy.  A preliminary injunction preserves the status quo while the Court determines the

Department's authority to make the Final Rule as well as the Final Rule's validity.  *See, e.g.*, *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (enjoining the Department from applying a new rule pending a full determination of the matter on the merits).

Accordingly, the Court determines that the State Plaintiffs have satisfied all of the elements required for the issuance of a preliminary injunction.

## SCOPE OF THE INJUNCTION

The parties dispute the scope of the injunction.  The State Plaintiffs seek to apply the injunction nationwide.  Defendants contend a nationwide injunction is inappropriate.  Instead, Defendants suggest the injunction should be limited to the states that showed evidence of irreparable harm.

Absent contrary intent from Congress, federal courts have the power to issue injunctions in cases where they have jurisdiction.  *Califano v. Yamasaki*, 442 U.S. 682, 705 (1979).  It is established that "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Id.* at 702 (citation omitted).

A nationwide injunction is proper in this case.  The Final Rule is applicable to all states. Consequently, the scope of the alleged irreparable injury extends nationwide.  A nationwide injunction protects both employees and employers from being subject to different EAP exemptions based on location.  This Court is not alone in its decision.  *See Texas v. United States*, No. 7:16-cv-54, 2016 WL 4426495, at *17 (N.D. Tex. Aug. 21, 2016) (issuing a nationwide injunction to ban enforcement of a Department of Education rule related to transgender bathroom policies); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-66, 2016 WL

3766121, at *46 (N.D. Tex. June 21, 2016) (issuing a nationwide injunction to bar implementation of the Department's "Advice Exemption Interpretation").

## CONCLUSION

The Court determines that the State Plaintiffs have satisfied all prerequisites for a preliminary injunction. Fed. R. Civ. P. 65(d). The State Plaintiffs have established a prima facie case that the Department's salary level under the Final Rule and the automatic updating mechanism are without statutory authority. The Court concludes that the governing statute for the EAP exemption, 29 U.S.C. § 213(a)(1), is plain and unambiguous and no deference is owed to the Department regarding its interpretation.

Although the State Plaintiffs have made a persuasive case that *Garcia* may have been implicitly overruled, this Court is constrained to follow *Garcia* absent an express statement from the Supreme Court overruling it. For that reason, the Court cannot address the State Plaintiffs' general objection that any application of the FLSA's overtime requirement to them as sovereign states violates the Tenth Amendment.

Because the Court concludes that 29 U.S.C. § 213(a)(1) does not grant the Department the authority to utilize a salary-level test or an automatic updating mechanism under the Final Rule, the Court does not evaluate the State Plaintiffs' non-delegation argument.

Finally, the Court has authority to enjoin the Final Rule on a nationwide basis and decides that it is appropriate in this case, and therefore **GRANTS** the State Plaintiffs' Emergency Motion for Preliminary Injunction (Dkt. #10).

Therefore, the Department's Final Rule described at 81 Fed. Reg. 32,391 is hereby enjoined. Specifically, Defendants are enjoined from implementing and enforcing the following regulations as amended by 81 Fed. Reg. 32,391; 29 C.F.R. §§ 541.100, 541.200, 541.204,

541.300, 541.400, 541.600, 541.602, 541.604, 541.605, and 541.607 pending further order of this Court.

The Court has considered the issue of security pursuant to Rule 65(c) of the Federal Rules of Civil Procedure and determines that Defendants will not suffer any financial loss that warrants the need for the State Plaintiffs to post security.  The Fifth Circuit has held that a district court has the discretion to "require no security at all."  *Kaepa, Inc. v. Acchilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).  After considering the facts and circumstances of this case, the Court finds that security is unnecessary and exercises its discretion not to require the posting of security in this situation.

**IT IS SO ORDERED.**
**SIGNED this 22nd day of November, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE