1

```
 1                     UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF TEXAS
 2                          SHERMAN DIVISION

 3
      STATE OF NEVADA, ET AL      :      DOCKET NO. 4:16CV731
 4                                :
      VS.                         :      SHERMAN, TEXAS
 5                                :      NOVEMBER 16, 2016
      UNITED STATES DEPARTMENT    :      9:00 A.M.
 6    OF LABOR, ET AL             :

 7

 8                     PRELIMINARY INJUNCTION HEARING
                   BEFORE THE HONORABLE AMOS L. MAZZANT,
 9                    UNITED STATES DISTRICT JUDGE

10    APPEARANCES:

11    FOR THE STATE PLAINTIFFS:    MR. LAWRENCE VANDYKE
                                   NV OFFICE OF ATTORNEY GENERAL
12                                 100 N. CARSON STREET
                                   CARSON CITY, NEVADA 89701
13
                                   MR. JORDAN SMITH
14                                 NV OFFICE OF ATTORNEY GENERAL
                                   555 E. WASHINGTON, SUITE 3900
15                                 LAS VEGAS, NEVADA  89101

16                                 MR. AUSTIN R. NIMOCKS
                                   TX OFFICE OF ATTORNEY GENERAL
17                                 P.O. BOX 12548
                                   AUSTIN, TEXAS  78711
18

19    FOR THE BUSINESS PLAINTIFFS: MR. MAURICE BASKIN
                                   MS. TAMMY D. MCCUTCHEN
20                                 LITTLER MENDELSON, PC
                                   815 CONNECTICUT NW, SUITE 400
21                                 WASHINGTON, DC  20006

22                                 MR. ROBERT F. FRIEDMAN
                                   LITTLER MENDELSON, PC
23                                 2001 ROSS, SUITE 1500
                                   DALLAS, TEXAS  75201
24

25
```

```
 1   FOR THE DEFENDANTS:           MS. JULIE SHANA SALTMAN
                                   MR. KEVIN MATTHEW SNELL
 2                                 U.S. DEPARTMENT OF JUSTICE
                                   CIVIL DIVISION
 3                                 20 MASSACHUSETTS AVE NW
                                   WASHINGTON, DC  20530
 4
                                   MR. JAMES GARLAND GILLINGHAM
 5                                 U.S. ATTORNEY'S OFFICE
                                   110 N. COLLEGE, SUITE 700
 6                                 TYLER, TEXAS  75701

 7

 8   COURT REPORTER:              MS. JAN MASON
                                  OFFICIAL REPORTER
 9                                101 E. PECAN #110
                                  SHERMAN, TEXAS  75090
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

3

1           THE COURT:  Please be seated.

2       Good morning.  We are here in Case 4:16CV731, the State

3   of Nevada, et al versus United States Department of Labor,

4   et al.

5       And for the Plaintiffs?  And one thing I would ask,

6   always -- the acoustics in here, you know, have some issues,

7   so please always make sure to turn on your mic.

8           MR. VANDYKE:  Good morning, Your Honor.  My name is

9   Lawrence VanDyke and I'm representing the 21 states.  With me

10  is Jordan Smith from the Nevada Attorney General's Office, and

11  then also with me is Austin Nimocks from the Texas Attorney

12  General's Office, Your Honor.

13          THE COURT:  Thank you.

14          MR. BASKIN:  Your Honor, for the business Plaintiffs,

15  Maurice Baskin with the Littler Mendelson Firm from Washington,

16  DC.  With me, Robert Friedman and Tammy McCutchen also with the

17  Littler Firm.

18          THE COURT:  Thank you very much.  And from the

19  Department of Labor?

20          MS. SALTMAN:  Good morning, Your Honor.  I'm Julie

21  Saltman.  I'm with the U.S. Department of Justice and I'm

22  representing the federal defendants in this case.  With me

23  today are Mr. Kevin Snell, also with the U.S. Department of

24  Justice who will also present argument today, and Steven

25  Gardiner from the Department of Labor and Assistant United

4

1    States Attorney James Gillingham from the Eastern District of

2    Texas.

3              THE COURT:  Very good.  Mr. Gillingham, what office

4    are you in?  I'm not sure we've met.

5              MR. GILLINGHAM:  Your Honor, I drove up from Tyler

6    this morning.

7              THE COURT:  Okay.  Well, welcome to Sherman.  Welcome

8    everybody to Sherman.

9        Then for purposes of today's argument, I presume first

10   from the States, you're going to rely upon your affidavit

11   testimony for the record purposes and it's going to be

12   argument only today, I assume.

13             MR. VANDYKE:  That's correct, Your Honor.  We don't

14   have any witnesses for anything.

15             THE COURT:  I assume the Department of Labor has no

16   witnesses as well?

17             MS. SALTMAN:  That's correct, Your Honor.  We have no

18   witnesses.

19             THE COURT:  Then the way I thought I would structure

20   this, of course I'll let Mr. VanDyke for the States go first.

21   I'll then let the business Plaintiffs also make their argument

22   and then call on the Department of Labor, since there's overlap

23   between the business Plaintiffs and the States.

24       Otherwise, if you're ready to go, I'm ready to hear

25   from y'all.

5

1          MR. VANDYKE:  Thank you, Your Honor.  I think I'll

2   step over here, if that's all right.

3          THE COURT:  Yes, please.

4          MR. VANDYKE:  Good morning, Your Honor.  May it

5   please the Court.

6       As has undoubtedly not escaped your notice, there's

7   been pretty comprehensive briefing on this preliminary

8   injunction issue and so I'm not going to try to go through

9   all of that this morning, Your Honor.  I think what I would

10  like to try to do instead is hit some of the highlights and

11  certainly answer any questions that you have, but I have an

12  order I was thinking about going through it.  I'll run by

13  it, and if that works for you, that's the order I'll go

14  with, Your Honor.

15         THE COURT:  Well, let me just start off and let me

16  ask some of the questions I have and then I'll let you make

17  whatever argument you want to make.

18         MR. VANDYKE:  Certainly.

19         THE COURT:  Let's start off with, of course, Section

20  213(a)(1) exempts FLSA, minimum wage and overtime protections

21  for any employee employed in a bona fide executive,

22  administrative or professional capacity, and I'll probably just

23  start referring to that as EAP.  I think everyone here knows

24  what that means.  But it also says as such terms are defined

25  and limited from time to time by regulations of the Secretary.

1  How is that not an express delegation of the authority to the

2  Department of Labor to define the scope and definition of these

3  statutory terms?

4      MR. VANDYKE:  Your Honor, I think it is an express

5  delegation, and so we don't -- the States certainly don't

6  contest that there is a delegation here to the -- that the FLSA

7  delegates to the Department the authority to define these

8  terms.  But we also, as we stated in our briefing, think that

9  they are -- and as cases like Chevron make clear, they are

10 still limited by the language of those terms.

11     So I think there is a delegation to define specifically

12 what -- what executive or administrative or professional

13 means, and maybe even capacity, but they're limited by the

14 meaning of those terms.  And I don't think that those terms,

15 as I think we briefed at length, those terms don't include

16 the ability to say, well, you're not an executive employee,

17 for instance, if you make below a certain salary.  I mean,

18 the Department itself has said the opposite of that in the

19 past, in the Stein/Weiss type reports, and we've cited to

20 that.

21     In the 1981 Minimum Wage Study Commission, which the

22 Department cited to in its briefing, it said it is clear

23 that Congress intended all bona fide executives,

24 administrators and professionals to be exempt from the

25 minimum wage and overtime protections of the Act.  The

1    current salary test is a basic criteria and used to identify

2    exempt workers implicitly introduces a minimum wage type

3    concept counter to the original intent of the exemption.

4            So we're not arguing that they don't have -- to be

5    clear, we have a -- we do argue that Garcia is incorrect,

6    and we don't expect Your Honor to overturn the Supreme Court

7    on that one, but we --

8            THE COURT:  I didn't start with the Tenth Amendment

9    because I believe that issue is foreclosed.  I understand

10   you're preserving that issue to hopefully get ultimately the

11   Supreme Court to revisit that issue.

12           MR. VANDYKE:  Exactly.  We have some issues in there

13   to preserve, which is why we -- but assuming that, you know,

14   Garcia is the law, I still -- so is Chevron, and I think the

15   Court is -- I think the Department is bound by the language of

16   the statute.  It puts parameters.  It has some delegation of

17   authority to it but it's got a limited delegation.  It's not

18   carte blanche to say executive is what we say it is.

19           THE COURT:  What is your view of what the limit of

20   that is?

21           MR. VANDYKE:  So I think the limit is that it cannot

22   include -- it cannot -- based on the clear language, they

23   cannot exclude anyone who -- any employee who is employed in a

24   bona fide executive, administrative or professional capacity.

25   So I think that they can, for instance, take salary into

1    consideration.  They can use salary.  Like they say often in

2    their briefing, that they use salary in tandem with a duties

3    test, but that's actually not correct, Your Honor.

4        Using -- the old long and short test regime where they

5    had a salary cut-off where above that salary you had one

6    test and below that salary you had a more rigorous test,

7    that would be using salary in conjunction with or in tandem

8    with a duties test.  But here it's a complete -- it's a

9    complete and categorical cut-off.  If you make less than

10   47,000, you just simply are not an executive employee, even

11   though --

12       THE COURT:  But in 2004 when they did away with the

13   long and short test and basically decided to stay with the

14   short test, there was a salary requirement.

15       MR. VANDYKE:  That's right, Your Honor.  They've had

16   a salary cut-off since 1940 and so we are saying that it is --

17       THE COURT:  But I'm saying you're making the

18   distinction between the long and the short test and the issue

19   of salary, but in 2004 until now they've been using those in

20   tandem, having a salary requirement as well as the duties test,

21   which is now the standard.

22       MR. VANDYKE:  Well, we would say since 2004 -- in

23   2004 they got rid of the long test, and so I think since 2004

24   they haven't used a salary test in tandem.  They just said if

25   you make less than 23,000, you're not an executive employee,

1    for example, but if you make more, then we look at your duties.

2    So we're either going to look at your salary or we're going to

3    look at your duties.

4        It's only, I think, when they had a test that actually

5    applied a different duties test, a more rigorous duties

6    test, depending on your salary, that's when you're actually

7    using them in tandem.  Otherwise, it's a salary only test I

8    think, Your Honor.

9            THE COURT:  Well, where does the statute foreclose

10   their ability to use salary as well as duties in defining what

11   an EAP or bona fide EAP employee would be?

12           MR. VANDYKE:  Well, I think, Your Honor, you have to

13   look at the text.  This is -- what we're talking about is a

14   Chevron Step One inquiry and we are saying that because the

15   text says that any bona fide EAP employee is eligible for the

16   exemption, and because the Department itself has acknowledged

17   in the past that --

18           THE COURT:  But does "any" mean "all" or does "any"

19   mean simply that you have to be a bona fide EAP as defined by

20   the Department of Labor?

21           MR. VANDYKE:  Well, that's the question, Your Honor.

22   I think that certainly seems to be the Department's position,

23   that "any" means -- or that bona fide EAP means what we say it

24   means because we've been given -- and it does within a

25   certain -- they have certain contours of discretion but they

10

1    don't -- I mean, the case law is clear when they are given

2    discretion to define it, they're still constrained by the

3    words.

4        And the Minimum Wage Commission, the Department itself

5    in the past has acknowledged, for instance, repeatedly

6    acknowledged that they don't have the ability to define EAP

7    based on salary alone, and so I don't think that they -- I

8    don't think they have the ability to say you are an

9    executive type employee based on your duties, but we're

10   going to exclude you just because you make less than a

11   certain amount.  That's a minimum wage type concept, Your

12   Honor.

13       THE COURT:  But it's the Department of Labor, under

14   this broad authority to define and to limit to set up a duties

15   test.  The statute doesn't say -- where does the statute say

16   they have to use a duties test?  That's what they developed

17   first.

18       MR. VANDYKE:  The statute doesn't tell them exactly

19   what they have to do, what kind of test they have to apply.

20   What the statute does do, it has, like every statute, it has

21   words and they're limited by the meaning of those words.  And

22   the statute, I think -- let me see if I can -- there's

23   certainly a lot of discretion, I think, that they have.

24       But you can think of extreme cases and I think our

25   friends, the business Plaintiffs, gave an example in their

1    briefing at some point about they couldn't just say, you

2    know, we've got broad discretion and so anybody that makes

3    less than a million is not an EAP employee and anybody that

4    makes over a million is an EAP employee.  I think we

5    intuitively recognize that that would not be consistent with

6    the text of the statute, and so I don't think similarly they

7    can say, well, you know, we're just going to draw a line and

8    say if you make less than 47,000, we're going to

9    categorically say you're not an EAP employee, even though

10   they have acknowledged in the past and the Minimum Wage

11   Commission and other people have acknowledged -- nobody has

12   ever, in fact, said that you can define somebody as an EAP

13   employee based on salary alone.  In fact, they have

14   disclaimed that before repeatedly.

15           THE COURT:  Well, for 75 years the Department of

16   Labor has been doing just that, having a salary requirement.

17   And I understand now they have increased the amount

18   significantly, but there has always been that for 75 years.

19           MR. VANDYKE:  And that's exactly right, Your Honor,

20   and I think that is the most difficult -- I acknowledge that

21   that is the most difficult thing that we have to overcome.  And

22   here's what I think overcomes that.

23       The reason I think they've had a salary test since 1940

24   or 1940-ish is because before 1970 -- before the 1980s, they

25   didn't have a Chevron two-step inquiry.  You just had an

1   arbitrary and capricious review.

2        So what happened, if you look -- and that's why I

3   wanted to lay out the history in our reply brief, Your

4   Honor.  If you look at what happened, essentially all of the

5   District Courts where this salary test was challenged struck

6   it down, including actually the District Courts in the Wirtz

7   case and the Yeakley case, which were overturned later, but

8   also three other District Courts.  So we have cited at least

9   five different District Courts that struck down the test on

10  an arbitrary and capricious only, a Chevron step-two review.

11       And if you look at the only Court that actually went

12  the other way, that led the way, the Yeakley Court, and all

13  the other courts followed the Yeakley's Tenth Circuit

14  decision.  What Yeakley says, if you read it, it says yeah,

15  this is inconsistent with the text but it's not arbitrary

16  and capricious because it's not unreasonable.  It's not

17  unreasonable that they would have a salary test.

18       It is inconsistent with the text because, to cite the

19  Yeakley Court, it said admittedly a person might be a bona

20  fide executive in the general acceptation of the phrase,

21  regardless of the amount of salary he received.

22       So the Court acknowledges that there is an

23  inconsistency with the text and the salary test, but it ends

24  up, because Chevron hasn't even been invented, it won't be

25  invented for decades later, so it says, you know, instead,

1    what we're going to do is we're going to just look at

2    arbitrary and capricious and we're going to uphold it on

3    that basis.

4        Then what happened is that ended up being the law, and

5    if you combine that with the fact that, as we have

6    illustrated and as the Department's own materials have said

7    forever, ever since the Stein and Weiss reports, they have

8    always set this so low, the game wasn't worth the candle.

9        The only time this ever got challenged, Your Honor, all

10   these cases are enforcement actions and it's somebody just

11   saying -- you know, adding it as a last argument in a long

12   line of arguments, sort of the last throw-away argument,

13   even in the Weiss type cases.

14       So that's why -- I know it's been around for 75 years

15   but it's because it has this legacy of the pre-Chevron

16   analysis, combined with the fact that nobody challenged it

17   after Chevron came about because the -- because the number

18   was set so low, Your Honor.

19           THE COURT:  Well, how do I reconcile the Fifth

20   Circuit has decided in the Wirtz case that it wasn't arbitrary

21   and capricious?  Now, that's pre-Chevron, and I understand

22   that, but that was a case where the person met the duties test

23   but also their salary apparently was lower than whatever the

24   threshold was at that time.  So how do I reconcile that with

25   your challenge today challenging that same salary requirement

1   when the Fifth Circuit has already made that decision?

2            MR. VANDYKE:  I think -- I think the key is the fact

3   that it was a pre-Chevron test, and it clearly relied on

4   Yeakley.  And Yeakley actually says, as the language I quoted

5   and we quoted other language from Yeakley in our reply brief,

6   Yeakley actually acknowledges that it's inconsistent with the

7   text.  I think Yeakley would have come out differently on a

8   Chevron Step One analysis but they didn't have that then, and

9   so Wirtz just relies on that, has no analysis of its own.  And

10  so I think this Court --

11           THE COURT:  But even if there's no analysis, I'm

12  bound by the Fifth Circuit authority.

13           MR. VANDYKE:  You are bound by it but it is

14  pre-Chevron, and so this Court I think could very easily say

15  this was decided under a pre-Chevron type analysis that did not

16  look at a Step One inquiry.  When I look at this at Step One, I

17  see that you cannot -- this does not allow you to have a salary

18  only test.  This is a salary only test.  It's a vestige of a

19  pre-Chevron type regime.  And so I think that's how the Court

20  can deal with this under Wirtz.

21       Now, to be clear, Your Honor, if -- I acknowledge that

22  you're in a position where you've got -- you've got a

23  practice that has been going on for 75 years and I

24  acknowledge that it would be difficult, I think, for you to

25  say I'm going to strike down a practice that has been going

1    on for 75 years.

2        Now, to be clear, I think it's a practice that has

3    been -- it has been unlawful, but -- as we say, it's been

4    unlawful but not particularly consequential, which is why it

5    has been going on for so long, and it's also a vestige of an

6    old type of analysis.

7        But I do think Your Honor could also -- I mean, the

8    other approach is the approach that has been I think laid

9    out more fulsomely by our friends, the Business Plaintiffs,

10   which is this really is -- and I think we make it clear in

11   our reply brief, Your Honor.  This really is a different

12   type of approach.

13       So not only is this different I think as a matter of

14   law than what's happened in the past, but this is a very

15   different approach than the Department of Labor has taken.

16   The Department of Labor in the past has always deliberately

17   set the number very low, and then for the majority of the

18   time had a different duties test, depending upon how much

19   salary, so a salary test that really did work in tandem

20   with -- with the duties test.

21       And what they've done now is they have said, you know,

22   2004 we think they paired a too low of a salary cut-off, the

23   old long duties test salary cut-off with the old less

24   rigorous short duties test.  So what we're going to do now

25   is we're going to move up the number, we're going to double

1   the number from 20 percent, the 20th percentile to the 40th

2   percentile, so that you end up excluding -- categorically

3   excluding everybody below the 40th percentile.

4       I want to make sure the Court understands what that is

5   doing is essentially every person who would have qualified

6   under the old long duties test, so those people that were

7   between the 20th and the 40th percentile for 55 years and

8   would have qualified under the long duties test now have

9   been categorically excluded by the Department of Labor.

10      So the Department of Labor is basically saying we're

11  going to have a test that -- that excludes a bunch of people

12  that we used to say for the majority of the life of this

13  rule would have been included.

14      So I think the Court has two options.  I think the

15  Court could say honestly, the salary test has always been

16  unlawful and it's inconsistent with the text, or at least

17  it's been unlawful since Chevron was decided.

18      Or the Court could say it's a little bit like a frog, a

19  frog in a pot that's heating up.  At some point you have

20  departed so far from the text, and we think that's when you

21  instituted a salary test at all or a salary only test, I

22  should say, and when -- so years ago, but you can also take

23  the position that they departed from it in this rule by

24  creating -- by creating a test that they know categorically

25  excludes a bunch of employees, significantly more than they

1    have ever done before, that they have acknowledged were EAP

2    employees for 55 years, Your Honor.

3         That's why I just want to make sure, because there

4    really is, I think, an attempt to say we're just doing what

5    we have always done, but this is very different.  They have

6    never had a number that was set anywhere near the 40th

7    percentile like they've done now, Your Honor.

8         So I think I prefer the first because I think it's more

9    intellectually sort of -- I like bright lines.  I guess I

10   like bright lines and so I prefer the first because it's

11   saying, listen, you just can't have a salary level test.

12        But if you don't do the first, I think the second is

13   also a proper way for the Court to analyze it.

14             THE COURT:  Well, how do I reconcile this with the

15   Auer -- I'm not sure I'm pronouncing that correctly -- versus

16   Robbins case?

17             MR. VANDYKE:  The Auer case, yeah.

18             THE COURT:  Okay.  So the Supreme Court said that the

19   FLSA grants the Secretary broad authority to define and to

20   limit the scope of the exemption for EAP employees.  And so how

21   do I reconcile that case with -- with what's happening here?

22             MR. VANDYKE:  Well, again, Your Honor, I do think

23   that they -- we're not arguing that they don't have broad

24   discretion.  You know, they --

25             THE COURT:  Okay.  Looking at that case, that case

1  basically says the Department of Labor set a salary

2  requirement.  Well, where in the statute does it say that you

3  have to be salary versus hourly?  Basically they took a whole

4  bunch of people out of exempt status or put them in exempt

5  status by creating a salary requirement.

6           MR. VANDYKE:  Right, Your Honor.  Well, so to be

7  clear, the Auer case involved -- I think Your Honor is probably

8  aware, there's a salary test and there's a salary level test,

9  and so this obviously --

10          THE COURT:  Right.  This is just talking about --

11          MR. VANDYKE:  You're saying as an analogy, you're

12 saying, well, if you can't do a salary level, if you can't base

13 it on salary, then why can they look at salary at all, I think

14 is what --

15          THE COURT:  Right.  Because, I mean, looking at the

16 rule they propose, it's basically saying that it's been since

17 2004 you have to be a salaried employee, you have to meet their

18 standard duties test and they set the new limit at 47,000 and

19 change below.  So that's how they define each of the various

20 EAPs.

21          MR. VANDYKE:  Well, so one -- one point I want to

22 make, and I think it's clear from our briefing, is I think the

23 Auer deference I don't think has any place with regard to the

24 States.  Auer deference is even more deferential than Chevron

25 deference, and I don't even think Chevron -- I don't think

1  agencies get Chevron deference, Chevron Step Two deference with

2  regards to States because of the clear statement rule.  They

3  certainly don't get Auer deference.

4      So with regard to the State Plaintiffs, I don't think

5  that you can take Auer's extreme deference, which has been

6  pretty strongly criticized by a lot -- I think I saw

7  somewhere that it was actually criticized by a majority of

8  the members of the Court, at least before Justice Scalia

9  passed.  But it hasn't been overturned, I understand.

10      THE COURT:  It's still binding authority from the

11  U.S. Supreme Court.  I'm just trying to reconcile this idea

12  that nothing in the statute -- because the argument you're

13  making is that the clear intent of the statute is that if

14  you're an EAP employee, you get the exemption.  And we're

15  looking at what the Department of Labor has done and they added

16  this salary requirement.  That wasn't an original requirement

17  in the original regulation and so --

18      MR. VANDYKE:  Right.

19      THE COURT:  I'm just trying to ask you to reconcile

20  that with, if they can have a salary requirement and that's

21  okay, why can't they add a salary level?

22      MR. VANDYKE:  That's a good -- and actually, my

23  colleague, Mr. Smith, actually just reminded me of something

24  that I remember now.  If you recall in Auer, Justice Scalia

25  actually specifically goes out of his way to say, by the way,

1   they did not challenge the validity.  The respondents or the

2   petitioners in that case did not challenge the validity, and I

3   think Scalia is doing that because he's saying, hey -- as you

4   know, Courts do that sometimes and say next time bring a

5   challenge to -- actually challenge the validity.  Instead of

6   challenging their discretion, actually challenge -- do what

7   we're doing here and challenge the ability to actually bring

8   it.

9        So the Court in Auer was not actually addressing, and

10  in fact, expressly disclaimed addressing the salary basis

11  test, the general validity of it.  It was only addressing if

12  you're not going to challenge the general validity of it,

13  it's only addressing --

14       THE COURT:  So is it your opinion -- that's not the

15  issue before the Court, but do you believe the salary -- being

16  a salaried employee, that's not valid under the statute, that

17  requirement?

18       MR. VANDYKE:  Your Honor, I don't -- honestly, I'm

19  not trying to dodge the question, Your Honor.  I really haven't

20  thought about it, because I haven't thought about whether or

21  not -- I don't believe a salary basis test as a categorical

22  exclusion is valid.  Obviously we made that point.  Whether or

23  not the salary requirement itself, that it be salary as opposed

24  to hourly, would be invalid, I just haven't really thought

25  through whether or not there's a way to say that that is

1    consistent with their discretion.

2         THE COURT:  And that's why I'm asking you, how do you

3    reconcile that?  I mean, how do I reconcile that that is not in

4    the statute, whether they're hourly or salaried?  They've added

5    that requirement and the Supreme Court -- I understand you're

6    asserting that they haven't --

7         MR. VANDYKE:  I suppose --

8         THE COURT:  Justice Scalia left open the question of

9    whether that was valid or not because it wasn't challenged, but

10   it is clear in that case they said it's in their broad

11   discretion to define and to limit and they can set that salary.

12        MR. VANDYKE:  Yeah, as long as it's -- you know,

13   assuming that it's valid, they said that.  But I suppose it's

14   possible that you could say that it's within your discretion to

15   say if you're an executive employee, you have to make a salary

16   to be considered an executive or administrative or -- or

17   professional capacity, a professional employee.  I don't want

18   to say that's necessarily correct or not, but certainly it's a

19   different question to say you need to be paid on a salary basis

20   in order to qualify as one than to say, oh, and by the way, you

21   also need to make $500,000.  And I'm just throwing that number

22   out because I think throwing out a higher number shows the

23   absurdity of having a cut-off, a numeric cut-off.  Because we

24   all know there are many people that are, as the Yeakley Court

25   said, in a general acceptation of the phrase, executive,

22

1    administrative or professional employees that make less than

2    half a million dollars a year.

3         It's also true, Your Honor, that within a general

4    acceptation of the phrase, there's many of them that make

5    less than $47,000 a year, Your Honor.  We have many of them

6    that work for our states.

7              THE COURT:  But isn't that the next step?  I mean, if

8    they're allowed to have a salary requirement, isn't the next

9    step, and wouldn't that be admissible under this broad

10   authority they're given to say to be an EAP employee, you have

11   to make under a certain amount?

12             MR. VANDYKE:  No, I think making a salary, it's

13   actually -- I remember reading this in either the Weiss report

14   or the Stein report.  Making a salary is different than the

15   amount of salary you make, because salaried employees, in

16   theory, they get paid their salary whether they work 35 hours

17   or whether they work 45 hours in a week.

18        They also -- I remember in the Weiss report or the

19   Stein report, I can't remember which one it was, but they

20   actually talk about the other benefits that typically come

21   with being a salaried type employee.  Usually you get paid

22   time off, whereas hourly employees sometimes don't get paid

23   time off.  You get -- there's certain abilities to be

24   elevated.  So there's things that go with salary typically,

25   I think, that the Department could take cognizance of.

1    And that's very different than saying, yeah, but

2  $47,000 is the magic number, and if you make less than that,

3  you're not an EAP employee.

4    I do think the salary, it's a different -- logically,

5  it's different to say somebody has to be making a salary for

6  us to consider them to be an executive person than to say

7  somebody has to be making this particular salary, because as

8  the -- as the Court said in Stein, I think it's the Stein

9  report, it specifically said -- I've got it here somewhere I

10  think.  But it said that there's people that are paid --

11  yes, the Stein report on page 22.  It says some foremen and

12  supervisors are paid exceedingly low wages.

13    So I think it's different to say, yeah, but we're not

14  going to consider you an executive or an administrative

15  employee if you're paid on an hourly basis, because if

16  you're paid -- I mean, I used to work in construction before

17  I went to law school and really the difference -- I mean,

18  I'll just say it.  The difference in our company, and this

19  is just an anecdotal example, but the difference between

20  foremen and supervisors was all the foremen and supervisors

21  were paid on a salary basis and the laborers and the

22  equipment operators were paid on an hourly basis, and on an

23  hourly basis they typically made more money than the

24  supervisors and the foremen, especially with all the

25  overtime they worked.  But they made more money.  And it

24

1   proves the point that sometimes foremen and supervisors are

2   paid exceedingly low wages but they're still EAP employees,

3   Your Honor.

4           THE COURT:  So is it the State's position that you're

5   basically restricting the authority to define and to limit to a

6   duties test?

7           MR. VANDYKE:  I think -- well, to be clear, because I

8   think there's some misrepresentation somewhere in the briefing

9   where we are represented as saying that you just can't take

10  salary into account, and we are not saying that, to be clear.

11      What we're saying is that you would have to use salary

12  actually in tandem with a duties test, and one way that you

13  could do that is the way they did it before where you vary

14  the level of the rigor of the duties test by the salary

15  that's made.

16      So, in other words -- I'll give you an example.  I've

17  heard that the new Chief Executive -- I read somewhere that

18  the new Chief Executive of the United States is not going to

19  get any salary at all, which I think again illustrates the

20  point.  He's actually foregoing his salary.  He's going to

21  be the third President to do that.  And yet, I don't think

22  that's going to -- you know, he's still going to be the

23  executive.  I mean, it just illustrates the point that

24  you're still -- whether or not you're the executive, whether

25  or not you have that position, so I don't think that -- I

1   think that it could be possible somebody like a Bill Gates

2   type could make -- could make -- could say I'm not going to

3   draw a salary but I'm still going to be the CEO of a

4   company.

5        I think it would be permissible for them to say if

6   you're only making $10 a year, you need to pass a very

7   rigorous duties test in order to demonstrate that you're an

8   EAP employee.  But it's not permissible for them to say if

9   you don't make 47,000, you're just not an EAP employee

10  because of the example I just gave, Bill Gates, President

11  Trump.  Just because they make a low salary would not

12  actually change whether or not they were an EAP type

13  employee, Your Honor.

14       So just to be clear, our point is not that you can't

15  take salary into consideration at all.  In fact, they've

16  done it the way we're talking about in the past, at least in

17  part, when they had the cut-off between the long and the --

18  I'm not necessarily saying they have to bring back the long

19  duties test and the short duties test.

20       What we're saying is they can't do what they've done

21  here, which is, if you read the rule, they admit and say

22  we've got a duties test now.  The way this has evolved over

23  time, we now have a duties test.  It's just not very

24  rigorous and we don't trust our duties test to actually do

25  much, so what we're going to do is just ratchet up the

1  salary test really high to make sure that -- instead of

2  using a salary test like we used it in the past, which was

3  to say we want to keep out -- we want to use it as a cut-off

4  to keep out people that are clearly not EAP employees, sort

5  of as a first cut, instead, what they're doing is they're

6  trying to use the salary test to make sure that nobody who

7  is not an EAP employee somehow sneaks through with their not

8  rigorous enough duties test.  That's what's going on.  It's

9  a very different approach, Your Honor.

10          THE COURT:  Well, walk me through how you perceive I

11  can decide this in the first step of Chevron.

12          MR. VANDYKE:  Okay.  So I think Your Honor could say

13  that, number one, the Minimum Wage Commission in 1991

14  acknowledged, as did the Department of Labor, that it cannot

15  define EAP employees by salary alone.  And in 198- -- when was

16  Chevron?  1984, in 1984.  That the old cases that decided this

17  back in the '40s were all decided pre-Chevron, and then in 1984

18  Chevron made clear that you have to look at the text.  And the

19  text here does not allow them to have a test that categorically

20  excludes people based on salary alone.

21      So any test that says you cannot have somebody -- you

22  cannot get EAP status at all based on salary alone is -- is

23  not allowed under the rules.  That's one approach.  That

24  would be the approach consistent with our -- with ours.

25      The other would be that you cannot have a test that

1   categorically excludes a substantial number of employees,

2   something they have never done before.  So you can't have a

3   test that is set so that -- they've acknowledged for over 55

4   years that these people that would have passed under the

5   long duties test are in fact bona fide EAP employees and now

6   they're categorically excluding all of those that fall under

7   47,000.  So they can't do that.  That's not consistent.

8       Having a test that categorically excludes a bunch of

9   people who are bona fide EAP employees based on their duties

10  and that deliberately does that is simply not consistent

11  with the text that says any employee employed in a bona fide

12  EAP -- And, Your Honor, I think you can cite to what they

13  themselves have acknowledged over the years, two different

14  things.  One is that they couldn't exclude employees based

15  on salary alone, or include, include or exclude, and also

16  that they have acknowledged over the years that --

17      I forgot the second one.  It was a really profound

18  point and it will come back to me.

19      But one is that they can't do it on salary alone.  Oh,

20  and the other is that they have always had an approach,

21  understanding under the rule that -- that they have

22  intentionally tried to make it so that they did not -- I

23  forget the language.  We cite it in our brief, but the

24  language that they say the overwhelming majority, the

25  overwhelming majority of bona fide EAP employees are above.

1    They always set the salary cut-off so that the overwhelming

2    majority were above it and now they have deliberately

3    changed that approach.

4         So they changed -- the fact that they changed their

5    approach to be inconsistent with what they have done for 75

6    years, I think, is further evidence that they're not

7    consistent with the text.

8              THE COURT:  But isn't that -- when you start talking

9    about that issue, isn't that a Chevron Two analysis?

10             MR. VANDYKE:  I mean, it could be, Your Honor.

11             THE COURT:  Not really a Chevron One?

12             MR. VANDYKE:  It could be, but I don't think it has

13   to be.  So I think it could be in this sense, and this is where

14   I think the Business Plaintiffs have put more emphasis.  We

15   have an arbitrary and capricious claim in our case too but they

16   have put more emphasis on it.

17        I do think the fact that literally the majority of the

18   Courts that considered this under an arbitrary and

19   capricious challenge in the 1940s actually struck it down.

20   Five District Courts at least by my counting, and maybe

21   more, actually struck it down.  And only after the Yeakley

22   Court said -- they upheld it on arbitrary and capricious,

23   but the majority of the Courts actually said this salary

24   basis test is inconsistent on an arbitrary and capricious

25   challenge.

1     Fast-forward 75 years later and I think -- so what that

2     tells me, Your Honor, is that this was a close -- the

3     arbitrary and capricious question was a close question 40

4     some years ago, and that was before Chevron, which I think

5     put more bite in it, and it was also before they ratcheted

6     up the -- that's back when they were expressly attempting to

7     set the salary test so low that it would make sure and not

8     exclude hardly any EAP employees.

9     But now they have changed their approach so I think if

10    it was a close question on arbitrary and capricious before,

11    it's -- it's no longer even a close question I think on

12    arbitrary and capricious.  So I think the Court could decide

13    it on that, but I think you could also decide it at Chevron

14    Step One because -- and the best analogy I can think of is

15    the frog in the boiling pot.  The difficulty of this case is

16    they do obviously have some discretion.

17              THE COURT:  That's high legal analysis, but go ahead.

18              MR. VANDYKE:  I admit that.  I admit it.

19    The difficulty is that they have some -- they have

20    discretion, Your Honor.  They have discretion to define

21    these terms, E, A and P.  They have discretion.  But at some

22    point, as Chevron and other cases make clear, they have to

23    stay within the bounds of the words, and that's not --

24    unfortunately, that's not a bright line test.

25    But I think they have strayed outside the meaning of

1   those words, now that they are deliberately shifting from a

2   primarily duties focus with a very low salary level test

3   that was just meant to weed out the easy cases to now a

4   primarily salary cut-off which excludes almost 40

5   percentile, Your Honor, excludes almost half of the salaried

6   employees in the United States, or I guess it uses the

7   southern -- it uses the number from the southern area so

8   it's probably a little lower than that.  But at least a

9   third of the salaried employees of the United States are

10  excluded under this, so I think it's a very different

11  approach.

12        And so go back to the frog in the boiling pot.  At some

13  point the pot gets hot enough that the frog should -- the

14  Court should say this is no longer within the ambit of these

15  words.  And I think we're at least there.

16        Now, I think we're there because the salary test was

17  never allowed by the words, but I think the Court could also

18  say, you know, sure you can have a salary level test but you

19  can't have -- you cannot use a salary level test to exclude

20  so many people.  You can't do that.  It -- that's not as

21  bright of a line as I would like.

22            THE COURT:  I think your second part is -- your first

23  part is certainly Chevron One, but your second part seems to me

24  to be a Chevron Two.

25        But let me ask you this.  To do Chevron One, I have to

1    find that it's unambiguous, and I'm trying to reconcile how

2    do I find that it's unambiguous when Congress specifically

3    gave the Department of Labor authority to define and to

4    limit these terms, which are not defined in the statute?

5              MR. VANDYKE:  Our point with regard to that, Your

6    Honor, is that things can be ambiguous with regard to some

7    aspects of a statute and can be unambiguous with regard to

8    other aspects.

9         And I had thought of an example at one point to make

10   that, so maybe I'll try that.  So if the Court had a rule

11   that said any -- let's see how effective this example is.

12   Any government attorney --

13             THE COURT:  I hope it's better than the frog and

14   the --

15             MR. VANDYKE:  Yeah, so the frog fell on -- I won't

16   even try.

17        But the -- any government attorney that comes in front

18   of me will be, you know, will be treated wonderfully or

19   something like that.  Now, it may be that "wonderfully" and

20   even "government attorney" are somewhat ambiguous and so

21   there would be some amount of deference.  You know, is a

22   government attorney a federal government attorney, a state

23   government attorney, a local government attorney, is it all

24   of the above.  So there may be some ambiguity.

25        But where there's not ambiguity, Your Honor, is if I

1   am -- if I do fall within that category, then you're saying

2   any government attorney will be treated wonderfully, then I

3   will be treated wonderfully.  So my point is that there is

4   some ambiguity in that statement perhaps, but there's other

5   areas where it's not ambiguous.

6        Similarly here, Your Honor, sure, there's ambiguity,

7   deliberate ambiguity.  I don't really like the word

8   "ambiguity" because ambiguity almost connotes like it was a

9   mistake, loose drafting, so to speak.  And here it was

10  deliberately delegated to decide whether or not -- you know,

11  to define the contours of what an executive, administrative

12  or professional employee is.

13       But what was not -- what was not delegated, Your Honor,

14  was what you do with those employees, and it says any

15  employee gets it, not just those -- again, I'll use another

16  example that I think was a good example from the Business

17  Plaintiffs' briefing.  You couldn't say, for example, well,

18  executive, administrative and professional is ambiguous so

19  we're just going to say that anybody who is over 65 gets

20  overtime.  Well, no, because that has nothing to do with

21  whether or not you -- because we want to help elderly

22  people.  You know, that has nothing to do with executive,

23  administrative or professional capacity.

24       So two things.  One is, some aspects of this may be

25  ambiguous or delegated, while other aspects aren't.  And you

1   also again, as I said before, you have to be constrained by

2   the words themselves.  Executive, administrative and

3   professional have meanings.  They have meanings, as the 1981

4   Commission recognized, as the Department itself has

5   recognized for 75 years when they have said, no, we can't

6   have a salary only test.  They have recognized that the

7   meanings of executive, administrative and professional don't

8   turn on salary alone.

9          THE COURT:  Well, I know looking at the statute, of

10  course, Congress has had multiple opportunities because the

11  salary requirement that the Department of Labor enacted 75

12  years ago has been changed over time, the last time in 2004,

13  and the statute was amended at some point.  I didn't write down

14  the year where they added the "time" language.  That wasn't in

15  the original statement, I believe.  So that was added sometime

16  later when there was a salary requirement as part of the test

17  that the Department of Labor set up.

18    Why doesn't that mean that Congress basically allowed

19  there -- without adding some language about a salary test,

20  accepting what the Department of Labor had done, and also,

21  couldn't "time to time" also mean this idea that Congress

22  intended to allow them to change the figures for the salary?

23          MR. VANDYKE:  So two thoughts on that, Your Honor.

24  One is that I think we cited in our briefing that the Court has

25  cautioned when to find Congressional acquiescence to agency

1   rules, because there's many reasons why Congress may not move

2   on something.

3       For instance, in this instance I think the fact that

4   the salary level test was always set so low, and therefore,

5   is not only part of the reason why it was challenged so

6   rarely, because, again, even though it may have been

7   unlawful, the game wasn't worth the candle.

8       But similarly, it would make Congress not particularly

9   interested in messing with it either because there wouldn't

10  be an outcry because it was set so low.  So that's the first

11  point is that I think the cases that urge strong caution

12  against finding Congressional acquiescence apply with

13  special force here because of the actual factual background

14  here.

15      Then the second point which is related is that -- is

16  that if Congress acquiesced in anything, they didn't

17  acquiesce in this rule, in a rule that categorically

18  excludes 40 percent of salaried employees.  They acquiesced

19  in an old rule that was deliberately set low.

20      So I don't think they can try to wrap themselves in the

21  mantle of Congressional acquiescence for something that's a

22  completely new approach to the rule, Your Honor.  That's why

23  we're all here challenging something that really has not

24  been challenged for 75 years, because it's such a different

25  approach.

1            THE COURT:  Well, let's assume with me that I agree

2    with you -- and this is just a hypothetical -- that executive,

3    administrative, professional is unambiguous for purposes of the

4    Chevron One analysis.  How do I look at the words "bona fide",

5    when you add bona fide EAP, does that create some ambiguity?

6    Does that suggest that EAP means something more than just what

7    EAP means?

8            MR. VANDYKE:  Actually, I think it's the opposite.

9    The way I read it is bona fide in a way is saying people that

10   are really or real EAP employees.  So what I would read that is

11   what is real.  Well, real is whatever the words mean.  And so I

12   think actually in some ways that takes away from the

13   Department's argument that -- the way I read the Department's

14   response to us on our Chevron Step One argument is, listen,

15   bona fide EAP is what we say it is.  You know, and that's the

16   way it's been for 75 years.

17       Well, I don't think so.  I think they are bound by the

18   words.  And I think bona fide when it says -- it's basically

19   bringing in a concept that EAP has a meaning, as they

20   said in -- as the Yeakley Court said, the general

21   acceptation of the phrase, or as the Minimum Wage Study

22   Commission said in 1981, the original intent of the

23   exemption.  They had a thought of what these EAP employees

24   were, and they recognized that over time exactly what kind

25   of person based on what they did would qualify and fall

1   within the ambit of those terms might sort of change, right?

2   You can imagine with our society and the types of different

3   jobs, those things would change.

4       But what they never anticipated, what they never meant

5   is that it would turn on salary alone, and I just -- I don't

6   think we can, with a straight face, anybody with a straight

7   face could say that -- especially the Congress in 1938 or

8   any Congress since meant for this, intended for this

9   provision to be construed primarily as a salary cut-off as

10  opposed to what the duties of the people meant.

11      So I think the bona fide -- I guess that's a long way

12  of saying I think when you add "bona fide" in front of these

13  categories, it's saying real.  When you say real, I think

14  it's basically saying the type of person that people would

15  think was -- I think it adds to the strength of the fact

16  that this is based on duties alone.

17      And that -- that combined with, as we put it, as we

18  stated in our briefs, there is -- if you look at the

19  definitions at the time, or even today, of what an executive

20  or administrative or professional employee is, those are all

21  based on salary.

22      And the Government has come back and said, yeah, but

23  it -- it includes a status element too.  But of course.

24  Sure.  I mean, I'll concede that an executive employee, you

25  know, includes sort of a status element.  But the problem is

1    that status too doesn't turn on salary.

2         I go back to the President Trump example.  He's not

3    going to draw a salary apparently.  Neither have two other

4    Presidents before him, and yet, I don't think anybody

5    thought, well, he's not quite a President because he's not

6    drawing a salary.

7         The Yeakley case when it said a person might be a bona

8    fide -- again, Yeakley uses the words "bona fide".  So a

9    person might be a bona fide executive in a general

10   acceptation, regardless of the amount of salary.

11        In the Stein report when it said that some foremen and

12   supervisors are paid exceedingly low wages, that's why it

13   set the salary requirement so low.  That's why they set it

14   so low is because they recognized everybody was focused

15   primarily on duties and they saw the salary requirement as

16   basically just a bright line rule that allowed you to

17   exclude the really clearly non-bona fide EAP people, but not

18   as something that actually defined a bona fide EAP person,

19   Your Honor.  That's something that sort of evolved over time

20   I think.

21             THE COURT:  Well, do you have any case that you cite

22   to me in the brief that does a Chevron One analysis on any kind

23   of statute that actually explicitly says we're going to

24   basically allow the Department, whatever department would be

25   appropriate for that statute, to define and to limit the terms?

1    Because there are many statutes where --

2              MR. VANDYKE:  Right.

3              THE COURT:  There are many statutes where terms are

4    undefined and the agency has to go through the rule-making

5    process, but this statute actually says -- do you have any

6    cases that does a Chevron One analysis that has statutory

7    language that says -- let me make sure I quote it properly --

8    that as such terms are defined and limited from time to time by

9    regulations of the Secretary?

10             MR. VANDYKE:  I think if I understand what you're

11   saying, Your Honor, is it's do I have any cases where there was

12   an express delegation to an agency, and yet, they still did a

13   Chevron Step One analysis like we're asking for.  We're saying,

14   sure, other aspects it would have to be a Chevron Step Two

15   because it was expressly delegated, but the -- but there's a

16   footfall here because of the fact that they're not staying

17   within the terms or because of other parts of the statute.

18        So I don't know if I made it any clearer, but I think I

19   understand what you're saying.  We do cite to some -- we do

20   cite to some -- in our reply brief we cite to cases that

21   say, for instance, on page six of the reply, most statutes

22   are ambiguous to some degree from the Mescalero case, but in

23   the City of Arlington case --

24             THE COURT:  Well, I ask that question -- I don't

25   remember seeing that case in looking through the cases dealing

1    with a Chevron One analysis on a statute that expressly

2    deferred to the Secretary.

3          MR. VANDYKE:  So the answer to your question, Your

4    Honor, I'm not aware of facts right now, of facts -- of a case

5    that has facts where they did that.  I am aware of cases that

6    talk about the fact that Chevron deference only goes to the

7    aspects of the statute that are actually ambiguous or that were

8    actually delegated and doesn't -- and that you can't do what I

9    think the Department is asking for here, and that is to say,

10   well, since some part of it was delegated, we get Chevron

11   deference for everything.

12        So we cite cases that say for the principle, that that

13   is not the proper way to do Chevron deference.  You get

14   Chevron deference for the parts that are actually ambiguous,

15   like, for instance, executive, administrative and

16   professional are, but you don't get Chevron deference for

17   any -- you don't get Chevron deference beyond what the

18   actual words mean.

19        So we cite cases in our brief.  The City of Arlington

20   case where it says an agency must have received

21   Congressional authority to determine the particular matter

22   at issue in the particular matter adopted.  And so we cite

23   cases for that principle.  I don't recall, Your Honor, if we

24   have cases where it was actually done.  You know, I don't

25   recall the facts of those cases, so I apologize that I don't

1   but I'll see --

2         THE COURT:  I think you're getting an assist here

3   maybe.

4         MR. VANDYKE:  I know. I know.

5         MR. SMITH:  We'll see, Your Honor.

6         MR. VANDYKE:  So in the Supreme Court Beef Processors

7   case that we cite from the Fifth Circuit, if you recall, so Mr.

8   Smith has given me some language.  It says thus, the FMIA gives

9   the Secretary the power to create sanitation regulations and

10  commands him to withhold meat approval where the meat is

11  processed under unsanitary conditions.  So they --

12        THE COURT:  Right, but that statute did not have --

13  and correct me if I'm wrong.  I didn't think that statute had

14  any similar language like here where there's an express grant.

15        MR. VANDYKE:  Well, but --

16        THE COURT:  The terms weren't defined in that

17  statute.

18        MR. VANDYKE:  But whether or not you have express

19  delegation or whether or not you have implicit delegation

20  because it's ambiguous, I don't know that something would --

21  just because you have an express delegation, I think you're in

22  the same position as if the Court finds that you had implicit

23  delegation, which I guess is what they have here.

24        So once you're in the land where you say, okay, you've

25  got some authority delegated to you, you've got some

41

1   authority, but you're limited either by the words or by --

2   by the words or you're limited by the fact that this is all

3   that was delegated to you, not this other area over here.

4       I think that's what we've got in -- I don't think it's

5   good enough to say in response to the Supreme beef case to

6   say, yeah, but that didn't involve an express delegation,

7   because it still did involve a delegation.  Whether it's

8   express or implied, it's a delegation.

9           THE COURT:  Well, I'm sure you're familiar with the

10  Long Island Care at Home versus Coke case.

11          MR. VANDYKE:  Yeah.

12          THE COURT:  Now, that dealt also with an FLSA case,

13  but it talks about and the Supreme Court indicated that in this

14  case the FLSA expressly leaves gaps in terms of creating

15  definitions in that case for domestic service employment and

16  companionship services, and it provides the Department with the

17  power to fill those gaps through rules and regulations.

18      Don't we have that same situation here where a bona

19  fide EAP is not defined?

20          MR. VANDYKE:  You're right, Your Honor.

21          THE COURT:  And they get to fill those gaps in.

22          MR. VANDYKE:  They have to fill those gaps but they

23  are still constrained by -- it still needs to be something

24  within the realm of the words, and that's why they can't --

25      I go back to my example that I think is a powerful

1    example to say they couldn't say, for instance, we consider

2    somebody to not be an executive who is over 65 years old,

3    because we have -- and we all would immediately say, no,

4    that has nothing to do with whether you're bona fide EAP.

5    So you're constrained by the words.

6         In the same way they themselves have said before in the

7    Stein report, some foremen and supervisors are paid

8    exceedingly low wages.  In the Yeakley case they said a

9    person might be a bona fide executive in a general

10   acceptation of the phrase, regardless of the amount of

11   salary he receives.  So I still think they're bound by those

12   words.

13        We're not -- it's really important, I think, Your

14   Honor, we are not arguing that they don't have some

15   delegation.  There are gaps.  They were given things to --

16   but what they can't do is they can't leverage the fact that

17   there is some gap given to them to then basically do stuff

18   that's inconsistent with the text that Congress gave to

19   them.  That's the Chevron Step One analysis I think, Your

20   Honor.

21             THE COURT:  I guess what I'm struggling with, and I

22   probably asked it multiple different ways, is for me to say

23   that the terms for a Chevron One analysis are unambiguous, how

24   do I comport that with Congress giving the Department of Labor

25   such broad authority to define and to limit the terms that are

1   undefined?

2          MR. VANDYKE:  I think it would be -- I think the way

3   to do it, Your Honor, would be to say we've got -- to do what I

4   think we have done in our brief and say we don't -- we

5   acknowledge that they are given broad deference to define these

6   terms but they can't color outside the lines by -- the lines

7   may be -- you know, the picture may be big and they can do

8   whatever they want within those lines, but they can't color

9   outside the lines.

10          So then the question becomes, what are those lines.

11   And I think what the Court would look at for those lines is

12   the definition of the terms, which we've talked about at

13   length, and they have not given any reason to think that the

14   definitions of those terms include salary.  The closest they

15   could get to was status, but as I've said and pointed out,

16   status and salary are two different things.

17          Then the other thing is their own -- theirs and other

18   authorities, like the Minimum Wage Commission's

19   acknowledgment in the past that salary is not -- that you

20   can be a bona fide EAP employee regardless of your salary

21   and their own acknowledgment that by setting the salary

22   level very low and specifically saying we're doing that

23   because some foremen and supervisors are paid exceedingly

24   low wages, and by acknowledging that they could not have a

25   test that turned on salary alone in the past, they have

44

1   acknowledged that that's outside the lines, that that's

2   outside the lines.

3        So I don't think this Court has -- just to be clear,

4   this Court doesn't have to say they don't have discretion

5   in order to decide this case in a Chevron Step One analysis.

6   This Court can say they have lots of discretion but they

7   have overstepped that discretion or they're trying -- which

8   is sort of the same thing, they're trying to leverage that

9   discretion to doing something that they don't have

10  discretion to do.  That's I think the way this case is

11  decided at Chevron Step One.

12       THE COURT:  But doesn't part of that analysis really

13  shift to Chevron Two, whether --

14       MR. VANDYKE:  I don't think so because it's not -- I

15  think there's two distinct analyses.  One is to say are they

16  coloring inside the lines, to use my analogy, and that is

17  Chevron Step One because you're looking at the line and saying

18  are they constrained by the text.  The second is to say are

19  they doing crazy things inside the lines.  That's the arbitrary

20  and capricious challenge.  So I think that is the difference.

21       I think arguably you could, like five District Courts

22  determined back in the '40s when they were doing less crazy

23  things inside the lines, I think maybe they could lose on an

24  arbitrary and capricious challenge.

25       But I think this case is easier than that because I

1    think the Court can say they're coloring outside the lines.

2    So it really is -- I think it's a distinct conceptual

3    difference here in this case between saying -- between the

4    Chevron Step One and Step Two.

5        And we are talking about Step One.  We're talking about

6    are they doing something that's inconsistent with the words

7    "any bona fide executive, administrative and professional".

8    And I think -- and it's not just me that thinks that.  They

9    think that by saying they can't do a salary level and the

10   Minimum Wage Study Commission acknowledges --

11        THE COURT:  They don't think they're doing just a

12   salary test.

13        MR. VANDYKE:  The salary only test.

14        THE COURT:  Right.  Of course, I've looked at the

15   regulation, which is way too long, but -- and you've cited it

16   in the brief but I went through and looked at the actual hard

17   text.  I mean, they acknowledge that this idea that it does

18   work in tandem, that they have a salary requirement and the

19   three steps, a duties test as well as a salary level test.

20        MR. VANDYKE:  You're right.  We're using more their

21   salary alone language to show that there's an illogical

22   inconsistence.  Now, admittedly, they think they work in tandem

23   and they don't think they're using a salary alone test because

24   their argument is essentially we have a duties test and a

25   salary test, so we have two different tests so they work in

1    tandem.

2         But what we're saying is, yeah, but they don't actually

3    work in tandem.  It's actually I think very helpful, in

4    their sur-reply they provide this example of a vision test.

5    They say it's illogical fallacy the way we're using the

6    salary alone because if you had a vision test for a driver's

7    exam, then they say under our way of looking at it, the

8    vision test would be a vision alone test.

9         But actually I think that helps prove our point, and

10   that is if you're a blind person and you go in to get your

11   driver's license, right?  And you come back and you don't

12   say I was so close to getting my driver's license, I had

13   like a 95 percent on the written part and on the driving

14   part, but then I got to the vision test and that was the

15   thing that just pushed me over the edge was the vision test.

16   No.  You come back and you say it turns out they don't give

17   driver's licenses to blind people.  It is a vision only

18   test.  I mean, if you're blind, you don't get driver's

19   licenses.

20        And it's the same way here.  If you go in to get an EAP

21   exemption and you come back, you don't say, well, I was so

22   close, but the salary thing was the thing that kind of

23   pushed me over the edge.  That would be in tandem.  That's

24   not the way it works.  You come back and say, you know what,

25   I make less than $47,000 and I'm just categorically not

1    eligible for it.

2        So I recognize that they're not acknowledging that they

3    have a salary only test, but just like a vision test, if

4    you're blind, you can't get a driver's license and you can't

5    get a driver's license because you're blind, period.  It

6    doesn't matter how -- how good you were on there.  You can

7    get 110 percent on the written exam and it won't make a

8    difference.

9        It's the same thing here, Your Honor.  So I'm not

10   saying that they concede that they have a salary only test.

11   What I'm saying is that they do have a salary only test and

12   they have conceded in the past that that would not be

13   permissible.

14            THE COURT:  Of course, you addressed Chevron One.

15   Most of the response on this issue addresses the Chevron Two

16   analysis.  If I get to the Chevron Two analysis, what's your

17   argument there?  Because you don't really -- you attack that I

18   shouldn't go to Chevron Two, but let's say I find the statute

19   is ambiguous and doesn't answer this question and go to Chevron

20   Two, what would be your position there?

21            MR. VANDYKE:  Well, I think the argument there, Your

22   Honor, would be similar to the way that the District Courts

23   that have struck it down on a Chevron Step Two arbitrary and

24   capricious challenge in the past, and that was to say salary is

25   just -- is just not a deciding factor.  It can't be a deciding

1   factor for whether you're an EAP employee.

2       So it's similar I think to the -- it would be a similar

3   type analysis.  Just say it's arbitrary within sort of the

4   common meaning of the word arbitrary to say at 47,000 you've

5   got -- you get a -- you can't get this, even though you meet

6   the requirements for an EAP employee in all other regards.

7       So -- so the other thing I guess I do want to talk

8   about clear statement, but hopefully I'll have a chance to

9   talk about that because I want to make sure -- I think

10  that's the thing that makes this really easy for the States,

11  but I'll save that till the end, Your Honor, unless you want

12  me to --

13          THE COURT:  Go ahead.  I was just looking to make

14  sure --

15          MR. VANDYKE:  My colleague was --

16          THE COURT:  These were all the questions I had

17  regarding what I perceive as the crux of the case is this issue

18  I have spent the last hour asking you questions about, so

19  certainly if there are other things you want to argue, please

20  do so.

21          MR. VANDYKE:  Certainly, Your Honor.  If it is

22  ambiguous, if it is ambiguous, I think -- I don't know how

23  we -- how the States don't automatically win under the clear

24  statement rule, and I just want to make a couple points about

25  that.

1          The briefs on the clear statement rule are a little bit
2    like ships passing in the night.  I mean, I think the
3    Federal Government, the Department in their reply literally
4    addressed the clear statement rule in a paragraph and then
5    in their sur-reply I think they had like three or four
6    paragraphs.

7          Their view seems to be that the clear statement rule
8    does not apply because there was something delegated here.
9    Sort of like what you were saying earlier on the Chevron
10   Step One.  Something was delegated.  They were delegated
11   authority and the -- and the FLSA was clearly intended by
12   Congress to -- to apply to the states.  Therefore, basically
13   whatever they decide applies to the states.

14         But the clear statement rule still applies.  As we see
15   from the Swain case and other cases, the clear statement
16   rule -- let me put it this way:  All clear statement cases
17   involve some delegation of authority from Congress to an
18   agency to apply a rule to the states.

19         The question then becomes what is the sphere of that
20   delegated authority, and I think under the clear statement
21   rule the point is a federal agency cannot apply a rule to
22   the states in a way that would affect core functions of the
23   states, like this rule would in affecting employment
24   relationships with their employees, unless they have been
25   clearly delegated that particular authority from Congress.

1        I don't see how they -- they don't even make the

2    argument that they have been clearly delegated authority to

3    have a categorical salary cut-off.  They try to defend it

4    through ambiguity.

5        So I just don't see how the States could possibly not

6    win on the clear statement rule because it's not enough to

7    just say, well, we've been delegated authority and FLSA was

8    meant to apply to states.  That doesn't answer the question

9    of, yes, but how did Congress expect the FLSA to apply to

10   states.  And the answer to that question under the clear

11   statement rule is you only get to apply -- it's a very

12   strict standard for what agencies are allowed to do.  They

13   basically have to have a clear statement from Congress

14   before they can apply something in a certain way to states.

15       So the other thing too is in reality, the only

16   authority they really cite in response is Garcia.  They say

17   Garcia, Garcia, Garcia, but the Gregory case cites Garcia.

18   The Gregory case cites Garcia as the basis for the clear

19   statement rule, because Garcia says we're going to look to

20   the political process to protect states, and the Gregory

21   case says, well, if you're going to look to the political

22   process, then you need to make sure Congress has clearly

23   intended to abrogate to states sovereignty in this area

24   before you apply it.  So I think Garcia actually cuts the

25   other way, Your Honor.

51

1        So I don't know if you have any questions about the

2   clear statement rule.  It is a little bit of an odd thing

3   because I'm a little surprised by this, but it seemed like

4   we're talking past each other in the briefs.  It seems to me

5   clear that the clear statement rule applies, but the

6   Department seems to see it another way.

7              THE COURT:  I have no questions regarding that.

8              MR. VANDYKE:  All right.  Well, I think that's --

9   does Your Honor have any questions about -- the only other

10  thing we haven't talked about at all is irreparable harm.  I

11  guess that's another area where I think that the irreparable

12  harm on this is clear.  I think we made a strong showing,

13  stronger than the majority of multistate type actions or even

14  non-multistate type actions where there was -- and I think also

15  that the Department itself has said that there's going to be a

16  hundred million plus hit to the states and local governments in

17  the first year alone.  The irreparable harm here I think is

18  obvious.

19       I also think the one thing that in their sur-reply

20  the -- the Department says, yeah, well, the States haven't

21  really made a -- I guess they say we didn't say anything in

22  our reply about the balance of the harm or the public harm

23  factor, and so therefore, I guess they think we haven't made

24  enough showing.  I think it would be -- I just want to make

25  one point with regard to that.  That's one of the four

1  factors for a PI, and I think it would be extraordinary if

2  this Court was to conclude, A, that we have shown a

3  likelihood of success on the merits.  In other words, you

4  agree with us that the law is likely unlawful.  So let's say

5  we prevail on that and you also agree with us on irreparable

6  harm, but then to conclude, oh, but the public harm weighs

7  the other way.  Basically that would require the Court to

8  say we think that the public interest -- that there's a

9  strong public interest in having the federal government

10  apply an unlawful law.

11       And that's why I think in the Fifth Circuit immigration

12  case, the Texas case, it says that this factor, the public

13  harm factor, overlaps considerably with the -- with the

14  irreparable harm factor, because if you in fact have shown

15  that a law is likely to be unlawful and you've shown

16  irreparable harm, in a context like this, I think it would

17  be very odd, to say the least, to not also have the public

18  interest factor also weigh in favor of enjoining the law,

19  because I don't think the federal government can ever have

20  an interest in promoting or promulgating an unlawful rule,

21  if that makes sense to Your Honor.

22            THE COURT:  Then also why don't you address the issue

23  of whether it should be nation-wide, assuming we get there.

24            MR. VANDYKE:  One thing I thought of --

25            THE COURT:  Just let me finish.

53

1          MR. VANDYKE:  I'm sorry, Your Honor.

2          THE COURT:  Because, of course, the Department

3    asserts that it should only apply to the 21 states.  And so

4    address that, because apparently the other states didn't really

5    care to join in the lawsuit, so they apparently --

6          MR. VANDYKE:  Well, I will say --

7          THE COURT:  Let me finish.  They apparently have no

8    problem with the change by the Department of Labor, so --

9          MR. VANDYKE:  Right.

10         THE COURT:  And are prepared for it to go into effect

11   here on December 1st.

12         MR. VANDYKE:  Right, Your Honor.  I think -- I do

13   want to -- as somebody who has worked in a couple different

14   State Attorney General's offices, I will say that, like other

15   contexts, states coordinating with other states can be a little

16   bit like herding cats.  So I certainly would not read into the

17   fact that we don't have more states as necessarily an

18   affirmative message that these states don't care.

19      I think probably some of the States care but just

20   getting -- you know, this was all happening just before the

21   election season and a lot of elected officials were busy

22   doing other things, and so --

23      But I think that's important that Your Honor not think

24   that, because I do think there are actually a significant

25   number of other states that aren't involved in the

1    litigation that probably do care deeply about this because

2    of the fiscal hit they're going to get and maybe are wishing

3    now that they had joined.

4         But I don't think that they necessarily need to be a

5    party anyway because, as we cite in our briefs, many Courts

6    have said when you have a rule like this that's national in

7    scope, in the Perez case and the persuader rule case, it

8    said when a reviewing court determines that agency

9    regulations are unlawful, the ordinary result is that the

10   rules are vacated, not that their application to the

11   individual petitioner is prescribed, or petitioners.

12        And in the Texas case, the immigration case, the Fifth

13   Circuit said that partial implementation there would detract

14   from the immigrated scheme of regulations created by

15   Congress.

16        And the same thing is true here.  This is a national

17   statute with a national -- a rule that's national in scope.

18   I do think that there is a little bit of a -- I cannot

19   imagine that the Defendants in this case in any other

20   context would say that they were okay with a Balkanized

21   rule.  I think they're just saying that here because they

22   want to limit the scope of the injunction.

23        The last thing I would say on that is if you look at

24   the rule itself, in the rule itself they actually were urged

25   by some commentators to adopt a rule that would have

1  different salary levels in different parts of the country,

2  which is effectively what would happen if Your Honor offered

3  a partial injunction here, did a partial injunction, is you

4  have different rules in different parts.  They expressly

5  rejected that because they said it would not be good to have

6  different rules in different parts of the country.

7       So I think that probably speaks with more volume than

8  what I think is sort of the litigation words that basically

9  come, and understandably, that they would like to limit the

10 rule, the scope of any ruling from this Court.

11      I think what they said when they were doing the rule

12 actually has more force, Your Honor, and that is that it's

13 important that the rule be national in scope and that it

14 apply nationally or not apply nationally.

15      The other thing I'll say, and here I'm speaking for

16 people that aren't before the Court, I've thought about this

17 and I don't know any way to say it other than this, and that

18 is, I would fully expect that if Your Honor was to issue an

19 injunction but limit it only to the 21 states, the half or

20 so States, there's a lot of states that probably would

21 suddenly think, wow, we really want to be in that litigation

22 and they may come try to intervene or join and try to get

23 the benefit of the injunction.

24      So in some ways I think just having a national

25 injunction would -- would prevent the procedural weirdness

 1    of what is the Court to do with that and what are we

 2    supposed to do with that.  So that's another thought I would

 3    just throw out that I think it's -- I know your answer could

 4    be, well, they should have joined the litigation and that's

 5    probably my answer too.  You should have joined with us.

 6         But it still would be a bit of an awkward situation

 7    because suddenly you would have a bunch of states, because

 8    this really is a very real fiscal hit to these states

 9    starting on -- I mean, I have them calling me -- starting on

10    December 1st.

11              THE COURT:  I've reviewed the affidavits.

12              MR. VANDYKE:  What?

13              THE COURT:  I've reviewed the affidavits in terms

14    of --

15              MR. VANDYKE:  Well, thank you, Your Honor.  Thank you

16    for your patience and for your engagement on this.  I

17    appreciate it.

18              THE COURT:  Thank you.  Mr. Baskin, go ahead.

19              MR. BASKIN:  Thank you, Your Honor.

20         And I might as well pick up where you left off, even

21    though it's in reverse order in effect.  But on the

22    nation-wide injunction, I did want to make the Court aware

23    of a recent case decided in the Eastern District, Associated

24    Builders and Contractors of Southeast Texas versus Rung

25    challenging another unlawful regulation.  Judge Crone issued

1   a preliminary injunction, nation-wide in scope, even though

2   there were only three Plaintiffs in front of her

3   representing certain industries that were complaining

4   about -- this was the black-listing rule, so-called, fair

5   pay and safe workplaces.

6        And recognizing -- citing the Texas versus U.S. case on

7   immigration and recognizing that the real test is whether

8   partial implementation of the rule in question would detract

9   from the integrated scheme of regulations created by

10  Congress.  And so there is no need for everyone in the

11  country to join a single case, although frankly, in this

12  case we practically have everyone in the country, certainly

13  on the business community side that has become a Plaintiff,

14  representing every conceivable -- virtually every

15  conceivable industry.

16       But it is not necessary for every Plaintiff to show

17  irreparable harm.  I would add that in the ABC, Associated

18  Builders case I just mentioned, not all the Plaintiffs

19  submitted affidavits of irreparable harm.  The bottom line

20  is that if there is any irreparable harm to any Plaintiff to

21  have a preliminary injunction against a nation-wide rule, it

22  is standard in case after case in this circuit for the

23  injunction to be issued on a nation-wide basis, as long as

24  your ruling relates to the substantive lawfulness of the

25  rule, which is probably what I should turn back to next

1   since you don't reach the injunction unless you're satisfied

2   of the likelihood of success on the merits.

3        And on that aspect, as you know, our emphasis, we

4   overlap but we have a different emphasis in this case, but

5   it is an overlapping one because starting with the initial

6   brief of the States, they said, yes, we want it to say no

7   salary at all is permissible, but certainly no salary that

8   knocks 4.2 million people out of the exempt status.

9        Our focus is on that second part, which you discussed

10  at some length with counsel for the States.  But I want to

11  steer you towards reasons why both Chevron Step One and

12  Chevron Step Two, we and the States should prevail on this

13  point.

14       The notion that even if a salary of some kind is within

15  their authority, to set now, after 75 years, a salary that

16  is no longer at the low end of the scale but is at this

17  magical new 40 percent threshold that is going to knock

18  millions of people out of their exempt status is not

19  authorized by Congress, and so that's Chevron Step One,

20  using all the tools of statutory construction, which I'm

21  going to show you.  Then even if you get past that, it is

22  not a permissible construction under Chevron Step Two.

23       So let's start at Chevron Step One and we actually come

24  around to it using the tool of statutory construction that

25  you yourself referred to and so did the Government, which is

1    the Congressional reenactment doctrine.  That works in some

2    measure.  You were saying it doesn't help the States because

3    Congress reenacted the statute while there was the salary

4    test and never objected to it.

5        But what was Congress reenacting?  It was reenacting a

6    test that was set at the low end.  In fact, since 1940 the

7    contemporaneous people right there after they passed the

8    Act, they said -- this is the Labor Department people, Stein

9    in the Stein report said, and I'm quoting, it would be

10   contrary to the mandate of Congress if the Department set

11   the minimum salary at a level that would exclude many

12   employees from exemption who would meet the duties

13   requirements.

14       That was the understanding of the Department from the

15   very beginning, and in the '49 and in the '58 and '63, every

16   time they upped the threshold, they acknowledged and

17   re-affirmed that they needed to keep it at the low end so

18   that it would be a proxy for what is, as they at other times

19   refer to as the obvious exempt people, which goes back to

20   the definition of terms.

21       Now, when you look at that long-standing history, which

22   is undisputed by the Government, they can't dispute it, it's

23   all in the reports and it's been repeatedly cited.  Each

24   time they redo it, they go back to the original.  If that

25   was the understanding, that it has to be at the low end,

60

1    then that is what Congress was reenacting.

2        When you look at the cases, some cited by the

3    Government in their brief thinking where it helped them, but

4    they seemed to ignore how it hurts them, because it strongly

5    supports our argument.  What the Court has said in those

6    cases, the Bell Aerospace case, the Sebelius case, the

7    Commodity Futures case, each time they're saying this is

8    persuasive evidence of legislative intent, the original

9    legislative intent.

10       So it is the tool of statutory construction that allows

11   you to say at Chevron Step One Congress did not intend for

12   the Government to go outside that realm.  Yes, they can get

13   by with the salary test at the low level and Congress had no

14   problem with that, but Congress repeatedly reenacted and

15   amended, and by the way, no one mentioned but added the

16   computer professionals to the mix, and set it at certain

17   rates, did not say that they -- Congress did all that

18   reenacting, all under the belief and presumption, and

19   indeed, requirement that the test be continued at the low

20   level.

21       Now, what is also undisputed here is we now have jumped

22   from a threshold that was never -- it started off at about

23   the ten percent level, creeped up some, and I believe 2004

24   it reached its peak at 20 percent of salaried employees.

25   Now we're at 40 percent, the biggest increase in the history

1   of the 75 year history of this regulation, knocking out

2   millions of employees, already disrupting millions of

3   businesses.  That is all in the administrative record in the

4   comments that we've cited, including many non-profit

5   businesses that really don't see a clear path forward to how

6   they're going to be able to operate, affecting their good

7   will, their customer base, the relationships between the

8   employees, doing all of this without any authorization from

9   Congress, and indeed, without a rational basis.

10         So that's all at Chevron Step One, but if you feel that

11   there's still ambiguity and that you should view it as a

12   Chevron Step Two case, all of the same reasoning

13   demonstrates that it is not a permissible construction of

14   the Act.

15         So whether it is an unambiguous act or whether it's

16   wrong because whatever ambiguity there is, we know it's not

17   permissible because Congress said it wasn't because the

18   contemporaries understood from the beginning what it was

19   supposed to be.

20              THE COURT:  But at Step Two I have to give great

21   deference to the agency's decision.

22              MR. BASKIN:  But not be a rubber stamp.

23              THE COURT:  Well, I understand that, but how I define

24   that deference and their -- if I'm at a Step Two analysis, when

25   they have been using the salary test for 75 years -- now, true,

1    they have expanded it.  What's the limit of that deference that

2    I should give?

3             MR. BASKIN:  You just actually described it, from our

4    standpoint.  We're saying assume they can use a salary test.

5    You used the one that they have been using for 75 years.  Now

6    they're using something radically, totally different, and so it

7    is outside the level of deference.

8         And the choice you get in the cases about what is the

9    deference, what's too much deference, it seems to come down

10   to what's rational.  Also, don't be a rubber stamp.  That's

11   why I said that that's your limit.  You would have to be a

12   rubber stamp to let this go by, because what they have done

13   does not make sense based on this long history of what the

14   Department itself has recognized as what they were supposed

15   to be about.  They have made a fundamental, radical social

16   policy change.  That is not something to which they are

17   entitled to deference.

18        Put another way, if you look at this define and limit

19   language, it does not -- and this goes to the examples that

20   we gave in our brief.  It is not license to do something and

21   create a test that makes it -- eviscerates the EAP concept

22   itself as to what is a bona fide executive, administrative

23   or professional employee.  And it is clear from the record

24   and from the outcry of the business community and the

25   States, and we are on the same page on this, that this is

1    going to knock out millions of people who are, by any other

2    measure, bona fide executives, administrators and

3    professionals.

4         Maybe another way to say it, it's a common sense test,

5    and they have gone beyond common sense.  They are doing

6    social engineering, and they are almost direct about that.

7              THE COURT:  Well, common sense, that's not a legal

8    test.

9              MR. BASKIN:  Actually, when you get to the question

10   of what is deference and what is rational, what is arbitrary,

11   common sense is the flip side of arbitrary, and common sense is

12   sometimes a measure.  And there are some Court cases that say

13   sometimes common sense is what you should apply.

14        But if you prefer the rubber stamp approach or simply

15   the arbitrary and capricious concept, we go into some length

16   in the briefs about that.

17             THE COURT:  Well, there aren't really a lot of cases

18   that when you get to Step Two that really give agencies

19   deference.  So how do I reconcile this body of case law at Step

20   Two that doesn't really overturn and find that they went

21   beyond?

22             MR. BASKIN:  Well, there are cases, the State Farm

23   Mutual case, the recent Encino case from the Supreme Court,

24   there are cases in which the Courts have said that the Chevron

25   deference is not appropriate where the agency either has

64

1    unexplained inconsistencies, which they are legion throughout

2    this process, or they are ignoring the regulated industries and

3    the reliance of those industries on the old tests.

4         And there is some overlap between is this a Chevron

5    Step Two analysis, is it arbitrary and capricious.  There's

6    been a lot of overlap over the years between those.

7         But there are definitely cases that get past Chevron

8    Step One, but the Courts, nevertheless, step in because by

9    whatever rubric you want to call it, the agency has simply

10   gone too far.  They have done something that, particularly

11   here where we know now that Congress did not intend for them

12   to do this because Congress repeatedly ratified the old

13   standard and reenacted it, and you look at the disruptive

14   effect that it is having and is about to have, frankly, is

15   already having on millions of businesses.

16        And it's not internally consistent with the

17   Department's own approach over many years, and the

18   Department refuses to acknowledge the inconsistencies.

19   They're acting as if, oh, well, no big deal.  It somehow

20   aligns statistically with some reasoning or other, but it

21   makes no sense what they're saying.

22        Never before have they kicked off millions of people

23   who are otherwise bona fide exempt, never before have they

24   been at this high threshold level.  So much higher

25   qualitatively by any measure that it cannot be rationally

1   explained, and their efforts to explain it did not make

2   sense.

3       I'll just give one example.  They talk about, well,

4   this is somehow consistent with the ratio of short duty to

5   long duty measures.  But here -- and they say the $913

6   number is consistent with the previous ratio, but there is

7   no other number that they're comparing it to because there

8   is no short duties and long duties test.  So when you look

9   at the paragraph where they say that, they don't -- they

10  don't give the denominator.  I mean, there is no ratio.

11      So this concept of a ratio, which was never before the

12  standard, makes no sense, even if you took the ratios that

13  used to be a little bit higher for one test or the other,

14  was never close to the range that they have reached now.  So

15  they have to be taken to task for failing to adequately

16  justify, despite hundreds of pages of trying, failing to

17  justify how they have jumped and why they have jumped to

18  this radical number that is so far a departure from 75 years

19  of experience.

20      And there are certainly cases that have applied Chevron

21  Step Two to say that the agency has gone too far, and we'll

22  be happy to provide supplemental briefing with cases of that

23  type.  And, of course, we will have another round of

24  supplemental briefing in our case on the summary judgment

25  portion of this and we'll be sure to give attention to that,

1  though it would be great, in the meantime, to have an

2  injunction of some kind in place because I think it's worth

3  noting, this is in effect a midnight regulation.

4      The agency, the Department has tried and made all kinds

5  of efforts to get this in place before a new administration

6  so that they could have their legacy, if you will, this

7  social engineering.  We are -- as the Court may have heard,

8  there was an election and obviously there's a change, and

9  the new administration, frankly, should be given the

10  opportunity to determine if this is consistent with the

11  objectives going forward.

12      There is nothing lost by putting a hold on this to

13  allow that to happen.  But there's also nothing lost from

14  the public interest in recognizing the rule of law --

15          THE COURT:  Just to be fair, even with the new

16  administration coming and a new Secretary of the Department of

17  Labor at some point in the future, they would -- in order to

18  change it, they would have to go through the rule making

19  process to change it.  It's not like a new President can just

20  wipe this away by some kind of executive order, because there's

21  a process that they went by and a new administration can go

22  through that same process.  It's not a quick process.

23          MR. BASKIN:  But there is a difference in dealing

24  with a rule that has gone into effect and a rule that has not.

25  You have the power to put this on hold, to maintain the status

1  quo until the next administration can take a look at it.

2          THE COURT:  And a status quo injunction is a TRO.

3  It's not a preliminary injunction, so -- I mean, that would be

4  speculation on the Court's part.  In my view, that's not a

5  consideration, what the next administration might do or might

6  not do.

7          MR. BASKIN:  Okay.

8          THE COURT:  And I understand your argument and that

9  you're asking me to do that, but that has no consideration in

10  the Court's decision, ultimately what it decides in the case.

11          MR. BASKIN:  All right.  We'll accept that.

12          THE COURT:  Well, no, because, I mean, I don't know

13  what they're going to do.  It would be pure speculation.  I

14  mean, let's say -- that shouldn't be a basis for an injunction,

15  if ultimately I granted one, because what happens if the new

16  administration doesn't change course and the Trump

17  administration thinks that, yeah, I think that's a good thing

18  they're doing?  I have no idea.

19      But basically that shouldn't be a basis for an

20  injunction because that delays a change of whatever policy

21  decision is being made, which the Court -- to be clear, the

22  Court is not involved in this kind of policy decision.

23  Certainly the Department of Labor is trying to raise

24  salaries.  That's not the Court's job.  If I grant an

25  injunction, there will be a large segment, millions of

1   people, that aren't going to get overtime that would get it

2   otherwise.  They're not going to be happy.

3       And so the Court is not making a decision on the issue

4   of whether or not that's a good thing or bad thing.  I'm

5   looking at the legal issues involved in the case, and in no

6   way -- whatever I decide, there will be no basis on this

7   issue of whether or not I think or don't think that some

8   people should get overtime or that businesses have to pay

9   this overtime.

10          MR. BASKIN:  Right.  You certainly should be basing

11  your decision on the law, although in a preliminary injunction,

12  that too is partly to maintain the status quo, where the rule

13  has not gone into effect.  A preliminary injunction serves that

14  same purpose as a TRO in this situation, and this rule does not

15  go into effect until December 1st and is not meant to prejudge.

16  We, frankly, have no idea what the next administration would do

17  either.

18      It's only to allow, in terms of the public interest,

19  which is one of the factors, an equitable consideration, but

20  we certainly hear you that you don't want to make that part

21  of your consideration.

22          THE COURT:  Well, I'll look at the factors for a

23  preliminary injunction, which you have all been discussing.

24  It's different, I'm saying, because in a TRO situation, that is

25  a pure let's preserve the status quo and I look at that and

1    then we set a preliminary injunction hearing 14 days later to

2    decide do you meet all the standards.

3         But go ahead.  I don't mean to --

4              MR. BASKIN:  Well, it's semantics perhaps.

5              THE COURT:  I understand.

6              MR. BASKIN:  But I certainly hear you.  The reason

7    that we got into that was because this is social engineering,

8    and I want to get to a couple points you made accurately about

9    what they are attempting to do.  Number one, to raise people's

10   wages, raise the wages of exempt people.  That's an

11   impermissible objective under the rule, as they themselves have

12   said repeatedly over the years, and that many employees will be

13   hurt by not being able to get overtime.

14        But actually, many employees are going to be hurt by

15   losing their exempt status, which is a matter of status in

16   the world of many different industries and it's something

17   that the industries themselves, the businesses have

18   commented on and that we have provided you information

19   about, that the Department has failed to take into account

20   or to adequately address.  It's because the employees by

21   being an exempt person, using the salary, having the

22   flexibility to come and go without being on the clock, as it

23   were, that is a status that many of them want and it is an

24   opportunity for advancement in many of these businesses

25   throughout many different industries.

70

1          So the employees -- there's this notion that the

2     Department has advanced that this is all to the good for the

3     employees, but in fact, many employees will be hurt by it.

4          I did want to bring to your attention a recent -- in

5     fact, it just came out yesterday, November 14th, the

6     Congressional Budget Office just did an analysis of this

7     rule and indicated that it's going to cost the business

8     community one billion, that's with a B.  That's by the end

9     of 2017 alone.  That it will also hurt many employees for

10    the reasons that I've just said.

11         This goes obviously directly to our arbitrary and

12    capricious arguments and the reasons why the Court, we

13    implore you and ask you to grant the State's motion and/or

14    our motion, whichever motion is needed to keep this very bad

15    rule from going into effect on December 1st.

16         We did not -- I cannot recall now whether there was

17    discussion of the indexing and the three year issue.  We do

18    believe strongly that that is a violation.  There's no

19    delegation of authority to do that.

20         There is some discussion in the Department's brief that

21    it somehow is not ripe for review.  First they say we're too

22    late.  Then say we're too early.  That cannot be right.  The

23    violation is happening now, when the Department is in effect

24    saying it's okay because we're asking -- we asked for

25    comments now on the rule, even though the comments we're

1  asking for is on a rule that says there will be no more

2  comments when we go to make our next change.  That is not a

3  permissible construction of the Administrative Procedure Act

4  and we think, regardless of what else happens, the three

5  year indexing provision should be declared unlawful.

6      We also mentioned in our discussion of arbitrary and

7  capriciousness, or Chevron Step Two, whichever one it is,

8  that the Department is completely arbitrary in their

9  handling of commissions and bonuses, because it's an

10  acknowledgment that they said they needed to and wanted to

11  include them in terms of the salary threshold.  That's an

12  acknowledgment that the threshold is too high, and so they

13  were recognizing that people should be allowed to have -- to

14  use these amounts to get to it, but then they do it in such

15  a way, limiting it to ten percent, limiting it to quarterly

16  calculations, that the business community has offered

17  comments in the record to demonstrate that it completely

18  does away with this supposed necessary aid to determining

19  what the salary is.

20      So we just wanted to call your attention to that as

21  well as another ground for the arbitrary and capricious

22  aspect of it.

23      I'm happy to answer any other questions, but you've

24  been patient and we appreciate it.

25          THE COURT:  No.  Thank you.

1          MR. BASKIN:  Thank you.

2          THE COURT:  I think we'll go ahead and maybe take a

3    ten minute break and then we'll come back and hear the

4    Department of Labor's response.  It's been a good argument and

5    I'm looking forward to the next part of it.

6          We'll be in recess for ten minutes.

7                    (Recess.

8          THE COURT:  Please be seated.

9        Ms. Saltman, are you going to be doing the argument, at

10   least initially?

11         MS. SALTMAN:  Yes, Your Honor.

12         THE COURT:  Okay.  Very good.  And if you'll turn

13   your mic on, even though there is a stationary mic there.  It

14   just makes it easier if you drift from that, one or the other

15   will pick you up.

16         MS. SALTMAN:  Yes, Your Honor.

17         THE COURT:  So let me just start and ask, what is the

18   limit to the Department of Labor's authority to define and to

19   limit?

20         MS. SALTMAN:  Yes, that's a good question, and I

21   think it's a question that's been somewhat confused by the

22   position the Plaintiff States have taken.

23       So Your Honor is correct that there is a two-step

24   analysis that the Court must go through when reviewing an

25   agency regulation here.

1      Now, in this case there is an express delegation of

2  authority from Congress.  Congress asked the Department to

3  define and to limit the terms "bona fide executive,

4  administrative or professional capacity".  Now, the fact

5  that Congress did expressly grant the Department authority

6  to define those terms is itself an indication that those

7  terms are ambiguous.

8      So the -- if the Court were to decide this case at

9  Chevron Step One, the analysis is somewhat different, but

10  that's not relevant here because this case can't be decided

11  at Chevron Step One when there are indeed gaps left in the

12  statutory language that Congress expects the Department to

13  fill through regulation.

14      THE COURT:  Well, at Step One don't I look at the

15  words and give them their plain and ordinary meaning?  And, of

16  course, the States have given the Court definitions from the

17  '30s when the statute was created.  I haven't heard -- in your

18  briefing you don't contest those definitions were the correct

19  definitions from that time and nothing about those definitions

20  indicate a salary.  They're really functional kind of, or a

21  duties based test.

22      So on a Chevron One analysis, despite the fact that

23  express authority was given to define the various terms,

24  that doesn't change that and just make the statute

25  ambiguous, because it would be no different than any other

74

1    statute where -- Mr. VanDyke mentioned that it's either this

2    is an express delegation or it's implicit in many statutes

3    because they don't define the terms.

4            MS. SALTMAN:  Well, I think there's some confusion

5    over what the term "ambiguous" means in the context of a

6    Chevron analysis.  That is actually a term of art here.  What

7    ambiguous means is that there are terms in the statute that are

8    open-ended that cannot be clearly and precisely understood just

9    from reading them and looking at their meaning.  And that's

10   certainly the case with Section 213(a)(1) because the terms

11   "bona fide executive, administrative or professional capacity"

12   are open-ended, and indeed, Congress explicitly left those gaps

13   for the agency to fill and then directed the agency to define

14   and to limit those terms from time to time through regulation.

15           So to --

16           THE COURT:  Well --

17           MS. SALTMAN:  To address your point regarding the

18   definitions, the Plaintiff States have cited some definitions

19   that the terms "executive, administrative and professional" can

20   be defined in terms of functions.  We have also cited

21   definitions, particularly in our sur-reply, that these words

22   also are defined in terms of status.

23           And, moreover, a few points here --

24           THE COURT:  But they -- I mean, Mr. VanDyke accepted

25   that premise that -- they said the States would accept status,

1   but neither one of those, whether it's their definition or the

2   definition which somehow defines status indicates salary, a

3   salary test.

4          MS. SALTMAN:  Well, going back to the Stein report in

5   1940, status has long been associated with salary.  So salary

6   is a quantitative indicator of the qualitative concept of

7   status.  In fact, the word "bona fide" which is included in

8   this statute and which the Department has to interpret, that is

9   an adjective.  That requires a qualitative judgment.

10         So when read together also with the word "capacity",

11  which doesn't just say any employee who performs executive,

12  administrative or professional duties, it says is employed

13  in a bona fide executive, administrative or professional

14  capacity.  That phrase read together does not -- does not

15  foreclose the Department taking into consideration both the

16  duties these employees perform and the status they have

17  achieved, the type of employment that they have.

18         I think it's instructive to look at Congress's intent

19  in creating this exemption.  This is historically called the

20  white collar exemption.  This is an exemption for employees

21  who have attained a certain level at their jobs so that they

22  do not need the FLSA's minimum wage and overtime protections

23  like other employees do.  And the State Plaintiffs actually

24  sort of addressed this.  These are employees who have

25  greater flexibility.  They have attained more autonomy in

1   their jobs.  They often have better benefits, and indeed,

2   they often are paid more than employees who need the Act's

3   protections.

4        So Congress intended to exempt from these protections

5   people who had other incidental benefits to their job, so

6   Congress was envisioning an exemption that encompassed not

7   just people who performed certain functions but also people

8   who had attained these jobs that provided them additional

9   benefits or other protections, rendering the overtime and

10  minimum wage protections unnecessary.  So it was Congress's

11  intent in creating this exemption --

12       THE COURT:  Well, would you agree with me that it is

13  unambiguous that the intent of Congress is that if you're a

14  bona fide EAP employee, you get the exemption?

15       MS. SALTMAN:  Yes, a bona fide -- someone who is

16  employed in a bona fide executive, administrative or

17  professional capacity should be exempt from the overtime

18  provision, but that phrase "bona fide executive, administrative

19  or professional capacity" nowhere mentions duties and it

20  doesn't mention a salary basis test either, which the

21  Plaintiffs conceded the Department has authority to adopt.

22       THE COURT:  Well, let's go back to again the first

23  question I asked.  So what is the limit on -- in the statute of

24  how far you can go in setting some kind of salary?  For

25  example, in the briefing they mentioned do you believe the

1  Department of Labor could say it's a million dollars.

2        MS. SALTMAN:  Right.  So this -- in answering your

3  question, I do think it's important to remain clear that

4  this -- that type of analysis -- were the Court to consider

5  where the Department is drawing the line for the salary level,

6  that is a Chevron Step Two analysis.

7     Now, Chevron Step Two does create boundaries on what

8  the agency can do.  It is not unbounded discretion, and

9  those boundaries are the agency's action has to be or cannot

10 be -- it has to be reasonable.  What that means is it cannot

11 be arbitrary or capricious and it cannot be contrary to law.

12    So Chevron Step Two does take into account what the

13 statute is actually authorizing the Department to do.

14        THE COURT:  That's a different analysis.  I'm asking

15 a more basic question.  Do you -- do you believe that they

16 would have the authority to set it at a million dollars or

17 $250,000?  I mean, absent this issue of whether it's arbitrary

18 or capricious on the rule-making authority, the question is do

19 you believe they have that authority?  If they wanted to set it

20 there, could they go there?  Now, whether it would be

21 challenged later under the other standard, that's one thing,

22 but do you believe that there essentially is no limit?

23        MS. SALTMAN:  No, we -- our position is certainly

24 that the Department is bound by the language of the statute

25 under a Chevron Step Two analysis, because the statute does not

1   unambiguously direct the agency to set a certain type of test

2   or to set a test at a certain level.  So this is not a Chevron

3   Step One case.

4       The boundary, where the statute comes in, is at Chevron

5   Step Two.  That's the only point I'm trying to make.

6           THE COURT:  Why couldn't it be a Step One Chevron

7   situation?  If the statute is unambiguous, the intent of

8   Congress is that if you're a bona fide EAP employee in that

9   capacity, you get the exemption.

10          MS. SALTMAN:  Because -- because bona fide EAP

11  capacity is ambiguous necessarily.  That's why Congress

12  directed the agency to define it and limit it.  Like I said,

13  the fact that we're having to go to Congressional intent to

14  decide what they meant by bona fide EAP capacity signals that

15  this is not -- these terms are open-ended.  That's what

16  ambiguous means in this context.  And so this case can't be

17  decided at Chevron Step One.

18          THE COURT:  But you agree with me that looking at the

19  terms that Congress wrote, given the ordinary meaning, that if

20  you're a bona fide EAP employee in that capacity, you get the

21  exemption.  Then it leads to the Department of Labor having to

22  define what an EAP employee is, but the clear intent was if

23  you're an EAP employee, you get the exemption.

24          MS. SALTMAN:  Yes, that's correct, but Congress

25  directed the agency to exempt bona fide EAP employees.  They

1  didn't just say all EAP employees or any employee who works in

2  some capacity doing executive, administrative or professional

3  job functions.  They said bona fide EAP capacity.  So Congress

4  didn't direct the agency to exempt all EAP employees.  They

5  said bona fide EAP employees and then they let the agency

6  define what that means.

7          THE COURT:  What -- excuse me.  So how do you

8  define -- what does "bona fide" mean to you in terms of this

9  statute?

10          MS. SALTMAN:  Well --

11          THE COURT:  Or not to you but to the Department of

12  Labor.

13          MS. SALTMAN:  Of course.  Going back, as we detail in

14  greater length in our briefs, going back to the 1940s these

15  terms read together have been read to -- to encompass a group

16  of employees who perform certain duties but who have also

17  attained a certain status at their job, and the greatest single

18  indicator of that kind of status in their job is salary level.

19    So the Department has long interpreted these terms

20  together to mean that these are employees who perform

21  certain types of duties that are typical of the EAP types of

22  jobs, who also have attained a certain level of status and

23  thereby are paid a certain salary at their jobs and who are

24  paid on a salary basis.

25          THE COURT:  Well, looking at the history here, it

80

1    seems to me the Department of Labor has really looked at "bona

2    fide" to mean duties, and I'm trying to understand where the

3    salary part comes in, because as the States have pointed out,

4    the salary was set at a very low amount.  It was a floor.  It

5    was not a ceiling.  So that's what I'm trying to understand is

6    it's very different than what's happening today under the new

7    rule versus what they have done for 75 years.

8            MS. SALTMAN:  With all due respect, Your Honor, that

9    is how Plaintiffs have mischaracterized the regulatory history.

10   That is not an accurate portrayal of the way the salary test

11   and the duties test have worked in tandem throughout history to

12   distinguish these -- properly distinguish the overtime exempt

13   employees.

14       So historically, ever since 1949, there has been a

15   two-tiered system for distinguishing overtime exempt

16   employees under this rule.  There was a long test and a

17   short test.

18       Now, the Plaintiffs have misstated that there was one

19   duties test -- I'm sorry, one salary level and then

20   different duties test that people had to meet.  There  was

21   actually -- under the long test, there was a very rigorous

22   duties test, and under that duties test, the employee -- the

23   subject employee could not work for more than -- there was a

24   20 percent cap on the non-exempt work they could do.

25       So take, for example, an employee who works in retail.

1    In order for the employee to be exempt under the long test,

2    that employee could not spend more than 20 percent of her

3    job stocking shelves, working the register, doing intake,

4    doing the kind of jobs that are not the kind of executive

5    jobs that would push her up into passing the long test.  But

6    this long test, because the duties requirement was very high

7    for the long test, it was matched with a lower salary level.

8        By contrast, there was also a short test, and under the

9    short test the duties level -- the duties test was much

10   easier to meet.  There was no cap on non-exempt work, so an

11   employer who's trying to categorize an employee doesn't have

12   to go and try to figure out exactly what percentage of that

13   employee's work is spent doing exempt and non-exempt work.

14   So this was an easier test to apply to people.  It provided

15   a little more clarity and was easier to meet.

16       But the salary level test, paired with that short test,

17   was much higher.  In fact, it was historically between 130

18   and 180 percent higher than the long duty/salary test.  And

19   the reason they made the salary test higher is they hoped

20   that the long test and the short test might be more

21   appropriate for different types of employees, but they

22   should exempt the same types of bona fide EAP employees just

23   using sort of different metrics.

24       Now, in 2004 what the Department did was they abandoned

25   the two-tier system, and that's because 30 years had passed

1   since the last rule making, and at that point the long --

2   the long test had basically -- the salary level for the long

3   test from 1974 that was in place in 2004 had become so

4   obsolete that it was below the minimum wage level.  So the

5   long test had essentially just become obsolete.

6       So what the Department did was they adopted the short

7   test, the easier duties test to meet, and they called it the

8   standard duties test.  But then they paired that with what

9   was much closer to the long test salary level test, so they

10  took the easier test from both of the two different metrics

11  and paired them together, and what that resulted in -- the

12  result of that is in the intervening 12 years, that salary

13  level test adopted in 2004 has become totally obsolete.  It

14  is no longer effective at distinguishing bona fide EAP

15  employees.

16      So what the Department has done here is adopted a

17  salary level test that is within the range of what a short

18  level salary test would have been.  So like I said, the 2004

19  standard duties test, which is unchanged in the current

20  rule, is similar to the short test duties test.  Now, like I

21  said, the short test salary test was always higher.  It was

22  between 130 and 180 percent higher than the long test salary

23  test.  So what the Department did is they went to that 130

24  to 180 percent range and they created a range, and that

25  range was $889 to $1231 per week.  And they chose a level,

83

1   especially after the NPRN, they chose a level at the very

2   low end.  So they went up from 889 to 913.  So they chose

3   $913 per week as their range.

4        And that is, contrary to what the Plaintiff States said

5   today, it's not a radical change.  It does not far exceed

6   what the Department has done in the past.  In fact, it's at

7   the low end of the historical range of how the Department

8   has defined a salary level test to be matched with a duties

9   test that does not include a cap on non-exempt work.

10            THE COURT:  Looking at what you've done, so on

11   November 30th we have, based on your numbers, 4.2 million

12   people who are considered exempt based on their duties and the

13   lower salary threshold set in 2004, and on December 1st those

14   4.2 million go ahead and are going to be eligible for overtime,

15   irrespective of their duties.  So how do you explain that

16   distinction?

17            MS. SALTMAN:  Well, the fact that the salary level

18   test is dispositive for those employees does not mean that it

19   is a salary only test.

20        We do rely on the driver's license example in our

21   briefing and I think that's instructive.  There are -- there

22   could be -- if you go to get a driver's license and there's

23   a vision test, a written test and a driving test, and you

24   pass two of the tests, the written and the driving test, but

25   you fail the vision test, that doesn't mean that the DMV has

84

1    instituted a vision only test for driver's licenses.  It

2    means that for this particular person the vision test was

3    dispositive.  Now --

4         THE COURT:  Well, I saw that last night and I had to

5    contemplate, okay, is this a good example or not, and I wasn't

6    sure it was a good example, because what I looked at was, okay,

7    let's see what the statutes would have been.  Well, the statute

8    for the drivers test would have said the intent of the state

9    would be to get a driver's license, you have to pass a driving

10   test, a written test as well as a vision test.

11        Here the statute we're looking at is saying the clear

12   intent of the statute is if you're an EAP employee, you get

13   overtime.

14        So I don't think those are comparing apples to apples

15   in my mind.  Now, I know the State looked at the example in

16   a different way, so I don't think that's a good example

17   because that's not what's happening here.

18        MS. SALTMAN:  Well, but what is happening here is

19   that the number of employees who meet the duties test but fail

20   the salary level test is actually in line with historical

21   levels.

22        THE COURT:  Well, let me ask this then.  So if we

23   adjust the 2004 figure to inflation, what would that figure be?

24        MS. SALTMAN:  So I don't have an exact number for

25   you.

1          THE COURT:  Oh, I'm not -- I didn't expect you to

2    have an exact number, but can you give me an estimate of what

3    that number would be?  I assume that was looked at.

4          MS. SALTMAN:  Well, actually in the NPRN, one of

5    the -- the Department proposed two different options for

6    setting a salary level test.  They said we can look to

7    inflation and use the CPIU, or we can adopt this methodology

8    where we pick the 40th percentile of salaried workers, and the

9    NPRM, they just ended it there, the 40th percentile of salaried

10   workers.

11     Now, commenters favored the approach the Department

12   took.  Many commenters thought that using the CPIU would not

13   provide the same level of certainty and would also not as

14   effectively distinguish bona fide EAP employees.  So the

15   Department chose the methodology it did.

16     In fact, there were comments that pointed out that

17   choosing the 40th percentile nationally disadvantaged lower

18   wage regions, and  so in the final rule the Department

19   changed the proposal from the NPRM and said they actually

20   picked the 40th percentile of salaried workers in the lowest

21   wage census region to account for differences in the country

22   and to set this as low as possible so as not to disadvantage

23   the lowest wage census region in the country.

24     So the --

25          THE COURT:  It looks like you're getting an assist.

1          MS. SALTMAN:  And just to answer your question

2    directly, the -- the -- using the 2004 method, if we just

3    adjusted that for inflation, that would be $570 per week, so

4    that is below -- that is less than the $913 per week that the

5    Department adopted.  It's either 570 or $596 a week.  In any

6    event, it's below the 913 that the Department adopted.

7          But, as the Department acknowledged, in the final rule,

8    the 2004 salary level test was -- like I said, they paired

9    the lower duties test with the lower salary level test, and

10   the Department feels that was actually a methodological

11   error that became extremely pronounced over time so that now

12   the salary level test is actually below the poverty line for

13   a family of four.

14         That's not appropriate for a white collar -- for an

15   exemption for white collar employees.  So the Department had

16   to not just update the old salary level in light of economic

17   changes, they also had to correct a methodological error

18   that the Department had paired the less rigorous duties test

19   with the less rigorous salary test and that didn't

20   approximate the intent of Congress.

21         THE COURT:  But how do you respond to this idea that

22   for 75 years of history that figure has been a floor?  And I

23   understand the argument you're making, that if you adjust it

24   for inflation, that number would be below.  But it would still

25   operate the way it has always operated and that's a floor, that

1    typically you're never going to find an employee that does EAP

2    duties that would be below the figure that it's currently now,

3    or depending on -- I just did my own quick calculation.  If

4    it's the 570 it would be $26,364, less than that.  I didn't

5    do it based on 590, but you understand the point I'm trying to

6    make.

7         So can you explain that distinction?  This seems like a

8    much more drastic change.

9         MS. SALTMAN:  So, again, so it has never been the

10   case that the salary level test was a ceiling that nobody who

11   met the duties test fell below.  In fact, historically the

12   salary level test, there are about approximately 20 percent of

13   people who meet the duties test but don't meet the salary

14   levels test and therefore are not exempt.

15        Now, under this salary level test adopted in the final

16   rule, that number is 22 percent.  So 22 percent of people

17   meet the duties test but do not meet the salary level test

18   under the rule, and that is in line with the approximately

19   20 percent that it has been in the past.  So this is not a

20   drastic change.

21        This is -- the Department does not have to -- the rule

22   does not have to -- in order for these two tests to work in

23   tandem, the salary level test does not have to be

24   non-dispositive for every single employee who meets the

25   duties test.  There are some employees who meet the duties

1    test and fail the salary level test.  There are some who

2    meet the salary level test and fail the duties test.  In

3    fact, there are 6.5 million employees for whom the duties

4    test is actually -- they fail the duties test but they meet

5    the salary level test.  So the duties test is actually the

6    reason why they don't qualify for the exemption.  But that

7    doesn't mean that the Department has adopted a duties only

8    test either.

9         So the point is these numbers -- we've laid them out in

10   our brief.  I think they're instructive to show that what

11   the Department is doing here is drawing a line, and that is

12   what Congress delegated the Department with the authority to

13   do, and they had to draw that line reasonably.

14        Now, the line that they drew is responsive to the

15   commenters.  It is in line with -- it is at the very low end

16   of the range historically for the short level salary test.

17   It is in line with only having 20 percent of people who

18   don't meet the salary test but do meet the duties test.  So

19   this is not a radical change.  This is in line with

20   historical and regulatory precedent.

21        THE COURT:  Well, let me ask you this example.  Say

22   you have a local company, you have two managers of a store, and

23   because neither one makes the same amount of money, one manager

24   who meets the -- both of them meeting the EAP duties.  One

25   makes $47,000.  The other makes -- let's see, what's the

1   figure?  It would be -- one makes $47,000 and one makes

2   $47,500.  They do the exact same duties.  One becomes exempt,

3   one isn't exempt, under the new rule.  How do you explain that?

4            MS. SALTMAN:  Like I said, there is -- it's a fact

5   that both the duties test and the salary level test are

6   dispositive for some employees, and the Department here --

7            THE COURT:  But I mean --

8            MS. SALTMAN:  I can't answer your -- I'm sorry.

9            THE COURT:  But how do you reconcile that, that two

10  employees, especially in a small business where they have

11  multiple managers, and because not everybody -- you know,

12  salaries are not open to the public for -- the States' probably

13  would be.  Those are all public records, but for private

14  companies, salaries are not open records.  And so you could

15  have one employee who may do exactly the same job, same duties,

16  and would meet the duties test, but yet, one will get overtime,

17  one won't, just because of the difference of $500 in their

18  salary.

19           MS. SALTMAN:  Well, that's true of the salary level

20  rule set in place by the 2004 rule as well.  I mean, there

21  could always be employees who do very similar duties but have

22  slightly different salaries and one is over the line, one is

23  under the line.  Anywhere the Department sets a salary test,

24  they run the risk of doing that.

25         But the point is, the Department has the authority to

1  set the salary level test, as the Fifth Circuit recognized

2  in Wirtz v Mississippi Publishers.  That's good law and the

3  Court can't --

4        THE COURT:  Well, but that case is pre-Chevron so

5  they didn't do a Chevron analysis really.  That case also dealt

6  with -- it was in the 1960s so it didn't deal with this

7  situation where this rule changes the figure dramatically.

8     I mean, you have to concede, this is dramatic change in

9  the figures that have been used throughout history to now.

10       MS. SALTMAN:  It is not a dramatic change -- it is

11 not a dramatic change with regard to the levels that were set

12 for the short test throughout history.  That is not accurate.

13 But it is a drastic change from the 2004 level because that

14 level was set, what we believe now with hindsight, was set too

15 low.  That was not a level that could easily approximate the

16 type of bona fide EAP employee that Congress intended to

17 exempt.

18       THE COURT:  Well, let me -- I want to cite some of

19 the things in the record and get you to respond.  Of course,

20 the Department of Labor concedes that the statute, and I'm

21 quoting, does not reference a salary level or salary basis test

22 and these changes were all made without specific Congressional

23 authorization, and it's citing from the Federal Regulations, 81

24 Federal Regulations 32431.

25    The Department of Labor also concedes that it's not

1  authorized to adopt a salary only test and the phrase "bona

2  fide EAP" in the statute requires performance of specific

3  duties, and that's also the same 81 Federal Regulations

4  32429.

5      How are these concessions not at odds with the

6  following proposed regulation, which is our rule in dispute

7  today?  Quote:  "White collar employees subject to the

8  salary level test earning less than $913 per week will not

9  qualify for the EAP exemption, and therefore, will be

10 eligible for overtime, irrespective of their job duties and

11 responsibilities", close quote.  And that's also 81 Fed Reg

12 32405.

13     Now, under your proposed rule, employers would have to

14 pay overtime to a bona fide EAP that are doing those duties.

15 The duties test would be eliminated for employees earning

16 less than $47,000.

17     And, again, I think based on your numbers, 4.2 million

18 people would lose the exemption on December 1st without any

19 change in the duty analysis.  Is this not in effect

20 simply -- you don't want to concede this, but isn't it

21 really just a salary test?  Because duties have no regard to

22 anything.

23         MS. SALTMAN:  No, Your Honor, it's not.  Again, I

24 point you to the statistic that for -- it's only 22 percent of

25 employees who meet the duties test that do not also meet the

1  salary level test.  So Plaintiffs' characterization of this

2  test as drastically shifting the metric in terms of creating a

3  salary level that exempts people who are well outside of the

4  historical levels that have been set, that's just not accurate.

5      The salary level test here -- yes, there are some

6  employees who meet the duties test but don't meet the salary

7  level test, but these two tests work in tandem because

8  Congress didn't just intend for the agency to look at

9  duties.

10      And the salary level test has been used historically

11  since the 1940s.  It has long been thought to be a good

12  indicator of who is a bona fide EAP employee, who is the

13  kind of employee that Congress intended to exempt with this

14  white collar exemption.

15      THE COURT:  Well, if Congress intended to have some

16  kind of salary component, they could have put that in the

17  statute and allowed Department of Labor to figure out what that

18  should be without defining the exact salary of -- but they

19  don't do that.  So where is there support to allow you to take

20  away Congress's specific intent to make people who are EAP

21  capacity employees, to make them non-exempt merely based on

22  their salary?

23      MS. SALTMAN:  Well, there are a couple of -- there

24  are a couple of things I want to make in response to your

25  question.  First, Congress did not specifically direct the

1  agency to use any kind of test to distinguish these employees.

2  That's right.  Congress used open-ended terms and then

3  delegated to the Department the authority to make these kind of

4  judgment calls.

5       And there's a reason Congress did this.  This is a very

6  technical question.  We've been throwing around a lot of

7  numbers, and as you noted, the rule is quite long.  There's

8  a great deal of economic analysis.  It is a tough thing to

9  draw this line in an appropriate way.  But Congress

10  recognized that the agency is in the best position to do

11  this, both because the agency has the technical expertise

12  and also because the agency is in a position to work with

13  stakeholders in the regulated community and to understand

14  the different and conflicting equities that these

15  stakeholders all have in where this line is drawn.

16       So that is -- that is another way to think about what

17  Congress was doing when they left these terms so open-ended

18  that the agency was able to create this three-part test.

19       Now, the agency created this three-part test over 75

20  years ago and Courts have upheld it.  The Fifth Circuit --

21  it's true that the Fifth Circuit case, Wirtz v Mississippi

22  Publisher case was decided before Chevron, but in that case

23  the Court recognized the, quote, broad latitude that

24  Congress had given the agency to define these terms, and it

25  said that the salary level test was a reasonable

1    interpretation of those terms.

2        In fact, that was a case, as the Court recognized in

3    its questions earlier, that was a case in which an

4    individual met the duties test but did not meet the salary

5    level test, and the Court said, properly following the line

6    of cases that led to Chevron that also engage in a similar

7    two-part analysis, there was broad latitude baked into this

8    statutory language and it was under that latitude that the

9    Department adopted a salary level test, and that's a

10   rational decision that the Court must defer to.  And that's

11   still good law.  That's still instructive in this case.  The

12   analysis has not changed.

13       THE COURT:  Well, isn't that case really

14   distinguishable from what we have here today because that was

15   the issue -- it's very fact specific of what the salary test,

16   and I think it was $30 a week I think maybe in that case.  I

17   would have to go back and check.  I have the case here.  But it

18   was some low amount.  Although we're dealing with a salary

19   issue challenge here, aren't we dealing with a situation where

20   it is being increased to a significant level?  Which is not the

21   same situation that was done in the '60s when the Fifth Circuit

22   addressed that issue, albeit, not with much analysis, and

23   again, pre-Chevron.  It just seems to me that's -- the issue

24   I'm addressed with today is whether or not the increase in this

25   to the 40th percentile somehow is a drastic change.

1          MS. SALTMAN:  The question of whether it's a drastic

2     change presumes that a salary level test that's not a drastic

3     change is authorized under the statute.  I mean, this -- my

4     point is --

5          THE COURT:  Let me ask it this way:  It is quite

6     possible -- that's why I asked the question regarding if we

7     adjusted for inflation, it would be, you know, maybe 20 -- I'm

8     not sure what the figure is.  My calculator went off.  But I

9     did the calculation, so it could be that, but if -- but today

10    the figure you're raising is significantly higher.  So even if

11    we look back to the Fifth Circuit decision, if you adjusted

12    that for whatever inflation, is there ever a situation dealing

13    with increasing it to the 40th percentile to having just a

14    lower level floor level?

15         I guess I could say it this way:  Isn't it quite

16    possible that the Court could find that what the Department

17    of Labor has done in this case, raising it to the 40th

18    percentile, fails, but it doesn't necessarily mean that the

19    lower level salary test -- I don't have to declare all 75

20    years to be out the window by declaring this?

21         MS. SALTMAN:  So, yes.  Yes, the Court can consider

22    where the Department set the salary level test in this case,

23    but it can only do so under Chevron Step Two.  That is not a

24    Chevron Step One argument.  That is actually completely

25    contradictory to a Chevron Step One argument.  You can't win at

1    both on one regulation.

2         And here if the Department has the authority to set a

3    salary level test -- like you said, it's not mentioned in

4    the statute.  If the Department has the authority to set a

5    salary level test, as it has done for 75 years, Chevron Step

6    One is foreclosed, period.

7         There's no -- the question of whether the salary level

8    test is such a drastic change that it's unlawful, that is a

9    question of whether the change is so drastic that it's

10   arbitrary, capricious or contrary to law.  That's a Chevron

11   Step Two argument.

12             THE COURT:  In Wirtz in the Fifth Circuit, that was

13   pre-Chevron so they didn't do a Chevron One analysis to see

14   what that would be, so essentially their argument is more of a

15   Chevron Two.  But even in that situation, that's why I'm saying

16   isn't it distinguishable because they were analyzing the

17   statute at that time which -- or the rule at that time which

18   really, to everyone's appearance, was a floor, whereas this

19   isn't a floor.  You're actually encompassing a lot of people, a

20   significant number of people that have been exempt and would be

21   exempt on November 30th but won't be exempt on the next day on

22   December 1st.

23             MS. SALTMAN:  Your Honor, we -- we dispute that the

24   salary level test in place in 1966 was significantly more of a

25   floor than the salary level test in the new rule.  Both rules

1    are a floor to some extent, and for both rules there are people

2    who pass and who fail the salary level test.

3         For example, the compensation requirement adopted for

4    EAP employees in 1938 was 120 times the minimum wage in

5    effect at the time, so this was the floor they chose in

6    1938.  The salary level test adopted in the final rule is

7    about 126 times the current minimum wage.

8         So the salary level test first adopted in 1938 is about

9    the same distance from the minimum wage as the salary level

10   test adopted in this rule is, and that's in the rule making

11   record.  That's one of the things the agency considered.

12        And, again, this is the kind of technical consideration

13   that the agency, not the Court, is in the best position to

14   decide, and more so than Congress too, which is why Congress

15   delegated this authority to the agency.

16        But getting back to your question about Wirtz, the

17   point is that if the agency has authority to set a salary

18   level under the terms of the statute, then there is

19   ambiguity in those terms, because the statute doesn't

20   mention a salary level.  So if the agency has the authority

21   to define those terms to include any kind of salary level,

22   those terms are the kind of open-ended, ambiguous terms that

23   trigger a Chevron Step Two analysis.  There's no way to get

24   this case into Step One.

25             THE COURT:  Well, how do you reconcile that with the

1   Department's many statements that they don't have authority to

2   create a salary only test?  And I think in looking at the

3   regulation, I think there were some comments where even AT&T

4   asked them to do away with the duties test and just create a

5   salary test, among others as well.  So you recognize you can't

6   create a salary only test.

7          MS. SALTMAN:  Yes, of course, but that's -- again,

8   there are boundaries under Chevron Step Two and the statute

9   provides -- it's under Section 706 of the APA.  The agency

10  cannot interpret a statute in a way that is arbitrary,

11  capricious or manifestly contrary to law.  Now, that's a high

12  bar to show.

13         THE COURT:  And I come back to the question I've

14  asked already, but you have employees who are clearly EAP

15  functioning employees based on duties, all the sudden lose

16  their exempt status simply because of a salary test that has

17  been created by the Department of Labor.

18         MS. SALTMAN:  Right.  So --

19         THE COURT:  So why -- I don't understand why that's

20  not a de facto salary only test, because as I mentioned

21  earlier, in the regulation it's irrespective of duties in terms

22  of people being engulfed in that.

23         MS. SALTMAN:  But the salary -- a salary only test

24  would be if the Department did away with the duties test or

25  said the duties test means any employee who works.  That would

1   be getting rid of the duties test.  Here there is a duties

2   test.

3        The reason that those employees fail the salary level

4   test, and it's significant, is because they have already met

5   the duties test.  These two tests -- for each employee, they

6   have to be analyzed under both the duties test and the

7   salary test, and they also have to meet the salary basis

8   test.  So for every single employee, they have to be

9   analyzed under all three tests.

10        Now, the fact that some employees fail one of the three

11  tests does not mean that that one test is determinative for

12  all employees or even for the vast majority of employees.

13  It just means, yes, these are tests.  The agency drew lines

14  in three different ways and some people fall below all of

15  them, some people fall above all of them, and then other

16  people are in between.  But that doesn't mean that any of

17  these tests have been adopted in a way that obviates the

18  other test.

19        THE COURT:  Again, I'm trying to reconcile this idea.

20  It is clear when we started this argument today you were

21  agreeing with me that the clear intent of Congress in the

22  statute was if you're a bona fide EAP employee in that

23  capacity, you get the exemption.  And that is not true when you

24  impose a salary test.  They meet the duties test, so they're

25  doing the duties of an EAP employee, but yet, somehow they lose

1    it just based on their salary.

2            MS. SALTMAN:  But the -- just doing the duties is not

3    enough to make you a bona fide EAP employee.  That's never been

4    enough under this regulatory scheme.  Just meeting the duties

5    test, especially the current short duties test that's in place,

6    which is much easier to meet than the historically, much more

7    difficult long duties test that had a cap on non-exempt work,

8    meeting this easier standard duties test is not enough to

9    distinguish bona fide EAP employees.

10           THE COURT:  Well, the Department of Labor had free

11   rein to define the duties, and of course I think even the

12   regulations in the statements, you found that to be too

13   difficult to redefine the duties.  But they could have done

14   that.  Congress gave them the authority to define any of the

15   duties.

16       But I'm trying to figure out where authority came in

17   the statute to add a salary requirement and somehow define

18   EAP employees with a salary requirement that in practicality

19   you have people who have been EAP employees since 2004 all

20   the sudden lose that exempt status only because of their

21   salary.  I mean, they're still a manager.  They're still a

22   manager of a store doing all the duties of an EAP employee,

23   but all the sudden they lose it because of the salary.  How

24   do you say that's not a pure salary test?

25           MS. SALTMAN:  Because -- because, first, you asked

1    how could -- you asked a two-part question so I just want to

2    address the duties test first.

3         First, the statute doesn't mention a duties test

4    anywhere, so if the Department has the authority to create a

5    duties test, it also has the authority to create a salary

6    test because it has determined --

7              THE COURT:  No, that's not really the same thing,

8    because you look at that -- I mean, you give the plain meaning

9    of the words as in 1933 and you don't really dispute their

10   definitions.  All the definitions would include this kind of

11   function or duties part, so that's clear under the clear

12   reading of the statute that you would evaluate duties to do

13   that.

14        The question is, where does the salary requirement come

15   in?  And, again, you disagree with my view, but my view is

16   for 75 years it's been a floor.  That's the way I look at

17   it, and maybe I'm wrong.  But it's no longer a floor.  It's

18   a ceiling, and so I view that as a drastic change.

19        The question is, do you have authority -- does the

20   Department of Labor have authority to do that?  I know I may

21   not be very artful in my questions, but it seems a drastic

22   change that people who are clearly doing the duties of an

23   EAP employee lose their exemption for no other reason than

24   they make now less than $47,000.

25             MS. SALTMAN:  The problem is that the statute doesn't

1    contemplate only a duties test and it hasn't for 75 years.

2        I understand that the Court is characterizing the

3    duties test historically as a floor, but that's just grossly

4    over-simplifying the way the duties test and the salary test

5    have long worked in tandem to distinguish appropriate bona

6    fide executive, administrative and professional employees.

7        Now, for example, the non-exempt work cap is actually

8    really instructive here because there are plenty of

9    employees who might spend 90 percent of their time -- let's

10   take the example of a retail store again.  There might be an

11   employee who spends 90 percent of her time working the

12   register but she spends 10 percent of her time supervising a

13   new employee.  Does that make that employee a manager?

14   Under a very low level duties test, maybe it could.

15       The point is the salary level test helps distinguish on

16   those tough calls who is actually -- who actually has the

17   kind of status that comes with having an executive position

18   or a professional position.

19           THE COURT:  But the Department of Labor could have

20   redefined the duties test.  They could have created a more

21   rigorous test.  I mean, I think it's clearly within their

22   discretion to do that because I think duties are a crucial part

23   of the clear reading of the statute, but they decided not to go

24   that route.

25           MS. SALTMAN:  Well, the Department actually proposed

1   in the notice of proposed rule-making that it should change the

2   duties test, and it even suggested that maybe it should adopt a

3   cap on non-exempt work to give the duties test a little bit

4   more force.  And that was -- most commenters disagreed with

5   that approach.  In fact, several of the Business Plaintiff

6   commenters responded to that proposal and said that they

7   disagreed with it.

8       So in response to the response of the regulated

9   community, the Department decided to keep the 2004 standard

10   duties test in place but fix the methodological error that

11   took place in 2004 and adopt a salary level test that once

12   again works in tandem with the duties test to appropriately

13   exempt bona fide EAP employees.

14       This -- the statute doesn't say all employees who

15   perform duties that are executive, administrative or

16   professional in nature.

17           THE COURT:  So explain to me that, as of today, we

18   have bona fide EAP employees that lose their exempt status on

19   December 1st.  How do you explain that?  I mean, because their

20   duties haven't changed.  Today they're EAP, and by creating a

21   salary test -- and that's where I'm saying, that's the only

22   thing that has changed is they're EAP employees through

23   November 30th but on December 1st they're no longer EAP

24   employees by merely changing the salary, albeit, it's a salary

25   test.

1         MS. SALTMAN:  So those people, people who fall within

2   that band and I think the people you're referring to, those

3   people have been misclassified as EAP employees.  They are

4   wrongly classified right now.

5         Like I said, there are people who for a family of four

6   have a salary that puts them below the poverty line who are

7   being classified as white collar employees under the current

8   test in place.  The test is both outdated and it was -- it

9   was set through some methodological error to begin with.  So

10  right now it is very out of sync with where it should be

11  based on the duties test that was adopted in 2004.  So what

12  the rule is doing, it is correcting that.

13        And, yes, that means that for some employees, their

14  status changes just because of their salary, but that is

15  because the old salary level that was put in place in 2004

16  was not effective at effectuating Congress's intent.

17          THE COURT:  Well, that sounds like what you're saying

18  is that it's not the defining and limiting the words, but

19  Department of Labor's decision to say we want to give everyone

20  a raise and raise the salaries up.  I mean, using the

21  Plaintiff's terminology, is that social engineering?  How does

22  that fit within the intent of Congress in saying if you're a

23  bona fide EAP employee, you get the exemption?

24          MS. SALTMAN:  Well, like I said --

25          THE COURT:  I mean, raising salaries is not part of

1   that clear intent of Congress.

2          MS. SALTMAN:  For 75 years taking salary into

3   account, and indeed, raising the salary level with new

4   regulations has been interpreted to be within the intent of

5   Congress.  And that is exactly what the Fifth Circuit upheld in

6   Wirtz v Mississippi Publishers.

7          Again, the Supreme Court in Auer acknowledged that the

8   Secretary has granted broad latitude to define these terms,

9   and the Secretary has long interpreted these terms to

10  include a salary level test that necessarily causes some

11  people who pass the duties test to fail the salary test.

12  That has always been the case.

13         And, yes, it is the case with this rule too, and yes,

14  there is a drastic change, but the change comes not because

15  this duties test is out of line with -- I'm sorry.  This

16  salary test is out of line with previous salary tests.  As I

17  said, it's actually on the low, very low end of the range of

18  short level salary tests that have historically been in

19  place.

20         The reason there's a drastic change is because the 2004

21  salary level test was set at the time so low that it was not

22  effectively exempting the right people.  And what this test

23  does is it accounts for the 12 years that have passed since

24  2004 and the economic changes that have happened, but it

25  also corrects the mistake that the Department inadvertently

1   made when it was collapsing the two-tiered system that had

2   become so outdated into a simpler standard duties test and

3   standard salary level test.

4        Now, this is within the Department's authority and that

5   is why I keep coming back to Chevron, because if the Court

6   is considering where the agency drew this line, that is not

7   a Chevron Step One argument.  And the -- because the agency

8   is in the best position to make these technical decisions,

9   the Court must defer to them as long as they are reasonable,

10  as long as the agency's path can be reasonably discerned.

11       And the rule provides a significant amount of

12  background that shows that the agency took into account

13  historical levels when setting this salary test and they did

14  so in a way that was in line with the short level salary

15  test that had always been paired with what is currently now

16  the standard duties test.

17       The agency's path here is certainly well-established in

18  the rule and it more than meets the standard in a case like

19  Encino Motorcars.  This is -- as the Court acknowledged in

20  questioning the Plaintiffs here, under Chevron Step Two the

21  Court owes the agency considerable deference.

22       So, yes, there might be people who, because their

23  salary is just below the line on the new salary, their

24  status changes on December 1st.  But the point is the

25  agency's rule doesn't have to be the best possible rule.  It

1   doesn't have to be the best interpretation or the

2   interpretation the Court thinks is right or the Court would

3   prefer.  It just has to meet a base line standard of

4   reasonableness, and this -- this salary level more than

5   meets that standard, and the Plaintiffs have provided no

6   basis to overturn it.

7           THE COURT:  How does it not -- because it has to be

8   reasonable, of course, and there's deference in the Step Two,

9   but also it has to go in line with the clear intent of

10  Congress.  And the clear intent of Congress, again, is if

11  you're a bona fide employee in that capacity, you get the

12  exemption.  And merely by adding a salary requirement, you're

13  taking people that meet those duties, a duties test, but don't

14  get it.

15          MS. SALTMAN:  But, again, the Department is not

16  adding a salary level requirement.  The Department is

17  essentially fixing the salary level requirement so that it

18  actually works in tandem with the duties test to appropriately

19  distinguish bona fide EAP employees.

20          THE COURT:  But for 75 years it has always acted more

21  as a floor.  Whether that was -- and let's presume that the

22  Department of Labor made a miscalculation in 2004 when they did

23  that.  For all these years, for everyone operating under this

24  system, whether it was employers or employees, they operated

25  under the system where that was a floor, and now that's not a

108

1   floor.  Whether it's because of an internal mistake by the

2   Department of Labor when they set this in 2004, but that has

3   been the system for all these years.  It has not been what you

4   have done or what the Department of Labor has done now in

5   setting it at such a high amount.

6            MS. SALTMAN:  So it is true that under the long test

7   that was historically in place where there was a cap on

8   non-exempt work and a much more rigorous duties test, the

9   salary level test acted as more of a floor.  That is not

10  accurate with respect to the short test.  Under the short test,

11  the duties test was much easier to meet and it was the salary

12  level test that was higher and much more difficult to meet.

13  And the standard duties test put in place in 2004 was taken

14  from the short test.

15       So the current test that's in place is very similar to

16  the short test.  There is no cap on non-exempt work.  The

17  duties test is more of a baseline test.  It is easier to

18  meet.  And historically, paired with such a duties test, the

19  Department has used a much higher salary test, a salary

20  level test that is between 130 and 180 percent higher than

21  the long duties test.

22       So, like I said, within that 130 to 180 percent range,

23  the Department chose a salary level that is at the very

24  bottom.  They went up from the very lowest -- 130 percent

25  would have been $889 per week.  They went up to 913.

1          THE COURT:  Well, as I asked you earlier, if it had

2     been just adjusted for inflation, the 2004 figure, we wouldn't

3     be here today, would we?  If you had increased it to

4     inflation -- and maybe that's a more appropriate question for

5     the Plaintiffs.  But I would perceive we wouldn't be here today

6     if that was what was done, because it would still be operating

7     more the way it has, whether it's an error or not, as more of a

8     floor.

9          MS. SALTMAN:  Your Honor, that -- as I said, the

10    2004 -- to just adjust the 2004 duties -- I'm sorry, salary

11    test for inflation would have compounded the methodological

12    error that took place in 2004 when that test was set so low

13    that it was no longer accurately distinguishing who was a bona

14    fide EAP employee.

15         So the Department had to take a different approach.

16    And this was the approach that was the simplest to

17    administer, that took into account the comments of so many

18    commenters who wanted something that provided clarity and

19    that would also stand the test of time.

20         This -- this was an approach, too, that was in line in

21    terms of the number -- in terms of the people who fail the

22    duties -- I'm sorry, fail the salary test but pass the

23    duties test.  This test was in line with setting that line

24    at a place that, yes, there are some people for whom the

25    salary test is determinative, but it's not every person.

1   It's not every person who passes the duties test.

2   Plaintiffs have mischaracterized this.

3        So -- so I think that there has been some

4   misunderstanding that this test operates differently than

5   the short duties test has operated in the past.  That is not

6   borne out by the regulatory history.  The history shows that

7   the salary level test under the short test was historically

8   much higher than the long test salary level test, and it did

9   cut off for some employees exempt status who met the duties

10  test, but it was supposed to, because it was supposed to

11  account for the fact that the duties test was much easier to

12  meet than it was under the long test where there was a cap

13  on non-exempt work.

14       So there's a reason that the salary level test was set

15  where it was on the short test, and there's a reason that

16  the Department of Labor had to readopt that type of salary

17  test so that these two tests could work in tandem to

18  actually identify the bona fide EAP employees that Congress

19  intended to exempt.

20       Again, the fact that some employees don't pass one of

21  these tests doesn't mean that that test is dispositive for

22  all employees or that the Department has adopted that test

23  to the exclusion of the other two tests.  There's a

24  considerable amount of analysis about what type of duties or

25  what type of people meet the duties test and how that

111

1  correlates to the type of people who meet the salary level

2  test.  There was a lot of thought and analysis that went

3  into crafting two tests that would work together to cull the

4  correct bona fide EAP employees that Congress intended to

5  exempt in this white collar exemption.

6          THE COURT:  So the Department of Labor's position is

7  if you make 47,476 or less, then you're not an EAP employee.

8          MS. SALTMAN:  Not a bona fide --

9          THE COURT:  A bona fide EAP.

10         MS. SALTMAN:  You're not employed in a bona fide EAP

11  capacity.

12         THE COURT:  And again I come back to the situation

13  where you have 4.2 million people that, under the duties test,

14  qualify as a bona fide EAP employee now that lose that status

15  simply, again, based on a salary test.  That's what I'm

16  struggling with.

17         MS. SALTMAN:  I understand, but I think first -- I

18  understand and -- I understand, and I think there's

19  partially -- I think this analysis would be -- I think it would

20  behoove the Court to remember that this rule has to be analyzed

21  under the Chevron framework, and I know we've talked a lot

22  about it, but I think the issue has gotten very confused.

23      And I just -- I want to make clear that if the

24  Department has authority to set a salary level test, which

25  is not mentioned in the statute, then those terms are

1    ambiguous.  They are open-ended, and they provide authority

2    to set a salary level test.  Wherever that salary level

3    may be, that's a second question.  We're not there yet.

4         The point is if those terms, "bona fide executive,

5    administrative or professional capacity", provide authority

6    for the Department to set a duties test, a salary basis test

7    and a salary level test, those terms are necessarily

8    ambiguous.

9         And in fact, that is confirmed by the fact that

10   Congress said -- directed the agency to define and to limit

11   those terms through regulation.

12        So this case cannot be decided at Chevron Step One if

13   the Court -- unless the Court finds that any salary level

14   test is unlawful.

15        So that gets us to Chevron Step Two, and while I

16   understand that the Court is having trouble with the fact

17   that this salary level test is a larger change from the 2004

18   salary level test because that test was set in error, we now

19   know, too low to account for the change in the standard

20   duties test, this decision was made by the agency because it

21   is in the best position to make this decision based on its

22   technical expertise and its ability to work with

23   stakeholders and understand the different equities at play.

24        And under very well-established precedent from Chevron

25   and its progeny, the Court must defer to this decision as

1    long as it's reasonable.

2         Now, the Plaintiffs brought up, for example, could the

3    Department set a rule creating a test with a million dollars

4    a year, a million dollar a week salary level test, or could

5    they say that people over the age of 65 get overtime.  Those

6    type of tests -- I think you can make the argument that

7    those type of tests would be contrary to statute or would be

8    arbitrary or capricious.

9         But they have not shown here that this test, which sets

10   the salary level test well within the historical range for

11   the short level salary level test, is arbitrary, capricious

12   or contrary to law.  That is a very high standard to make.

13        Now, a million dollars a year, that is a salary that is

14   so high, the vast majority of Americans do not meet that

15   salary.  The 47,000 salary level -- the 40th percentile that

16   the Department chose, that's the 40th percentile of salaried

17   workers in all fields, not just EAP employees.  So that's

18   another point.  This is not just 40 percent of EAP employees

19   who are below the salary level test.  It's the 40th

20   percentile of salaried employees across the country, but

21   this is actually adjusted for the lowest level wage region

22   based on the U.S. census, which is the south region.

23             THE COURT:  What was the Department of Labor's reason

24   or justification for picking the 40th percentile?

25             MS. SALTMAN:  That level was chosen based on -- like

1    I said, the Department looked at, historically looked at what

2    salary level would be based -- what salary level in today's

3    terms would be appropriate for the short level duties test.

4    Because like I said, in 2004 the Department adopted the

5    standard duties test, which is very similar.  It's

6    substantially similar to the short level duties test, the

7    easier duties test with no cap on non-exempt work.

8         So they looked historically to see what type of salary

9    level -- they used projections based on ratio.  So, for

10   example, I pointed to the minimum wage projection.  So in

11   1938 the short duty salary -- I'm sorry.  There wasn't a

12   two-tier system yet.  The salary level adopted in 1938 was

13   120 times the minimum wage, so they picked a salary level in

14   this rule making that 126 times the minimum wage.  So it's

15   in line with the proportions that have traditionally been

16   chosen by the agency.

17        Also, an important proportion is that historically the

18   short level salary test was 130 to 180 percent higher than

19   the long test salary test, and so they picked a salary

20   level, the 40th percentile, which was at the very low end of

21   the 130 to 180 range, projecting, using today's figures,

22   what would be the range of the short level salary test if

23   that were still -- if we still used a short test and a long

24   test.

25        Now, the reason they picked the 40th percentile is

1   because it was at the very low range of that 130 to

2   180 percent band and because it was sort of an easy -- there

3   was an easy definite point that they could use.  So instead

4   of picking a number that was somewhat uncertain or that

5   would have to be calculated using a new methodology in

6   future years, they picked the 40th percentile because that's

7   a publicly available number.  The Bureau of Labor Statistics

8   publishes every year the salary levels in the different

9   census wage regions.

10          So this means that all the Department has to do is go

11   to the BLS, the Bureau of Labor Statistics, pull the number,

12   which is the 40th percentile of salaried wages in the lowest

13   wage census region, and adopt that as its salary test.  They

14   picked something that would be simple, predictable and

15   publicly available.

16          And that's why they picked the 40th percentile and not,

17   for example, the 35th or whatever, because it was within

18   that 130 band range -- 130 to 180 range, and also because it

19   was in line historically with -- proportionally with the

20   type of salary levels that have been chosen for this kind of

21   test.

22              THE COURT:  So if we're at Chevron Two, how do you

23   reconcile this case or is this case similar to Encino Motorcars

24   that you have to provide a reasonable basis, a reasoned basis

25   for this change?  Because I know you're not conceding it, but

116

1    it appears to me to be a radical change, from a floor to a

2    ceiling.  And maybe my interpretation of that is wrong, but it

3    seems like for 75 years everyone has operated one way and it is

4    now changing drastically where duties aren't going to matter.

5         And I know you say they work in tandem, but the reality

6    is, it doesn't matter what their duties are.  Under the new

7    rule, if they are -- if their duties -- if a person is a

8    manager and would qualify and that's all they do but their

9    salary is less, they lose exempt status purely because of

10   their salary and it doesn't change the fact that their

11   duties are still as an executive.  And just because you try

12   to define it by salary doesn't change that, and that is a

13   complete change.

14        So why doesn't -- in a Chevron Two analysis, I don't

15   have to give complete deference if you go against what the

16   will of Congress is.  And the will of Congress is if you're

17   an EAP employee, a bona fide EAP employee, you get the

18   exemption, period.

19             MS. SALTMAN:  Right.  But, again, bona fide EAP

20   employee has long been interpreted not just to connote duties.

21   As early as 1940 the Department of Labor in the Stein report

22   and later again in later rule-makings in 1949 and in 1958, in

23   looking at these statutory terms, the Department determined

24   that salary was necessary to appropriately distinguish overtime

25   exempt employees under this exemption.

1          THE COURT:  Let's assume that's true, that you have

2     the power to do that.  Still, isn't it a drastic change that if

3     you look at the figure in 2004, you adjust for inflation, it's

4     drastically different than what you have come up with now using

5     the 40th percentile?

6          MS. SALTMAN:  Well, so under Chevron Step Two, to get

7     to your initial question, whether this is a drastic change or

8     not, the agency can change its position.  The agency can make a

9     drastic change as long as that decision is reasonable.

10     And the issue in Encino was it has to be supported.

11     The decision has to be supported and the agency's path in

12     reaching its decision has to be able to be discerned by the

13     Court and by the public, and the agency has easily met this

14     standard.

15     The rule very thoroughly lays out the economic analysis

16     the agency went through that I have explained very generally

17     today.  There is a significant amount of detail in the rule

18     explaining how the agency reached this decision and why it

19     reached this decision.

20     The rule explains why the 2004 salary level test was

21     set so low that it was too low.  It was ineffective.  The

22     2004 salary level test now in 2016, it is contrary to the

23     intent of Congress because it is not effectively

24     distinguishing EAP employees.  So the new salary level test

25     is a change because that -- that test had become so obsolete

1  and was initially set too low to begin with and then became

2  even more obsolete that there had to be a drastic change to

3  bring that salary level test back in line with its

4  historical place.

5          THE COURT:  But, I mean, looking at the actions of

6  Congress -- I think I asked Mr. VanDyke this question -- about

7  the statute has been amended over time, and of course, these

8  changes over the years on the salary have changed but it has

9  been so low, and whether that was a mistake or not to be so low

10  or not, we don't know what Congress would do if this -- in the

11  history, over the 75 years, had put it at the 40th percentile

12  and raised the salary to that limit.

13      I mean, it's my understanding I think one of the Houses

14  of Congress already passed something to delay this for six

15  more months.  I don't think the other House has taken the

16  issue up.  But it is clear that the intent of Congress is if

17  you're an EAP employee, a bona fide one, you get the

18  exemption.  And the fact that it's been amended over the

19  time or Congress has not taken any action to include -- to

20  disagree about a salary test, again, that's because it was

21  so low, whether correct or not.

22          MS. SALTMAN:  Again, I -- I don't -- I have to

23  dispute the Court's characterization of the historical salary

24  level test as being so low.  The 2004 salary level test was set

25  in error too low.  I was not talking about the 1974 or the

1    preceding salary level test.  In fact --

2           THE COURT:  Well, let's just talk about that.  From

3    2004 to now you say it has been set too low but that is what

4    all the businesses and employees have been living under.

5           MS. SALTMAN:  That's true, but again, the -- the

6    Department is in the best position to make the decision of

7    where this line should be drawn, and they did so here

8    reasonably, so the Court must defer to it.

9         Now, if Congress wants to come in and change the law

10   and limit the agency's authority, Congress can do that.

11          THE COURT:  But the agency exceeds their authority if

12   they do something against the intent of the Act, and the intent

13   of the Act is you get -- you're exempt if you're an EAP

14   employee, bona fide.  And you're basically taking away

15   employees who truly are EAP employees, they are today and

16   they're not on December 1st, because their arbitrary -- well, I

17   don't mean to use that word.  Just because you set a salary

18   test that has been increased.

19          MS. SALTMAN:  But as the rule -- the rule addresses

20   this point and discusses at length, many employees -- these

21   4.2 million employees were categorized as overtime exempt in

22   error, contrary to the intent of Congress.  And I think that's

23   maybe where the mismatch is.

24          THE COURT:  Cite me where that's at.

25          MS. SALTMAN:  All right.  We'll look for a citation

1    for you.

2            THE COURT:  Because I don't necessarily recall that.

3        While they're looking, I'll let your team look for

4    that.

5            MS. SALTMAN:  Okay.  So, yeah, while we're looking

6    for a quote for you, discussing the fact that the mismatch

7    between the old duties test resulted in these people

8    erroneously being categorized as overtime exempt, that -- I

9    would think that that's discussed in the need for rule-making

10   section that explains that this rule had become obsolete

11   because these employees who were being classified as overtime

12   exempt were not the employees that Congress had intended to

13   exempt as bona fide EAP employees.

14       So -- and the fact that the agency made a change to

15   bring this salary level test more in line with an historic

16   short level salary test from 1949 to 1970 -- I'm sorry, to

17   2004 before the change, that is a reasonable decision that

18   the agency made and the Court must defer to it.

19       I think -- I just think it's important to remember that

20   the salary level test has not always been a floor.  That

21   collapses the old system where there was this two-tiered

22   system and there was a long test and a short test.  These

23   were both used.  And I can't emphasize enough how different

24   that system was because there was this cap on non-exempt

25   work that people had to meet for the long test, and that's a

1    harder -- that's a harder call to make for some employees.

2         THE COURT:  And going back to the example talking

3    about like a manager of a store.  Let's say we have a manager

4    of a convenience store or a gas station.  They're clearly

5    meeting the duties test and they're clearly a bona fide EAP

6    employee, but because the employer only pays them $45,000 a

7    year -- and they clearly work a lot of overtime, and as a

8    manager I'm sure they do.  I don't know that for a fact but I

9    presume that.  Doesn't that go against the clear intent of

10   Congress, someone who is clearly a manager, an executive in an

11   administrative capacity does not get the exempt status purely

12   because the Department of Labor decided to raise the salary

13   limit to an area that takes away their exempt status?

14        MS. SALTMAN:  So there are always going to be people

15   who slip through the cracks for any of these tests, and the

16   Department is not held to a standard where it has to accurately

17   distinguish every single bona fide employee.  The Department

18   just has to set a reasonable line.

19        THE COURT:  I understand, but here you have

20   4.2 million, which I think in the rule that may be a

21   conservative estimate, it may be more than that, that's not a

22   small number of just -- we know based on the rule analysis that

23   at least 4.2 million people who are exempt today lose that

24   exempt status only because of their salary, not because they

25   don't do the work of what an executive, administrative or

122

1    professional employee would do.

2            MS. SALTMAN:  Right.  But my point is that because

3    the 2004 test was set so low, and as we recognize now, was set

4    in error so low, those -- not all perhaps, but a number of

5    those people were inappropriately classified as bona fide EAP

6    employees.  That was an incorrect classification based on the

7    fact that the 2004 test from the beginning was too low.  There

8    was a methodological error that caused that test to be out of

9    sync with the duties test adopted in 2004, and then over 12

10   years, as that test became more and more out of date, as

11   economic conditions changed, that error became compounded.

12        So it is not that 4.2 million bona fide EAP employees

13   are now not exempt.  That assumes that the 2004 level

14   currently in place would be an accurate indicator of bona

15   fide EAP status, and it is not, both because of the amount

16   of time that has passed and because it was originally set

17   too low so that there was a mismatch between that test and

18   the short duties test that was adopted as the standard

19   salary level test.

20            THE COURT:  Has your team found that cite?

21            MS. SALTMAN:  Could I have a minute to consult?

22            THE COURT:  Yes, go ahead.

23            MS. SALTMAN:  Thank you.

24                    (Pause in proceedings.

25            MS. SALTMAN:  Thank you, Your Honor.

1    So we said in our briefs the quote that the agency

2 sought to address a mismatch between the 2004 salary level

3 test that was adopted and the 2004 duties test that was

4 adopted, and we're working on getting the exact cite for

5 you, but that is cited in our briefs and we can cite that in

6 our summary judgment brief as well but --

7    THE COURT:  Well, in your argument you've indicated

8 that it was in error, the calculation was an error.

9    MS. SALTMAN:  Yes.  So what I mean, in the rule the

10 Department calls the 2004 -- the Department states that the

11 2004 test was set under a methodological error.  But just to

12 illustrate that point --

13    THE COURT:  And do you have that cite?

14    MS. SALTMAN:  We're working on getting that cite.

15    So to illustrate that point, the rule states that an

16 additional 4.2 million employees who meet the standard

17 duties test but may not have met the long duties test prior

18 to 2004.  So what that means is that in 2004 there were

19 people who failed the long duties test, and then in 2004

20 when the tests were collapsed and only the standard duties

21 test was adopted, those people were suddenly brought within

22 the exemption.  And now, because the salary level test is so

23 low that it's out of sync with the current duties test in

24 place, it is correcting -- it's maybe readjusting some of

25 those people back outside of the exemption, as they were

124

1    before 2004.

2            THE COURT:  So why didn't the Department of Labor

3    just alter the duties test?

4            MS. SALTMAN:  Well, the Department proposed altering

5    the duties test in the NPRM and commenters opposed it.

6    Commenters like the simplicity and the clarity of the standard

7    duties test, and so the Department chose to keep that test in

8    place but change the salary level test.

9        And let me read from page 32412.

10           THE COURT:  32412?

11           MS. SALTMAN:  I'm sorry.  32412.

12           THE COURT:  Let me find it.

13           MS. SALTMAN:  Sure, sure.

14           THE COURT:  Okay.  Go ahead.

15           MS. SALTMAN:  At the top of the middle column:

16   Accordingly, the Department set the standard salary level using

17   a methodology that yielded a result consistent with the

18   methodology we had historically used to set the salary level

19   paired with the long duties test, even though the new standard

20   duties test was based on the short duties test.  This was a

21   methodological error.  And they're talking about the 2004

22   duties test.

23           THE COURT:  But that's not dealing with that the 2004

24   amount was some kind of error.  It was more of them making the

25   decision to change the duties test.  That's not talking about

1   the figure for the salary part of the test.  That's not what

2   that's talking about.  It's talking about the duties test.

3          MS. SALTMAN:  Right, but -- so because the -- what

4   this is talking about is the salary level test was a

5   methodological error, not the duties test.  What they're saying

6   is that the salary level, paired with the long duties test, was

7   historically much lower than the salary level paired with the

8   short duties test.

9      So what happened was when the agency matched the low

10  duties test of the short duties test with the low salary

11  level test of the long duties test that was, quote, a

12  methodological error.  What they should have done was match

13  the low duties test of the short duties test with the higher

14  salary level test of the short duties test.

15         THE COURT:  But in the same way, they could have

16  easily altered the duties part of the test.

17         MS. SALTMAN:  Yes, and like I said, that was a

18  proposal the Department raised in the NPRM.  Commenters

19  objected to it.  They considered the factors and they made

20  their decision and they provided a reasoned basis for their

21  decision to keep the 2004 duties test in place.  That passes

22  Chevron Step Two.

23     The agency is the party that's in the best position to

24  decide what's the best way to administer this.  The agency

25  understands how this test is used by employers across the

1  country in many different fields, and based on the comments

2  that -- over 270,000 comments that the Department received

3  in response to this rule, the Department determined that the

4  best way to administer this exemption was to keep the 2004

5  duties test in place, as many of the Business Plaintiffs who

6  submitted comments lobbied for, and then to raise the salary

7  level to bring it back more in line with the short test

8  salary level and correct the mismatch between the salary

9  level and the duties test that had been inadvertently

10  affected in  2004.

11        So to sum up --

12        THE COURT:  Let me ask you a question.  In terms of

13  -- and I hadn't heard this.  They said the CBO came out with

14  the cost impact.  Do you agree that it could be a billion

15  dollars for 2017?  I haven't seen the report so I didn't know

16  about that until it was mentioned.

17        MS. SALTMAN:  In all honesty, Your Honor, I didn't

18  know about it either and I haven't seen it either so I'm not

19  going to comment on it.  But I will say that it is not part of

20  the record in the PI proceedings and it is not part of the

21  administrative record, so it is not before this Court for

22  review.

23        THE COURT:  Well, it's a public record, is it not?

24  So I could take judicial notice.  If the CBO report is out

25  there, I can take judicial notice of that, can't I?

1          MS. SALTMAN:  You can, but, I mean, in the PI

2     context, the Plaintiffs have the burden of demonstrating all

3     the PI factors.  They haven't cited to that.  They didn't bring

4     it to the Court's attention.

5          And in an APA case, the Court is limited to review of

6     the administrative record.  Even though there are publicly

7     available records, the Court must review the administrative

8     record that was before the agency when it made its decision

9     just to make sure that the agency carefully reviewed that

10    record and based its decision on --

11         THE COURT:  But for the injunction, for the harm, I

12    can look at that.  It's publicly available.  I mean, they

13    argued it here today at the hearing, which they have the right

14    to offer evidence, if they so desire.  So I'm just saying for

15    purposes not of the administrative record, of course -- I agree

16    with you on that -- but in terms of the injunction, in terms of

17    looking at the harm, if that's truly what the CBO said, why am

18    I not allowed to look at that?

19         MS. SALTMAN:  Well, first, I mean, the Plaintiffs --

20    the State Plaintiffs who asked for a PI didn't present that

21    piece of evidence today.

22         But, moreover, that number, without context, doesn't --

23    doesn't further their arguments at all.  We don't know what

24    the CBO looked at.  We don't know if the CBO even looked at

25    State governments, the Plaintiffs who have asked for a PI in

1    this case.

2        So, you know, we're happy to submit further briefing on

3    the relevance of that statistic once we've had a chance to

4    look for it, but without context, we don't know if it even

5    relates -- if it even took into account the State Plaintiffs

6    who asked for preliminary relief today.

7              THE COURT:  Okay.

8              MS. SALTMAN:  So just to sum up, as I said, this case

9    has to be decided at Chevron Step Two.  The Supreme Court has

10   recognized the broad authority that Congress granted to the

11   agency under the statute.  The terms are open-ended, and that

12   is how they provide for a duties, a salary level and a salary

13   basis test.  So necessarily, the Court must decide this case at

14   Step Two, and under well-established case law, the Court must

15   defer to the agency's decision here.

16       And quickly to address -- the same analysis rings true

17   for the automatic updating mechanism as well, and I did just

18   want to clarify for the Court one thing with automatic

19   updating mechanism that I think will help the Court

20   understand that complicated issue.

21       Plaintiffs' arguments with respect to that issue are

22   entirely baseless.  They have identified no case that shows

23   that such a ministerial act by the agency is a substantive

24   rule subject to notice and comment on rule-making.

25       And just so the Court understands what happens when an

1   automatic update occurs, I think that could be instructive.

2   So the Bureau of Labor Statistics, like I said, they publish

3   these salary figures on their Website every year.  So at

4   least 150 days before an automatic update, the Department of

5   Labor goes to the Bureau of Labor Statistics Website, pulls

6   the figure for the 40th percentile in the lowest wage census

7   region, publishes it in a Federal Register Notice and on the

8   Department's Website.

9        That's it.  There's no decision making.  There's no

10  reviewing evidence.  There's no considering different

11  options.  It is a purely ministerial function of

12  republishing a publicly available number from the Bureau of

13  Labor Statistics Website.

14       So that is the kind of ministerial function that does

15  not rise to the level of a substantive rule.  And

16  Plaintiffs --

17            THE COURT:  So what happens next then?  So that's put

18  in the register and then what happens?

19            MS. SALTMAN:  Then 150 days from that date, that

20  becomes the new salary level threshold.

21            THE COURT:  So what opportunity does everybody have

22  to object?

23            MS. SALTMAN:  So within those 150 days, that's a lot

24  of time built in before the effective date, and if people do

25  have an objection that -- with the way that that was done or

1    something, there is a process for that to play out, first

2    through the administrative process.  If at that time -- look,

3    this claim isn't ripe.  We don't know what is going to be filed

4    in 2019 and we don't know how big that change is going to be,

5    if it's even going to affect the Plaintiffs.  But if at that

6    time --

7         I'm sorry.  To the extent the Plaintiffs are

8    challenging the validity of the automatic updating adopted

9    in the final rule, we don't dispute that that's ripe.  It's

10   just their arguments fail under Chevron Step Two because

11   that's within the agency's rule-making authority.

12        But in 2019, if there's a person who has agreed and

13   wants to bring a challenge at that point, they do have

14   options.  They can file a petition for rule making with the

15   agency.  They can raise their concerns to the agency.

16        And in addition, the APA always provides a limit on the

17   agency's -- on any agency action, but there has to be a

18   final agency action that has been complete at that time, and

19   we don't have that here with respect to what would be

20   published in 2019.

21        So if the Court has no further questions, my colleague,

22   Mr. Snell, is going to address the Tenth Amendment remaining

23   merits questions and also the remaining PI factors.

24             THE COURT:  Okay.  Thank you.

25             MS. SALTMAN:  Thank you very much.

1          MR. SNELL:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. SNELL:  So as Ms. Saltman just said, I was going

4    to clean up the rest of the merits arguments, but I did hear

5    you say earlier that you believe the Tenth Amendment issue to

6    be foreclosed, so if you would rather, I can skip straight to

7    the PI.

8          THE COURT:  I believe that it is as a general matter,

9    so a higher court will have to decide that issue.  I know they

10   want to preserve that issue and that's the way I'll treat that.

11   Even though it has been questioned and some people question it,

12   it's still binding authority on the Court.

13         MR. SNELL:  Okay.  And then with respect to the

14   non-delegation argument, the Plaintiffs have abandoned that in

15   their reply, so unless the Court has questions about that

16   issue, I can gloss over that and just go straight to the PI

17   factors.

18         THE COURT:  Go ahead.

19         MR. SNELL:  Okay.  So I just want to kind of

20   highlight and not say everything that we said in our brief

21   because I know that the Court has read it, but I do think that

22   there will be a substantial harm to the public interest.

23      Of course, it's the Plaintiff States' obligation to

24   show all four factors, and as we noted in our sur-reply that

25   we filed last night, their reply doesn't take into account

1   any of the public interest factors that we highlighted in

2   our response in opposition.

3       And as Your Honor noted earlier, we're talking about

4   over 4 million people who in a matter of weeks are going to

5   be expecting perhaps to become either overtime protected or

6   to earn more money in the -- to either become -- to have

7   their salary raised, perhaps, or to receive overtime pay

8   because they don't retain their exemption status.  So there

9   will be a particular public harm here, and again, that is

10  not contested by the Plaintiff States.

11      THE COURT:  And couldn't one argue that is the intent

12  of the Department of Labor in putting -- in adding the salary

13  level where it is, to essentially force employers to either pay

14  overtime, but more likely, cause people to get raises and force

15  salaries up to above the limit so that they're still exempt?

16      MR. SNELL:  Right.  I would defer to Ms. Saltman to

17  the extent it bleeds over to the APA, but the Department does

18  acknowledge that one purpose of the overtime rule is to spread

19  employment, both so that workers don't have the same employee

20  working 80 hours a week but perhaps either hire two employees

21  or to compensate that one employee who's working more than 40

22  hours a week for all of their hard work.

23      THE COURT:  Okay.  Go ahead.  I'm sorry.

24      MR. SNELL:  Okay.  So, yeah, I just wanted to

25  reiterate that it is the Plaintiffs' burden to show that not

1   only have they clearly established irreparable harm on their

2   own behalf, but that irreparable harm that they're claiming is

3   going to outweigh the public interest.

4        With respect to the nation-wide injunction, it's

5   certainly the Department's position that an injunction

6   shouldn't issue in this case for all of the reasons we have

7   cited both in our briefs and here today.

8        But to the extent the Court were to disagree and to

9   issue an injunction, we would -- we would argue that the

10  injunction should be no broader than necessary to afford the

11  State Plaintiffs relief, that this is the State Plaintiffs'

12  preliminary injunction motion.  And to the extent necessary

13  to mitigate any irreparable harm they have shown, an

14  injunction need not be any broader.  That's both under

15  Supreme Court precedent and the Fifth Circuit precedent

16  which has recognized this general rule.

17       The State Plaintiffs haven't made any showing that

18  other states will be harmed by this or that they will be

19  harmed by this rule applying to other states, so there's no

20  need for this rule to then extend to other state employers.

21       Then with respect to the District Court cases that the

22  Business Plaintiff raised earlier and that the State

23  Plaintiffs raised in their brief, those cases don't take

24  into account this general rule that an injunction should

25  apply no broader than necessary.  Instead, the State

1  Plaintiffs and those Courts seem to assume that because we

2  have a federal policy, that that federal policy would apply

3  nation-wide, and therefore, the policy should be enjoined

4  nation-wide.

5      But that's not the law under the Supreme Court and

6  that's not the law under the Fifth Circuit, as we have laid

7  out in our briefs.  And I think doing that really

8  short-changes a number of benefits from -- a number of

9  benefits from judicial review.

10     For example, and I know we raised this in our brief,

11  but the Supreme Court has held non-mutual collateral

12  estoppel doesn't apply to the government because the Supreme

13  Court relies on Circuit splits.  So to be a nation-wide

14  injunction, we would be foreclosed from pressing what we

15  consider to be very meritorious claims in other courts.

16     And it would also afford the Plaintiffs classified

17  relief, even though they haven't made any sort of showing

18  under Rule 23.

19     So for these reasons, we would ask that if the Court

20  were to extend a preliminary injunction, that it would not

21  extend nation-wide.

22        THE COURT:  Thank you.  Does anybody from the

23  Plaintiffs want to give a limited response?

24        MR. VANDYKE:  I will.

25        THE COURT:  If you'll just turn your mic back on.

1        MR. VANDYKE:  I'll try to be quick, Your Honor.  The

2   old adage about not standing between somebody and their lunch.

3        THE COURT:  Well, I'm working at my desk today

4   because I have something at 1:00 and a hearing at 2:00, so I'm

5   fine.

6        MR. VANDYKE:  So, Your Honor, the Court asked several

7   times and I think it is precisely the key appropriate question.

8   To the Department you asked, what is the limit to the

9   Department's authority, and I think there's two limits

10  obviously.  There's the text of the statute here and then

11  there's what's arbitrary and capricious or a reasonableness

12  analysis, so those two parts of the Chevron inquiry.

13       And I think just focusing on the first part, the

14  Chevron Step One, I think the meaning of the words -- I

15  think you look to the definitions, which Your Honor has

16  talked about.  We have provided the meanings of the

17  definitions.

18       Then you look I think to other sources, and in that

19  case I think you would look to what the Department of Labor

20  said in the past, and that's why we cited the Weiss and

21  Stein reports and the 1981 Minimum Wage Report and the

22  Department of Labor's own words.

23       The other thing I think -- and we pointed that all out

24  and it's all in our brief.  The other thing the Court can

25  look at is those 1940 District Court cases.  I think they

1    provide a road map actually for the Chevron Step One because

2    the odd thing about those cases, if you read them, and I

3    would ask the Court to look again at our reply on page 30.

4              THE COURT:  And I have read all those opinions.

5              MR. VANDYKE:  We have the Buckner case, and if you

6    look at it, those cases are obviously not applying a Chevron

7    Step One because it doesn't exist yet.  But if you read the

8    text of what they actually say, they are a Chevron Step One.

9    It's saying, hey, a salary requirement is not consistent.  And

10   they do that over and over again.

11        And then the only Court that actually provides a

12   reasoned analysis is the Yeakley Court, and the Yeakley

13   Court itself says, hey, yeah, we acknowledge that this isn't

14   really technically in line with the text of the statute but

15   it's not unreasonable.

16        And so I do think that the Court can look to -- I think

17   you asked me before, what's sort of a road map, and I think

18   the Court can actually look at those cases.  They are

19   purporting to apply an arbitrary and capricious analysis,

20   but if you actually read the text, they say it's not a --

21   for instance, the Buckley or the Devoe case says a natural

22   and admissible attribute of the term bona fide executive and

23   administrative capacity does not admit to have a salary

24   level.  So they're really doing a textual analysis, really a

25   Chevron Step One, so -- but they couldn't call it that

1   because it was before that.

2        There were several other things I wanted to respond to.

3   The Department really stressed this point, and I think

4   they're wrong on it, and I think it is a key point but I

5   think they're wrong.  That is, they talked about if you're

6   talking of boundaries, then you're doing a Chevron Step Two

7   analysis, Your Honor.

8        They also said Chevron Step One cannot be used if

9   you're trying to figure out where the line has to be drawn.

10  So, in other words, I think they're trying to say Chevron

11  Step One only works for the States' argument that a salary

12  test is always impermissible.  But if you're trying to

13  decide I think a salary test may be permissible but not too

14  high, then you can't be a Chevron Step One.

15       Obviously, the States' main argument is that a salary

16  test is always impermissible, and that is a Chevron Step

17  One.  But I also think, Your Honor, that you can do a

18  Chevron Step One analysis even if what you're doing is

19  saying is the salary test where they put it in this rule too

20  high.

21       And I'll explain why, several things.  One is if you

22  look at our brief, our reply brief on page seven, we cite to

23  the Utility Regulatory Group case, which is a 2014 U.S.

24  Supreme Court case.  It says under Chevron's deferential

25  framework, agencies must operate within the bounds of

138

1    reasonable interpretation.  That's a Chevron Step One.

2    That's language in the context of the Court applying Chevron

3    Step One.

4        I think if you take that language and you ask

5    yourself -- in the Weiss report, I think it's important to

6    go back to the Weiss report, page eight of the Weiss report.

7    It said that -- it defended their use of a salary test by

8    saying that it was a, quote, ready method of screening out

9    obviously non-exempt employees.

10       I think that's the same concept that Your Honor used

11   when you said it's a floor.  They used it as a floor.  They

12   said this is just -- and they defended it and they said

13   that's why in an overwhelming majority of the cases, careful

14   inspection shows that it doesn't actually screen out hardly

15   any bona fide.

16       Now, our point has always been, well, if it's any, it

17   violates the text.  But even if you concede that that's a

18   permissible use, to have it as this floor that's just sort

19   of an easy test, the proxy I think they used the language,

20   sort of a proxy for the easy cases.  And that's always how

21   it has been defended, by the way.  It's always been defended

22   that way in the past until now.

23       Then I still think you can say they're not doing that

24   anymore and you can decide that at Chevron Step One.  You

25   can say, okay, that's permissible.  We don't think it is,

1  but this is sort of a -- this is sort of I think the

2  Business Plaintiffs' argument, but I think it's another

3  route that the Court can take.  And that can be a Chevron

4  Step One argument.

5       I think Your Honor said a couple times, and I didn't

6  really hear them contest it, that the Department is trying

7  to raise salaries here.  That's what they're trying to do.

8  And if you go back to that same Weiss report, they actually

9  dealt with that.  They actually dealt with that.  Weiss said

10 the administrator is not authorized to set wages or salaries

11 for executive, administrative or professional employees.

12 Consequently, improving the conditions of such employees is

13 not the objective of the regulations.  The salary test and

14 the regulations are just guides to help in distinguishing

15 bona fide executive, administrative and professional

16 employees.

17      That's -- that's sort of what it said on page eight

18 where it said it's a ready method of screening out the easy

19 cases.  And it says the regulations must, therefore, have as

20 their primary objective the drawing of a line separating

21 exempt/non-exempt employees rather than improving the

22 status.

23      So I think if what they're doing is inconsistent with

24 that, and it is, then I think it can -- that can be a

25 Chevron Step One analysis.

140

1        The other thing I want to respond to that I think is

2   very important and I think is another sort of

3   misunderstanding, the Department over and over and over

4   again said this is not a dramatic change with regard to

5   where the short level test has been set.  And I agree with

6   that.  I agree that we've had a -- we've essentially had a

7   short level test for 55 years, plus another 14, because

8   since 2004 we basically had the short level.  So that's 69

9   of the 75 years we've been talking about.  Basically the

10  entire time we've had the short level test.  Well, no.  They

11  dropped it down to a long level for that last 14 years.

12       But they -- that short level test that they're now

13  trying to raise it to has never, before now, been a cut-off.

14  See, they keep comparing it to the old short level test, but

15  for 55 years the short level test was not a cut-off that you

16  could categorically exclude it under.  There were still

17  many, many employees who could meet, who could still get the

18  exclusion.  They just had to meet a tougher test, the long

19  duties test.

20       Then for the last 14 years, like they said, they

21  dropped it down so they can't point to that time as having

22  had a short level test that was -- they have never had this

23  level of a test that set at the short level at this 40th

24  percentile and had it be a categorical cut-off under it.

25       And the reason they never had it is all that stuff I

1    just cited to from the Weiss and Stein report.  They -- they

2    have always acknowledged that it's impermissible for them to

3    categorically exclude a bunch of employees who would be

4    eligible under a duties test.  So that's really important.

5    It's not the same thing is what they say.

6         And then they also talk about -- well, I guess the last

7    thing, Your Honor, I would like to say is the one billion --

8    there was some talk about the $1 billion, and I wasn't

9    familiar before I came in too.  I'll just say, one thing the

10   States have made very clear is that the 113 or $130 million

11   impact that the Department of Labor itself has anticipated

12   in the next year just to states and local governments alone,

13   so I'll be honest with you, I'm not at all shocked.  I was a

14   little shocked at how low it was at a billion dollars.  If

15   they estimate the states are going to get hit to a tenth of

16   that amount, I'm surprised that the number isn't much higher

17   and wouldn't be surprised if it is.

18        So I think the Court certainly can take judicial notice

19   of that, and at a minimum, can take notice of the Department

20   of Labor's own report that has a similarly high number for

21   the states alone.

22        The other thing I want to point out about the indexing

23   mechanism and ripeness, Your Honor, that I think one thing

24   that hasn't been taken into account with this ripeness

25   argument is many states, like Texas and Nevada, their

1   legislators only meet every two years for a few months.  So

2   this idea that we can wait until 150 days before and somehow

3   challenge that, that just doesn't work for states.  We have

4   to -- we have to do our budgets for the next two years in

5   the six months before those two years, so it's two and a

6   half year lead time.  150 days just doesn't cut it.

7       So the three year lead time is actually a pretty good

8   amount of time for the states, so I don't think the ripeness

9   argument works.

10      The other thing I would like to point out, I think it's

11  never been the case that you have to address something in

12  your reply brief or you waived it.  Sometimes you just don't

13  address stuff in your reply brief because you feel like it

14  has been significantly addressed or it could be because you

15  don't think the other side actually poked any holes in it.

16  You know, if nobody laid a glove on you, you just sit down.

17      But we certainly don't -- we did not mean to or intend

18  to waive our non-delegation argument.  I will say that our

19  non-delegation argument is similar to our Garcia type

20  argument and we think it's more for the Supreme Court

21  perhaps to look at in the future.

22      And then the last thing I would point out, the brief

23  explains all of the different District Courts that have

24  granted nation-wide injunctions to a broad class, and I

25  think I heard them say again, like they did in their

143

1   sur-reply, that, well, they -- essentially they're kind of

2   saying, well, those District Courts got it wrong.

3        I will just say I just received word that Judge

4   Cummings in a Northern District case just granted summary

5   judgment and entered a nation-wide preliminary injunction in

6   that Perez case just now, just since these proceedings have

7   been going on.  So that's yet another District Court case

8   that has granted a nation-wide injunction against -- in that

9   case it's the Department of Labor's persuader rule.  So

10  there's a lot of District Courts getting it wrong if that's

11  actually -- if it is actually wrong.

12       And that's it, Your Honor, unless you have any more

13  questions.

14            THE COURT:  Thank you, Mr. VanDyke.

15            MR. BASKIN:  Briefly?

16            THE COURT:  Sure, Mr. Baskin.

17            MR. BASKIN:  If I can briefly sum up and, first of

18  all, give you the cite to this CBO report so that you can see

19  for yourself what it says, and everybody apparently.  I just

20  got it last night, a supplemental authority by way of motion to

21  introduce supplemental authority or by whatever means.  It's a

22  public record.

23       I should add, that same Judge Cummings in the persuader

24  case has a lengthy discussion about what a Judge is entitled

25  to consider in an administrative procedure act case of this

144

1   type, indicating with great clarity that you're not limited

2   to the administrative record.  There are many exceptions to

3   that rule stated by the Justice Department and the Fifth

4   Circuit, and I refer you to Judge Cummings' decision in that

5   regard in the NFIB case.  It's called National Federation of

6   Independent Business that counsel for the States was just

7   referring to.

8        Anyway, the CBO report is CBO.gov/publication/51925.

9   The actual title is Economic Effects of Cancelling the

10  Scheduled Changes to the Overtime Regulations, which is in

11  effect subtracting the damage that they believe is done.

12       And I note that one of the conclusions is that real

13  family income will increase by cancelling, because it will

14  decrease if the rule is allowed to -- real family income of

15  employees will decrease as a result of this rule, contrary

16  to the Department's claims that this is all one way helpful

17  to the employees.

18       Factually, I must take issue.  Counsel for the States

19  accurately said that this short duties has never been used

20  in this way, never been used as a cut-off, keeping employees

21  from being eligible for the exemption if they meet, for

22  example, the long duties test.

23       But where the Department is wrong, there is no data in

24  the record to say that the short duties number that they had

25  come up with over the years was anything approaching the

145

1   percentile of the salary threshold now in place.

2       If you look at all the numbers that were in place going

3   back to the $30, but if you go back to when they started the

4   short duties test in I guess 1949, it too -- it was a

5   percentage above the long duties test but it was still never

6   approaching the test that -- the standards that we're at

7   today.

8       And so for purposes of our emphasis and our argument,

9   the questions that you asked the Justice Department remain

10  unanswered.  What are the limits?  I heard no answer.  Isn't

11  this a radical change?  Their only answer is to make things

12  up, regrettably.  And that's true of the rule itself.  The

13  page that she cites in the rule in which they discuss their

14  logic to coming up with this 40 percentile number consists

15  of -- they accuse the 2004 Department of this methodological

16  error, ignoring that the Department actually increased the

17  percentage number to account for the consolidation.  In

18  fact, it had been -- prior to then it had been in the

19  ten percent range.  They raised it to 20 percent,

20  acknowledging that issue about long duties and short duties

21  tests.

22      Now they're taking that increase and piling on top of

23  it a doubling once again.  So the notion -- clearly, as the

24  Court has indicated and asked -- you asked tough questions

25  of both sides -- but on those questions, the Department did

146

1    not answer and it clearly remains a radical change in the

2    level of the salary, which is contrary to Congressional

3    intent, either at Step One or impermissible construction at

4    Step Two.  And for those reasons, we ask that when you

5    enjoin the rule, if you enjoin the rule for the States on

6    those grounds, on anything other than Garcia type grounds,

7    the business community which is before you should also be

8    the beneficiary of that injunction.

9         Otherwise, there would be an entirely chaotic

10   situation, which is why all the Courts faced with this type

11   of rule on a national basis have proceeded to issue a

12   nation-wide injunction.  It's because it is a nation-wide

13   rule that affects people all over the country and people

14   coming in to Texas and going out of Texas.  Any other answer

15   would be, well, chaos.  And so we think that is the

16   appropriate way to proceed.  We strongly urge you to do so.

17        You can do it also by granting our motion for summary

18   judgment on the expedited basis, and we defer to your

19   discretion on how to achieve all that.  All we know is, and

20   you know, December 1 is coming up and we certainly urge and

21   hope for all the businesses around the country who are

22   closely watching this that the Court act to give some

23   relief.  Thank you.

24            THE COURT:  Thank you.  Okay.  Did you have something

25   else you wanted to add?  Or no?

1          MS. SALTMAN:  Your Honor, if -- may we have a very

2    brief response?

3          THE COURT:  Yes, go ahead.

4          MS. SALTMAN:  I know that we've discussed this at

5    length.  I'm not going to reiterate the arguments I've already

6    made.

7      I just implore the Court to pay careful attention to

8    the Chevron analysis.  It has really been mischaracterized

9    by the Plaintiffs here.  I would -- I think that the line of

10   cases, the Home Care case and also the Long Island Care at

11   Home V Coke case are instructive here, if the Court is

12   trying to decide which level of Chevron analysis is

13   appropriate.

14     Just note that in the Home Care case, there that was

15   after the Coke case where the Supreme Court recognized that

16   the words "companionship services" and "domestic service

17   employment" were ambiguous, and that under those two terms

18   which didn't mention anything about third party employers,

19   the Department could issue a rule that takes a position on

20   whether or not employees paid by third party employers are

21   exempt under the statutory language "companionship services

22   and domestic service employment".

23     Now, later when the Department changed its position

24   entirely, took an entirely different position on the third

25   party question, that rule was challenged and a District

1    Court in the District of DC decided that case at Chevron

2    Step One.   The DC Circuit overruled that decision and said

3    that case was properly decided at Chevron Step Two and that

4    because the Supreme Court has recognized the broad latitude

5    that the Department had to define those terms, the Court had

6    to defer to the Agency's interpretation there.

7         So I would just encourage the Court to follow the

8    analysis of the Chevron line of cases and analyze this

9    regulation issued under a broad and explicit grant of

10   statutory authority accordingly.

11        And, again, our -- we did respond to the Court's

12   questions.   Our explanation of the short test and the long

13   test is the proper one.   I won't go through it again because

14   I know I have before.

15        And then, Your Honor, there was -- I had a couple of

16   housekeeping questions and I don't know if this is the

17   proper time to raise them, but I was wondering --

18             THE COURT:  Does it go to the issue of the

19   injunction?

20             MS. SALTMAN:  Well, to the schedule set in place for

21   deciding the Business Plaintiffs' --

22             THE COURT:  We'll talk about that in a second.

23             MS. SALTMAN:  Sure.  No problem.  Thank you very much

24   then, Your Honor.

25             THE COURT:  Then, of course, you kind of talked about

1   I think the Coke case.  That argument really hasn't been made

2   by them.

3       I'll give the Plaintiffs the final word on that issue

4   if you want to address it.  It's not necessary but it's up

5   to you if you want to.

6           MR. VANDYKE:  Your Honor, all I would say, as we say

7   in our briefs, the Coke case and the Home Care case are both

8   Chevron Step Two cases.  And I think that our argument here is

9   that the language "bona fide executive, administrative and

10  professional capacity" does not include a salary test, or does

11  not include the ability to define those terms on salary,

12  because that's -- I would emphasize again, it's not just us

13  saying it but it's the Department saying it before in the past,

14  the 1981 Commission, all these other District Court cases.

15      But even if you come to the conclusion that it can

16  include it, what it can't do is it can't -- it can only

17  include it as a proxy for the duties, and so that's very

18  different than the Coke case which said these terms are

19  ambiguous.

20      So this is sort of the same point I was making about

21  it's a question of whether or not they're coloring outside

22  the lines or not, versus are they doing something arbitrary

23  and capricious within the lines.  I think those other -- the

24  Coke case is whether they're doing something arbitrary and

25  capricious within the lines.  What we're saying is they're

1    coloring outside the lines either by having a salary test at

2    all or by having a salary test that they acknowledge will --

3    will exclude people who are in fact bona fide EAP employees,

4    including people that would have been bona fide EAP

5    employees under the long test for the vast majority of the

6    life of this rule, Your Honor.

7              THE COURT:  Thank you.  Oh, Mr. Baskin, did you --

8              MR. BASKIN:  I'm sorry, just very briefly, since I

9    have some familiarity with the Home Care -- the second case

10   referred to.  It's distinguishable on its facts, number one.

11   The Court found no applicability of the Congressional

12   Reenactment Doctrine because it was a fairly short period of

13   time between the reversals, unlike here where we have this 75

14   year period where we have a statutory tool indicating

15   Congressional intent that limited and limits what the

16   Department can do here.

17        So just totally different on its facts.  The Department

18   is doing something here with the salary basis test that has

19   no real comparison or relevance to the Coke situation, so

20   that's all I had to say about it.

21             THE COURT:  Thank you.  Of course, I'm going to take

22   the motion under advisement but I will tell you my intent is to

23   make a decision and issue a ruling by Tuesday.  In part because

24   if I deny the motion, I have to be able to tee up the summary

25   judgment, which we can address now.

1      I think I've already set -- in a prior telephone

2  conference I think entered an order indicating the

3  administrative record and finishing the briefing.

4      If I deny the motion on Tuesday, I will set the hearing

5  for the 28th.  Now, all the other deadlines are already

6  there.  I don't think I set the time and I'm not going to do

7  that unless I deny it.  Because if I grant it, then we don't

8  have to go forward on an expedited basis with the summary

9  judgment.

10      Does that address, Ms. Saltman -- what other issue did

11  you have?

12          MS. SALTMAN:  Your Honor, I had two questions.

13  Regarding the hearing on the 28th, just because that's the

14  Monday after Thanksgiving and so people might not necessarily

15  be at their duty stations, is this a hearing that will take

16  place here in Sherman, Texas?  You mentioned in our phone

17  conversation a telephone hearing.  I just wanted some clarity

18  on that, if you have it.

19          THE COURT:  I haven't thought about that.  I think

20  because of the importance of it, if I get to that issue, it

21  might be an in person hearing.  I'll make that decision on

22  Tuesday, because if I deny it, then I'll have to go and look at

23  the issues that don't overlap and see whether I think an in

24  person hearing would be necessary.

25      As you can see, I prepared for this hearing and had

1  lots of questions and I presume that would be the case if we

2  go to that motion, which I have not prepared on that issue,

3  other than the overlap.  So right now I would plan to be in

4  person but I won't make that decision until Tuesday.

5       And, of course, it's requiring great court resources to

6  try to do something as quick as we have done this, so I'll

7  do the best I can in trying to meet that goal.

8            MS. SALTMAN:  I understand.  Thank you, Your Honor.

9  And then I just wanted to let the Court know, we will be filing

10  the administrative record on Friday.  We proposed to file the

11  regulatory documents, an index of the 270,000 comments and then

12  copies of the full comments that either party relies on in

13  their briefing for the record that we file with the Court on

14  the Court's docket.  And we ran this proposal by the State

15  Plaintiffs and the Business Plaintiffs and they don't oppose

16  this proposal.  So I wanted to let the Court know that we can

17  present this in a paper motion if that's the best way to do it.

18            THE COURT:  No, if they're in agreement, you can skip

19  that procedural step.  Let's just make sure if there's any

20  objection.  I like to have it on the record.

21            MR. BASKIN:  No objection.

22            THE COURT:  Mr. VanDyke?

23            MR. VANDYKE:  No objection.

24            THE COURT:  Okay.  So that's solved, Ms. Saltman.

25            MS. SALTMAN:  Thank you very much, Your Honor.

153

1          THE COURT:  Anything else?

2          MS. SALTMAN:  No, Your Honor.

3          THE COURT:  Anything else from the Plaintiffs?

4          MR. BASKIN:  No, Your Honor.

5          THE COURT:  Thank you again for very interesting and

6    spirited argument.  I think it's been helpful to the Court.

7        We'll be in recess or I'll be in recess until I guess

8    2:00 o'clock.  Have a good day.

9

10

11

12

13

14

15

16

17

18   I certify that the foregoing is a correct transcript from

19   the record of proceedings in the above-entitled matter.

20

21   /s/_____        _____

     Jan Mason                         Date

22

23

24

25